UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE JONES

**08 CIV 10841**

————————————————— x

IRON WORKERS LOCAL NO. 25 PENSION :
FUND, Individually and On Behalf of All
Others Similarly Situated,

                            Plaintiff,

        vs.

CREDIT-BASED ASSET SERVICING AND
SECURITIZATION LLC, MERRILL LYNCH
MORTGAGE INVESTORS, INC., MERRILL
LYNCH, PIERCE, FENNER & SMITH
INCORPORATED, J.P. MORGAN
SECURITIES INC., ABN AMRO
INCORPORATED, C-BASS 2007-CB4
TRUST, PAUL PARK, BRIAN T.
SULLIVAN, MICHAEL M. MCGOVERN
AND DONALD J. PUGLISI,

                         Defendants.

————————————————— x

Civil Action No.

CLASS ACTION COMPLAINT FOR
VIOLATION OF §§11, 12(A)(2) AND 15 OF
THE SECURITIES ACT OF 1933

DEMAND FOR JURY TRIAL



RECEIVED
DEC 1 2 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons who acquired asset-backed certificates (the "Certificates") pursuant and/or traceable to the false and misleading Registration Statement which incorporated the prospectus supplement ("Prospectus Supplement" hereinafter collectively referred to as "Registration Statement"), including documents incorporated by reference therein, filed by Credit-Based Asset Servicing and Securitization LLC ("C-BASS") with the United States Securities and Exchange Commission ("SEC"), dated April 26, 2007. This action involves solely strict liability and negligence claims brought pursuant to the Securities Act of 1933 ("1933 Act").

2.      C-BASS was incorporated in the State of Delaware in July 1996. C-BASS's principal business is the purchasing of residential mortgage loans, primarily sub-prime in nature, from multiple parties including banks and other financial institutions, and mortgage-related securities, including non-investment grade subordinated securities, for investment and securitization.

3.      On or about March 3, 2007, C-BASS filed the registration statement ("Registration Statement") in connection with and for the purpose of registering and issuing hundreds of millions of dollars of Certificates. On March 7, 2007, Merrill Lynch filed Amendment No. 1 to Form S-3 Registration Statement with the SEC, pursuant to the registration of $85 billion in asset backed securities. On March 22, 2007, C-BASS filed a prospectus pursuant to the Registration Statement with the SEC. That prospectus was amended on April 26, 2007. The Certificates were supported by pools of residential mortgage loans (the "Mortgage Pool"). The Mortgage Pool consists of two loan groups ("Loan Group I" and "Loan Group II"). Loan Group I consists of 1,333 adjustable-rate mortgage loans and Loan Group II consists of 1,200 fixed-rate Mortgage Loans.

4.      The Registration Statement was materially false and misleading in that it included false statements and/or omissions about: (i) the underwriting standards purportedly used in

- 1 -

connection with the underwriting of the underlying mortgage loans; (ii) the loan-to-value ratios used to qualify borrowers; (iii) the appraisals of properties underlying the mortgage loans; and (iv) the debt-to-income ratios for applicants associated with the underlying mortgage loans.

5.      Further, the Registration Statement materially misrepresented the credit quality of the mortgage loans underlying the Certificates by inaccurately stating that no delinquent loans would be included in the relevant mortgage pools and that 100% of the loans included in the Mortgage Pool were performing. In fact, delinquent loans were included in the pools supporting the Certificates in excess of the represented percentages. Defendants failed to disclose that such loans were: (i) leading indicators of fraudulent loans; (ii) demonstrated heightened risks that the relevant lenders were not applying the disclosed underwriting standards; and (iii) undermined the quality of the "investment grade" ratings assigned to the Certificates by "independent" rating agencies.

6.      In fact, the originators of the underlying mortgage loans held by C-BASS 2007-CB4 Trust (the "Trust") were issued to borrowers who: (i) did not meet the prudent or maximum debt-to-income ratio purportedly required by the lender; (ii) did not provide adequate documentation to support the income and assets required to issue the loans pursuant to the disclosed guidelines; (iii) were steered to stated income/asset and low documentation mortgage loans by lenders, lenders' correspondents or lenders' agents, such as mortgage brokers, because the borrowers could not qualify for mortgage loans that required full documentation; and (iv) did not have the income or assets required by the disclosed guidelines necessary to afford the required mortgage loan payments, which resulted in a mismatch between the needs and capacity of the borrowers. Moreover, the lenders and/or their agents knew that the borrowers either could not provide the required documentation or that the borrowers refused to provide it and that the appraised values of many properties were regularly inflated since appraisers were induced by lenders, lenders' correspondents

-2-

and/or their mortgage brokers/agents to provide the desired appraisal value regardless of the actual value of the underlying property so the loans would be approved and funded. In this way, many appraisers were rewarded for their willingness to support predetermined property values in direct violation of USPAP appraisal regulations.[1]

7.     In fact, the underwriting, quality control, and due diligence practices and policies utilized in connection with the approval and funding of the mortgage loans were so weak that borrowers were being extended loans based on stated income in the mortgage loan applications with purported income amounts that could not possibly be reconciled with the jobs claimed on the loan application.

8.     As a result of the false and misleading statements and omissions in the Registration Statement, the Certificates were sold to plaintiff and the Class. Plaintiff and the Class would not have purchased the Certificates had the true facts been disclosed. In fact, the Certificates were secured by assets with a dramatically greater risk profile than represented in the Registration Statement. By failing to disclose the truth about the underlying assets and the processes used to purchase those assets for sale to investors, defendants were able to obtain superior credit ratings on the Certificates, which ratings would not have been obtained for these Certificates without the misrepresentations/omissions in the Registration Statement about the underlying mortgage loans as detailed herein.

9.     In late 2007, the truth about the mortgage loans that secured the Certificates began to be revealed to the public. As a result, the Certificates are no longer marketable at prices anywhere

---

[1]     The Uniform Standards of Professional Appraisal Practice ("USPAP") are the generally accepted standards for professional appraisal practice in North America. USPAP contains standards for all types of appraisal services. Standards are included for real estate, personal property, business and land mass appraisal.

near the price paid by plaintiff and the Class. Moreover, the holders of the Certificates are exposed to much more risk with respect to both the timing and absolute cash flow to be received than the Registration Statement had represented.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o].

11.     This Court has jurisdiction of this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v] and 28 U.S.C. §1331.

12.     Venue is properly laid in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. §1391(b) and (c).  Many of the acts and conduct complained of herein occurred in substantial part in this District.

13.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications.

## PARTIES

14.     Iron Workers Local No. 25 Pension Fund acquired Class A2D Certificates pursuant and traceable to the Registration Statement and has been damaged thereby.

15.     Defendant C-BASS was incorporated in the State of Delaware in July 1996 as a venture of Mortgage Guaranty Insurance Corporation ("MGIC"), Enhance Financial Services Group, Inc. ("EFSG") and certain members of C-BASS management. On February 28, 2001, Radian Group Inc. ("Radian") acquired EFSG, including EFSG's interest in C-BASS.  The principal executive offices of the C-BASS are located at 335 Madison Avenue, 19th Floor, New York, New York 10017. C-BASS was the "sponsor" who acquired the mortgage loans.

16.     Defendant Merrill Lynch Mortgage Investors, Inc. ("ML Mortgage Investors") is a Delaware corporation whose offices are located at 4 World Financial Center, 10th Floor, New York, New York, 10080. ML Mortgage Investors is an affiliate of Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), one of the underwriters.   ML Mortgage Investors was the "depositor" who deposited the mortgage loans in the issuing entity.   ML Mortgage Investors is engaged in the business of acting as depositor of trusts that issue series of notes that are secured by, or certificates that represent interests in, the assets of the trust. ML Mortgage Investors acquires assets specifically for inclusion in securitizations from the sellers in privately negotiated transactions.

17.     Defendant Merrill Lynch was the lead underwriter of the Certificates. Merrill Lynch helped draft and disseminate the offering documents.

18.     Defendant J.P. Morgan Securities Inc. ("JP Morgan") was one of the underwriters of the Certificates.  JP Morgan helped draft and disseminate the offering documents.

19.     Defendant ABN AMRO Incorporated ("ABN AMRO") was one of the underwriters of the Certificates. ABN AMRO helped draft and disseminate the offering documents.

20.     Defendant C-BASS 2007-CB4 Trust (or the "Trust") was the "Issuing Entity." C-BASS 2007-CB4 Trust is a New York common law trust with no officers or directors and no continuing duties other than to hold the mortgage loans and related assets and issue the certificates.

21.     Defendant Paul Park ("Park") was the President and Chairman of ML Mortgage Investors.  Park signed the false and misleading Registration Statement.

22.     Defendant Brian T. Sullivan ("Sullivan") was the Vice President and Treasurer of ML Mortgage Investors.  Sullivan signed the false and misleading Registration Statement.

- 5 -

23.     Defendant Michael M. McGovern ("McGovern") was a member of the Board of Directors of ML Mortgage Investors. McGovern signed the false and misleading Registration Statement.

24.     Defendant Donald J. Puglisi ("Puglisi") was a member of the Board of Directors of ML Mortgage Investors. Puglisi signed the false and misleading Registration Statement.

25.     Defendants Park, Sullivan, McGovern and Puglisi are referred to herein as the "Individual Defendants." The Individual Defendants signed the Registration Statement. The Individual Defendants functioned as directors or trustees to the C-BASS 2007-CB4 Trust.

26.     The Certificates were issued by C-BASS 2007-CB4 Trust. C-BASS 2007-CB4 Trust issued hundreds of million of dollars worth of Certificates pursuant to the Registration Statement. The Certificate classes and the amounts issued are as follows:

| Certificates | Amount Issued |
|---|---|
| A-1A | $168,865,000 |
| A-1B | $ 55,839,000 |
| A-1C | $28,311,000 |
| A-2A | $67,002,000 |
| A-2B | $ 28,911,000 |
| A-2C | $ 18,027,000 |
| A-2D | $12,660,000 |
| M-1 | $17,922,000 |
| M-2 | $16,429,000 |
| M-3 | $10,206,000 |
| M-4 | $8,961,000 |
| M-5 | $8,214,000 |
| M-6 | $7,467,000 |
| B-1 | $7,467,000 |
| B-2 | $ 6,472,000 |
| B-3 | $5,974,000 |
| B-4 | $7,716,000 |
| **Grand Total:** | **$476,443,000.00** |

27.     The true names and capacities (whether individual, corporate, associate, or otherwise) of defendants Does 1 through 20, inclusive, and each of them, are unknown to plaintiff, who sues

said defendants by such fictitious names. Plaintiff is informed and believes and thereon alleges that each of the defendants fictitiously named herein is legally responsible in some manner for the events described herein, and thereby proximately caused the damage to the plaintiff and the members of the Class. Plaintiff will seek to amend this complaint to state the true names and capacities of said defendants when they have been ascertained.

## CLASS ACTION ALLEGATIONS

28.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons or entities who acquired Certificates pursuant and/or traceable to the false and misleading Registration Statement and who were damaged thereby (the "Class").

29.   Excluded from the Class are defendants, the officers and directors of the defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

30.   The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by C-BASS, the underwriters, C-BASS 2007-CB4 Trust or their transfer agents. Record owners and other members of the Class may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Hundreds of millions of dollars worth of Certificates were sold publicly pursuant to the Registration Statement.

31.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

32.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

33.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: whether defendants violated the 1933 Act; whether the Registration Statement issued by defendants to the investing public negligently omitted and/or misrepresented material facts about the underlying mortgage loans comprising the pools; and to what extent the members of the Class have sustained damages and the proper measure of damages.

34.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## BACKGROUND

35.     C-BASS was incorporated in the State of Delaware in July 1996. C-BASS's principal business is the purchasing of residential mortgage loans, primarily sub-prime in nature, from multiple parties, including banks and other financial institutions, and mortgage-related securities, including non-investment grade subordinated securities, for investment and securitization.

36.     On March 7, 2007, Merrill Lynch filed Amendment No. 1 to Form S-3 Registration Statement with the SEC, pursuant to the registration of $85 billion in asset backed securities. The

Registration Statement incorporated by reference subsequent filings: This Prospectus incorporates by reference all documents and reports filed on behalf of the Depositor with respect to a Trust Fund pursuant to Section 13(a), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, prior to the termination of the offering the related Securities. Upon request by any person to whom this prospectus is delivered in connection with the offering of one or more classes of Offered Securities, the Depositor will provide or cause to be provided without charge a copy of any of the documents and/or reports incorporated herein by reference, in each case to the extent the documents or reports relate to such Classes of Offered Securities, other than the exhibits to such documents (unless those exhibits are specifically incorporated by reference in such documents).

37.     Prior to creating the Certificates, C-BASS acquired mortgage loans which were mainly originated by New Century Mortgage Corporation, People's Choice Home Loan, Inc., Wilmington Finance, Inc., Fieldstone Mortgage Company and various other originators. C-BASS then sold the mortgage pools to ML Mortgage Investors.

38.     ML Mortgage Investors deposited the mortgage loans into C-BASS 2007-CB4 Trust who then issued the Certificates.

39.     Merrill Lynch, JP Morgan and ABN AMRO sold the Certificates to the investing public pursuant to the Registration Statement.

40.     C-BASS caused the Prospectus Supplement to the Registration Statement be issued on April 26, 2007. The Registration Statement was used to register, issue and sell hundreds of millions of dollars in Certificates.

41.     C-BASS caused the Registration Statement to be filed with the SEC. The Registration Statement discussed the mortgage loans contained in the Mortgage Pools held by the

- 9 -

Trust and represented that the loans underlying the Certificates were loans made to borrowers whose income was sufficient to satisfy the payments required by the corresponding mortgage loan.

42.     The Registration Statement describes the assets supporting the Certificates. Accurate information about the composition and characteristics of the asset pool is the cornerstone of the disclosure required under the 1933 Act. Complete and accurate information is even more important in the context of selling "asset-backed securities"[2] such as the Certificates because the performance of the Certificates is based almost entirely upon the quality of the assets C-BASS sold to the Trust.

43.     While the Registration Statement contained information about the mortgage loans underlying the Certificates, some of the most important information for plaintiff and the other members of the Class was omitted from, or misrepresented in, the Registration Statement. That information pertained to the underwriting, quality control, due diligence, approval and funding practices and policies for the mortgage loans, and the likelihood borrowers would repay the mortgage loans according to the terms of the mortgage note and the mortgage or the deed of trust. The quality of the mortgage loans depended on several factors, including creditworthiness of borrowers, debt-to-income levels, loan-to-value ratios, assets of the borrowers, occupancy of the properties securing the mortgage loans, and the accuracy of other data collected during the origination of the mortgage loans as well as whether borrowers made timely payments on the mortgage loans. The foregoing information was omitted from, or materially misrepresented, in the Registration Statement.

---

[2]     The SEC defines an "asset-backed security" as a "security that is primarily serviced by the cash flows of a discrete pool of receivables or other financial assets, either fixed or revolving, that by their terms convert into cash within a finite time period, plus any rights or other assets designed to assure the servicing or timely distributions of proceeds to the securityholders; provided that in the case of financial assets that are leases, those assets may convert to cash partially by the cash proceeds from the disposition of the physical property underlying such leases."

44.     Further, in order to register and offer the Certificates, C-BASS was required to obtain
an "investment grade" credit rating for the Certificates. The credit ratings had to be assigned by a
nationally recognized statistical rating organization, or NRSO. C-BASS therefore made it a
condition precedent to each offering that the registered and offered Certificates receive "investment
grade" ratings from an NRSO. The NRSOs that rated the Certificates were Standard & Poor's
("S&P"), Moody's Investors Services ("Moody's") and Fitch Ratings ("Fitch") (collectively, the
"Rating Agencies"). Accurate and unbiased credit ratings were crucial to investors who purchased
the Certificates. The accuracy of the ratings was undermined in this case because the Rating
Agencies relied upon the information in the Registration Statement, which contained material
misstatements and omissions. The independence of the credit ratings was undermined in this case
because the Rating Agencies suffered serious conflicts of interest, which were never disclosed in the
Prospectus Supplement.

45.     For these reasons and other reasons, the Registration Statement is false and
misleading.

### THE REGISTRATION STATEMENT
### WAS MATERIALLY FALSE AND MISLEADING

#### False Statements Concerning the Originators' Underwriting Practices

46.     The Registration Statement emphasized the underwriting standards utilized to
generate the underlying mortgage loans held by the Trust, but omitted material facts relating to those
standards. The documents stated that certain underwriting standards were applied by or on behalf of
each originator to evaluate each borrower's credit standing and repayment ability, and to determine
the value and adequacy of the mortgaged property as collateral.

47.     With regard to C-BASS's underwriting standards, the Registration Statement stated:

**The Sponsor or a loan reviewer has reviewed a majority of the files related to
the Mortgage Loans in connection with the acquisition of the Mortgage Loans**

by the Sponsor for credit and compliance considerations. These files may include the documentation pursuant to which the Mortgage Loan was originally underwritten, as well as the mortgagor's payment history on the Mortgage Loan. In its review, the Sponsor evaluates the mortgagor's credit standing, repayment ability and willingness to repay debt. A mortgagor's ability and willingness to repay debts (including the Mortgage Loans) in a timely fashion is determined by the Sponsor by reviewing the quality, quantity and durability of income history, history of debt management, history of debt repayment and net worth accumulation of the mortgagor to the extent such information is available. In addition, the Sponsor may also obtain and review a current credit report for the mortgagor. During its mortgage file review, the Sponsor also confirms that the Mortgage Loan was originated in material compliance with applicable federal, state and local laws and regulations. In connection with its review for property value considerations the Sponsor may obtain, for a portion of the Mortgage Loans, a current appraisal, broker's price opinion, automated valuation methodology price ("AVM") and/or drive-by or desk review of such property or any combination thereof, prepared within six months of the Sponsor's purchase.

The Sponsor purchases mortgage loans that were originated pursuant to one of the following documentation programs.

Full Documentation.

Mortgage loans originally underwritten with "Full Documentation" include a detailed application designed to provide pertinent credit information. As part of the description of the mortgagor's financial condition, the mortgagor was required to fill out a detailed application designed to provide pertinent credit information. As part of the description of the mortgagor's financial condition, the mortgagor provided a balance sheet, current as of the origination of the mortgage loan, describing assets and liabilities and a statement of income and expenses, as well as authorizing the originator to obtain a credit report which summarizes the mortgagor's credit history with local merchants and lenders and any record of bankruptcy. In addition, an employment verification was obtained wherein the employer reported the length of employment with that organization, the mortgagor's salary as of the mortgage loan's origination, and an indication as to whether it is expected that the mortgagor will continue such employment after the mortgage loan's origination. If a mortgagor was self-employed when such mortgagor's loan was originated, the mortgagor submitted copies of signed tax returns. The originator was also provided with deposit verification at all financial institutions where the mortgagor had demand or savings accounts.

In determining the adequacy of the property as collateral at origination, an independent appraisal was made of each property considered for financing. The appraiser inspected the property and verified that it was in good condition and that construction, if new, had been completed at the time of the loan's origination. Such appraisal was based on the appraiser's judgment of values,

giving appropriate weight to both the then market value of comparable homes and the cost of replacing the property.

Other Levels of Documentation.

Other mortgage loans purchased by the Sponsor were originally underwritten pursuant to alternative documentation programs that require less documentation and verification than do traditional "Full Documentation" programs, including "No Documentation," "Limited Documentation," "Alternative Documentation," "Stated Documentation" and "Streamlined Documentation" programs for certain qualifying mortgage loans. Under a "No Documentation" program, the originator does not undertake verification of a mortgagor's income or assets. **Under a "Limited Documentation" program, certain underwriting documentation concerning income and employment verification is waived "Alternative Documentation" programs allow a mortgagor to provide W-2 forms instead of tax returns, permit bank statements in lieu of verification of deposits and permit alternative methods of employment verification. Under "Stated Documentation" programs, a mortgagor's income is deemed to be that stated on the mortgage application and is not independently verified by the originator. These are underwriting programs designed to streamline the underwriting process by eliminating the requirement for income verification. Depending on the facts and circumstances of a particular case, the originator of the mortgage loan may have accepted other information based on limited documentation that eliminated the need for either income verification and/or asset verification.** The objective use of limited documentation is to shift the emphasis of the underwriting process from the credit standing of the mortgagor to the value and adequacy of the mortgaged property as collateral. "Streamlined Documentation" programs are used for mortgage loans issued to government entities which are being refinanced by the same originator. The originator verifies current mortgage information, but does not undertake verification of the mortgagor's employment or assets and does not conduct a new appraisal of the property considered for refinancing. The objective of Streamlined Documentation programs is to streamline the underwriting process in cases where the originator has the mortgagor's complete credit file from the original loan transaction.

Owner-Financed Mortgage Loans. The Sponsor routinely purchases mortgage loans that are owner-financed mortgage loans ("Owner-financed Mortgage Loans"). Owner-financed Mortgage Loans are originated by the individual sellers of the related mortgaged property who generally are inexperienced in matters pertaining to mortgage banking. These mortgage loans were originated with less stringent standards than the other mortgage loans the Sponsor typically purchases. The mortgagor under an Owner-financed Mortgage Loan generally does not complete a mortgage loan application and the seller of the related property generally does not verify the income or employment of the related mortgagor. In connection with the Sponsor's acquisition of an Owner-financed Mortgage Loan, the Sponsor obtained and reviewed the credit history and payment history of the mortgagor. In deciding to purchase Owner-financed Mortgage Loans, the Sponsor generally places considerable emphasis on the value of the mortgaged property. The Sponsor, in

- 13 -

connection with its underwriting of an Owner-financed Mortgage Loan, calculates the loan-to-value ratio of the mortgage loan at the time of acquisition for underwriting purposes to determine the mortgagor's equity in the related mortgaged property. **A drive-by appraisal of the market value of each mortgaged property relating to an Owner-financed Mortgage Loan generally was obtained within 90 days prior to the Sponsor's purchase of such mortgage loan. However, in certain instances, the Sponsor may have utilized a previous appraisal if it was completed within one year prior to the Sponsor's purchase, in which case the Sponsor will generally require the appraiser to recertify the value in such appraisal. The Sponsor may have acquired an Owner-financed Mortgage Loan based upon a statistical valuation provided by independent data providers of the mortgaged property and subsequently obtained a drive-by appraisal, generally within three months of acquisition.**

The Owner-financed Mortgage Loans comprise approximately 2.94% of the Mortgage Loans (by aggregate Principal Balance as of the Cut-off Date). None of the Group I Mortgage Loans are Owner-financed Mortgage Loans. Approximately 8.83% of the Group II Mortgage Loans are Owner-financed Mortgage Loans. [Emphasis added.]

48.     ***Omitted Information***: Defendants had no reasonable basis to provide any assurances concerning the underwriting standards applied to the loans. Defendants did not conduct adequate quality control reviews of the loans purchased.

49.     ***Omitted Information.*** The Registration Statement did not inform investors that equity-based lending – *i.e.*, lending to borrowers without regard to their ability to pay for the loan being marketed to them and based solely on Loan to Value ("LTV") ratios – dramatically increases the risks associated with those loans. The documents did not inform investors that the reduced verification loans were widely granted by mortgage brokers who had used and abused the programs to place borrowers in loans where the mortgage loans exceeded the borrower's ability to pay over a long period of time. Defendants did not accurately disclose the delinquency, foreclosure and other performance statistics associated with such loans. The documents failed to quantify the increased risk by, for example, disclosing the delinquency rates associated with "low-doc" loans that had aggressive appraisals and/or limited income and/or asset verification and/or second mortgages.

50.   **Omitted Information.**   Defendants failed to inform investors that "non-full" appraisals were conducted with respect to the loans in the Mortgage Pools and that such appraisals undermined the accuracy of the "investment grade" rating assigned by the Rating Agencies. In fact, rating Agencies have publicly testified that they rely on the representations made in the securitization documents when determining what rating to assign to a particular security. Moody's has stated that it analyzes appraisals (the "value" in "loan-to-value" ratios) evident in the "amount of equity that borrowers have or do not have in their homes" but "regardless of the quantity of data we assess, if the data we receive is faulty – *e.g.*, as a result of misrepresentation – the quality of our rating is jeopardized." S&P has also testified before Congress that it relies on home appraisals and the "the amount of equity a borrower has in the home" in arriving at its credit rating determination. S&P further stated that "issuers and arrangers of mortgage-backed securities bundle those loans *and perform due diligence" and in order "[f]or system to function properly, S&P relies, as it must, on these participants to fulfill their roles and obligations to verify and validate information before they pass it on to others, including S&P.*"[3] [Emphasis added.] Similarly, Fitch stated in 2004 that it revised its residential mortgage-based securities rating system (*i.e.*, the system applied to the Certificates) specifically to take into consideration the heightened risk associated with mortgages utilizing "nonfull" appraisals. Moody's, S&P and/or Fitch rated the Certificates. It was a condition precedent to issuing the Certificates from those Trusts that the Certificates achieve "investment grade" ratings. Thus, defendants' failure to provide accurate information concerning appraisals (stemming at least in part from a defective or non-existent due diligence process) also affected the ratings achieved by – indeed, the very issuance of – the Certificates.

---

[3]   IMPACT OF CREDIT-RATING AGENCIES CQ Congressional Testimony September 26, 2007 Wednesday, Vickie A. Tillman, Standard & Poor's Credit Market Services.

51. ***Omitted Information.*** The Registration Statement also assured investors that the mortgages held in the Trusts were secured by properties that had on-site inspections and appraisals. These statements are false and misleading because they fail to inform investors that defendants conducted scant, if any, quality control to determine the accuracy of the statements and because the disclosures do not report accurately the appraisal practices that were employed to originate the mortgage loans that were sold to the Trusts. The importance of these omissions is highlighted by the fact that low-doc mortgage loans were granted "primarily or entirely" on the basis of the appraised value of the property securing the mortgages.

52. ***Omitted Information.*** The Registration Statement disclosed "loan-to-value" statistics but failed to disclose how those statistics were affected by the variety of non-disclosed appraisal practices discussed above.

53. ***Omitted Information.*** The representations concerning the lenders' underwriting processes were materially false and misleading because C-BASS failed to disclose that the loans transferred into the Trust were originated and/or sold by lenders and their agents, such as mortgage brokers, who had become so aggressive in approving and funding the mortgage loans that many were made to borrowers who had either not submitted, or had altered, the required documentation. Some documentation alteration was even done by the brokers. Similarly, self-employed borrowers, for whom stated income applications were actually required, would include income levels which were routinely inflated to extreme levels, relative to the stated job titles, in order to get the mortgage loans approved and funded. Borrowers who simply could not qualify for a loan were steered into "no doc" loans, and their applications included, *inter alia*, inflated income information. Lenders encouraged this inflation in order to sign and close loans. These procedures had the effect of dramatically increasing the risk profile of the Certificates. Defendants neither disclosed these

practices nor explained the paucity and deteriorating quality control standards applied by defendants when packaging the loans for sale via the Certificates.

54.    *Omitted Information.*  The representations concerning the origination of the mortgage loans were false and misleading because the mortgage loans that were originated by the lenders were based upon falsified information. Mortgage loans were issued to borrowers even though lenders knew that the borrowers could not provide the required documentation to support their mortgage loan application. The underwriting practices and policies utilized in connection with the approval and funding of the mortgage loans allowed loans to borrowers based on stated income amounts that were either never submitted, or inflated stated income falsified by an agent of the lender, or mortgage broker. Additionally, property appraisals for a material portion of the mortgage loans were not objective, meticulous or compliant with USPAP, but rather, were perfunctory exercises by appraisers motivated to reach a certain conclusion.

## False Statements Concerning the Representations and Warranties Made by C-BASS

55.    With respect to Representations and Warranties, the Registration Statement includes the statements set forth below:

The Seller hereby represents and warrants to the Purchaser, with respect to the Mortgage Loans, that as of the Closing Date or as of such date specifically provided herein: --

\*        \*        \*

(29) To the best of the Seller's knowledge, there was no fraud or gross negligence involved in the origination of any Mortgage Loan by the applicable mortgagee or Mortgagor, and to the best of the Seller's knowledge, there was no fraud or gross negligence by the appraiser or any other party involved in the origination of any such Mortgage Loan.

(30) Each mortgage file contains an appraisal of or a broker's price opinion regarding the related Mortgaged Property indicating an appraised value equal to the appraised value identified for such Mortgaged Property on the Mortgage Loan Schedule. Each appraisal has been prepared on FNMA or FHLMC forms.

- 17 -

\*        \*        \*

(37) Except for the Mortgage Loans identified on the Mortgage Loan Schedule as delinquent, there is no default, breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and the Seller has not waived any default, breach, violation or event of acceleration.

\*        \*        \*

(42) No Mortgage Loan is delinquent. The Seller has not waived any default, breach, violation or event of acceleration, and the Seller has not taken any action to waive any default, breach, violation or event of acceleration, with respect to any Mortgage Loan.

\*        \*        \*

(45) Each Mortgage Loan is directly secured by a Mortgage on a residential property, and either (1) substantially all of the proceeds of the Mortgage Loan were used to acquire, improve or protect the portion of the residential property that consists of an interest in real property (within the meaning of Treasury Regulations Sections 1.856-3(c) and 1.856-3(d)) and the interest in real property was the only security for the Mortgage Loan as of the Testing Date (as defined below), or (2) the fair market value of the interest in real property which secures the Mortgage Loan was at least equal to 80% of the principal amount of the Mortgage Loan (a) as of the Testing Date, or (b) as of the Closing Date. For purposes of the previous sentence, (1) the fair market value of the referenced interest in real property shall first be reduced by (a) the amount of any lien on the interest in real property that is senior to the Mortgage Loan, unless the Mortgage Loan includes both a first lien loan and a second lien loan on the same Mortgaged Property, in which case the 80% test shall be applied in the aggregate, and (b) a proportionate amount of any lien on the interest in real property that is on a parity with the Mortgage Loan, and (2) the "Testing Date" shall be the date on which the referenced Mortgage Loan was originated unless (a) the Mortgage Loan was modified after the date of its origination in a manner that would cause "significant modification" of the Mortgage Loan within the meaning of Treasury Regulations Section 1.1001-3, and (b) the "significant modification" did not occur at a time when the Mortgage Loan was in default or when default with respect to the Mortgage Loan was reasonably foreseeable.

\*        \*        \*

(55) Information provided to the rating agencies, including the loan level detail, is true and correct according to the rating agency requirements.

56.    *Omitted Information.*  The representations concerning the performance of the

mortgage loans was false and misleading since many borrowers of the mortgage loans had missed

one or more of their first few mortgage payments prior to the transfer of the loans to the Trust. It was industry knowledge that any borrower who missed the first payments due on a mortgage loan typically would not be able to catch up on their payments or be able to make payments on a going-forward basis.

57.     *Omitted Information.* As a consequence of the trustee's failure to review the "Servicer Mortgage File," it was impossible for the trustee to reach a determination – based solely on the documents it was reviewing – that the mortgage loans sold to the Trust were "defective." The false assurances concerning the enforceability and quality of those loans affected the risk attending the Certificates. Simply stated, loans backed by mortgages that have been reviewed for legal enforceability and compliance by an entity owing contractual and fiduciary duties *to the investors* are more valuable than loans that have not been reviewed in this manner.

58.     Statements by Michael Nakef, the head of the Asset Backed Finance Rating Group at Moody's – the group that rated the Certificates – underscore the importance of the accuracy of representations made in the Prospectus Supplement. Mr. Nakef stated before the U.S. Senate on September 26, 2007 that Moody's reviews the "representations and warranties to the trust for the benefit of investors in every transaction," which "typically stipulate that, prior to the closing date, all requirements of federal, state or local laws regarding the origination of the loans have been satisfied, including those requirements relating to: usury, truth in lending, real estate settlement procedures, predatory and abusive lending, consumer credit protection, equal credit opportunity, and fair housing or disclosure."

59.     With respect to the foregoing representation that is *nearly identical* to those made in the Prospectus Supplement, Mr. Nakef stated on behalf of Moody's that "Moody's has historically relied on these representations and warranties and *we would not rate a security* unless the originator

- 19 -

or the investment bank had made representations and warranties such as those discussed above." *Id.* (Emphasis added.) Also on September 26, 2007, Vickie A. Tillman, Executive Vice President of Standard & Poor's Credit Market Services, and head of Ratings Services (another entity that rated the Certificates in 2005) stated that S&P "also reviews, with the assistance of internal and external counsel, the legal documents of the securities to be issued, and, where appropriate, opinions of third-party counsel that address transfer of the assets and insolvency of the transferor, as well as security interest and other legal or structural issues." Since the Prospectus Supplement specifically states that it was a "condition to the issuance of any class of Offered Securities that they shall have been rated not lower than investment grade, that is, in one of the four highest rating categories, by a Rating Agency," none of the Certificates would have even been issued but for defendants' misrepresentations.

**False Statements in the Registration Statement Concerning Mortgage Loan Performance Statistics**

60.     The Registration Statement stated that the pool of mortgage loans would consist of mortgage loans having the following aggregate characteristics:

| | |
|---|---|
| Number of Mortgage Loans | 2,533 |
| Aggregate Current Principal Balance | $497,856,173.78 |
| Average Outstanding Principal Balance | $196,548 |
| Range of Outstanding Principal Balances | $14,563 to $1,496,228 |
| Average Original Principal Balance | $197,212 |
| Range of Original Principal Balances | $14,620 to $1,500,000 |
| Loans with Prepayment Penalties | 81.13% |
| Weighted Average Mortgage Interest Rate | 8.225% |
| Weighted Average Net Mortgage Interest Rate | 7.719% |
| Range of Mortgage Interest Rates | 5.000% to 13.875% |
| Weighted Average Original LTV | 80.84% |

| | |
|---|---|
| Weighted Average Original Term to Maturity | 356 months |
| Weighted Average Remaining Term to Stated Maturity | 351 months |
| Percentage of Balloon Loans | 37.14% |
| Percentage of Second Liens | 2.60% |
| Percentage of Sub-Prime Loans | 96.41% |
| Percentage of Owner-Financed Loans | 2.94% |
| **Percentage of Performing Loans** | **100.00%** |
| Max ZIP Code Concentration (%) | 0.40% |
| Max ZIP Code Concentration (ZIP) | 90019 |
| Top 3 Geographic Concentrations: | |
| California | 24.90% |
| Florida | 17.87% |
| Arizona | 5.64% |

61.     Moreover, with regard to the Mortgage Pool Statistics, the Registration Statement

stated, in pertinent part, as follows:

> The Mortgage Pool consists of fixed-rate Mortgage Loans and adjustable-rate
> Mortgage Loans. The Mortgage Pool Loan Balance as of the Cut-off Date is equal to
> $497,856,173.78. The Mortgage Loans have original terms to maturity ranging from
> 120 to 480 months. The following statistical information, unless otherwise specified,
> is based upon the Mortgage Pool Loan Balance as of the Cut-off Date.

> The Mortgage Loans are secured by mortgages, deeds of trust or other similar
> security instruments (each, a "Mortgage") creating first liens (each, a "First Lien") or
> second liens (each a "Second Lien") on residential properties consisting primarily of
> one- to four-family dwelling units (each, a "Mortgaged Property").

> Approximately 45.46% of the Mortgage Loans had a Loan-to-Value Ratio at
> origination in excess of 80% and do not have primary mortgage insurance. None of
> the Mortgage Loans had a Loan-to-Value Ratio at origination in excess of 100% and
> do not have primary mortgage insurance. There can be no assurance that the Loan-to-
> Value Ratio of any Mortgage Loan determined at any time after origination is less
> than or equal to its original Loan-to-Value Ratio. Approximately 95.43% of the
> Mortgage Loans have scheduled Monthly Payments due on the first day of the month
> (the day such Monthly Payments are due with respect to each Mortgage Loan, a
> "Due Date"). The "Loan to Value Ratio" of a Mortgage Loan shall generally mean
> the ratio, expressed as a percentage of (i) the sum of (a) the principal amount of the
> Mortgage Loan as of the Cut-off Date plus (b) the outstanding balance of the First

Lien, if any, at origination of the Mortgage Loan over (ii) the lower of the appraised value of the related Mortgaged Property at origination or the sale price.

Approximately 81.13% of the Mortgage Loans provide for payment by the mortgagor of a prepayment charge in limited circumstances on certain prepayments. No such prepayment charge will be distributed to the holders of the Offered Certificates.

Approximately 37.14% of the Mortgage Loans will not fully amortize by their respective maturity dates (each, a "Balloon Loan"). The Monthly Payment for each Balloon Loan is based on an amortization schedule ranging from 240 months to 600 months, except for the final payment (the "Balloon Payment"), which is due and payable between the 120th month and the 360th month following origination of such Mortgage Loan. The amount of the Balloon Payment on each Balloon Loan is substantially in excess of the amount of the scheduled Monthly Payment for such Mortgage Loan.

Each Mortgage Loan accrues interest at a per annum rate (the "Mortgage Interest Rate") of not less than 5.000% per annum and not more than 13.875% per annum, and as of the Cut-off Date the weighted average Mortgage Interest Rate of the Mortgage Loans was approximately 8.225% per annum.

The weighted average remaining term to maturity of the Mortgage Loans will be approximately 351 months as of the Cut-off Date. None of the Mortgage Loans had a first Due Date prior to January 2004 or after April 2007 or will have a remaining term to maturity of less than 98 months or greater than 478 months as of the Cut-off Date. The latest maturity date of any Mortgage Loan is February 1, 2047.

The average Principal Balance of the Mortgage Loans at origination was approximately $197,212. The average Cut-off Date Principal Balance of the Mortgage Loans was approximately $196,548. No Mortgage Loans had a Cut-off Date Principal Balance of greater than approximately $1,496,228 or less than approximately $14,563.

Approximately 2.60% of the Mortgage Loans are secured by a Second Lien on the related Mortgaged Property, and approximately 97.40% of the Mortgage Loans are secured by a First Lien on the related Mortgaged Property.

Approximately 17.53% of the Mortgage Loans will provide for interest only Monthly Payments ("Interest Only Mortgage Loan") for the first 12, 24, 60, 72, 84 or 120 months of the term of the Interest Only Mortgage Loan. The Monthly Payment with respect to such Interest Only Mortgage Loan will include accrued interest and principal on such Mortgage Loan beginning on the 13th, 25th, 61st, 73rd, 85th or 121st month of the term of such Interest Only Mortgage Loan. As a result of this payment structure, Monthly Payments beginning in the 13th, 25th, 61st, 73rd, 85th or 121st month of the term of such Interest Only Mortgage Loan may be significantly

larger than the first 12, 24, 60, 72, 84 or 120 Monthly Payments, respectively, required under the Mortgage Note.

Approximately 2.94% of the Mortgage Loans are Owner-financed Mortgage Loans.

62.    ***Omitted Information.*** The offering documents failed to disclose: (i) all of the delinquent loans in the Mortgage Pools; (ii) the accounting techniques used to produce those statistics, including whether they take into consideration the effect of any non-payment grace periods, re-ageing, restructuring, partial payments or other practices used to calculate "current" loans that have, in fact, missed payments; and (iii) how extensively such processes were used, including their effects on the delinquency statistics presented.

63.    ***Omitted Information.*** There were delinquent loans included in the Trusts in excess of the percentages specified in the Registration Statement. Further, defendants failed to disclose the facts that these and other early payment defaults were in breach of the representations and warranties that were provided to the Rating Agencies. Moreover, defendants failed to disclose that those breaches affected the ratings assigned to the Certificates; and that the early payment defaults were indicators of poor underwriting done by the entity that originated those loans. Defendants further failed to disclose the facts that such defaults indicated fraudulent loans were included in the portfolios sold to investors.

**False Statements in the Registration Statement Concerning Mortgage Loan Originators**

64.    The Prospectus Supplement represented that the principal originators for the mortgage loans found in Series 2007-CB4 Trust were: (i) New Century Mortgage Corporation ("New Century"); (ii) People's Choice Home Loan, Inc. ("People's Choice"); (iii) Wilmington Finance, Inc. ("Wilmington Finance"); and (iv) Fieldstone Mortgage Company ("Fieldstone Mortgage"). With regard to the origination of the mortgages found in the pool, the Prospectus Supplement stated:

- 23 -

Originators

Approximately 19.94% of the mortgage loans were originated by New Century Mortgage Corporation, a California corporation . . . .

Approximately 19.90% of the mortgage loans were originated by People's Choice Home Loan, Inc., a Wyoming corporation . . . .

Approximately 18.61% of the mortgage loans were originated by Wilmington Finance, Inc., a Delaware corporation  . . . .

Approximately 13.01% of the mortgage loans were originated by Fieldstone Mortgage Company, a Maryland corporation . . . .

The remainder of the mortgage loans were originated by various other originators, none of whom originated more than 10% of the mortgage loans.

(a)     *Omitted Information*.  New Century engaged in the following practices that were not disclosed in the Registration Statement:

(i)     In order to maintain high origination volumes, New Century would look the other way as mortgage brokers overstated a borrower's income and appraised value of a residence;

(ii)     In almost 50% of the loans it originated, New Century used a "stated income or no income verification approach" to inflate income of borrowers so they could qualify for loans which they would have little ability to pay over the long-term; and

(iii)     The appraisals of many properties were inflated, as appraisers were pressured by New Century and/or their mortgage brokers/agents to provide the desired appraisal value regardless of the actual value of the underlying property so the loans would be approved and funded.

(b)     *Omitted Information*.  People's Choice engaged in the following practices that were not disclosed in the Registration Statement:

- 24 -

(i)       Approximately 70% of People's Choice mortgage loans came from mortgage brokers. In order to keep the mortgage brokers from working with other mortgage companies, People's Choice would give mortgage brokers free reign to manipulate documentation in order to have a high volume of loan originations;

(ii)      Many borrowers missed one or more of their first three payments due under the mortgage notes indicating poor underwriting done by People's Choice;

(iii)     Borrowers did not have the income required by People's Choice own guidelines to afford the required mortgage loan payments because mortgage brokers forged borrowers' bank statements, signatures and income; and

(iv)      In order to receive a lower interest rate, many of the borrowers often stated on the mortgage loan applications that they were going to occupy the residence. However, borrowers often bought the home for a quick profit and never had an intention to occupy the residence.

(c)       *Omitted Information.*   Wilmington Finance engaged in the following practices that were not disclosed in the Registration Statement:

(i)       Wilmington Finance's underwriting practices and policies utilized in connection with the approval and funding of mortgage loans were so weak that borrowers were being extended loans based on stated income on the mortgage loan applications without any due diligence as to whether the borrower could afford to pay its monthly mortgage payments. Wilmington Finance would look the other way as mortgage brokers manipulated loan applications to keep up with the competition and churn out a high number of loan originations; and

(ii)      Many of Wilmington Finance's mortgage loans had prepayment penalties and interests rates at least 300 basis points over par.

(d)    *Omitted Information.*  Fieldstone Mortgage engaged in the following practices that were not disclosed in the Registration Statement:

(i)    Fieldstone Mortgage created a mortgage loan program called "South Street" in which borrowers coming out of bankruptcy can receive a mortgage loan with no required documentation;

(ii)    The underwriting, quality control, and due diligence practices and policies utilized in connection with the approval and funding of the mortgage loans were so weak or non-existent that borrowers were being extended loans based on stated income in the mortgage loan applications that was not verified. Fieldstone Mortgage relied upon credit scores, property values and a borrower's debt history. Although "stated income" mortgages were originally designed for self-employed borrowers, "stated income" mortgages were widely used beyond these types of borrowers;

(iii)    Fieldstone Mortgage was experiencing rising delinquencies and increased defaults, indicating poor underwriting done by Fieldstone Mortgage; and

(iv)    In August 2007, Fieldstone Mortgage announced it was unable to originate residential mortgage loans and to access the credit markets. Subsequently, most of its employees were laid off.

**Defendants' Material Misstatements and Omissions Concerning Conflicts of Interest with the Rating Agencies**

65.    *Omitted Information.*  While the Registration Statement informed investors that it was a "condition to the issuance of any class of Offered Securities that they shall have been rated not lower than investment grade, that is, in one of the four highest rating categories, by a Rating Agency," defendants failed to explain that the agencies would be compensated only if they provided the desired rating. Investors placed their trust in the credit ratings largely *because* they were

provided by independent agencies. The recently revealed conflicts of interest discussed herein undermined the credibility of the ratings at the time they were issued. One investment banker who has experience with rating agencies stated on April 24, 2008 to the Senate Banking, Housing and Urban Affairs Committee that "[t]here is a far more serious conflict of interest than is commonly believed at the root of the current rating agency business model" and went on to say that "one could make the case that whenever a rating analyst is supervised by a manager whose compensation is determined by market share or revenue growth (rather than ratings accuracy) the objectivity of ratings is compromised."

66. *Omitted Information.* As reported on April 11, 2008, in *The Wall Street Journal,* a former Moody's analyst further stated that while there was no explicit directive to subordinate ratings objectivity to earn business from investment banks, there was "a palpable erosion of institutional support for rating analysis that threatened market share." It was reported in the same article that "Moody's agreed to switch analysts on deals after bankers complained."

67. Representative Gary Ackerman made the following statement on September 5, 2007, to the Committee on House Financial Services regarding the rating agency conflicts:

> Originators then took these [mortgage] loans – many of which should have been assessed as much riskier than they were – and packaged them into securities to sell to investors. *If there had been full disclosure, smart and careful investors would have judged that these mortgage backed bonds carried a disproportionately high level of risk.*
>
> *              *              *
>
> The credit-rating firms were double-dipping; profiting first from helping to put these shady securities together, and then collecting fees for deliberately rating these risky products at a higher value than they were worth. It's like hiring a judge to advise you as to how to commit an act and then paying him to decide whether you have committed a crime. [Emphasis added].

68. The former Chairman of the SEC, Arthur Levitt, Jr., made the remarks quoted below on November 27, 2007, in Ontario, at a forum for securities regulators and market participants to

discuss important capital markets issues. Mr. Levitt's remarks were entitled "Strengthening the

Gatekeepers: The importance of independence and accountability to capital markets."

- In terms of market meltdowns and the degree of pain inflicted on the financial system, the subprime mortgage crisis has the potential to rival just about anything in recent financial history including the post-Enron turndown of a few years ago.

- The scope of this crisis is not the only similarity to the Enron-era scandals. They also share root causes that include conflicts of interest, a lack of accountability, and limited transparency leavened with a healthy dose of naive greed.

- *Indeed, the subprime meltdown – which is still roiling the markets and the economic health of the world – is yet another example of what happens when independence and accountability is compromised among key market actors . . . of what happens when trust breaks down.*

- *Just like we did in the months after the implosion of Enron and Worldcom, we are now learning that a number of critical gatekeepers and market actors did not perform as we had hoped.*

- First, consider the credit rating agencies.

- Until the 1970s, the business model of credit rating agencies was fairly straightforward: Investors bought a subscription to receive ratings which were then used to make investment decisions.

- But then the business model changed, and the issuers of securities themselves became the ones who paid to be rated . . . and as structured finance increased in popularity, it deepened this relationship between issuer and rater.

- Now, *investors are relying on credit ratings to make informed investment decisions, but the credit rating firms are paid not by investors but by the companies they rate. And as complex, structured debt products have increased in popularity, the relationship between rater and issue became even closer – and the line between independent rater and paid advisor became blurred.*

- *This very circumstance suggests that a potential conflict of interest – between providing objective ratings and satisfying their corporate clients may be distorting the rating agencies' judgment. That they are both coach and referee.* [Emphasis added.]

Defendants' failure to disclose all of the compensation arrangements with the Rating Agencies is a

material omission in the Registration Statement.

- 28 -

69.     Defendants' inaccurate disclosures and omissions with respect to the fees paid to the Rating Agencies and failure to disclose all conflicts of interest involving the Rating Agencies materially distorted the information provided to all of the investors who acquired Certificates pursuant or traceable to the Registration Statement. A reasonable investor would want to know all of the circumstances surrounding the fact that the "independent" agency rating the securities he or she is about to acquire is being paid large sums of money by the entities who are *selling* the securities to them for a fee.

## DISCLOSURES EMERGE ABOUT THE PROBLEMS UNDERLYING THE LOANS

70.     In late 2007, disclosures concerning the credit quality of the assets supporting the Certificates began to emerge. Substantial negative action was taken by various rating agencies with respect to Certificates.

71.     C-BASS's Class A1A Certificates

(a)     On October 17, 2008, Moody's downgraded C-BASS's Class A1A Certificates from Aaa to Aa3.

(b)     On April 15, 2008, S&P downgraded C-BASS's Class A1A Certificates from AAA to AAA*-. Then, on May 1, 2008, S&P upgraded C-BASS's Class A1A Certificates from AAA*- to AAA. Lastly, on August 19, 2008, S&P downgraded C-BASS's Class A1A Certificates from AAA to AAA*-.

(c)     Fitch has yet to downgrade or affirm C-BASS's Class A1A Certificates. A chart showing the price of C-BASS's Class A1B Certificates from its inception is shown below:

- 29 -



72. C-BASS's Class A1B Certificates.

(a) On February 1, 2008, Fitch downgraded C-BASS's Class A1B Certificates from AAA to AAA*-. Then, on February 29, 2008, Fitch downgraded C-BASS's Class A1B Certificates from AAA*- to AA.

(b) On October 17, 2008, Moody's downgraded C-BASS's Class A1B Certificates from Aaa to Ba1.

(c) On April 15, 2008, S&P downgraded C-BASS's Class A1B Certificates from AAA to AAA*-. Then, on May 1, 2008, S&P upgraded C-BASS's Class A1B Certificates from AAA*- to AAA. Lastly, on August 19, 2008, S&P downgraded C-BASS's Class A1B Certificates from AAA to AAA*-. A chart showing the price of C-BASS's Class A1B Certificates from its inception is shown below:



73.     C-BASS's Class A1C Certificates.

(a)     On December 14, 2007, Fitch downgraded C-BASS's Class A1C Certificates from AAA to AA.  Then, on February 1, 2008, Fitch downgraded C-BASS's Class A1C Certificates from AA to AA*-.  Lastly, on February 29, 2008, Fitch downgraded C-BASS's Class A1C Certificates from AA*- to A*-.

(b)     On October 17, 2008, Moody's downgraded C-BASS's Class A1C Certificates from Aaa to B1.

(c)     On April 15, 2008, S&P downgraded C-BASS's Class A1C Certificates from AAA to AAA*-.  Then, on May 1, 2008, S&P upgraded C-BASS's Class A1C Certificates from AAA*- to AAA.  Lastly, on August 19, 2008, S&P downgraded C-BASS's Class A1C Certificates

from AAA to AAA*-.  A chart showing the price of C-BASS's Class A1C Certificates from its

inception is shown below:



74.    C-BASS's Class A2A Certificates.

(a)    On April 15, 2008, S&P downgraded C-BASS's Class A2A Certificates from

AAA to AAA*-.  Then, on May 1, 2008, S&P upgraded C-BASS's Class A2A Certificates from

AAA*- to AAA.  Lastly, on August 19, 2008, S&P downgraded C-BASS's Class A2A Certificates

from AAA to AAA*-.

(b)    Moody's and Fitch have yet to downgrade or affirm C-BASS's Class A1A

Certificates. A chart showing the price of C-BASS's Class A1B Certificates from its inception is

shown below:



75.    C-BASS's Class A2B Certificates.

(a)    On February 1, 2008, Fitch downgraded C-BASS's Class A2B Certificates from AAA to AAA*-.  Then, on February 29, 2008, Fitch downgraded C-BASS's Class A2B Certificates from AAA*- to AA.

(b)    On October 17, 2008, Moody's downgraded C-BASS's Class A2B Certificates from Aaa to Aa1.

(c)    On April 15, 2008, S&P downgraded C-BASS's Class A2B Certificates from AAA to AAA*-.  Then, on May 1, 2008, S&P upgraded C-BASS's Class A2B Certificates from AAA*- to AAA.  Lastly, on August 19, 2008, S&P downgraded C-BASS's Class A2B Certificates from AAA to AAA*-.  A chart showing the price of C-BASS's Class A2B Certificates from its inception is shown below:



76.    C-BASS's Class A2C Certificates.

(a)    On December 14, 2007, Fitch downgraded C-BASS's Class A2C Certificates from AAA to AA. On February 1, 2008, Fitch downgraded C-BASS's Class A2C Certificates from AA to AA*-. Then, on February 29, 2008, Fitch downgraded C-BASS's Class A2C Certificates from AA*- to A*-.

(b)    On October 17, 2008, Moody's downgraded C-BASS's Class A2C Certificates from Aaa to Baa1.

(c)    On April 15, 2008, S&P downgraded C-BASS's Class A2C Certificates from AAA to AAA*-. Then, on May 1, 2008, S&P upgraded C-BASS's Class A2C Certificates from AAA*- to AAA. Lastly, on August 19, 2008, S&P downgraded C-BASS's Class A2C Certificates from AAA to AAA*-. A chart showing the price of C-BASS's Class A2C Certificates from its inception is shown below:



77.     C-BASS's Class A2D Certificates.

(a)     On December 14, 2007, Fitch downgraded C-BASS's Class A2D Certificates from AAA to AA. On February 1, 2008, Fitch downgraded C-BASS's Class A2D Certificates from AA to AA*-. Then, on February 29, 2008, Fitch downgraded C-BASS's Class A2D Certificates from AA*- to A*-.

(b)     On October 17, 2008, Moody's downgraded C-BASS's Class A2D Certificates from Aaa to Baa1.

(c)     On April 15, 2008, S&P downgraded C-BASS's Class A2D Certificates from AAA to AAA*-. Then, on May 1, 2008, S&P upgraded C-BASS's Class A2D Certificates from AAA*- to AAA. Lastly, on August 19, 2008, S&P downgraded C-BASS's Class A2D Certificates from AAA to AAA*-. A chart showing the price of C-BASS's Class A2D Certificates from its inception is shown below:



78.    The ratings action represents only a partial picture of the rapid deterioration of the Certificates issued pursuant to the Prospectus Supplement as other performance measures of the Certificates show substantial decay.  Hundreds of millions of dollars worth of mortgages sold by Defendants to investors via the Certificates have missed mortgage payments for 90 or more days, far in excess of what investors would anticipate from "investment grade" securities.

## COUNT I

### Violations of §11 of the 1933 Act
### Against All Defendants

79.    Plaintiffs repeat and reallege each and every allegation contained above.

80.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

81.     The Registration Statement for the Certificates was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

82.     The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

83.     As issuer of the shares, C-BASS 2007-CB4 Trust is strictly liable to Plaintiff and the Class for the misstatements and omissions.

84.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

85.     By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

86.     Plaintiff acquired the Certificates pursuant and/or traceable to the Registration Statement.

87.     Plaintiff and the Class have sustained damages. The value of the Certificates has declined substantially subsequent to and due to Defendants' violations.

88.     At the times they purchased the Certificates, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to December 14, 2007. Less than one year elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiff filed its complaint.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against All Defendants

89.     Plaintiff repeats and realleges each and every allegation contained above.

90.     This Count is brought by Plaintiff pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of all purchasers of the Certificates in connection with, and traceable to, the Prospectus Supplement. For purposes of this Count, Plaintiff affirmatively states that it does not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

91.     Defendants were sellers, offerors and/or solicitors of purchasers of the Certificates offered pursuant to the Prospectus Supplement. Defendants issued, caused to be issued, and/or signed the Prospectus Supplement in connection with the Certificates. The Prospectus Supplement was used to induce investors, such as Plaintiff and the other members of the Class, to purchase the Certificates.

92.     The Prospectus Supplement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts. The Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectus Supplement. Defendants solicited such purchases for their personal financial gain through the preparation and dissemination of the Prospectus Supplement.

93.     Defendants:

(a)     made the decision to conduct the offering at the price set forth in the offering documents. These Defendants drafted, revised and/or approved the Prospectus Supplement. The

- 38 -

Prospectus Supplement was calculated to create interest in the Certificates and was widely distributed by or on behalf of these Defendants for that purpose;

        (b)     finalized the Prospectus Supplement and caused it to become effective; and

        (c)     conceived and planned the offering and orchestrated all activities necessary to affect the sale of these securities to the investing public by issuing securities, promoting the securities and supervising their distribution and ultimate sale to the investing public.

94.     As set forth more specifically above, the Prospectus Supplement contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in light of circumstances in which they were made, not misleading.

95.     Plaintiff and the other Class members did not know, nor could they have known, of the untruths or omissions contained in the Prospectus Supplement.

96.     The Defendants named in this Count were obligated to make a reasonable and diligent investigation of the statements contained in the Prospectus Supplement to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading. None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus Supplement were accurate and complete in all material respects. Had they done so, these Defendants could have known of the material misstatements and omissions alleged herein.

97.     This claim was brought within one year after discovery of the untrue statements and omissions in the Prospectus Supplement and within three years after the Certificates were sold to the Class in connection with the offering.

98.     By reason of the misconduct alleged herein, the Defendants named in this Count violated Section 12(a)(2) of the Securities Act and are liable to Plaintiff and Class members who purchased or acquired the Certificates pursuant to the Prospectus Supplement, each of whom has been damaged as a result of such violation. Accordingly, Plaintiff and/or the other members of the Class who hold shares issued pursuant to the Prospectus Supplement have the right to rescind and recover the consideration paid for their Certificates, and hereby tender their Certificates to the Defendants sued herein. Class members who have sold their shares seek damages to the extent permitted by law.

## COUNT III

### Violations of Section 15 of the Securities Act
### Against All Defendants

99.     Plaintiff repeats and realleges each and every allegation contained above.

100.    This Cause of Action is brought pursuant to §15 of the 1933 Act against all Defendants.

101.    Each of the Defendants was a control person of C-BASS and of the Trust by virtue of his or her position as a director and/or senior officer of C-BASS. The Individual Defendants were responsible for the preparation of the contents of the Registration Statement and Prospectus Supplement.

102.    Each of the Defendants was a culpable participant in the violations alleged herein, based on their having prepared, signed or authorized the signing of the Registration Statement and the dissemination of the Prospectus Supplement and having otherwise participated in the consummation of the offerings detailed herein.

103.    ML Mortgage Investors was the depositor and C-BASS 2007-CB4 Trust was the issuer for the Certificates. Defendant C-BASS was the sponsor or promoter of the Certificates and

- 40 -

was a control person of the Trusts. The defendants named herein were responsible for overseeing the formation and management of the Trust as well as the operations of the Trust, including routing payments from the borrowers to investors.

104.    C-BASS and the Individual Defendants prepared, reviewed and/or caused the Prospectus Supplement to be filed and disseminated.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying plaintiff as Class representative;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Granting recission as to Count II;

E.    Awarding statutory damages; and

F.    Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: December 12, 2008
                  COUGHLIN STOIA GELLER
                    RUDMAN & ROBBINS LLP
                  SAMUEL H. RUDMAN
                  DAVID A. ROSENFELD
                  MARIO ALBA JR.
                  CAROLINA C. TORRES

                                    SAMUEL H. RUDMAN

                  58 South Service Road, Suite 200
                  Melville, NY 11747
                  Telephone: 631/367-7100
                  631/367-1173 (fax)

                  *Attorneys for Plaintiff*

I:\C_Bass\Pleadings\CPT.doc

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

IRON WORKERS LOCAL NO. 25 PENSION FUND ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.     (a)     Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*Belodoff v. Netlist, Inc., et al.*, No. SACV-07-00677-DOC(MLGx) (C.D. Cal.)

*In re Radian Sec. Litig.*, No. 2:07-cv-03375-MAM (E.D. Pa.)

*Eastriver Partners, Inc. v. Focus Media Holding Limited. et al.*, No. 1:07-cv-10617-LTS (S.D.N.Y.)

*In re Orion Sec. Litig.*, No. 1:08-cv-01328-RJS (S.D.N.Y.)

(b)     Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

*Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp., et al.*, No. 2:08-cv-00797-WEC (E.D. Wis.)

(c)     Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*Hutton v. Hansen Natural Corporation, et al.*, No. CV-06-07599-JFW(PLAx) (C.D. Cal.)

*AI Credit Company v. RAIT Financial Trust, et al.*, No. 07-3148 (E.D. Pa.)

*Greenberg v. American Home Mortgage Invest Corp., et al.*, No. 2:07-cv-3152-TCP-ETB (E.D.N.Y.)

*Esses v. SIRF Technology Holdings, Inc., et al.*, No. CV-08-00856-MMC (N.D. Cal.)

C-BASS

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___9th___ day of ___December___, 2008.

IRON WORKERS LOCAL NO. 25
PENSION FUND

By: _____

Its: ___ADMINISTRATOR___

- 2 -

C-BASS