```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------x
IRON WORKERS LOCAL NO. 25 PENSION       :
FUND, Individually and On Behalf of     :
All Others Situated Similarly           :
                                        :
            Plaintiff,                  :
                                        :     08 Civ. 10841 (JSR)
            -v-                         :
                                        :
CREDIT-BASED ASSET SERVICING AND        :
SECURITIZATION, LLC, et al.,            :
                                        :
            Defendants.                 :
---------------------------------------x

---------------------------------------x
PUBLIC EMPLOYEES' RETIREMENT SYSTEM     :
OF MISSISSIPPI, Individually and On     :
Behalf of All Others Similarly          :
Situated,                               :
                                        :     09 Civ. 1392 (JSR)
            Plaintiff,                  :
                                        :          OPINION
            -v-                         :
                                        :
MERRILL LYNCH & CO. INC., et al.,       :
                                        :
            Defendants.                 :
---------------------------------------x
```

JED S. RAKOFF, U.S.D.J.

By motions filed earlier this year, the two respective plaintiffs in these consolidated class actions each sought to be appointed "lead plaintiff," a position that carries with it enhanced responsibility for the conduct of the litigation and – dare one mention it – increased legal fees for the law firm representing whichever plaintiff is chosen to lead. The choice presented a classic dilemma, in the sense of a choice between two less-than-perfect plaintiffs. Still, a choice had to be made if the case were to proceed, and so on April 23, 2009, the Court issued a "bottom-

line" Order granting the motion of the Public Employees' Retirement System of Mississippi ("MissPERS") to be lead plaintiff, appointing one of MissPERS' counsel, Bernstein Litowitz Berger & Grossman LLP ("Bernstein Litowitz"), as lead counsel, and denying the motion of Iron Workers Local No. 25 Pension Fund ("Iron Workers Fund") to be lead plaintiff.  This Opinion states the reasons for those rulings.

Each of the plaintiffs sought to represent a putative class of investors who purchased from defendant Merrill Lynch & Co., Inc. and/or its affiliates "certificates" backed by pools of subprime mortgages and the like.  The central thrust of the complaints was that defendants failed to disclose the extent of the underlying risk.  The complaints sufficiently overlapped that the Court ordered them consolidated (– two other actions have been similarly consolidated since –), and both plaintiffs sought to be appointed lead plaintiff in the consolidated action pursuant to the relevant provisions of the Private Securities Litigation and Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 77z-1(a)(3)(B)("Appointment of lead plaintiff").[1]

After receiving written submissions, the Court held an evidentiary hearing on April 1, 2009, at which the Court was made aware of problematic relationships between plaintiffs and their counsel (discussed below) that arguably affected the pending motions.

---

[1] 15 U.S.C. § 77z-1 is the part of the PSLRA applicable to cases, like this, brought under the Securities Act of 1933. Parallel provisions of the PSLRA applicable to cases brought under the Securities Exchange Act of 1934 are found at 15 U.S.C. § 78u-(4).

2

The Court therefore invited, and received, further briefing before issuing its "bottom-line" ruling on April 23, 2009.

It is axiomatic, and the parties here do not dispute, that the lead plaintiff provisions of the PSLRA were intended to curtail the vice of "lawyer-driven" litigation, i.e., lawsuits that, because of the huge potential fees available in contingent securities fraud class actions, were initiated and controlled by the lawyers and appeared to be litigated more for their benefit than for the benefit of the shareholders they ostensibly represented. See, e.g., In re Doral Fin. Corp. Sec. Litig., 414 F. Supp. 2d 398, 401 (S.D.N.Y. 2006) ("[the PSLRA] was enacted to address perceived abuses in securities fraud class actions created by lawyer-driven litigation"); In re Pfizer Inc. Sec. Litig., 233 F.R.D. 334, 337 (S.D.N.Y. 2005) ("One of the principal legislative purposes of the PSLRA was to prevent lawyer-driven litigation."). To help combat this problem, the lead plaintiff provisions of the PSLRA required that a court "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." 15 U.S.C. § 77z-1(a)(3)(B)(i). Further, the provisions created a "rebuttable presumption" that the "most adequate" plaintiff is, inter alia, the person or group of persons that "has the largest financial interest in the relief sought by the class." 15 U.S.C. § 77z-1(a)(3)(B)(iii)(I)(bb). "The theory of these provisions was that if an investor with a large financial stake in the litigation was made lead plaintiff, such a plaintiff – frequently a large institution or

3

otherwise sophisticated investor – would be motivated to act like a 'real' client, carefully choosing counsel and monitoring counsel's performance to make sure that adequate representation was delivered at a reasonable price." In re Razorfish, Inc. Sec. Litig., 143 F. Supp. 2d 304, 307 (S.D.N.Y. May 3, 2001) (citing Elliott J. Weiss & John S. Beckerman, Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions, 104 Yale L.J. 2053, 2089 (1995)); see also In re Donnkenney Inc. Sec. Litig., 171 F.R.D. 156, 157-58 (S.D.N.Y. 1997).

  Accordingly, each of the plaintiffs, in their initial papers on these motions, focused much of their attention on demonstrating that they had a substantial financial interest. MissPERS, in particular, emphasized that it had purchased 177,500 of the underlying certificates, compared with the Iron Workers Funds' 100,000. But the Iron Workers Fund argued that it alone held an interest in one of the classes of certificates at issue here, and that MissPERS could therefore "not fairly and adequately protect the interests of the class." 15 U.S.C. § 77z-1(a)(3)(B)(iii)(II)(bb).

  At the evidentiary hearing, however, the Court was made aware of an arrangement between the Iron Workers Fund and its counsel, Coughlin Stoia Geller Rudman & Robbins LLP ("Coughlin Stoia"), that cast in doubt the adequacy of the Fund to serve as lead plaintiff in any event. Specifically, the evidence showed the Fund had entered into a contractual arrangement with Coughlin Stoia whereby, in return for Coughlin Stoia's providing free "monitoring" of the Funds' investments, the Fund agreed that, if Coughlin Stoia recommended

4

bringing a securities class action and the Fund approved doing so, Coughlin Stoia would be retained, on a contingent fee basis, to represent the Fund.  As Dennis Kramer, the Fund's administrator, testified:

> Q.      [by the Court] ... what you've chosen to enter into, as I understand it, is a contract where the monitoring counsel will also be the counsel who represents you if a lawsuit is brought, is that right?
>
> A.      [by Mr. Kramer] Yes, that's true.
>
> Q.      And the only way they get paid is if they bring such a lawsuit and recover, is that right?
>
> A.      Correct.

Transcript, April 1, 2009 ("Tr.") at 8.

Going far beyond any traditional contingency arrangement of which the Court is aware, this practice, on its face, creates a clear incentive for Coughlin Stoia to discover "fraud" in the investments it monitors and to recommend to the Fund's non-lawyer administrator (and, through him, to the trustees) that the Fund, at no cost to itself, bring a class action lawsuit.  In other words, the practice fosters the very tendencies toward lawyer-driver litigation that the PSLRA was designed to curtail.

At the evidentiary hearing, the Court also questioned whether the seeming conflict of interest inherent in this arrangement violated ethical prohibitions.  <u>See, e.g.,</u> ABA Code of Professional Responsibility, Disciplinary Rule 5-101 ("[a] lawyer shall not accept or continue employment if the exercise of professional judgment on

5

behalf of the client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests . . . ."). At the time, Coughlin Stoia's chief response was a variation on everybody-does-it: "this portfolio monitoring is not something that's unique to our firm." Tr. at 11. There was also a suggestion that free monitoring was of special benefit in this time of economic hardship – in apparent disregard of the ever-applicable adage that there is no such thing as a free lunch.

Subsequently, however, Coughlin Stoia identified two reported cases in which district courts had appeared untroubled by this kind of arrangement, see In re Am. Italian Pasta Co. Sec. Litig., 2007 U.S. Dist. LEXIS 21365 (W.D. Mo. 2007)("the Court is not surprised Lead Plaintiff has arranged for a law firm to keep it apprised of events (including lawsuits) that might be of interest"); Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., 2004 U.S. Dist. LEXIS 27008 (C.D. Cal. 2004) ("Nothing about these [monitoring agreements] renders Carpenters inadequate as a class representative."). Additionally, Couglin Stoia submitted a sworn declaration from a well-known expert on legal ethics, Prof. Geoffrey C. Hazard, Jr. of the Hastings College of the Law, University of California, who, while noting the Court's "legitimate concern" with the apparent conflict of interest, concluded that "in my opinion, there is no improper conflict of interest." Declaration of Geoffrey C. Hazard, Jr. dated April 8, 2009 ("Hazard Decl.") ¶ 4 (emphasis added). Prof. Hazard reached this conclusion "based on discussion of the issue with experienced lawyers on both sides," id. ¶ 10, that

6

convinced him that "a plaintiff's lawyer, in a securities case that is worth bringing on a contingent basis, has every incentive to proceed only if the claim is reasonably viable on the basis of informed professional judgment," id. ¶ 9, and that, while "[t]here are plaintiff cases brought on the basis of contingent fees that should not have been brought[, m]y impression is that the lawyers in such cases are inexperienced or unrealistic, and that they do not long remain in contingent fee practice," id. ¶ 8(d). "Accordingly, on the question of the viability of the claim, the interests of an experienced plaintiff's counsel in contingent fee cases, not only in securities litigation but generally, are aligned with the claimant." Id. ¶ 10.

Although the Court has the very greatest respect for Prof. Hazard, it must be noted that these are quite sweeping conclusions to be reached on the basis of little more than "discussions" with unnamed "experienced lawyers," id. ¶ 10. One might have supposed that defendants in securities class actions, facing potentially huge damages, might be prepared to pay substantial sums to settle even those actions where the chances of plaintiffs' ultimately prevailing were remote and that this might give plaintiffs' lawyers a motive to bring even dubious actions if a compliant plaintiff could be found. Professor Hazard, indeed, acknowledges that "[m]any observers have had similar suppositions," but opines, in somewhat conclusory fashion, that they are "not accurate," id. ¶ 7.

This Court need not resolve this debate in the abstract, for if Prof. Hazard were correct, Congress would never have enacted the

PSLRA in the first place, because it would have agreed with Prof. Hazard that experienced securities class action lawyers would almost never be motivated to bring abusive lawsuits, let alone to convince their clients to come along (cost-free) for the ride. But, as noted, it was Congress' conclusion that abusive lawyer-driven litigation existed in this context that gave rise to the PSLRA. Indeed, Congress even included in the PSLRA, under the title "Sanctions for abusive litigation," a requirement that a court at the end of any such action make specific findings of whether litigation abuse had been present at any stage and, if so, impose mandatory sanctions. 15 U.S.C. 77z-1(c). Congress, then, has rejected Prof. Hazard's primary suppositions, and this Court must be guided accordingly.

Prof. Hazard goes on, however, to assert that, in any event, "[i]n the field of contemporary securities claims and litigation, most of the clients are sophisticated and have access to sophisticated advisers, financial and legal, in determining whether to bring suit." Id. ¶ 11. But, even if true elsewhere, this is not true in the case of the Iron Workers Fund. The Court, from its own observation of the testimony and demeanor of the Fund's administrator, readily perceived that he was not particularly sophisticated in evaluating securities class actions and, indeed, had only a rough idea of what this lawsuit was all about. But who were the "sophisticated advisers, financial and legal" who would advise him and the Fund "in determining whether to bring suit"? – why, the very lawyers who would be bringing the suit, Couglin Stoia. Accordingly, the Court need not determine whether there here exists a

conflict of interest that violates ethical rules. What is crystal clear to the Court is that the Iron Workers Fund is in no position to adequately monitor the conduct of this complex litigation when it has not even taken the necessary steps to assure itself that the advice it is getting from its monitors is disinterested, let alone take the necessary steps to find out much about the lawsuit it is being asked to oversee.

This is not to say that the alternative lead plaintiff, MissPERS, is without blemish. It too employs plaintiffs' firms to "monitor" its investments free of charge, although there are a number of important differences that serve to mitigate, though not entirely eliminate, the dangers outlined above. First, MissPERS relies on something like twelve different firms to monitor its investments, and no such firm is guaranteed that it will be selected to bring the potential lawsuit it identifies in the course of its monitoring. Tr. at 20. On the contrary, MissPERS "play[s] off one against the other," id., both in terms of determining whether a given lawsuit should be brought and in determining the fee arrangement, id. Second, the ultimate evaluation of the monitoring firms' recommendations, and the oversight of such litigation as is then brought, is entrusted to a group of lawyers in the Attorney General's Office of the State of Mississippi, who bring their own expertise to bear, Tr. at 23-25. Here, Special Assistant Attorney General George W. Neville, the MissPERS client representative responsible for this case, who testified at the evidentiary hearing, plainly had a sophisticated knowledge of such matters. Third, as it happens, the

basis for this particular litigation was brought to MissPERS' attention, not by any of its monitoring firms, but by another Mississippi law firm, Pond Gadow & Tyler, P.A. ("Pond Gadow"), which will <u>not</u> be serving as lead counsel in this case (though it will be involved). Tr. at 17-18. All these circumstances render it much more likely that MissPERS can adequately oversee this litigation than could the Iron Workers Fund.

The Fund, however, argues that, precisely because MissPERS is involved in fifteen securities fraud actions under Mr. Neville's supervision, MissPERS is a "professional plaintiff" of the kind that the PSLRA disfavors. Specifically, the relevant provision of the PSLRA provides that "[e]xcept as the court may otherwise permit, consistent with the purposes of this section, a person may be a lead plaintiff . . . in no more than 5 securities class actions brought as plaintiff class actions pursuant to the Federal Rules of Civil Procedure during any 3-year period." 15 U.S.C. § 77z-1(3)(B)(vi). Even in the abstract, however, it would seem that this provision might apply with less force when the plaintiff is a state agency – after all, a state regularly brings suit in hundreds of cases – and, as already noted, in this case, where the alternative lead plaintiff, the Iron Workers Fund, seems to have little real expertise in handling such cases, the accumulated experience of MissPERS in pursuing multiple securities fraud actions seems a benefit more than a detriment. Moreover, as many courts have noted, the provision of the PSLRA restricting the use of professional plaintiffs was largely directed at private individuals, and courts have routinely waived the

restriction in the case of qualified institutional investors.[2]  See, e.g., Kuriakose v. Fed. Home Loan Mortgage Co., 2008 U.S. Dist. LEXIS 95506, at *25 (S.D.N.Y. Nov. 24, 2008); Police & Fire Ret. Sys. v. SafeNet, Inc., 2007 U.S. Dist. LEXIS 97959, at *11 (S.D.N.Y. Feb. 21, 2007); Nursing Home Pension Fund v. Oracle Corp., 2006 U.S. Dist. LEXIS 84470, at *14-15 (N.D. Cal. Dec. 20, 2006); In re Fannie Mae Sec. Litig., 355 F. Supp. 2d 261, 264 (D.D.C. 2005); In re Vicuron Parms., Inc. Sec. Litig., 225 F.R.D. 508, 512 (E.D. Pa. 2004); Meeuwenberg v. Best Buy Co., 2004 U.S. Dist. LEXIS 7686, at *7 (D. Minn. Apr. 29, 2004).

As for the objection, noted previously, that MissPERS did not own an interest in one of the class of certificates at issues in this consolidated litigation, the record presently before the Court does not suggest that this matters, for the central allegations here are the same for all classes of certificates.  Nevertheless, the Court holds open the possibility that additional lead plaintiffs (such as from the other two cases more recently consolidated into this action) may have to be added if subsequent circumstances warrant.

Finally, there is the question of which law firm(s) should represent MissPERS as lead plaintiff.  MissPERS recommends the two

---

[2] See H.R. Conf. Rep. No. 104-369 at *35, reprinted in 1995 U.S.C.C.A.N. 730, 734 ("Institutional investors seeking to serve as lead plaintiff may need to exceed this limitation and do not represent the type of professional plaintiff this legislation seeks to restrict.  As a result, the Conference Committee grants courts discretion to avoid the unintended consequences of disqualifying institutional investors from serving more than five times in three years.  The Conference Committee does not intend for this provision to operate at cross purposes with the 'most adequate plaintiff' provision.")

firms that have represented it thus far: Bernstein Litowitz and Pond Gadow.  But, concededly, only the former is experienced in securities class actions, and the Court sees no need for two firms to represent the lead plaintiff.  Hence, the Court appoints Bernstein Litowitz as the sole lead lawyer.[3]

For the foregoing reasons, the Court hereby reaffirms its Order of April 23, 2009 appointing MissPERS as lead plaintiff and Bernstein Litowitz as lead counsel.

_____
JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
       May 26, 2009

---

[3] The Court is not unaware of disturbing allegations that state entities not unlike MissPERS, and law firms not unlike Bernstein Litowitz, have engaged in "pay-for-play" arrangements, by which such an entity will not even consider hiring such a law firm unless the law firm has contributed to the campaign fund of the relevant state elected official, such as the attorney general. See, e.g., John C. Coffee, Jr., 'Pay-to-Play' Reform: What, How, and Why?, New York Law Journal, May 21, 2009, p. 5. But no such allegations are presently before the Court in this case.

12