### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, IRON WORKERS LOCAL NO. 25 PENSION FUND, WYOMING STATE TREASURER, LOS ANGELES COUNTY EMPLOYEES RETIREMENT ASSOCIATION, CONNECTICUT CARPENTERS PENSION FUND AND CONNECTICUT CARPENTERS ANNUITY FUND, Individually and On Behalf of All Others Similarly Situated, | Civil Action No. 08 CIV. 10841 (JSR) ECF Case |
| Plaintiffs, | PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT BY THE MERRILL DEFENDANTS, ABN AMRO, INC., JP MORGAN SECURITIES, INC. AND CREDIT-BASED ASSET SERVICING AND SECURITIZATION |
| v. | DEMAND FOR JURY TRIAL |
| MERRILL LYNCH & CO. INC., MERRILL LYNCH MORTGAGE LENDING, INC., MERRILL LYNCH MORTGAGE INVESTORS, INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, FIRST FRANKLIN FINANCIAL CORPORATION, CREDIT-BASED ASSET SERVICING AND SECURITIZATION LLC, J.P. MORGAN SECURITIES, INC., ABN AMRO INCORPORATED, MCGRAW-HILL COMPANIES, MOODY'S INVESTORS SERVICE, INC., MATTHEW WHALEN, PAUL PARK, BRIAN T. SULLIVAN, MICHAEL M. MCGOVERN, DONALD J. PUGLISI, DONALD C. HAN, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................iii-xiii

I.      INTRODUCTION ...................................................................................................1

II.     SUMMARY OF ALLEGATIONS ........................................................................6

III.    LEGAL ARGUMENT...........................................................................................10

    A.   Named Plaintiffs Have Standing To Bring The
        Claims In The Complaint..................................................................................14

        1.   Claims On Behalf Of Absent Purchasers..................................................14

        2.   Named Plaintiffs Purchased Pursuant To The Same
                Registration Statements As Absent Class Members...................................19

        3.   Named Plaintiffs Have Individual Standing To
                Advance Section 12 Claims On Their Own Behalf...................................20

    B.   The Complaint Alleges Material Misstatements
        And Omissions In The Offering Documents ..........................................................22

        1.   False And Misleading Statements Concerning
                Underwriting Guidelines...........................................................................23

            a.   The Offering Documents Did Not Disclose The
                Information About Systemic Violations Of
                Underwriting Guidelines...............................................................31

            b.   Plaintiffs Are Not Required To Allege Defendants'
                Scienter ..........................................................................................37

        2.   False And Misleading Information About
                Appraisals And Loan-To-Value.................................................................41

        3.   Plaintiffs Allege Actionable Misstatements And
                Omissions Regarding The Ratings.............................................................45

    C.   The Complaint Sufficiently Pleads Section 11
        Claims Against The Merrill Sponsor, First Franklin,
        Merrill And C-BASS .......................................................................................48

    D.   The Individual Defendants, Merrill Lynch, The
        Merrill Sponsor, First Franklin, C-BASS And
        Merrill Lynch PFS Are Liable As Control Persons...............................................51

    E.   Plaintiffs' Claims Are Timely.................................................................53

i

1.    A Reasonable Investor Was Not On Inquiry Notice
Until, At The Earliest, April 24, 2008 ........................................54

2.    MissPERS Was Not On Notice Of Claims Against
Merrill Lynch Two Years Ago ...................................................57

3.    The Standard For Inquiry Notice Is That Of An
Ordinary Investor.......................................................................61

4.    Unrelated Lawsuits Provided No Notice Of The
Probability of Plaintiffs' Claims ................................................62

5.    General News Articles Do Not Demonstrate A
Probable Securities Act Claim ...................................................64

6.    Defendants' "Evidence" Is Controverted..................................66

IV.    CONCLUSION.........................................................................................68

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Activision Sec. Litig.*,
    621 F. Supp. 415 (N.D. Cal. 1985) ....................................................................22

*In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*,
    2007 U.S. Dist. LEXIS 66911 (S.D.N.Y. Sept. 7, 2007) .................................51, 52

*AIG Global Sec. Lending Corp. v. Banc of Am. Secs., LLC*,
    2005 U.S. Dist. LEXIS 21605 (S.D.N.Y. Sept. 26, 2005) .....................................55

*Akerman v. Oryx Commc'ns, Inc.*,
    609 F. Supp. 363 (S.D.N.Y. 1984) ....................................................................22

*In re Alcatel Sec. Litig.*,
    382 F. Supp. 2d 513 (S.D.N.Y. 2005) ................................................................21

*In re Alstom SA Sec. Litig.*,
    406 F. Supp. 2d 402 (S.D.N.Y. 2005) ................................................................66

*Alves v. Harvard Pilgrim Health Care, Inc.*,
    204 F. Supp. 2d 198 (D. Mass. 2002) ................................................................18

*In re Am. Cont'l Corp./Lincoln Sav. and Loan Sec. Litig.*,
    794 F. Supp. 1424 (D. Ariz. 1992) ....................................................................17

*In re Ames Dep't Stores, Inc. Note Litig.*,
    991 F.2d 968 (2d Cir. 1993).........................................................................65, 66

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) ........................................................................... passim

*Atlas v. Accredited Home Lenders Holding Co.*,
    556 F. Supp. 2d 1142 (S.D. Cal. 2009).........................................................28, 45

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)................................................................................10

*Bano v. Union Carbide Corp.*,
    361 F.3d 696 (2d Cir. 2004)..............................................................................53

*Barnes v. Osofsky*,
    373 F.2d 269 (2d Cir. 1967).........................................................................15, 17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544, 127 S. Ct. 1955 (2007)...............................................11, 21, 24, 25

*Berwecky v. Bear, Stearns & Co.*,
    197 F.R.D. 65 (S.D.N.Y. 2000) ...........................................................................17

*In re Blech Sec. Litig.*,
    No. 94 Civ. 7696 (RWS), 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) ..............16

*Blum v. Yaretsky*,
    457 U.S. 991, 102 S. Ct. 2777 (1982) ..................................................................15

*Boykin v. KeyCorp*,
    521 F.3d 202 (2d Cir. 2008)..................................................................................25

*Briarwood Invs., Inc. v. Case Invs. Trust, Inc.*,
    2009 U.S. Dist. LEXIS 18963 (S.D.N.Y. Mar. 4, 2009) ......................................36

*In re Brooks Automation Inc. Sec. Litig.*,
    2007 U.S. Dist. LEXIS 88045 (D. Mass. Nov. 6, 2007) .......................................21

*Burstyn v. Worldwide Xceed Group, Inc.*,
    2002 WL 31191741 (S.D.N.Y. Sept. 30, 2002)...............................................45, 51

*In re Cabletron Sys.*,
    311 F.3d 11 (1st Cir. 2002).....................................................................................53

*Caiola v. Citibank, N.A.*,
    295 F.3d 312 (2d Cir. 2002)....................................................................................47

*Capri v. Murphy*,
    856 F.2d 473 (2d Cir. 1988)....................................................................................22

*Caranci v. Blue Cross & Blue Shield*,
    194 F.R.D. 27 (D.R.I. 2000) ...................................................................................18

*Cates v. Cooper Tire & Rubber Co.*,
    253 F.R.D. 422 (N.D. Ohio 2008) ..........................................................................18

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care,
    L.L.C*,
    433 F.3d 181 (2d Cir. 2005).....................................................................................15

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care,
    L.L.C.*,
    504 F.3d 229 (2d Cir. 2007)...............................................................................15, 18

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002).....................................................................................12

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ........................................................ passim

*Dartley v. ErgoBilt Inc.*,
    2001 WL 313964 (N.D. Tex. Mar. 29, 2001) .......................................................22

*DDi Corp. Sec. Litig.*,
    2005 WL 3090882 (C.D. Cal. 2005) ...............................................................16, 21

*DeMaria v. Andersen*,
    318 F.3d 170 (2d Cir. 2003) .........................................................................17, 22

*In re Deutsche Telekom AG Sec. Litig.*,
    2002 WL 244597 (S.D.N.Y. Feb. 20, 2002) .......................................................22

*Dodds v. Cigna Secs., Inc.*,
    12 F.3d 346 (2d Cir. 1993) ..........................................................................55, 61

*Dorchester Investors v. Peak Int'l Ltd.*,
    134 F. Supp. 2d 569 (S.D.N.Y. 2001) ............................................................55, 68

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
    2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000) ................................................16, 55

*ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*,
    2009 U.S. App. LEXIS 972 (2d Cir. Jan. 21, 2009) .............................................28

*Eisenberg v. Gagnon*,
    766 F.2d 770 (3d Cir. 1985) .............................................................................16

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) ..........................................................................69

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
    2004 WL 405886 (S.D. Tex. Feb. 25, 2004) ........................................................22

*In re Executive Telecard, Ltd. Sec. Litig.*,
    913 F. Supp. 280 (S.D.N.Y. 1996) .....................................................................55

*Feinman v. Dean Witter Reynolds, Inc.*,
    84 F.3d 539 (2d Cir. 1996) ..........................................................................27, 36

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    308 F. Supp. 2d 249 (S.D.N.Y. 2004) .................................................................17

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    352 F. Supp. 2d 429 (S.D.N.Y. 2005) .................................................................52

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   2009 U.S. Dist. LEXIS 37090 (S.D.N.Y. Mar. 23, 2009) ..........................................34, 37, 48

*Fogarazzo v. Lehman Bros., Inc.*,
   341 F. Supp. 2d 274 (S.D.N.Y. 2004) ...............................................................................63, 65

*Foman v. Davis*,
   371 U.S. 178 (1962) ..................................................................................................................69

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*,
   376 F. Supp. 2d 385 (S.D.N.Y. 2005) ......................................................................................10

*In re Friedman's, Inc. Sec. Litig.*,
   385 F. Supp. 2d 1345 (N.D. Ga. 2005) .....................................................................................18

*Fuqua v. Ernst & Young LLP*,
   2002 WL 535085 (2d Cir. 2002)...............................................................................................53

*In re Fuwei Films Sec. Litig.*,
   2009 U.S. Dist. LEXIS 59658 (S.D.N.Y. July 10, 2009) ............................................37, 38, 41

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000).......................................................................................................27

*Garb v. Republic of Poland*,
   440 F.3d 579 (2d Cir. 2006).......................................................................................................12

*Garber v. Legg Mason*,
   537 F. Supp. 2d 597 ..............................................................................................................27, 28

*Gargiulo v. Demartino*,
   527 F. Supp. 2d 384 (E.D. Pa. 2007) ........................................................................................21

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147, 102 S. Ct. 2364 (1982)........................................................................................15

*Giarraputo v. Unumprovident Corp.*,
   2000 U.S. Dist. LEXIS 19138 (D. Me. Nov. 8, 2000)..............................................................37

*In re Global Crossing*,
   322 F. Supp. 2d .................................................................................................................51, 52, 53

*In re Global Crossing, Ltd. Sec. Litig.*,
   313 F. Supp. 2d 189 (S.D.N.Y. 2003)........................................................................................17

*Goldman v. Belden*,
   754 F.2d 1059 (2d Cir. 1985).............................................................................................27, 36

*Grand Lodge of Pa. v. Peters*,
  550 F. Supp. 2d 1363 (M.D. Fla. 2008)...................................................................21

*In re Grand Theft Auto Video Game Consumer Litig.*,
  2006 WL 3039993 (S.D.N.Y. Oct. 25, 2006) .........................................................14

*Grasty v. Amalgamated Clothing & Textile Workers Union*,
  828 F.2d 123 (3d Cir. 1987)...................................................................................14

*Gratz v. Bollinger*,
  539 U.S. 244, 123 S. Ct. 2411 (2003)...................................................................15

*Griffin v. PaineWebber, Inc.*,
  2001 WL 740764 (S.D.N.Y. June 29, 2001) .........................................................22

*Gustafson v. Alloyd Co.*,
  513 U.S. 561 (1995).........................................................................................21, 32

*Harris v. City of New York*,
  186 F.3d 243 (2d Cir. 1999)...................................................................................58

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983).................................................................................3, 11, 38

*Hevesi v. Citigroup, Inc.*,
  366 F.3d 70 (2d Cir. 2004).....................................................................................16

*Hicks v. Morgan Stanley & Co.*,
  2003 WL 21672085 (S.D.N.Y. July 16, 2003) .....................................................16

*Hoffman v. UBS-AG*,
  591 F. Supp. 2d 522 (S.D.N.Y. 2008)...................................................................17

*Hotel Employees & Rest. Employees Union Local 100 v. State of N.Y. Dep't of Parks & Rec.*,
  311 F.3d 534 (2d Cir. 2002)...................................................................................12

*Hoxworth v. Blinder, Robinson & Co.*,
  980 F.2d 912 (3d Cir. 1992)...................................................................................16

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*,
  936 F.2d 759 (2d Cir. 1991)...................................................................................34

*Ingenito v. Bermec Corp.*,
  441 F. Supp. 525 (S.D.N.Y. 1977).........................................................................49

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003)............................................................ passim

*In re Intial Public Offering Sec. Litig.*,
    2004 U.S. Dist. LEXIS 9284 (S.D.N.Y. May 21, 2004) .................................................64, 65

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A.*,
    146 F.3d 66 (2d Cir. 1998)......................................................................................12

*Jackson v. First Fed. Sav., F.A.*,
    709 F. Supp. 863 (E.D. Ark. 1988) .......................................................................22

*Jaser v. New York Prop. Ins. Underwriting Ass'n*,
    815 F.2d 240 (2d Cir. 1987)..............................................................................41, 69

*In re JDS Uniphase Corp. Sec. Litig.*,
    2005 WL 43463 (N.D. Cal. Jan. 6, 2005) ............................................................24

*Joseph v. Wiles*,
    223 F.3d 1155 (10th Cir. 2000) ............................................................................17

*In re Juniper Networks, Inc. Sec. Litig.*,
    542 F. Supp. 2d 1037 (N.D. Cal. 2008) ...............................................................17

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)..................................................................................58

*Kassner v. 2nd Ave. Delicatessen, Inc.*,
    496 F.3d 229 (2d Cir. 2007)..................................................................................10

*Lapin v. Goldman Sachs Group, Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006)..................................................................66

*LC Capital Partners, LP v. Frontier Ins. Group*,
    318 F.3d 148, 156 (2d Cir. 2003).........................................................................54

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161, 168 (2d Cir. 2005).........................................................................54

*Levitt v. Bear Stearns & Co.*,
    340 F.3d 94 (2d Cir. 2003)..............................................................................55, 61

*Marks v. CDW Computer Ctrs.*,
    122 F.3d 363, 367 (7th Cir. 1997))......................................................................54

*Maywalt v. Parker & Parsley Petroleum Co.*,
    147 F.R.D. 51 (S.D.N.Y. 1993) ...........................................................................16

*Menowitz v. Brown*,
    991 F.2d 36 (2d Cir. 1993)....................................................................................55

*In re Metlife Demutualization Litig.*,
    2009 U.S. Dist. LEXIS 46730 (E.D.N.Y. May 27, 2009) .....................................................27

*Miller v. Lazard, Ltd.*,
    473 F. Supp. 2d 571 (S.D.N.Y. 2007)...............................................................................37, 44

*Milman v. Box Hill Sys. Corp.*,
    72 F. Supp. 2d 220 (S.D.N.Y. 1999)...........................................................................27, 36, 66

*In re MobileMedia Sec. Litig.*,
    28 F. Supp. 2d 901 (D.N.J. 1998) ............................................................................................16

*Mobley v. Acme Mkts., Inc.*,
    473 F. Supp. 851 (D. Md. 1979) ..............................................................................................14

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009)..............................................................................44, 57, 66

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
    2008 U.S. Dist. LEXIS 106909 (S.D.N.Y. Feb. 2, 2008)................................................39, 41

*Mutchka v. Harris*,
    373 F. Supp. 2d 1021 (C.D. Cal. 2005) ...................................................................................16

*In re N2K Inc. Sec. Litig.*,
    82 F. Supp. 2d 204 (S.D.N.Y. 1999).......................................................................................39

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) ...................................................................................44

*Newman v. Warnaco Group, Inc.*,
    335 F.3d 187 (2d Cir. 2003).............................................................................................53, 67

*Nivram Corp. v. Harcourt Brace Joranovich, Inc.*,
    840 F. Supp. 243 (S.D.N.Y. 1993).........................................................................................53

*In re NovaGold Res., Inc. Sec. Litig.*,
    2009 WL 1575220 (S.D.N.Y. June 5, 2009) ........................................................................10

*In re Number Nine Visual Tech. Corp. Sec. Litig.*,
    51 F. Supp. 2d 1 (D. Mass. 1999) ...........................................................................................37

*Olkey v. Hyperion 1999 Term TRUST*,
    98 F. 3d 2 (2d Cir. 1996) .........................................................................................................37

*Oneida Indian Nation v. New York*,
    691 F.2d 1070 (2d Cir. 1982)..................................................................................................11

*P. Stolz Family P'ship L.P. v. L.P. Daum*,
    355 F.3d 92 (2d Cir. 2004).................................................................47

*P. Stolz Family P'Ship L.P. v. Daum*,
    166 F. Supp. 2d 871 (S.D.N.Y. 2001)...............................................51

*Panther Partners, Inc. v. Ikanos Communc'ns, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008)...............................................39

*In re Paracelsus Corp., Sec. Litig.*,
    6 F. Supp. 2d 626 (S.D. Tex. 1998) ..................................................18

*In re Philip Servs. Corp. Sec. Litig.*,
    383 F. Supp. 2d 463 (S.D.N.Y. 2004)...............................................52

*Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*,
    1996 WL 739170 (W.D. Mich. Sept. 27, 1996) ...............................17

*Pinter v. Dahl*,
    486 U.S. 622 (1988)...............................................................31, 48

*In re Polaroid Corp. Sec. Litig.*,
    465 F. Supp. 2d 232 (S.D.N.Y. 2006)...............................................54

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    163 F.R.D. 200 (S.D.N.Y. 1995) ......................................................16

*Randall v. Loftsgaarden*,
    478 U.S. 647 (1986)....................................................................3, 4

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..........................................................37, 38

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007)..........................................................12, 58

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000).............................................................61

*In re Salomon Analyst Level 3 Litig.*,
    373 F. Supp. 2d 248 (S.D.N.Y. 2005)...............................................42, 43

*Schnall v. Annuity and Life Re (Holdings), Ltd.*,
    2004 WL 367644 (D. Conn. Feb. 22, 2004) ....................................45

*Schoenhaut v. Am. Sensors*,
    986 F. Supp. 785 (S.D.N.Y. 1997)....................................................22

*In re Scottish Re Group Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007)..............................................................21, 41

*SEC v. Capital Gains Research Bureau, Inc.*,
    375 U.S. 180, 84 S. Ct. 275 (1963)........................................................................31

*SEC v. Chinese Consol. Benevolent Ass'n*,
    120 F.2d 738 (2d Cir. 1941), *cert. denied*, 314 U.S. 618 (1941)..........................48

*SEC v. Kern*,
    425 F.3d 143 (2nd Cir. 2005).............................................................................48, 49

*SEC v. N. Am. Research & Dev. Corp.*,
    424 F.2d 63 (2d Cir. 1970)......................................................................................49

*SEC v. Universal Express, Inc.*,
    475 F. Supp. 2d 412 (S.D.N.Y. 2007)....................................................................49

*Shah v. Meeker*,
    435 F.3d 244 (2d Cir. 2006)........................................................................54, 61, 62

*Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.*,
    941 F. Supp. 1369 (S.D.N.Y. 1996)......................................................................64

*Smith v. United Healthcare Servs., Inc.*,
    2002 WL 192565 (D. Minn. Feb. 5, 2002) ............................................................18

*Special Situations Fund, III, L.P. v. Cocchiola*,
    2007 U.S. Dist. LEXIS 56627 (D.N.J. Aug. 2, 2007)...........................................49

*Staehr v. Hartford Fin. Servs. Group, Inc.*,
    547 F.3d 406 (2d Cir. 2008)........................................................................... passim

*In re StockerYale Sec. Litig.*,
    453 F. Supp. 2d 345 (D.N.H. 2006).......................................................................44

*In re SupportSoft, Inc. Sec. Litig.*,
    2005 WL 3113082 (N.D. Cal. Nov. 21, 2005) ......................................................13

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006).............................................................................15, 21

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506, 122 S. Ct. 992 (2002)......................................................................10

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    2005 U.S. Dist. LEXIS 19506 (S.D.N.Y. 2005)...............................................54, 65

*Tedesco v. Mishkin*,
    689 F. Supp. 1327 (S.D.N.Y. 1988)..............................................................16

*Thompson v. Metro. Life Ins. Co.*,
    149 F. Supp. 2d 38 (S.D.N.Y. 2001).............................................................57

*Tokio Marine & Fire Ins. Co. v. Employers Ins. of Wausau*,
    786 F.2d 101 (2d Cir. 1986)..........................................................................69

*TSC Indus. v. Northway, Inc.*,
    426 U.S. 438 (1976)..........................................................................27, 28, 47

*In re Twinlab Corp. Sec. Litig.*,
    103 F. Supp. 2d 193 (E.D.N.Y. 2000) ....................................................11, 38

*In re Union Carbide Class Action Sec. Litig.*,
    648 F. Supp. 1322 (S.D.N.Y. 1986)...............................................................27

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003).......................................................24, 37

*In re Wash. Mut.*,
    2008 U.S. Dist. LEXIS 41575 (W.D. Wash. 2009)......................................28

*In re WebSecure Sec. Litig.*,
    182 F.R.D. 364 (D. Mass. 1998)...................................................................22

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996)............................................................................21

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003).......................................................11, 51

*In re WorldCom, Inc. Sec. Litig.*,
    2003 WL 22790942 (S.D.N.Y. Nov. 25, 2003)............................................57

*In re WRT Energy Sec. Litig.*,
    2005 WL 2088406 (S.D.N.Y. Aug. 30, 2005)..............................................11

*Wynder v. McMahon*,
    360 F.3d 73 (2d Cir. 2004)............................................................................25

## STATUTES, RULES & REGULATIONS

15 U.S.C. 77k(a) ............................................................................... passim

15 U.S.C. § 77b(a)(11)..............................................................................48, 49

15 U.S.C. § 77k(a)(5)..................................................................................46, 48

15 U.S.C. § 77k(b) ........................................................................................................3

15 U.S.C. § 77m ..........................................................................................................53

15 U.S.C. § 77o ...........................................................................................................51

29 U.S.C. § 1132(a)(1)(B) ..........................................................................................18

Fed. R. Civ. P. 15(a) ...................................................................................................68

Fed. R. Evid. 201(b) ....................................................................................................11

The Public Employees' Retirement System of Mississippi ("Lead Plaintiff"), along with the Wyoming State Treasurer ("Wyoming"), the Los Angeles County Employees Retirement Association ("LACERA"), the Connecticut Carpenters Pension Fund and Connecticut Carpenters Annuity Fund ("Connecticut Carpenters"), and Iron Workers Local No. 25 Pension Fund ("Iron Workers") (collectively, "Plaintiffs"), submit this Memorandum of Law in opposition to the Motion of The Merrill Lynch Defendants and the Individual Defendants To Dismiss the Consolidated Class Action Complaint ("ML Mot."); the Motion to Dismiss of ABN AMRO, Incorporated and JP Morgan Securities, Inc. ("Underwriter Mot."); and the Motion to Dismiss of Credit-Based Asset Servicing and Securitization LLC ("C-BASS Mot.").  Doc. Nos. 59, 56, and 67.

I.    <u>INTRODUCTION</u>

This securities class action arises from Defendants' sale of mortgage pass-through certificates ("Certificates") through offering documents that contained untrue statements and omitted material facts.  Plaintiffs assert claims for violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") against Merrill Lynch & Co., Inc. ("Merrill Lynch") and the entities that structured and sold the Certificates,[1] the underwriters,[2] the Individual Defendants who signed the registration statements,[3] and the rating agencies that were

---

[1]  Merrill Lynch Mortgage Investors, Inc. (the "Merrill Depositor"), Merrill Lynch Mortgage Lending, Inc. (the "Merrill Sponsor"); Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch PFS"); First Franklin Financial Corporation ("First Franklin"); and Credit-Based Asset Servicing and Securitization LLC ("C-BASS").

[2]  "Underwriter Defendants" refers to Merrill Lynch PFS; J.P. Morgan Securities, Inc. ("J.P. Morgan"); and ABN AMRO Incorporated ("ABN AMRO").

[3]  "Individual Defendants" refers to Matthew Whalen; Paul Park; Brian T. Sullivan; Michael M. McGovern; Donald J. Puglisi; and Donald C. Han.  Each of the Individual Defendants signed at least one of the Registration Statements.  ¶¶30-35.

necessary participants in distributing the Certificates and who are therefore liable as underwriters.[4]

Merrill Lynch was a major participant in all aspects of the lucrative market for mortgage-backed securities.  Merrill Lynch established the Merrill Sponsor, who, along with First Franklin and C-BASS, originated and acquired an enormous volume of loans for resale to investors in the form of mortgage-backed securities.  ¶¶5, 38, 58.  Another Merrill Lynch subsidiary, the Merrill Depositor, securitized the loans so that the rights to cash flow from the loans could be sold to investors after obtaining investment-grade ratings from the Rating Agency Defendants.  ¶¶4, 6, 39, 40, 38-39, 58-59, 56, 154, 158, 160, 169.  From January 2006 until November 2007, Merrill Lynch sold over $63 billion of Certificates pursuant to the three Registration Statements at issue in this case.[5]  The Certificates maintained their investment-grade ratings until April 2008.  ¶160.  However, they have since been downgraded due to soaring foreclosures and delinquencies in the loan pools.  ¶¶174-75.

As set forth below, the Offering Documents purported to describe the loans and the quality of the investments but contained untrue statements and omitted material facts that were necessary to make the statements in the Offering Documents not misleading.  By way of example, the Prospectus Supplements claimed that "[a]ll of the Mortgage Loans were required to meet the underwriting criteria substantially similar to that described in this prospectus

---

[4]  "Rating Agency Defendants" refers to McGraw-Hill Companies, a division of which is Standard & Poor's ("McGraw-Hill"), and Moody's Investors Service, Inc. ("Moody's").  The Rating Agency Defendants each filed separate motions to dismiss ("Moody's Mot."; "McGraw-Hill Mot.").  Doc. Nos. 61, 62.  For facts and law opposing such motions, Plaintiffs respectfully refer the Court to their concurrently-filed opposition brief.

[5]  The August Registration Statement, the December Registration Statement and the March Registration Statement are collectively referred to herein as the "Registration Statements."  The Registration Statements, Prospectuses and each of the respective Prospectus Supplements are collectively referred to herein as the "Offering Documents."

supplement." ¶63.  Loans were purportedly made based on careful analysis of borrowers' credit histories, willingness and ability to repay mortgages, and the adequacy of mortgaged property as collateral.  ¶¶47, 60, 66, 91, 100, 108-09, 113.  In truth, the originators systematically departed from underwriting standards and disregarded appraisal standards in order to increase loan volume.

The Offering Documents contained additional material misstatements and omissions regarding the value of the underlying real estate and the appraisal standards by which such real estate was valued, as well as the level of credit enhancement and the credit ratings.  The Complaint's allegations of falsity are well supported by, among other facts, witness accounts and internal documents, the findings of government investigations and ensuing lawsuits, and the reported findings and conclusions from governmental hearings and investigations. Plaintiffs have alleged reliable, contemporaneous facts that collectively demonstrate the falsity of the Offering Documents.  Nothing more is required at the pleading stage.

In short, the Complaint is a well-pled document, complying with Supreme Court and Second Circuit precedent.  The Supreme Court has noted that liability under §§ 11 and 12 of the Securities Act is "virtually absolute, even for innocent misstatements."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) (citing 15 U.S.C. § 77k(b)).  Section 11 of the 1933 Act "was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering."  *Id*. at 381-82.  Section 12(a)(2) of the 1933 Act provides similar liability for misstatements in the prospectuses.  *Randall v. Loftsgaarden*, 478 U.S. 647 (1986).  In sum, the 1933 Act provides a "harsh, nearly strict-liability rule designed to make sure those involved in securities offerings meticulously prepare the registration statement."  *In re Countrywide Fin. Corp. Sec. Litig.*, 588

F. Supp. 2d 1132, 1170 n.47 (C.D. Cal. 2008).  Congress implemented this harsh remedy because the 1933 Act "'[aims] . . . to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation [and] to place adequate and true information before the investor.'"  *Loftsgaarden*, 478 U.S. at 659 (quoting S. Rep. No. 476-73, at 1 (1st Sess. 1933)).

Contrary to Defendants' assertions, Plaintiffs have standing to assert claims on behalf of investors who purchased in each of the trusts.  Each Plaintiff alleges purchases of Certificates pursuant or traceable to the Registration Statements; thus, each Plaintiff has stated an individual claim against Defendants under Sections 11 and 12 of the Securities Act in accordance with both Article III of the United States Constitution and statutory standing requirements.  Their ability to represent absent class members who purchased in different trusts is not a question of standing, but is merely a question of Rule 23 typicality (which, given the extensive overlap of representations in the various Offering Documents, will be satisfied at class certification).

In their motions, Defendants assert that the Offering Documents so obviously contained false and misleading statements that Plaintiffs should have asserted their claims sooner – in fact, that the claims were ***probable*** by some unspecified time before December 2007.  *See* ML Mot. at 11-33; Underwriter Mot. at 3; C-BASS Mot. at 17.  Defendants are wrong.  Securities Act claims on behalf of Merrill Lynch Certificate purchasers were not probable until, at the earliest, April 24, 2008, when Moody's and S&P first downgraded the investment-grade Certificates to below-investment grade.  ¶160.  The various lawsuits, general news articles and transcript upon which Defendants rely in their attempt to demonstrate inquiry notice make no mention of the Merrill Lynch Certificates at issue in this litigation.

While contending in one breath that Plaintiffs' claims were so obvious that they should have been asserted sooner, Defendants inconsistently assert in the next breath that no claim exists because the omitted information was in fact disclosed in the Offering Documents. *See* ML Mot. at 37-41; Underwriter Mot. at 4-9; C-BASS Mot. at 17-22. Not so. As explained below, the purported "disclosures" do not even remotely match the omitted information set forth in the Complaint.

Attempting to create a scienter requirement where none exists, Defendants contend that they only had a duty to disclose "known" omitted information about underwriting violations. ML Mot. at 6, 41-43. Focusing exclusively on their omissions, however, Defendants ignore that Section 11 first and foremost imposes strict liability for any material "untrue statement" in a registration statement. Material omissions are also actionable. Here, Defendants misconstrue Regulation AB, asserting that their disclosure obligation for omitted information is limited to just subpart (a)(3) of Item 1111. In truth, the disclosure obligations under Regulation AB are much broader. *See, e.g.,* 17 C.F.R. § 229.1110. In addition, separate and apart from Regulation AB, Defendants had an affirmative duty to state all material facts in the Offering Documents "necessary to make the statements therein not misleading," 15 U.S.C. § 77k(a), and failed to do so.

Defendants also attempt to rewrite the Complaint in order to blame the "economic downturn" for skyrocketing delinquencies and foreclosures in the loan pools. ML Mot. at 1, 3, 6; Underwriter Mot. at 7-8; C-BASS Mot. at 9-10, 19. If, at trial, Defendants wish to attempt to blame other factors, they may do so. Such contentions are not grounds for dismissal. At this stage, "[i]t is not the Court's role to speculate on the causes of the current economic situation." *Countrywide,* 588 F. Supp. 2d at 1173-74 (rejecting defendants' argument that mortgage lender

suffered losses due to "an 'unprecedented' external 'liquidity crisis'" and "other macroeconomic arguments"). Accordingly, Defendants' Motions to Dismiss should be denied.

## II. SUMMARY OF ALLEGATIONS

Merrill Lynch, acting in coordination with the Rating Agency Defendants, sold over $63 billion of Certificates to investors in 84 different trusts pursuant to the Offering Documents. ¶¶42-44. The Certificates were sold primarily to conservative institutional investors, such as Plaintiffs here, who purchased the Certificates as purportedly safe, investment-grade investments. ¶53. As set forth below, however, the Offering Documents contained untrue statements of material fact, or omitted to state material facts necessary to make statements about the underlying loans and their origination not misleading.

Before the proliferation of securitized residential loans, the traditional mortgage model involved a bank loaning money to a borrower and also retaining the risk that the borrower would default. ¶121. Under the traditional model, the loan originator had financial incentives to use prudent underwriting practices to ensure that the borrower had the ability to repay the note and that the underlying property was sufficiently valuable to serve as collateral. *Id.* With the proliferation of securitizations, however, the traditional model gave way to the "originate to distribute" model. ¶122. Under this model, the originator sold its mortgages into the secondary market, where the loans were pooled together, securitized and sold to investors in the form of mortgage-backed securities. Securitization meant that the originators were no longer required to hold them to maturity, and the credit risk was instead transferred to investors. ¶123. It is now known that such selling of mortgages undermined the originator's incentives to follow prudent underwriting practices. Loan fees and sales revenue became the originator's primary profit mechanism, making the sheer quantity of loans more important than the quality of the loans.

This model was highly lucrative for Wall Street banks during the housing boom, and Merrill Lynch was at the center of the frenzy, originating and funding sub-prime loans and securitizing the increasing numbers of loans. In 2005, Merrill Lynch purchased a 20% share in one of its primary loan originators, Ownit Mortgage Solutions, Inc. ("Ownit"). ¶102. Merrill Lynch established the Merrill Sponsor and First Franklin and, together with C-BASS, originated and acquired enormous volumes of loans from various loan originators, including Countrywide Home Loans, Inc. ("Countrywide"), American Home Mortgage Corp. ("American Home Mortgage"), Wells Fargo and others. ¶¶65-118.

Merrill Lynch established another subsidiary, the Merrill Depositor, to securitize the loans obtained by its sponsors, so that the rights to cash flow from the inventory of loans could be sold to investors. ¶¶38-9, 58-9. To complete the sale of the loans (and to transfer the risk), Merrill needed to create securities in the form of certificates that would be branded with the highest investment-grade ratings from rating agencies.

Defendants Moody's and McGraw-Hill (through its division, Standard & Poor's ("S&P's")) rated the Certificates. ¶¶4, 6, 39, 40. The ratings were critically important and necessary in order for Merrill Lynch to issue the Certificates. ¶¶56, 154, 158, 160, 169. Ratings, which allow investors to compare the risk profiles of different investments in order to determine equivalent levels of risk, are supposed to be objective and independent. ¶¶4, 6, 169. Moody's highest investment rating is "Aaa." S&P's highest rating is "AAA." ¶¶6, 39. These ratings signify the highest investment-grade, are considered to be of the "best quality," and are supposed to carry the smallest degree of investment risk. Ratings of "AA," "A," and "BBB" represent high credit quality, upper-medium credit quality and medium credit quality, respectively. *Id.*

7

These ratings are considered "investment-grade ratings."  Any instrument rated lower than BBB or Bbb are considered below investment-grade.  *Id.*

Many institutional investors, such as banks, mutual funds and public pension funds, are required to purchase and hold only "investment-grade" instruments and securitized interests. ¶53.  Thus, Merrill Lynch required that each Certificate have a pre-determined rating as a condition of its sale.  ¶¶56, 154, 158, 160, 169.  The Offering Documents state that, as a "condition to the issuance of any class of Offered Securities[,] they shall have been rated not lower than investment grade, that is, in one of the four highest rating categories, by a Rating Agency."  ¶169.  The Offering Documents, however, omitted to state that the rating agencies were paid to issue investment-grade ratings, and that the compensation of the rating agency manager was determined by market share and revenue growth, not based on the accuracy of ratings.  ¶¶169-72.

The Offering Documents stated that the ratings assigned to the Certificates "address the likelihood of the receipt by certificateholders of payments required under the operative agreements."  ¶154.  The ratings "take into consideration the credit quality of the mortgage pool including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream of the mortgage pool is adequate to make payments under the certificates."  *Id.*  The Offering Documents failed to disclose that the Rating Agency Defendants used outdated and unreliable models when rating MBS between 2005 and 2007.  ¶¶166-67.  Accordingly, the Certificates' ratings were unjustifiably high.  ¶¶9, 151, 157, 161.

The Certificates were collateralized by residential mortgages, meaning the investors' interest and principal payments depended on payments from borrowers on the underlying

mortgages.  ¶¶45-50.  The quality of the underlying loans and the value of the collateral were, therefore, material information.  The Offering Documents contained specific sections describing the originators and purported "Underwriting Guidelines" used to originate the mortgage collateral (¶¶60-3); the supposed appraised value of the properties and the Loan-to-Value ("LTV") ratios of the underlying mortgages (¶¶139-44); and the collateralization and credit enhancements of the issuing trusts (¶¶152-56).

The Offering Documents specifically set forth the Underwriting Guidelines and provided that the originators were required to assess borrower creditworthiness through an examination and verification of borrower assets, credit history and employment.  ¶¶58, 60.  The Guidelines, however, contained material misstatements and omissions because, in fact, the Guidelines were systematically disregarded.  ¶¶7, 57, 60-4.  The Complaint details the unsound and reckless underwriting practices of originators identified in the Offering Documents.  ¶¶65-138.

Likewise, the Offering Documents contain detailed descriptions of the supposed valuation of the properties through standard appraisals and the LTV ratio of the loans.  ¶¶139-44, 150-51.  Contrary to these representations, loans were frequently based on inflated appraisals and understated LTV ratios.  ¶¶145-49, 151.  Moreover, statements in the Offering Documents about "credit enhancement," including "overcollateralization" (¶¶152-56), were materially false and omitted the true facts about the failure of originators to follow their stated underwriting and property appraisal standards.  ¶157.

The credit crisis and collapse of the mortgage markets triggered a number of governmental and other investigations, the findings of which only emerged in 2008.  ¶¶162-5, 172.  Such findings support the Complaint's allegations that the quality of the loans and the collateral underlying the Certificates had been overstated since inception.  ¶¶7, 9, 164.  Until

April 24, 2008, Moody's and S&P maintained investment-grade ratings on the Certificates. ¶160.  However, the ratings on virtually all of the Certificates within each of the Issuing Trusts have since been downgraded.  ¶¶9, 167, 173.  Further, the delinquency, foreclosure and bank ownership rates on the underlying mortgages have soared.  For example, in one of the Issuing Trusts, more than 67% of the underlying mortgages are either 60 days or more delinquent, in foreclosure, or the collateral was retaken by the lender.  ¶174.  In the Merrill Lynch Mortgage Investors Trust, Series 2006-RM3, more than 37% of the underlying mortgage loans are in foreclosure.  *Id.*  Likewise, in the Merrill Lynch Mortgage Investors Trust, Series 2006–FM1, more than 36% of the underlying mortgages are in foreclosure.  *Id.*  Given the significant downgrades and delinquencies, Plaintiffs' Certificates have lost substantial value.  ¶¶9, 173, 201.

III.    LEGAL ARGUMENT

In assessing Defendants' Rule 12(b)(6) motion, the Court must accept the Complaint's factual allegations as true and draw all inferences in Plaintiffs' favor.  *See Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC,* 376 F. Supp. 2d 385, 393 (S.D.N.Y. 2005).  The issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511, 122 S. Ct. 992, 997 (2002).  The court "accept[s] all factual allegations in the complaint."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

Securities Act claims are governed by the notice pleading standard set forth in Fed. R. Civ. P. 8(a), requiring just "a short and plain statement of the claim showing that the pleader is entitled to Relief."  *In re NovaGold Res., Inc. Sec. Litig.*, No. 08 Civ. 7041 (DLC), 2009 WL 1575220, at *14-*15 (S.D.N.Y. June 5, 2009).  As the Supreme Court recently reaffirmed in *Ashcroft v. Iqbal,* "the pleading standard Rule 8 announces 'does not require detailed factual

allegations,'" though the complaint must offer more than just "a formulaic recitation of the elements of the causes of action." 129 S. Ct. 1937, 1949. Under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007), a pleader must "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" *Iqbal*, 129 S. Ct. 1937, 1949 (emphasis in original). To satisfy this plausibility standard, a ***probability*** of entitlement to relief need not be shown; rather, a plaintiff must only show that the mere plausibility of entitlement to relief has been pled.

Section 11 of the Securities Act imposes a "stringent standard of liability" and "places a relatively minimal burden on a plaintiff." *Herman & MacLean*, 459 U.S. at 381-82, 103 S. Ct. 683, 686-87. The plaintiff need only "allege that he purchased the security and that the registration statement contains false or misleading statements concerning a material fact."[6]

Here, the Complaint's allegations readily satisfy Rule 8. Rather than accept as true the well-pleaded allegations, Defendants rely upon matters outside of the Complaint and on unwarranted factual inferences and assertions that are not subject to judicial notice. ML Mot. at 2-3, 14-33; C-BASS Mot. at 9-10, 19-21. Absent a valid request for judicial notice, matters extraneous to the Complaint cannot be considered.[7] When a court considers extrinsic documents

---

[6] *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 201 (E.D.N.Y. 2000) (internal citation omitted); *In re WRT Energy Sec. Litig.*, No. 96 Civ. 3610 (JFK), 2005 WL 2088406, at *1 (S.D.N.Y. Aug. 30, 2005); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 407-08 (S.D.N.Y. 2003) (finding it sufficient for purposes of pleading a Section 11 claim for plaintiff to allege that "'material facts have been omitted' from a registration statement or 'presented in such a way as to obscure or distort their significance'").

[7] For a court to take judicial notice of an adjudicative fact, it must be "one not subject to dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). *See, e.g., Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 424-25 (2d Cir. 2008) (court must not judicially notice extraneous materials for "the truth of their contents"); *Oneida Indian Nation v. New York,* 691 F.2d 1070,

that are not proper for judicial notice, it must convert the motion to a motion for summary judgment and provide plaintiffs with an opportunity to conduct discovery and submit additional supporting materials. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 154-55 (2d Cir. 2002).

Here, Defendants attempt to introduce extraneous "evidence" and spin the "facts" in their favor. For example, Defendants attempt to introduce the out-of-court statements of a *New York Times* reporter for the truth of his statements about the "nationwide collapse" of the real estate market.[8] Such assertions are outside of the Complaint and not the proper subject for judicial notice. Moreover, Defendants' spin of the "facts" – that the "nationwide collapse" supposedly caused the delinquencies and defaults in the pool – is irrelevant at this stage.[9] The Offering Documents' statements about adequate collateral and other credit enhancements were designed

1086 (2d Cir. 1982) (extrinsic evidence not proper basis upon which to grant motion to dismiss without affording plaintiffs an evidentiary hearing).

[8] ML Mot. at 50 (citing Kasner Decl. Ex. 264). Plaintiffs do not object to the Court's consideration of documents that are referenced in or integral to the Complaint or that are properly the subject of judicial notice. *See Staehr,* 547 F.3d at 425; *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). Plaintiffs object, however, to the consideration of any documents outside of the Complaint for the truth of the matters asserted therein. *Id.* at 509 (court cannot take judicial notice of an extrinsic document for the truth of the matter asserted). *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A.*, 146 F.3d 66, 70 (2d Cir. 1998) (court may not take judicial notice of proceedings in another case "for the truth of the matters asserted in the other litigation"). Defendants improperly seek judicial notice of Ex. 100 to show that "many commentators believed that the credit rating agencies were too slow." ML Mot. at 32. Likewise, Plaintiffs object to Ex. 43; it contains excerpts from the book, *Crash Proof: How to Profit from the Coming Economic Collapse* (Wiley 2007), which is neither an authoritative text or treatise, nor academic literature. *See Garb v. Republic of Poland*, 440 F.3d 579, 594 n.18 (2d Cir. 2006) (noting that court has "taken judicial notice of 'authoritative texts,' such as a book setting forth the 'history of Lincoln Center.'") (citing *Hotel Employees & Rest. Employees Union Local 100 v. State of N.Y. Dep't of Parks & Rec.*, 311 F.3d 534, 540 n.1 (2d Cir. 2002)).

[9] ML Mot. at 1, 3, 6; Underwriter Mot. at 7-8; C-BASS Mot. at 9-10, 19. Similarly, as explained below (*infra* at § III.E.2), Defendants' "spin" on the testimony of George Neville, Esq., Special Assistant Attorney General of the Attorney General's Office of the State of Mississippi, is inappropriate to consider on a motion to dismiss and ignores key testimony from Mr. Neville.

to assure investors that they would be protected against a potential housing market downturn. ¶¶51-2, 152-56. As a result of overinflated appraisals (¶¶8, 47, 88, 103, 117-18, 134, 147, 149, 151), Defendants misrepresented the adequacy of the collateral and all of the data necessarily dependent on those appraisals, thereby misrepresenting the Certificates. A housing downturn is not a defense to liability for these misrepresentations.

Defendants also mischaracterize the Complaint's allegations of false and misleading statements as the alleged failure to disclose "the risks associated with subprime mortgages." ML Mot. at 37; Underwriter Mot. at 7; C-BASS Mot. at 5-8. This case, however, is not about the nondisclosure of the risk of subprime loans, or whether subprime loans are riskier than loans conforming to the standards of Fannie Mae or Freddie Mac. While subprime borrowers have financial and credit profiles that render them unable to qualify for prime loans, originators still must properly underwrite subprime loans and value the collateral through legitimate appraisals. Indeed, such underwriting assumes particular importance for subprime borrowers precisely because they do not qualify for prime loans. Hence, the Offering Documents represented that the underwriting included, for example, "an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral." ¶108. The Complaint alleges that the Offering Documents failed to disclose the systematic violations of underwriting standards as originators were motivated, not by the borrower's "ability to repay the mortgage loan," but rather by the drive to increase loan volume.

In short, Defendants' "spin" of the Complaint is not grounds for dismissal. *See In re SupportSoft, Inc. Sec. Litig.*, No. C04-5222, 2005 WL 3113082, at *6 (N.D. Cal. Nov. 21, 2005) (denying motion because "[t]he problem with defendants' position ... is that it miscasts the allegations in plaintiffs' complaint"). "Plaintiffs are the master of their complaint .... Defendants

must take the Complaint[] as [it is] written." *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 332-33 (S.D.N.Y. 2003).

A.    Named Plaintiffs Have Standing To
      Bring The Claims In The Complaint

1.    Claims On Behalf Of Absent Purchasers

By contending that the named plaintiffs do not have "standing" to advance claims based on securities they did not purchase, Defendants "confuse standing and the typicality requirement of Rule 23(a)(3)." *Grasty v. Amalgamated Clothing & Textile Workers Union*, 828 F.2d 123, 130 n.8 (3d Cir. 1987). Because named plaintiffs have standing to advance claims based on their *own* purchases, any challenge to their ability to bring claims on behalf of *absent* class members is not a question of "standing" but of their fitness to represent a defined class, and is therefore inappropriate for resolution on a motion to dismiss. *See id*; *Mobley v. Acme Mkts., Inc.*, 473 F. Supp. 851, 858-59 (D. Md. 1979) ("[d]efendant has confused standing with typicality;" issues concerning the class should not be addressed on a motion to dismiss); *In re Grand Theft Auto Video Game Consumer Litig.*, No. 06-MD1739, 2006 WL 3039993, at *3 (S.D.N.Y. Oct. 25, 2006) (named plaintiffs individually have standing; the question "whether their injuries are sufficiently similar to those of the purported Class …. is, at least in the first instance, appropriately answered through the class certification process").

Ordinarily, no party has standing to bring the claims of another. "The class-action device was designed as 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155, 102 S. Ct. 2364, 2369 (1982). If the named plaintiff has ***individual*** standing to bring claims on his or her own behalf, inquiries regarding the plaintiff's ability to represent *absent* plaintiffs is examined under Rule 23. As the Second Circuit explains:

> To establish Article III standing in a class action … for every named defendant there must be at least one named plaintiff who can assert a claim directly against that defendant, and at that point standing is satisfied and only then will the inquiry shift to a class action analysis.[10]

In this case, the named Plaintiffs allege that they purchased securities in or traceable to one or more of the relevant Offerings, and suffered damages as a result, ¶¶179, 192, 201, 205. They have therefore met the requirements of Article III and Securities Act standing.  *See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C*, 433 F.3d 181, 198 (2d Cir. 2005); *Barnes v. Osofsky*, 373 F.2d 269, 273 (2d Cir. 1967); *In re Suprema Specialties, Inc. Sec. Litig*., 438 F.3d 256, 274 n.7 (3d Cir. 2006).  And, as Plaintiffs make clear in ¶179, "for every named defendant there [is] at least one named plaintiff who can assert a claim directly against that defendant," *Cent. States II*, 504 F.3d at 241.  Therefore, "standing is satisfied and … the inquiry shift[s] to a class action analysis." *Id.*

---

[10]  *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 241 (2d Cir. 2007) ("*Cent. States II*").  *See also* 1 Alba Conte & Herbert B. Newberg, Newberg on Class Actions, § 2.7, at 2-40-41 (4th ed. 2009) ("Whether or not the named plaintiff who meets individual standing requirements may assert the rights of absent class members is neither a standing issue nor an Article III case or controversy issue but depends rather on meeting the prerequisites of Rule 23 governing class actions."); 7AA CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY K. KANE, FEDERAL PRACTICE & PROCEDURE § 1785.1 (3d ed. 2005) ("Representative parties who have direct and substantial interest have standing; the question whether they may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on an assessment of typicality and adequacy of representation.").  To be sure, there has been some confusion distinguishing Article III standing and Rule 23 typicality.  In *Blum v. Yaretsky*, 457 U.S. 991, 102 S. Ct. 2777 (1982), the Supreme Court held that certain named plaintiffs did not have "standing" to represent a subset of absent class members because those class members suffered a different injury from that experienced by the named plaintiffs.  *See id.* at 1001-02.  The same year, the Supreme Court used a Rule 23 typicality analysis to address the same issue.  *Gen. Tel. Co.* 457 U.S. at 158-60, 102 S. Ct. at 2371-72.  For this reason, the Supreme Court acknowledged that "there is tension in our prior cases" regarding the distinction between typicality and standing.  *Gratz v. Bollinger*, 539 U.S. 244, 263 n.15, 123 S. Ct. 2411, 2423 (2003) (citing *Blum* and *Gen. Tel.*).  Without resolving the confusion, *Gratz* explained that whether characterized as Rule 23 or Article III, the question of a named plaintiff's ability to represent *absent* class members depends on whether the named plaintiff's injury "implicate[s] a significantly different set of concerns" than the class's injuries, *id.* at 265, an inquiry facially similar to the test for Rule 23 typicality.

Courts routinely employ this reasoning when dealing with cases involving securities. For example, in *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200 (S.D.N.Y. 1995) – approved in *Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 82-83 (2d Cir. 2004) – the court used an ordinary Rule 23 analysis to permit plaintiffs who had invested in a small subset of 700 partnerships to represent absent class members who had invested in the remaining partnerships. *See Prudential*, 163 F.R.D. at 208; *see also Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 923 (3d Cir. 1992) (investors in 15 securities permitted to advance Section 12 claims on behalf of purchasers of 21 securities); *Eisenberg v. Gagnon*, 766 F.2d 770, 784 (3d Cir. 1985) (investors in two partnerships permitted to represent investors in three different partnerships); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ.4318(HB), 2000 WL 1357509, at *3 (S.D.N.Y. Sept. 20, 2000) ("[C]lass representatives need not have invested in each security so long as the plaintiffs have alleged a single course of wrongful conduct with regard to each security. Courts have not addressed this concern *vis a vis* the doctrine of standing, but rather have examined such concerns pursuant to Rule 23(a)(3)'s typicality requirement.").[11]

---

[11] *See also Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071(HB), 2003 WL 21672085, at *5 (S.D.N.Y. July 16, 2003) (because the plaintiff had Section 11 standing individually, inquiries regarding the plaintiff's ability to represent absent Section 12 claimants concerned "typicality rather than standing"); *Mutchka v. Harris*, 373 F. Supp. 2d 1021, 1024 (C.D. Cal. 2005); *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 911 n.7 (D.N.J. 1998) (plaintiffs have standing to bring their own Section 11 and 12 claims; "Concerns over whether stock purchasers should represent notes purchasers are better addressed at the time of class certification."); *In re DDi Corp. Sec. Litig.*, No. CV-03-7063 NM, 2005 WL 3090882, at *6 (C.D. Cal. July 21, 2005) (same); *In re Blech Sec. Litig.*, No. 94 Civ. 7696 (RWS), 2003 WL 1610775, at *17 (S.D.N.Y. Mar. 26, 2003) (seven named representatives could represent purchasers of all securities because "[t]here need not be a class representative for every Blech security, as long as all the securities are part of a common fraudulent or manipulative scheme"); *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 70-71 (S.D.N.Y. 2000); *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 56-57 (S.D.N.Y. 1993) (named plaintiffs who invested in two partnerships could represent those who had invested in a third partnership); *Tedesco v. Mishkin*, 689 F. Supp. 1327, 1335-36 (S.D.N.Y. 1988) (Securities Act claims; "to satisfy the typicality requirement, it is not necessary for the named plaintiffs to have invested in all of the investment vehicles where complaint

To support their argument that "standing" is lacking, Defendants cite cases holding that Section 11 requires the plaintiff to allege purchases traceable to the offering at issue. *See, e.g.*, *Barnes*, 373 F.2d at 273; *Joseph v. Wiles*, 223 F.3d 1155, 1159 (10th Cir. 2000); *DeMaria v. Andersen*, 318 F.3d 170, 176 (2d Cir. 2003); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 207 (S.D.N.Y. 2003); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 257 (S.D.N.Y. 2004). But these cases only address the standing requirements for individual, or named, plaintiffs to advance claims on their own behalf; none purports to address the conditions under which named plaintiffs who have standing to bring their own claims may then represent a class of absent purchasers.[12]

Defendants next contend that the language of the Securities Act itself – which permits claims based on "such security" as was acquired pursuant to a defective registration statement or prospectus – forbids named plaintiffs from representing absent class members who purchased different securities. ML Mot. at 33-35; Underwriter Mot. at 11-12; C-BASS Mot. at 11. Defendants thus apparently mean to suggest that the Securities Act must be read to curtail the ordinary application of Rule 23. But, as the cases cited above show, courts frequently apply

---

alleges a single pattern of fraud"); *In re Am. Cont'l Corp./Lincoln Sav. and Loan Sec. Litig.*, 794 F. Supp. 1424, 1461 (D. Ariz. 1992) (Securities Act claims; "The court concludes that plaintiffs need not name a representative of the class for each subgroup of securities, where common issues predominate as to all securities."); *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, Nos. 1:95-cv-141, 1:95-cv-290, 1996 WL 739170, at \*2, \*4 (W.D. Mich. Sept. 27, 1996) (employing a typicality and course of conduct analysis to permit representation for Securities Act claims that the named plaintiffs did not share); *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1052 (N.D. Cal. 2008) (same).

[12] Defendants also cite *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522 (S.D.N.Y. 2008) for the proposition that Article III standing is lacking. There, the court correctly held that in most instances, standing must be examined before typicality, but failed to recognize that any consideration of plaintiffs' ability to represent *absent* plaintiffs (rather than bring claims based on their own purchases) is, in fact, a typicality question and not a standing question. *See* NEWBERG § 2.7, at 2-40-41.

ordinary Rule 23 principles to Section 11 and 12 claims.[13]  Indeed, the Securities Act was passed

in 1933 – five years before the adoption of the Federal Rules of Civil Procedure in 1938, and

thirty-three years before the typicality inquiry was added to the Rule in 1966.  It can hardly be

argued that the 1933 Congress intended the phrase "such security" as a talisman to ward off the

application of Rule 23 principles thirty-three years before such principles even existed.  Nor is

there support for the notion that the mere phrasing used to provide a private right of action in a

federal statute will be read to alter the Rule 23 inquiry; for example, beneficiaries of one ERISA

plan may represent a class that includes beneficiaries of other, similar plans, even though the

statute permits beneficiaries to sue to "recover benefits **due to him under the terms of his plan**,

to **enforce his rights under the terms of the plan**, or to clarify **his rights to future benefits

under the terms of the plan**." 29 U.S.C. § 1132(a)(1)(B) (emphasis added).[14]

    Although Defendants claim that *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345

(N.D. Ga. 2005), supports their argument that the Securities Act alters ordinary class action

procedures, Underwriter Mot. at 11-12, that case actually supports Plaintiffs.[15]  There, the

---

[13] Only a single case cited by Defendants, *In re Paracelsus Corp., Sec. Litig.*, 6 F. Supp. 2d 626 (S.D. Tex. 1998), may have held that the language of the Securities Act precludes a plaintiff with standing to bring his own claims from representing a class of purchasers of a different security. However, in *Paracelsus*, it appears that the stockholders sought to represent noteholders, which may have led the court to conclude that the named plaintiffs' claims were not sufficiently typical, *see id.* at 629, 631; moreover, *Paracelsus* cited no case law for the proposition that Rule 23 applies any differently in the Securities Act context than for any other type of claim.

[14] *See, e.g., Cates v. Cooper Tire & Rubber Co.*, 253 F.R.D. 422, 430 (N.D. Ohio 2008); *Smith v. United Healthcare Servs., Inc.*, No. Civ-00-1163 ADM/AJB, 2002 WL 192565, at *4 (D. Minn. Feb. 5, 2002); *Alves v. Harvard Pilgrim Health Care, Inc.*, 204 F. Supp. 2d 198, 205 (D. Mass. 2002); *Caranci v. Blue Cross & Blue Shield*, 194 F.R.D. 27, 39-40 (D.R.I. 2000).

[15] As Defendants point out, *Friedman's* also dismissed a claim against an underwriter because no named plaintiff had made any purchases in the only offering in which the underwriter had participated.  *Id.* at 1371-72.  However, this was simply an ordinary application of the rule that "for every named defendant there must be at least one named plaintiff who can assert a claim directly against that defendant."  *Cent. States II*, 504 F.3d at 241.  Here, however, as the

plaintiff had purchased securities in one offering, and brought Section 11 claims on behalf of a class that – just as in this case – included purchasers from other offerings derived from the same shelf registration. *See id.* at 1372-73. The court reasoned that because the plaintiff had standing to advance his own claims, the offerings involved similar misstatements, and because the defendant's involvement in each offering was similar, the issue of the plaintiff's "standing" to represent absent class members could be addressed "at a later stage." *Id.* at 1373.

Finally, Defendants claim because different prospectus supplements described different loan pools and underwriting standards, somehow standing is lacking. ML Mot. at 34; Underwriter Mot. at 12. This argument concerns Rule 23 typicality and commonality, and therefore is more properly examined at class certification when a full factual record can be put before the Court. However, even at this early stage, it is evident that Plaintiffs have made at least a preliminary showing of typicality and commonality by alleging that the prospectus supplements shared many of the same or similar false statements, by alleging that many of the same underlying facts will be used to prove the falsity of the statements, and by including in the Complaint Plaintiffs with a sufficient variety of purchases to ensure coverage of all of the false statements alleged. ¶¶13-17, 177-78.

> ### 2. Named Plaintiffs Purchased Pursuant To The Same Registration Statements As Absent Class Members

Even if Defendants are correct that purchasers of securities pursuant to one registration statement cannot represent absent plaintiffs who purchased pursuant to a different registration statement, here, all of the Offerings were issued pursuant to three registration statements, and there is at least one named plaintiff who bought from each. ¶¶13-17. In *Countrywide*, 588 F.

---

Underwriter Defendants concede, one named plaintiff is specifically alleged to have bought in offerings in which they participated, Underwriter Mot. at 11. Therefore, Plaintiffs have standing to advance their own claims, and any further inquiry concerns typicality.

Supp. 2d 1132 (C.D. Cal. 2008), the court examined just such a situation and held that purchasers of securities based on an initial shelf registration statement could serve as representatives for purchasers from other offerings, "[s]o long as (1) the securities are traceable to the same initial shelf registration and (2) the registration statements share common 'parts' that (3) were false and misleading at each effective date."[16]  ML Mot. at 33-35; Underwriter Mot. at 12-15.  Here, the Complaint alleges that the prospectus supplements – which were incorporated by reference into the relevant registration statement, and thus were common "parts" of the registration statements, *see Countrywide*, at 1164-65 – contained common misrepresentations. ¶57.  Therefore, the named Plaintiffs may represent absent purchasers.

### 3. Named Plaintiffs Have Individual Standing To Advance Section 12 Claims On Their Own Behalf

Defendants additionally contend that the named Plaintiffs have failed to properly plead that they personally have valid claims under Section 12.[17]  Defendants demand a level of particularity in pleading that goes far beyond the requirements of Rule 8(a).

Defendants first argue that the Complaint is insufficient because it alleges only that Plaintiffs acquired securities "pursuant and/or traceable to the Offering Documents."  ¶¶1, 13-17, 176, 191, 199, 200.  As a factual matter, Defendants misdescribe the Complaint, which also specifies which security each plaintiff bought, the date of the purchase, and the underwriters for each security, ¶¶21-25; alleges that the Underwriters sold the securities, ¶18, 21-2, 26-7, 56, 197; and that Plaintiffs acquired securities "pursuant and/or traceable to the defective Prospectus

---

[16] *Id.* at 1166.  The court did not consider, nor was it apparently argued, that the ability of a named plaintiff to represent absent purchasers is governed by Rule 23, not the text of the statute.

[17] Defendants' standing challenges under Section 11 are limited to their argument that named plaintiffs cannot represent absent purchasers; no Defendant argues that named Plaintiffs lack standing with respect to their own purchases under Section 11.

Supplements." ¶¶197-99.  Countless courts have found similar allegations to be sufficient.  *See, e.g.*, *Suprema*, 438 F.3d at 274 at n.7; *Gargiulo v. Demartino*, 527 F. Supp. 2d 384, 392 (E.D. Pa. 2007); *In re Brooks Automation Inc. Sec. Litig.*, No. 06-11068, 2007 U.S. Dist. LEXIS 88045 (D. Mass. Nov. 6, 2007). [18]  Defendants' citations to such cases as *Gustafson v. Alloyd Co.*, 513 U.S. 561, 578 (1995) and *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 530 n.8 (S.D.N.Y. 2005), are not to the contrary – neither of these addresses *pleading* requirements for a Section 12 cause of action.[19]

The Underwriter Defendants also claim that the Complaint is deficient because it does not particularly identify which named Plaintiffs bought from which underwriters.  Underwriter Mot. at 13-14. However, such detail is simply not required at the pleading stage.  *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 718 n.22 (3d Cir. 1996); *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 400 (S.D.N.Y. 2007); *Schoenhaut v. Am. Sensors*, 986 F. Supp. 785, 790 n.6 (S.D.N.Y. 1997); *DDi Corp.*, 2005 WL 3090882, at *19.  Though the Underwriter Defendants offer citations for the proposition that a plaintiff must prove at ***trial*** that he or she purchased from a particular underwriter, these cases do not address pleading requirements.  *See*

---

[18]  The Complaint does not run afoul of *Bell Atl. Corp. v. Twombly*, 550 U.S. 544  (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), as Defendants suggest.  As explained above, the Complaint provides details of the securities purchased and each Defendant's involvement.  This is more than sufficient to show that it is "plausible" that Plaintiffs have a meritorious claim. *See Twombly*, 550 U.S. at 556 (noting that the plausibility standard "does not impose a probability requirement").

[19]  Nor does *Grand Lodge of Pa. v. Peters*, 550 F. Supp. 2d 1363 (M.D. Fla. 2008), offer any support to Defendants.  That case concerned a Section 11 claim in a *secondary* public offering, which meant that it was evident on the complaint's face that tracing the shares would be an exceedingly difficult, if not impossible, task, because the secondary shares were immediately absorbed into the market and became indistinguishable from earlier-offered shares.  Under these circumstances, the court felt that more detail was necessary.  *See id.* at 1376.  In this case, there are no comparable difficulties.  Moreover, the *Grand Lodge* court, located in the Eleventh Circuit, explicitly rejected the pleading standards common in Second Circuit courts in favor of its more demanding standard.  *See id.*

*Capri v. Murphy*, 856 F.2d 473 (2d Cir. 1988); *Akerman v. Oryx Commc'ns, Inc.*, 609 F. Supp. 363, 374 (S.D.N.Y. 1984) (addressing the issue after "extensive discovery"). Cases involving plaintiffs who admitted that they had not purchased from the defendants,[20] or plaintiffs who never alleged that the defendants sold securities to the named plaintiffs, or that plaintiffs bought in the offering,[21] or defendants who never sold shares to the public at all,[22] are similarly inapposite.

B.    The Complaint Alleges Material Misstatements
      And Omissions In The Offering Documents

Section 11 liability exists when, as here, the registration statement "contained an untrue statement of a material fact *or* omitted to state a material fact required to be stated therein *or* necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  The Offering Documents contained material statements regarding (i) the underwriting process and standards by which the loans held in the respective Issuing Trusts were originated, including the type of loan and documentation level; (ii) the standards and guidelines used by First Franklin and/or the Merrill Sponsor when evaluating and acquiring the loans; (iii) representations concerning the value of the underlying real estate securing the loans pooled in the respective Issuing Trusts, in

---

[20]  *See DeMaria*, 153 F. Supp. 2d at 307-08; *Griffin v. PaineWebber, Inc.*, No. 99CIV2292, 2001 WL 740764, at *1 (S.D.N.Y. June 29, 2001); *Jackson v. First Fed. Sav., F.A.*, 709 F. Supp. 863, 883 (E.D. Ark. 1988); *In re Activision Sec. Litig.*, 621 F. Supp. 415, 426 (N.D. Cal. 1985). Notably, the *Activision* court certified a defendant class that included defendants who had sold to absent class members, but had not sold securities to the particular named plaintiffs.  *See id.* at 432.

[21]  *See Dartley v. ErgoBilt Inc.*, No. Civ.A.398CV-1442, 2001 WL 313964, at *2 (N.D. Tex. Mar. 29, 2001); *In re WebSecure Sec. Litig.*, 182 F.R.D. 364, 368-69 (D. Mass. 1998).  And in *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, No. MDL1446, 2004 WL 405886 (S.D. Tex. Feb. 25, 2004), the court was explicitly *unconcerned* with the fact that the intervening plaintiff had not specified which underwriter sold it securities, so long as it specified which securities it had purchased.  *See id.* at 1 n.7.

[22]  *See In re Deutsche Telekom AG Sec. Litig.*, No. 00-9475, 2002 WL 244597 (S.D.N.Y. Feb. 20, 2002).

terms of LTV and the appraisal standards by which such real estate values were measured; (iv) the level of credit enhancement, such as overcollateralization and excess interest, calculated to afford a certain pre-determined level of protection to investors; and (v) the credit rating of the Certificates.

1.    False And Misleading Statements
Concerning Underwriting Guidelines

The Offering Documents purported to describe the originators and the underwriting standards used to originate the underlying mortgage loans.  The Offering Documents represented that the loans "were originated generally in accordance with the underwriting guidelines described in 'Underwriting Guidelines'" and that "[a]ll of the Mortgage Loans were required to meet the underwriting criteria substantially similar to that described in this prospectus supplement."    ¶¶60, 63.  Loans were purportedly extended based on analysis of borrowers' credit histories, willingness and ability to repay mortgages, and the adequacy of mortgaged property as collateral.  ¶¶60-61.  The Complaint provides factual support and details showing that loan originators, contrary to the representations in the Offering Documents, systematically disregarded their stated underwriting guidelines and made loans in order to increase loan volumes.  ¶¶67, 84-87, 92-97, 102, 103, 110, 111, 117, 127-29, 130-34, 136, 137-38.

In *Twombly*, the Supreme Court held that in order to survive a motion to dismiss, the complaint must plead "enough facts to state a claim to relief that is plausible on its face."  550 U.S. at 570.  Plaintiffs have more than satisfied this requirement.  The factual support is summarized below:

●    Delinquencies, defaults and downgrades linked to underwriting:  The Complaint details how proper loan underwriting is critical to assessing the borrowers' ability to repay the loans.  ¶45.  The delinquency, foreclosure and bank ownership rates on the underlying mortgages confirm the failure to adhere to stated underwriting guidelines.  The Complaint sets forth that 36% to 67% of mortgages in identified trusts are either 60 days or more delinquent, in

23

foreclosure, or the collateral was retaken by the lender. ¶¶174-75. Moreover, the ratings on virtually all of the Certificates within each of the Issuing Trusts have now been downgraded.[23]

● <u>Witness accounts, internal documents, and statements from management show originators' failure to follow underwriting standards</u>: The Complaint includes detailed accounts from percipient witnesses about the originator's underwriting practices, as well as the contents of internal documents, that substantiate the systematic failure to follow underwriting standards. ¶¶84-87 (Countrywide); ¶¶92-97 (American Home Mortgage); ¶¶102-03 (Ownit); ¶¶110-11 (IndyMac); ¶117 (First Franklin); ¶¶127-29 (New Century); ¶¶130-34 (Accredited Home Lenders); ¶136 (Wells Fargo); ¶¶137-38 (Argent Mortgage Co., L.L.C.).

● <u>Governmental investigations and lawsuits</u>: The attorneys general from various states, as well as the FBI, have commenced investigations and initiated lawsuits against Countrywide and others. ¶¶68, 74-76, 118. The findings reported since March 2008 from these investigations establish that major originators in the Certificates failed to meet their underwriting standards, driven instead to extend as many loans as possible in order to increase volume. ¶¶69-71, 77.

● <u>Governmental Hearings and Conclusions</u>: The Complaint alleges the findings and conclusions expressed at governmental hearings. For example, the Chairman of the Federal Reserve Board testified to Congress that "deterioration in underwriting standards . . . is another important factor underlying the current crisis. A large share of subprime loans that were originated during [2004 – 2007] feature high combined loan-to-value ratios and, in some cases, layers of additional risk factors, such as a lack of full documentation or the acceptance of very high debt-to-income ratios." ¶125.

In their motions, Defendants dispute materiality, contending that the Complaint does not allege "the extent to which improperly originated loans were included in any of the asset pools" or that "each of the 84 offerings at issue in this case were tainted by problems." ML Mot. at 43-45; Underwriter Mot. at 19-23. This demand for still greater particularity fails for a number of reasons. First, there is no dispute that the Complaint is governed by Rule 8's "short and plain statement" standard for notice pleading. *See Iqbal*, 129 S. Ct. at 1949 ("the pleading standard Rule 8 announces does not require 'detailed factual allegations'"); *Boykin v. KeyCorp*, 521 F.3d

---

[23] *See In re JDS Uniphase Corp. Sec. Litig.*, No. C 02-1486, 2005 WL 43463, at *6-*7 (N.D. Cal. Jan. 6, 2005) (sudden write-off of $270 million of inventory where plaintiff alleged inventory buildup over previous year created strong inference that statements were "false when made"); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 175 (S.D.N.Y. 2003) ("The fact that plaintiff relies on evidence that post-dates the Form F-4 does not vitiate the false or misleading nature of the registration statement.").

202, 213-14 (2d Cir. 2008) ("The [Supreme] Court reiterated that 'specific facts are not necessary,' and that the complaint 'need only give the defendant fair notice of what the … claim is and the grounds upon which it rests.'"); *Wynder v. McMahon*, 360 F.3d 73, 77 (2d Cir. 2004) ("Rule 8 pleading is extremely permissive" and "evidence … in detail" is not a requirement imposed by Rule 8)**.** *Twombly* and *Iqbal* require allegations that suggest ***plausibility***, to be sure, but do not demand probability or increased particularity.

While Defendants demand greater particularity in knee-jerk fashion, the Complaint in fact amasses several categories of facts supporting a reasonable inference that the Underwriting Guidelines were systematically disregarded.   As noted above, witness accounts, internal documents and statements from the managers of substantial originators show pervasive disregard for supposedly disciplined underwriting practices.   The founder and CEO of Ownit, a substantial originator in 13 Trusts, admitted that after Merrill's acquisition, Ownit reduced its stated underwriting standards in order to increase volume and originated higher-yield, riskier loans. ¶103.  This fact was not disclosed.  Rather, the Prospectus Supplement promoted Ownit's careful underwriting: "It was required to be clearly shown that the borrower had a proven, historical cash flow, which will support the requested loan amount." ¶100.

Likewise, IndyMac was a major originator for loans in seven trusts.   The Prospectus Supplements described a careful underwriting process: "IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral."   ¶108.   The truth, however, was much different according to IndyMac's former Chairman and CEO:  "Speculators often lied about homes being owner-occupied and lenders got

caught up in the housing frenzy. ***We got too carried away and loosened our guidelines too far***." ¶111.

Moreover, government investigations and ensuing lawsuits support the factual allegations of systematic violations of the underwriting guidelines, contrary to representations in the Prospectus Supplements. ¶¶68-77, 118. MBIA Insurance Corp ("MBIA") filed a complaint against Countrywide and its successor, Bank of America. ¶89. Based on MBIA's review of approximately 19,000 loan files, MBIA discovered "an extraordinarily high incidence of material deviations from the underwriting guidelines Countrywide represented it would follow." MBIA discovered that many of Countrywide's loan applications "lack[ed] key documentation, such as a verification of borrower assets or income; include[d] an invalid or incomplete appraisal; demonstrate[d] fraud by the borrower on the face of the application; or reflect[ed] that any of borrower income, FICO score, or debt, or DTI [debt-to-income] or CLTV, fail[ed] to meet stated Countrywide guidelines (***without any permissible exception***)." Significantly, "MBIA's re-underwriting review . . . revealed that almost 90% of defaulted or delinquent loans in the Countrywide Securitizations show material discrepancies." ¶89.

Moreover, the reported findings and conclusions from governmental hearings and investigations support a reasonable inference of falsity. The President's Working Group on Financial Markets, for example, concluded that "[t]he turmoil in financial markets clearly was triggered by a ***dramatic weakening of underwriting standards for U.S. subprime mortgages, beginning*** in late 2004 and extending into early 2007." ¶125. (Emphasis in original). Similarly, Jerome Fons, a former Managing Director of Credit Policy at Moody's, testified before Congress that the rating agencies "did not update their models or their thinking" during the period of deterioration in credit standards. ¶168.

Defendants contend that the omitted information was not material. ML Mot. at 43-48; Underwriter Mot. at 19-23; C-BASS Mot. at 19-22. Assessments of materiality, however, are questions of fact that ordinarily are inappropriate for resolution on a motion to dismiss.[24] Therefore, the standard for dismissal is "extraordinarily high." *See In re Metlife Demutualization Litig.*, 00-CV-2258 (TCP), 2009 U.S. Dist. LEXIS 46730, at *88 (E.D.N.Y. May 27, 2009). A "complaint may not properly be dismissed pursuant to 12(b)(6) . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 228 (S.D.N.Y. 1999) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985) (internal quotations omitted; alterations in original); *see also Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539, 540-41 (2d Cir. 1996).

Attempting to meet this high standard, Defendants first suggest that purchasers of highly-rated tranches of Certificates would not have considered systematic violations of underwriting standards as capable of altering the total mix of available information. ML Mot. at 44; C-BASS Mot. at 21. Violations of underwriting standards, however, undoubtedly constitute material information to investors. *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1154 (S.D. Cal. 2009); *In re Wash. Mut.*, No. 2:08 Md. 1919 (MJP), 2008 U.S. Dist. LEXIS

---

[24] *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) ("a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.") (*quoting Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)); *In re Union Carbide Class Action Sec. Litig.*, 648 F. Supp. 1322, 1326 (S.D.N.Y. 1986) ("Courts should be particularly hesitant to dismiss a securities complaint on grounds of materiality."). "Ordinarily, materiality is a mixed question of law and fact left to the finder of fact to determine." *Garber v. Legg Mason*, 537 F. Supp. 2d 597, 611 (S.D.N.Y. 2008) (referring to *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)).

41575, at *47 (W.D. Wash. May 15, 2009); *Countrywide*, 588 F. Supp. 2d at 1145-46.  Indeed, when explaining Regulation AB, the SEC specifically stated that "[i]nformation regarding characteristics and quality of the assets is important for investors in assessing how a pool will perform."  70 Fed. Reg. 1506 at 1511.

The test for materiality, moreover, is an objective one:  Whether "a reasonable investor" would consider the information important in making an investment decision.  *TSC*, 426 U.S. at 449.  Here, many of the purchasers of the Certificates are ***required*** to hold only investment-grade securities.  ¶53.  Consequently, the increased risk of downgrades due to delinquencies and defaults is unquestionably material.[25]  That is particularly true here because the Offering Documents themselves identified originators as material – those having originated more than 10% of the loans – while omitting the truth about the underwriting practices of those originators. ¶58.

---

[25]  None of Defendants' authorities resemble the facts of this case.  This case concerns untrue statements and omissions about loans in a fixed pool for mortgage-backed securities, for which information about underwriting, loan origination, collateral, credit enhancements and credit ratings is material.  For example, *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597 (S.D.N.Y. 2008), arose from Legg Mason's "swap" of certain assets with Citigroup.  The plaintiffs alleged the failure to disclose (1) the planned departure of an asset manager, (2) a "dramatic increase" in integration-related expenses, and (3) owed distribution fees, amounting to only .4% of Legg Mason's budget.  The court explained that "by their very nature, swap transactions … will generate changes in personnel and increases in expenses," and the "owed distribution" fees of .4% were too small to be material.  *Id.* at 612.  That is not the case here.  Further, the plaintiffs in that case, unlike here, alleged the failure to disclose known trends as required by Item 303 of Regulation S-K – a disclosure item that is inapplicable to the Certificates because Item 303 applies to "management discussion and analysis of financial condition and results of operations." Likewise, *ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, No. 07-1786-cv, 2009 U.S. App. LEXIS 972 (2d Cir. Jan. 21, 2009), is off point.  There, shareholders of JP Morgan Chase & Co. ("JPMC") alleged that they were defrauded by JPMC's complicity in Enron's financial scandals.  On the unique facts of that case, the court found that alleged misrepresentations relating to less than two percent of defendant's assets were immaterial.  *Id.* at *204.  Again, that is not the case here.

Defendants attempt to dispute the materiality of the underwriting violations by Countrywide, American Home Mortgage, Ownit, First Franklin and IndyMac.  In so doing, Defendants mischaracterize the Complaint, wrenching snippets of the Complaint from their proper context.  Defendants assert that "the thrust" of the allegations concerning Countrywide and American Home Mortgage is that they "permitted exceptions."  ML Mot. at 46-7 n.27.  In truth, however, the system of exceptions was not followed; the entire process of exceptions based on prudent lending criteria was disregarded, and, as a result, loans were routinely made where the requisite lending justification did not exist.  For example, Countrywide used Countrywide Loan Underwriting Expert System ("CLUES") to indicate whether the loan was within Countrywide's underwriting guidelines.  ¶72.  CLUES reports indicating a loan was not within Countrywide's underwriting guidelines often were ignored in order to effectuate the loan.  *Id.* Federal investigators found that "Countrywide's loan documents often were marked by dubious or erroneous information about its mortgage clients."  ¶77.  Nevertheless, "The company . . . packaged many of those mortgages into securities and sold them to investors…."  *Id.*

Likewise, Defendants isolate snippets from the Complaint's allegations about Ownit and additional originators and contend that each snippet, when viewed in isolation, would not be material.  ML Mot. at 45; Underwriter Mot. at 20.  Contrary to Defendants' contentions, the Complaint does not allege that the Prospectus Supplements merely failed to disclose that Ownit originated subprime loans.  ML Mot. at 46.  Rather, the Offering Documents failed to disclose that Ownit, 20% owned by Merrill Lynch, did not comply with its stated underwriting policies and lowered its standards in order to increase loan volume. ¶101.  This is corroborated by first-hand accounts:  "[I]f you had a pulse or you could breathe, you got a loan."  ¶104.  The Merrill Depositor continued to issue mortgage pass-through Certificates with underlying Ownit loans

well into 2007, after Ownit had collapsed and filed for bankruptcy amid reports of huge loan buyback requests.[26]

The Underwriter Defendants argue that they should be absolved of liability, contending that the Complaint fails to adequately detail the untrue statements and omissions from the Offering Documents where they acted as underwriters (the 2006-CB4 Trust; the 2006-CB8 Trust; and the 2007-CB4 Trust).  Underwriter Mot. at 15-22.  This argument is without merit.  As an initial matter, the Underwriter Defendants are strictly liable for any untrue statement or omission in the Offering Documents for the Certificates they underwrote.  Here, the Complaint identifies originators from all three trusts and the untrue statements and omissions in each.

For example, Ownit served as an originator of loans underlying the 2006 CB-4 Trust. ¶¶43, 99. As explained above, the Complaint alleges that Ownit admitted to reducing its stated underwriting standards in order to increase volume.  ¶103.  Additionally, Argent Mortgage Company, L.L.C. ("Argent") served as an originator for underlying loans in the 2006 CB-8 Trust.  ¶¶43, 119.  The Complaint details that, in violation of the stated underwriting standards, employees of Argent actively assisted mortgage brokers in falsifying borrowers' financial information by "tutoring . . . mortgage brokers in the art of fraud."  ¶137.  Argent's lack of verification was so poor that a "borrower [who] claimed to work a job that didn't exist . . . got enough money to buy four houses."  ¶137.  Finally, as the Underwriter Defendants acknowledge, New Century Financial Corporation ("New Century") served as an originator for underlying loans in the 2007 CB-4 Trust.  ¶¶43, 119.  As detailed in the Complaint, the court-appointed

---

[26] ¶106.  Defendants' contention that isolated phrases from the Complaint about First Franklin and IndyMac likewise ignores the additional information that puts such phrases into context and fails to establish that the omitted facts about their violations of underwriting guidelines were immaterial.  ¶¶107-11; 112-92.

bankruptcy examiner for New Century issued a detailed report which cited "serious loan quality issues at [New Century] beginning as early as 2004" and numerous "red flags" relating to loan quality. ¶126. Further, New Century's problems began when it "started to abandon prudent underwriting guidelines" at the end of 2003 in order to "push more loans through" the system. ¶127. As a result of these violations of the stated underwriting standards, as of April 2009, over 39% of the loans underlying the 2007-CB4 Trust's Certificates were delinquent between 60 and 90 days, in foreclosure, or bank-owned. ¶175.

In short, the Complaint alleges that the Offering Documents "contained an untrue statement of a material fact" about adherence to Underwriting Guidelines and "omitted to state a material fact … necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a); ¶¶4, 7, 64, 67, 181-82, 197. In addition, the Complaint includes extensive facts and categories of support to show the facial plausibility that statements were false when made – such as the untrue assertion in the Prospectus Supplements that the loans "were originated generally in accordance with the underwriting guidelines described in 'Underwriting Guidelines'" and "[a]ll of the Mortgage Loans were required to meet the underwriting criteria substantially similar to that described in this prospectus supplement." ¶¶60, 63.

a.   The Offering Documents Did Not Disclose The Information About Systemic Violations Of Underwriting Guidelines

The modern securities laws were designed to "substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186, 84 S. Ct. 275, 280 (1963). The Securities Act "was designed to provide investors with full disclosure of material information concerning public offerings." *Ernst & Ernst*, 425 U.S. at 195, 96 S. Ct. at 1382; *see also Pinter v. Dahl*, 486 U.S. 622, 650 n.26 (1988) (the very purpose of the Securities

Act is "to promote full and fair disclosure of information to the public in the sales of securities"). Indeed, "[t]he primary innovation of the 1933 Act was the creation of federal duties – for the most part, registration and disclosure obligations – in connection with public offerings." *Gustafson*, 513 U.S. at 571, 115 S. Ct. at 1063.

Defendants assert that the Offering Documents disclosed all of the information that the Complaint alleges was omitted. ML Mot. at 37; Underwriter Mot. at 4-9; C-BASS Mot. at 17-22. Not so. The purported "disclosures" do not "match" the omitted information set forth in the Complaint.

The Offering Documents, while noting in certain instances that the guidelines themselves allowed for exceptions, also specifically stated that "exceptions" were only to be made where there were "compensating factors," such as low loan-to-value ratios, low debt-to-income ratios, good credit history, [and] stable employment," as follows:

> On a case by case basis, the Ameriquest Loan Sellers may determine that, ***based upon compensating factors***, a loan applicant, not strictly qualifying under one of the risk categories described below, warrants an exception to the requirements set forth in the Ameriquest Underwriting Guidelines. ***Compensating factors may include, but are not limited to, loan-to-value ratio, debt-to-income ratio, good credit history, stable employment history, length at current employment and time in residence at the applicant's current address***. It is expected that a substantial number of the mortgage loans to be included in the mortgage pool will represent such underwriting exceptions.

Kasner Dec., Ex 239 at S-38. Likewise,

> In accordance with First Franklin Financial's guidelines for acquisition, all of the mortgage loans of a type similar to the Mortgage Loans were required to be underwritten by the third party originator's underwriters having the appropriate signature authority. Each underwriter is granted a level of authority commensurate with their proven judgment, maturity and credit skills. On a case by case basis, a third party originator may determine that, ***based upon compensating factors***, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. ***Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address***. It is

32

expected that a substantial portion of the Mortgage Loans may represent such underwriting exceptions.

Kasner Decl., Ex. 240 at S-35.

As a result, merely disclosing the authority to make an "exception" does not cure the alleged omissions because the standards for making exceptions (*i.e.*, legitimate **compensating factors**) were disregarded. *See, e.g.*, ¶¶64, 67, 71, 87, 96-7, 129. There was no disclosure that originators routinely violated underwriting guidelines in an effort to increase loan volumes. ¶¶58, 84, 101-02, 129. Rather, the Offering Documents stated that "[a]ll of the Mortgage Loans were required to meet the underwriting criteria substantially similar to that described in this prospectus supplement." ¶63.

Defendants also argue that there can be no actionable omissions regarding Underwriting Guidelines because the Offering Documents provided "actual statistics… show[ing] the nature of the loans" and "in-depth statistics regarding both the borrowers' creditworthiness and the loans themselves." ML Mot. at 38-39. In truth, however, the tabular information utterly fails to disclose the borrowers' creditworthiness or the true nature of the loans. The mere fact that the Offering Documents included tabular data provides no information to investors about violations of Underwriting Guidelines, including fraudulently-obtained loans or loans without the necessary "compensating factors" for exceptions. For example, disclosing the gross number of loans that were made with reduced documentation says nothing about the failure to properly value the collateral or the creditworthiness of the borrower. As such, the data does not, and cannot, cure the material omissions in the Complaint. "[A] violation of Section 11 will be found when material facts have been omitted or presented in such a way as to obscure or distort their significance." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d

Cir. 1991); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, Civ. No. 02-3400, 2009 U.S. Dist. LEXIS 37090, at *24 (S.D.N.Y. Mar. 23, 2009).

The Defendants next submit a chart that purports to compare Plaintiffs' "alleged omissions" in the Complaint to "actual disclosures" in the Offering Documents. ML Mot. at 40-41. Defendants characterize the Complaint's alleged omissions as merely (1) "exceptions;" (2) "risky loans;" (3) "documentation and verification;" (4) "high loan-to-value ratios;" and (5) "layering of risk factors." ML Mot. at 40-41. As explained above, Defendants' characterizations are inaccurate and incomplete. Moreover, conspicuously missing from Defendants' list of "alleged omissions" are systematic violations of underwriting guidelines, conflicts of interest, and unjustifiably high credit ratings.

Further, Defendants' analysis is fundamentally flawed. Defendants' characterizations of the "alleged omissions" are mere isolated fragments from sentences in the Complaint removed from context. Likewise, the purported "Actual Disclosures" do not correspond with either the information that was omitted or the specific challenged statements in the Offering Documents. Fatal to Defendants' chart is the fact that the "Actual Disclosures" are from Prospectus Supplements that do not correspond to the loan originators. For example, Defendants cite the Complaint's allegations regarding American Home Mortgage, including a first-hand account about how "overrul[ing] the objections of the underwriters in order to complete the loan" became "commonplace," but compare it to an alleged "disclosure" for a trust in which American Home Mortgage is not identified as an originator. ML Mot. at 40-41. There is, therefore, no possible disclosure.

Moreover, it is readily apparent that Defendants' characterization of the "Alleged Omissions" and the "Actual Disclosures" do not match the specific statements challenged in the

Complaint.  *See, e.g.,* ¶¶66, 91-2, 100, 108, 113-15.   For example, First Franklin's stated underwriting standards were "primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan….  First Franklin Financial considers, among other things, a mortgagor's credit history, repayment ability and debt service to income ratio ("Debt Ratio"), as well as the value, type and use of the mortgaged property."  ¶113.  In their Motion, Defendants describe the "Actual Disclosure" of systematic violations of underwriting guidelines as follows:

> The mortgagors generally do not qualify for loans conforming to Fannie Mae or Freddie Mac guidelines . . .  the mortgage loans are likely to experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by Fannie Mae and Freddie Mac conforming guidelines.

ML Mot. at 39.

Defendants conveniently omit the first sentence:  "***The underwriting guidelines used by First Franklin Financial Corporation in connection with the origination of the mortgage loans in the trust fund consider the credit quality of a mortgagor and the value of the mortgaged property.***"  Kasner Decl. Ex. 243 at S-17 (emphasis added).  Unquestionably, the purported "disclosure" does not match the information omitted, including the originators' drive to originate as many loans as possible regardless of creditworthiness and the processing of fraudulent applications.  ¶¶58, 84, 86, 89, 101-02, 117-18, 127, 129.

Likewise, Defendants' purported "disclosure" of reduced documentation loans does not match with the allegations in the Complaint or the specific statements.  ML Mot. at 40.  For example, the Offering Documents represented that Countrywide "evaluate[d] the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  … [The] borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage

loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income") ratios are within acceptable limits. . . ." ¶66. The Complaint alleges that Countrywide, however, failed to observe its underwriting standards, processing loans with missing and inadequate documents, excessive debt-to-income ratios and other material violations. ¶¶67-71. In fact, a review by MBIA revealed that "almost 90% of defaulted or delinquent loans in the Countrywide Securitizations show material discrepancies." ¶89.

Under these circumstances, it is impossible for Defendants to establish, as they must, that the alleged disclosure "cured" a false statement or omission as a matter of law. *See Briarwood Invs., Inc. v. Case Invs. Trust, Inc.*, 07-Civ. 8159 (LLS), 2009 U.S. Dist. LEXIS 18963, at *8-*10 (S.D.N.Y. Mar. 4, 2009). The complaint "may not properly be dismissed pursuant to Rule 12(b)(6) . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Milman*, 72 F. Supp. 2d at 228 (quoting *Goldman*, 754 F.2d at 1067 (internal quotations omitted; alterations in original); *see also Feinman*, 84 F.3d at 540-41.

Further, Defendants' reliance on boilerplate risk disclosures cannot inoculate them from liability for the false and misleading statements in the Offering Documents. *See* ML Mot. at 40-41 (citing Kasner Ex. 238 at S-17, S-28, S-45); Underwriter Mot. at 4-9; C-BASS Mot. at 17-22. As Judge Conner recently wrote, it is because "risk factors" have become ubiquitous in securities offering documents that:

> The cautionary language must be specific, prominent and must directly address the risk that plaintiffs' claim was not disclosed. (Citation omitted). ***The***

36

> *requirement that the cautionary language must match the specific risk is particularly important*, considering that most, if not all, security offerings, contain cautionary language. (Citation omitted).

*In re Flag Telecom*, 2009 U.S. Dist. LEXIS 37090, at \*29 (citing *Olkey v. Hyperion 1999 Term TRUST*, 98 F. 3d 2, 5-6 (2d Cir. 1996) and *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 579 (S.D.N.Y. 2007)).  *See also Vivendi*, 381 F. Supp. 2d at 183 ("boilerplate warnings will not suffice . . . . The cautionary statements must convey substantive information . . . ."). Here, as explained above, Defendants' boilerplate risk disclosures are too general and do not address the omitted information.

Moreover, risk disclosures can only apply to *future events*. "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("'The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'").[27] Here, the statements are clearly historical in nature because they concern the underwriting guidelines already used – or violated – on existing loans in the pools.

> b.   Plaintiffs Are Not Required
>       To Allege Defendants' Scienter

Plaintiff's Securities Act claims do not require proof of scienter. "Neither Section 11 nor Section 12(a)(2) requires that plaintiffs allege the scienter or reliance elements of a fraud cause

---

[27]   *See also, In re Fuwei Films Sec. Litig.*, No. 07 Civ. 9416 (RJS), 2009 U.S. Dist. LEXIS 59658, at \*52-\*53 (S.D.N.Y. July 10, 2009); *Giarraputo v. Unumprovident Corp.*, Civ. No. 99-301, 2000 U.S. Dist. LEXIS 19138, at \*55-\*56 (D. Me. Nov. 8, 2000) ("the statement in question must be a 'forward looking statement' such as a financial projection, future management plans or objectives, statements of future economic performance or other statements of prediction"); *In re Number Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1, 23 (D. Mass. 1999) ("bespeaks caution" doctrine may not be invoked to protect defendants' misrepresentations regarding present facts).

of action." *Rombach*, 355 F.3d at 169 n.4. "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case." *Herman & MacLean*, 459 U.S. at 382; *Fuwei Films*, 2009 U.S. Dist. LEXIS 59658, at *50 n.15; *see also Twinlab*, 103 F. Supp. 2d at 202-05 ("the defendant's knowledge of the misrepresentations is not an element of a [Securities Act] claim; indeed, a defendant can be held liable even for an innocent misstatement . . . . . Lack of knowledge of misleading statements in a prospectus is an affirmative defense . . . for which defendants bears the burden of proof."). Accordingly, Plaintiffs are not required to plead that Defendants knew of the truth or omission.

Nevertheless, Defendants assert that Plaintiffs here must allege facts suggesting Defendants' knowledge of violations of underwriting standards (although Defendants do not assert such a requirement for the Complaint's additional categories of untrue statements and omissions). ML Mot. at 5; Underwriter Mot. at 18-19. Defendants are wrong. Section 11 imposes liability for "any untrue statement of material fact" in the registration statement. *See* 15 U.S.C. 77k(a). Here, the Complaint alleges such untrue statements – including "[the loans] were originated generally in accordance with the underwriting guidelines described in 'Underwriting Guidelines'" in the Supplements; and "[a]ll of the Mortgage Loans were required to meet the underwriting criteria substantially similar to that described in this prospectus supplement." ¶¶60, 63. In addition, the Offering Documents represented that the loans were extended based on analysis of borrowers' credit histories, willingness and ability to repay mortgages, and the adequacy of mortgaged property as collateral. ¶¶60-61. Further, the Prospectus Supplements included specific statements purporting to set forth the underwriting guidelines of particular originators. ¶¶66, 91-2, 100, 108, 113-14

Defendants' motion is devoid of a single decision holding that untrue statements about underwriting standards in offering documents for an asset-backed security cannot form the basis of a Section 11 claim, absent allegations of knowledge.   Rather, Defendants ignore the Complaint's allegations of untrue statements and focus instead on the duty to disclose omitted information, citing decisions that stand for the unremarkable proposition that SEC Regulations describe the contents of registration statements and prospectuses.[28]   Plaintiffs do not dispute that Regulation AB applies to the Offering Documents.

The SEC promulgated Regulation AB in 2004, which is a principle-based regime rather than a rules-based system.   SEC Release Nos. 33-8518; 34-50905: Asset-Backed Securities, 70 Fed. Reg. 1506, 1531 (Jan. 7, 2005) (Codified at 17 C.F.R. 210, 228, 229, 230, 232, 239, 242, 245, and 249).   Regulation AB has twenty-three separate items, and of these, 18 (items 1102-1120) "constitute the basic disclosure package for Securities Act registration statements for ABS offerings."   70 Fed Reg. 1506 at 1532.   In other words, Regulation AB "provide(s) enough clarity so that the disclosure concept or object is understood and can be applied on a consistent basis, while not providing too much detail that could obscure or override the concept or objective…. "   *Id.*   The SEC used "illustrative lists, with a reference that the actual disclosure must be tailored based on the material aspects of the transaction involved… to identify the types of disclosures that may be applicable in response to the identified disclosure concept."   *Id.* at 1531-32.

---

[28]   *See In re N2K Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 207 (S.D.N.Y. 1999); *see also In re Morgan Stanley Tech. Fund Sec. Litig.*, No. 02 Civ 6153, 2008 U.S. Dist. LEXIS 106909, at *21 (S.D.N.Y. Feb. 2, 2008); *Panther Partners, Inc. v. Ikanos Communc'ns, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008).

Against this backdrop, Defendants urge the Court to focus narrowly on just Item 1111(a)(3) of Regulation AB. ML Mot. at 42-43. Defendants conveniently fail to acknowledge others Items, such as Items 1104 and 1110, as part of the "comprehensive guide to drafters of registrations statements" when purporting to describe the "relevant" disclosure requirements of Regulation AB. *See* ML Mot. at 42. In particular, Item 1110 concerns the disclosure of "Originators" and it directly addresses disclosures concerning underwriting standards when issuing ABS, requiring each Prospectus Supplement to "[i]dentify any originator or group of affiliated originators, apart from the sponsor or its affiliate*s*, that originated, or is expected to originate, 10% or more of the pool assets," and, for those that originated 20% or more of the pool assets, to include "a description of the originator's origination program," including "***information material to an analysis of the performance of the pool assets, such as the originator's credit-granting or underwriting criteria for the asset types being securitized***." 17 C.F.R. § 229.1110 (emphasis added). *See also* 17 C.F.R. § 229.1104 ("sponsors"). Nothing in Item 1110 limits disclosure of such information "to the extent known."

Defendants point only to a particular example of what must be disclosed in Item 1111, "Pool Assets," in an attempt to impose "to the extent known" as an additional element to Section 11 liability. Item 1111 sets forth "[g]eneral information regarding pool asset types and selection criteria" that must be disclosed to allow investors to make a "material evaluation of the pool data." 17 C.F.R. § 229.1111. In that context, Item 1111 imposes a duty to disclose changes to the underwriting criteria "used to originate or purchase the pool assets," to the "extent known." Here, however, Plaintiffs do not allege changes to the underwriting criteria or the extent to which policies are or could be overridden. Rather, Plaintiffs allege that the originators systematically disregarded their stated (i.e., unchanged) underwriting guidelines, thereby making Defendants'

statements that the loans were originated in accordance with the stated underwriting guidelines untrue and misleading. Nothing more is required.[29]

Separate and apart from the duty to disclose under Regulation AB, Defendants also had a duty to state all material facts in the Registration Statements "necessary to make the statements therein not misleading," 15 U.S.C. § 77k(a), and failed to do so.[30] Defendants' own authority recognizes this separate duty.[31] Here, as explained above, the Offering Documents contained statements requiring additional disclosure of omitted facts concerning the underwriting practices in order to make such statements not misleading.

2.    False And Misleading Information
     <u>About Appraisals And Loan-To-Value</u>

As Plaintiffs allege, and Defendants do not dispute, the fundamental basis upon which the Certificates are valued is the ability of the borrowers to repay the underlying loans *and the adequacy of the collateral on those loans* in case of default. ¶45. Accordingly, accurate appraisals of the collateralized real estate, and the calculated LTV ratios and averages based on those appraisals, were essential to investors' assessment of the price and risk of the offered Certificates. ¶¶46-50. Here, Plaintiffs allege that Defendants misrepresented the value of the underlying real estate securing the loans pooled in the respective Issuing Trusts, in terms of LTV averages and the appraisal standards by which such real estate values were measured; and, as a

---

[29]  If the Court determines that Plaintiffs are required to plead facts showing Defendants' knowledge, Plaintiffs respectfully request leave to amend. Such leave is freely granted when justice requires. *Jaser v. New York Prop. Ins. Underwriting Ass'n*, 815 F.2d 240, 243 (2d Cir. 1987); *Scottish Re Group*, 524 F. Supp. 2d at 388. Leave to amend would be particularly appropriate here because Plaintiffs are unaware of any decision construing Regulation AB as Defendants do here, and Defendants have not identified any.

[30]  ¶187. *See also* 17 C.F.R. § 230.408; *Fuwei Films*, 2009 U.S. Dist. LEXIS 59658, at *43-*44.

[31]  *See Morgan Stanley*, 2008 U.S. Dist. LEXIS 106909, at *39; *N2K Inc. Sec. Litig.*¸ 82 F. Supp. 2d at 209.

41

result, the LTV ratios in the Offering Documents were artificially low, making it appear that the loans underlying the trust, and thus the Certificates, were safer than they were.  ¶¶139-151.

Plaintiffs do not allege, as Defendants contend, that a "nationwide group of appraisers … were effectively engaged in a massive fraud."  ML Mot. at 49.  Nor do Plaintiffs rely on "second-guessing" particular appraisals.  *Id.*  Rather, Plaintiffs allege that appraisers "experience[d] systemic problems of coercion" whereby they were forced to raise property valuations or suffer "negative ramifications" and other repercussions.  ¶¶146-47.  These allegations are supported by testimony of the Chair of the Appraisal Institute before the Senate Committee on Banking (¶146), and a survey of a statistically significant sample of appraisers, where 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to make mortgage deals go through.  ¶147.  Moreover, these allegations are supported by four confidential witnesses who audited appraisals for loan originators who routinely rejected loans with overinflated appraisals only to have management override the decision.  ¶¶103-04, 117, 134.  Among the confidential witnesses is a Corporate Underwriter from defendant sponsor First Franklin who estimates that one in four appraisals reviewed at First Franklin was overinflated.  ¶134.

The systemic over-inflation of appraisals and the necessary effects that overinflated appraisals have on LTV ratios made the LTV data in the Offering Documents objectively and subjectively false.  As such, Defendants' reliance on *In re Salomon Analyst Level 3 Litig.* is unavailing.  ML Mot. at 49, citing *Salomon,* 373 F. Supp. 2d 248, 251 (S.D.N.Y. 2005).  In *Salomon*, the court found that a stock analyst's opinion of a stock's value based on his "discretionary choices" and the "model he finds most persuasive for that company does not omit a material fact by failing to note that others may have different opinions or analytic approaches."

373 F. Supp. 2d at 251-52.  In accord, Plaintiffs do not allege that any particular appraisal was false or that the Offering Documents failed to disclose that another appraisal may have valued the property differently.  Rather, Plaintiffs allege that the LTV ratios in the Offering Documents would have been higher if the underlying properties were appraised according to the originators' pre-established, *independent* appraisal procedures, in accordance with the Uniform Standards of Professional Appraisal Practice ("USPAP"), as stated in the Prospectus Supplements.  ¶¶66, 91, 108, 115, 139-151.

Defendants' assertion that the Prospectus Supplements "warned that the LTV ratios on the loans underlying the offerings at issue in this case were high" misses the point.  ML Mot. at 50.  Plaintiffs' allegations are that the LTV ratios *would have been higher* if the properties were appraised according to the standards set forth in the Offering Documents.  Indeed, the fact that LTV ratios were already "high" made the accuracy of that data that much more important.  By way of example, the MLFFML Trust Series 2007-A Prospectus Supplement stated, "the weighted average Combined Loan-to-Value Ratio of the Mortgage Loans as of the Cut-off date was 99.54%."  ¶144.  In light of the fact that the Offering Documents stated that, unless specified, the LTV ratio of loans underlying the Certificates would not exceed 100% (¶143), and in dealing with data measured and reported by the hundredths of a percentage point, even the slightest difference in appraisals would be material.[32]

Despite Defendants' attempts to mischaracterize the allegations in the Complaint, Plaintiffs certainly do not assert that the Prospectus Supplements were totally void of any risk warnings.  *See* ML Mot. at 50-51.  Offering documents routinely include warnings drafted by

---

[32]  Notwithstanding that Plaintiffs make a clear showing of materiality, Plaintiffs reassert that assessments of materiality are inappropriate for resolution by motion to dismiss.  *See infra*, § III.B.1.a.

43

corporate lawyers.  *See Miller*, 473 F. Supp. 2d at 579.  Plaintiffs acknowledge that the Prospectus Supplements included the possibility of a housing market downturn.  However, as would be the case with any investment decision, the Offering Documents misrepresented the risk associated with the Certificates, generally and with a housing market downturn, in particular.

Adequate collateral and other credit enhancements are specifically designed and intended to protect investors against a potential housing market downturn and other investment risks associated with the Certificates.  The Offering Documents included comprehensive and detailed data on LTV ratios, overcollateralization and subordination levels, which – *if accurate* – enables investors to properly assess the extent of the afforded protections against such known risks. Here, as a result of overinflated appraisals, Defendants misrepresented the adequacy of the collateral and all of the data necessarily dependent on those appraisals, thereby misrepresenting the Certificates.  The fact that the housing downturn actually occurred is not a defense to liability for these misrepresentations, and is not appropriately considered for other purposes at this stage of the litigation.[33]

---

[33]  *See, e.g.*, *Countrywide,* 588 F. Supp. 2d at 1173-74; *In re New Century,* 588 F. Supp. 2d 1206, 1230 (C.D. Cal. 2008) (rejecting claim that mortgage lender and securitizer was "taken by surprise when the [housing] market took an unexpected turn for the worse"); *Atlas v. Accredited,* 556 F. Supp. 2d at 1161 n.7 (refusing to consider defense counsel's summary of "non-prime lending industry events" as a defense to liability); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493 (S.D.N.Y. 2009) (rejecting defendants' argument that the decline in stock price was due to intervening cause of market collapse as result of subprime mortgage crisis); *In re StockerYale Sec. Litig.,* 453 F. Supp. 2d 345, 359 (D.N.H. 2006) ("Defendants' reference to a wide range of economic and other factors that may have caused or contributed to the decline in price of StockerYale shares raises issues that will be addressed at later stages of this litigation, but those possibilities do not warrant dismissal…"); *Schnall v. Annuity and Life Re (Holdings), Ltd.,* No. 3:02 CV 2133, 2004 WL 367644, at *9 (D. Conn. Feb. 22, 2004) ("While a trier of fact might blame market forces rather than accounting violations for that decline, the allegations in the Complaint are sufficient to withstand [this] motion to dismiss."); *Burstyn v. Worldwide Xceed Group, Inc.,* No. 01 Civ. 1125, 2002 WL 31191741, at *6 (S.D.N.Y. Sept. 30, 2002) (same).

The Underwriter Defendants argue that the Offering Documents contain no misrepresentations regarding the level of credit enhancement. Underwriter Mot. at 23. The Underwriter Defendants are wrong. As the Complaint details, the Offering Documents provided for various forms of credit enhancement which purported to provide investors with protection against shortfalls in payments received on the mortgage loans. ¶153. These enhancements included pre-determined levels of overcollateralization, along with subordination, shifting interests, and excess interest. ¶¶153-55. As detailed above, however, the statements related to the level of credit enhancements in the Certificates were untrue and misleading because they failed to disclose that many of the loan originators did not follow their underwriting and property appraisal standards which increased the risk that many borrowers would not be able to repay their loans, foreclosure sales would not recoup the full value, and the aggregate expected principal payments would not exceed the aggregate class principal of the Certificates. *Id.*

3.    Plaintiffs Allege Actionable Misstatements
      And Omissions Regarding The Ratings

In their motions, Defendants incorporate various contentions from the Rating Agency Defendants' Motion To Dismiss. Plaintiffs adopt and incorporate herein the arguments from Plaintiffs' Opposition To The Rating Agency Defendants' Motion To Dismiss ("Plaintiffs' RA Opp.").

Although Defendants argue that SEC Rule 436(g) immunizes them from liability for the ratings being unjustifiably high, they conveniently omit the relevant portion of the Rule which states that it only applies to ratings of "debt securities, a class of convertible debt securities, or a class of preferred stock." 17 C.F.R. § 230.436(g)(1). ML Mot. at 51. Accordingly, and as detailed further in Plaintiffs' RA Opp., Rule 436(g) does not exempt the Certificates' ratings. *See* 47 Fed. Reg. 11380, 11392 n.53 (Mar. 16, 1982); *see also* SEC Release No. 33-7085 n.19

(Aug. 31, 1994). Therefore, the ratings are part of the Offering Documents, and all Defendants are liable for the unjustifiably high ratings. 15 U.S.C. § 77k(a)(5).

Plaintiffs allege that the Certificates' ratings were unjustifiably high because they were "based on insufficient information and faulty assumptions concerning how many underlying mortgages were likely to default." ¶161. The ratings constitute an affirmative misrepresentation of the character and investment risk of the Certificates. Plaintiffs also allege that the Offering Documents omitted facts necessary to make statements regarding the ratings not misleading. For example, Plaintiffs allege that Defendants failed to disclose that the Rating Agency Defendants' compensation was based on the issuance of the pre-determined ratings, rather than objective and independent analysis. ¶169.

Defendants argue that they did not have a duty to disclose information omitted from the Offering Documents about the ratings or the Rating Agency Defendants' compensation. ML Mot. at 51; Moody's Mot. at 16; McGraw-Hill Mot. at 21-23. Defendants fail to recognize that Section 11, applicable SEC regulations, and case law require that once a party chooses to speak on a material topic, that party has a duty to add any further material information necessary to make the previous statements not misleading. *See* 17 C.F.R. § 230.408; *see also Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002). Here, having chosen to include the pre-determined ratings in the Offering Documents, Defendants had a duty to disclose other material facts.

Instead, the Offering Documents omitted facts which directly affected the likelihood that the Certificates would perform as the ratings represented. For example, although the Offering Documents stated that the Certificates' issuance was conditioned on the assignment of a particular set of ratings, Defendants did not disclose that the Rating Agency Defendants' fees

were based on the issuance of the ratings, rather than objective and independent analysis.[34]  This meant that investors were unaware of the Ratings Agency Defendants' significant conflict of interest, and that those conflicts could interfere with "providing ratings of integrity."  ¶172.  Undoubtedly, this would have been viewed by the reasonable investor as significantly altering the total mix of available information.  *TSC*, 426 U.S. at 449.

Finally, Defendants incorporate the Rating Agency Defendants' argument that the unjustifiably high ratings are protected by the "bespeaks caution" doctrine.  McGraw Mot. at 23-24; Moody's Mot. at 17-19.  As fully set forth in Plaintiffs' RA Opp., the bespeaks caution doctrine applies only to forward-looking, prospective representations and not to material omissions or misstatements of historical fact.  *See P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004).  Here, the misrepresentations regarding the use of rating models that were based on "outdated assumptions, relaxed criteria and inaccurate loan information" and the failure to disclose Rating Agency Defendants' compensation and conflicts of interest are both misrepresentations of present or historical fact.  ¶¶8, 161-169.  Second, for the bespeaks caution doctrine to apply, "[t]he cautionary language must be ***specific, prominent and must directly address the risk*** that plaintiffs' claim was not disclosed."  *Flag Telecom*, 2009 U.S. Dist. LEXIS 37090, at *28.  Here, none of the cited language discloses the fact that the unjustifiably high ratings were based on outdated models, or that the Rating Agency Defendants had conflicts of interest which "conflict[ed] with providing ratings of integrity."  ¶172.

---

[34]  ¶169.  The fact that investors were unaware of these facts defeats Defendants' claim that the issuer-pay compensation model was "publicly known."  As detailed in Plaintiffs' RA Opp., the degree to which the MBS compensation model "exacerbated" the conflicts of interest inherent in the issuer-pay model was unknown until the SEC published the Summary Report in July 2008. ¶172.  *See* Plaintiffs' RA Opp. at § III.D.1.

C.    The Complaint Sufficiently Pleads
      Section 11 Claims Against The Merrill
      Sponsor, First Franklin, Merrill And C-BASS

Section 11(a) defines the persons who are subject to strict liability for misrepresentations and omissions in a registration statement to include, *inter alia*, "…(4)… any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement… (5) every underwriter with respect to such security."  15 U.S.C. §77k(a)(5).  Here, the Merrill Sponsor, First Franklin and C-BASS are strictly liable as experts and underwriters.   Merrill is strictly liable as an underwriter.

The term "underwriter" includes "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, ***or participates or has a direct or indirect participation in any such undertaking***. . ." 15 U.S.C. § 77b(a)(11) (emphasis added).  The Second Circuit has explicitly recognized that the definition of underwriter includes every person who engages in "steps ***necessary*** to the distribution of security issues."  *SEC v. Kern*, 425 F.3d 143, 152 (2nd Cir. 2005) (citing *SEC v. Chinese Consol. Benevolent Ass'n*, 120 F.2d 738, 741 (2d Cir. 1941), *cert. denied*, 314 U.S. 618 (1941) (emphasis added)).

The Conference Committee Report that accompanied the Securities Act confirms that, in addition to traditional underwriters, the definition in § 77b(a)(11) includes:

> Persons…who participate in any underwriting transaction or who have a direct or indirect participation on such a transaction…***The test is one of participation in the underwriting undertaking*** rather than that of a mere interest in it.

H.R. Conf. Rep. No. 152, 73rd Cong., 1st Sess. 24 (1933); *cf. Pinter*, 486 U.S. at 646, 108 S. Ct. at 2078 (recognizing that liabilities and obligations expressly grounded in participation are found

in numerous places in the Securities Act, including the provisions defining underwriter in §
77b(a)(11)).

Indeed, courts in this Circuit and elsewhere have interpreted the term "underwriter"
broadly. *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 431 (S.D.N.Y. 2007) (stating that
"[t]he term [underwriter] should be 'broadly defined to include anyone who directly or indirectly
participates in a distribution of securities from an 'issuer' to the public'" (quoting *SEC v. N. Am.
Research & Dev. Corp.*, 424 F.2d 63, 72 (2d Cir. 1970))). *See also Ingenito v. Bermec Corp.*,
441 F. Supp. 525, 536 (S.D.N.Y. 1977) (recognizing that an underwriter is an entity who either
performs the traditional underwriting function, or "participates in the transmission process
between the issuer and the public"); *Special Situations Fund, III, L.P. v. Cocchiola*, No. 02-3099,
2007 U.S. Dist. LEXIS 56627, at *16 (D.N.J. Aug. 2, 2007) ("To be an underwriter under the
Securities Act, it is not necessary for a person to undertake the risk that they will be left holding
the shares…. Nor must a party actually sell shares to the public to be an underwriter under the
Securities Act, ***mere participation in an offering is enough***") (emphasis added)).

Here, the Complaint details the Sponsors' direct participation in the securitization and
offering of the Certificates and the steps that were "necessary" to the distribution of the
Certificates. *See SEC v. Kern*, 425 F.3d at 152. Specifically, the Merrill Sponsor, First Franklin
and C-BASS were each identified as, and served as, "sponsors" of the various offerings.[35]  As
detailed in the Complaint, the entire mortgage securitization process begins with the "sponsor,"
who either originated the loans or acquired the loans from other loan originators, in exchange for
cash. ¶38.  The "sponsor" then sells the underlying loans to the "depositor," who then securitizes

---

[35]  C-BASS notes that the Complaint intended to identify the sponsor for each Issuing Trust, but
failed to do so.  C-BASS Mot. at 11.  As C-BASS concedes, it was the sponsor for the 2007-CB4
Trust, 2006-CB8 Trust, 2006 CB-4 Trust and the Ownit Mortgage Loan Trust, Series 2006-1.  *Id.*

the loans so that the rights to the cash flows can be sold to investors. ¶39. The Prospectus Supplements further detailed the Sponsors' direct participation in steps "necessary" to the distribution of the Certificates: "In coordination with the Underwriter, [the Merrill Sponsor] works with rating agencies, mortgage loan sellers and servicers in structuring the securitization transaction." *See* May 25, 2007 First Franklin Mortgage Loan Trust, Series 2007-FFC Prospectus Supplement at S-35-S-36. Likewise, the Complaint details Merrill's role in establishing the Merrill Sponsor and the Merrill Depositor to issue and distribute the Certificates.

In addition, the Sponsors are liable under Section 11 as experts who consented to inclusion of their evaluation. The Prospectus Supplements expressly represented that the Sponsors were experts in their field of sponsoring securitizations. *See, e.g.*, May 25, 2007 First Franklin Mortgage Loan Trust, Series 2007-FFC Prospectus Supplement at S-35 ("MLML has been the sponsor of securitizations backed by residential mortgage loans, including subprime mortgage loans, since 2003.")

The Sponsors, as experts in sponsoring mortgage securitization transactions, each consented to inclusion of their evaluation of underlying mortgage loans. In particular, the Prospectus Supplements stated that "the Sponsor's underwriting and acquisition underwriting standards were primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgaged loan." ¶60. Moreover, "the Prospectus Supplements represented that each of the loan originators must have met First Franklin's and/or the Merrill Sponsor's minimum standards based on certain acquisition guidelines, in order to submit loan packages, and that those loans must have been in compliance with the terms of a signed mortgage loan purchase agreement." ¶61. Accordingly, the Merrill Sponsor, First Franklin and C-BASS are liable under Section 11

50

as both underwriters and experts who consented to inclusion of their evaluation.  Merrill is liable as an underwriter for taking steps necessary to the distribution of the Certificates.

> D.    The Individual Defendants, Merrill Lynch,
>        The Merrill Sponsor, First Franklin, C-BASS
>        And Merrill Lynch PFS Are Liable As Control Persons

Section 15 extends liability created under §§ 11 and 12(a)(2) to "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under section[s] [11 or 12]."  15 U.S.C. § 77o.  To plead a claim under Section 15, "a plaintiff must allege (1) a primary violation by a controlled person and (2) direct or indirect control by the defendant of the primary violator."  *See, e.g., Global Crossing*, 322 F. Supp. 2d at 349; *In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*, Civ. No. 03-MD-1529 (LMM), 2007 U.S. Dist. LEXIS 66911, at *30 (S.D.N.Y. Sept. 7, 2007).  Here, as set forth fully above, the Complaint adequately alleges primary violations for both §§ 11 and 12(a)(2) claims.  Thus, Plaintiffs' § 15 claims are viable as the underlying §§ 11 and 12(a)(2) claims are actionable as a matter of law.

District courts within the Second Circuit are divided as to whether plaintiffs must plead culpable participation for Section 15 liability.  *Compare Initial Pub. Offering*, 241 F. Supp. 2d at 396 (concluding that plaintiff survived motion to dismiss by adequately alleging control) and *WorldCom*, 294 F. Supp. 2d at 414-416 (no culpable participation necessary) *with Burstyn*, 2002 U.S. Dist. LEXIS 18555 (describing split and holding that plaintiffs must plead culpable participation).  Defendants ignore the split in authority, relying solely on *P. Stolz Family P'Ship L.P. v. Daum*, 166 F. Supp. 2d 871, 873 (S.D.N.Y. 2001) requiring a complaint allege "meaningful culpable conduct."

Two district courts have set forth the standards for alleging claims under Section 20(a) of the Securities Exchange Act of 1934 and Section 15 of the Securities Act, and then noted that Section 20(a) contains the "additional requirement that plaintiff allege culpable participation."

51

*See Global Crossing,* 322 F. Supp. 2d at 349; *Adelphia*, 2007 U.S. Dist. LEXIS 66911, at *30. Section 15, however, does not require allegations of culpable participation.

Indeed, in conducting such analyses, courts have held where officers or directors have signed financial statements containing materially false or misleading statements, control as to the financial statements is sufficiently pled.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429 (S.D.N.Y. 2005) (concluding that officers or directors who signed registration statement controlled company at time of company's IPO); *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 485 (S.D.N.Y. 2004) (holding that directors who also signed registration statement controlled those who wrote the report).

Here, Plaintiffs have specifically alleged that the Individual Defendants were officers and/or directors of the Merrill Depositor during the relevant time period, and each signed one or more of the Registration Statements.  ¶¶30-35.  Accordingly, control as to the Registration Statements is sufficiently pled.  Plaintiffs further alleged that each Individual Defendant along with Merrill Lynch, the Merrill Sponsor, First Franklin, C-BASS, and Merrill Lynch PFS, by virtue of their control, ownership, offices, directorship and specific acts, had the power and influence to cause the Merrill Depositor to engage in violations of the Securities Act.  ¶204. Moreover, the Complaint alleges that Merrill Lynch established the Merrill Sponsor, who along with First Franklin and C-BASS (entities that Merrill acquired), originated and acquired an enormous volume of loans for resale to investors in the form of mortgage-backed securities.  ¶¶5, 38, 58.  Clearly, these allegations assert more than Merrill's position as the parent entity.  *See* ML. Mot. at 55.  These facts amply state a claim pursuant to Section 15.

Moreover, the question of whether a defendant exercised sufficient control over a primary violator is an inherently factual question "'that will not ordinarily be resolved summarily

at the pleading stage'" because the control issue "raises a number of complexities that should not be resolved on such an undeveloped record."  *In re Cabletron Sys.*, 311 F.3d 11, 41 (1st Cir. 2002) (citing 2 T.L. Hazen, *Treatise on the Law of Securities Regulation* § 12.24(1) (4th ed. 2002)); *Global Crossing*, 322 F. Supp. 2d at 351 (noting that control person analysis is a "decidedly fact-based determination").

E.    Plaintiffs' Claims Are Timely

Section 13 of the Securities Act provides, in part, that "[n]o action shall be maintained to enforce any liability created under [Section 11] of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m.  "Discovery" for purposes of the statute of limitations gives rise to a duty of inquiry on behalf of the plaintiff.  *Fuqua v. Ernst & Young LLP*, No. 01-7974, 2002 WL 535085, at *2 (2d Cir. Apr. 10, 2002).

The statute of limitations is "an affirmative defense on which the defendant has the burden of proof."  *Bano v. Union Carbide Corp.*, 361 F.3d 696, 710 (2d Cir. 2004).  "The defendant's normal burden includes showing when the cause of action accrued."  *Id*.  The Second Circuit has set forth a particularly stringent standard.  "Inquiry notice exists only when **uncontroverted** evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct."  *Newman v. Warnaco Group, Inc*., 335 F.3d 187, 194-95 (2d Cir. 2003) (quoting *Nivram Corp. v. Harcourt Brace Joranovich, Inc*., 840 F. Supp. 243, 249 (S.D.N.Y. 1993) (emphasis added)).  *See also Initial Pub. Offering*, 241 F. Supp. 2d at 347 ("Unless Defendants can produce '**uncontroverted** evidence [that] irrefutably demonstrates when Plaintiff discovered or should have discovered the fraudulent scheme,' they cannot satisfy the heavy burden of establishing inquiry notice as a matter of law'") (emphasis added) (citation omitted).

53

To demonstrate that Plaintiffs had such inquiry notice, Defendants must present evidence of "storm warnings" of a probable claim.  *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 427 (2d Cir. 2008).  The storm warnings must "relate directly" to the misrepresentations and omissions on which plaintiffs base their claims.  *Id.*  The Second Circuit imputes knowledge of storm warnings to plaintiffs only when the available information makes wrongdoing "***probable***, not merely possible."  *Shah v. Meeker*, 435 F.3d 244, 249 (2d Cir. 2006) (emphasis added).

"[T]he U.S. Court of Appeals for the Second Circuit has stressed the caution with which courts must approach the inquiry notice question on a motion to dismiss."  *In re Polaroid Corp. Sec. Litig.*, 465 F. Supp. 2d 232, 246 (S.D.N.Y. 2006) (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005) ("Whether a plaintiff had sufficient facts to place it on inquiry notice is 'often inappropriate for resolution on a motion to dismiss'") (quoting *LC Capital Partners, LP v. Frontier Ins. Group*, 318 F.3d 148, 156 (2d Cir. 2003) (quoting *Marks v. CDW Computer Ctrs.*, 122 F.3d 363, 367 (7th Cir. 1997))).  *See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05 Civ. 1898, 2005 U.S. Dist. LEXIS 19506, at *39 (S.D.N.Y. Sept. 6, 2005) (denying motion to dismiss 10(b) action brought on behalf of purchasers of mortgage-backed certificates alleging material misrepresentations and omissions regarding the integrity of defendants' underwriting standards for loan origination, finding a heavy burden of establishing inquiry notice as a matter of law, and noting that "[a] close reading of the [analyst] reports cited by defendants in support of their claim of inquiry notice reveals that few of the facts necessary to establish plaintiff's core claims are found in those reports.").

1.    A Reasonable Investor Was Not On Inquiry
Notice Until, At The Earliest, April 24, 2008

It is axiomatic that "whether a plaintiff had sufficient facts to place it on inquiry notice is 'often inappropriate for resolution on a motion to dismiss.'"  *LC Capital*, 318 F.3d at 156.  As

stated above, inquiry notice is only triggered "'when the circumstances would suggest to an investor of ordinary intelligence the **probability** that she has been defrauded.'" *Levitt v. Bear Stearns & Co.*, 340 F.3d 94, 101 (2d Cir. 2003) (emphasis added).  It is for this reason that federal courts have repeatedly held that the question of when the statute of limitations begins to run on federal securities law claims is inherently fact specific.[36]

Here, the issuance of the Certificates was specifically conditioned on the assignment of pre-determined credit ratings, always the best quality, or AAA, on the highest level tranches. The Complaint alleges that Plaintiffs and the Class purchased Certificates that were far riskier than represented and that were not of the "best quality," or even "medium credit quality" and were not equivalent to other investments with the same credit ratings.  ¶9.  No "probable" Securities Act claims on behalf of Merrill Lynch Certificate purchasers were reasonably known prior to December 5, 2007.[37]  Indeed, these claims were not "probable" until, at the earliest, April 24, 2008, when the Rating Agency Defendants first downgraded the investment-grade Certificates to below-investment grade.  ¶160.

---

[36]  *See, e.g., Dorchester Investors v. Peak Int'l Ltd.*, 134 F. Supp. 2d 569, 577 (S.D.N.Y. 2001) (finding that "the issue of whether Plaintiffs were on inquiry notice, and thus whether their claims are barred by the statute of limitations, is a factual one to be resolved by the trier of fact."); *AIG Global Sec. Lending Corp. v. Banc of Am. Secs., LLC*, No. 01 Civ. 11448 (JGK), 2005 U.S. Dist. LEXIS 21605, at *46 (S.D.N.Y. Sept. 26, 2005) (question of constructive knowledge and inquiry notice may be "one for the trier of fact and therefore ill-suited for determination on a motion to dismiss"); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318 (HB), 2000 U.S. Dist. LEXIS 94, at **10-11 (S.D.N.Y. Jan. 6, 2000) ("[T]he issue of constructive knowledge and inquiry notice should more properly be resolved by the trier of fact at a later stage in this litigation.").  It is a question of law only if "no reasonable fact finder analyzing the circumstances as presented, could determine that inquiry notice did not exist." *In re Executive Telecard, Ltd. Sec. Litig.*, 913 F. Supp. 280, 283 (S.D.N.Y. 1996) (citing *Dodds v. Cigna Secs., Inc.*, 12 F.3d 346 (2d Cir. 1993); *Menowitz v. Brown*, 991 F.2d 36 (2d Cir. 1993)).

[37]  Defendants argue that December 5, 2007 is the earliest date that could be relevant to the statute of limitations.  *See* ML Mot. at 13, n.10.

Thus, prior to April 2008, there was no information in the market indicating that these Certificates were toxic and Plaintiffs had no way to know that these Certificates were in fact riskier than represented. The only information in the market up until that point was that different securities had been downgraded, that Merrill was alerted to the inferior status of, for example, mortgage-related assets held by Bear Stearns, and that there were questions regarding potential conflicts of interest with ratings agencies. None of this general information irrefutably demonstrates that a reasonable investor had knowledge of a probable Securities Act claim. *See Initial Public Offering*, 241 F. Supp. 2d at 347.

Defendants devote the bulk of their motions to dismiss to the notion that Plaintiffs were on inquiry notice at some unspecified date prior to December 5, 2007. *See* ML Mot. at 13; C-BASS Mot. at 17. Defendants cite other lawsuits which do not name Merrill Lynch or any of the Defendants in this action and do not involve the issuance of the Certificates alleged in the Complaint. They also cite articles which likewise do not discuss the Certificates at issue here. Defendants' entire argument rests on the false assumption that because there was general information in the market regarding the loosening of underwriting standards throughout the mortgage lending industry, Plaintiffs were on notice of their claims alleged in the Complaint. Not so.

The Second Circuit and district courts within the Second Circuit have rejected similar arguments cobbling together lawsuits and general news articles to establish inquiry notice at the pleading stage. For example, in *Staehr*, defendants indentified complaints in four lawsuits, various articles from news sources and industry newsletters, portions of defendants' regulatory filings with the SEC, and samples of annual insurance filings. 547 F.3d at 416. The Second Circuit conducted an analysis of the various new articles and found that "the publicly available

56

information in the record before us consists almost exclusively of generic articles on conflicts of interest for insurance brokers, not insurers" and that "there is no mention of [the defendant] at all except in one *National Underwriter* article." *Id.* at 429. The Second Circuit concluded that "[t]he news reports in the record were insufficient to give a reasonable investor notice of a probability that they might have been defrauded." *Id.* Likewise, the Second Circuit further concluded that lawsuits that did not name the defendant, or accuse the defendant of similar wrongdoing, were insufficient to place a reasonable investor on inquiry notice. *Id.* at 434.

In *Moody's Corp.*, 599 F. Supp. 2d at 506-507, the defendants, like here, submitted a voluminous record of media reports and statements concerning potential conflicts of interest in the credit-ratings industry. The court held that these statements, which referred to the credit ratings industry in general without specific reference to Moody's, were insufficient to raise the probability of fraud and did not trigger inquiry notice. *Id.* at 506. *See also Thompson v. Metro. Life Ins. Co.*, 149 F. Supp. 2d 38, 51 (S.D.N.Y. 2001) (two dozen articles reflecting "general public awareness" of industry wrongdoing insufficient to put plaintiffs on inquiry notice); *In re WorldCom, Inc. Sec. Litig.*, No. 02CIV.3288, 2003 WL 22790942, at *5 (S.D.N.Y. Nov. 25, 2003) (press reports regarding conflicts between research departments and investment banking departments at large financial institutions did not constitute "storm warnings" where press reports were vague and did not discuss corporation in particular).

  2.  MissPERS Was Not On Notice Of
      Claims Against Merrill Lynch Two Years Ago

Defendants claim that MissPERS admitted that its claims were time barred at the April 1, 2009 Lead Plaintiff hearing. ML Mot. at 14. Defendants are wrong. First, Defendants' reliance upon George Neville's (Special Assistant Attorney General of the Attorney General's Office of the State of Mississippi) limited testimony in connection with the Court's determination of the

57

lead plaintiff is out of context and inappropriate on a motion to dismiss. *See Roth*, 489 F.3d at 509 ("[i]n considering a motion under Fed. R. Civ. P. 12(b)(6) to dismiss a complaint for failure to state a claim on which relief can be granted, the district court is normally required to look only to the allegations on the face of the complaint."). Mr. Neville's testimony does not appear in the Complaint, is not integral to the Complaint and was necessarily limited to the Court's examination on the determination of a lead plaintiff. As such, Mr. Neville's testimony is hardly a complete record on the issue of inquiry notice.

It is well settled that, in evaluating a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court must accept as true all well-pleaded allegations in the Complaint and must grant Plaintiffs all reasonable inferences that may be drawn from the Complaint. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001). Likewise, it is well settled that Plaintiffs are not required to plead facts countering affirmative defenses. *Harris v. City of New York*, 186 F.3d 243, 251 (2d Cir. 1999) (citing 5 Charles Wright & Arthur Miller, Federal Practice and Procedure: Civil 2d § 1276 (2d ed. 1990 & 1999 pocket part)). Here, the Complaint alleges that "Plaintiffs could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time" and that "Moody's and S&P maintained investment-grade ratings on the Certificates until, at the earliest, April 24, 2008." *See* Complaint at ¶¶160, 194. Clearly, the face of the Complaint establishes that Plaintiffs' claims are timely. Nevertheless, if the Court considers Mr. Neville's testimony, such testimony, as detailed below, makes clear that MissPERS was not on inquiry notice of the claims alleged herein at any time prior to April 24, 2008.

At no time during the April 1, 2009 hearing did Mr. Neville testify specifically about notice of the claims against Merrill Lynch at issue in this action. *See* Transcript at 19-34.

Rather, Mr. Neville testified that approximately two years ago, Pond Gadow & Tyler P.A. ("Pond Gadow"), a local Mississippi bankruptcy firm, encountered problematic loans:

> In every case where they had a mortgage, these people had the higher risk mortgages, obviously, what we call subprime, and that they either misrepresented about what the terms are, especially on the refinancing, when the call came in on the balloon note or whether it came when the rate fluctuated, but consistently, what they found was that there was no underwriting criteria that they understood to be appropriate being done with their clients when they got their mortgages.

Transcript at 21:22-22:5.  Notably, Pond Gadow "told [the Mississippi Attorney General's Office] that the problem *may not exist, then,* because a lot of these bonds were being sold."  *Id.* at 22:18-19 (emphasis added).

Indeed, when Pond Gadow notified Mr. Neville of the faulty loans they had encountered in the course of their bankruptcy work, they were unaware that MissPERS had purchased Merrill Lynch Certificates.  Transcript at 32:19-33:13 (testifying that Pond Gadow then pulled the public records of MissPERS to determine which bonds had been purchased and then conducted analysis).

In fact, when Pond Gadow encountered loans in their bankruptcy law practice in Mississippi, MissPERS' Certificates each maintained their initial AAA credit rating from S&P and Moody's.

**Credit Ratings as of 9/30/07**

| Certificate | S&P | Moody's |
| --- | --- | --- |
| CBASS 2007-CB4 A2D | AAA | Aaa |
| FFMER 2007-2 A2A | AAA | Aaa |
| FFMER 2007-3 A2B | AAA | Aaa |
| FFMER 2007-4 2A1 | AAA | Aaa |
| FFMER 2007-A A1 | AAA | Aaa |
| MANA 2007-A3 A2B | AAA | Aaa |
| MANA 2007-AF1 AV1 | AAA | Aaa |
| MLCC 2006-2 4A | AAA | Aaa |
| MLMI 2006-A1 1A1 | AAA | Aaa |
| MLMI 2006-AHL1 A2A | AAA | Aaa |
| MLMI 2006-FF1 M4 | AA+ | A1 |
| MLMI 2006-FM1 A2A | AAA | Aaa |
| MLMI 2006-MLN1 A2A | AAA | Aaa |
| MLMI 2006-RM3 A2A | AAA | Aaa |
| MLMI 2006-RM5 A2A | AAA | Aaa |
| MLMI 2006-WMC2 A2C | AAA | Aaa |
| MLMI 2006-WMC2 A2D | AAA | Aaa |
| OWNIT 2006-2 A2B | AAA | Aaa |
| MANA 2007-F1 2A1 | NR | Aaa |

*See* Declaration Of Timothy A. DeLange In Support Of Plaintiffs' Opposition To The Merrill

Lynch Defendants' Motion To Dismiss The Consolidated Complaint ("DeLange Decl.") at ¶2.

Mr. Neville confirmed this at the April 1, 2009 hearing:

> Well, they discovered a problem that they believed was going to be a future
> problem, because, *as you know, two years ago, most of these certificates, bonds,
> they had not deflated in any value*.  *There was no fear in the marketplace about
> purchasing these, so there was not really anything ripe*, but they knew it was
> going to come, so they went in, did their background and came to us and said
> here's what we know.

Transcript at 32:5-11 (emphasis added).  In fact, the first downgrade on MissPERS' Certificates

did not occur until a year later, on April 24, 2008, when S&P downgraded the Merrill Lynch

First Franklin Mortgage Loan Trust Certificate from AAA to BB.  MissPERS' other Certificates

maintained their initial AAA ratings until August 8, 2008, October 27, 2008 and April 21, 2009,

respectively.

"Moreover, whether the securities fraud claim of a person who receives 'storm warnings'

is time barred 'turns on *when*, after obtaining inquiry notice,' the plaintiff 'in the exercise of

reasonable diligence, should have discovered the facts underlying the [defendant's] alleged

fraud.'"  *Levitt*, 340 F.3d at 101 (quoting *Rothman v. Gregor*, 220 F.3d 81, 97 (2d Cir. 2000))

(emphasis in original).   Mr. Neville's testimony makes clear that MissPERS conducted a reasonable inquiry into the alleged claims and could not have determined the probability of such claims at an earlier date.  Specifically, Mr. Neville testified:

> No.  Actually, the Pond [Gadow] firm developed the bonds themselves that they knew the retirement system held.  They had already gone and done their own pulling of the records, so to speak, non-electronically, manually, and found which ones that they thought were going to be at the highest risk or were starting to collapse, and then Bernstein Litowitz and their law firm and their analysts went back and did double checks and . . . .

*See* Transcript at 30:12-20.   Clearly, as Mr. Neville detailed at the April 1, 2009 hearing, MissPERS' claims are timely.[38]

### 3.    The Standard For Inquiry Notice Is That Of An Ordinary Investor

As detailed above, a plaintiff is on inquiry notice only "when the circumstances would suggest to ***an investor of ordinary intelligence*** the probability" that he or she has a claim.  *Shah*, 435 F.3d at 249 (quoting *Dodds*, 12 F.3d at 350 (emphasis added)).  Here, in direct conflict with controlling authority in this Circuit, Defendants improperly attempt to substitute the knowledge and expertise of Plaintiffs' lawyers for that of "an investor of ordinary intelligence."  *See* ML Mot. at 15-16 (citing information in press releases, unrelated lawsuits and "the files of the lawyers representing Lead Plaintiff (and other Plaintiffs) in this litigation").

The Second Circuit has rejected Defendants' exact contention, recognizing that "[t]here is a fundamental flaw to this argument."  *Staehr*, 547 F.3d at 436.  In *Staehr*, defendants argued that if the plaintiff in a previously filed lawsuit could detect "storm warnings," then so, too, could the plaintiff in that case.  *Id.* at 435.  There, the plaintiff in the previously filed lawsuit was a lawyer affiliated with a law firm that touts its insurance law practice.  *Id.* at 436.  The Second

---

[38]  Should the Court grant the motion to dismiss based on inquiry notice, Plaintiffs request leave to amend to plead MissPERS' inquiry.

Circuit squarely rejected this contention, finding that "[a]n insurance lawyer might very well have a sophisticated understanding of the insurer-broker business, but he does not set the standard. The fact that an investor of more-than-ordinary intelligence filed a lawsuit. . . cannot be used as a bellwether for the adequacy of the 'storm warnings.'" *Id.* Likewise, Plaintiffs' attorneys' knowledge and understanding of securities litigation and subprime lending practices cannot be substituted here for an "investor of ordinary intelligence." *Shah*, 435 F.3d at 249.

4.    Unrelated Lawsuits Provided No<br>Notice Of The Probability of Plaintiffs' Claims

Defendants cite to several lawsuits, which they contend put Plaintiffs on inquiry notice that the Offering Documents contained untrue statements and omissions. ML Mot. at 15. The mere existence of these unrelated lawsuits – none of which involve any Defendant in this action – could not trigger inquiry notice under controlling Second Circuit authority. The standard articulated in *Lentell* requires that storm warnings be "company-specific" and that "the triggering . . . data must be such that it relates directly to the misrepresentations and omissions" plaintiffs allege in the Complaint. 396 F.3d at 169, 171. These lawsuits fall short of triggering inquiry notice of Plaintiffs' claims alleged herein.

Attempting to support their Motions, Defendants apparently scoured the country for pending subprime litigation. Defendants have not, however, provided any evidence that any reasonable investor who purchased the Certificates here knew about these lawsuits. *See Staehr*, 547 F.3d at 416, 435 (noting that a lawsuit would trigger inquiry notice "only if an investor of ordinary intelligence would have been reasonably aware of the complaint"). Nevertheless, Defendants cannot avoid the fact that none of the lawsuits proffered identifies Merrill Lynch, or the Certificates at issue in this litigation, or that such Certificates were toxic or less than AAA-related securities. The lawsuits imparted neither "company-specific" information relating to

62

Merrill Lynch, nor transaction-specific information relating to the Certificates.  *See Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 299-300 (S.D.N.Y. 2004) (media reports of industry-wide fraud did not trigger inquiry notice because the reports did not specifically mention defendants).  Rather, each of the lawsuits involves claims against various originators of mortgage loans throughout the country for those originators' statements regarding their own financial condition and underwriting guidelines in their SEC filings and press releases.  What was unknown to Plaintiffs and the Class – until the Certificates were downgraded in April 2008 – was that the underlying loans in the Certificates suffered from this same disregard for underwriting guidelines.

The downgrades revealed for the first time what Merrill Lynch now concedes – the underlying mortgage pools contained loans originated in violation of the stated underwriting guidelines.  Clearly, the information and allegations in the various lawsuits alone were not sufficient to disclose the probability of Plaintiffs' claims here and, therefore, cannot constitute "storm warnings."  *Staehr*, 547 F.3d at 428 (2d Cir. 2008) ("Because nearly all of the stories in the record are devoid of company-specific information, the argument that they constitute "storm warnings" is far from compelling.").  *See also Lentell*, 396 F.3d at 169.

Critically, none of the lawsuits allege that the Certificates at issue here were far riskier than represented and that they were not of the "best quality," or even "medium credit quality." ¶9.  None of the lawsuits allege that the particular mortgage loans underlying the Certificates were originated in violation of the underwriting guidelines represented in the Offering Documents.  Likewise, the lawsuits do not allege that the credit ratings of the Certificates, as stated in the various Prospectus Supplements, were based on outdated assumptions, relaxed ratings criteria, and inaccurate loan information.

Defendants argue that the lawsuits revealed an industry-wide loosening of underwriting standards. ML Mot. at 16-20. Even if true, it is undisputed that none of these lawsuits revealed that the industry-wide loosening of underwriting standards had permeated the mortgage securitization industry in general, or the Certificates in particular. Indeed, it is undisputed that the first major credit rating downgrade of the Certificates – the first indication to Plaintiffs and the Class that their Certificates were far riskier than originally represented – did not occur until April 24, 2008. ¶160. Likewise, it is undisputed that each of the complaints constituting this consolidated action was filed well within one year from April 24, 2008. In the context of a 10(b) fraud claim, courts have held that the filing of an earlier lawsuit does not trigger inquiry notice if the allegations in the earlier actions do not "provide notice of a scheme sufficiently similar to the alleged fraud in the instant case to put Plaintiffs on inquiry notice." *In re Intial Pub. Offering Sec. Litig.*, No. MDL 1554, 2004 U.S. Dist. LEXIS 9284, at *64 (S.D.N.Y. May 21, 2004). *See also In re Ames Dep't Stores, Inc. Note Litig.*, 991 F.2d 968, 980 (2d Cir. 1993) (concluding that a prior lawsuit against the same defendants based in part on the same wrongful course of conduct did not trigger inquiry notice because the earlier suit only provided a "hint of the debacle that was to come"); *Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.*, 941 F. Supp. 1369, 1375 (S.D.N.Y. 1996) ("The filing of a class action suit by common stockholders does not, as a matter of law, put noteholders on inquiry notice as to their own claims."). The lawsuits Defendants rely upon here do not discuss Merrill Lynch, or any of the Defendants, and clearly do not constitute inquiry notice.

5.     General News Articles Do Not
       Demonstrate A Probable Securities Act Claim

For the same factual and legal reasons that the unrelated lawsuits failed to trigger inquiry notice, Defendants find no support for their inquiry notice arguments in the cited media articles.

Even if appropriate for review on a motion to dismiss, the articles do nothing more than generically report on the loosening of underwriting guidelines in the mortgage lending industry. It is fatal to Defendants' inquiry notice argument that none of the plethora of general news articles or transcripts upon which they rely ever mention or refer to the Certificates at issue in this litigation.[39]   Nor do any of the articles or transcripts reveal that the Certificates contained toxic loans or that they were not of the "best" or "medium credit quality."   Rather, the articles and transcripts refer primarily to various originators of the loans underlying the Certificates. Significantly, Plaintiffs' claims are not against the originators.   Accordingly, these generic articles are insufficient to trigger inquiry notice.  *Staehr*, 547 F.3d at 428; *Fogarazzo*, 341 F. Supp. 2d at 299-300 (media reports of industry-wide fraud did not trigger inquiry notice because the reports did not specifically mention defendants); *Initial Pub. Offering*, 2004 U.S. Dist. LEXIS 9284, at *58 (holding that media articles did not trigger inquiry notice because they said "nothing about the actual scheme alleged to have damaged Plaintiffs in the instant case"); *Teamsters Local*, 2005 U.S. Dist. LEXIS 19506, at *40-*41 (S.D.N.Y. Sept. 6, 2005) (citations omitted) ("These reports put investors on notice that Bombardier's 'aggressive underwriting practices' and 'combination of underwriting and servicing problems' had led to the weak performance of the collateral pool. Aggressive underwriting, however, does not amount to 'routine disregard [for] all underwriting guidelines'").

---

[39]   Indeed, the majority of the news articles and testimony do not refer to Merrill Lynch at all. Those articles that do mention Merrill Lynch can be broken down into three general categories: (1) articles mentioning Merrill Lynch's financial condition (*e.g.*, Exs. 50, 107, 152, 159, 160, 162); (2) articles regarding Merrill Lynch's acquisition of Ownit and First Franklin (*e.g.*, Exs. 29, 37, 45, 48, 62, 75, 81, 128, 145, 146); and (3) articles regarding Merrill Lynch's investments in Bear Stearns' hedge fund (*e.g.*, Exs. 92, 95, 100).

6.    Defendants' "Evidence" Is Controverted

Where defendants offer reassurances, reasonable words of comfort or otherwise controvert the basis for any claim, the storm warnings are "controverted" and inquiry notice cannot exist. *Milman*, 72 F. Supp. 2d at 229 (citing *Ames Dep't Stores*, 991 F.2d 968 (2d Cir. 1993); *see also Moody's Corp.*, 599 F. Supp. 2d at 506 (Plaintiffs not on inquiry notice when they "reasonably rely" on the "reliable words of comfort from management"); *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 234 (S.D.N.Y. 2006) ("A plaintiff may not be considered to have been placed on inquiry notice, 'despite the presence of some ominous indicators,' when 'the warning signs are accompanied by reliable words of comfort from management.'") (quoting *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 421 (S.D.N.Y. 2005)).

Here, the lawsuits, general news articles and testimony were "controverted." Defendants' own contemporaneous reaction to the proffered lawsuits and articles establishes that these actions provided no notice of Plaintiffs' claims alleged herein. Notably, none of the lawsuits Defendants offer were disclosed or even discussed by Defendants in the Offering Documents. Indeed, if these lawsuits and the allegations contained therein notified investors that the originators violated the stated underwriting guidelines in the various Prospectus Supplements (as Defendants contend), the absence of any discussion of them in such Offering Documents further confirms the falsity of Defendants' statements.

For example, Merrill contends that allegations regarding lending practices at First Franklin appeared in press accounts as early as May 6, 2007. ML Mot. at 25. On May 27, 2007, three weeks after Defendants allege it was known that First Franklin originated "liar loans," Defendants issued a Prospectus Supplement in which "[a]ll of the Mortgage Loans were originated or acquired by First Franklin Financial." *See* May 25, 2007 First Franklin Mortgage

Loan Trust, Series 2007-FFC Prospectus Supplement, attached to the DeLange Decl. as Exhibit ("Ex.") G at S-29. On October 9, 2007, more than four months later, Defendants issued two more Prospectus Supplements for more than $14 billion in Certificates with underlying Mortgage Loans that were all "originated by First Franklin Financial." *See* October 9, 2007 Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-5 Prospectus Supplement, DeLange Decl. Ex. H at S-32; October 9, 2007 Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-H1 Prospectus Supplement, DeLange Decl. Ex. I at S-34. The First Franklin Mortgage Loan Trusts contain no disclosure or mention of First Franklin originating "liar loans." *See Newman*, 335 F.3d at 194-95 (no inquiry notice triggered when material information concerning fraud omitted from company's SEC filing).

Likewise, Defendants assert that allegations regarding Countrywide's lending practices were known in August 26, 2007, and point to the shareholder derivative complaint file in October 2007. ML Mot. at 22-23. On October 30, 2007, Defendants issued a Prospectus Supplement in which "[a]pproximately 91.86% of the Mortgage Loans were underwritten in accordance with the underwriting guidelines of Countrywide Home Loans, Inc." *See* October 30, 2007 Merrill Lynch Alternative Note Asset Trust, Series 2007-OAR5 Prospectus Supplement, DeLange Decl. Ex. J at S-28. Again, the Prospectus Supplement, issued months after Defendants claim Plaintiffs were on notice of Countrywide's disregard of its underwriting standards, contains no disclosures of such failure to follow its stated underwriting standards. Nevertheless, four of the tranches of Certificates were rated AAA, and all seven of the tranches were rated investment grade. *Id.* at S-9.

Moreover, the Offering Documents themselves provided explicit reassurances of the quality of the underwriting standards. Specifically, the Offering Documents stated:

67

> Prior to acquiring any residential mortgage loans, [the Merrill Sponsor] conducts a review of the related mortgage loan seller that is based upon the credit quality of the selling institution. [The Merrill Sponsor's] review process may include reviewing select financial information for credit and risk assessment and conducting an underwriting guideline review, senior level management discussion and/or background checks. . .
>
> The underwriting guideline review entails a review of the mortgage loan origination processes and systems. In addition, such review may involve a consideration of corporate policy and procedures relating to state and federal predatory lending, origination practices by jurisdiction, historical loan level loss experience, quality control practices, significant litigation and/or material investors.

*See, e.g.,* May 25, 2007 First Franklin Mortgage Loan Trust, Series 2007-FFC Prospectus Supplement at S-35. The additional Prospectus Supplements contained virtually identical reassurances.

In sum, none of the generic reports about lawsuits, media articles or testimony on which Defendants rely provided Plaintiffs notice that the Certificates were far riskier than represented and were not of the "best quality," or even "medium credit quality" that they were rated. ¶9. The "heavy burden" of establishing that Plaintiffs were actually on notice of the ***probability*** of their claims more than one year before bringing this suit simply has not been met. *See Initial Pub. Offering*, 241 F. Supp. 2d at 347 ("Unless Defendants can produce 'uncontroverted evidence [that] irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent scheme,' they cannot satisfy the heavy burden of establishing inquiry notice as a matter of law.""). At best, Defendants have created a factual issue not appropriate for determination on a motion to dismiss. *See Dorchester*, 134 F. Supp. 2d at 577.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that Defendants' motions should be denied. In the event the Court decides to dismiss all or part of Plaintiffs' allegations, Plaintiffs respectfully request leave to replead. Fed. R. Civ. P. 15(a) sets forth a policy in favor

of granting leave to amend, stating that "leave shall be freely given when justice so requires." *Jaser v. N.Y. Prop. Ins. Underwriting Ass'n*, 815 F.2d 240, 243 (2d Cir. 1987) (reversing denial of request for leave to amend pursuant to "liberal policy"). "The Supreme Court has made clear that 'this mandate is to be heeded,' and that leave to amend should be permitted in the absence of an apparent or declared reason, such as undue delay, bad faith, or undue prejudice to the opposing party." *Tokio Marine & Fire Ins. Co. v. Employers Ins. of Wausau*, 786 F.2d 101, 103 (2d Cir. 1986) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *Eminence Capital, L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (*per curiam*) (dismissal with prejudice and without leave to amend is not appropriate unless it is clear "that the complaint could not be saved by amendment."). Here, as none of these factors are present, leave to amend is appropriately granted.

Dated: July 22, 2009

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP


_____/s/ David R. Stickney_____
DAVID R. STICKNEY

DAVID R. STICKNEY
TIMOTHY A. DeLANGE
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323
davids@blbglaw.com
timothyd@blbglaw.com

*Lead Counsel for the Class and Counsel for Lead Plaintiff Public Employees' Retirement System of Mississippi and Plaintiff Los Angeles County Employees Retirement Association*

POND, GADOW & TYLER, P.A.
JOHN GADOW
BLAKE TYLER
502 South President Street
Jackson, MS 39201
johngadow@pgtlaw.com

btyler@pgtlaw.com

*Counsel for Plaintiff Public Employees'*
*Retirement System of Mississippi*


COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARIO ALBA, JR.
CAROLINA C. TORRES
58 South Service Road, Suite 200
Melville, NY 11747
Tel:    (631) 367-7100
Fax:    (631) 367-1173

*Counsel for Plaintiff Iron Workers*
*Local No. 25 Pension Fund*


BERMAN DeVALERIO
JEFFREY C. BLOCK
One Liberty Square
Boston, MA 02109
Tel:    (617) 542-8300
Fax:    (617) 542-1194
           -and-
JOSEPH J. TABACCO, JR.
NICOLE LAVALLEE
425 California Street, Suite 2100
San Francisco, CA 94104
Tel:    (415) 433-3200
Fax:    (415) 433-6382

*Special Assistant Attorneys General*
*for the State of Wyoming*


BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP
KATHARINE M. RYAN
JOHN A. KEHOE
KAREN E. REILLY
280 King of Prussia Road
Radnor, PA 19087
Tel:    (610) 667-7706
Fax:    (610) 667-7056

*Counsel for Plaintiffs Connecticut*

70

*Carpenters Pension Fund and Connecticut*
*Carpenters Annuity Fund*