# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, IRON WORKERS LOCAL NO. 25 PENSION FUND, WYOMING STATE TREASURER, LOS ANGELES COUNTY EMPLOYEES RETIREMENT ASSOCIATION, CONNECTICUT CARPENTERS PENSION FUND AND CONNECTICUT CARPENTERS ANNUITY FUND, Individually and On Behalf of All Others Similarly Situated,

                    Plaintiffs,

    v.

MERRILL LYNCH & CO. INC., MERRILL LYNCH MORTGAGE LENDING, INC., MERRILL LYNCH MORTGAGE INVESTORS, INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, FIRST FRANKLIN FINANCIAL CORPORATION, CREDIT-BASED ASSET SERVICING AND SECURITIZATION LLC, J.P. MORGAN SECURITIES, INC., ABN AMRO INCORPORATED, MCGRAW-HILL COMPANIES, MOODY'S INVESTORS SERVICE, INC., MATTHEW WHALEN, PAUL PARK, BRIAN T. SULLIVAN, MICHAEL M. MCGOVERN, DONALD J. PUGLISI, DONALD C. HAN,

                    Defendants.

Civil Action No. 08 CIV. 10841 (JSR)
ECF Case

PLAINTIFFS' OPPOSITION TO MOODY'S INVESTORS SERVICE, INC. AND McGRAW-HILL COMPANIES, INC.'S MOTIONS TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

DEMAND FOR JURY TRIAL

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ..................................................................................... ii

I.      INTRODUCTION ......................................................................................... 1

II.     SUMMARY OF ALLEGATIONS ............................................................... 3

III.    ARGUMENT ................................................................................................ 8

        A.      The Rating Agency Defendants Are Liable As
                Underwriters Under Section 11 ...................................................... 9

                1.      Underwriters Are Those Who Participate In Steps
                        Necessary To A Security's Distribution ............................. 9

                2.      The Rating Agency Defendants Participated In
                        Steps Necessary To The Certificates' Distribution ................ 12

        B.      SEC Rule 436(g)(1) Does Not Preclude Plaintiffs' Claims ................ 15

        C.      The First Amendment Does Not Preclude Plaintiffs' Claims ............. 18

        D.      The Rating Agency Defendants Are Liable For The False
                And Misleading Statements ............................................................ 20

                1.      Material Misstatements And Omissions ............................. 20

                2.      The Rating Agency Defendants Had A Duty To
                        Disclose Omitted Material Facts ........................................ 24

                3.      The Bespeaks Caution Doctrine Is Inapplicable ................ 27

        E.      Plaintiffs Were Not On Inquiry Notice ........................................... 29

        F.      Plaintiffs Have Standing To Pursue Claims Related To All
                Offerings And Certificates ............................................................. 33

IV.     CONCLUSION ............................................................................................ 34

# TABLE OF AUTHORITIES

Case(s)                                                                                                    Page

*Ackerberg v. Johnson*,
   892 F.2d 1328 (8th Cir. 1989) ............................................................13

*In re Alstom SA Sec. Litig.*,
   406 F. Supp. 2d 402 (S.D.N.Y. 2005) ...............................................31

*In re Ames Dep't Stores, Inc. Note Litig.*,
   991 F.2d 968 (2d Cir. 1993) .........................................................29, 31

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) ....................................................................8

*Bano v. Union Carbide Corp.*,
   361 F.3d 696 (2d Cir. 2004) ...........................................................29

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................. passim

*Berckeley Inv. Group, Ltd. v. Colkitt*,
   455 F.3d 195 (3d Cir. 2006) ...........................................................13

*Caiola v. Citibank, N.A.*,
   295 F.3d 312 (2d Cir. 2002) ...........................................................24

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
   504 F.3d 229 (2d Cir. 2007) ...........................................................34

*Conley v. Gibson*,
   355 U.S. 41 (1957) ..........................................................................8

*Demaria v. Andersen*,
   318 F.3d 170 (2d Cir. 2003) ...........................................................21

*In re Donald J. Trump Casino Sec. Litig.*,
   7 F.3d 357 (3d Cir. 1993) ...............................................................28

*Dorchester Investors v. Peak Int'l Ltd.*,
   134 F. Supp. 2d 569 (S.D.N.Y. 2001) .........................................29, 33

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
   472 U.S. 749 (1985) .......................................................................19

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
   511 F. Supp. 2d 742 (S.D. Tex 2005) .........................................17, 18

*In re Executive Telecard, Ltd. Sec. Litig.*,
    913 F. Supp. 280 (S.D.N.Y. 1996)........................................................................30

*In re Fitch, Inc.*,
    330 F.3d 104 (2d Cir. 2003)...............................................................................19

*In re Flag Telecom Holdings, Ltd., Sec. Litig.*,
    2009 U.S. Dist. LEXIS 37090 (S.D.N.Y. March 23, 2009) ...........................27, 28

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000)...............................................................................23

*Glazer v. Formica Corp.*,
    964 F.2d 149 (2d Cir. 1992)...............................................................................24

*Goldman v. Belden*,
    754 F.2d 1059 (2d Cir. 1985).............................................................................21

*Hall v. The Children's Place Retail Stores, Inc.*,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008)................................................................23

*Harden v. Raffensperger, Hughes & Co.*,
    65 F.3d 1392 (7th Cir. 1995) .......................................................................11, 12

*Herman & MacLean v. Huddleston*,
    459 U.S. 375, 103 S. Ct. 683 (1983)..................................................................20

*Ingenito v. Bermec Corp.*,
    441 F. Supp. 525 (S.D.N.Y. 1977).....................................................................10

*In re Initial Pub. Offering Sec. Litig.*,
    358 F. Supp. 2d 189 (S.D.N.Y. 2004)................................................................28

*In re Jenny Craig Sec. Litig.*,
    1994 U.S. Dist. LEXIS 19781 (S.D. Cal. Nov. 22, 1994) .....................................17

*Kassner v. 2nd Ave. Delicatessen, Inc.*,
    496 F.3d 229 (2d Cir. 2007)................................................................................8

*Lapin v. Goldman Sachs Group, Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006).................................................................31

*LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*,
    951 F. Supp. 1071 (S.D.N.Y. 1996)...............................................................18, 19

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)...........................................................................29, 30

*Lin v. Interactive Brokers Group, Inc.*,
    574 F. Supp. 2d 408 (S.D.N.Y. 2008)...................................................................................25

*In re Lorsin, Inc.*,
    82 S.E.C. Docket 3044...............................................................................................................13

*McFarland v. Memorex Corp.*,
    493 F. Supp. 631 (N.D. Cal. 1980) ................................................................................13, 14, 15

*In re Merrill Lynch & Co., Research Reports Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003)......................................................................................26

*In re Metlife Demutualization Litig.*,
    2009 U.S. Dist. LEXIS 46730 (E.D.N.Y. May 27, 2009) ..................................................21

*Milman v. Box Hill Sys. Corp.*,
    72 F. Supp. 2d 220 (S.D.N.Y. 1999)..............................................................................21, 24, 31

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009)......................................................................................31

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
    2009 WL 256005 (S.D.N.Y. Feb. 2, 2009)..............................................................................26

*Newman v. Warnaco Group, Inc.*,
    335 F.3d 187 (2d Cir. 2003).......................................................................................................29

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996).............................................................................................................28

*P. Stolz Family P'ship L.P. v. Daum*,
    355 F.3d 92 (2d Cir. 2004).........................................................................................................27

*Pinter v. Dahl*,
    486 U.S. 622 (1988)....................................................................................................................10

*In re Prudential Sec. Inc. P'shps Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996)..............................................................................................28

*In re Refco, Inc. Sec. Litig.*,
    2008 U.S. Dist. LEXIS 62543 (S.D.N.Y. Aug. 14, 2008) ................................................14, 15

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)......................................................................................14

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).......................................................................................................27

*Schuh v. Druckman & Sinel, LLP*,
    2009 U.S. Dist. LEXIS 47185 (S.D.N.Y. Feb 3, 2009)........................................................15

*SEC v. Chinese Consol. Benevolent Ass'n, Inc.*,
    120 F.2d 738 (2d Cir. 1941), *cert. denied*, 314 U.S. 618 (1941)...........................................10

*SEC v. Holschuh*,
    694 F.2d 130 (7th Cir. 1982) ................................................................................................11

*SEC v. Kern*,
    425 F.3d 143 (2d Cir. 2005).........................................................................................2, 10, 12

*SEC v. Lybrand*,
    200 F. Supp. 2d 384 (S.D.N.Y. 2002)..................................................................................13

*SEC v. N. Am. Research & Dev. Corp.*,
    424 F.2d 63 (2d Cir. 1970)....................................................................................................10

*SEC v. Universal Express, Inc.*,
    475 F. Supp. 2d 412 (S.D.N.Y. 2007)..................................................................................10

*SEC v. Van Horn*,
    371 F.2d 181 (7th Cir. 1966) ................................................................................................11

*Special Situations Fund, III, L.P. v. Cocchiola*,
    2007 WL 2261557 (D.N.J. Aug. 3, 2007) ...........................................................................10

*Staehr v. Hartford Fin. Servs. Group, Inc.*,
    547 F.3d 406 (2d Cir. 2008)......................................................................................29, 30, 33

*In re Taxable Mun. Bond Sec. Litig.*,
    1993 U.S. Dist. LEXIS 18592 (E.D. La. Dec. 29, 1993)......................................................19

*TSC Indus. v. Northway, Inc.*,
    426 U.S. 438 (1976)..............................................................................................................21

*In re Twinlab Corp. Sec. Litig.*,
    103 F. Supp. 2d 193 (E.D.N.Y. 2000) ............................................................................20, 25

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 431 (S.D.N.Y. 2003)..................................................................................29

*In re WorldCom, Inc. Sec. Litig.*,
    346 F. Supp. 2d 628 (S.D.N.Y. 2004)..................................................................................24

*In re WorldSpace Sec. Litig.*,
    2008 WL 2856519 (S.D.N.Y. July 21, 2008) .................................................................29, 33

## STATUTES, RULES & REGULATIONS

15 U.S.C.
  § 77b(a)(11) ............................................................................... passim
  § 77k(a) ....................................................................................... passim
  § 77k(a)(5) ..............................................................................9, 22, 24

17 C.F.R.
  § 230.408................................................................................................25
  § 230.436(g)(1) ....................................................................................16

46 Fed. Reg. 42024 01, 42025 (Aug. 18, 1981)................................16

47 Fed. Reg. 11380, 11392 n.53 (Mar. 16, 1982) ...........................16

59 Fed. Reg. 46314, 46316 n.19 (Sept. 7, 1994) ............................16

Federal Rules of Civil Procedure
  Rule 8...................................................................................................2, 9
  Rule 8(a)..................................................................................................8

Federal Rules of Evidence
  Rule 201(b) ..........................................................................................33

The Public Employees' Retirement System of Mississippi ("Lead Plaintiff" or "MissPERS"), along with the Wyoming State Treasurer ("Wyoming"), the Los Angeles County Employees Retirement Association ("LACERA"), the Connecticut Carpenters Pension Fund and Connecticut Carpenters Annuity Fund ("Connecticut Carpenters"), and the Iron Workers Local No. 25 Pension Fund ("Iron Workers") (collectively, "Plaintiffs"), respectfully submit this memorandum of law in support of their opposition to Moody's Investors Service, Inc. and McGraw-Hill Companies, Inc.'s Motions To Dismiss The Consolidated Class Action Complaint [Dkts. 61, 62].

I.      INTRODUCTION

This class action asserts claims under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, 15 U.S.C. § 77 *et seq.* (the "Securities Act"), related to over $63 billion of purportedly investment grade mortgage-backed certificates ("Certificates") which Defendants offered to investors between 2005 and 2007 through registration statements, prospectuses and prospectus supplements ("Offering Documents") which contained untrue statements and omissions.[1]

The Rating Agency Defendants played a pivotal role in the issuance of the Certificates. They assisted in evaluating and structuring the mortgage loan pools underlying the Certificates. ¶¶26, 27, 40, 56, 57, 152-53, 158-61, 169.  The distribution of the Certificates to investors was

---

[1] ¶57.  References to "¶__" are to paragraphs of the Class Action Complaint for Violations of §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Complaint") [Dkt. 52].  "Defendants" refers collectively to (1) Merrill Lynch & Co., Inc. ("Merrill Lynch"), Merrill Lynch Mortgage Investors, Inc. (the "Merrill Depositor"), Merrill Lynch Mortgage Lending, Inc. (the "Merrill Sponsor"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch PFS") (collectively, the "Merrill Lynch Defendants"); (2) First Franklin Financial Corporation, Credit-Based Asset Servicing and Securitization LLC; (3) J.P. Morgan Securities, Inc., ABN AMRO, Inc. ("Underwriter Defendants"); (4) Matthew Whalen, Paul Park, Brian T. Sullivan, Michael M. McGovern, Donald J. Puglisi and Donald C. Han (the "Individual Defendants"); and (5) Standard & Poor's ("S&P") (a division of McGraw-Hill Companies) and Moody's Investors Service, Inc. ("Moody's") (together, the "Rating Agency Defendants").

expressly conditioned on the Rating Agency Defendants assigning pre-determined, investment-grade ratings. ¶¶56, 154, 158, 160, 169. Without these ratings, the Certificates could not have been distributed. As such, the Rating Agency Defendants clearly acted as "underwriters" within the Securities Act and are, therefore, strictly liable for any untrue statement or material omission in the Offering Documents. *SEC v. Kern*, 425 F.3d 143, 152 (2d Cir. 2005) (underwriter includes every person who engages in "steps necessary to the distribution of security issues.").

Here, Plaintiffs have properly alleged, in accordance with the notice pleading standards of Fed. R. Civ. P. 8 and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), that the Rating Agency Defendants acted as underwriters. Under the Securities Act, an underwriter is defined broadly to include "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking. . ." 15 U.S.C. 77b(a)(11). Here, the Rating Agency Defendants performed tasks necessary to the distribution of the Certificates as they (1) participated in the structuring of the offerings; and (2) assigned and issued ratings that were a condition precedent to the Certificates' distribution. ¶¶26, 27, 40, 56, 57, 152-54, 158-61, 169.

The Rating Agency Defendants have now admitted that the Certificates' ratings were based on insufficient information and faulty assumptions. ¶¶161-62, 164, 166-68. The former Managing Director and Head of Residential Mortgage Backed Securities Ratings at S&P testified that the credit rating models were not updated on a timely basis. ¶167. By early 2004, S&P had developed, but not implemented, a ratings model that considered nearly 10 million loans and "covered the full spectrum of new mortgage products, particularly in the Alt-A and fixed/floating payment type categories." *Id.* Additionally, a former Managing Director of Credit Policy at

Moody's testified that the rating agencies "did not update their models or their thinking" during the period at issue. ¶168. Likewise, the SEC concluded on July 8, 2008 that none of the rating agencies had specific written procedures for rating mortgage-backed securities, that ratings criteria were not disclosed, and that "significant steps" in the rating process were not documented. ¶164. As a result, the Certificates received unjustifiably high ratings. ¶¶9, 167, 173.

In sum, Plaintiffs have properly alleged that the Certificates' ratings were unjustifiably high and that the Rating Agency Defendants failed to disclose that (1) the Certificates' ratings were based on outdated and unreliable modeling of borrowers' default risks; and (2) their compensation arrangement could interfere with "providing ratings of integrity." ¶¶166, 172. As underwriters, the Rating Agency Defendants are strictly liable for all of the misstatements and omissions in the Offering Documents, including the misstatements concerning the ratings. Accordingly, the Rating Agency Defendants' Motions To Dismiss should be denied.

## II.    SUMMARY OF ALLEGATIONS

The Rating Agency Defendants, in coordination with the Merrill Lynch Defendants, took steps necessary to the distribution of over $63 billion in Certificates in 84 different offering trusts.[2] The Certificates were sold primarily to conservative institutional investors – such as the Plaintiffs – who purchased the Certificates as purportedly safe, investment-grade instruments. ¶53. As set forth below, however, the Offering Documents contained untrue statements of material fact and omitted material facts necessary to make statements about the underlying loans, their originations and the ratings not misleading.

---

[2] ¶¶42-44. For further factual detail, Plaintiffs respectfully refer the Court to the concurrently-filed Plaintiffs' Opposition To The Motions To Dismiss The Consolidated Class Action Complaint By The Merrill Lynch Defendants, ABN AMRO, Inc., JP Morgan Securities, Inc. and Credit-Based Asset Servicing And Securitization (the "Merrill Lynch Opposition").

As detailed further in the Merrill Lynch Opposition, Merrill Lynch established the Merrill Sponsor, who, along with First Franklin and C-BASS, originated and acquired large volumes of loans from various originators, including Countrywide Home Loans, Inc. ("Countrywide"), American Home Mortgage Corp. ("American Home Mortgage"), IndyMac Bank F.S.B. ("IndyMac"), and Ownit Mortgage Solutions, Inc. ("Ownit"). ¶¶5, 38, 65-138. Then, the Merrill Depositor acquired the loans, transferred them to an issuing trust and "securitized" the pool so the rights to the cash flows could be sold to investors. ¶¶38-9. The Rating Agency Defendants rated the Certificates.[3] It was an express condition of the issuance of the Certificates that they be assigned particular, pre-determined, investment-grade ratings. ¶¶56, 154, 158, 160, 169. Determining the Certificates' ratings in advance was necessary to market the securities to conservative investors such as banks, mutual funds and public pension funds, many of whom are required to purchase and hold only investment-grade securities. ¶53.

Historically, Nationally Recognized Statistical Rating Organizations ("NRSRO") such as the Rating Agency Defendants functioned as independent and objective consultants, and did not create or design any of the financial products they rated. ¶53. Here, however, in order to conform the loan pools underlying the Certificates to the pre-determined ratings, the Rating Agency Defendants participated directly in the structuring of the mortgage loan pools underlying the Certificates and issued the pre-determined ratings. ¶¶40, 152, 158-160, 161. For example, Defendants structured the Certificates with certain "credit enhancements" which purported to provide investors with additional layers of protection, and came in various forms including

---

[3] ¶39. Moody's highest investment rating is "Aaa." S&P's highest rating is "AAA." These ratings signify the highest investment-grade, and are considered to be of the "best quality," and carry the smallest degree of investment risk. Ratings of "AA," "A," and "BBB" represent high credit quality, upper-medium credit quality and medium credit quality, respectively. These ratings are considered "investment-grade ratings." Any instrument rated lower than BBB is considered below investment-grade.

subordinations, shifting interest, overcollateralization and excess interest. ¶152. The Rating

Agency Defendants had significant control of the Certificates' credit enhancements:

> The amount of any applicable credit support supporting one or more classes of
> offered securities, including the subordination of one or more classes of securities,
> **will be determined on the basis of criteria established by each rating agency**
> rating such classes of securities based on an assumed level of defaults,
> delinquencies, other losses or other factors.

*See* Declaration of Joshua M. Rubins In Support Of Moody's Investors Service, Inc.'s Motion To

Dismiss ("Rubins Decl."), Ex. B at 4 (emphasis added).

The Rating Agency Defendants' compensation and compensation scheme was not

disclosed in the Offering Documents and, therefore, investors were unaware of significant

conflicts of interest which affected the objectivity and independence of the ratings. ¶¶169-172.

The compensation scheme generated conflicts of interest as "rating agencies have an interest in

generating business from the firms that seek the rating, which could conflict with providing

ratings of integrity." ¶172. A number of factors exacerbated these conflicts. Because a limited

number of major investment banks controlled the mortgage securitization market, the Rating

Agency Defendants were not incentivized to update their models since doing so would result in

their inability to generate the required "AAA" ratings. This limitation would hinder the Rating

Agency Defendants' future engagement to rate mortgage-backed securities, a business with

"high profit margins." Further, "[w]hile each rating agency ha[d] policies and procedures

restricting analysts from participating in fee discussions with issuers, these policies still allowed

key participants in the ratings process to participate in fee discussions." ¶172.

The Offering Documents stated that the ratings assigned to the Certificates "address the

likelihood of the receipt by certificateholders of payments required under the operative

agreements." ¶158. Further, the ratings purported to "take into consideration the credit quality

of the mortgage pool including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream of the mortgage pool is adequate to make payments under the certificates." ¶154.

As is now known, the ratings were unjustifiably high and did not represent the true risk of the underlying mortgage loans as they were based on insufficient information and faulty assumptions concerning the likelihood of delinquencies and defaults in the underlying mortgages. ¶161. Further, executives of the Rating Agency Defendants have admitted that the method they used to rate mortgage-backed securities between 2006 and 2007 was significantly flawed as it was based on outdated and unreliable modeling of borrowers' default risks. ¶¶161-62, 164, 166-68. Frank Raiter, the former Managing Director and Head of Residential Mortgage Backed Securities Ratings at S&P, stated that credit rating modeling was not updated on a timely basis, despite the fact that by early 2004, S&P had developed a ratings model that considered nearly 10 million loans and "covered the full spectrum of new mortgage products, particularly in the Alt-A and fixed/floating payment type categories." ¶167. Jerome Fons, a former Managing Director of Credit Policy at Moody's, testified that the rating agencies "did not update their models or their thinking" during the period of deterioration in credit standards. ¶168. According to Mr. Raiter, a consequence of continuing to use outdated versions of the rating model was:

> the failure to capture changes in performance of the new non-prime products. As a result, expected loss estimates no longer provided the equity necessary to support the AAA bonds. This, in turn, generated the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market.

*Id.* Deven Sharma, the President of S&P, stated that "many of the forecasts we used in our ratings analysis of certain structured finance securities have not been borne out." ¶166.

On July 8, 2008, the SEC issued the *The Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies* ("Summary Report")

following its investigation into the rating agencies' role in rating mortgage-backed securities. The Summary Report found numerous flaws in the rating agencies' methodologies, including:

- Relevant ratings criteria were not disclosed;

- None of the rating agencies examined had specific written procedures for rating RMBS and CDOs;

- The rating agencies did not always document significant steps in the rating process – including the rationale for deviations from their models and for rating committee actions and decisions – and they did not always document significant participants in the ratings process;

- Rating agencies do not appear to have specific policies and procedures to identify or address errors in their models or methodologies;

- The rationale for deviations from the model or out of model adjustments was not always documented in deal records. As a result, in its review of rating files, the Staff could not always reconstruct the process used to arrive at the rating and identify the factors that led to the ultimate rating; and

- There was a lack of documentation of rating agency committee actions and decisions.

¶164. The Summary Report also stated that the rating agencies' actions "make it difficult for the rating agencies' internal compliance staff or internal audit staff to assess compliance with the firms' policies and procedures when conducting reviews of rating agency activities." ¶165.

The SEC has proposed new regulatory rules that would, *inter alia:* (1) prohibit rating agencies from issuing ratings on mortgage pass-through certificates, unless information on the underlying loans was made available; (2) prohibit credit rating agencies from structuring the same products they rate; and (3) require public disclosure of the information used by credit rating agencies in determining a rating on a structured product. ¶163.

The Rating Agency Defendants maintained investment-grade ratings on the Certificates until April 24, 2008, but have since downgraded many of the Certificates. ¶¶9, 160, 167, 173. The delinquency, foreclosure and bank ownership rates on the underlying mortgage loans have soared. ¶174. For example, in one of the issuing trusts, more than 67% of the underlying

mortgages are either 60 days or more delinquent, in foreclosure, or the collateral was retaken by the lender. ¶174. In another, more than 37% of the underlying mortgage loans are in foreclosure. *Id.* As a result, the value of the Certificates has declined significantly.

III.    ARGUMENT

As explained in the Merrill Lynch Opposition, Fed. R. Civ. P. 8(a) requires only "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the...claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41 (1957)). Plaintiffs are not required to plead "detailed factual allegations." *Twombly*, 550 U.S. at 555.

Accordingly, a Section 11 claim can only be dismissed at the pleading stage if the plaintiff's factual allegations are insufficient "to state a claim to relief that is plausible on its face." *Id.* at 570. This "plausibility standard" only requires a plaintiff to plead facts evidencing the possibility, rather than the probability, that a defendant has acted unlawfully. *Twombly*, 550 U.S. at 555. In evaluating a case at the pleading stage, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1943 (2009); *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).

As detailed below, the Complaint properly alleges, in accordance with Fed. R. Civ. P. 8 and *Twombly*, that the Offering Documents contained untrue statements and omissions and that the Rating Agency Defendants acted as underwriters in connection with the Certificates. ¶¶4, 7-9, 26, 27, 40, 56, 57, 64, 67, 120, 151-54, 157-61, 169, 181-82. These facts not only provide "fair notice" of Plaintiffs' claims, but are sufficient to state a plausible claim that the Rating

Agency Defendants acted as underwriters and are strictly liable under Section 11.  Accordingly, the Rating Agency Defendants' Motions To Dismiss should be denied.

      A.      The Rating Agency Defendants Are
                Liable As Underwriters Under Section 11

            1.      Underwriters Are Those Who Participate In
                      Steps Necessary To A Security's Distribution

Section 11 provides a private right of action to persons who acquire securities pursuant to a registration statement which contains "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  Section 11 liability is based on a requirement that "all those responsible for statements upon the face of which the public is solicited to invest its money shall be held to standards like those imposed by law upon a fiduciary."  H.R. Conf. Rep. No. 73-85, at 5 (1933).  Section 11(a) defines the persons who are subject to strict liability for misstatements and omissions in a registration statement to include, *inter alia*, "…(4)…any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement…(5) every underwriter with respect to such security."  15 U.S.C. § 77k(a)(5).  Here, the Rating Agency Defendants acted as underwriters in connection with the offerings of the Certificates pursuant to the Offering Documents.

The term "underwriter" includes "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, ***or participates or has a direct or indirect participation in any such undertaking*** . . ." 15 U.S.C. § 77b(a)(11) (emphasis added).   The Conference Committee Report that accompanied the Securities Act confirms that, in addition to traditional underwriters, the definition in § 77b(a)(11) includes:

Persons…who participate in any underwriting transaction or who have a direct or indirect participation on such a transaction…***The test is one of participation in the underwriting undertaking*** rather than that of a mere interest in it.

H.R. Conf. Rep. No. 73-152, at 24 (1933); *cf. Pinter v. Dahl*, 486 U.S. 622, 650 n.26 (1988) (recognizing that liabilities and obligations expressly grounded in participation are found in numerous places in the Securities Act, including the provisions defining underwriter in § 77b(a)(11)).

Courts in this Circuit and elsewhere have interpreted the term "underwriter" broadly. *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 431 (S.D.N.Y. 2007) (stating that "[t]he term [underwriter] should be 'broadly defined to include anyone who directly or indirectly participates in a distribution of securities from an 'issuer' to the public'" (quoting *SEC v. N. Am. Research & Dev. Corp.*, 424 F.2d 63, 72 (2d Cir. 1970))). *See also Special Situations Fund, III, L.P. v. Cocchiola*, 2007 WL 2261557, at *5 (D.N.J. Aug. 3, 2007) ("To be an underwriter under the Securities Act, it is not necessary for a person to undertake the risk that they will be left holding unsold shares…. Nor must a party actually sell shares to the public to be an underwriter under the Securities Act, ***mere participation in an offering is enough***") (emphasis added). Even *Ingenito v. Bermec Corp.*, 441 F. Supp. 525, 536 (S.D.N.Y. 1977), on which the Rating Agency Defendants rely, recognizes that an underwriter is an entity who either performs the traditional underwriting function, "or he performs some act (or acts) that facilitates the issuer's distribution. He participates in the transmission process between the issuer and the public." *Id.* at 536.

The Second Circuit has explicitly recognized that the definition of underwriter includes every person who engages in "steps ***necessary*** to the distribution of security issues." *Kern*, 425 F. 3d at 152 (citing *SEC v. Chinese Consol. Benevolent Ass'n, Inc.*, 120 F.2d 738, 741 (2d Cir. 1941), *cert. denied*, 314 U.S. 618 (1941) (emphasis added). The Seventh Circuit agrees, and has

applied this standard in a Section 11 context. *See Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392, 1400 (7th Cir. 1995). In *Harden*, the defendant was retained as a "qualified independent underwriter" to perform due diligence on the registration statement and recommend a minimum yield. At no point did the defendant "purchase or sell securities, solicit orders, take part in the actual distribution, assume any risk of sale of the securities or do other things commonly associated with an underwriter's role." *Id.* at 1396. Nevertheless, the court found that the defendant was an underwriter under Section 11 because "its role … was '***necessary*** to the distribution of [the Firstmark] securities.'" *Id.* at 1401 (quoting *SEC v. Holschuh*, 694 F.2d 130, 139 n. 13 (7th Cir. 1982) (emphasis added)); *accord SEC v. Van Horn*, 371 F.2d 181 (7th Cir. 1966).

The Rating Agency Defendants' contention that they can escape liability because their consent was not included in the Offering Documents is a red herring. Moody's Mot. at 10-11; McGraw-Hill Mot. at 5-6, 8-12.[4] Plaintiffs allege that the Rating Agency Defendants are liable as underwriters under Section 11(a)(5), not as experts under Section 11(a)(4). The Rating Agency Defendants cite no authority requiring underwriters to consent to being named as having prepared or certified a portion of the registration statement. Likewise, the Rating Agency Defendants' assertion that they were not identified to investors as having prepared any part of the Offering Documents is incorrect. In fact, each Prospectus Supplement named the Rating Agency Defendants as having prepared and assigned the Certificates' ratings, and stated that it was "a

---

[4] "Moody's Mot." and "McGraw-Hill Mot." refer to the Motions To Dismiss of Moody's and McGraw-Hill, respectively [Dkts. 61, 62]. "ML Mot." refers to the Motion To Dismiss of the Merrill Lynch Defendants and the Individual Defendants [Dkt. 59]. "Underwriter Mot." refers to the Motion To Dismiss of ABN AMRO, Incorporated and JP Morgan Securities, Inc. [Dkt. 56]. "C-BASS Mot." refers to the Motion To Dismiss of Credit-Based Asset Servicing and Securitization LLC [Dkt. 67].

condition of the issuance of the Offered Certificates that they be assigned" particular, pre-determined ratings. ¶158.

2.    The Rating Agency Defendants Participated In
Steps Necessary To The Certificates' Distribution

The Rating Agency Defendants' contention that the Complaint merely parrots the statutory definition of an underwriter is incorrect. Moody's Mot. at 2, 8; McGraw-Hill Mot. at 16. In fact, Plaintiffs allege that the Rating Agency Defendants participated extensively in the Certificates' offering and performed tasks that were necessary to the distribution of the Certificates. Specifically, the Complaint alleges that the Rating Agency Defendants (1) participated extensively in the structuring of the offerings; and (2) assigned and issued the ratings that were a condition precedent to the distribution of the Certificates. ¶¶26, 27, 40, 56, 57, 152-54, 158-61, 169.

As stated above, the assignment of the ratings – according to the explicit language of the Prospectus Supplements – was *a condition of the issuance* of the Certificates. ¶¶26, 27, 40, 56, 57, 153, 158-160, 169. In other words, without the Rating Agency Defendants' pre-determined ratings, these Certificates would never have been "distributed" to investors. Clearly, the Rating Agency Defendants' participation *was necessary* to the distribution of the Certificates. *See Kern*, 425 F.3d at 152; *Harden*, 65 F.3d at 1395. The Rating Agency Defendants also worked "[i]n coordination" with the sponsor, the underwriters, the mortgage loan sellers and the servicers "in structuring the securitization transaction." *See* Rubins Decl., Ex. B at S-35-36. Having participated in structuring the transaction – and engaged in steps necessary to the distribution of the Certificates – the Rating Agency Defendants are liable as underwriters.

The Rating Agency Defendants argue that Section 11's definition of underwriter should be narrowly construed. For example, they argue that only parties that serve as "conduits" from

the issuer to investors can be characterized as underwriters. In support of this argument, however, they cite numerous cases which deal with the Section 4(1) registration exemption for routine transactions between individual investors. *See* Moody's Mot. at 12-16 (citing *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 214-15 (3d Cir. 2006); *Ackerberg v. Johnson*, 892 F.2d 1328, 1335-36 (8th Cir. 1989); *McFarland v. Memorex Corp.*, 493 F. Supp. 631, 644 (N.D. Cal. 1980)); McGraw-Hill Mot. at 12-18 (citing *McFarland*, 493 F. Supp. at 643; *In re Lorsin, Inc.*, 82 S.E.C. Docket 3044, Release No. 250 (May 11, 2004); *SEC v. Lybrand*, 200 F. Supp. 2d 384, 393 (S.D.N.Y. 2002); *Ackerberg*, 892 F.2d at 1336-37)). None of these cases hold, however, that Section 2(a)(11)'s definition of underwriter should be limited to "conduits." *See In re Lorsin*, 82 S.E.C. Docket 3044, at *7 (remarking that case turned on whether defendant acquired stock from an issuer with a view towards distribution); *Lybrand*, 200 F. Supp. 2d at 393 (noting that Congress enacted a broad definition of underwriter and finding that defendants were not eligible for exemption under Section 4(1), as they acquired their shares with an intention to transfer them); *Ackerberg*, 892 F.2d at 1337 (holding that no public offering took place because purchaser was a sophisticated investor who was not in need of the protections afforded by registration under the 1933 Act); *Berckeley Inv. Group*, 455 F.3d at 212-15 (holding that the key inquiry was whether defendant could demonstrate that sales were made to individuals or entities that did not require registration protections).

The Rating Agency Defendants also maintain that in order to be classified as an underwriter, a party must actually distribute the security, rather than simply participating in a necessary step in the distribution of that security. Moody's Mot. at 13-14, McGraw-Hill Mot. at 2, 13-14. They rely, however, on a number of distinguishable cases. For example, in *McFarland*, 493 F. Supp. 631, plaintiffs alleged that original warrant holders who sold the

warrants to underwriters (who in turn exercised the warrants and sold the stock through a public offering) were liable as underwriters.  *Id.* at 644.  The court found that the original warrant holders had "no interest, direct or indirect," and played an inactive role in the offering.  *Id.* at 646.

The Rating Agency Defendants also attempt to compare this case to *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 629 (S.D.N.Y. 2007) (*"Refco I"*) and *In re Refco, Inc. Sec. Litig.*, 2008 U.S. Dist. LEXIS 62543, at *4 (S.D.N.Y. Aug. 14, 2008) (*"Refco II"*).  Moody's Mot. at 12-13; McGraw-Hill Mot. at 9-11, 17.  There, defendants purchased unregistered bonds and "immediately resold the bonds" to the plaintiffs.  *Refco I*, 503 F. Supp. 2d at 620.  Later, Refco permitted the holders of the unregistered bonds to exchange their holdings for registered bonds. Plaintiffs alleged that the offering documents for the registered bond offering contained misstatements, and that the defendants – purchasers of the unregistered bonds – were underwriters of the registered bonds.  *Id.* at 629.  The court dismissed plaintiffs' complaint as there was only a "single sentence" alleging that the defendants acted as underwriters.  *Id.* at 629-30.

In their amended complaint, the *Refco* plaintiffs alleged that the purchasers of the unregistered bonds and their lawyers commented on draft registration statements for the registered offering.  *Refco II*, 2008 U.S. Dist. LEXIS 62543, at *4.  In concluding that the defendants were not liable as underwriters, the court remarked that Section 2(a)(11)'s definition of underwriter did not include those who "merely comment[ed] on a draft of a registration statement...."  *Id.*

Here, unlike the passive warrant holders in *McFarland* and the original purchasers of the unregistered bonds in *Refco*, the Rating Agency Defendants actively participated in structuring

the securitizations, assigned the necessary, pre-determined ratings and "h[e]ld themselves out as professionals who are able to evaluate the financial condition of the issuer," and "exercised control over the content" of the Offering Documents. *Id.* ¶¶56, 154, 158, 160, 185. Clearly this level of participation exceeds that found in *Refco II*, where the defendants "merely comment[ed]" on a registration statement, and in *McFarland*, where the defendants were inactive participants with no interest in the offering.

The Rating Agency Defendants' reliance on *Schuh v. Druckman & Sinel, LLP*, 2009 U.S. Dist. LEXIS 47185 (S.D.N.Y. Feb 3, 2009), in support of the argument that Plaintiffs' claims are "conclusory" is likewise inapposite. Moody's Mot. at 14-15. In *Schuh*, plaintiffs alleged that defendants were statutory "debt collectors," but the complaint was devoid of any facts supporting this allegation. 2009 U.S. Dist. LEXIS 47185, at *6-7. In stark contrast, the Complaint here contains numerous factual allegations in support of its claim that the Rating Agency Defendants were underwriters. ¶¶56, 154, 158, 160, 185. Plaintiffs have clearly stated a claim, "plausible on its face," that the Rating Agency Defendants acted as underwriters. *Twombly*, 550 U.S. at 570.

B.     SEC Rule 436(g)(1) Does
       Not Preclude Plaintiffs' Claims

The Rating Agency Defendants argue that SEC Rule 436(g) provides complete immunity for the ratings in the Offering Documents. Moody's Mot. at 9-11; McGraw-Hill Mot. at 6-8. This argument is without merit.[5]

The plain text of Rule 436(g) shows that its exemption is of limited coverage:

Notwithstanding the provisions of paragraphs (a) and (b) of this section, ***the security rating*** assigned to ***a class of debt securities, a class of convertible debt securities, or a class of preferred stock*** by a nationally recognized statistical

---

[5] Rule 436(g) is inapplicable to the remaining untrue statements and omissions in the Offering Documents. The Rating Agency Defendants, having acted as underwriters, are strictly liable for those untrue statements and omissions.

rating organization [NRSRO] . . . shall not be considered a part of the registration statement prepared or certified by a person within the meaning of sections 7 and 11 of the Act.

SEC Regulation C, Rule 436(g)(1), 17 C.F.R. § 230.436(g)(1) (emphasis added).

By its plain terms, Rule 436(g) does not apply to the ratings of the Certificates. *See Adoption of Integrated Disclosure System*, Securities Act Release No. 6383, 47 Fed. Reg. 11380, 11392 n.53 (Mar. 16, 1982) (codified at 17 C.F.R. pts. 200, 201, 229, 230, 239, 240, 249, 250, 260, and 274) (noting that investment companies may include security ratings for equities in registration statements, but "may not be able to rely on Rule 436(g) in connection with such ratings in view of the Rule's limitation to debt and convertible debt securities and preferred stock."); *see also Nationally Recognized Statistical Rating Organizations*, SEC Release Nos. Release Nos. 33-7085; 34-34616, 59 Fed. Reg. 46314, 46316 n.19 (Sept. 7, 1994) (stating that "Rule 436(g) under the Securities Act does not cover equity securities"). Here, the Offering Documents state that the Certificates (1) "represent **ownership interest** in the issuing entity," and (2) "represent **beneficial ownership interests** in the underlying trust fund assets." *See* Rubins Decl., Ex. B at S-7. In other words, the Offering Documents themselves represent that the Certificates are not "debt securities, convertible debt securities or preferred stock." Thus, the ratings are not exempt pursuant to Rule 436(g), and must be "considered a part of the registration statement." ¶¶37, 41; 17 C.F.R. § 230.436(g)(1). Accordingly, Defendants – including the Rating Agency Defendants – are strictly liable for the untrue statements and omissions regarding the ratings.

Moreover, Rule 436(g) only exempts "the rating organization from liability **as an expert** under Section 11 of the Securities Act for security ratings included in registration statements." *Disclosure of Security Ratings in Registration Statements*, SEC Release Nos. 33-6336, 34-18012, 46 Fed. Reg. 42024 01, 42025 (Aug. 18, 1981) (emphasis added). As detailed herein, the Rating

Agency Defendants are liable as "underwriters" based on their participation in structuring the mortgage loan pools underlying the Certificates and taking steps necessary to the distribution of the Certificates. Accordingly, Rule 436(g) does not insulate the Rating Agency Defendants from liability for the additional misstatements and omissions in the Offering Documents.

The Rating Agency Defendants' reliance on *dicta* from *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 511 F. Supp. 2d 742, 817 n.77 (S.D. Tex 2005) does not support the argument that Rule 436(g) operates to absolve them of liability. Moody's Mot. at 11. There, plaintiffs asserted claims for negligent misrepresentation and for violation of the Connecticut Unfair Trade Practices Act against rating agencies related to their failure to exercise reasonable care relating to Enron's credit ratings and creditworthiness prior to its bankruptcy. *Id*. at 809. Plaintiffs did not allege violations of Section 11, nor did defendants invoke Rule 436(g). In a footnote, the court cited Rule 436(g), but did not apply it to the facts or rely upon it in reaching its conclusions. *Id*. at 817 n.77. *Enron* does not state that Rule 436(g) covers the rating of "ownership interests" in mortgage-backed securities, nor does it state that Rule 436(g) absolves rating agencies from liability where, like here, they act as underwriters.

The only other authority the Rating Agency Defendants cite is an unreported, three-paragraph case from outside the Second Circuit which does not mention Rule 436(g). *See* Moody's Mot. at 9-10 (citing *In re Jenny Craig Sec. Litig.*, 1994 U.S. Dist. LEXIS 19781, at *1 (S.D. Cal. Nov. 22, 1994)). Nothing in *Jenny Craig* suggests that Rule 436(g) provides absolute immunity to the Rating Agency Defendants for their role as an underwriter and for the untrue ratings in the Offering Documents. Indeed, the Rating Agency Defendants have not – and cannot – cite authority which supports their position, as the plain text of Rule 436(g) mandates that NRSROs are protected (1) only for a particular subset of securities not at issue here (*e.g.*

debt securities, convertible debt securities and preferred stock); and (2) only in their role as ratings "experts."

        C.       The First Amendment Does
                      Not Preclude Plaintiffs' Claims

The Rating Agency Defendants also argue that "courts have held that ratings issued by Moody's and other agencies are opinions that cannot, under the First Amendment, form the basis for liability." Moody's Mot. at 9 n.9; *see also* McGraw-Hill Mot. at 2, 7. The First Amendment does not provide blanket immunity from liability, and does not protect the Rating Agency Defendants here in their role as underwriters.[6] As the court in *Enron* stated, however, ***"there is no automatic, blanket, absolute First Amendment protection for reports from the credit rating agencies based on their status as credit rating agencies."*** 511 F. Supp. 2d at 817 (emphasis added). Other courts agree.

For example, in *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071 (S.D.N.Y. 1996), a credit rating agency was alleged to have recklessly disregarded the issuer's history of fraud and non-compliance with governing agreements. The court sustained investors' claims that the rating agency misrepresented the strength of the issuer and its bonds, and rejected the rating agency's claims that its ratings were entitled to the "privileges and immunities accorded to the press." *Id.* at 1095. The court also rejected the rating agency's attempt to invoke the "actual malice" standard, in part because the rating was privately

---

[6] Unquestionably, the First Amendment does not protect the multitude of misstatements relating to the origination of the underlying loans, the appraisals, the loan-to-value ratios and the overcollateralization that the Rating Agency Defendants are strictly liable for as underwriters.

contracted for and intended for use in the offering documents alone, rather than for publication in a general publication.[7]

Similarly, in *In re Fitch, Inc.,* 330 F.3d 104, 108-09 (2d Cir. 2003), the Second Circuit held that the First Amendment provides little protection to credit rating agencies who rate structured securities, like the ones at issue here. In *Fitch*, the rating agency assigned ratings to securities related to collateralized loan obligations. *Id.* at 107. The court concluded, for two independent reasons, that the First Amendment should not provide protections for rating agencies like it does for members of the press. First, the Court found that Fitch rated only transactions it has been hired to rate: "Unlike a business newspaper or magazine, which would cover any transactions deemed newsworthy, Fitch only 'covers' its own clients. We believe this practice weighs against treating Fitch like a journalist." *Id.* at 109-110. Notably, the fact that Fitch posted all of its ratings on its website did not dissuade the court from this conclusion. *Id.* at 106. Second, emails and other documents submitted under seal persuaded the court that Fitch took "a fairly active role . . . in commenting on proposed transactions and offering suggestions about how to model the transactions to reach the desired ratings." *Id.* at 110. This role revealed "a level of involvement with the client's transactions that is not typical of the relationship between a journalist and the activities upon which the journalist reports." *Id.* at 111.

Similar to the rating agencies in *LaSalle* and *Fitch*, the Rating Agency Defendants here privately contracted with the Merrill Lynch Defendants to assign ratings on each Certificate. Likewise, as in *Fitch*, the Rating Agency Defendants took an active role in the offerings. ¶¶4,

---

[7] *Id.* 1095-97 (citing *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 762 (1985)). *LaSalle* endorsed the approach taken by the court in *In re Taxable Mun. Bond Sec. Litig.*, 1993 U.S. Dist. LEXIS 18592, at *14-*15 (E.D. La. Dec. 29, 1993). There, the court rejected an argument by S&P that its ratings were protected by the First Amendment and stated that "the Fifth Circuit has held that statements about creditworthiness and even predictions may be actionable under the federal securities laws." *Id.*

53, 56, 159, 160.  Therefore, the Rating Agency Defendants are not journalists, the ratings are not "opinions," and neither is entitled to protection under the First Amendment.

        D.       The Rating Agency Defendants Are
                   Liable For The False And Misleading Statements

The Offering Documents contained materially false and misleading statements regarding (i) the underwriting process and standards by which the underlying mortgage loans were originated; (ii) the standards and guidelines used when evaluating and acquiring the loans; (iii) the value of the underlying real-estate securing the loans; (iv) the level of credit enhancement calculated to afford a certain pre-determined level of protection to investors; and (v) the credit rating of the Certificates.  ¶57.  In their motions to dismiss, the Rating Agency Defendants focus on the unjustifiably high ratings.  With respect to the additional untrue statements and omissions in the Offering Documents, Plaintiffs incorporate herein the arguments from § III.B of the Merrill Lynch Opposition.  Notably, the Rating Agency Defendants, as underwriters, are strictly liable for the additional untrue statements and material omissions in the Offering Documents.

        1.       Material Misstatements And Omissions

As stated above, Section 11 liability exists where a registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  Section 11 of the Securities Act imposes a "stringent standard of liability" and "places a relatively minimal burden on a plaintiff."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82, 103 S. Ct. 683, 686-87 (1983).  The plaintiff need only "allege that he purchased the security and that the registration statement contains false or misleading statements concerning a material fact."  *In re*

*Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 201 (E.D.N.Y. 2000). The Complaint amply meets this standard.

An omitted fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *see also Demaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003) ("A prospectus will violate federal securities laws if it does not disclose 'material objective factual matters,' or buries those matters beneath other information, or treats them cavalierly"). Materiality is a mixed question of law and fact which is typically left for the jury to decide. *TSC*, 426 U.S. at 450. Therefore, the standard on a motion to dismiss is "extraordinarily high." *See In re Metlife Demutualization Litig.*, 2009 U.S. Dist. LEXIS 46730, at *88 (E.D.N.Y. May 27, 2009). A "complaint may not properly be dismissed pursuant to 12(b)(6) ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 228 (S.D.N.Y. 1999) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).

The Certificates' ratings were unjustifiably high and did not represent the true risk of the Certificates as they were "based on insufficient information and faulty assumptions." ¶161. Further, the Rating Agency Defendants have admitted that the methodology used to rate mortgage-backed securities between 2005 and 2007 was based on outdated and unreliable modeling of borrowers' default risks. ¶166. Indeed, the President of S&P admitted that "many of the forecasts we used in our ratings analysis of certain structured finance securities have not been borne out." ¶166. Further, a former Managing Director of Credit Policy at Moody's stated

that the rating agencies "did not update their models or their thinking" during the period.  ¶168. The unjustifiably high ratings were untrue statements regarding the character and investment risk of the Certificates.  As underwriters, the Rating Agency Defendants are strictly liable for these and all other untrue statements in the Offering Documents.  15 U.S.C. § 77k(a)(5).

Plaintiffs also allege that the Offering Documents omitted facts necessary to make statements regarding the ratings not misleading.  15 U.S.C. § 77k(a).  For example, the Rating Agency Defendants failed to disclose that they were using outdated and unreliable models despite the existence of updated models.  The former Managing Director and Head of Residential Mortgage Backed Securities Ratings at S&P confirmed that by early 2004, S&P had developed, but not implemented, an updated model which considered a broader spectrum of mortgage products, particularly those in the Alt-A and fixed/floating payment type categories.  ¶167. Additionally, the Rating Agency Defendants failed to disclose that their compensation was based on the issuance of the pre-determined ratings, rather than objective and independent analysis. ¶¶161-62, 164, 166-69.  The SEC's Summary Report noted that "[t]he conflict of interest inherent in this model is that rating agencies have an interest in generating business from the firms that seek the rating, which could conflict with providing ratings of integrity."  ¶172.  The Summary Report also noted that the conflict of interest inherent in the issuer-pay model was "exacerbated" in rating mortgage-backed securities such as the Certificates.  An investment banker experienced with rating agency procedures has stated that this serious conflict of interest could lead to the objectivity of ratings being "compromised."  ¶171.  These omitted facts directly affected the likelihood that the Certificates would perform as the ratings represented.

The Rating Agency Defendants also assert that because certain facts regarding the Certificates' ratings and the Rating Agency Defendants' compensation were purportedly

publicly-known, they are immune from Section 11 liability.[8]  Defendants are wrong.  As the Complaint alleges, Defendants are liable for omitting material facts necessary to make all statements, including the ratings, not misleading.  Contrary to the Rating Agency Defendants' baseless conclusions, these omissions were not publicly-known and were not known by investors in the Merrill Certificates.  For example, although McGraw-Hill states that its ratings models for mortgage-backed securities were available via its website (Moody's specifically states that its models were not available), investors were unaware that credit rating modeling was not updated on a timely basis, and that as of 2004, S&P had a new, but un-deployed model that "covered the full spectrum of new mortgage products."  ¶167.  This fact was not publicly-disclosed until Frank Raiter's testimony on October 22, 2008.  *Id.*  Further, while McGraw-Hill contends that "the fact that S&P was engaged and paid by the issuers of the securities it rates is something that S&P has repeatedly and publicly stated," the Offering Documents omitted the information and the degree to which the rating agencies' drive to maintain its mortgage-backed securities business "exacerbated" these conflicts.  ¶172.  Investors were unaware of the full truth about these conflicts of interest until the SEC published the Summary Report in July 2008.  *Id.*

In sum, the Rating Agency Defendants' ratings affirmatively misrepresented the Certificates' risk.  In addition, the Rating Agency Defendants omitted material information necessary to make the ratings not misleading.  These facts are not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."

---

[8] McGraw-Hill Mot. at 20-21.  Defendants assertion is a twist on the "truth-on-the-market" defense which does not apply to Section 11 claims.  Nevertheless, any argument that the facts regarding the alleged misstatements and omissions were publicly-known is an intensely fact-specific inquiry which is inappropriate for resolution at the motion to dismiss stage. *Cf. Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (finding that the "truth-on-the-market" defense to securities fraud under Section 10(b) is "intensely fact-specific"); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 229 (S.D.N.Y. 2008) (holding that the "truth-on-the-market" defense is a fact-intensive query rarely settled on a motion to dismiss).

*Milman*, 72 F. Supp. 2d at 228.  Accordingly, the Complaint adequately alleges material misstatements and omissions regarding the ratings of the Certificates.

> 2.  The Rating Agency Defendants Had
> A Duty To Disclose Omitted Material Facts

The Rating Agency Defendants argue that they are not liable for omitting material facts relating to:  (1) the use of outdated and unreliable models; and (2) their compensation scheme because Plaintiffs "do not and cannot point to any rule or regulation" which required that this information be disclosed.  Moody's Mot. at 16-17; McGraw-Hill Mot. at 21-22.  Defendants are wrong.

In addition to the express language of Section 11, regulations and case law establish the Rating Agency Defendants' duty to disclose facts necessary to make statements in a registration statement not misleading.  15 U.S.C. § 77k(a).  For example, item 408 of Regulation C tracks Section 11's requirement nearly *verbatim*, stating: "In addition to the information expressly required to be included in a registration statement, there shall be added such further information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 230.408.  Second Circuit case law confirms the existence of this disclosure duty.  *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) (noting that once a party chooses to discuss material issues, he or she "ha[s] a duty to be both accurate and complete"); *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992) ("When a corporation does make a disclosure-whether it be voluntary or required-there is a duty to make it complete and accurate."); *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 687 (S.D.N.Y. 2004).

Here, the Offering Documents included disclosures regarding the structure and ratings of the Certificates.  As such, Defendants had a duty to disclose all material information regarding

the structure and ratings, including the compensation the Rating Agency Defendants received.[9]

Yet they did not. For example, although the Offering Documents stated that the Certificates' issuance was conditioned on the issuance of the ratings, it was not disclosed that the Rating Agency Defendants' fees were based on the issuance of the ratings, rather than objective and independent analysis. ¶169. Thus, investors were unaware that the conflicts of interest already present in the "issuer-pay" model were exacerbated and that the Rating Agency Defendants were not incentivized to update their models (as doing so could lead to the inability to generate the necessary investment-grade ratings). ¶¶169-72. Further, the Offering Documents failed to disclose that by early 2004, S&P had developed, but never implemented, a ratings model that "covered the full spectrum of new mortgage products, particularly in the Alt-A and fixed/floating payment type categories" and that Moody's "did not update their models or their thinking" during the period.[10]

---

[9] *See* 17 C.F.R. § 230.408. Specifically, the Complaint alleges that the Rating Agency Defendants had a duty to ensure that any statements included in the Offering Documents "were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading." ¶187.

[10] ¶167-68. The Rating Agency Defendants argue that even if they had a "duty to disclose," Plaintiffs have not alleged facts sufficient to show that the omitted facts were "known to the Defendants at the time the Offering Documents became effective." McGraw-Hill Mot. at 22-23; Moody's Mot. at 17. The Securities Act, however, does not require Plaintiffs to plead Defendants' knowledge of misrepresentations or omissions. "Lack of knowledge of misleading statements in a prospectus is an affirmative defense to a claim . . . for which the defendant bears the burden of proof." *Twinlab*, 103 F. Supp. 2d at 203-05 ("the defendant's knowledge of the misrepresentations is not an element of a [Securities Act] claim; indeed, a defendant can be held liable even for an innocent misstatement."). The Rating Agency Defendants' citation of *Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408 (S.D.N.Y. 2008), supports Plaintiffs' position. There, defendants moved to dismiss plaintiffs' complaint, arguing that they had no duty to disclose the allege misstatements as they had no knowledge of the misstatements at the time investors purchased in the initial public offering. *Id.* 421-22. The court recognized that whether the defendants had knowledge was a factual inquiry, and ordered discovery on the issue. *Id.* 422-23. Plaintiffs respectfully refer the Court to the Merrill Lynch Opposition, at § III.B.1.b.

The Rating Agency Defendants cite two factually inapposite cases in support of their argument that they had no duty to disclose. In *In re Morgan Stanley Tech. Fund Sec. Litig.*, 2009 WL 256005, at *7 (S.D.N.Y. Feb. 2, 2009), plaintiffs alleged that the defendant (an investment bank and a series of its mutual funds) had a duty to disclose: (1) conflicts of interest between the defendant's analysts and its investment banking business; and (2) select business practices that had the effect of inflating the price of its shares. *Id.* The court, however, found that the defendant had no duty to disclose because (1) the regulations on which plaintiffs relied were inapplicable to the defendant, and did not give rise to a duty, *id.* at *7-*11, and (2) plaintiffs "***have not alleged any facts***" that business practices caused an inflation in the company's shares and "***there are no allegations*** that any of the Funds' investor advisors were aware of the alleged conflicts of interest." *Id.* at *12 (emphasis added).

Here, by contrast, Section 11 and the regulations promulgated thereunder clearly establish a duty to disclose information necessary to make other statements in the Offering Documents not misleading. Further, unlike the complaint in *Morgan Stanley*, the Complaint here alleges specific omitted information regarding the use of outdated and unreliable models and the Rating Agency Defendants' compensation which directly affected whether the Certificates' ratings accurately represented the investment risk of the Certificates.[11]

---

[11] ¶¶161-172, 187. The facts and conditions *In re Merrill Lynch & Co., Research Reports Sec. Litig.*, 272 F. Supp. 2d 243 (S.D.N.Y. 2003), are akin to those in *Morgan Stanley*, and thus equally distinguishable. There, the court held that the defendant mutual fund had no duty to disclose (1) that its broker-dealer affiliate provided investment banking services to companies in which it invested; and (2) that the affiliate issued purportedly misleading research reports on many of the securities held in the defendant's portfolios. *Id.* at 250-52. As in *Morgan Stanley*, the court's reasoning turned largely on the fact that the plaintiffs attempted unsuccessfully to import duties from inapplicable SEC regulations. The court also found that there was no duty because the information regarding the purported conflicts of interest was public knowledge. *Id.* Here, as explained above, many material facts regarding the Rating Agency Defendants remained undisclosed until the SEC's Summary Report was published in July 2008.

### 3. The Bespeaks Caution Doctrine Is Inapplicable

The Rating Agency Defendants cite nine boilerplate statements in the Offering Documents about the nature of the unjustifiably high ratings, and claim that these statements insulate them from liability under the "bespeaks caution" doctrine. Moody's Mot at 17-19; McGraw-Hill Mot. at 23-24. The statements – which generally assert that (1) the ratings are not recommendations to buy, sell or hold the Certificates; and (2) the ratings do not guarantee payment – do not insulate the Rating Agency Defendants from liability.

First, the "bespeaks caution" doctrine applies only to forward-looking, prospective representations and not to material misstatements or omissions of historical fact. *See P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004) ("It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language."). As explained by the Second Circuit:

> The cautionary language associated with the 'bespeaks caution' doctrine is aimed at warning investors that bad things may come to pass in dealing with the contingent or unforeseen future. Historical or present fact-knowledge within the grasp of the offeror-is a different matter. Such facts exist and are known; they are not unforeseen or contingent.

*Id.* at 97. Here, the fact that the Rating Agency Defendants' models were based on "outdated assumptions, relaxed criteria and inaccurate loan information" and that their compensation was not adequately disclosed, are misrepresentations of ***present or historical fact***. ¶¶8, 161-169. Thus, the bespeaks caution doctrine is inapplicable. *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

Second, "[t]he cautionary language must be ***specific, prominent and must directly address the risk*** that plaintiffs' claim was not disclosed." *In re Flag Telecom Holdings, Ltd.,*

*Sec. Litig.*, 2009 U.S. Dist. LEXIS 37090, at *28-*29 (S.D.N.Y. March 23, 2009) (citing *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5-6 (2d Cir. 1996) (emphasis added)). "The requirement that the cautionary language match the specific risk is particularly important, considering that most, if not all security offerings contain cautionary language." *Flag Telecom*, 2009 U.S. Dist. LEXIS 37090, at *28; *see also In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371- 72 (3d Cir. 1993); *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 212-13 (S.D.N.Y. 2004) ("[g]eneralized disclosures of amorphous risks will not shield defendants from liability as the cautionary language must be 'too prominent and specific to be disregarded' and must 'warn investors of exactly the risk that plaintiffs' claim was not disclosed.'"). Here, even if the statements were forward-looking – which they are not – none of the boilerplate disclosures deals specifically with the risk that the Rating Agency Defendants were using outdated and unreliable models or that their compensation arrangement created a conflict of interest which might result in the Certificates' ratings being unjustifiably high.

Third, no amount of general cautionary language can protect a company from failure to disclose a specific, known risk or a risk that has already occurred. *In re Prudential Sec. Inc. P'shps Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996). The Rating Agency Defendants have now admitted that although they were aware of a model as early as 2004 that considered nearly 10 million loans and "covered the full spectrum of new mortgage products, particularly in the Alt-A and fixed/floating payment type categories," they did not use it. The specific, known risk of using outdated models had already occurred at the time the Offering Documents were issued. Accordingly, the Rating Agency Defendants cannot now hide behind boilerplate cautionary language to avoid liability.

E.    Plaintiffs Were Not On Inquiry Notice

The Rating Agency Defendants adopt The Merrill Lynch Defendants' assertion of the affirmative defense of statute of limitations.[12]   Plaintiffs adopt and incorporate herein the authorities and arguments from the Merrill Lynch Opposition.

Inquiry notice is an inherently fact-specific question on which Defendants have the burden of proof.  *Bano v. Union Carbide Corp.*, 361 F.3d 696, 710 (2d Cir. 2004); *see also Dorchester Investors v. Peak Int'l Ltd.*, 134 F. Supp. 2d 569, 577 (S.D.N.Y. 2001).  In order to satisfy this burden, the Rating Agency Defendants must present evidence of so-called "storm warnings."  *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 427 (2d Cir. 2008).  Storm warnings must "relate directly" to the misrepresentations and omissions and the wrongdoing "must be probable, not merely possible."  *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 431, 444-45 (S.D.N.Y. 2003) (quoting *Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir. 2003)).

Establishing inquiry notice as a matter of law is a heavy burden and, therefore, is typically not decided on a motion to dismiss.  *In re WorldSpace Sec. Litig.*, 2008 WL 2856519, at *4 (S.D.N.Y. July 21, 2008); *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005)*; In re Ames Dep't Stores, Inc. Note Litig.*, 991 F.2d 968, 979-81 (2d Cir. 1993).  "Inquiry notice exists only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct."  *Newman*, 335 F.3d at 194-95.   In fact, it is a question of law only if "no reasonable fact finder analyzing the

---

[12] Moody's Mot. at 19, McGraw-Hill Mot. at 18-19; ML Mot. at 29-31.  The Rating Agency Defendants also argue that Section 13's three-year statute of repose bars six of the 84 offerings at issue.  The Rating Agency Defendants do not dispute that the claims brought in connection with the remaining 78 offerings are not barred by the statute of repose.  Further, the statute of repose on these six offerings applies only to claims against the Rating Agency Defendants, and not to any of the additional Defendants.

circumstances as presented, could determine that inquiry notice did not exist." *In re Executive Telecard, Ltd. Sec. Litig.*, 913 F. Supp. 280, 283 (S.D.N.Y. 1996).

In support of their heavy burden, Defendants include 40 exhibits – ranging from articles and snippets of testimony to subprime mortgage-related litigation – that purport to establish the existence of inquiry notice as to Plaintiffs' claims against the Rating Agency Defendants prior to December 5, 2007. For example, Defendants cite articles and testimony which generally describe potential flaws in the Rating Agency Defendants' methodologies and the conflict of interest inherent in the "issuer-pay" compensation model. ML Mot. at 29-31. Defendants also note that the SEC announced its investigation into rating agency practices in September 2007 and that there were at least three lawsuits filed in 2007 related to the rating agencies' conduct with regard to mortgage-backed securities. *Id.*

The Second Circuit requires that storm warnings be "company-specific" and that "the triggering . . . data must be such that it relates directly to the misrepresentations and omissions" plaintiffs allege in the complaint. *Lentell*, 396 F.3d at 169-71 ("generic articles on the subject of structural conflicts [at financial firms]" did not place investors on inquiry notice). Generic storm warnings not directly related to the claims at issue do not suffice. *See, e.g., Staehr*, 547 F.3d at 415 (finding that investors were not on inquiry notice when the record consisted "almost exclusively of generic articles"). Here, none of the articles or testimony mention – directly or indirectly – the Rating Agency Defendants' conduct in rating the Merrill Lynch Certificates at issue in this litigation. Further, the lawsuits do not name Merrill Lynch, much less impart "company-specific" information about Merrill Lynch or the Certificates. Many of these facts were not fully revealed until the publication of the SEC's July 2008 Summary Report. ¶¶164-65, 172. Others did not emerge until the testimony at the Oversight Committee in October 2008.

¶¶166-68.  In fact, in an enormous admission, the Rating Agency Defendants themselves did not downgrade the investment-grade Certificates to below investment-grade until April 24, 2008. ¶160.

Moody's attempt to establish inquiry notice at the motion to dismiss stage with this exact tactic was recently rejected.  In *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 506-07 (S.D.N.Y. 2009), defendants submitted numerous SEC releases, news articles and other publications that warned of potential conflicts of interest in the credit-ratings industry.  The court found that the statements only referred to the credit ratings industry generally, and identified only potential conflicts of interest and "possible mismanagement" of those conflicts.  *Id.* at 506. Further, Moody's made numerous statements which comforted investors that the conflicts and mismanagement did not apply to them.  *Id.*  Accordingly, the court concluded that despite the volume of news articles which defendants submitted, there was nothing that supported the notion that plaintiffs were on inquiry notice.  *Id.*

Further, these submissions cannot establish inquiry notice because the Rating Agency Defendants offered the market reassurances and reasonable words of comfort which "controverted" facts establishing any basis for a claim.  *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 229 (S.D.N.Y. 1999) (citing *Ames*, 991 F.2d 968 (2d Cir. 1993)); *see also Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 234 (S.D.N.Y. 2006) ("A plaintiff may not be considered to have been placed on inquiry notice, 'despite the presence of some ominous indicators,' when 'the warning signs are accompanied by reliable words of comfort from management.'") (quoting *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 421 (S.D.N.Y. 2005)).  Here, numerous contemporaneous reassuring statements controvert the articles and lawsuits.  For example, Defendants argue that a May 16, 2007 *Financial Times* article disclosed

that the Rating Agency Defendants helped to structure mortgage-backed securities, and that this could lead to "a significant incentive to look kindly on the products they are rating." ML Mot. at 30. Defendants fail to include, however, the reassuring statement from S&P's head of European structured finance which concludes the same article:

> Banks come to us with a proposed transaction and we explain how it might be rated under our criteria. In many cases, the transaction is then restructured by the bank in order to meet our criteria. ***There's nothing sinister about this process – we don't advise on how deals should be structured or arbitrate on which deals can proceed or not.***

*See* Declaration of Jay B. Kasner In Support Of ML Mot., Ex. 79 at 5.

The Rating Agency Defendants also provided numerous additional reassuring statements throughout 2006 and 2007 defending the ratings of structured products and claiming that conflicts of interest had no effect on the ratings process. For example:

- On December 5, 2006, the *Wall Street Journal* noted that "[b]ecause the underlying loans have gotten riskier, credit-rating agencies are telling issuers of mortgage-backed bonds to set aside more money to cover losses than they did three years ago in order to get an AAA rating for their bonds." The head of RMBS Surveillance at S&P states, ***"we are really monitoring very, very closely the portfolios of all the subprime issuers."***

- On August 31, 2007, Vickie Tillman, an executive vice president at S&P, submitted a letter to the editor of the *Wall Street Journal*. In the letter, she reassured investors that ***"rating agencies such as Standard & Poor's do not structure transactions, nor do we determine which deals can proceed and which cannot."***

- On September 17, 2007, the *Wall Street Journal* published a letter submitted by S&P which stated that it does ***"not structure transactions, nor do we determine which deals can proceed and which cannot."***

- On September 28, 2007, Ms. Tillman stated the following about the rating agencies' potential conflicts of interest: "[s]ome have questioned whether the 'issuer pays' model has led S&P and others to issue higher, or less rigorously analyzed, ratings so as to garner more business. ***There is no evidence – none at all – to support this contention with respect to S&P."***

- On October 1, 2007, Michael Kanef, group managing director at Moody's, stated that Moody's has ***"successfully managed related conflicts of interest***

***and provided the market with objective, independent, and unbiased credit opinions."***

- On October 11, 2007, Ms. Tillman submitted a letter to the editor of the *Washington Post* in response to a column entitled "Markets' World of Worry," that questioned whether, in pursuit of fees, rating agencies gave higher ratings than they otherwise would. In the letter, Ms. Tillman reiterated that ***"[t]here is no evidence – none at all – to support this contention with respect to S&P."***[13]

In sum, at the same time the Rating Agency Defendants claim there was information in the market sufficient to put Plaintiffs on inquiry notice of "probable" Securities Act claims regarding the Merrill Lynch Certificates, the Rating Agency Defendants were reassuring the market that no wrongdoing existed.

Defendants' submissions do not, by themselves or when appropriately coupled with reassuring statements, ***irrefutably*** demonstrate that Plaintiffs discovered or should have discovered the misstatements in the Certificate offerings prior to December 5, 2007. *WorldSpace*, 2008 WL 2856519, at *4. At best, Defendants' submissions raise a factual issue of when Plaintiffs were on inquiry notice which cannot be decided at this stage. *See, e.g., Dorchester*, 134 F. Supp. 2d at 577 (finding that "the issue of whether Plaintiffs were on inquiry notice, and thus whether their claims are barred by the statute of limitations, is a factual one to be resolved by the trier of fact.").

      F.      **Plaintiffs Have Standing To Pursue Claims**
                         **Related To All Offerings And Certificates**

The Rating Agency Defendants incorporate Merrill Lynch's argument that Plaintiffs lack standing to assert claims for certain trusts. Moody's Mot. at 29; McGraw-Hill Mot. at 2 n.1; ML

---

[13] *See* Declaration of Timothy A. DeLange In Support Of Plaintiffs' Opposition To The Merrill Lynch Defendants' Motion To Dismiss The Consolidated Complaint ("DeLange Decl."), Exs. A, B, C, D, E, F (all emphasis added). Plaintiffs respectfully request that the Court take judicial notice of the exhibits attached to the DeLange Decl. Judicial notice here is proper, as Plaintiffs do not offer the exhibits for the truth of the matter but simply for the fact that the statements therein were made. *See Staehr*, 547 F.3d at 425; Fed. R. Evid. 201(b).

Mot. 33-36. Plaintiffs incorporate herein the arguments from § III.A. of the Merrill Lynch Opposition. As detailed there, the named Plaintiffs allege that they purchased securities in or traceable to one or more of the registrations statements here, and suffered damage as a result. ¶¶179, 192, 201, 205. Therefore, they have adequately alleged Article III and Section 11 standing under the Second Circuit standard. *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 241 (2d Cir. 2007) ("*Cent. States II*") ("To establish Article III standing in a class action … for every named defendant there must be at least one named plaintiff who can assert a claim directly against that defendant, and at that point standing is satisfied and only then will the inquiry shift to a class action analysis.").

IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Rating Agency Defendants' Motions To Dismiss The Consolidated Complaint.

Dated: July 22, 2009

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP


*/s/ David R. Stickney*
DAVID R. STICKNEY

DAVID R. STICKNEY
TIMOTHY A. DeLANGE
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:     (858) 793-0070
Fax:    (858) 793-0323
davids@blbglaw.com
timothyd@blbglaw.com

*Lead Counsel for the Class and Counsel for Lead Plaintiff Public Employees' Retirement System of Mississippi and Plaintiff Los Angeles County Employees Retirement Association*

POND, GADOW & TYLER, P.A.
JOHN GADOW
BLAKE TYLER
502 South President Street
Jackson, MS 39201
johngadow@pgtlaw.com
btyler@pgtlaw.com

*Counsel for Plaintiff Public Employees'*
*Retirement System of Mississippi*


COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARIO ALBA, JR.
CAROLINA C. TORRES
58 South Service Road, Suite 200
Melville, NY 11747
Tel:    (631) 367-7100
Fax:   (631) 367-1173

*Counsel for Plaintiff Iron Workers*
*Local No. 25 Pension Fund*


BERMAN DeVALERIO
JEFFREY C. BLOCK
One Liberty Square
Boston, MA 02109
Tel:    (617) 542-8300
Fax:   (617) 542-1194
     -and-
JOSEPH J. TABACCO, JR.
NICOLE LAVALLEE
425 California Street, Suite 2100
San Francisco, CA 94104
Tel:    (415) 433-3200
Fax:   (415) 433-6382

*Special Assistant Attorneys General*
*for the State of Wyoming*

BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP
KATHARINE M. RYAN
JOHN A. KEHOE
KAREN E. REILLY
280 King of Prussia Road
Radnor, PA 19087
Tel:     (610) 667-7706
Fax:    (610) 667-7056

*Counsel for Plaintiffs Connecticut
Carpenters Pension Fund and Connecticut
Carpenters Annuity Fund*