# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, et al., | Civil Action No. 08 CIV. 10841 (JSR) ECF Case |
| Plaintiffs, | |
| v. | AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF §§ 11, 12(a)(2) AND 15 OF THE SECURITIES ACT OF 1933 |
| MERRILL LYNCH & CO. INC., et al., | |
| Defendants. | DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS

Page

I.      SUMMARY OF THE ACTION ...................................................................1

II.     JURISDICTION AND VENUE ..................................................................4

III.    THE PARTIES..............................................................................................4

        A.      Lead Plaintiff ...................................................................................4

        B.      Additional Named Plaintiffs .........................................................5

        C.      Defendants .......................................................................................7

IV.     FACTUAL BACKGROUND........................................................................9

        A.      The Mechanics Of Structuring Asset-Backed Pass-
                Through Certificates ......................................................................9

        B.      Assessing The Quality Of Mortgage Pass-Through
                Certificates ....................................................................................12

V.      THE MERRILL LYNCH CERTIFICATE OFFERINGS ...............................14

VI.     THE OFFERING DOCUMENTS CONTAINED
        MATERIAL MISSTATEMENTS AND OMISSIONS
        REGARDING UNDERWRITING STANDARDS........................................15

        A.      Countrywide Home Loans, Inc.'s Underwriting
                Practices ........................................................................................18

        B.      American Home Mortgage Corp.'s Underwriting
                Practices ........................................................................................27

        C.      Ownit Mortgage Solutions, Inc.'s Underwriting
                Practices ........................................................................................30

        D.      First Franklin's Underwriting Practices...................................32

        E.      ResMAE's Underwriting Practices ...........................................36

        F.      WMC's Underwriting Practices .................................................38

        G.      Fremont's Underwriting Practices .............................................41

        H.      Wachovia's Underwriting Practices ..........................................44

        I.      C-BASS's Underwriting Practices .............................................46

        J.      Additional Originators' Underwriting Practices......................50

VII.    THE OFFERING DOCUMENTS MISSTATED THE
        TRUE LTV RATIOS ASSOCIATED WITH THE
        UNDERLYING MORTGAGES ...........................................................................58

VIII.   THE OFFERING DOCUMENTS MISREPRESENTED
        THE OVERCOLLATERALIZATION OF THE ISSUING
        TRUSTS.............................................................................................................62

IX.     THE RATINGS AND STATEMENTS ABOUT
        RATINGS MISSTATED THE QUALITY OF THE
        CERTIFICATES.................................................................................................64

X.      EACH OFFERING DOCUMENT CONTAINED
        UNTRUE STATEMENTS AND MATERIAL
        OMISSIONS .......................................................................................................69

XI.     THE PERFORMANCE AND VALUE OF THE
        CERTIFICATES.................................................................................................70

XII.    MERRILL LYNCH'S CONTROL OF THE MERRILL
        DEPOSITOR.......................................................................................................74

XIII.   CLASS ACTION ALLEGATIONS ...................................................................76

XIV.    PLAINTIFFS HAVE STANDING TO PURSUE THE
        CLAIMS ALLEGED...........................................................................................78

XV.     CAUSE OF ACTION .........................................................................................79

COUNT I  For Violation Of Section 11 Of The Securities Act
        Related To Merrill Lynch Alternative Note Asset Trust,
        Series 2007-A3..................................................................................................79

COUNT II  For Violation Of Section 11 Of The Securities Act
        Related To Merrill Lynch Alternative Note Asset Trust,
        Series 2007-AF1 ...............................................................................................81

COUNT III  For Violation Of Section 11 Of The Securities Act
        Related To Merrill Lynch First Franklin Mortgage Loan
        Trust, Series 2007-2 ........................................................................................83

COUNT IV  For Violation Of Section 11 Of The Securities Act
        Related To Merrill Lynch First Franklin Mortgage Loan
        Trust, Series 2007-3 ........................................................................................85

COUNT V  For Violation Of Section 11 Of The Securities Act
        Related To Merrill Lynch First Franklin Mortgage Loan
        Trust, Series 2007-4 ........................................................................................87

COUNT VI  For Violation Of Section 11 Of The Securities Act
        Related To Merrill Lynch First Franklin Mortgage Loan
        Trust, Series 2007-A ........................................................................................89

COUNT VII  For Violation Of Section 11 Of The Securities Act
    Related To C-BASS Mortgage Loan Asset-Backed
    Certificates, Series 2007-CB4 .................................................................. 91

COUNT VIII  For Violation Of Section 11 Of The Securities Act
    Related To Merrill Lynch Alternative Note Asset Trust,
    Series 2007-F1 ........................................................................................ 93

COUNT IX  For Violation Of Section 11 Of The Securities Act
    Related To Merrill Lynch Mortgage Investors Trust, Series
    2006-MLN1 ............................................................................................ 95

COUNT X  For Violation Of Section 11 Of The Securities Act
    Related To Merrill Lynch Mortgage Investors Trust, Series
    2006-FM1 ............................................................................................... 98

COUNT XI  For Violation Of Section 11 Of The Securities Act
    Related To Merrill Lynch Mortgage Investors Trust, Series
    2006-FF1 .............................................................................................. 100

COUNT XII  For Violation Of Section 11 Of The Securities Act
    Related To Merrill Lynch Mortgage Investors Trust, Series
    2006-RM5 ............................................................................................. 102

COUNT XIII  For Violation Of Section 11 Of The Securities Act
    Related To Merrill Lynch Mortgage Investors Trust, Series
    MLCC 2006-2 ...................................................................................... 104

COUNT XIV  For Violation Of Section 11 Of The Securities Act
    Related To Merrill Lynch Mortgage Investors Trust, Series
    2006-AHL1 ........................................................................................... 106

COUNT XV  For Violation Of Section 11 Of The Securities Act
    Related To Merrill Lynch Mortgage Investors Trust, Series
    2006-RM3 ............................................................................................. 108

COUNT XVI  For Violation Of Section 11 Of The Securities Act
    Related To Merrill Lynch Mortgage Investors Trust, Series
    2006-WMC1 ......................................................................................... 110

COUNT XVII  For Violation Of Section 11 Of The Securities Act
    Related To Merrill Lynch Mortgage Investors Trust, Series
    2006-WMC2 ......................................................................................... 112

COUNT XVIII  For Violation Of Section 11 Of The Securities Act
    Related To Merrill Lynch Mortgage Investors Trust, Series
    2006-A1 ................................................................................................ 114

COUNT XIX  For Violation Of Section 11 Of The Securities Act
    Related To Ownit Mortgage Loan Trust, Series 2006-2 ...................... 117

COUNT XX  For Violation Of Section 12(a)(2) Of The Securities
    Act ....................................................................................................... 119

COUNT XXI  For Violation Of Section 15 Of The Securities Act.............................................120

RELIEF REQUESTED.........................................................................................................121

Plaintiffs, as defined below in paragraph 1, allege the following upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief are based on the investigation of their undersigned counsel, which investigation continues.  Many of the facts related to Plaintiffs' allegations are known only by the Defendants named herein, or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support for the allegations set forth below will be developed after a reasonable opportunity for discovery.

I.     SUMMARY OF THE ACTION

1.     Lead Plaintiff, the Public Employees' Retirement System of Mississippi ("MissPERS"), and Plaintiffs Iron Workers Local No. 25 Pension Fund ("Iron Workers"), the Wyoming State Treasurer ("Wyoming"), the Los Angeles County Employees Retirement Association ("LACERA"), and the Connecticut Carpenters Pension Fund and Connecticut Carpenters Annuity Fund ("Connecticut Carpenters") (collectively, "Plaintiffs") bring this class action on behalf of themselves and all persons or entities who purchased or otherwise acquired mortgage pass-through certificates ("Certificates") in any of the nineteen (19) offerings identified below in ¶¶37-39 pursuant or traceable to Merrill Lynch Mortgage Investors, Inc.'s Registration Statements.[1]

2.     By this action, Plaintiffs seek redress pursuant to the Securities Act of 1933 (the "Securities Act") against Defendants Merrill Lynch & Co., Inc. ("Merrill Lynch"), Merrill Lynch Mortgage Investors, Inc. (the "Merrill Depositor"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch PFS"), J.P. Morgan Securities, Inc. ("J.P. Morgan"), ABN

---

[1] "Registration Statements" refers collectively to the February 2, 2007 Registration Statement, as amended ("March Registration Statement"), December 21, 2005 Registration Statement, as amended ("December Registration Statement"), and August 5, 2005 Registration Statement, as amended ("August Registration Statement").  The Registration Statements, Prospectuses and each of the respective Prospectus Supplements are collectively referred to herein as the "Offering Documents."

AMRO, Incorporated ("ABN AMRO") and Matthew Whalen, Paul Park, Brian T. Sullivan, Michael M. McGovern, Donald J. Puglisi and Donald C. Han (the "Individual Defendants").

3.     Plaintiffs assert claims for violations of Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Accordingly, this action involves solely strict liability and negligence claims brought pursuant to the Securities Act.  Plaintiffs specifically disclaim any allegations of fraud on the part of any Defendant.

4.     This action arises from Defendants' sale of asset-backed pass-through certificates (or, as commonly referred, mortgage pass-through certificates).  Asset-backed pass-through certificates are securities entitling the holder to income payments from pools of loans and/or asset-backed or mortgage-backed securities ("ABS" or "MBS," respectively). Fundamentally, the value for pass-through certificates depends on the ability of borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral in the event of default.  As alleged below, however, the Offering Documents contained untrue statements and omissions concerning the quality of loans and the adequacy of collateral within the loan pools.

5.     The Certificates were supported by pools of mortgage loans that the Merrill Depositor acquired from Merrill Lynch Mortgage Lending, Inc. (the "Merrill Sponsor"), First Franklin Financial Corporation ("First Franklin") and Credit-Based Asset Servicing and Securitization LLC ("C-BASS").  The Merrill Sponsor, First Franklin and C-BASS originated and/or purchased the mortgage loans from various mortgage originators, including, among others, Countrywide Home Loans, Inc. ("Countrywide"), American Home Mortgage Corp. ("American Home Mortgage"), Ownit Mortgage Solutions, Inc. ("Ownit"), New Century Mortgage Corporation ("New Century"), IndyMac Bank, F.S.B. ("IndyMac"), WMC Mortgage Corporation ("WMC"), ResMAE Mortgage Corporation ("ResMAE") and Fremont Investment & Loan ("Fremont").

6.     Moody's, a division of Moody's Corp., and McGraw-Hill Companies, through its division, Standard & Poor's ("S&P") (the "Rating Agencies"), provided ratings for the

Certificates.  Ratings are supposed to reflect the risk associated with investment alternatives. Here, the Offering Documents included these ratings, which determined, in part, the price at which these Certificates were offered to Plaintiffs and the Class.  Moody's highest investment rating is "Aaa."  S&P's highest rating is "AAA."  These ratings signify the highest investment-grade, and are considered to be of the "best quality," and carry the smallest degree of investment risk.  Ratings of "AA," "A," and "BBB" represent high credit quality, upper-medium credit quality and medium credit quality, respectively.  These ratings are considered "investment-grade ratings."  Any instrument rated lower than BBB is considered below investment-grade.  Moody's and S&P originally assigned investment-grade ratings on most tranches of the Certificates.  As alleged below, however, the Offering Documents misrepresented the quality of the loans in the loan pools and included ratings that were unjustifiably high.

7.     The Offering Documents contained untrue statements of material fact, or omitted to state material facts necessary to make the statements therein not misleading, regarding: (1) the underwriting standards purportedly used in connection with the origination of the underlying mortgages; (2) the maximum loan-to-value ratios used to qualify borrowers; (3) the appraisals of the properties underlying the mortgages; (4) the debt-to-income ratios permitted on the loans; and (5) the ratings of the Certificates.

8.     The true facts which were omitted from the Offering Documents were:

- The loan originators, including First Franklin, Countrywide, Ownit, American Home Mortgage, New Century, IndyMac, WMC, ResMAE, and Fremont had not followed their stated underwriting standards when issuing loans to borrowers;

- The Merrill Sponsor, C-BASS and First Franklin failed to follow their loan purchasing guidelines when acquiring many of the underlying mortgage loans;

- The underlying mortgages were based on collateral appraisals that overstated the value of the underlying properties; and

- The ratings stated in the Prospectus Supplements were based on outdated assumptions, relaxed ratings criteria, and inaccurate loan information.

9.     As a result of these untrue statements and omissions in the Offering Documents, Plaintiffs and the Class purchased Certificates that were far riskier than represented and that were not of the "best quality," or even "medium credit quality" and were not equivalent to other investments with the same credit ratings.   Contrary to representations in the Offering Documents, the Certificates exposed purchasers to increased risk with respect to absolute cash flow and the timing of payments.   The Rating Agencies have now downgraded nearly all of the Certificates.   Virtually all of the Certificates represented to be investment-grade instruments in the Offering Documents have been downgraded to below investment-grade instruments.   The Certificates, therefore, are no longer marketable near the prices paid by Plaintiffs and the Class.

II.     JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.   This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v and 28 U.S.C. § 1331.

11.     Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b) and (c).   Many of the acts and conduct complained of herein occurred in substantial part in this District, including the dissemination of the materially false and misleading statements complained of herein.   In addition, Defendants conduct business in this District.

12.     In connection with the acts and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications.

III.     THE PARTIES

A.     Lead Plaintiff

13.     Lead Plaintiff the Public Employees' Retirement System of Mississippi ("MissPERS") is a governmental defined benefit pension plan qualified under Section 401(a) of the Internal Revenue Code, and is the retirement system for nearly all non-federal public

employees in the State of Mississippi.  Established by the Mississippi Legislature in 1952, MissPERS provides benefits to over 75,000 retirees, and future benefits to more than 250,000 current and former public employees.  MissPERS acquired Certificates pursuant and/or traceable to the Offering Documents.  MissPERS purchased Series 2007-A Mortgage Pass-Through Certificates issued by the Merrill Lynch First Franklin Mortgage Loan Trust, Series MLCC 2006-2, and 2006-A1 Mortgage Pass-Through Certificates issued by the Merrill Lynch Mortgage Investors Trust, as well as Series 2007-F1 Mortgage Pass-Through Certificates issued by the Merrill Lynch Alternative Note Asset Trust, as reflected in the certification attached to the Consolidated Complaint filed on May 20, 2009.  On April 23, 2009, the Court appointed MissPERS as Lead Plaintiff.

> B.   Additional Named Plaintiffs

14.   Plaintiff Iron Workers Local No. 25 Pension Fund ("Iron Workers") is a Taft-Hartley pension fund.  Iron Workers has approximately 4,000 participants and $622 million in assets.  Iron Workers acquired Certificates pursuant to the Offering Documents.  Iron Workers purchased Mortgage Pass-Through Certificates issued by the C-BASS 2007-CB4 Trust, as reflected in the certification attached to the Consolidated Complaint filed on May 20, 2009.

15.   Plaintiff Wyoming State Treasurer ("Wyoming") manages and invests all funds of the State of Wyoming (with the exception of the State Retirement Fund).  Wyoming currently manages over $10 billion in non-pension funds.  Wyoming acquired Certificates pursuant and/or traceable to the Offering Documents.  Wyoming purchased Series 2006-WMC1, 2006-A1, 2006-WMC2, 2006-AHL1, 2006-MLN1, 2006-RM3, 2006-FM1, and 2006-RM5 Certificates issued by Merrill Lynch Mortgage Investors Trust, as well as Series 2007-2, 2007-3, and 2007-4 Certificates issued by Merrill Lynch First Franklin Mortgage Loan Trust, as reflected in the certification attached to the Consolidated Complaint filed on May 20, 2009.

16.   Plaintiff Los Angeles County Employees Retirement Association ("LACERA") administers defined retirement plan benefits for the employees of Los Angeles County and participating agencies.  As of June 30, 2008, LACERA had 158,000 members, including more

than 52,000 benefit recipients and maintained over $38 billion in net assets.  LACERA acquired Certificates pursuant and/or traceable to the Offering Documents.  LACERA purchased Series 2006-WMC2, 2006-A1, and 2006-FF1 Certificates issued by Merrill Lynch Mortgage Investors Trust, as well as Series 2007-A3 and 2007-AF1 Certificates issued by Merrill Lynch Alternative Note Asset Trust, as reflected in the certification attached to the Consolidated Complaint filed on May 20, 2009.

17.     Plaintiffs Connecticut Carpenters Pension Fund and Connecticut Carpenters Annuity Fund ("Connecticut Carpenters") are Taft-Hartley pension fund systems.  Connecticut Carpenters acquired Certificates pursuant to the Offering Documents.  Connecticut Carpenters purchased Series 2006-2 Certificates issued by Ownit Mortgage Loan Trust, as reflected in the certification attached to the Consolidated Complaint filed on May 20, 2009.

18.     Plaintiffs purchased the following Certificates in the below Offerings directly from Defendant Merrill Lynch PFS:

| Trust | Pro. Supp. Date | Plaintiff | Purchase Date | Purchased From |
|---|---|---|---|---|
| Merrill Lynch Alternative Note Asset Trust, Series 2007-F1 | 3/28/07 | MissPERS | 3/29/07 | Merrill Lynch PFS |
| Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-A | 9/7/07 | MissPERS | 8/30/07 | Merrill Lynch PFS |
| Merrill Lynch Mortgage Investors Trust, Series 2006-A1 | 3/29/06 | MissPERS | 3/9/06 | Merrill Lynch PFS |
| Merrill Lynch Mortgage Investors Trust, Series 2006-FF1 | 12/22/06 | LACERA | 12/14/06 | Merrill Lynch PFS |
| Merrill Lynch Alternative Note Asset Trust, Series 2007-A3 | 4/30/07 | LACERA | 4/20/07 | Merrill Lynch PFS |
| Merrill Lynch Mortgage Investors Trust, Series 2006-RM5 | 10/27/06 | Wyoming | 10/19/06 | Merrill Lynch PFS |
| Merrill Lynch Mortgage Investors Trust, Series 2006-AHL1 | 6/29/06 | Wyoming | 6/16/06 | Merrill Lynch PFS |
| Merrill Lynch Mortgage Investors Trust, Series 2006-FM1 | 6/29/06 | Wyoming | 6/23/06 | Merrill Lynch PFS |
| Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2 | 4/27/07 | Wyoming | 4/16/07 | Merrill Lynch PFS |
| Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3 | 5/30/07 | Wyoming | 5/23/07 | Merrill Lynch PFS |
| Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4 | 6/26/07 | Wyoming | 6/18/07 | Merrill Lynch PFS |

| Trust | Pro. Supp. Date | Plaintiff | Purchase Date | Purchased From |
|---|---|---|---|---|
| C-BASS 2007-CB4 Trust | 4/26/07 | Iron Workers | 4/23/07 | Merrill Lynch PFS |
| Ownit Mortgage Loan Trust, Series 2006-2 | 3/9/06 | Connecticut Carpenters | 3/1/06 | Merrill Lynch PFS |

C.    Defendants

19.    Defendant Merrill Lynch & Co., Inc. (defined above as "Merrill Lynch") is a Delaware Corporation with its principal executive office located at 250 Vesey Street, 4 World Financial Center, New York, New York.  Merrill Lynch is a holding company which, through its subsidiaries, purports to be a leading global trader and underwriter of securities and derivatives across a broad range of asset classes and serves as a strategic advisor to corporations, governments, institutions and individuals worldwide.  On January 1, 2009, Merrill Lynch became a wholly-owned subsidiary of Bank of America Corporation.

20.    Defendant Merrill Lynch Mortgage Investors, Inc. (defined above as the "Merrill Depositor") is a Delaware corporation and a limited purpose, indirect wholly-owned subsidiary of Merrill Lynch, with its principal place of business at 250 Vesey Street, 4 World Financial Center, New York, New York.  The Merrill Depositor is an affiliate of the Merrill Sponsor, First Franklin and Merrill Lynch PFS.  The Merrill Depositor served in the role as "Depositor" in the securitization of the Issuing Trusts, and was an "Issuer" of the Certificates within the meaning of Section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4).

21.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated (defined above as "Merrill Lynch PFS") is a Delaware corporation with its principal place of business located at 250 Vesey Street, 4 World Financial Center, New York, New York.  Merrill Lynch PFS is an affiliate of the Merrill Sponsor, First Franklin and the Merrill Depositor.  Merrill Lynch PFS acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11).  As an underwriter, Merrill Lynch PFS participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to

Plaintiffs and other Class members.  Merrill Lynch PFS acted as an underwriter for each of the offerings at issue in this action.

22.   Defendant J.P. Morgan Securities, Inc. (defined above as "J.P. Morgan") was one of the underwriters for the C-BASS 2007-CB4 Trust.  J.P. Morgan drafted and disseminated the Offering Documents for the offering of Certificates in the 2007-CB4 Trust and acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11).

23.   Defendant ABN AMRO Incorporated (defined above as "ABN AMRO") was one of the underwriters for the C-BASS 2007-CB4 Trust.   ABN AMRO drafted and disseminated the Offering Documents for the offering of Certificates by the 2007-CB4 Trust and acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11).

24.   Defendants Merrill Lynch PFS, J.P. Morgan, and ABN AMRO are collectively referred to herein as the "Underwriter Defendants."

25.   Defendant Matthew Whalen ("Whalen") was, at relevant times, President and Chairman of the Board of Directors of the Merrill Depositor.  Defendant Whalen signed the December and August Registration Statements.

26.   Defendant Paul Park ("Park") was, at relevant times, the President and Chairman of the Board of Directors of the Merrill Depositor.  While serving as President and Chairman of the Merrill Depositor, defendant Park was concurrently a managing partner of defendant Merrill Lynch.  Defendant Park signed the March Registration Statement.

27.   Defendant Brian T. Sullivan ("Sullivan") was, at relevant times, the Vice President, Treasurer (Principal Financial Officer) and Controller of the Merrill Depositor. Defendant Sullivan signed the Registration Statements.

28.   Defendant Michael M. McGovern ("McGovern") was, at relevant times, a Director of the Merrill Depositor.  Defendant McGovern signed the Registration Statements.

While serving as a Director of the Merrill Depositor, defendant McGovern was concurrently a Director and Senior Counsel of defendant Merrill Lynch.

29.     Defendant Donald J. Puglisi ("Puglisi") was, at relevant times, a Director of the Merrill Depositor.  Defendant Puglisi signed the Registration Statements.

30.     Defendant Donald C. Han ("Han") was, at relevant times, the Treasurer of the Merrill Depositor.  Defendant Han signed the August Registration Statement.

31.     Defendants Whalen, Park, Sullivan, McGovern, Puglisi, and Han are collectively referred to herein as the "Individual Defendants."

IV.     FACTUAL BACKGROUND

     A.     The Mechanics Of Structuring Asset-Backed Pass-Through Certificates

32.     Asset-backed pass-through certificates (or mortgage pass-through certificates, as they are more commonly referred) are securities in which the holder's interest represents an equity interest in the "issuing trust."  The pass-through certificates entitle the holder to income payments from pools of mortgage loans and/or MBS.  Although the structure and underlying collateral of the mortgages and MBS vary, the basic principle is the same.

33.     Wall Street banks, including Merrill Lynch, entered into the complex, high-margin business of packaging mortgages and selling them to investors as MBS, including mortgage pass-through certificates.  To derive profits from the securitization business, Wall Street Banks, including Merrill Lynch, created and controlled special-purpose entities ("SPEs"), wholly-owned subsidiaries that purchased residential mortgage loans for securitization and sale to investors.

34.     First, Wall Street Banks create a "depositor" that acquires an inventory of loans from a "sponsor"/"seller," who either originated the loans or acquired the loans from other loan originators, in exchange for cash.  The type of loans in the inventory may vary, including conventional, fixed or adjustable rate mortgage loans (or mortgage participations), secured by first liens, junior liens, or a combination of first and junior liens, with various lifetimes to

maturity.  The depositor then transfers, or deposits, the acquired pool of loans to the issuing trust.

35.     The depositor then securitizes the pool of loans so that the rights to the cash-flows from the inventory can be sold to investors.  The securitization transactions are structured such that the risk of loss is divided among different levels of investment, or "tranches." Tranches are related MBS offered as part of the same pass-through certificate offering, each with a different level of risk and reward.  Any losses to the underlying loans, due to default, delinquency or otherwise, are applied in reverse order of seniority.  As such, the most senior tranches of pass-through certificates are often rated as the best quality, or "AAA."  Junior tranches, which usually obtain lower ratings, ranging from "AA" to "BBB-," are less insulated from risk, but offer greater potential returns.

36.     By working together, the underwriters, the depositor, and the rating agencies are able to ensure that each particular mortgage pass-through certificate tranche will receive a pre-determined credit rating at the time of offering.  Once the tranches are established, the issuing trust passes the certificates back to the depositor, who then passes the certificates to one or more underwriters.  The underwriters offer the various certificates to investors, in exchange for cash that will be passed back to the depositor, minus any fees owed to the underwriters.



37.     Each purchased or acquired certificate represents an equity interest in the issuing trust and the right to future payments of principal and interest on the underlying loans.  Those payments are collected by the loan servicer and distributed, through the issuing trust, to investors at regular distribution intervals throughout the life of the loans.  Mortgage pass-

through certificates must be offered to the public pursuant to a registration statement and prospectus in accordance with the provisions of the Securities Act.

38.     With respect to the March Registration Statement, the following chart identifies the following: (1) each Issuing Trust; (2) the stated value of the Certificates issued; and (3) the Prospectus Supplement dates pursuant to which the Certificates were issued and sold.

| Issuing Trust | Approximate Amount ($$$) | SEC Filing Date of Prospectus Supplement |
|---|---|---|
| Merrill Lynch Alternative Note Asset Trust, Series 2007-A3 | 483,874,100 | 4/30/2007 |
| Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1 | 680,620,637 | 6/1/2007 |
| Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2 | 1,937,062,100 | 4/27/2007 |
| Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3 | 1,835,617,100 | 5/30/2007 |
| Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4 | 1,547,200,100 | 6/26/2007 |
| Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-A | 219,636,100 | 9/7/2007 |

39.     With respect to the December Registration Statement, the following chart identifies the following: (1) each Issuing Trust; (2) the stated value of the Certificates issued; and (3) the Prospectus Supplement dates pursuant to which the Certificates were issued and sold.

| Issuing Trust | Approximate Amount ($$$) | SEC Filing Date of Prospectus Supplement |
|---|---|---|
| C-BASS 2007-CB4 Trust | 476,443,000 | 4/26/2007 |
| Merrill Lynch Alternative Note Asset Trust, Series 2007-F1 | 439,565,336 | 3/28/2007 |
| Merrill Lynch Mortgage Investors Trust, Series 2006-MLN1 | 787,216,100 | 9/28/2006 |
| Merrill Lynch Mortgage Investors Trust, Series 2006-FM1 | 424,683,100 | 6/29/2006 |
| Merrill Lynch Mortgage Investors Trust, Series 2006-FF1 | 2,280,872,100 | 12/22/2006 |
| Merrill Lynch Mortgage Investors Trust, Series 2006-RM5 | 520,625,100 | 10/27/2006 |
| Merrill Lynch Mortgage Investors Trust Series MLCC 2006-2 | 628,422,100 | 4/27/2006 |

11

| Issuing Trust | Approximate Amount ($$$) | SEC Filing Date of Prospectus Supplement |
|---|---|---|
| Merrill Lynch Mortgage Investors Trust, Series 2006-AHL1 | 413,329,100 | 6/29/2006 |
| Merrill Lynch Mortgage Investors Trust, Series 2006-RM3 | 740,607,100 | 6/27/2006 |

40. With respect to the August Registration Statement, the following chart identifies the following: (1) each Issuing Trust; (2) the stated value of the Certificates issued; and (3) the Prospectus Supplement dates pursuant to which the Certificates were issued and sold.

| Issuing Trust | Approximate Amount ($$$) | SEC Filing Date of Prospectus Supplement |
|---|---|---|
| Merrill Lynch Mortgage Investors Trust, Series 2006-WMC1 | 1,204,884,100 | 2/14/2006 |
| Merrill Lynch Mortgage Investors Trust, Series 2006-WMC2 | 1,205,046,100 | 3/28/2006 |
| Merrill Lynch Mortgage Investors Trust, Series 2006-A1 | 656,531,100 | 3/29/2006 |
| Ownit Mortgage Loan Trust, Series 2006-2 | 533,541,100 | 3/9/2006 |

B. <u>Assessing The Quality Of Mortgage Pass-Through Certificates</u>

41. The fundamental basis upon which certificates are valued is the ability of the borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral. Thus, proper loan underwriting is critical to assessing the borrowers' ability to repay the loans, and a necessary consideration when purchasing and pooling loans. If the loans pooled in the MBS suffer defaults and delinquencies in excess of the assumptions built into the certificate payment structure, certificate owners suffer more than expected losses because the cash flow from the certificates would necessarily diminish.

42. Likewise, independent and accurate appraisals of the collateralized real estate are essential to ensure that the mortgage or home equity loan can be satisfied in the event of a default and foreclosure on a particular property. An accurate appraisal is necessary to determine the likely price at which the foreclosed property can be sold and, thus, the amount of money available to pass through to certificate holders.

43.     An accurate appraisal is also critical to calculating the loan-to-value ("LTV") ratio, which is a financial metric commonly used to evaluate the price and risk of MBS and mortgage pass-through certificates.  The LTV ratio expresses the amount of mortgage or loan as a percentage of the appraised value of the collateral property.  For example, if a borrower seeks to borrow $90,000 to purchase a home worth $100,000, the LTV ratio is equal to $90,000 divided by $100,000, or 90%.  If, however, the appraised value of the house has been artificially inflated to $100,000 from $90,000, the real LTV ratio would be 100% ($90,000 divided by $90,000).

44.     From an investor's perspective, a high LTV ratio represents a greater risk of default on the loan.  First, borrowers with a small equity position in the underlying property have "less to lose" in the event of a default.  Second, even a slight drop in housing prices might cause a loan with a high LTV ratio to exceed the value of the underlying collateral, which might cause the borrower to default and would prevent the issuing trust from recouping its expected return in the case of foreclosure and subsequent sale of the property.

45.     Consequently, the LTV ratios of the loans underlying mortgage pass-through certificates are important to investors' assessment of the value of such certificates.  Indeed, prospectuses typically provide information regarding the LTV ratios, and even guarantee certain LTV ratio limits for the loans that will support the certificates.

46.     The underwriting standards and appraisals of the pooled loans are critically important considerations when setting assumptions and parameters for each certificate tranche. The assumed amount of expected payments of principal and interest will necessarily affect the total available funds and potential yield to investors.  In addition, the assumed amount of expected payments will affect the offered credit enhancement, such as overcollateralization, excess interest, shifting of interests, and subordination.

47.     Overcollateralization is the amount by which the aggregate stated principal balance of the mortgage loans exceeds the aggregate class principal balance for the certificate tranches.  In other words, overcollateralization serves as a cushion, so that in the case of default

on certain loans, the remaining payments would be adequate to cover the yield on all certificates without any tranche taking a loss.

48.     A similar cushion is provided by the interest generated by the loans in excess of what is needed to pay the interest on the certificates and related expenses of the trust.  Often, the tranches are structured so that the weighted average interest rate of the mortgage loans is higher than the aggregate of the weighted average pass-through rate on the certificates, plus servicing fee rates on the mortgage loans.  If the assumed underwriting standards and appraisals are inaccurate, the stated credit enhancement parameters will be inaccurate, and investors will not receive the level of protection set forth in the respective registration statement and prospectus(es).

49.     Traditionally, rating agencies published ratings to reflect an unbiased assessment of risk associated with a particular investment instrument.  The rating of any particular MBS was critical to its issuance because of regulations requiring many institutional investors, such as banks, mutual funds and public pension funds, to hold only "investment-grade" bonds and securitized interests.  Indeed, many MBS – including mortgage pass-through certificates – were promoted to institutional investors.

V.     THE MERRILL LYNCH CERTIFICATE OFFERINGS

50.     On August 5, 2005, Defendants filed with the Securities and Exchange Commission ("SEC") on Form S-3 a Registration Statement under the Securities Act, as amended on August 17, 2005 (the "August Registration Statement"), with which Defendants indicated their intention to sell $15 billion mortgage pass-through certificates.  On December 21, 2005, Defendants filed with the SEC on Form S-3 a Registration Statement under the Securities Act, as amended on February 24, 2006, March 21, 2006 and March 28, 2006 (the "December Registration Statement"), with which Defendants indicated their intention to sell $35 billion mortgage pass-through certificates.  On February 2, 2007, Defendants filed with the SEC on Form S-3 a Registration Statement under the Securities Act, as amended (the "March Registration Statement"), with which Defendants indicated their intention to sell $85 billion

mortgage pass-through certificates. The Certificates would be issued pursuant to the Registration Statements and accompanying prospectuses, also filed with the SEC (the "Prospectuses"), generally explaining the structure of the Issuing Trusts and providing an overview of the Certificates. The Registration Statements were prepared by the Merrill Depositor and the Underwriter Defendants, and signed by the Individual Defendants.

51. Subsequently, the Prospectus Supplements were filed with the SEC containing a detailed description of the mortgage pools underlying the Certificates and containing representations about the loan origination process and the quality of the loans. The respective Prospectus Supplements provided the specific terms of the particular Certificate series offering. Each Prospectus Supplement included tables with data concerning the loans underlying the Certificates, including (but not limited to) the type of loans, the number of loans, the mortgage rate and net mortgage rate, the aggregate scheduled principal balance of the loans, the purported weighted average of original combined LTV ratio, and the geographic concentration of the mortgaged properties.

52. The Merrill Depositor and the Underwriter Defendants prepared the Prospectus Supplements. As a condition of the issuance of the Certificates, the Offering Documents represented that the Certificates received pre-determined investment-grade ratings. The Underwriter Defendants sold the Certificates pursuant to the Prospectus Supplements. The Registration Statements incorporated by reference the subsequently filed Prospectus Supplements.

VI.   THE OFFERING DOCUMENTS CONTAINED
      MATERIAL MISSTATEMENTS AND OMISSIONS
      REGARDING UNDERWRITING STANDARDS

53. The Offering Documents contained material statements regarding, *inter alia*, (i) the underwriting process and standards by which the loans held in the respective Issuing Trusts were originated, including the type of loan and documentation level; (ii) the standards and guidelines used by First Franklin, the Merrill Sponsor and/or C-BASS when evaluating and acquiring the loans; (iii) representations concerning the value of the underlying real-estate

securing the loans pooled in the respective Issuing Trusts, in terms of LTV averages and the appraisal standards by which such real estate values were measured; (iv) the level of credit enhancement, such as overcollateralization and excess interest, calculated to afford a certain pre-determined level of protection to investors; and (v) the credit rating of the Certificates.

54.     The Offering Documents emphasized the underwriting standards used to originate the underlying mortgage loans.  Indeed, each Prospectus Supplement set forth the underwriting standards for the originators who originated 20% or more of the underlying loans in that Issuing Trust.  Contrary to these representations, many of these originators of the underlying mortgages did not originate loans in accordance with their stated underwriting standards.  Rather, as set forth below, these originators extended loans that did not comply with their underwriting standards in order to increase loan volume regardless of the borrower's ability to meet its obligations.  Merrill Lynch created the Merrill Depositor to acquire these mortgage loans, deposit them into the Issuing Trusts and sell the securitized Certificates to investors.

55.     Although the percentages vary among the Issuing Trusts, the Prospectus Supplements stated that First Franklin originated, or that the Merrill Sponsor or C-BASS acquired, most of the mortgage loans underlying the Certificates.  For example, the MLFFML Trust, Series 2007-A, Prospectus Supplement stated that "All of the Mortgage Loans were originated by the Sponsor [First Franklin].  Certain of the Mortgage Loans were subsequently purchased by [the Merrill Sponsor] from the Sponsor in bulk acquisition.  All of the Mortgage Loans will be transferred and assigned by either [First Franklin or the Merrill Sponsor] to [the Merrill Depositor] on the Closing Date."

56.     The Prospectus Supplements represented that the mortgage loans underlying the Certificates "were originated generally in accordance with the underwriting guidelines described in 'Underwriting Guidelines'" in this Prospectus Supplement.  As represented in the Prospectus Supplements, the Sponsor's underwriting and acquisition underwriting standards

were primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgaged loan.

57. Regarding acquired loans, the Prospectus Supplements represented that the Merrill Sponsor's standards required that the underwriting of the mortgages was conducted with a view toward the resale of the loans in the secondary mortgage market. The Merrill Sponsor's stated guidelines required third-party originators to consider, among other things, the mortgagor's credit history, repayment ability, and debt-to-income ratio, as well as the type and use of the mortgaged property. In addition, the Prospectus Supplements represented that each of the loan originators must have met First Franklin's and/or the Merrill Sponsor's minimum standards based on certain acquisition guidelines, in order to submit loan packages, and that those loans must have been in compliance with the terms of a signed mortgage loan purchase agreement.

58. Furthermore, the Prospectus Supplements represented that third-party originators of loans acquired by First Franklin (or indirectly by the Merrill Sponsor, through First Franklin) were originated in accordance with the underwriting program called the Direct Access Program, which relied upon a borrower's credit score to determine a borrower's likely future credit performance. First Franklin's acquisition guidelines required that the third-party originator approve the mortgage loan using the Direct Access Program risk-based pricing matrix.

59. The Registration Statements and the Prospectuses stated the "Underwriting Guidelines" concerning the loans underlying each of the Certificates offered pursuant to the Registration Statements. Specifically, the Prospectus Supplements state that "All of the Mortgage Loans were required to meet the underwriting criteria substantially similar to that described in this prospectus supplement." Each of the Prospectus Supplements identified loan originators in the mortgage pools underlying the Certificates for that particular Issuing Trust and provided representations regarding the underwriting standards utilized by the originators of 20% or more of the underlying loans.

17

60.    The representations regarding the underwriting standards utilized by the identified loan originators were untrue and omitted material facts.  Indeed, as detailed below, many of the identified loan originators systematically disregarded their stated underwriting guidelines.

A.    <u>Countrywide Home Loans, Inc.'s Underwriting Practices</u>

61.    The Prospectus Supplements misrepresented and omitted material facts regarding the underwriting practices of Countrywide, which was an originator of mortgage loans identified for the following Issuing Trusts:

> Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1
> Merrill Lynch Mortgage Investors Trust, Series 2006-A1

62.    The Prospectus Supplements for each of the above Issuing Trusts stated that:

> As part of its evaluation of potential borrowers, Countrywide Home Loans generally requires a description of income.  If required by its underwriting guidelines, Countrywide Home Loans obtained employment verification providing current and historical income information and/or telephonic employment confirmation. . . .
>
> ***Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.*** Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income") ratios are within acceptable limits. . . .
>
> Countrywide Home Loans may provide secondary financing to a borrower contemporaneously with the origination of a mortgage loan, subject to the following limitations:  The Loan-to-Value Ratio of the senior (i.e. first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%.

*   *   *

In addition to Countrywide Home Loans' standard underwriting guidelines (the "Standard Underwriting Guidelines"), which are consistent in many respects with the guidelines applied to mortgage loans purchased by Fannie Mae and Freddie Mac, Countrywide Home Loans uses underwriting guidelines featuring expanded criteria (the "Expanded Underwriting Guidelines"). . . .

Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances up to $650,000, up to 75% for mortgage loans with original principal balances up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000….

Mortgage loans which are underwritten pursuant to the Expanded Underwriting Guidelines may have higher Loan-to-Value Ratios, higher loan amounts and different documentation requirements than those associated with the Standard Underwriting Guidelines. The Expanded Underwriting Guidelines also permit higher debt-to-income ratios than mortgage loans underwritten pursuant to the Standard Underwriting Guidelines.

Countrywide Home Loans' Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances up to $650,000, up to 80% for mortgage loans with original principal balances up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000, and up to 70% for mortgage loans with original principal balances of up to $3,000,000.  Under certain circumstances, however, Countrywide Home Loans' Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000.

63.     While the Offering Documents represented that Countrywide's underwriting of mortgages was designed to ensure a prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral, the Offering

19

Documents contained untrue statements of material fact and material omissions.  Countrywide's underwriting standards were designed to originate as many mortgage loans as possible without regard to the ability of the borrower to repay such mortgages.  Indeed, it has now been revealed that Countrywide's loan originators systematically disregarded and/or manipulated the income, assets, and employment status of borrowers seeking mortgage loans.

64.     Attorneys General from various states have now initiated investigations into Countrywide's lending practices and also have alleged that Countrywide systematically departed from the underwriting standards it professed using for originating residential loans. For example, the Illinois Attorney General began an investigation into Countrywide's loan practices and, on June 25, 2008, filed an action in the Chancery Division of the Circuit Court of Cook County, Illinois, entitled *The People of the State of Illinois v. Countrywide Financial Corporation, et al.*, No. 08CH22994 (the "Illinois AG Complaint").

65.     According to the Illinois AG Complaint, Countrywide employees who the Illinois AG interviewed stated that Countrywide originated loans that did not meet its underwriting criteria because Countrywide employees were incentivized to increase the number of loan originations without concern for whether the borrower was able to repay the loan.  With respect to stated income loans, Countrywide employees explained to the Illinois AG that, while the company had a "reasonableness standard" in order to check fraudulent stated income, employees were only required to use their judgment in deciding whether or not a stated income loan seemed reasonable.  To supplement an employee's judgment as to whether or not a potential borrower's income was "reasonable," beginning in 2005, Countrywide required its employees to utilize a website, www.salary.com, to determine the reasonableness of a potential borrower's stated income.  Even if the stated salary was outside of the range provided by the website, Countrywide employees could still approve the loan.  The Illinois AG contends that the foregoing "reasonableness" test contravened proper underwriting practices.

66.     The Illinois AG Complaint also alleges that Countrywide employees did not properly ascertain whether a potential borrower could afford the offered loan, and many of

Countrywide's stated income loans were based on inflated estimates of borrowers' income. For example, according to the Illinois AG Complaint: (1) a Countrywide employee estimated that approximately 90% of all reduced documentation loans sold out of a Chicago office had inflated incomes; and (2) one of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely doubled the amount of the potential borrower's income on stated income mortgage applications.

67.     The California Attorney General also commenced an investigation into Countrywide's lending activities and filed a complaint in the Northwest District of the Superior Court for Los Angeles County, entitled *The People of the State of California v. Countrywide Financial Corporation, et al.*, No. LC081846 (the "California AG Complaint"). Similar to the Illinois AG Complaint, the California AG Complaint also alleged that Countrywide departed from its stated underwriting standards. For example, the Complaint alleged that employees were pressured to issue loans to unqualified borrowers by permitting exceptions to underwriting standards, incentivizing employees to extend more loans without regard to the underwriting standards for such loans, and failing to verify documentation and information provided by borrowers that allowed them to qualify for loans. The absence of readily obtainable asset verifications was also reported in an April 6, 2008 article in *The New York Times*. The article noted that even though Countrywide had the right to verify stated income on an application through the IRS (and this check took less than one day to complete), income was verified with the IRS on only 3%-5% of all loans funded by Countrywide in 2006.

68.     According to the California AG Complaint, Countrywide used a system called CLUES or Countrywide Loan Underwriting Expert System, to provide a loan analysis report that indicated whether the loan was within Countrywide's underwriting guidelines. CLUES reports indicating a loan was not within Countrywide's underwriting guidelines often were ignored in order to effectuate the loan.

69.     Moreover, like the Illinois AG Complaint, the California AG Complaint contained statements from Countrywide employees that they utilized www.salary.com purportedly to confirm a borrower's stated income. According to the California AG Complaint,

California employees would know ahead of time the range of salaries that www.salary.com would provide for a particular job and, therefore, knew by how much they could overstate a borrower's income.  A former California loan officer for Countrywide further explained that its loan officers typically explained to potential borrowers that "with your credit score of X, for this house, and to make X payment, X is the income that you need to make" after which the borrower would state that he or she made X amount of income.

70.     Likewise, the Connecticut Attorney General (the "Connecticut AG") filed a complaint in Superior Court, Judicial District of Hartford, entitled *State of Connecticut v. Countrywide Financial Corporation, et al.*, No. CV08-40390945, alleging that Countrywide's employees inflated borrowers' incomes in order to qualify them for loans they otherwise would not have received.

71.     Many of the allegations in the Illinois, California and Connecticut complaints were confirmed by investigations in other states such as Washington, West Virginia, Indiana and Florida.  Significantly, on October 6, 2008, Countrywide announced that it had settled the claims brought by 11 states, including California and Illinois, for an estimated $8.4 billion.

72.     Countrywide's underwriting standards are also the subject of an investigation by the Federal Bureau of Investigation ("FBI"), which *The Wall Street Journal* first reported on March 8, 2008, in an article entitled "FBI Investigates Countrywide – U.S. Scrutinizes Filings on Financial Strength, Loan Quality for Fraud."  According to the article, the FBI investigation is focused on "whether company officials made misrepresentations about the company's financial position and the quality of its mortgage loans in securities filings."

73.     On March 11, 2008, *The Wall Street Journal* published another article further detailing the FBI's investigation of Countrywide's lending practices. According to the sources interviewed by *The Wall Street Journal*, federal investigators were finding that "Countrywide's loan documents often were marked by dubious or erroneous information about its mortgage clients, according to people involved in the matter.  The company . . . packaged many of those

mortgages into securities and sold them to investors, raising the additional question of whether Countrywide understated the risks such investments carried."

74.     Press reports and articles highlight the excess lending and failure to follow stated underwriting standards that existed throughout Countrywide during the time the Merrill Depositor was issuing Certificates with underlying Countrywide loans.   For example, on August 26, 2007, in an article entitled "Inside the Countrywide Lending Spree," the *New York Times* described how Countrywide's focus on underwriting was not the ability of a borrower to repay a loan, but the amount of fees Countrywide could generate.   Thus, Countrywide steered borrowers to loans with higher interest rates and the most fees, resulting in greater delinquencies.

75.     Indeed, in a May 7, 2007 letter to the Office of Thrift Supervision, Countrywide Home Loans stated that in the fourth quarter of 2006 alone "almost 60% of the borrowers who obtained subprime hybrid ARMs would not have qualified at the fully indexed rate" and that "25% of the borrowers would not have qualified for any other [Countrywide] product."   The fully indexed rate ("FIR") is the amount of interest that is payable on an ARM once the teaser rate is removed.   The "teaser rate," typically 1%-1.25%, is only applied to the loan for the first month. Once the teaser rate is removed, the interest on the mortgage begins accruing according to the FIR.

76.     The FIR can change over time and is dependent on fluctuations in the current value of the chosen rate index, such as the 11th District Cost of Funds Index ("COFI"), the 12 Month Treasury Average Index or the London Interbank Offer Rate. The FIR is calculated by taking the current value of the rate index (which fluctuates monthly) and adding the margin agreed to by the borrower. The margin remains static for the life of the loan. The margin on Countrywide loans could be as high as 4%.   Thus, if the Countrywide ARM identifies the rate index as COFI (which was at 2.8% in July 2008) and the margin as 4%, then once the cap or "teaser rate" has expired, the borrower will be subject to an interest rate equal to the FIR or 6.8% for that month.

77.     Because the borrower has the option of making monthly payments as though the interest rate had not changed, most of those who had Countrywide ARMs paid only the "minimum" payment – a payment that is based on the teaser rate of 1% to 1.25% as opposed to the FIR of 6.8%, meaning that borrowers were making payments that were less than the amount of interest accruing on the loan after the teaser rate expired. The unpaid interest that accrued while the borrower was making payments based on the teaser rate was tacked onto the principal. Once the principal was 115% of the original loan, then the borrower's monthly payment immediately was raised to a level that would pay off the new balance (original principal plus the unpaid interest) of the loan.  This was called "payment shock."

78.     Countrywide admitted to the Office of Thrift Supervision that, even though 60% of its potential borrowers would not have qualified for a Countrywide loan with an interest rate of 6.8%, these same borrowers nevertheless were approved for a loan whose interest rate reached 6.8% once the teaser rate of 1.25% expired.

79.     Moreover, on February 23, 2008, *The Wall Street Journal* published an article entitled "Mortgage Chief Picked by BofA Sparks Worries – Countrywide Executive Spearheaded Pursuit of Subprime Business."  The article reported that Countrywide's stated underwriting standards were not followed and warnings from Countrywide's risk-control managers were not heeded.

80.     Indeed, according to Confidential Witness ("CW") 1, an underwriter for Countrywide in the Jacksonville, Florida, processing center between June 2006 and April 2007, as much as 80% of the loans originated involved significant variations from the underwriting standards that necessitated a signoff by management.  According to CW1, Countrywide was very lax when it came to underwriting guidelines.  Management pressured underwriters to approve loans and this came from "up top" because management was paid based, at least in part, on the volume of loans originated.  CW1's manager told CW1 to approve as many loans as possible and push loans through.  According to CW1, most loans declined by underwriters would "come back

to life" when new information would "miraculously appear" – which indicated to CW1 that Countrywide was not enforcing its underwriting standards.

81.     According to CW2, a Senior Underwriter in Roseville, California, from September 2002 to September 2006, Countrywide would regularly label loans as "prime" even if made to unqualified borrowers (including those who had recently gone through a bankruptcy and were still having credit problems).   According to CW2, Countrywide's lending practices got riskier in 2006 and Countrywide was more lax in enforcing its underwriting policies during that year.

82.     According to CW3, an Underwriter from Long Island, New York, between March 2000 and January 2007, Countrywide extended loans to individuals with increasing debt-to-income ratios.   Initially, Countrywide limited debt-to-income ratios to 38%, but this rose to 50%. According to CW3, Countrywide branch managers' compensation was tied to loan origination volume and not the quality of the loans.   Thus, according to CW3, branch managers pushed originators to sell more loans despite the riskiness of these loans.

83.     In addition, according to CW4, an Executive Vice President of Production Operations and later an Executive Vice President of Process Improvement, who worked at Countrywide for 17 years before leaving in October 2005, Countrywide created a computer system (or "rules engine") that routed highly risky loans out of the normal loan approval process to a central underwriting group for evaluation.   The system was called the Exception Processing System.   According to CW4, the Exception Processing System identified loans that violated Countrywide's underwriting requirements.   However, according to CW4, loans identified by the Exception Processing System as violating underwriting standards were ***not*** rejected.   Rather, according to CW4, Countrywide executives wanted the Company's Central Underwriting group to review such loans to evaluate whether these loans should require a higher price (up front points) or a higher interest rate in light of the violation at issue.   Central Underwriting entered information into the Exception Processing System about its decisions to approve such loans and charge additional fees to the borrower.

84.     Moreover, according to Mark Zachary, a former Regional Vice President of Countrywide's joint venture with KB Home, Countrywide Mortgage Ventures, LLC, Countrywide blatantly ignored its underwriting policies and procedures.  Mr. Zachary stated that there was a problem with appraisals performed on KB Homes being purchased with Countrywide loans.  According to Mr. Zachary, the appraiser was being strongly encouraged to inflate appraisal values by as much as 6% to allow the homeowner to "roll up" all closing costs.  According to Mr. Zachary, this inflated value put the buyer "upside down" on the home immediately after purchasing it, *i.e.*, the borrower owed more than the home's worth.  Thus, the borrower was more susceptible to default.  It also put the lender and secondary market investor at risk because they were unaware of the true value of their asset.  According to Mr. Zachary, Countrywide performed an audit in January 2007 into these matters which corroborates his story.

85.     On September 30, 2008, MBIA Insurance Corp. ("MBIA") filed a complaint against Countrywide in New York state court, entitled *MBIA Insurance Corp. v. Countrywide, et al.*, No. 08/602825.  The MBIA complaint alleges that Countrywide fraudulently induced it to provide insurance for certain investment certificates.  MBIA was able to obtain approximately 19,000 loan files for the Certificates it insured as a result of its contractual agreements with Countrywide.   After reviewing the portfolios and re-underwriting each loan provided by Countrywide, MBIA discovered that there was "an extraordinarily high incidence of material deviations from the underwriting guidelines Countrywide represented it would follow."  MBIA discovered that many of the loan applications "lack[ed] key documentation, such as a verification of borrower assets or income; include[d] an invalid or incomplete appraisal; demonstrate[d] fraud by the borrower on the face of the application; or reflect[ed] that any of borrower income, FICO score, or debt, or DTI [debt-to-income] or CLTV, fail[ed] to meet stated Countrywide guidelines (without any permissible exception)."  Significantly, "MBIA's re-underwriting review . . . revealed that almost 90% of defaulted or delinquent loans in the Countrywide Securitizations show material discrepancies."

B.   American Home Mortgage Corp.'s Underwriting Practices

86.   The Prospectus Supplements misstated and omitted material facts regarding the underwriting practices of American Home Mortgage Corp. ("American Home"), which was an originator identified for the Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1.

87.   For example, the Prospectus Supplement stated that:

> The ["conforming or "prime"] mortgage loans have been purchased or originated, underwritten and documented in accordance with the guidelines of Fannie Mae, Freddie Mac, the Federal Housing Administration (FHA), the U.S. Department of Veterans Affairs (VA), the U.S. Department of Agriculture Guaranteed Rural Housing Program (GRH), Ginne Mae, the underwriting guidelines of specific private investors, and the non-conforming or Alt-A underwriting guidelines of the Originator.

> The Originator's non-conforming underwriting guidelines are similar to those of the government sponsored enterprises Fannie Mae and Freddie Mac, but these loans are "non-conforming" in that the may not conform to the maximum loan amounts and in some cases underwriting guidelines of Fannie Mae and Freddie Mac.  These non-conforming loans do not conform to and are not insurable by the Federal Housing Administration nor can they be guaranteed by the U.S. Department of Veterans Affairs.

> The Originator's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt.

> Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisals Practice adopted by the Appraisal Standard Board of Appraisal Foundation.  The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms.  Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment.  In addition, each appraisal is reviewed for accuracy and consistency by the Originator's vendor management company or an underwriter of the Originator or a mortgage insurance company contract underwriter.

> The appraiser's value conclusion is used to calculate the ration (loan-to-value) of the loan amount to the value of the property. For loans made to purchase a property, this ratio is based on the lower of the sales price of the property and the appraised value. The Originator sets various maximum loan-to-value ratios based on the loan amount, property type, loan purpose and occupancy of the subject property securing the loan.

88.     American Home greatly reduced and/or eliminated its underwriting standards in order to approve as many mortgages as possible.  For example, an internal American Home "Credit Update" presentation dated from October 2005 set forth revised credit factors which made clear that American Home's underwriting guidelines were to be either relaxed substantially or essentially rendered meaningless, in order to allow American Home to make loans to high-risk borrowers.  Specifically, the Credit Update sets forth the previous "interpretation" of the underwriting guidelines under a heading entitled "What we observed in [our] prior history" alongside the new "interpretation" under a heading entitled "Where We Are Now."  These new "guideline interpretations" included:

- Not requiring verification of income sources on stated income loans;

- Reducing the time that need have passed since the borrower was in bankruptcy or credit counseling;

- Reducing the required documentation for self-employed borrowers; and

- Broadening the acceptable use of second and third loans to cover the full property value.

89.     Indeed, an internal American Home e-mail sent on November 2, 2006, from Steve Somerman, an American Home Senior Vice President of Product and Sales Support in California and co-creator of the American Home's "Choice Point Loans" program, to loan officers nationwide, stated that American Home would make a loan to virtually any borrower, regardless of the borrower's ability to verify income, assets or even employment. That e-mail specifically encouraged loan officers to make a variety of loans that were inherently risky and extremely susceptible to delinquencies and default, including (1) stated income loans, where both the income and assets of the borrower were taken as stated on the credit application without

verification; (2) "NINA" or No Income, No Asset loans, which allowed for loans to be made without any disclosure of the borrower's income or assets; and (3) "No Doc" loans, which allowed loans to be made to borrowers who did not disclose their income, assets or employment history.

90.     According to CW5, a former Senior Underwriter at American Home from 2002 to 2007, underwriters' objections to loans were frequently vetoed.  CW5 stated that underwriters would "say[] 'no way' on a lot of things, 'I would never give a borrower a loan like this,'" but the loans would be approved nonetheless.  According to CW5, loans would be approved over the underwriter's objection if he refused to put his name on a loan, "It happened more than it should have."

91.     Moreover, American Home permitted numerous "exceptions" to its underwriting standards.  CW6, an Assistant Vice President for Direct Consumer Lending in American Home's loan origination business segment between July 2006 and August 2007, explained that exceptions were always being made to the underwriting guidelines.  When CW6's staff raised concern with the sales department about loans that did not meet the underwriting guidelines, the sales department would contact the Melville, New York, headquarters to approve an exception to those guidelines so that the loan could be completed.  Examples of such exceptions included reducing the required credit score or increasing the loan-to-value ratio.  CW6 stated that, when the exception at issue involved accepting a reduced credit score, it was commonplace to overrule the objections of the underwriters in order to complete the loan.

92.     According to CW7, whose job at American Home from July 2005 through April 2007 was to review the underwriting of loans before they were sold to secondary market investors, exceptions to underwriting guidelines were made "all the time."  For example, borrowers who claimed to be self-employed were not required to prove that they had been in business for a specified period of time, as required by the underwriting guidelines.

93.     On April 30, 2007, American Home filed for bankruptcy.  In connection with its bankruptcy, American Home filed a List of Creditors Holding 30 Largest Unsecured Claims. The list included the Merrill Sponsor as a creditor with a $5,137,161 repurchaser claim.

C.     Ownit Mortgage Solutions, Inc.'s Underwriting Practices

94.     The Prospectus Supplements misstated and omitted material facts about the underwriting practices of Ownit Mortgage Solutions, Inc. ("Ownit"), which was an originator of mortgages identified for the Ownit Mortgage Loan Trust, Series 2006-2.

95.     For example, the Prospectus Supplements represented that:

> Ownit (headquartered in Agoura Hills, California) was a wholesaler consumer finance company that originated non-conforming mortgage loans…. Ownit is the originator of the "RightLoan", a proprietary loan product that focuses on purchase, owner occupied, full documentation loans…. Ownit risk-based priced each loan by combining the credit score and loan-to-value price to price the loan.
>
> ***The underwriting Guidelines and Credit Matrices of the RightLoan are designed to be used as a guide in determining the credit worthiness of the borrower and his/her ability to repay.*** The guidelines, a reasonable loan amount and the RightLoan itself offer a solution that also facilitates making logical exceptions to those guides.  Exceptions to the guidelines were made if the Loan met the primary criteria of the RightLoan and offers supported compensating factors when a deviation occurred.  In all cases, the exception(s) and compensating factor(s) were clearly documented in the file and required branch manager approval and a second signature from the corporate underwriter.
>
> Using the three components, capacity, credit and collateral, the underwriter analyzed the loan profile.  Capacity, which is the borrower's ability to repay, was determined by cash flow.  It was required to be clearly shown that the borrower had a proven, historical cash flow, which will support the requested loan amount. . . .
>
> Several aspects are considered in determining the borrower's capacity or ability to repay the loan.  The key factors used by Ownit were employment documentation, history and amount of income used to derive debt to income ratios. . . .

> A satisfactory credit history is the most reliable criterion for
> determining a borrower's credit worthiness. . . .
>
> The collateral value and amount of equity in the subject property
> were important factors in assessing the risk of a particular loan.

96.     While the Prospectus Supplements represented that Ownit utilized guidelines and credit-rating matrices in the underwriting of mortgages through its RightLoan product, Ownit did not comply with its underwriting standards and omitted to state that it lowered its underwriting standards in order to increase loan volume by extending higher-yield, riskier loans.

97.     In 2005, Merrill Lynch purchased a 20% share in one of its primary loan originators, Ownit.  Ownit originated $6 billion in loans from September 2005 to December 2006.  In fact, Ownit's founder and CEO William Dallas ("Dallas") admitted that after Merrill Lynch's acquisition, Ownit lowered its underwriting standards to increase volume and originated higher-yield, riskier loans.  According to Dallas, Ownit originated $6 billion in loans from September 2005 to December 2006.

98.     According to CW8, a senior underwriter at the Atlanta, Georgia, branch of Ownit from May 2005 to December 2006, appraisals were "absolutely" higher than the actual value of properties.  For example, CW8 described that appraisals were based on sales that were not true comparables to the subject properties and that "for a good year or two, everyone was riding on totally inflated values."

99.     CW9, a senior underwriter at Ownit's Portland, Oregon, branch from February 2006 until December 2006, stated that at Ownit "if you had a pulse or you could breathe, you got a loan."  CW9 stated that all appraisals were supposed to go through some type of review.  According to CW9, the underwriters did a desk review, but they were not closely scrutinized.  CW9 further stated that none of the appraisals went further than a desk review and if an underwriter questioned the appraisal, management would just sign off on it.

100.    Ownit filed for bankruptcy in December 2006 "amid reports that the subprime lender had been hit by huge loan buyback requests from an investor" according to Workout Wire, *BuyBacks Appear to Shutter Two Firms*, December 8, 2006.  In connection with Ownit's

31

bankruptcy, Merrill Lynch LP Holdings, Inc. filed an unsecured repurchase claim for $92,965,222.

101.     Nevertheless, according to Janet Tavakoli, a derivatives expert and author of "Dear Mr. Buffett: What an Investor Learns 1,269 Miles From Wall Street" (John Wiley & Sons, 2009), the Merrill Depositor continued to issue mortgage pass-through certificates with underlying Ownit loans well into 2007, *after* Ownit had collapsed and filed for bankruptcy amid reports of huge loan buyback requests.  For example, Ownit was an originator of 16.95% of the underlying loans in the Merrill Lynch Mortgage Investors Trust, Series 2007-SD1, prospectus supplement dated June 11, 2007.

D.     First Franklin's Underwriting Practices

102.     The Offering Documents misrepresented and omitted material facts about the underwriting practices of First Franklin, which was the loan originator of all loans in the following Trusts:

> Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-A
> Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2
> Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3
> Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4
> Merrill Lynch Mortgage Investors Trust, Series 2006-FF1

103.     In regard to First Franklin's underwriting standards, these Prospectus Supplements stated that:

> ***First Franklin Financial's underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.***  The standards established by First Franklin Financial require that mortgage loans of a type similar to the Mortgage Loans be underwritten by First Franklin Financial with a view toward the resale of the mortgage loans in the secondary mortgage market.  In accordance with First Franklin Financial's underwriting guidelines, First Franklin Financial considers, among other things, a mortgagor's credit history, repayment ability and debt service to income ratio ("Debt Ratio"), as well as the value, type and use of the mortgaged property.

*     *     *

***Wholesale Origination***.  A significant majority of the Mortgage Loans were originated by First Franklin Financial based on loan application packages submitted to First Franklin Financial by mortgage brokers that do not fund the mortgage loans themselves. These mortgage brokers must meet minimum standards set by First Franklin Financial and, once approved, the mortgage brokers are eligible to submit loan application packages in compliance with the terms of their mortgage broker agreements. . . .

***Retail Origination***.  First Franklin Financial originates loans in its retail channel based on loan applications submitted directly by borrowers in its operation located in Lake Forest, California.  The retail operation acquires customers primarily through online lead generators, but also relies to a small extent on direct mail and phone contact to solicit borrowers.

***CORE Program***.  All of the Mortgage Loans were originated by First Franklin Financial under an underwriting program called the CORE Program (the "CORE Program").   Within the CORE Program, there are four documentation programs…. While each underwriting program is intended to assess the risk of default, the CORE Program makes use of credit bureau risk scores (the "Credit Bureau Risk Score").  The Credit Bureau Risk Score is a statistical ranking of likely future credit performance developed by Fair, Isaac & Company ("Fair Isaac") and the three national credit repositories Equifax, Trans Union and Experian. . . .

In accordance with First Franklin Financial's guidelines, under the CORE Program, First Franklin Financial requires that the Credit Bureau Risk Score be used to determine program eligibility…. The Credit Bureau Risk Score, along with the loan-to-value ratio, is an important tool in assessing the creditworthiness of a borrower in the CORE Program.  However, these two factors are not the only considerations in underwriting a CORE Program mortgage loan. First Franklin Financial requires a review of each CORE Program mortgage loan to determine whether First Franklin Financial's guidelines for income, assets, employment and collateral are met.

In accordance with First Franklin Financial's Guidelines, all of the Mortgage Loans were required to be written by underwriters having the appropriate signature authority. Each underwriter is granted a level of authority commensurate with his or her proven judgment, maturity and credit skills.  On a case by case basis, an underwriter may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below warrants an

33

underwriting exception.  Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address.  It is expected that a limited portion of the Mortgage Loans may represent such underwriting exceptions.

104.    In regards to First Franklin's acquisition underwriting standards, the Prospectus Supplements stated:

First Franklin Financial's acquisition underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgage property as collateral for the mortgage loan.  The standards established by First Franklin Financial require that the mortgage loans of a type similar to the Mortgage Loans were underwritten by the third party originators with a view toward the resale of the mortgage loans in the secondary mortgage market.  In accordance with First Franklin Financial's guidelines for acquisition, the third party originators must consider, among other things, a mortgagor's credit history, repayment ability and debt service to income ratio.  ("Debt Ratio"), as well as the value, type and use of the mortgaged property.

\*    \*    \*

The third party originators are required to conduct a number of quality control procedures, including a post funding compliance audit as well as a full re-underwriting of a random selection of loans to assure asset quality.  Under the asset quality audit, all loans are required to be reviewed to verify credit grading, documentation compliance and data accuracy.  Under the asset quality procedure, a random selection of each month's originations must be reviewed by each third party originator.

The loan review is required to confirm the existence and accuracy of credit documentation, appraisal analysis and underwriting decision.  A report detailing audit findings and level of error is sent monthly to each branch for response.  The audit findings must then be reviewed by the third party originator's senior management.  Adverse findings are to be tracked monthly and over a rolling six month period. This review procedure allows the third party originator to assess the programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staffing.

> Under the mortgage loan programs, various risk categories are used to grade the likelihood that the applicant will satisfy the repayment conditions of the loan.

105.    In regards to First Franklin's underwriting and appraisal quality control procedures, the Prospectus Supplements stated:

> In accordance with First Franklin Financial's guidelines, the underwriters are required to verify the income of each applicant under various documentation programs. . . .
>
> First Franklin Financial is required to comply with applicable federal and state laws and regulations and generally requires an appraisal of the mortgaged property which conforms to Freddie Mac and/or Fannie Mae standards; and if appropriate, a review appraisal.   Generally, appraisals are provided by appraisers approved by First Franklin Financial, but all review appraisals may only be provided by First Franklin Financial. . . .
>
> First Franklin Financial conducts a number of quality control procedures, including a post funding compliance audit as well as a full re-underwriting of a random selection of mortgage loans to assure asset quality.   Under the asset quality audit, all mortgage loans are required to be reviewed to verify credit grading, documentation compliance and data accuracy.   Under the asset quality procedures, First Franklin Financial reviews a random selection of each month's originations. . . .
>
> Under the CORE Program, various risk categories are used to assess the likelihood that the applicant will satisfy the repayment conditions of the loan.   These risk categories establish the maximum permitted loan-to-value ratio and loan amount, given the occupancy status of the mortgaged property and the applicant's credit history and Debt Ratio.

106.    The Prospectus Supplements represented that First Franklin's underwriting of mortgages considered mortgagor's credit history, repayment ability and debt service to income ratio.   However, First Franklin lacked such underwriting standards and approved loans from wholesale originators without proper documentation and verification of mortgagor information which resulted in loan defaults and repurchases.

107.    CW10, a Corporate Underwriter at First Franklin from 2006 until June 2007 who audited appraisals, estimated that one in four appraisals reviewed at First Franklin was

35

overinflated.  CW10 stated that most lenders maintained blacklists for appraisers who submitted appraisals with overinflated values or unsupported comparables, however, First Franklin had no such lists.  Many times CW10 would reject loans with overinflated appraisals, only to have them approved by managers.

108.    On December 30, 2006, Merrill Lynch purchased First Franklin from National City Corporation ("National City") for $1.3 billion.  On April 13, 2007, National City received a dispute notice from Merrill Lynch asserting that the closing date net asset values and related purchase price were overstated by $67 million.  Merrill Lynch's dispute notice alleged that National City had breached certain representations or warranties concerning First Franklin's alleged losses associated with its claimed repurchase of loans.  On May 5, 2008, Merrill Lynch announced that it would stop funding loans at First Franklin and explore selling the company. Thereafter, on June 30, 2008, National City was notified that the Chicago Regional Office of the SEC was conducting an informal investigation of National City and requested that it provide the SEC with certain documents concerning its loan underwriting experience, dividends, bank regulatory matters and the sale of First Franklin.  First Franklin's loans suffered from the same problems as the rest of the mortgage industry, as explained below, and were negatively impacted by lax underwriting, fraudulent home appraisals, and borrowers who exaggerated their incomes.

E.    ResMAE's Underwriting Practices

109.    ResMAE Mortgage Corporation ("ResMAE") was an originator for the Merrill Lynch Mortgage Investors Trusts 2006-RM3 and 2006-RM5.  The Prospectus Supplements for MLMI 2006-RM3 and MLMI 2006-RM5 stated the following about ResMAE's underwriting guidelines:

> **The underwriting standards of ResMAE are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.**  ResMAE considers, among other things, a mortgagor's credit history, repayment ability and

debt service-to income ratio (referred to herein as the Debt Ratio), as well as the value, type and use of the mortgaged property.

\*   \*   \*

All of the mortgage loans were underwritten by ResMAE's underwriters having the appropriate signature authority. Each underwriter is granted a level of authority commensurate with their proven judgment, maturity and credit skills. On a case by case basis, ResMAE may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address. A substantial portion of the Mortgage Loans represent such underwriting exceptions.

110. The Offering Documents contained materially untrue statements and omissions related to ResMAE's underwriting standards because ResMAE systematically disregarded its stated underwriting standards and regularly made exceptions to its underwriting guidelines in the absence of sufficient compensating factors.

111. According to CW19, a former area credit manager at ResMAE from 2004 through 2005, the sales department "push[ed] . . . through" stated income loans that listed implausible incomes. "[T]hat's where things got ridiculous, because as underwriters you were told that things have to make sense, you can't have somebody that is a waitress that is making $5,000 a month and we would say we want to go 'full documentation' and sales would say 'no' and push it through."

112. CW19 also stated that exceptions to ResMAE's underwriting guidelines accounted for "50 percent" of all underwritten loans. "[L]oan officers and sales [department employees]," mostly requested exceptions and would take the requests to sales managers for approval." According to CW19, this created a "dangerous" "conflict of interest" between sales managers, who had underwriting authority, and loan officers and sales employees who were paid on commission.

113.    CW19 also witnessed numerous instances of "property flipping" and a lot of "straw buyers" that would list the property as "owner occupied" on their loan applications when in fact it was not.  Underwriters were encouraged not to "dig [too] deep" when they suspected flipping was occurring.  There were even several instances where the property "didn't even exist, it was like a vacant lot, but yet we had an address and pictures, but when the review appraiser went out there was no property."

114.    CW20, a former Senior Vice President of ResMAE from 2003 through 2006, confirmed that "exceptions were not uncommon, there were [a] significant [amount of] exceptions . . . as much as 50%."

115.    CW21 was a former regional credit manager at ResMAE from March 2004 through March 2007.  CW21 stated that exceptions to the underwriting guidelines were commonplace and that "40% to 50%" of loans that were originated pursuant to exceptions.  CW21 also noticed problems with stated income loans and appraisals, especially in 2005 and 2006.  CW21 saw "fraud from appraisers, title companies and . . . borrowers.  Yeah, they were altering documents and that kind of stuff; that was very big in 2005 and 2006.  Especially the stated income, they would state that they made this income and they didn't, it was [a] misrepresentation."  During the last six months of CW21's employment at ResMAE, CW21 saw a large percentage of exceptions as the result of "an effort to increase [loan] production."

F.    WMC's Underwriting Practices

116.    WMC Mortgage Corp. ("WMC") was an originator for Merrill Lynch Mortgage Investors Trusts 2006-WMC1 and 2006-WMC2.  The Prospectus Supplements for MLMI 2006-WMC1 and MLMI 2006-WMC2 stated the following about WMC's underwriting guidelines:

> The Mortgage Loans have been either (i) originated generally in
> accordance with the underwriting guidelines established by WMC
> Mortgage Corp. (collectively, the "Underwriting Guidelines") or
> (ii) purchased by WMC Mortgage Corp. after re-underwriting the
> Mortgage Loans generally in accordance with the Underwriting
> Guidelines. WMC Mortgage Corp. also originates certain other
> mortgage loans that are underwritten to the guidelines of specific

investors, however, such mortgage loans are not included among those sold to the trust fund as described herein.

> ***The Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the [mortgage] in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults.***

> On a case-by-case basis WMC Mortgage Corp. may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category or other guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low debt-to-income ratio ("Debt Ratio"), good mortgage payment history, an abundance of cash reserves, excess disposable income, stable employment and time in residence at the applicant's current address. It is expected that a substantial number of the Mortgage Loans to be included in the trust fund will represent such underwriting exceptions.

117.    The Offering Documents contained materially untrue statements and omissions related to WMC's underwriting standards because WMC systematically disregarded its stated underwriting standards and regularly made exceptions to its underwriting guidelines in the absence of sufficient compensating factors.

118.    In 2004, General Electric purchased WMC, which was then the sixth-largest subprime lender in the nation, from private equity firm Apollo Management.  WMC's concentration was in nonprime loans and jumbo loans up to $1 million dollars.  According to a March 2007 *MortgageDaily.com* article, WMC was faced with growing delinquencies in 2007, and announced that it would no longer write mortgages with no down payments.  On September 20, 2007, General Electric closed WMC's operations, taking a $400 million charge as a result.

119.    WMC's reckless underwriting practices resulted in a large number of foreclosures, ranking WMC fourth in the Comptroller of the Currency's "Worst Ten of the Worst Ten" list presented in April 2010 to the FCIC.  According to Reuters, WMC originated "some of the worst-performing loans in the . . .  $575 billion market for home equity asset-

backed securities." *See GE's WMC Mortgage loans hit subprime index*, Reuters, March 9, 2007.

120.    On September 2, 2009, PMI Mortgage Insurance Co. ("PMI") sued WMC in California state court for misrepresentations and failure to adhere to its contractual repurchase obligations relating to the securitization of a pool of WMC mortgage loans. *PMI Mortgage Ins. Co., et al. v. WMC Mortgage Corp., et al.*, BC-391072 (Los Angeles Super. Ct.). PMI alleged that WMC "made extensive representations and warranties" about the underwriting of its mortgage loans and the accuracy of the information underlying such loans. According to PMI, a Clayton Fixed Income Services, Inc. ("Clayton") investigation into a sample of thousands of WMC-originated loans revealed that WMC "breached various representations and warranties . . . because, *inter alia*, the loan-to-value ratio at the time of origination was greater than 100%; fraud, errors, misrepresentations, or gross negligence took place on the part of WMC . . . ; the loans did not comply with WMC's own underwriting standards at the time of origination; certain documents were missing; and/or WMC had failed to utilize a methodology in underwriting the loans that employed objective mathematical principles designed to determine that, at the time of origination, the borrower had the reasonable ability to make timely payments on the [m]ortgage [l]oans." According to the PMI Complaint, the Clayton investigation "demonstrate[d] a systemic failure by WMC to apply sound underwriting standards and practices which cuts across all of the [loans in the securitization]."

121.    In June 2008, the Washington State Department of Financial Institutions, Division of Consumer Services filed a Statement of Charges and Notice of Intention to Enter an Order to Revoke License, Prohibit From Industry, Impose Fine, Order Restitution and Collect Investigation Fees against WMC Mortgage and its principal owners. The Statement of Charges was the result of a lengthy investigation in which WMC's and its business partners' books were subpoenaed. The investigation found that WMC had originated loans with unlicensed or unregistered mortgage brokers, understated amounts of finance charges on multiple loans, understated amounts of payments made to escrow companies, understated annual percentage

rates by almost .5%, and committed many other violations of Washington State deceptive and unfair practices laws.

       G.    <u>Fremont's Underwriting Practices</u>

       122.    Fremont Investment & Loan ("Fremont") was an originator for Merrill Lynch Mortgage Investors Trust 2006-FM1.  The Prospectus Supplement for MLMI 2006-FM1 stated the following about Fremont's underwriting guidelines:

> Fremont's Underwriting Standards.  Substantially all of the mortgage loans originated by Fremont are based on loan application packages submitted through licensed mortgage brokers. These brokers must meet minimum standards set by Fremont based on an analysis of the following information submitted with an application for approval: applicable state license (in good standing), signed broker application and agreement, and signed broker authorization.  Once approved, licensed mortgage brokers are eligible to submit loan application packages in compliance with the terms of a signed broker agreement.

>          * * *

> ***Fremont's underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.***  The Scored Programs assess the risk of default by using Credit Scores obtained from third party credit repositories along with, but not limited to, past mortgage payment history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratios as an aid to, not a substitute for, the underwriter's judgment. All of the mortgage loans in the mortgage pool were underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market.

       123.    The Offering Documents contained materially untrue statements and omissions related to Fremont's underwriting standards because Fremont systematically disregarded its stated underwriting standards and regularly made exceptions to its underwriting guidelines in the absence of sufficient compensating factors.

       124.    Fremont originated subprime loans on a wholesale basis through independent loan brokers in nearly all 50 states.  Fremont was one of the country's largest subprime lenders

until March 2007, when the Federal Deposit Insurance Corporation ("FDIC") forced it out of the lending business for extending credit "in an unsafe and unsound manner" and committing violations of law and FDIC regulations.

125.    On March 7, 2007, following an extensive investigation, the FDIC issued a Cease & Desist Order to Fremont, concluding that Fremont was "operating with inadequate underwriting criteria and excessive risk in relation to the kind and quality of assets held by the Bank," "operating with a large volume of poor quality loans," and "engaging in unsatisfactory lending practices."

126.    On October 4, 2007, the Massachusetts Attorney General brought an enforcement action against Fremont for "unfair and deceptive business conduct," "on a broad scale." *Massachusetts v. Fremont Investment & Loan and Fremont General Corp.*, No. 07-4373 (Sup. Ct. Mass.) (the "Massachusetts Action").  Specifically, the Massachusetts Action alleged that Fremont abdicated its underwriting standards, provided misleading or incomplete information to borrowers, made loans that it knew couldn't be repaid and participated in predatory lending.

127.    According to the Massachusetts Action, Fremont's loans were "structurally unfair due to their multiple layers of risk with no meaningful consideration whether borrowers [could] afford to pay the loans."  Fremont "approve[ed] borrowers without considering or verifying the relevant documentation related to the borrower's credit qualifications, including the borrower's income"; "approv[ed] borrowers for loans with inadequate debt-to-income analyses that do not properly consider the borrowers' ability to meet their overall level of indebtedness and common housing expenses"; "failed to meaningfully account for [ARM] payment adjustments in approving and selling loans"; "approved borrowers for these ARM loans based only on the initial fixed 'teaser' rate, without regard for borrowers' ability to pay after the initial two year period"; "consistently failed to monitor or supervise brokers' practices or to independently verify the information provided to Fremont by brokers"; and "ma[de] loans based on information that Fremont knew or should have known was inaccurate or false,

42

including, but not limited to, borrowers' income, property appraisals, and credit scores."  On June 18, 2008, Fremont filed for bankruptcy.

128.    Numerous confidential witnesses corroborate the FDIC's findings and those in the Massachusetts Action.  For example, according to CW22, an Assistant Vice President, Regulatory Risk Examiner at Fremont, who was involved in the FDIC's investigation of Fremont, Fremont's Regulatory Risk Management group (of which CW22 was a member) submitted numerous, adverse written findings to senior Fremont executives in 2005 and 2006, which specifically highlighted unfair and deceptive acts that Fremont was engaging in, "pretty obvious" poor underwriting, and problematic incentive compensation.  CW22 stated that some of the fraud was "so egregious" including "ridiculous" stated income applications, yet nothing was being done about "obvious problems" including repeated broker fraud.

129.    Fremont's stated underwriting guidelines were not applied in a manner that evaluated the borrower's ability to replay.  According to CW23, (an account executive at Fremont's Anaheim, California center from November 2005 to June 2006), and CW24 (an account manager at Fremont's Downers Grove, Illinois center from August 2005 to January 2007), when borrowers were rejected for failing to meet Fremont's underwriting criteria for fully documented loans, the loans were simply converted to "stated income" loans – with a higher reported income than previously documented – and approved.  According to the separate accounts of CW25 (an underwriter at Fremont's Downers Grove, Illinois center from August 2002 to January 2007) and CW26 (a senior account manager at Fremont's Downers Grove, Illinois center from July 2001 to February 2007), Fremont approved loans with unrealistic stated incomes, including "pizza delivery men" with reported monthly income of $5,000 or $6,000. Fremont accepted claims that "landscapers and housekeepers" earned $10,000 in monthly income, according to CW27 (a former senior underwriter at Fremont's Anaheim and Ontario, California centers from 2002 to 2007), and that "window washers" made $75,000 per year, according to CW26.

130.    According to CW28, an account manager from 2005 through May 2007, Fremont continually ignored obviously fraudulent documents when approving loans.  By way of example, Fremont ignored a case where 40 loan files from the same broker had the exact same banking statements, according to CW29, a former quality control investigator at Fremont from 2002 until March 2007.  Indeed, fraudulent bank statements and W2s were discovered and ignored every day, according to CW30, a Fremont quality control auditor from May 2005 to February 2007.  According to CW31, an assistant operations manager at Fremont's Anaheim, California center from October 2003 to January 2007, when Fremont could not ignore fraudulent information, such as a false pay stub, it simply removed the information from the file or replaced it.

H.    Wachovia's Underwriting Practices

131.    Wachovia Mortgage Corporation ("Wachovia") was an originator for the Merrill Lynch Alternative Note Asset Trust, Series 2007-F1.  The Prospectus Supplement for MLALT-2007-F1 stated the following about Wachovia's underwriting guidelines:

> Wachovia manually underwrites every Jumbo A Fixed Rate, Jumbo LIBOR ARM and Jumbo Alt A Fixed Rate/ARM loan and generally follows Fannie Mae guidelines.  Wachovia uses Custom Desktop Underwriter to supplement the underwriting of the Jumbo A Fixed Rate and the Jumbo LIBOR ARM loans to ensure the consistent and objective application of risk evaluation; however, income/asset documentation, credit requirements, collateral documentation must be met for each product.
>
> * * *
>
> ***The borrower's capacity to repay, creditworthiness, source of funds for down payment and the adequacy of the collateral securing the mortgage are evaluated per guidelines stated within the Wachovia Mortgage Corporation online Products and Underwriting Manual.***
>
> * * *
>
> Exception loans which are originated outside of stated guidelines are available to customers with demonstrated Wachovia relationships and/or strong compensating factors. Exception loans

44

must be approved by exception officers within Wachovia, GBG or the Wealth Management group.

132.    The Offering Documents contained materially untrue statements and omissions related to Wachovia's underwriting standards because Wachovia systematically disregarded its stated underwriting standards and regularly made exceptions to its underwriting guidelines in the absence of sufficient compensating factors.   Wachovia's underwriting was characterized by, among other things: (a) widespread falsification of borrower income and employment information; (b) regular use of "instant underwriting events," during which high-risk loans were approved without meaningful review.   Additionally, Wachovia's compensation structure incentivized employees to increase the volume of loans originated, without regard to borrower risk.

133.    Wachovia was a nationwide mortgage lender which originated conforming and non-conforming, conventional, FHA and VA loans.   On October 1, 2006, Wachovia's parent corporation, Wachovia Corporation, purchased Golden West, a California-based thrift which specialized in residential mortgage lending.

134.    Golden West principally originated adjustable-rate mortgages known as "Pick-A-Pay" ("Option ARM") loans, which initially carried a low "teaser" interest rate, but later "reset" to a higher rate.   Additionally, these loans contained a "negative amortization" feature which provided the borrower the option of paying less than the calculated monthly interest.   If the borrower elected negative amortization, the remaining interest would simply be added to the principal balance (causing the balance to grow rather than shrink each month).   These features caused Option ARM loans to be potentially much riskier than traditional mortgage loans and required conservative underwriting in order to limit risk.

135.    After the Golden West acquisition, Wachovia expanded the origination of Option ARM loans.   In a December 25, 2008 *New York Times* article, Russell W. Kettell, a former chief financial officer of a Golden West subsidiary stated, "the merger created 'pressure' for 'a pretty good-sized increase in loan volume,'" and Wachovia "'wanted volume and wanted growth.'"   In

45

2007, Wachovia extended $33.4 billion in Option ARM loans – a 34% increase over 2004 and 2005.

136.     According to CW32, a former Wachovia mortgage consultant from 2005 to 2008 in Connecticut: "One of the things we were taught to sell was our underwriting, that we could make and break our own rules.  It was in our [sales] slides.  We would get [loans] done." CW33, a former Golden West and later Wachovia mortgage consultant and Territory Manager during 2004 to 2007, described how a lot of "the wrong borrowers" were put into Pick-A-Pay loans, and that this was especially true after the merger: "Wachovia had people working for them who didn't understand the product," and qualified many people in those loans "who didn't deserve them" at the minimum payment rate.

137.     Wachovia's Option ARM personnel in California routinely held "instant underwriting" events during which they collected large groups of the high-risk loans from outside mortgage brokers, and approved them *en masse*, without regard for stated underwriting guidelines or credit risk.  For example, CW34, a former senior account executive and manager at Golden West and then Wachovia from 1997 to 2007, stated that "instant underwritings" were a method for account executives to "go out and tell brokers to bring in all your crap loans that are sitting on your desk that you don't want that you are having trouble getting through" so they could be approved.  Underwriters reviewed the loans, but "had to underwrite loads and loads of loans," which fostered mistakes and easier underwriting.  CW35, a California-based Senior Underwriter who worked first for Golden West and then Wachovia from 2001 to 2009, recalled one of his managers asking instant underwriters to approve a large stack of mortgages where many of the borrowers were delinquent on everything except their mortgage.  CW35 stated that "instant underwriting" was basically telling the brokers "Yeah, we can do the loan.  We'll bring it back and get it done."

I.       C-BASS's Underwriting Practices

138.     Credit-Based Asset Servicing and Securitization LLC's (defined above as "C-BASS") was a mortgage investment and servicing company that specialized in the purchase and

securitization of subprime mortgages.  *FitchRatings* described C-BASS's general business strategy of as one that "targeted investment in 'scratch and dent' sub-performing and non-performing whole loans, subprime whole loans, subordinate RMBS and servicing rights … " Similarly, the *American Banker* described C-BASS as a firm "best known for buying 'scratch-and-dent' home loans."  "Scratch-and-dent loans" are loans or mortgages that have one or more combination of "defects" stemming from originations made outside a lender's implemented credit guidelines, deficiencies in loan documentation, errors made in following regulatory compliance laws, irregular payment history or borrower defaults.

139.   C-BASS did not originate loans, but frequently served as the "Sponsor" of securitizations, including the C-BASS 2007-CB4 Trust.  The Prospectus Supplement for C-BASS 2007-CB4 Trust stated that C-BASS purchased the mortgage loans underlying the Certificates from "various originators" including New Century Financial Corporation ("New Century").  The C-BASS 2007-CB4 Offering Documents stated that the loans C-BASS acquired from these originators were "subjected to due diligence review" and that "[C-BASS] or a loan reviewer has reviewed a majority of the files related to the Mortgage Loans in connection with the acquisition of the Mortgage Loans … for credit and compliance considerations" as follows:

> *In its review, the Sponsor evaluates the mortgagor's credit standing, repayment ability and willingness to repay debt.  A mortgagor's ability and willingness to repay debts (including the Mortgage Loans) in a timely fashion is determined by the Sponsor by reviewing the quality, quantity and durability of income history, history of debt management, history of debt repayment and net worth accumulation of the mortgagor to the extent such information is available.*

> In addition, the Sponsor may also obtain and review a current credit report for the mortgagor.  During its mortgage file review, the Sponsor also confirms that the Mortgage Loan was originated in material compliance with applicable federal, state and local laws and regulations.  In connection with its review for property value considerations the Sponsor may obtain, for a portion of the Mortgage Loans, a current appraisal, broker's price opinion, automated valuation methodology price ("AVM") and/or drive-by or desk review of such property or any combination thereof, prepared within six months of the Sponsor's purchase.

140.    The Offering Documents contained materially untrue statements and omissions related to C-BASS's "due diligence review" procedures because C-BASS's "due diligence review" was ineffective and did not result in a determination of "the mortgagor's ability and willingness to repay debts."  Originators from whom C-BASS purchased loans, including New Century: (1) systematically disregarded their underwriting standards and originated mortgage loans with the intent of increasing volume, rather than evaluating the mortgagor's ability and willingness to repay the loan; and (2) regularly made exceptions to their underwriting guidelines in the absence of sufficient compensating factors.  ¶¶143-47.  As shown in the chart below at paragraph 209, the percentage of loans in C-BASS 2007-CB4 that are currently either 60 days or more delinquent, in foreclosure, or bank-owned is 46.76%.

141.    Mortgage insurers MGIC Investment Corporation ("MGIC") and Radian Group, Inc. each owned a 46% interest in C-BASS.  In 2006, MGIC's interest was valued at $450 million and C-BASS was responsible for 24% and 16% of MGIC's 2006 profits, respectively. MGIC's CFO sat on C-BASS's Board of Directors.  On April 12, 2007, C-BASS CEO Bruce Williams explained in a MGIC conference call that MGIC would report a pretax loss primarily attributable to C-BASS's subprime loan portfolio:

> This past quarter the subprime market experienced a substantial repricing and increase in credit risk premium.  ***This is primarily due to the well-publicized issues with subprime loans, especially the 2006 vintage to include poor underwriting, increasing delinquencies, and foreclosures.***

142.    On July 31, 2007, C-BASS issued a press release stating that it paid $290 million in lender margin calls "during the first 6 months of 2007."  On August 1, 2007, MGIC filed a Form 8-K which stated that, on July 26, 2007, MGIC determined that C-BASS was materially impaired.  Specifically, the 8-K noted:

> After considering the accelerating amount of margin calls to which C-BASS was subject and C-BASS's available resources to meet such margin calls, ***on July 26, 2007, the Company's Chief Financial Officer and its Chief Accounting Officer concluded that a material charge for impairment of the Company's investment in C-BASS was required under generally accepted***

> *accounting principles.*  These officers … determined that the
> upper boundary of the impairment charge *could be the Company's*
> *entire investment in C-BASS [$516 million].*

Radian issued a similarly-worded announcement, declaring its investment in C-BASS
"impaired."

143.    New Century originated nearly 20% of the loans that C-BASS purchased or
acquired for inclusion in the C-BASS 2007-CB4 Trust.  According to the Prospectus
Supplement, C-BASS purportedly conducted a due diligence review and "evaluated the
mortgagor's credit standing, repayment ability and willingness to repay debt," including the
New Century loans underlying the C-BASS 2007-CB4 Trust.  Prior to its collapse and
bankruptcy filing, New Century was one of the nation's largest mortgage finance companies.
On February 29, 2008, Michael J. Missal, Bankruptcy Court Examiner for New Century
("Examiner"), issued a detailed report of the various deficiencies at New Century, including lax
mortgage origination standards.  The Examiner's report detailed "serious loan quality issues at
[New Century] beginning as early as 2004"; numerous "red flags" relating to loan quality; and
the failure of New Century's senior management and board of directors to devote sufficient
attention to improving loan quality until it "was too late to prevent the consequences of
longstanding loan quality problems in an adversely changing market."

144.    Numerous    confidential    witnesses    corroborate    the    Examiner's    findings.
According to CW11, a former New Century fraud investigator and senior loan underwriter
employed from January 1999 until April 2007 and who examined numerous New Century
mortgage loans, New Century's problems began when it "started to abandon prudent
underwriting guidelines" at the end of 2003 in order to "push more loans through" the system.
According to CW11, New Century, in effect, "stopped underwriting" and adopted an approach
that the Company would be "okay if [it] could out run [its] delinquency rate."

145.    According to CW36, a former New Century Vice President of Corporate Finance
from 2002 until April 2007, starting in 2004-05 New Century changed its practice with respect
to stated income loans.  Although the Company had always had the program, it was originally

used primarily with self-employed borrowers.  CW36 stated that New Century began allowing riskier stated income loans for W-2 wage earners, who should have been able to verify their stated income, but did not.

146.    According to CW12, a former New Century Senior Vice President employed from July 2005 until April 2006 in Irvine, California, New Century could only meet its increasing year-over-year sales projections if it lowered underwriting standards.  According to CW12, the former Senior Vice President of New Century would approve just about any loan under New Century's "weak" underwriting standards.

147.    According to CW13, a former New Century underwriting unit manager employed from 1998 through October 2006, underwriting standards were loosened in order to increase sales volume.   According to CW13, exceptions to New Century's underwriting standards were "the norm" and employees were told to make loans "work."  At one meeting in the late spring of 2006, operations manager told CW13 and other underwriters that they had to do what was necessary to increase volume.

J.    Additional Originators' Underwriting Practices

148.    The Prospectus Supplements stated that the following mortgage originators contributed mortgage loans to the 19 trusts at issue:

| Originators | |
|---|---|
| Accredited Home Lenders, Inc. | Merrill Lynch Credit Corporation |
| Ameriquest Mortgage Company | Mortgage IT, Inc. |
| Argent Mortgage Company, L.L.C. | Mortgage Lenders Network USA, Inc. |
| Fieldstone Mortgage Company | People's Choice Home Loan, Inc. |
| First National Bank of Nevada | PHH Mortgage Corporation |
| First Republic Bank | Washington Mutual Bank |
| GreenPoint Mortgage Funding Inc. | Wilmington Finance, Inc. |
| IndyMac Bank, F.S.B. | |

149.    The Prospectus Supplements set forth the underwriting standards for additional originators who originated 20% or more of the underlying mortgages in any one trust.  These

statements were untrue and omitted material facts because many originators industry-wide systematically failed to follow their stated underwriting guidelines.

150. By way of background to the industry-wide failures, the traditional mortgage model involved a bank originating a loan to the borrower/homeowner and retaining the credit (default) risk. As such, under the traditional model, the loan originator had a financial incentive to ensure that (1) the borrower had the financial wherewithal and ability to repay the promissory note; and (2) the underlying property had sufficient value to enable the originator to recover its principal and interest in the event that the borrower defaulted on the promissory note.

151. With the advent of securitization, the traditional model gave way to the "originate to distribute" model, in which banks and originators sold the mortgages and transferred credit risk to investors through mortgage-backed securities. Securitization meant that those originating mortgages were no longer required to hold them to maturity. By selling the mortgages to investors, the originators obtained funds, enabling them to issue more loans and generate transaction fees. This increased the originators' focus on processing mortgage transactions rather than ensuring their credit quality.

152. Loan fees and sales revenue became the originator's primary profit mechanism, making the sheer quantity of loans issued more important than the quality of any particular loan. To facilitate more loans, lenders began to offer more aggressive loan products such as subprime mortgages, hybrid loans and negative amortization "option ARM" loans, with little or no documentation. As loan origination quantities increased, loan originators failed to follow their stated underwriting and appraisal standards, and other methods of risk assessment.

153. Wall Street banks, including Merrill Lynch, entered into the complex, high-margin business of packaging mortgages and selling them to investors as MBS, including mortgage pass-through certificates. By buying and packaging mortgages, Wall Street enabled the lenders to extend credit even as lending practices deteriorated and the dangers grew in the housing market. At the center of the escalation was Wall Street's partnership with subprime

lenders.  This relationship was a driving force behind the once-soaring home prices and the spread of exotic loans that are now defaulting and foreclosing in record numbers.

154.    As is now evident, far too much of the lending during that time was neither responsible nor prudent.  According to Ben S. Bernanke, Chairman of the Federal Reserve Board, in a March 14, 2008 speech at the National Community Reinvestment Coalition Annual Meeting, "[t]he deterioration in underwriting standards that appears to have begun in late 2005 is another important factor underlying the current crisis.  A large share of subprime loans that were originated during this time feature high combined loan-to-value ratios and, in some cases, layers of additional risk factors, such as a lack of full documentation or the acceptance of very high debt-to-income ratios."   In its March 2008 Policy Statement on Financial Market Developments, the President's Working Group on Financial Markets concluded that "[t]he turmoil in financial markets clearly was triggered by a *dramatic weakening of underwriting standards for U.S. subprime mortgages, beginning* in late 2004 and extending into early 2007." (Emphasis in original).  As U.S. housing prices subsequently declined, the delinquency rate for such mortgages soared.

155.    For example, IndyMac Bank F.S.B. ("IndyMac") was an originator of mortgages in the Merrill Lynch Alternative Note Asset Trust, Series 2007-F1.  On July 11, 2008, IndyMac collapsed and went into receivership of the Federal Deposit Insurance Corporation due to under-capitalization.  It was forced to retain $10.7 billion worth of loans that it could not sell in the secondary market.  A July 12, 2008 article published in the *Pasadena Star-News* entitled "IndyMac Cashes Out" quoted Michael W. Perry, IndyMac's former Chairman and CEO, stating, "Speculators often lied about homes being owner-occupied and lenders got caught up in the housing frenzy.  We got too carried away and loosened our guidelines too far."   An IndyMac spokesperson represented in an interview with *The Orange County Register* that IndyMac, "given strong competition in a declining overall mortgage market . . . in order to compete and grow, loosened its lending standards along with everyone else, though in a more responsible way . . ."

156.     Accredited Home Lenders Holding Co. ("Accredited") originated loans in the Merrill Lynch Mortgage Investors 2006-AHL1 Trust.  Former employees of Accredited Home confirm the lack of underwriting and appraisal standards.  According to CW14, a Corporate Underwriter at Accredited between June 2004 and March 2005, managers on the sales side frequently overruled underwriting decisions.  CW14 noted such loans were tracked internally, and it was well-known they performed poorly.  Moreover, according to CW14, in early 2005, Accredited approved risky loans that did not comply with its own underwriting guidelines in an effort to reach monthly production targets.

157.     According to CW15, a Corporate Underwriter at Accredited between August 2003 and February 2006 in Tampa, Florida, Operations Managers and Senior Operations Managers constantly overruled decisions to reject loan applications.  According to CW15, "The problem with the whole system was the overrides.  The overrides were rampant.  If the borrower breathed, he got the loan."

158.     According to CW16, a Corporate Underwriter at Accredited in San Diego between May 2002 and November 2006, Accredited's underwriters who reviewed and approved or denied loans were being overridden, frequently resulting in loans that did not comply with underwriting guidelines.  According to CW16, the number of overrides grew so large that Accredited was forced to institute a system to track such overrides.  The system included a box on the loan file that an underwriter needed to check if a higher-level manager approved the loan "as a business decision" over the recommendation of the underwriter.

159.     According to CW17, a Corporate Underwriter at Accredited between June 2000 and March 2007 in both the San Diego, California, and Austin, Texas, offices, "At the end of the month, we were handed loan files and told to just sign them with no audit."

160.     According to CW18, the Chief Appraiser at Accredited for five years between 2002 and June 2007, Accredited allowed both corporate underwriters and sales managers to override the decisions of licensed property appraisers.  In many cases, an appraisal reviewer working for Accredited would reject a loan application after concluding that the appraisal

submitted with the application was inflated.  According to CW18, the account executive who submitted the loan application would become annoyed by the rejection and appeal the decision to a sales manager who then would overturn the appraisal reviewer's decision without any valid justification.  According to CW18, overrides of appraisers' decisions were rampant: "As of June 2006, between 12% and 15% of our business was being done through management overrides."

161.    On May 1, 2009, Accredited filed for bankruptcy.  Accredited faced huge demands from banks to repurchase loans.  In bankruptcy filings, Accredited stated that it faces more than $200 million in repurchase claims.  The banks assert that certain loans they purchased are defective and violate the purchase agreements they made with Accredited because they contain serious mistakes or borrowers defaulted too quickly.

162.    Argent Mortgage Company, L.L.C. ("Argent") originated loans in Merrill Lynch Alternative Note Asset Trust, Series 2007-F1.  According to a December 7, 2008, article in the *Miami Herald*, employees of Argent – including a vice president named Orson Benn – actively assisted mortgage brokers in falsifying borrowers' financial information by "tutoring . . . mortgage brokers in the art of fraud."  Employees "taught [brokers] how to doctor credit reports, coached them to inflate [borrower] income on loan applications, and helped them invent phantom jobs for borrowers" so that loans could be approved.  According to Mr. Benn himself, "the accuracy of loan applications was not a priority."  The *Miami Herald* examined the applications for 129 Argent loans and "found at least 103 that contained false and misleading information" and "red flags: non-existent employers, grossly inflated salaries and sudden, drastic increases in the borrower's net worth."  The article noted that: "The simplest way for a bank to confirm someone's income is to call the employer.  But in at least two dozen cases, the applications show bogus telephone numbers for work references . . . ."  Argent's lack of verification was so poor that a "borrower [who] claimed to work a job that didn't exist . . . got enough money to buy four houses." Another borrower "claimed to work for a company that didn't exist – and got a $170,000 loan."

163.     Moreover, according to a May 11, 2008 *Cleveland Plain Dealer* article, Jacqulyn Fishwick, who worked for more than two years at an Argent loan processing center near Chicago as an underwriter and account manager, noted that "some Argent employees played fast and loose with the rules" and stated "I personally saw some stuff I didn't agree with."  Ms. Fishwick "saw [Argent] account managers remove documents from files and create documents by cutting and pasting them."

164.     GreenPoint Funding, Inc. ("GreenPoint") originated mortgages in (1) Merrill Lynch Alternative Note Asset Trust, Series 2007-A3 and 2007-AF1; and (2) Merrill Lynch Mortgage Investors 2006-A1.   In *U.S. Bank v. GreenPoint*, a consultant reviewed the documentation for GreenPoint loans underlying a securitized transaction and concluded that 93% of the loans that GreenPoint sold contained errors, omissions, misrepresentations, negligence, fraud or similar occurrences in connection with the origination and underwriting of the loans.[2]  Just two years after the closing of the securitization transaction, approximately 29% of the loans in the original pool balance had either been written down completely or were severely delinquent.

165.     According to the complaint in that action, the consultant found that loans which GreenPoint underwrote and originated suffered from serious defects including:

- pervasive misrepresentations and/or negligence with respect to the statement of the income, assets or employment of the borrower;

- misrepresentations of the borrower's intent to occupy the property as the borrower's residence and subsequent failure to so occupy the property;

- inflated and fraudulent appraisal values; and

- pervasive violations of GreenPoint's own underwriting guidelines and prudent mortgage-lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social-

---

[2] *See U.S. Bank Nat'l Ass'n, et al., v. GreenPoint Mortgage Funding, Inc.*, New York Sup. Ct. 09-600352 (Feb. 5, 2009) ("U.S. Bank v. GreenPoint"); *Bank of America, N.A. v. GreenPoint Mortgage Funding, Inc.*, Case No. 3:09-CV-71 (W. D. N.C. Feb. 26, 2009).

security numbers, (iii) with credit scores below the required minimum, (iv) with debt-to-income and/or loan-to-value ratios above the allowed maximum or (v) with relationships to GreenPoint or other non-arm's-length relationships.

166.    Similarly, numerous borrowers and former GreenPoint employees recently sued GreenPoint for failures in its origination and underwriting practices.  Such actions include a "whistleblower" action filed in June 2008 by a former senior underwriter who GreenPoint forced to approve mortgage loan applications containing fraudulent information by approving applications after the underwriter had either denied such applications or made approval contingent upon obtaining additional borrower documentation.  *Steinmetz v. GreenPoint Mortgage Funding, Inc.*, Case No. 08-civ-5367 (S.D.N.Y. June 12, 2008).

167.    First National Bank of Nevada ("FNBN") originated loans in Merrill Lynch Alternative Note Asset Trust, Series 2007-A3.  On July 25, 2008, the Office of the Comptroller of the Currency ("OCC") closed FNBN and named the FDIC as receiver.  A press release dated July 25, 2008 stated that the OCC acted after finding that FNBN was undercapitalized and had experienced substantial dissipation of assets and earnings due to "unsafe and unsound" lending practices.

168.    The Mortgage Lenders Network USA, Inc. ("MLN") originated mortgages in: (1) Merrill Lynch Mortgage Investors Trust 2006-MLN1; (2) Merrill Lynch Alternative Note Asset Trust, Series 2007-A3; and (3) Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1.  MLN originated wholesale subprime loans, and as of 3Q '06, was the fifteenth largest subprime lender in the United States.  During 4Q '06, MLN experienced a significant increase in the number of early payment defaults in its subprime loans.  As early payment default rates increased, MLN was forced to buy back the increasing number of loans that were subject to repurchase requests.

169.    MLN was forced to shut down its wholesale loan origination business as of December 29, 2006.  At the time, MLN had a number of outstanding loan commitments that had been closed, but not funded.  Although MLN funded certain of these commitments through

placement with other entities, not all were funded.  On January 2, 2007 MLN announced that during the prior two months lending conditions had "deteriorated dramatically," and that it had furloughed 80 percent of its employees.  On January 19, 2007, the Connecticut Banking Commissioner issued a cease-and-desist order which, among other things, ordered MLN to stop making loans.  Regulators in Massachusetts, Vermont, Rhode Island, Pennsylvania, New Hampshire, New York, Michigan, and Maine issued similar cease-and-desist orders. Ultimately, on February 5, 2007, MLN filed for bankruptcy.

170.    PHH Mortgage Corporation ("PHH") (on behalf of Merrill Lynch Credit Corporation ("MLCC")) originated loans in the Merrill Lynch Mortgage Investors Trust, Series MLCC 2006-2.    The MLCC 2006-2 Offering Documents represented that MLCC's underwriting standards – which PHH applied in originating loans – "evaluate[d] an applicant's credit standing, financial condition, and repayment ability, as well as the value and adequacy of the mortgaged property … as collateral."  Likewise, the MLCC 2006-2 Offering Documents represented that First Republic's underwriting standards were applied "to assess the prospective borrower's credit standing, their ability to repay, and the value and adequacy of the mortgaged property as collateral."

171.    The Prospectus Supplement for the MLMI MLCC 2006-2 Trust represented that the borrowers and the loans in MLMI MLCC 2006-2 were of superior quality.  For example, the MLMI MLCC 2006-2 Prospectus Supplement represented that First Republic, who originated 24% of the loans in the pool, typically loaned money to individuals "who are successful professionals, business executives, and/or entrepreneurs" and those with "high liquidity and … substantial net worth."  Further, the Prospectus Supplement represented that the mortgage loans underlying the Certificates were "primarily … adjustable rate, conventional, fully amortizing, first lien residential *prime* mortgage loans, substantially all of which have an original term to stated maturity of 30 years" (emphasis added).  The Prospectus Supplement stated that, upon issuance, 87.5% of the MLMI MLCC 2006-2 Certificates would be assigned investment-grade ratings and 62.5% would be rated AAA.

172.    The Offering Documents for MLMI MLCC 2006-2 contained materially untrue statements and omissions regarding MLCC and First Republic's underwriting and standards. PHH admitted in its Form 10-Q filed August 8, 2008 to "loans with origination flaws" and that the demand for its mortgages in the secondary market had therefore declined.  The MLMI MLCC 2006-2 Certificates have declined in value and are no longer marketable at the prices paid by Plaintiffs and the Class.  As reflected in its certification, Lead Plaintiff purchased MLMI MLCC 2006-2 Certificates on September 6, 2006 at a price of 92.65 and sold the same Certificates less than two years later on July 30, 2008 – a week before PHH's admission of "loans with origination flaws" – at 65.60, a 29% decrease in value.

## VII.    THE OFFERING DOCUMENTS MISSTATED THE TRUE LTV RATIOS ASSOCIATED WITH THE UNDERLYING MORTGAGES

173.    The Prospectus Supplements represented that the underlying mortgaged properties would provide adequate security for the mortgage loans, based in part on the appraised value of the properties securing the securitized mortgage loans.  The adequacy of the mortgaged properties as security for repayment of the loans will have generally been determined by appraisals, conducted in accordance with pre-established guidelines.

174.    Each securing property was to be appraised by a qualified, independent appraiser, and each appraisal was required to satisfy applicable government regulations and be on forms acceptable to Fannie Mae and Freddie Mac.  As required by Fannie Mae and Freddie Mac, and as represented by the underwriting standards set forth in certain of the Prospectus Supplements, the appraisals were to be in conformity with the Uniform Standards of Professional Appraisal Practice ("USPAP"), as adopted by the Appraisal Standards Board of the Appraisal Foundation.

175.    With respect to real estate appraisals, USPAP requires, *inter alia*:

An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.

In appraisal practice, an appraiser must not perform as an advocate for any party or issue.

58

An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions.

\*   \*   \*

It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

1.   the reporting of a predetermined result (*e.g.*, opinion of value);

2.   a direction in assignment results that favor the cause of the client;

3.   the amount of a value opinion;

4.   the attainment of a stipulated result; or

5.   the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

176.   In addition, the Prospectus Supplements represented that the appraisal procedure guidelines used by the loan originators, including First Franklin and C-BASS, required an appraisal report that included market data analysis based on recent sales of comparable homes in the area.  If appropriate, the guidelines required a review appraisal, consisting of an enhanced desk, field review or automated valuation report confirming or supporting the original appraisal value of the mortgaged property.

177.   As represented in the Registration Statements and the Prospectuses, the "Loan-to-Value Ratio" or "LTV Ratio" of a mortgage loan at any given time is the ratio (expressed as a percentage) of the then outstanding principal balance of the mortgage loan plus the principal balance of any senior mortgage loan to the "value" of the related mortgage property.  Only if specified in a particular Prospectus Supplement may the LTV Ratio of certain mortgage loans exceed 100%.  The "value" of the mortgaged property, other than with respect to refinance loans, is generally the lesser of:  (a) the appraised value determined in an appraisal by the loan originator at the time of the origination, or (b) the sale price for such property.

178.   The Prospectus Supplements also provided information regarding the weighted average combined original LTV Ratio of the loans underlying the Certificates.  The Combined LTV Ratio is provided in each Prospectus Supplement, in association with various loan groupings, including by loan type and documentation level, property type and geographical

location.  Moreover, each Prospectus Supplement made representations regarding the Combined LTV Ratio.  For example, the MLFFML Trust Series 2007-A Prospectus Supplement stated that "[t]he weighted average Combined Loan-to-Value Ratio of the Mortgage Loans as of the Cut-off date was 99.54%."

179.    In retail or in-house mortgage loan originations, many lenders allowed the sales personnel or account executives to order and control the appraisals. These sales personnel were typically on a commission-only pay structure and were therefore motivated to close as many loans as possible. These sales personnel and account executives would pressure appraisers to appraise properties at artificially high levels or they would not be hired again, resulting in appraisals being done on a "drive-by" basis where appraisers issued their appraisals without reasonable bases for doing so.

180.    This lack of independence was noted by Alan Hummel, Chair of the Appraisal Institute, in his testimony before the Senate Committee on Banking. Hummel noted this dynamic created a "terrible conflict of interest" where appraisers "experience systemic problems of coercion" and were "ordered to doctor their reports" or else they would never "see work from these parties again" and were "placed on exclusionary or 'do-not-use' lists." Too often, this pressure succeeded in generating artificially high appraisals and appraisals being done on a "drive-by" basis where appraisers issued their appraisal without reasonable bases for doing so.

181.    A 2007 survey of 1,200 appraisers conducted by October Research Corp. – a firm in Richfield, Ohio, who publishes Valuation Review – found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through. This figure was nearly double the findings of a similar study conducted just three years earlier. The 2007 study also "found that 75% of appraisers reported 'negative ramifications' if they did not cooperate, alter their appraisal, and provide a higher valuation." Adding to these problems was the fact that lenders, for originations completed by mortgage brokers, generally lacked knowledge of the accuracy of the appraisals since they were typically located far from the actual property and knew very little about the general area where the

property was located.  As a result of this conduct, loans were frequently based on inflated appraisals.

182.    As detailed above, CWs confirm the over-inflation of appraisals.  For example, CW8, a senior underwriter at the Atlanta, Georgia, branch of Ownit from May 2005 to December 2006, stated that appraisals were "absolutely" higher than the actual value of properties.  Likewise, CW9, a senior underwriter at the Portland, Oregon, branch of Ownit from February 2006 until December 2006, stated that at Ownit none of the appraisals went further than a desk review and if an underwriter questioned the appraisal, management would just sign off on it.

183.    As detailed above, CW10, a Corporate Underwriter at First Franklin from 2006 until June 2007, estimated that one in four appraisals reviewed at First Franklin was overinflated.  CW10 further stated that managers would approve loans that CW10 had rejected due to overinflated appraisals.

184.    In addition, according to CW37, an account manager at Fremont's Downers Grove, Illinois center from January 2002 to July 2006, CW37's superiors would call property appraisers and request that they inflate their appraisal values by at least a few thousand dollars, and the appraisers would do so.  According to CW29, while auditing loans in the Due Diligence Department and later, in connection with CW29's review of investor repurchase claims, CW29 discovered, among other things, incomplete appraisals, appraisals that did not match the address of the property, and appraisals that described the home as owner-occupied when it was rented, on the large majority of the loans.

185.    The Registration Statements and Prospectuses stated that only "[i]f specified in the related Prospectus Supplement, the Loan-to-Value Ratio of certain Mortgage Loans may exceed 100%."  Accordingly, each Prospectus Supplement included tabular data reflecting the "Range of Combined Loan-to-Value Ratios" indicating the number of loans per each range of Loan-to-Value Ratios, and the weighted average Combined Loan-to-Value Ratio for the mortgage loans.  For example, the MLFFML Trust Series 2007-A Prospectus Supplement

indicated that 4,714 loans (out of 5,004 total loans) were within the Loan-to-Value Ratio range of 95.01% to 100%. The weighted average Loan-to-Value ratio was represented as 99.54%. No loan was represented to have a Loan-to-Value Ratio of greater than 100%.

186.   The above statements, including the tabular statistics in each Prospectus Supplement regarding the purported Loan-to-Value Ratios of the underlying mortgages, were untrue and omitted material facts because they failed to disclose that the Loan-to-Value Ratios would have been higher if the underlying properties were appraised according to pre-established, independent appraisal procedures and in accordance with USPAP, as stated in the Prospectus Supplements. Due to the inflated appraisals, the LTV ratios listed in the Offering Documents were artificially low, making it appear that the loans underlying the trusts were safer and less risky than they really were.

## VIII.   THE OFFERING DOCUMENTS MISREPRESENTED THE OVERCOLLATERALIZATION OF THE ISSUING TRUSTS

187.   Defendants, in structuring the Certificate tranche parameters, provided for certain "Credit Enhancement," as set forth in the Prospectus Supplements. Credit enhancement is intended to provide protection to the holders of the Certificates against shortfalls in payments received on the mortgage loans, and helps increase the likelihood of the receipt of all payments under the agreements pursuant to which the Certificates are issued. The Certificate securitization and offering transactions provide various forms of credit enhancement, including subordination, shifting interests, overcollateralization and excess interest. Each form of credit enhancement is necessarily dependent on the application and effectiveness of the originator's underwriting standards, as well as an accurate appraisal of the mortgaged real estate and the corresponding LTV ratio.

188.   Each of the Prospectus Supplements represented a pre-determined amount of overcollateralization. In addition, the Certificate securitization and offering transactions were structured such that the loans were expected to generate more interest than was needed to pay interest on the Certificates (and related expenses of the Issuing Trust). Specifically, the

weighted average interest rate of the mortgage loan was expected to be higher than the aggregate of the weighted average pass-through rate on the Certificates, plus the servicing fee rate on the mortgage loans.

189.    The credit enhancements represented in the Prospectus Supplements directly impact and correlate with the representations regarding the ratings assigned to each Certificate tranche in a series offering.  As stated in the Prospectus Supplements, the ratings assigned to mortgage pass-through certificates "address the likelihood of the receipt by certifcateholders of payments required under the operative agreements."  The ratings "take into consideration the credit quality of the mortgage pool including any credit support providers, structural and legal aspects associated with the [C]ertificates, and the extent to which the payment stream of the mortgage pool is adequate to make payments under the [C]ertificates."   MLFFML Trust Series 2007-A Prospectus Supplement.[3]   As a condition to the issuance of the Certificates, each tranche in the series received respective ratings from the Rating Agency Defendants as set forth in the Prospectus Supplements.

190.    The Prospectuses represented that the securitization structure of each of the Certificate offerings was structured to include credit enhancement in the form of overcollateralization.  Each Prospectus Supplement stated a particular amount by which the aggregate stated principal balance of the mortgage loans was greater than the aggregate class principal of the Certificates at the time of the offering.  For example, the MLFFML Trust Series 2007-A Prospectus Supplement stated:

> The overcollateralization amount is the excess of the aggregate outstanding principal balance of the mortgage loans over the aggregate principal balance of the offered [C]ertificates and class B-4 certificates.  On the closing date, the overcollateralization amount will equal approximately 19.65% of the aggregate outstanding principal balance of the mortgage loans as of the cut-off date.

---

[3]  As is generally the case, the Prospectus Supplements for each Issuing Trust uniformly used the same or substantially similar language.

191.   The Prospectuses and Prospectus Supplements stated, "Generally, because more interest is required to be paid by the mortgagors than is necessary to pay the interest accrued on the [C]ertificates and the expenses of the issuing entity, there is expected to be excess interest each month.  On each distribution date, subject to limited exceptions described herein, the issuing entity will apply some or all of the excess interest as a principal payment on the most senior classes of [C]ertificates then outstanding until the overcollateralization target is reached…."

192.   The above statements were untrue and misleading because, as detailed above, they failed to disclose that many of the loan originators did not follow their underwriting and property appraisal standards.  Such failures increased the risk that many borrowers would not be able to repay their loans; foreclosure sales would not recoup the full value of the loans; and the aggregate expected principal payments would not, nor could they be expected to, exceed the aggregate class principal of the Certificates.  As such, the Certificates were not protected with the level of credit enhancement and overcollateralization represented to investors in the Prospectus Supplements.

IX.   THE RATINGS AND STATEMENTS ABOUT
        RATINGS MISSTATED THE QUALITY OF THE CERTIFICATES

193.   The Registration Statements and Prospectuses stated that it was "a condition of the issuance of the Offered Certificates that they be assigned" certain pre-determined ratings from the Rating Agencies, as set forth in the Prospectus Supplements.  As stated:

> Moody's ratings on mortgage pass-through certificates address the likelihood of the receipt by certificate holders of all distributions to which such certificateholders are entitled.   Moody's ratings opinions address the structural and legal issues associated with the Offered Certificates, including the nature of the underlying Mortgage Loans.
>
> S&P ratings on mortgage pass-through certificates address the likelihood of receipt by certificateholders of payments required under the operative agreements.   S&P's ratings take into consideration the credit quality of the mortgage pool including credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream of

the mortgage pool is adequate to make payments required under
the certificates.

194.    Each Prospectus Supplement listed the initial Ratings of the Certificates being
offered by the Issuing Trust.   In each, certain Certificates were rated as investment-grade, in
accordance with the pre-established rating systems utilized by the Rating Agencies.   For
example, the MLFFML Trust, Series 2007-A, Prospectus Supplement included the following
chart identifying each Series 2007-A Certificate rating:

**Ratings**

It is a condition of the issuance of the Offered Certificates that they be assigned the ratings
designated below by each of Moody's and S&P.

| Class of Certificates | Moody's | S&P |
|---|---|---|
| A-1 | Aaa | AAA |
| A-2 | Aaa | AAA |
| A-3 | Aaa | AAA |
| M-1 | Aa1 | AA+ |
| M-2 | Aa2 | AA |
| M-3 | Aa3 | AA- |
| M-4 | A1 | A+ |

| Class of Certificates | Moody's | S&P |
|---|---|---|
| M-5 | A2 | A |
| M-6 | A3 | A- |
| B-1 | Baa1 | BBB+ |
| B-2 | Baa2 | BBB |
| B-3 | Baa3 | BBB- |
| R | NR | AAA |

195.    As detailed above, the Rating Agencies provided pre-determined ratings for the
Certificates as a condition to the issuing of the Certificates to the public.   These pre-determined
credit ratings were, for virtually all tranches of the offered Certificates, investment-grade.   The
Rating Agencies maintained investment-grade ratings on the Certificates until, at the earliest,
April 24, 2008.

196.    The Offering Documents set forth ratings that were unjustifiably high and did not
represent the true risk of the Certificates, as they were based on inaccurate information provided
to the Rating Agencies from the Merrill Sponsor and the Merrill Depositor and faulty
assumptions concerning how many underlying mortgages were likely to default.   As a result, the
Certificates were secured by assets that had a much greater risk profile than represented.

Accordingly, Defendants were able to obtain superior ratings for the Certificates, when in fact they were not equivalent to other investments with the same credit ratings.

197.     The President's Working Group on Financial Markets, Policy Statement Financial Market Developments (March 2008), confirms that there were flaws in Rating Agencies' assessments of subprime MBS and other complex structured financial products, such as asset-backed pass-through certificates.  For instance, the President's policy statement noted that "[a]lthough market participants had economic incentives to conduct due diligence . . . the steps they took were insufficient."

198.     Consequently, on June 11, 2008, the SEC proposed new rules that would, *inter alia*, prohibit Rating Agencies from issuing ratings on a structured product, including mortgage pass-through certificates, unless information on the assets underlying the product was made available; prohibit Rating Agencies from structuring the same products they rate; and require the public disclosure of the information used by Rating Agencies in determining a rating on a structured product, including information on the underlying assets.

199.     In addition, on July 8, 2008, the SEC issued a Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies ("Summary Report").  The SEC's Summary Report found flaws in the Rating Agencies' procedures with respect to rating MBS products, including:

- Relevant ratings criteria were not disclosed;

- None of the Rating Agencies examined had specific written procedures for rating RMBS and CDOs;

- The Rating Agencies did not always document significant steps in the rating process – including the rationale for deviations from their models and for rating committee actions and decisions – and they did not always document significant participants in the ratings process;

- Rating Agencies do not appear to have specific policies and procedures to identify or address errors in their models or methodologies;

- The rationale for deviations from the model or out of model adjustments was not always documented in deal records.  As a result, in its review of rating files, the

Staff could not always reconstruct the process used to arrive at the rating and identify the factors that led to the ultimate rating; and

- There was a lack of documentation of rating agency committee actions and decisions.

200.   Furthermore, the SEC's Summary Report stated that the Rating Agencies' actions "make it difficult for the rating agencies' internal compliance staff or internal audit staff to assess compliance with the firms' policies and procedures when conducting reviews of rating agency activities."

201.   The Rating Agencies used models to produce the ratings for the Certificates. These models were based upon loan performance prior to the year 2000.  As detailed herein, however, an unprecedented decline and deterioration in mortgage lending standards occurred after the year 2000.  For example, after the year 2000, lenders began to offer more aggressive loan products, such as subprime mortgages, hybrid loans and negative amortization "option ARM" loans. The decline in lending standards and the increase in riskier exotic mortgage products after 2000 rendered the Rating Agencies' pre-2000 loan performance data obsolete. The Rating Agencies did not, however, update their models to reflect these changes.  Thus, when the Rating Agencies assigned "investment grade" ratings to the Certificates, their historical data no longer reflected the reality that mortgage credit quality was rapidly deteriorating and did not reflect the reality of the performance of the riskier exotic mortgage products.

202.   The Rating Agencies have admitted that the methodology used to rate mortgage-backed securities between 2005 and 2007 was based on outdated and unreliable modeling of borrowers' default risks.  On October 22, 2008, in testimony before the United States House of Representatives, Committee on Oversight and Government Reform, Deven Sharma, the President of S&P, stated that "many of the forecasts we used in our ratings analysis of certain structured finance securities have not been borne out."

203.   Frank Raiter, the former Managing Director and Head of Residential Mortgage Backed Securities Ratings at S&P, stated that credit rating modeling was not updated on a

timely basis, despite the fact that by early 2004, S&P had developed, but never implemented, a ratings model that considered nearly 10 million loans and "covered the full spectrum of new mortgage products, particularly in the Alt-A and fixed/floating payment type categories." According to Mr. Raiter, a "consequence of continuing to use out-dated versions of the rating model was the failure to capture changes in performance of the new non-prime products.  As a result, expected loss estimates no longer provided the equity necessary to support the AAA bonds.  This, in turn, generated the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market."

204.    Mr. Raiter stated that "had these models been implemented we would have had an earlier warning about the performance of many of the new products that subsequently lead to such substantial losses.  That, in turn, should have caused the loss estimates mentioned above to increase and could have thus caused some of these products to be withdrawn from the market . . . ."  Before the same Congressional Committee in October 2008, Jerome Fons, a former Managing Director of Credit Policy at Moody's, stated that the Rating Agencies "did not update their models or their thinking" during the period of deterioration in credit standards.

205.    Not only were the ratings based on eroding standards and flawed models, but the Rating Agencies also used the faulty data about the underlying loans that the Merrill Depositor provided to them.  Such data included LTV ratios, borrower credit-worthiness and ability to repay the mortgage, and the sufficiency of the collateral.  As detailed above, much of this data was inaccurate due to the systemic violations of the underwriting standards, inflated appraisals, and inaccurate LTV ratios.

206.    Because the Rating Agencies used flawed information and models to generate their ratings, the ratings assigned to the Certificates did not accurately reflect their risk. Certificates were given investment grade ratings when in reality they were not of investment grade quality.  As such, the statements in the Offering Documents regarding the ratings of the Certificates were untrue and omitted material information.

X.    EACH OFFERING DOCUMENT CONTAINED
      UNTRUE STATEMENTS AND MATERIAL OMISSIONS

207.    As summarized in the Table of Untrue Statements below, each Prospectus
Supplement contained untrue statements of material fact or omissions regarding: (1) the
underwriting standards purportedly used in connection with the origination of the underlying
mortgages; (2) the loan-to-value ratios and appraisals of the properties; (3) the amount of credit
enhancement supporting the Certificates; and (4) the ratings of the Certificates.

| **Table Of Untrue Statements** | | | | |
|---|---|---|---|---|
| | **(1)** **Underwriting Guidelines** | **(2)** **LTV Ratios And Appraisals** | **(3)** **Credit Enhancement** | **(4)** **Certificates' Ratings** |
| Merrill Lynch First Franklin Mortgage Loan Trust 2007-A | S-28-30[4] | S-27, S-30-31 | S-9 | S-90 |
| Merrill Lynch Mortgage Investors Trust MLCC 2006-2 | S-46-49, 50 | S-23, S-47-48 | S-9 | S-98 |
| Merrill Lynch Alternative Note Asset Trust 2007-F1 | S-36-40 | S-26-28, S-37-38 | S-7 | S-126 |
| C-BASS 2007-CB4 | S-27-29 | S-24-27, S-27-29 | S-7-8 | S-111-12 |
| Merrill Lynch Mortgage Investors Trust 2006-WMC1 | S-32-35 | S-31, S-33-34 | S-9-10 | S-113-14 |
| Merrill Lynch Mortgage Investors Trust 2006-AHL1 | S-33-38 | S-33, S-34-35 | S-10-11 | S-105-06 |
| Merrill Lynch Mortgage Investors Trust 2006-MLN1 | S-35-38 | S-35, S-36-37 | S-11-12 | S-111-12 |
| Merrill Lynch Mortgage Investors Trust 2006-RM3 | S-33-36 | S-32, S-34-35 | S-10-11 | S-102-03 |
| Merrill Lynch Mortgage Investors Trust 2006-FM1 | S-33-38 | S-33, S-35-36 | S-11-12 | S-105-06 |
| Merrill Lynch Mortgage Investors Trust 2006-RM5 | S-35-38 | S-34, S-36-37 | S-11-12 | S-107-08 |
| Merrill Lynch First Franklin Mortgage Loan Trust 2007-2 | S-34-37 | S-33, S-36-37 | S-11-12 | S-117-18 |

[4] "S-__" refers to the page numbers of the Prospectus Supplement.

| Table Of Untrue Statements | | | | |
|---|---|---|---|---|
| | (1)<br>Underwriting<br>Guidelines | (2)<br>LTV Ratios And<br>Appraisals | (3)<br>Credit<br>Enhancement | (4)<br>Certificates'<br>Ratings |
| Merrill Lynch First Franklin Mortgage Loan Trust 2007-3 | S-35-39 | S-34, S-38 | S-11-12 | S-124-25 |
| Merrill Lynch First Franklin Mortgage Loan Trust 2007-4 | S-35-39 | S-34, S-38 | S-11-12 | S-121-22 |
| Merrill Lynch Mortgage Investors Trust 2006-WMC2 | S-32-44 | S-32, S-34-35 | S-10-11 | S-110-11 |
| Merrill Lynch Mortgage Investors Trust 2006-A1 | S-25-31 | S-17-20, S-28 | S-5-6 | S-77-78 |
| Merrill Lynch Mortgage Investors Trust 2006-FF1 | S-35-39 | S-33, S-38 | S-11-13 | S-118 |
| Merrill Lynch Alternative Note Asset Trust 2007-A3 | S-45-55 | S-35-37, S-46 | S-9-10 | S-155 |
| Merrill Lynch Alternative Note Asset Trust 2007-AF1 | S-43-59 | S-32-36, S-44 | S-10-11 | S-170-71 |
| Ownit Mortgage Loan Trust 2006-2 | S-31-33 | S-30, S-33 | S-9-10 | S-92 |

## XI.   THE PERFORMANCE AND VALUE OF THE CERTIFICATES

208.    The ratings on virtually all of the Certificates within each of the Issuing Trusts have since been downgraded.  As reflected in the chart below, which reflects the Trusts in which the Plaintiffs purchased interests, virtually all of the Certificates that were originally rated "AAA" have been downgraded below investment grade.

| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI | | | | | | |
|---|---|---|---|---|---|---|
| | Initial Rating | | | Current Rating | | |
| | Moody's | S&P | Fitch | Moody's | S&P | Fitch |
| Merrill Lynch First Franklin Mortgage Loan Trust 2007-A | Aaa | AAA | | Baa1 | NR | |
| Merrill Lynch Mortgage Investors Trust MLCC 2006-2 | Aaa | AAA | | B3 | AAA | |

| | Moody's | S&P | Fitch | Moody's | S&P | Fitch |
|---|---|---|---|---|---|---|
| Merrill Lynch Mortgage Investors Trust 2006-A1 | Aaa | AAA | | B3 | CCC | |
| Merrill Lynch Alternative Note Asset Trust 2007-F1 | Aaa | | AAA | Caa1 | | CC |

| IRON WORKERS LOCAL NO. 25 PENSION FUND | | | | | | |
|---|---|---|---|---|---|---|
| | Initial Rating | | | Current Rating | | |
| | Moody's | S&P | Fitch | Moody's | S&P | Fitch |
| C-BASS 2007-CB4 Trust A2D | Aaa | AAA | AAA | Caa3 | CCC | CC |

| WYOMING STATE TREASURER | | | | | | |
|---|---|---|---|---|---|---|
| | Initial Rating | | | Current Rating | | |
| | Moody's | S&P | Fitch | Moody's | S&P | Fitch |
| Merrill Lynch Mortgage Investors Trust 2006-WMC1 | Aaa | AAA | | WR | NR | |
| Merrill Lynch Mortgage Investors Trust 2006-A1 | Aaa | AAA | | B3 | CCC | |
| Merrill Lynch Mortgage Investors Trust 2006-WMC2 | Aaa | AAA | | Ca | CC | |
| Merrill Lynch Mortgage Investors Trust 2006-AHL1 | Aaa | AAA | | Aaa | NR | |
| Merrill Lynch Mortgage Investors Trust 2006-MLN1 | Aaa | AAA | | Aa2 | BBB+ | |
| Merrill Lynch Mortgage Investors Trust 2006-RM3 | Aaa | AAA | | WR | NR | |
| Merrill Lynch Mortgage Investors Trust 2006-FM1 | Aaa | AAA | | Aaa | NR | |
| Merrill Lynch Mortgage Investors Trust 2006-RM5 | Aaa | AAA | | Ca | CCC | |

| | Moody's | S&P | Fitch | Moody's | S&P | Fitch |
|---|---|---|---|---|---|---|
| Merrill Lynch First Franklin Mortgage Loan Trust 2007-2 | Aaa | AAA | | Baa3 | AA | |
| Merrill Lynch First Franklin Mortgage Loan Trust 2007-3 | Aaa | AAA | | Caa3 | CCC | |
| Merrill Lynch First Franklin Mortgage Loan Trust 2007-4 | Aaa | AAA | | B1 | BBB | |

| CONNECTICUT CARPENTERS PENSION FUND AND CONNECTICUT CARPENTERS ANNUITY FUND | | | | | | |
|---|---|---|---|---|---|---|
| | Initial Rating | | | Current Rating | | |
| | Moody's | S&P | Fitch | Moody's | S&P | Fitch |
| Ownit Mortgage Loan Trust 2006-2 | Aaa | AAA | | B1 | BBB | |

| LOS ANGELES COUNTY EMPLOYEES RETIREMENT ASSOCIATION | | | | | | |
|---|---|---|---|---|---|---|
| | Initial Rating | | | Current Rating | | |
| | Moody's | S&P | Fitch | Moody's | S&P | Fitch |
| Merrill Lynch Mortgage Investors Trust 2006-WMC2 | Aaa | AAA | | Ca | CC | |
| Merrill Lynch Mortgage Investors Trust 2006-A1 | Aaa | AAA | | B3 | CCC | |
| Merrill Lynch Mortgage Investors Trust 2006-FF1 | A1 | AA+ | | B3 | B- | |
| Merrill Lynch Alternative Note Asset Trust 2007-A3 | Aaa | AAA | | Caa3 | CCC | |
| Merrill Lynch Alternative Note Asset Trust 2007- | Aaa | AAA | | Caa2 | D | |

209.    Further, the delinquency, foreclosure and bank ownership rates on the underlying mortgages have soared since issuance.  As reflected in the chart below, in 15 of the 19 Trusts in which the Plaintiffs purchased interests, the percentage of loans that are currently either 60 days

or more delinquent, in foreclosure, or bank-owned exceeds 35%.  In seven of these Trusts, the rate is at or above 50%.

| As of June 2010 | | | | | |
|---|---|---|---|---|---|
| | **Delinquent 60 days** | **Delinquent 90 days** | **Fore-closure** | **REO** | **Total** |
| Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-A | 4.75% | 7.43% | 0.00% | 0.00% | 12.18% |
| Merrill Lynch Mortgage Investors Trust, Series MLCC 2006-2 | 0.89% | 3.66% | 0.05% | 0.18% | 4.78% |
| Merrill Lynch Alternative Note Asset Trust, Series 2007-F1 | 3.23% | 3.86% | 7.90% | 3.49% | 18.48% |
| C-BASS Mortgage Loan Asset-Backed Certificates, Series 2007-CB4 | 2.92% | 17.21% | 18.66% | 7.97% | 46.76% |
| Merrill Lynch Mortgage Investors Trust, Series 2006-WMC1 | 3.40% | 26.49% | 26.99% | 2.62% | 59.50% |
| Merrill Lynch Mortgage Investors Trust, Series 2006-AHL1 | 1.93% | 23.58% | 26.41% | 3.21% | 55.13% |
| Merrill Lynch Mortgage Investors Trust, Series 2006-MLN1 | 2.44% | 26.59% | 28.64% | 2.93% | 60.60% |
| Merrill Lynch Mortgage Investors Trust, Series 2006-RM3 | 2.53% | 30.40% | 13.88% | 6.43% | 53.24% |
| Merrill Lynch Mortgage Investors Trust, Series 2006-FM1 | 3.21% | 24.35% | 41.28% | 3.83% | 72.67% |
| Merrill Lynch Mortgage Investors Trust, Series 2006-RM5 | 1.87% | 32.82% | 31.38% | 2.95% | 69.02% |
| Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2 | 2.77% | 16.60% | 20.77% | 4.79% | 44.93% |
| Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3 | 3.30% | 18.25% | 18.73% | 4.53% | 44.81% |
| Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4 | 2.91% | 18.19% | 19.70% | 4.87% | 45.67% |
| Merrill Lynch Mortgage Investors Trust, Series 2006-WMC2 | 3.11% | 25.45% | 32.31% | 2.88% | 63.75% |
| Merrill Lynch Mortgage Investors Trust, Series 2006-A1 | 2.22% | 15.92% | 15.66% | 4.28% | 38.08% |
| Merrill Lynch Mortgage Investors Trust, Series 2006-FF1 | 1.91% | 6.40% | 8.13% | 1.81% | 18.25% |

| As of June 2010 | | | | | |
|---|---|---|---|---|---|
| | Delinquent 60 days | Delinquent 90 days | Fore-closure | REO | Total |
| Merrill Lynch Alternative Note Asset Trust, Series 2007-A3 | 1.08% | 11.24% | 23.60% | 6.60% | 42.52% |
| Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1 | 2.35% | 14.50% | 14.41% | 4.14% | 35.40% |
| Ownit Mortgage Loan Asset-Backed Certificates, Series 2006-2 | 3.33% | 17.31% | 15.33% | 7.02% | 42.99% |

## XII.   MERRILL LYNCH'S CONTROL OF THE MERRILL DEPOSITOR

210.    The Merrill Depositor, a wholly-owned subsidiary of Merrill Lynch, is the issuer of the Certificates and committed primary violations of the Securities Act, as alleged herein. Merrill Lynch had the power to direct or cause the direction of the management and policies of the Merrill Depositor.  Indicia of Merrill Lynch's control over the Merrill Depositor include, for example, the following: (i) Merrill Lynch created the Merrill Depositor and defined its purpose; (ii) statements in Merrill Lynch's SEC filings show Merrill Lynch's control through comprehensive involvement with the Merrill Depositor's functional operations; (iii) Merrill Lynch directly participated in the Merrill Depositor's issuance of the Certificates, including prominently featuring "Merrill Lynch & Co." on the front page of each Prospectus and Prospectus Supplement; (iv) revenue from the Merrill Depositor's securitizations inured exclusively to Merrill Lynch's benefit; and (v) Merrill Lynch's managing partner and its director and senior counsel signed the Merrill Depositor's registration statements.

211.    Controlling the first step in the securitization process, Merrill Lynch created special-purpose entities ("SPEs"), wholly-owned subsidiaries, that purchased residential mortgage loans for Merrill Lynch's securitization business.  Merrill Lynch established the Merrill Depositor to acquire the mortgage loans from the Merrill Sponsor, and to securitize and sell them to investors in the form of the Certificates.  Merrill Lynch limited the Merrill Depositor to only one corporate purpose that advanced the interest of Merrill Lynch's securitization business.  According to the Offering Documents, the Merrill Depositor's

74

certificate of incorporation limited its activities to "those necessary or convenient to carry out its securitization activities."

212.    Publicly, Merrill Lynch represented that it (not the Merrill Depositor or its other SPEs) controlled Merrill Lynch's securitization business.  According to Merrill Lynch's Form 10-Ks for the years ended December 29, 2006 ("2006 Form 10-K") and December 28, 2007 ("2007 Form 10-K"), "[i]n the normal course of business, Merrill Lynch securitizes . . . residential mortgage loans."  Merrill Lynch described its comprehensive involvement with the operations of its SPEs, such as the Merrill Depositor.  Merrill Lynch's "involvement with SPEs used to securitize financial assets includes: structuring and/or establishing SPEs; selling assets to SPEs; managing or servicing assets held by SPEs; underwriting, distributing, and making loans to SPEs; making markets in securities issued by SPEs; engaging in derivative transactions with SPEs; owning notes or certificates issued by SPEs; and/or providing liquidity facilities and other guarantees to, or for the benefit of, SPEs."

213.    Merrill Lynch further controlled the Merrill Depositor through its executives and directors.  Defendant Park, a managing partner of Merrill Lynch, served as the President and Chairman of the Board of the Merrill Depositor.  Defendant McGovern, a Director and Senior Counsel at Merrill Lynch, served as a Director of the Merrill Depositor.  The Merrill Depositor did not have separate facilities outside of Merrill Lynch.  When Merrill Lynch created the Merrill Depositor, it located the Merrill Depositor's principal place of business at the same location as Merrill Lynch and with the identical registered agent and registered office in Delaware.

214.    Merrill Lynch also participated directly in the Merrill Depositor's issuance of the Certificates.  Such issuance was done pursuant to the Prospectus Supplements.  Merrill Lynch's own corporate title – "Merrill Lynch & Co." – was featured prominently in oversized and bold font on the front page of each Prospectus and Prospectus Supplements in this case.  Merrill Lynch, through the Merrill Depositor, used these Prospectuses and Prospectus Supplements to market and sell the Certificates to investors.



215.    The securitization activities of the Merrill Depositor inured exclusively to the benefit of Merrill Lynch.  Revenues from the issuance and sale of Certificates were passed through to Merrill Lynch and consolidated into its financial statements.  According to the 2007 Form 10-K, in 2006 and 2007, Merrill Lynch reported "cash inflows" of $95.8 billion and $100.2 billion, respectively, from residential mortgage loan securitization transactions.

## XIII.   CLASS ACTION ALLEGATIONS

216.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), individually and on behalf of themselves and all persons or entities who purchased or otherwise acquired beneficial interests in the following Trusts that issued Certificates pursuant and/or traceable to the Registration Statements: Merrill Lynch Alternative

Note Asset Trust, Series 2007-A3, Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1, Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2, Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3, Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4, Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-A, C-BASS 2007-CB4 Trust, Merrill Lynch Alternative Note Asset Trust, Series 2007-F1, Merrill Lynch Mortgage Investors Trust, Series 2006-MLN1, Merrill Lynch Mortgage Investors Trust, Series 2006-FM1, Merrill Lynch Mortgage Investors Trust, Series 2006-FF1, Merrill Lynch Mortgage Investors Trust, Series 2006-RM5, Merrill Lynch Mortgage Investors Trust Series MLCC 2006-2, Merrill Lynch Mortgage Investors Trust, Series 2006-AHL1, Merrill Lynch Mortgage Investors Trust, Series 2006-RM3, Merrill Lynch Mortgage Investors Trust, Series 2006-WMC1, Merrill Lynch Mortgage Investors Trust, Series 2006-WMC2, Merrill Lynch Mortgage Investors Trust, Series 2006-A1, Ownit Mortgage Loan Trust, Series 2006-2 (the "Class").

217.    This action is properly maintainable as a class action for the following reasons:

a)   The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through discovery, Plaintiffs believe that there are thousands of members of the proposed Class, who may be identified from records maintained by the Issuing Defendants and/or may be notified of this action using the form of notice customarily used in securities class actions.

b)   Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs have the same interests as the other members of the Class.   Accordingly, Plaintiffs are adequately representative of the Class and will fairly and adequately protect the interests of the Class.

c)  The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

d)  A class action is superior to all other methods for a fair and efficient adjudication of this controversy.  There will be no difficulty in the management of this action as a class action.  Furthermore, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

218.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member.  The common questions include, *inter alia*, the following:

a)  Whether Defendants violated the Securities Act;

b)  Whether statements made by Defendants to the investing public in the Registration Statements, Prospectuses and Prospectus Supplements both omitted and misrepresented material facts about the mortgages underlying the Issuing Trusts; and

c)  The extent and proper measure of the damages sustained by the members of the Class.

XIV.   <u>PLAINTIFFS HAVE STANDING TO PURSUE THE CLAIMS ALLEGED</u>

219.    Plaintiffs have constitutional standing to advance the claims alleged herein.  As set forth in the attached certifications, Plaintiffs purchased Certificates, allege to have been damaged by Defendants, and there is at least one named plaintiff who can assert a claim directly

against each defendant.   Accordingly, Plaintiffs have alleged concrete and particularized invasions of legally protected interests for all of the claims alleged under the Securities Act.

XV.   CAUSE OF ACTION

COUNT I

For Violation Of Section 11 Of The Securities Act Related
To Merrill Lynch Alternative Note Asset Trust, Series 2007-A3

220.   Lead Plaintiff and Plaintiff LACERA assert this claim against the Merrill Depositor, Merrill Lynch PFS, Paul Park, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi on behalf of investors who purchased or acquired Certificates in Merrill Lynch Alternative Note Asset Trust, Series 2007-A3.

221.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.   For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional misconduct.   This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

222.   This Count is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Defendants named in this Count.   This Count is predicated upon these Defendants' strict liability for making untrue statements and omissions in the Offering Documents for Merrill Lynch Alternative Note Asset Trust, Series 2007-A3 ("MLALT 2007-A3").   The MLALT 2007-A3 Certificates were issued pursuant or traceable to the March Registration Statement.   Individual Defendants Paul Park, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi each signed the March Registration Statement.

223.   The Offering Documents for the MLALT 2007-A3 Certificates were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

224.    The Defendants named in this Count directly and indirectly participated in the distribution of the Certificates and directly and indirectly participated in drafting and disseminating the Offering Documents.

225.    The Defendants named in this Count owed the Plaintiffs and other Class members a duty to make a reasonable and diligent investigation of the statements contained in the MLALT 2007-A3 Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

226.    The Defendants named in this Count failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the MLALT 2007-A3 Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

227.    The Defendants named in this Count issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the MLALT 2007-A3 Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

228.    By reason of the conduct alleged herein, each of the Defendants named in this Count violated Section 11 of the Securities Act, and is liable to Plaintiffs and the Class.

229.    Plaintiffs and other Class members acquired MLALT 2007-A3 Certificates pursuant and/or traceable to the March Registration Statement.  At the time Plaintiffs and Class members obtained their MLALT 2007-A3 Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

230.    Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Defendants named in this Count.

231.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the Defendants named in this Count, as set forth in Section 11 of the Securities Act.

232.    This action was brought within one year after the discovery of the untrue statements and omissions contained in the MLALT 2007-A3 Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the MLALT 2007-A3 Offering Documents at an earlier time.

COUNT II

For Violation Of Section 11 Of The Securities Act Related
To Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1

233.    Lead Plaintiff and Plaintiff LACERA assert this claim against the Merrill Depositor, Merrill Lynch PFS, Paul Park, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi on behalf of investors who purchased or acquired Certificates in Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1.

234.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional misconduct.  This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

235.    This Count is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Defendants named in this Count.  This Count is predicated upon these Defendants' strict liability for making untrue statements and omissions in the Offering Documents for Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1 ("MLALT 2007-AF1").  The MLALT 2007-AF1 Certificates were issued pursuant or traceable to the March Registration Statement.  Individual Defendants Paul Park, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi each signed the March Registration Statement.

236.     The Offering Documents for the MLALT 2007-AF1 Certificates were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

237.     The Defendants named in this Count directly and indirectly participated in the distribution of the Certificates and directly and indirectly participated in drafting and disseminating the Offering Documents.

238.     The Defendants named in this Count owed the Plaintiffs and other Class members a duty to make a reasonable and diligent investigation of the statements contained in the MLALT 2007-AF1 Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

239.     The Defendants named in this Count failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the MLALT 2007-AF1 Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

240.     The Defendants named in this Count issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the MLALT 2007-AF1 Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

241.     By reason of the conduct alleged herein, each of the Defendants named in this Count violated Section 11 of the Securities Act, and is liable to Plaintiffs and the Class.

242.     Plaintiffs and other Class members acquired MLALT 2007-AF1 Certificates pursuant and/or traceable to the March Registration Statement.  At the time Plaintiffs and Class members obtained their MLALT 2007-AF1 Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

243.   Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Defendants named in this Count.

244.   By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the Defendants named in this Count, as set forth in Section 11 of the Securities Act.

245.   This action was brought within one year after the discovery of the untrue statements and omissions contained in the MLALT 2007-AF1 Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the MLALT 2007-AF1 Offering Documents at an earlier time.

<u>COUNT III</u>

For Violation Of Section 11 Of The Securities Act Related
<u>To Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2</u>

246.   Lead Plaintiff and Plaintiff Wyoming assert this claim against the Merrill Depositor, Merrill Lynch PFS, Paul Park, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi on behalf of investors who purchased or acquired Certificates in Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2.

247.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional misconduct.  This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

248.   This Count is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Defendants named in this Count.  This Count is predicated upon these Defendants' strict liability for making untrue statements and omissions in the Offering Documents for Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2 ("MLFF 2007-2").  The MLFF 2007-2 Certificates were issued pursuant or traceable to the

March Registration Statement.  Individual Defendants Paul Park, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi each signed the March Registration Statement.

249.    The Offering Documents for the MLFF 2007-2 Certificates were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

250.    The Defendants named in this Count directly and indirectly participated in the distribution of the Certificates and directly and indirectly participated in drafting and disseminating the Offering Documents.

251.    The Defendants named in this Count owed the Plaintiffs and other Class members a duty to make a reasonable and diligent investigation of the statements contained in the MLFF 2007-2 Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

252.    The Defendants named in this Count failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the MLFF 2007-2 Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

253.    The Defendants named in this Count issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the MLFF 2007-2 Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

254.    By reason of the conduct alleged herein, each of the Defendants named in this Count violated Section 11 of the Securities Act, and is liable to Plaintiffs and the Class.

255.    Plaintiffs and other Class members acquired MLFF 2007-2 Certificates pursuant and/or traceable to the March Registration Statement.  At the time Plaintiffs and Class members

obtained their MLFF 2007-2 Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

256.    Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Defendants named in this Count.

257.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the Defendants named in this Count, as set forth in Section 11 of the Securities Act.

258.    This action was brought within one year after the discovery of the untrue statements and omissions contained in the MLFF 2007-2 Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the MLFF 2007-2 Offering Documents at an earlier time.

<u>COUNT IV</u>

For Violation Of Section 11 Of The Securities Act Related
<u>To Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3</u>

259.    Lead Plaintiff and Plaintiff Wyoming assert this claim against the Merrill Depositor, Merrill Lynch PFS, Paul Park, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi  on behalf of investors who purchased or acquired Certificates in Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3.

260.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional misconduct.  This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

261.    This Count is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Defendants named in this Count.  This Count is predicated upon these Defendants' strict liability for making untrue statements and omissions in the Offering Documents for Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3

("MLFF 2007-3").   The MLFF 2007-3 Certificates were issued pursuant or traceable to the March Registration Statement.  Individual Defendants Paul Park, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi each signed the March Registration Statement.

262.    The Offering Documents for the MLFF 2007-3 Certificates were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

263.    The Defendants named in this Count directly and indirectly participated in the distribution of the Certificates and directly and indirectly participated in drafting and disseminating the Offering Documents.

264.    The Defendants named in this Count owed the Plaintiffs and other Class members a duty to make a reasonable and diligent investigation of the statements contained in the MLFF 2007-3 Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

265.    The Defendants named in this Count failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the MLFF 2007-3 Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

266.    The Defendants named in this Count issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the MLFF 2007-3 Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

267.    By reason of the conduct alleged herein, each of the Defendants named in this Count violated Section 11 of the Securities Act, and is liable to Plaintiffs and the Class.

268.     Plaintiffs and other Class members acquired MLFF 2007-3 Certificates pursuant and/or traceable to the March Registration Statement.  At the time Plaintiffs and Class members obtained their MLFF 2007-3 Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

269.     Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Defendants named in this Count.

270.     By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the Defendants named in this Count, as set forth in Section 11 of the Securities Act.

271.     This action was brought within one year after the discovery of the untrue statements and omissions contained in the MLFF 2007-3 Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the MLFF 2007-3 Offering Documents at an earlier time.

<u>COUNT V</u>

For Violation Of Section 11 Of The Securities Act Related
<u>To Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4</u>

272.     Lead Plaintiff and Plaintiff Wyoming assert this claim against the Merrill Depositor, Merrill Lynch PFS, Paul Park, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi  on behalf of investors who purchased or acquired Certificates in Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4.

273.     Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional misconduct.  This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

274.     This Count is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Defendants named in this Count.  This Count is predicated

upon these Defendants' strict liability for making untrue statements and omissions in the Offering Documents for Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4 ("MLFF 2007-4"). The MLFF 2007-4 Certificates were issued pursuant or traceable to the March Registration Statement. Individual Defendants Paul Park, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi each signed the March Registration Statement.

275. The Offering Documents for the MLFF 2007-4 Certificates were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

276. The Defendants named in this Count directly and indirectly participated in the distribution of the Certificates and directly and indirectly participated in drafting and disseminating the Offering Documents.

277. The Defendants named in this Count owed the Plaintiffs and other Class members a duty to make a reasonable and diligent investigation of the statements contained in the MLFF 2007-4 Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

278. The Defendants named in this Count failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the MLFF 2007-4 Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

279. The Defendants named in this Count issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the MLFF 2007-4 Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

280.    By reason of the conduct alleged herein, each of the Defendants named in this Count violated Section 11 of the Securities Act, and is liable to Plaintiffs and the Class.

281.    Plaintiffs and other Class members acquired MLFF 2007-4 Certificates pursuant and/or traceable to the March Registration Statement.  At the time Plaintiffs and Class members obtained their MLFF 2007-4 Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

282.    Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Defendants named in this Count.

283.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the Defendants named in this Count, as set forth in Section 11 of the Securities Act.

284.    This action was brought within one year after the discovery of the untrue statements and omissions contained in the MLFF 2007-4 Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the MLFF 2007-4 Offering Documents at an earlier time.

<u>COUNT VI</u>

For Violation Of Section 11 Of The Securities Act Related
<u>To Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-A</u>

285.    Lead Plaintiff asserts this claim against the Merrill Depositor, Merrill Lynch PFS, Paul Park, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi on behalf of investors who purchased or acquired Certificates in Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-A.

286.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional misconduct.  This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

287.    This Count is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Defendants named in this Count.  This Count is predicated upon these Defendants' strict liability for making untrue statements and omissions in the Offering Documents for Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-A ("MLFF 2007-A").  The MLFF 2007-A Certificates were issued pursuant or traceable to the March Registration Statement.  Individual Defendants Paul Park, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi each signed the March Registration Statement.

288.    The Offering Documents for the MLFF 2007-A Certificates were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

289.    The Defendants named in this Count directly and indirectly participated in the distribution of the Certificates and directly and indirectly participated in drafting and disseminating the Offering Documents.

290.    The Defendants named in this Count owed the Plaintiffs and other Class members a duty to make a reasonable and diligent investigation of the statements contained in the MLFF 2007-A Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

291.    The Defendants named in this Count failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the MLFF 2007-A Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

292.    The Defendants named in this Count issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the MLFF 2007-A Offering

Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

293.    By reason of the conduct alleged herein, each of the Defendants named in this Count violated Section 11 of the Securities Act, and is liable to Plaintiffs and the Class.

294.    Plaintiffs and other Class members acquired MLFF 2007-A Certificates pursuant and/or traceable to the March Registration Statement.  At the time Plaintiffs and Class members obtained their MLFF 2007-A Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

295.    Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Defendants named in this Count.

296.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the Defendants named in this Count, as set forth in Section 11 of the Securities Act.

297.    This action was brought within one year after the discovery of the untrue statements and omissions contained in the MLFF 2007-A Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the MLFF 2007-A Offering Documents at an earlier time.

<u>COUNT VII</u>

For Violation Of Section 11 Of The Securities Act Related
<u>To C-BASS Mortgage Loan Asset-Backed Certificates, Series 2007-CB4</u>

298.    Lead Plaintiff and Plaintiff Iron Workers assert this claim against the Merrill Depositor, Merrill Lynch PFS, J.P. Morgan, ABN AMRO, Matthew Whalen, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi on behalf of investors who purchased or acquired Certificates in C-BASS Mortgage Loan Asset-Backed Certificates, Series 2007-CB4.

299.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation

that could be construed as alleging fraud or intentional misconduct. This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

300.   This Count is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Defendants named in this Count. This Count is predicated upon these Defendants' strict liability for making untrue statements and omissions in the Offering Documents for C-BASS Mortgage Loan Asset-Backed Certificates, Series 2007-CB4 ("C-BASS 2007-CB4"). The C-BASS 2007-CB4 Certificates were issued pursuant or traceable to the December Registration Statement. Individual Defendants Matthew Whalen, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi each signed the December Registration Statement.

301.   The Offering Documents for the C-BASS 2007-CB4 Certificates were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

302.   The Defendants named in this Count directly and indirectly participated in the distribution of the Certificates and directly and indirectly participated in drafting and disseminating the Offering Documents.

303.   The Defendants named in this Count owed the Plaintiffs and other Class members a duty to make a reasonable and diligent investigation of the statements contained in the C-BASS 2007-CB4 Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

304.   The Defendants named in this Count failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure that statements contained in the C-BASS 2007-CB4 Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

305.    The Defendants named in this Count issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the C-BASS 2007-CB4 Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

306.    By reason of the conduct alleged herein, each of the Defendants named in this Count violated Section 11 of the Securities Act, and is liable to Plaintiffs and the Class.

307.    Plaintiffs and other Class members acquired C-BASS 2007-CB4 Certificates pursuant and/or traceable to the December Registration Statement.  At the time Plaintiffs and Class members obtained their C-BASS 2007-CB4 Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

308.    Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Defendants named in this Count.

309.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the Defendants named in this Count, as set forth in Section 11 of the Securities Act.

310.    This action was brought within one year after the discovery of the untrue statements and omissions contained in the C-BASS 2007-CB4 Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the C-BASS 2007-CB4 Offering Documents at an earlier time.

<u>COUNT VIII</u>

For Violation Of Section 11 Of The Securities Act Related
<u>To Merrill Lynch Alternative Note Asset Trust, Series 2007-F1</u>

311.    Lead Plaintiff asserts this claim against the Merrill Depositor, Merrill Lynch PFS, Matthew Whalen, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi on

behalf of investors who purchased or acquired Certificates in Merrill Lynch Alternative Note Asset Trust, Series 2007-F1.

312.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional misconduct.  This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

313.    This Count is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Defendants named in this Count.  This Count is predicated upon these Defendants' strict liability for making untrue statements and omissions in the Offering Documents for Merrill Lynch Alternative Note Asset Trust, Series 2007-F1 ("MLALT 2007-F1").   The MLALT 2007-F1 Certificates were issued pursuant or traceable to the December Registration Statement.  Individual Defendants Matthew Whalen, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi each signed the December Registration Statement.

314.    The Offering Documents for the MLALT 2007-F1 Certificates were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

315.    The Defendants named in this Count directly and indirectly participated in the distribution of the Certificates and directly and indirectly participated in drafting and disseminating the Offering Documents.

316.    The Defendants named in this Count owed the Plaintiffs and other Class members a duty to make a reasonable and diligent investigation of the statements contained in the MLALT 2007-F1 Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

317.    The Defendants named in this Count failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure that statements contained in

the MLALT 2007-F1 Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

318.    The Defendants named in this Count issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the MLALT 2007-F1 Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

319.    By reason of the conduct alleged herein, each of the Defendants named in this Count violated Section 11 of the Securities Act, and is liable to Plaintiffs and the Class.

320.    Plaintiffs and other Class members acquired MLALT 2007-F1 Certificates pursuant and/or traceable to the December Registration Statement.  At the time Plaintiffs and Class members obtained their MLALT 2007-F1 Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

321.    Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Defendants named in this Count.

322.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the Defendants named in this Count, as set forth in Section 11 of the Securities Act.

323.    This action was brought within one year after the discovery of the untrue statements and omissions contained in the MLALT 2007-F1 Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the MLALT 2007-F1 Offering Documents at an earlier time.

<u>COUNT IX</u>

For Violation Of Section 11 Of The Securities Act Related
<u>To Merrill Lynch Mortgage Investors Trust, Series 2006-MLN1</u>

95

324.    Lead Plaintiff and Plaintiff Wyoming assert this claim against the Merrill Depositor, Merrill Lynch PFS, Matthew Whalen, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi on behalf of investors who purchased or acquired Certificates in Merrill Lynch Mortgage Investors Trust, Series 2006-MLN1.

325.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional misconduct.  This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

326.    This Count is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Defendants named in this Count.  This Count is predicated upon these Defendants' strict liability for making untrue statements and omissions in the Offering Documents for Merrill Lynch Mortgage Investors Trust, Series 2006-MLN1 ("MLMI 2006-MLN1").  The MLMI 2006-MLN1 Certificates were issued pursuant or traceable to the December Registration Statement.  Individual Defendants Matthew Whalen, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi each signed the December Registration Statement.

327.    The Offering Documents for the MLMI 2006-MLN1 Certificates were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

328.    The Defendants named in this Count directly and indirectly participated in the distribution of the Certificates and directly and indirectly participated in drafting and disseminating the Offering Documents.

329.    The Defendants named in this Count owed the Plaintiffs and other Class members a duty to make a reasonable and diligent investigation of the statements contained in the MLMI 2006-MLN1 Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

330.    The Defendants named in this Count failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure that statements contained in the MLMI 2006-MLN1 Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

331.    The Defendants named in this Count issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the MLMI 2006-MLN1 Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

332.    By reason of the conduct alleged herein, each of the Defendants named in this Count violated Section 11 of the Securities Act, and is liable to Plaintiffs and the Class.

333.    Plaintiffs and other Class members acquired MLMI 2006-MLN1 Certificates pursuant and/or traceable to the December Registration Statement.  At the time Plaintiffs and Class members obtained their MLMI 2006-MLN1 Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

334.    Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Defendants named in this Count.

335.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the Defendants named in this Count, as set forth in Section 11 of the Securities Act.

336.    This action was brought within one year after the discovery of the untrue statements and omissions contained in the MLMI 2006-MLN1 Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the MLMI 2006-MLN1 Offering Documents at an earlier time.

<u>COUNT X</u>

For Violation Of Section 11 Of The Securities Act Related
<u>To Merrill Lynch Mortgage Investors Trust, Series 2006-FM1</u>

337.   Lead Plaintiff and Plaintiff Wyoming assert this claim against the Merrill Depositor, Merrill Lynch PFS, Matthew Whalen, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi on behalf of investors who purchased or acquired Certificates in Merrill Lynch Mortgage Investors Trust, Series 2006-FM1.

338.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional misconduct.  This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

339.   This Count is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Defendants named in this Count.  This Count is predicated upon these Defendants' strict liability for making untrue statements and omissions in the Offering Documents for Merrill Lynch Mortgage Investors Trust, Series 2006-FM1 ("MLMI 2006-FM1").  The MLMI 2006-FM1 Certificates were issued pursuant or traceable to the December Registration Statement.  Individual Defendants Matthew Whalen, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi each signed the December Registration Statement.

340.   The Offering Documents for the MLMI 2006-FM1 Certificates were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

341.   The Defendants named in this Count directly and indirectly participated in the distribution of the Certificates and directly and indirectly participated in drafting and disseminating the Offering Documents.

342.   The Defendants named in this Count owed the Plaintiffs and other Class members a duty to make a reasonable and diligent investigation of the statements contained in

the MLMI 2006-FM1 Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

343.    The Defendants named in this Count failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure that statements contained in the MLMI 2006-FM1 Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

344.    The Defendants named in this Count issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the MLMI 2006-FM1 Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

345.    By reason of the conduct alleged herein, each of the Defendants named in this Count violated Section 11 of the Securities Act, and is liable to Plaintiffs and the Class.

346.    Plaintiffs and other Class members acquired MLMI 2006-FM1 Certificates pursuant and/or traceable to the December Registration Statement.  At the time Plaintiffs and Class members obtained their MLMI 2006-FM1 Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

347.    Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Defendants named in this Count.

348.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the Defendants named in this Count, as set forth in Section 11 of the Securities Act.

349.    This action was brought within one year after the discovery of the untrue statements and omissions contained in the MLMI 2006-FM1 Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable

diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the MLMI 2006-FM1 Offering Documents at an earlier time.

COUNT XI

For Violation Of Section 11 Of The Securities Act Related<br>To Merrill Lynch Mortgage Investors Trust, Series 2006-FF1

350.    Lead Plaintiff and Plaintiff LACERA assert this claim against the Merrill Depositor, Merrill Lynch PFS, Matthew Whalen, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi on behalf of investors who purchased or acquired Certificates in Merrill Lynch Mortgage Investors Trust, Series 2006-FF1.

351.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional misconduct.  This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

352.    This Count is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Defendants named in this Count.  This Count is predicated upon these Defendants' strict liability for making untrue statements and omissions in the Offering Documents for Merrill Lynch Mortgage Investors Trust, Series 2006-FF1 ("MLMI 2006-FF1").  The MLMI 2006-FF1 Certificates were issued pursuant or traceable to the December Registration Statement.  Individual Defendants Matthew Whalen, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi each signed the December Registration Statement.

353.    The Offering Documents for the MLMI 2006-FF1 Certificates were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

354.    The Defendants named in this Count directly and indirectly participated in the distribution of the Certificates and directly and indirectly participated in drafting and disseminating the Offering Documents.

100

355.    The Defendants named in this Count owed the Plaintiffs and other Class members a duty to make a reasonable and diligent investigation of the statements contained in the MLMI 2006-FF1 Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

356.    The Defendants named in this Count failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure that statements contained in the MLMI 2006-FF1 Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

357.    The Defendants named in this Count issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the MLMI 2006-FF1 Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

358.    By reason of the conduct alleged herein, each of the Defendants named in this Count violated Section 11 of the Securities Act, and is liable to Plaintiffs and the Class.

359.    Plaintiffs and other Class members acquired MLMI 2006-FF1 Certificates pursuant and/or traceable to the December Registration Statement.  At the time Plaintiffs and Class members obtained their MLMI 2006-FF1 Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

360.    Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Defendants named in this Count.

361.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the Defendants named in this Count, as set forth in Section 11 of the Securities Act.

362.    This action was brought within one year after the discovery of the untrue statements and omissions contained in the MLMI 2006-FF1 Offering Documents and within

three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the MLMI 2006-FF1 Offering Documents at an earlier time.

<u>COUNT XII</u>

For Violation Of Section 11 Of The Securities Act Related
<u>To Merrill Lynch Mortgage Investors Trust, Series 2006-RM5</u>

363.    Lead Plaintiff and Plaintiff Wyoming assert this claim against the Merrill Depositor, Merrill Lynch PFS, Matthew Whalen, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi on behalf of investors who purchased or acquired Certificates in Merrill Lynch Mortgage Investors Trust, Series 2006-RM5.

364.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional misconduct.  This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

365.    This Count is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Defendants named in this Count.  This Count is predicated upon these Defendants' strict liability for making untrue statements and omissions in the Offering Documents for Merrill Lynch Mortgage Investors Trust, Series 2006-RM5 ("MLMI 2006-RM5").   The MLMI 2006-RM5 Certificates were issued pursuant or traceable to the December Registration Statement.  Individual Defendants Matthew Whalen, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi each signed the December Registration Statement.

366.    The Offering Documents for the MLMI 2006-RM5 Certificates were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

367.    The Defendants named in this Count directly and indirectly participated in the distribution of the Certificates and directly and indirectly participated in drafting and disseminating the Offering Documents.

368.    The Defendants named in this Count owed the Plaintiffs and other Class members a duty to make a reasonable and diligent investigation of the statements contained in the MLMI 2006-RM5 Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

369.    The Defendants named in this Count failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure that statements contained in the MLMI 2006-RM5 Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

370.    The Defendants named in this Count issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the MLMI 2006-RM5 Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

371.    By reason of the conduct alleged herein, each of the Defendants named in this Count violated Section 11 of the Securities Act, and is liable to Plaintiffs and the Class.

372.    Plaintiffs and other Class members acquired MLMI 2006-RM5 Certificates pursuant and/or traceable to the December Registration Statement.  At the time Plaintiffs and Class members obtained their MLMI 2006-RM5 Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

373.    Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Defendants named in this Count.

374. By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the Defendants named in this Count, as set forth in Section 11 of the Securities Act.

375. This action was brought within one year after the discovery of the untrue statements and omissions contained in the MLMI 2006-RM5 Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the MLMI 2006-RM5 Offering Documents at an earlier time.

COUNT XIII

For Violation Of Section 11 Of The Securities Act Related
To Merrill Lynch Mortgage Investors Trust, Series MLCC 2006-2

376. Lead Plaintiff asserts this claim against the Merrill Depositor, Merrill Lynch PFS, Matthew Whalen, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi on behalf of investors who purchased or acquired Certificates in Merrill Lynch Mortgage Investors Trust, Series MLCC 2006-2.

377. Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional misconduct.  This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

378. This Count is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Defendants named in this Count.  This Count is predicated upon these Defendants' strict liability for making untrue statements and omissions in the Offering Documents for Merrill Lynch Mortgage Investors Trust, Series MLCC 2006-2 ("MLMI MLCC 2006-2").  The MLMI MLCC 2006-2 Certificates were issued pursuant or traceable to the December Registration Statement.  Individual Defendants Matthew Whalen, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi each signed the December Registration Statement.

379.    The Offering Documents for the MLMI MLCC 2006-2 Certificates were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

380.    The Defendants named in this Count directly and indirectly participated in the distribution of the Certificates and directly and indirectly participated in drafting and disseminating the Offering Documents.

381.    The Defendants named in this Count owed the Plaintiffs and other Class members a duty to make a reasonable and diligent investigation of the statements contained in the MLMI MLCC 2006-2 Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

382.    The Defendants named in this Count failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure that statements contained in the MLMI MLCC 2006-2 Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

383.    The Defendants named in this Count issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the MLMI MLCC 2006-2 Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

384.    By reason of the conduct alleged herein, each of the Defendants named in this Count violated Section 11 of the Securities Act, and is liable to Plaintiffs and the Class.

385.    Plaintiffs and other Class members acquired MLMI MLCC 2006-2 Certificates pursuant and/or traceable to the December Registration Statement.  At the time Plaintiffs and Class members obtained their MLMI MLCC 2006-2 Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

386.     Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Defendants named in this Count.

387.     By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the Defendants named in this Count, as set forth in Section 11 of the Securities Act.

388.     This action was brought within one year after the discovery of the untrue statements and omissions contained in the MLMI MLCC 2006-2 Offering Documents and within three years of the Certificates being offered to the public.   Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the MLMI MLCC 2006-2 Offering Documents at an earlier time.

<u>COUNT XIV</u>

For Violation Of Section 11 Of The Securities Act Related
<u>To Merrill Lynch Mortgage Investors Trust, Series 2006-AHL1</u>

389.     Lead Plaintiff and Plaintiff Wyoming assert this claim against the Merrill Depositor, Merrill Lynch PFS, Matthew Whalen, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi on behalf of investors who purchased or acquired Certificates in Merrill Lynch Mortgage Investors Trust, Series 2006-AHL1.

390.     Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional misconduct.  This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

391.     This Count is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Defendants named in this Count.  This Count is predicated upon these Defendants' strict liability for making untrue statements and omissions in the Offering Documents for Merrill Lynch Mortgage Investors Trust, Series 2006-AHL1 ("MLMI 2006-AHL1").  The MLMI 2006-AHL1 Certificates were issued pursuant or traceable to the

December Registration Statement.  Individual Defendants Matthew Whalen, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi each signed the December Registration Statement.

392.    The Offering Documents for the MLMI 2006-AHL1 Certificates were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

393.    The Defendants named in this Count directly and indirectly participated in the distribution of the Certificates and directly and indirectly participated in drafting and disseminating the Offering Documents.

394.    The Defendants named in this Count owed the Plaintiffs and other Class members a duty to make a reasonable and diligent investigation of the statements contained in the MLMI 2006-AHL1 Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

395.    The Defendants named in this Count failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure that statements contained in the MLMI 2006-AHL1 Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

396.    The Defendants named in this Count issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the MLMI 2006-AHL1 Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

397.    By reason of the conduct alleged herein, each of the Defendants named in this Count violated Section 11 of the Securities Act, and is liable to Plaintiffs and the Class.

398.    Plaintiffs and other Class members acquired MLMI 2006-AHL1 Certificates pursuant and/or traceable to the December Registration Statement.  At the time Plaintiffs and

Class members obtained their MLMI 2006-AHL1 Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

399.    Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Defendants named in this Count.

400.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the Defendants named in this Count, as set forth in Section 11 of the Securities Act.

401.    This action was brought within one year after the discovery of the untrue statements and omissions contained in the MLMI 2006-AHL1 Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the MLMI 2006-AHL1 Offering Documents at an earlier time.

COUNT XV

For Violation Of Section 11 Of The Securities Act Related
To Merrill Lynch Mortgage Investors Trust, Series 2006-RM3

402.    Lead Plaintiff and Plaintiff Wyoming assert this claim against the Merrill Depositor, Merrill Lynch PFS, Matthew Whalen, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi on behalf of investors who purchased or acquired Certificates in Merrill Lynch Mortgage Investors Trust, Series 2006-RM3.

403.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional misconduct.  This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

404.    This Count is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Defendants named in this Count.  This Count is predicated upon these Defendants' strict liability for making untrue statements and omissions in the Offering Documents for Merrill Lynch Mortgage Investors Trust, Series 2006-RM3 ("MLMI

2006-RM3"). The MLMI 2006-RM3 Certificates were issued pursuant or traceable to the December Registration Statement. Individual Defendants Matthew Whalen, Brian T. Sullivan, Michael M. McGovern and Donald J. Puglisi each signed the December Registration Statement.

405.    The Offering Documents for the MLMI 2006-RM3 Certificates were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

406.    The Defendants named in this Count directly and indirectly participated in the distribution of the Certificates and directly and indirectly participated in drafting and disseminating the Offering Documents.

407.    The Defendants named in this Count owed the Plaintiffs and other Class members a duty to make a reasonable and diligent investigation of the statements contained in the MLMI 2006-RM3 Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

408.    The Defendants named in this Count failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure that statements contained in the MLMI 2006-RM3 Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

409.    The Defendants named in this Count issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the MLMI 2006-RM3 Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

410.    By reason of the conduct alleged herein, each of the Defendants named in this Count violated Section 11 of the Securities Act, and is liable to Plaintiffs and the Class.

411.    Plaintiffs and other Class members acquired MLMI 2006-RM3 Certificates pursuant and/or traceable to the December Registration Statement.  At the time Plaintiffs and Class members obtained their MLMI 2006-RM3 Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

412.    Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Defendants named in this Count.

413.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the Defendants named in this Count, as set forth in Section 11 of the Securities Act.

414.    This action was brought within one year after the discovery of the untrue statements and omissions contained in the MLMI 2006-RM3 Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the MLMI 2006-RM3 Offering Documents at an earlier time.

<u>COUNT XVI</u>

For Violation Of Section 11 Of The Securities Act Related
<u>To Merrill Lynch Mortgage Investors Trust, Series 2006-WMC1</u>

415.    Lead Plaintiff and Plaintiff Wyoming assert this claim against the Merrill Depositor, Merrill Lynch PFS, Matthew Whalen, Brian T. Sullivan, Michael M. McGovern, Donald J. Puglisi and Donald C. Han on behalf of investors in Merrill Lynch Mortgage Investors Trust, Series 2006-WMC1.

416.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional misconduct.  This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

417.    This Count is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Defendants named in this Count.  This Count is predicated

upon these Defendants' strict liability for making untrue statements and omissions in the Offering Documents for Merrill Lynch Mortgage Investors Trust, Series 2006-WMC1 ("MLMI 2006-WMC1"). The MLMI 2006-WMC1 Certificates were issued pursuant or traceable to the August Registration Statement. Individual Defendants Matthew Whalen, Brian T. Sullivan, Michael M. McGovern, Donald J. Puglisi and Donald C. Han each signed the August Registration Statement.

418.    The Offering Documents for the MLMI 2006-WMC1 Certificates were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

419.    The Defendants named in this Count directly and indirectly participated in the distribution of the Certificates and directly and indirectly participated in drafting and disseminating the Offering Documents.

420.    The Defendants named in this Count owed the Plaintiffs and other Class members a duty to make a reasonable and diligent investigation of the statements contained in the MLMI 2006-WMC1 Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

421.    The Defendants named in this Count failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure that statements contained in the MLMI 2006-WMC1 Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

422.    The Defendants named in this Count issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the MLMI 2006-WMC1 Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

423.    By reason of the conduct alleged herein, each of the Defendants named in this Count violated Section 11 of the Securities Act, and is liable to Plaintiffs and the Class.

424.    Plaintiffs and other Class members acquired MLMI 2006-WMC1 Certificates pursuant and/or traceable to the August Registration Statement.  At the time Plaintiffs and Class members obtained their MLMI 2006-WMC1 Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

425.    Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Defendants named in this Count.

426.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the Defendants named in this Count, as set forth in Section 11 of the Securities Act.

427.    This action was brought within one year after the discovery of the untrue statements and omissions contained in the MLMI 2006-WMC1 Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the MLMI 2006-WMC1 Offering Documents at an earlier time.

## COUNT XVII

### For Violation Of Section 11 Of The Securities Act Related To Merrill Lynch Mortgage Investors Trust, Series 2006-WMC2

428.    Lead Plaintiff, Plaintiffs Wyoming and LACERA assert this claim against the Merrill Depositor, Merrill Lynch PFS, Matthew Whalen, Brian T. Sullivan, Michael M. McGovern,

Donald J. Puglisi and Donald C. Han on behalf of investors who purchased or acquired Certificates in Merrill Lynch Mortgage Investors Trust, Series 2006-WMC2.

429.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation

112

that could be construed as alleging fraud or intentional misconduct.  This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

430.    This Count is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Defendants named in this Count.  This Count is predicated upon these Defendants' strict liability for making untrue statements and omissions in the Offering Documents for Merrill Lynch Mortgage Investors Trust, Series 2006-WMC2 ("MLMI 2006-WMC2").  The MLMI 2006-WMC2 Certificates were issued pursuant or traceable to the August Registration Statement.  Individual Defendants Matthew Whalen, Brian T. Sullivan, Michael M. McGovern, Donald J. Puglisi and Donald C. Han each signed the August Registration Statement.

431.    The Offering Documents for the MLMI 2006-WMC2 Certificates were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

432.    The Defendants named in this Count directly and indirectly participated in the distribution of the Certificates and directly and indirectly participated in drafting and disseminating the Offering Documents.

433.    The Defendants named in this Count owed the Plaintiffs and other Class members a duty to make a reasonable and diligent investigation of the statements contained in the MLMI 2006-WMC2 Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

434.    The Defendants named in this Count failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure that statements contained in the MLMI 2006-WMC2 Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

435.    The Defendants named in this Count issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the MLMI 2006-WMC2 Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

436.    By reason of the conduct alleged herein, each of the Defendants named in this Count violated Section 11 of the Securities Act, and is liable to Plaintiffs and the Class.

437.    Plaintiffs and other Class members acquired MLMI 2006-WMC2 Certificates pursuant and/or traceable to the August Registration Statement.  At the time Plaintiffs and Class members obtained their MLMI 2006-WMC2 Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

438.    Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Defendants named in this Count.

439.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the Defendants named in this Count, as set forth in Section 11 of the Securities Act.

440.    This action was brought within one year after the discovery of the untrue statements and omissions contained in the MLMI 2006-WMC2 Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the MLMI 2006-WMC2 Offering Documents at an earlier time.

<u>COUNT XVIII</u>

For Violation Of Section 11 Of The Securities Act Related
<u>To Merrill Lynch Mortgage Investors Trust, Series 2006-A1</u>

441.    Lead Plaintiff, Plaintiffs Wyoming and LACERA assert this claim against the Merrill Depositor, Merrill Lynch PFS, Matthew Whalen, Brian T. Sullivan, Michael M. McGovern,

Donald J. Puglisi and Donald C. Han on behalf of investors who purchased or acquired Certificates in Merrill Lynch Mortgage Investors Trust, Series 2006-A1.

442.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional misconduct.  This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

443.    This Count is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Defendants named in this Count.  This Count is predicated upon these Defendants' strict liability for making untrue statements and omissions in the Offering Documents for Merrill Lynch Mortgage Investors Trust, Series 2006-A1 ("MLMI 2006-A1").  The MLMI 2006-A1 Certificates were issued pursuant or traceable to the August Registration Statement.  Individual Defendants Matthew Whalen, Brian T. Sullivan, Michael M. McGovern, Donald J. Puglisi and Donald C. Han each signed the August Registration Statement.

444.    The Offering Documents for the MLMI 2006-A1 Certificates were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

445.    The Defendants named in this Count directly and indirectly participated in the distribution of the Certificates and directly and indirectly participated in drafting and disseminating the Offering Documents.

446.    The Defendants named in this Count owed the Plaintiffs and other Class members a duty to make a reasonable and diligent investigation of the statements contained in the MLMI 2006-A1 Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

447.    The Defendants named in this Count failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure that statements contained in the MLMI 2006-A1 Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

448.    The Defendants named in this Count issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the MLMI 2006-A1 Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

449.    By reason of the conduct alleged herein, each of the Defendants named in this Count violated Section 11 of the Securities Act, and is liable to Plaintiffs and the Class.

450.    Plaintiffs and other Class members acquired MLMI 2006-A1 Certificates pursuant and/or traceable to the August Registration Statement.  At the time Plaintiffs and Class members obtained their MLMI 2006-A1 Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

451.    Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Defendants named in this Count.

452.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the Defendants named in this Count, as set forth in Section 11 of the Securities Act.

453.    This action was brought within one year after the discovery of the untrue statements and omissions contained in the MLMI 2006-A1 Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the MLMI 2006-A1 Offering Documents at an earlier time.

<u>COUNT XIX</u>

For Violation Of Section 11 Of The Securities Act Related
<u>To Ownit Mortgage Loan Trust, Series 2006-2</u>

454.    Lead Plaintiff and Plaintiff Connecticut Carpenters assert this claim against the Merrill Depositor, Merrill Lynch PFS, Matthew Whalen, Brian T. Sullivan, Michael M. McGovern,

Donald J. Puglisi and Donald C. Han on behalf of investors who purchased or acquired Certificates in Ownit Mortgage Loan Trust, Series 2006-2.

455.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional misconduct.  This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

456.    This Count is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Defendants named in this Count.  This Count is predicated upon these Defendants' strict liability for making untrue statements and omissions in the Offering Documents for Ownit Mortgage Loan Trust, Series 2006-2 ("OWNIT 2006-2").  The Ownit 2006-2 Certificates were issued pursuant or traceable to the August Registration Statement.  Individual Defendants Matthew Whalen, Brian T. Sullivan, Michael M. McGovern, Donald J. Puglisi and Donald C. Han each signed the August Registration Statement.

457.    The Offering Documents for the Ownit 2006-2 Certificates were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

458.    The Defendants named in this Count directly and indirectly participated in the distribution of the Certificates and directly and indirectly participated in drafting and disseminating the Offering Documents.

459.    The Defendants named in this Count owed the Plaintiffs and other Class members a duty to make a reasonable and diligent investigation of the statements contained in the Ownit 2006-2 Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

460.    The Defendants named in this Count failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure that statements contained in the Ownit 2006-2 Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

461.    The Defendants named in this Count issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the Ownit 2006-2 Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

462.    By reason of the conduct alleged herein, each of the Defendants named in this Count violated Section 11 of the Securities Act, and is liable to Plaintiffs and the Class.

463.    Plaintiffs and other Class members acquired Ownit 2006-2 Certificates pursuant and/or traceable to the August Registration Statement.   At the time Plaintiffs and Class members obtained their Ownit 2006-2 Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

464.    Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Defendants named in this Count.

465.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the Defendants named in this Count, as set forth in Section 11 of the Securities Act.

466.    This action was brought within one year after the discovery of the untrue statements and omissions contained in the Ownit 2006-2 Offering Documents and within three

years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the Ownit 2006-2 Offering Documents at an earlier time.

<u>COUNT XX</u>

<u>For Violation Of Section 12(a)(2) Of The Securities Act</u>

467.     Lead Plaintiff and Plaintiffs LACERA, Iron Workers and Wyoming bring this count against Merrill Lynch PFS on behalf of investors who purchased or acquired Certificates in the offerings directly from Merrill Lynch PFS, as reflected in ¶18.

468.     Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional misconduct.  This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

469.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of Plaintiffs and the Class, against Merrill Lynch PFS.

470.     Plaintiffs and other Class members purchased Certificates in the Offerings directly from Merrill Lynch PFS pursuant to the Offering Documents which contained untrue statements and omissions, as reflected in ¶207.  Merrill Lynch PFS sold these Certificates for its own financial gain.

471.      The Offering Documents contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading regarding: (1) the underwriting standards purportedly used in connection with the origination of the underlying mortgages; (2) the loan-to-value ratios and appraisals of the properties; (3) the amount of credit enhancement supporting the Certificates; and (4) the ratings of the Certificates.

472.     Merrill Lynch PFS owed to Plaintiffs and the other Class members who purchased Certificates pursuant to the Prospectus Supplements a duty to make a reasonable and diligent investigation of the statements contained in the Prospectus Supplements, to ensure that such statements were true and that there was no omission of material fact necessary to make the

statements contained therein not misleading.  Merrill Lynch PFS, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus Supplements, as set forth herein.

473.    Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the misrepresentations and omissions contained in the Prospectus Supplements.

474.    By reason of the conduct alleged herein, Merrill Lynch PFS violated Section 12(a)(2) of the Securities Act, and are liable to Plaintiffs and other Class members who purchased Certificates in the offerings pursuant to the Prospectus Supplements.

475.    Plaintiffs and other Class members were damaged by the Merrill Lynch PFS wrongful conduct.  Those Class members who have retained their Certificates have the right to rescind and recover the consideration paid for their Certificates, as set forth in Section 12(a)(2) of the Securities Act.  Those Class members who have sold their Certificates are entitled to rescissory damages, as set forth in Section 12(a)(2) of the Securities Act.  These Plaintiffs hereby tender their Certificates, or proceeds from the sale thereof, to Merrill Lynch PFS in exchange for the value of the consideration paid for such Certificates, plus interest.  In the alternative, these Plaintiffs seek recovery of damages in an amount to be proven at trial.

476.    This action was brought within one year after the discovery of the untrue statements and omissions contained in the Prospectus Supplements and within three years of the Certificates were sold to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the Prospectus Supplements at an earlier time.

COUNT XXI

For Violation Of Section 15 Of The Securities Act

477.    Plaintiffs bring this claim against Merrill Lynch on behalf of investors who purchased Certificates in the Offerings set forth in Counts I to XIX.  Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

478.     This Count is brought against Defendant Merrill Lynch pursuant to Section 15 of the Securities Act.  Merrill Lynch, by virtue of its control, ownership, offices, directorship, and specific acts, was at the time of the wrongs alleged herein a controlling person of the Merrill Depositor within the meaning of Section 15 of the Securities Act.

479.     Defendant Merrill Lynch controlled all aspects of the management and policies of the Merrill Depositor.  Merrill Lynch controlled the Merrill Depositor by virtue of the following: (i) Merrill Lynch created the Merrill Depositor as its SPE for the Certificates; (ii) revenue from the Merrill Depositor's securitizations inured exclusively to Merrill Lynch's benefit; (iii) statements in Merrill Lynch's SEC filings shows control through comprehensive involvement with the Merrill Depositor's operations; (iv) Merrill Lynch directly participated in the Merrill Depositor's issuance of the Certificates, including prominently featuring "Merrill Lynch & Co." on the front page of each Prospectus and Prospectus Supplement; and (v) Merrill Lynch's managing partner and director and senior counsel signed the Merrill Depositor's registration statements.

480.     Because of its sole ownership of the Merrill Depositor and its control and authority as the parent corporation, Merrill Lynch had the power and influence, and exercised that power and influence, to cause the Merrill Depositor to engage in violations of the Securities Act, as described herein.

481.     By virtue of the wrongful conduct alleged herein, Merrill Lynch is liable to Plaintiffs and other Class members for their sustained damages.

<u>RELIEF REQUESTED</u>

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)     Declaring this action properly maintainable as a class action and certifying Plaintiffs as Class representatives;

(b)     Awarding compensatory and/or rescissionary damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other relief as the Court may deem just and proper.

JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

Dated: July 6, 2010

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP

DAVID R. STICKNEY

DAVID R. STICKNEY
TIMOTHY A. DeLANGE
MATTHEW P. JUBENVILLE
TAKEO A. KELLAR
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323
davids@blbglaw.com
timothyd@blbglaw.com
matthewj@blbglaw.com
takeok@blbglaw.com
            -and-
DAVID WALES
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444
davidw@blbglaw.com

*Lead Counsel for the Class and Counsel for Lead Plaintiff Public Employees' Retirement System of Mississippi and Plaintiff Los Angeles County Employees Retirement Association*

POND, GADOW & TYLER, P.A.
JOHN GADOW
BLAKE TYLER
502 South President Street
Jackson, MS 39201
johngadow@pgtlaw.com
btyler@pgtlaw.com

*Counsel for Plaintiff Public Employees' Retirement System of Mississippi*

122

ROBBINS GELLER RUDMAN & DOWD
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARIO ALBA, JR.
CAROLINA C. TORRES
58 South Service Road, Suite 200
Melville, NY 11747
Tel:     (631) 367-7100
Fax:     (631) 367-1173

*Counsel for Plaintiff Iron Workers*
*Local No. 25 Pension Fund*

BERMAN DeVALERIO
JEFFREY C. BLOCK
One Liberty Square
Boston, MA 02109
Tel:     (617) 542-8300
Fax:     (617) 542-1194
             -and-
JOSEPH J. TABACCO, JR.
NICOLE LAVALLEE
425 California Street, Suite 2100
San Francisco, CA 94104
Tel:     (415) 433-3200
Fax:     (415) 433-6382

*Special Assistant Attorneys General*
*for the State of Wyoming*

BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP
KATHARINE M. RYAN
JOHN A. KEHOE
KAREN E. REILLY
280 King of Prussia Road
Radnor, PA 19087
Tel:     (610) 667-7706
Fax:     (610) 667-7056

*Counsel for Plaintiffs Connecticut*
*Carpenters Pension Fund and Connecticut*
*Carpenters Annuity Fund*