**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF :
MISSISSIPPI, et al., Individually and On Behalf of All :
Others Similarly Situated,                          :        08 Civ. 10841 (JSR)
                                                    :        ECF CASE
                                     Plaintiffs,    :
                                                    :
                        v.                          :
                                                    :
MERRILL LYNCH & CO. INC., et al.,                   :
                                                    :
                                     Defendants.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION
## OF THE MERRILL LYNCH DEFENDANTS AND INDIVIDUAL
## <u>DEFENDANTS TO DISMISS THE AMENDED CLASS ACTION COMPLAINT</u>

SKADDEN, ARPS, SLATE, MEAGHER &
  FLOM LLP
Jay B. Kasner
  (jay.kasner@skadden.com)
Christopher P. Malloy
  (christopher.malloy@skadden.com)
Scott D. Musoff
  (scott.musoff@skadden.com)
Four Times Square
New York, New York  10036
(212) 735-3000

Attorneys for Defendants Merrill Lynch &
  Co., Inc., Merrill Lynch Mortgage Investors,
  Inc., Merrill Lynch, Pierce, Fenner & Smith
  Incorporated, Matthew Whalen, Paul Park,
  Brian T. Sullivan, Michael M. McGovern,
  Donald J. Puglisi and Donald C. Han

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ......................................................................................... 1

FACTUAL BACKGROUND .............................................................................................. 5

A.      The Securitization Process ................................................................................... 5

B.      The Offering Materials ......................................................................................... 6

C.      The Decline of Real Estate Markets and Resulting Credit Crisis ....................... 8

ARGUMENT ...................................................................................................................... 9

THE AMENDED COMPLAINT SHOULD BE DISMISSED WITH
PREJUDICE ........................................................................................................................ 9

I.      PLAINTIFFS HAVE FAILED TO ALLEGE A CLAIM UNDER
        SECTIONS 11 AND 12(a)(2) OF THE SECURITIES ACT ............................... 9

        A.      Plaintiffs' Claims Must Comply with the Pleading Standards Set by
                the Supreme Court in *Twombly* and *Iqbal* ............................................... 9

        B.      The Allegations Drawn from Pleadings in Unproven Cases and
                Vague Confidential Witness Accounts Should Be Disregarded in
                Assessing the Amended Complaint ...................................................... 12

        C.      Plaintiffs Fail to Allege Any Untrue Statement or Misleading
                Omissions Regarding Appraisals, Loan-to-Value Ratios,
                Overcollateralization, and Ratings ...................................................... 13

                1.      Appraisals and Loan-to-Value Ratios Are Opinions and
                        Not Actionable Under Section 11 or 12(a)(2) ........................... 13

                2.      Investment Ratings and Credit Enhancements Are Not
                        Actionable Under Section 11 or 12(a)(2) .................................. 16

        D.      Plaintiffs' Allegations Concerning the Failure by Loan Originators
                to Comply with Underwriting Guidelines Fail to Allege an Untrue
                Statement or Omission ......................................................................... 17

                1.      First Franklin ............................................................................. 18

                2.      Ownit ......................................................................................... 19

3.  PHH Mortgage Corporation and First Republic ........................................21

4.  Mortgage Lenders Network USA, Inc. .....................................................22

5.  First National Bank of Nevada ................................................................23

6.  GreenPoint Funding, Inc. ........................................................................23

7.  The MANA 2007-F1 Offering (Argent, IndyMac and Wachovia) ..................................................................................24

8.  WMC Mortgage ......................................................................................25

9.  C-BASS 2007-CB4 Trust (C-BASS and New Century Lending) ................................................................................................26

10.  Accredited Home Lenders ......................................................................27

11.  ResMAE Mortgage Corporation ..............................................................27

12.  Fremont Investment and Loan ................................................................28

13.  American Home Mortgage .....................................................................28

E.  Plaintiffs Do Not Allege that Non-Compliant Loans Were Included in Each Loan Pool ..............................................................................29

II.  PLAINTIFFS HAVE FAILED TO ALLEGE ANY COGNIZABLE INJURY FOR CERTAIN OFFERINGS ............................................................31

III.  PLAINTIFFS HAVE FAILED TO ALLEGE RELIANCE FOR CERTAIN OFFERINGS ..........................................................................................33

IV.  PLAINTIFFS HAVE FAILED TO ALLEGE A SECTION 15 CLAIM AGAINST MERRILL LYNCH ...........................................................................34

CONCLUSION ........................................................................................................36

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                                              <u>Page</u>

*In re Agria Corp. Securities Litigation*, 672 F. Supp. 2d 520 (S.D.N.Y. 2009) ............................16

*Akerman v. Oryx Communications, Inc.*, 810 F.2d 336 (2d Cir. 1987) .........................................33

*Amida Capital Management II, LLC v. Cerberus Capital Management, L.P.*, 669
    F. Supp. 2d 430 (S.D.N.Y. 2009)........................................................................8

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ............................................................10, 11

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................4, 10, 31

*Bloomberg L .P. v. Board of Governors of Federal Reserve System*, 649 F. Supp.
    2d 262 (S.D.N.Y. 2009) .............................................................................8

*Brass v. American Film Technologies, Inc.*, 987 F.2d 142 (2d Cir. 1993) ...................................32

*City of Ann Arbor Employees' Retirement System v. Citigroup Mortgage Loan
    Trust Inc.*, 2010 WL 1371417 (E.D.N.Y. Apr. 6, 2010).....................................17

*City of Cleveland v. Ameriquest Mortgage Securities, Inc.*, No. 09-3608, 2010
    WL 2901049 (6th Cir. July 27, 2010).............................................................8

*In re Connetics Corp. Securities Litigation*, 542 F. Supp. 2d 996 (N.D. Cal. 2008)....................12

*Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111 (2d Cir. 1982) ...............................3, 10

*Demaria v. Andersen,* 153 F. Supp. 2d 300 (S.D.N.Y. 2001), *aff'd*, 318 F.3d 170
    (2d Cir. 2003)...........................................................................................34, 35

*Dent v. United States Tennis Ass'n*, 2008 WL 2483288 (E.D.N.Y. 2008) ...................................12

*In re Duke Energy Corp. Securities Litigation*, 282 F. Supp. 2d 158 (S.D.N.Y.
    2003) ....................................................................................................5

*ECA & Local 134 IBEW Joint Pension Trust  v. JP Morgan Chase Co.*, 553 F.3d
    187 (2d Cir. 2009).................................................................................11, 29

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994)....................11, 30, 32

*Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597 (S.D.N.Y. 2008) ......................................11, 30

*Good Hill Partners L.P. v. WM Asset Holdings Corp.*, 583 F. Supp. 2d 517
    (S.D.N.Y. 2008).....................................................................................3, 13

*Hemming v. Alfin Fragrances, Inc.*, 690 F. Supp. 239 (S.D.N.Y. 1988)......................................35

*Hevesi v. Citigroup Inc.*, 366 F.3d 70 (2d Cir. 2004) ..................................................33

*In re Huntington Bancshares Inc. Securities Litigation*, 674 F. Supp. 2d 951 (S.D. Ohio 2009) ..........................................................................................................22

*In re IndyMac Mortgage-Backed Securities Litigation*, 2010 WL 2473243 (S.D.N.Y. June 21, 2010)....................................................................11, 14, 15, 16, 17, 19

*In re Initial Public Offering Securities Litigation*, 544 F. Supp. 2d 277 (S.D.N.Y. 2008) ..............................................................................................................31

*In re Lehman Bros. Securities & ERISA Litigation*, 684 F. Supp. 2d 485 (S.D.N.Y. 2010) ......................................................................................................11, 16, 18

*Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976) ........................................12

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..................................................31

*Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576 (E.D. Pa. 2009)..................................................................................................8, 31

*In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 218 F.R.D. 76 (S.D.N.Y. 2003) ......................................................................................12

*In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 272 F. Supp. 2d 243 (S.D.N.Y. 2003)............................................................................32

*In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 289 F. Supp. 2d 416 (S.D.N.Y. 2003)................................................................................8

*New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*, 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) ......................................................11, 14, 16

*New Jersey Carpenters Health Fund v. Residential Capital, LLC*, 2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) ....................................................................16

*New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*, 2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010) ......................................................11, 16, 18

*New York State Teachers' Retirement Systems v. Fremont General Corp.*, 2009 WL 3112574 (C.D. Cal. Sep. 25, 2009) ..............................................................28

*New York State Teachers' Retirement Systems v. Fremont General Corp.*, 2010 WL 1473265 (C.D. Cal. Mar. 29, 2010) .......................................................................28

*P. Stolz Family Partnership, L.P. v. Daum*, 166 F. Supp. 2d 871 (S.D.N.Y. 2001), *aff'd in part, rev'd on other grounds*, 355 F.3d 92 (2d Cir. 2004) ....................................34

*Panther Partners, Inc. v. Ikanos Communications, Inc.*, 538 F. Supp. 2d 662 (S.D.N.Y. 2008), *aff'd*, 347 Fed.Appx. 617 (2d Cir. 2009) .........................................30, 31

*Paracor Finance, Inc. v. General Electric Capital Corp.*, 96 F.3d 1151 (9th Cir. 1996) ...........................................................................................................................35

*Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120 (1989) ..................................12

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299 (D. Mass. 2009) .........................................................................16, 17

*Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co., Inc.*, 2010 WL 2175875 (S.D.N.Y. June 1, 2010) .............................................1, 2, 3, 26, 34, 35

*Pyramid Holdings, Inc. v. Inverness Medical Innovations, Inc.*, 638 F. Supp. 2d 120 (D. Mass. 2009)..........................................................................12, 13, 19, 28

*RSM Production Corp. v. Fridman*, 643 F. Supp. 2d 382 (S.D.N.Y. 2009), *aff'd*, No. 09-1202-cv, 2010 WL 2838582 (2d Cir. July 21, 2010)............................................12

*Sloane Overseas Fund, Ltd. v. Sapiens International Corp., N.V.*, 941 F. Supp. 1369 (S.D.N.Y. 1996) .......................................................................................................35

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ..................................................5

*Tsereteli v. Residential Asset Securitization Trust*, 692 F. Supp. 2d 387 (S.D.N.Y. 2010) .........................................................................3, 11, 14, 15, 16, 18, 31

*Virtual Countries, Inc. v. Republic of South Africa*, 148 F. Supp. 2d 256 (S.D.N.Y. 2001) .............................................................................................................................8

*Wallace v. Buttar*, 239 F. Supp. 2d 388 (S.D.N.Y. 2003), *rev'd on other grounds*, 378 F.3d 182 (2d Cir. 2004)...........................................................................................36

Statutes and Rules

Securities Act of 1933, 15 U.S.C. §§ 77a to 77aa ........................................................................1

15 U.S.C. § 77k.............................................................................................................................2

15 U.S.C. § 77k(a) ..............................................................................................9, 33

15 U.S.C. § 77*l*(a)(2) ...........................................................................................2, 10

15 U.S.C. § 77*o* .........................................................................................................2

15 U.S.C. § 78*o* .......................................................................................................34

15 U.S.C. § 78*o*(d) ..................................................................................................33

Fed. R. Civ. P. 8(a) ..................................................................................................10

Fed. R. Civ. P. 10(b) ..................................................................................................2

17 C.F.R. § 229.1111(a)(3) (2010) ..........................................................................17

17 C.F.R. § 240.13a-13(b)(3) (2010) .......................................................................33

## Other Authorities

*Asset-Backed Securities*, Securities Act Release No. 8518, Exchange Act Release
    No. 50,905, 70 Fed. Reg. 1506 (2005) ..............................................................33

Allen Ferrell & Atanu Saha, *Securities Litigation and the Housing Market
    Downturn*, 35 J. Corp. L. 97 (2009) ...................................................................8

Talcott J. Franklin et al., *Mortgage and Asset Backed Securities Litigation
    Handbook* § 1:5 (2010) ......................................................................................1

Prospectus Supplement for Merrill Lynch Investors Trust, Series 2007-SD1,
    *available at* www.sec.gov/Archives/edgar/data/
    1389457/000095012307008520/x35800b5e424b5.txt .................................20, 21

SEC Form 10-D, Part I, Item 1, *available at*
    http://www.sec.gov/about/forms/form10-d.pdf ..................................................33

SEC Form 10-K, General Instruction J(1)(j), *available at*
    www.sec.gov/about/forms/form10-k.pdf ...........................................................33

Defendants Merrill Lynch & Co., Inc. ("Merrill Lynch"), Merrill Lynch Mortgage Investors, Inc. ("MLMI"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S"), Matthew Whalen, Paul Park, Brian T. Sullivan, Michael M. McGovern, Donald J. Puglisi, and Donald C. Han (collectively, "the Individual Defendants" and, with ML & Co, MLMI, and MLPF&S, the "Merrill Lynch Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Amended Class Action Complaint (the "Amended Complaint," or "AC") and to strike certain allegations.

## PRELIMINARY STATEMENT

Plaintiffs are sophisticated institutional investors that allege they purchased mortgage pass-through certificates (the "Certificates"), a type of mortgage-backed securities ("MBS"), securitized by affiliates of defendant Merrill Lynch.  Collectively, Plaintiffs allege they acquired securities in 19 separate offerings during the period February 2006 through September 2007.  As was fully disclosed, with some exceptions, the residential mortgages included in the issuing trusts were so-called "sub-prime" mortgages, that is, mortgages made to borrowers with poor credit[1] or originated with little or no documentation from the borrower.

This Court has already identified some of the defects in Plaintiffs' pleading methods.  In the first Consolidated Class Action Complaint, Plaintiffs had alleged claims under the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77a to 77aa, with respect to 84 separate offerings of Certificates.  In its opinion granting in part and denying in part the defendants' motions to dismiss, this Court recognized that Plaintiffs must allege a claim with respect to each offering and dismissed the claims relating to the 65 offerings in which Plaintiffs had never purchased securities. *Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co., Inc.*, 2010 WL 2175875, at *3 (S.D.N.Y. June 1, 2010).  The Court also recognized that Plaintiffs had not tied the alleged untrue statements to each of the offerings.  Specifically,

---

[1]   Generally, FICO scores below 620 are considered "subprime." *See, e.g.*, Talcott J. Franklin et al., *Mortgage and Asset Backed Securities Litigation Handbook* § 1:5 (2010).

the Court held that "the Complaint's conclusory allegations that most of the misleading statements were contained in each of the offering statements" was not sufficient to maintain the claims relating to the 2007-CB4 Trust, because there were no specific allegations about the offering documents for that trust.[2]  *Id*. at *6.

In their Amended Complaint, Plaintiffs attempt to replead their claims relating to the 2007-CB4 trust, as well as their claims under Sections 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77*l*(a)(2), 77*o*.[3]  At Defendants' request, the Court directed Plaintiffs to conform the Amended Complaint to Fed. R. Civ. P. 10(b), by stating their claims relating to each offering as a separate count.[4]  Now that they have done so, it is apparent that the defect the Court noted with respect to the 2007-CB4 Trust has not been cured and, indeed, affects many of the counts, and that the Amended Complaint is flawed for the additional reasons outlined below.

First, the Amended Complaint fails to allege any actionable disclosures.  Plaintiffs challenge statements in the offering materials regarding, essentially, three topics:  (i) that the appraisals for the underlying mortgage loans were inflated (AC ¶¶ 7-8, 173-186); (ii) that statements relating to the ratings assigned to the Certificates were false because the ratings were inflated (*id*. ¶¶ 7-8, 187-206); and (iii) that the disclosures relating to the loan originators'

---

[2]   The Court's opinion appears to dismiss the claims relating to the 2007-CB4 Trust offering only as to defendants J.P. Morgan and ABN AMRO.  *Public Employees' Retirement System of Mississippi*, 2010 WL 2175875, at *6.  The Court's rationale, however, that no misleading statements had been alleged with respect to that offering compels dismissal of the claim against all defendants, particularly now that the claim relating to that trust has been stated as a separate count.  (AC ¶¶ 298-310, Count VII).

[3]   Notably, Plaintiffs made no effort to re-plead many of the claims that were dismissed without prejudice, including their original claim that the Individual Defendants were liable as control persons and that Merrill Lynch was a statutory underwriter.  *Public Employees' Retirement System of Mississippi*, 2010 WL 2175875, at *5, *8.

[4]   The Amended Complaint does separate into distinct counts the claims under Section 11 of the Securities Act, 15 U.S.C. § 77k, with respect to each offering, but the claims under Sections 12(a)(2) and 15 are again lumped into single counts.

underwriting practices were false because the originators supposedly did not follow their own guidelines.  (*Id*. ¶¶ 7-8, 53-172).

As to the first two categories (appraisals and ratings), several courts in this district and elsewhere have held that nearly identical allegations are subject to dismissal because both appraisals and investment ratings are statements of opinion, not facts, which are actionable only if the complaint "alleges that the speaker did not truly have the opinion at the time it was made public." *Tsereteli v. Residential Asset Securitization Trust*, 692 F. Supp. 2d 387, 393 (S.D.N.Y. 2010); *see also Good Hill Partners L.P. v. WM Asset Holdings Corp.*, 583 F. Supp. 2d 517, 520 (S.D.N.Y. 2008) (Rakoff, J.).  The Amended Complaint is devoid of any such allegations and should be dismissed for the same reason.

The claims relating the loan originators' alleged deviations from their underwriting standards are also subject to dismissal.  In its June 14 Opinion, the Court concluded that Plaintiffs had alleged "repeated deviation from established underwriting standards" for loans underlying the Certificates.  It bears emphasis, however, that the cited allegations related only to loans originated by Countrywide Home Loans, Inc. ("Countrywide"), which had supplied mortgages for only 2 of 19 offerings remaining in the case.  *Public Employees' Retirement System of Mississippi*, 2010 WL 2175875, at *5.  As with all of the allegations, the underwriting allegations must be tested on a count-by-count, offering-by-offering basis.  *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 114-15 (2d Cir. 1982) ("[I]t is important that the wheat in plaintiff's pleading be separated from the chaff.").  Plaintiffs have failed to allege that each of the loan originators that supplied many of the other offerings disregarded their underwriting standards.  For example, Plaintiffs' allegations relating to First Franklin Financial ("First Franklin"), which originated the loans underlying five of the remaining offerings (Counts III, IV, V, VI, XI), are comprised of only a single confidential witness who purportedly disagreed with some of the appraisals First Franklin obtained, and allegations concerning First Franklin's former parent company that have no bearing on First Franklin's underwriting protocol.  (AC ¶¶ 107-08).

3

Second, the Amended Complaint is deficient as to all counts because Plaintiffs cannot allege facts tying their allegations to the loans underlying the Certificates. It appears that Plaintiffs will argue that the ratings downgrades and allegedly high delinquency rates on the underlying loan pools are an adequate proxy for showing that the loans in each trust were tainted by the conduct alleged in the Amended Complaint. The problem with this argument is that comparable MBS have suffered similar downgrades and delinquency rates. Delinquency rates are now 50% or higher for subprime mortgages included in MBS originally issued in 2006 and 2007 and the vast majority of MBS issued in those years have, like the Certificates, been downgraded by the rating agencies. Thus, citing the downgrades and delinquencies for the offerings at issue here does nothing to "raise [plaintiffs'] right to relief above the speculative." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Third, Plaintiffs have not suffered any cognizable injury as a result of the purported violations of the Securities Act. Plaintiffs purchased only senior-ranked Certificates that have priority rights to the cash flows from the underlying mortgage loans. Although they allege that the loan pools have high delinquency rates (like similar subprime loans in the current market), Plaintiffs have continued to receive all of their principal and interest. Indeed, with respect to five of the offerings, the Certificates Plaintiffs purchased *have already been paid off in full*. Plaintiffs have clearly not suffered any injury relating to these Certificates.

Fourth, Plaintiffs are required, but have failed, to allege actual reliance on the alleged misrepresentations as to those Certificates that they purchased well more than a year after the applicable offering. There is no presumption of reliance under Section 11 where the plaintiff purchased its securities after twelve or more months of post-offering earnings statements are made available to security holders.

Lastly, Plaintiffs have not cured the defects in the claim for control person liability against Merrill Lynch because they have not alleged a primary violation of the Securities Act by MLMI, the allegedly controlled entity, and have not alleged that Merrill Lynch controlled MLMI or had any culpable participation in the purported violations.

4

For the reasons set forth below, Plaintiffs' claims should be dismissed with prejudice.

## FACTUAL BACKGROUND[5]

**A.     The Securitization Process**

The Certificates are asset-backed securities, which entitle the holder to the cash flows from a defined pool of assets – in this case residential mortgage loans.  (AC ¶¶ 4, 32, 37, 41, 47).  The Certificates are divided into "tranches" bearing different risk profiles and credit ratings based on the priority rights to cash payments generated by the underlying loans.  (*Id.* ¶ 35).  Senior tranches are paid first and any losses to the underlying loans are applied in reverse order of seniority.  (*Id.*).  In addition to this subordination feature, the Certificateholders have credit enhancements such as overcollateralization, which represents the amount by which the principal and interest on the underlying mortgage loans exceeds the principal balance and interest rate for the Certificate tranches, serving as a cushion against defaults in the loan pools.  (*Id*. ¶¶ 47-48).  Here, Plaintiffs purchased only senior tranches and are entitled to significant protection from defaults in the underlying loan pools.  *See* Ex. 1 (Plaintiffs' certifications regarding purchases and sales of certificates, Attachments 1-5 to the Consolidated Complaint).[6] Indeed, Plaintiffs have continued to receive all the principal and interest they are owed and five of their Certificates have been paid off in full.  *See* Exs. 11 - 15 (certificateholder reports for MLMI 2006-FM1, MLMI 2006-RM3, MLMI 2006-AHL1, MLMI 2006-WMC1, FFML 2007-A).

Each series of Certificates is backed by a separate pool of loans, which have been assigned to an issuing trust unique to each offering.  (AC ¶ 32).  In total, the Certificates are

---

[5]   Plaintiffs' well pleaded allegations of fact – and not conclusory assertions – are accepted as true for purposes of this motion only.  *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 160 (S.D.N.Y. 2003) (Rakoff, J.).  This Court may also consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

[6]   References to "Ex. __" are to the accompanying Declaration of Jay B. Kasner.

5

backed by over 88,680 loans on geographically diverse properties originated over a 10-year period.  There were at least 23 banks and mortgage companies that originated the underlying mortgage loans.  (*Id*. ¶¶ 61-172).  For each offering, the "sponsor" either originated the loans or, in most cases, purchased them from one or more loan originators.  (*Id*. ¶ 34).  The sponsor in turn transferred the loans to the "depositor," in this case Defendant MLMI, which deposited the loans into the issuing trust.  The issuing trust, in turn, sold the Certificates to underwriters for sale to investors.   None of the remaining defendants were involved in originating the loans.

**B.     The Offering Materials**

The Certificates were registered pursuant to one of three shelf registration statements filed with the Securities and Exchange Commission ("SEC") by MLMI, respectively, on August 5, 2005, December 21, 2005 and February 2, 2007 (the "Shelf Registration Statements").  (*Id*. ¶ 50).  Each offering included a base prospectus (the "Prospectus") and a prospectus supplement (the "Prospectus Supplement").  (*Id*. ¶¶ 37, 51).

The Prospectus Supplements, which were unique to each offering, each contained extensive details regarding the pool of loans securing the offering.  Among other things, each included a comprehensive breakdown of the credit scores of the loan applicants, LTV ratios, the percentage of loans which lacked full-documentation, and product types (including riskier adjustable rate mortgage loans or balloon loans).  (*Id*. ¶ 53; *see, e.g.*, Ex. 19 at A-II-2 – A-II-7 (FFML 2007-2)).

The offering materials included prominent and substantial warnings regarding the matters that are the subject of the alleged untrue statements in the Amended Complaint.  (*See* Exs. 16 - 34.)  Among other things, investors were warned that many of the underlying mortgages were subprime loans which could experience significantly higher delinquency rates than more traditional loans,[7] *e.g.*, Ex. 24 at S-19 (MLMI 2006-WMC1) ("Delinquencies and

---

[7]     MLMI MLCC 2006-2 is an exception, being comprised primarily of "jumbo" loans, loans with large principal balances made mostly to prime borrowers.  *See* Ex. 27 at A-II-1 – A-II-34 (MLCC 2006-2).

liquidation proceedings are more likely with these mortgage loans than with mortgage loans that satisfy such credit standards."), and that the loans were more susceptible to loss in the event of an overall decline in real estate values, *e.g.*, Ex. 28 at S-20-21 (MLMI 2006-RM3) ("[C]hanges in the values of mortgaged properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the mortgage loans than on mortgage loans originated in a more traditional manner.  Similarly, an overall general decline in residential real estate values could cause a particularly severe decline in the value of the mortgaged properties relating to mortgage loans in the trust fund.").

      Later-issued Prospectus Supplements disclosed additional warnings, as the housing market began to turn.  *E.g.* Ex. 16 at S-13 – S-14 (MANA 2007-F1) ("[T]he residential mortgage market in the United States has recently encountered a variety of difficulties and changed economic conditions that may adversely affect the performance or market value of your certificates. . . . A continued decline or an extended flattening in [real estate values] may result in additional increases in delinquencies and losses on residential mortgage loans . . . .").  Several of the Prospectus Supplements disclosed that many loan originators were suffering financial difficulties and that some had filed for bankruptcy.  *E.g.* Ex. 23 at S-11 (C-BASS 2007-CB4) ("[S]everal residential mortgage loan originators who originate subprime mortgage loans have recently experienced serious financial difficulties and, in some cases, bankruptcy, including People's Choice Home Loan, Inc. and New Century Mortgage Corporation, two of the originators of the mortgage loans, which filed for bankruptcy protection . . . .").

      The offering materials further warned that there may be no secondary market for the Certificates.  *E.g.* Ex. 30 at S-25 (MLMI 2006-FM1) ("It is possible that a secondary market for the offered certificates will not develop or that your investment may not be liquid. Lack of liquidity could result in a substantial decrease in the market value of your certificates.").  They also included warnings regarding the limited utility of the investment ratings assigned to the Certificates, *e.g.*, Ex. 18 at S-22 (MANA 2007-AF1) ("Ratings on the Certificates Do Not Address All of the Factors You Should Consider When Purchasing Certificates. . . . ").  Finally,

the offering materials warned of the potential inadequacy of the credit enhancements.  Ex. 16 at
S-17 (MANA 2007-F1) ("The subordination and loss allocation features . . . are intended to
enhance the likelihood that holders of more senior classes of certificates will receive regular
payments of interest and principal, but are limited in nature and may be insufficient to cover all
losses on the mortgage loans.").

## C.    The Decline of Real Estate Markets and Resulting Credit Crisis

The collapse of the housing market in 2007 and 2008 precipitated a crisis in both
the mortgage markets and broader credit markets nationwide.[8]  As housing prices flattened and
then collapsed, delinquencies and foreclosures began to rise dramatically.  Contrary to the
inference Plaintiffs would like the Court to draw, just because there have been high
delinquencies and foreclosures on loans, does not mean that loan originators' purported disregard
of their underwriting standards is to blame.  Indeed, it is widely recognized that the collapse in
housing prices was the primary driver of delinquencies, as borrowers could no longer rely on the
appreciation in their property to refinance loans.  *See* Allen Ferrell & Atanu Saha, *Securities
Litigation and the Housing Market Downturn*, 35 J. Corp. L. 97, 106 (2009) ("[T]here is
substantial evidence in the academic literature that the decline in housing prices was in fact

---

[8]    Courts have routinely taken judicial notice of the current economic crisis, as well as prior
market downturns.  *See Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.*, 652 F.
Supp. 2d 576, 577 (E.D. Pa. 2009) ("There can be no serious dispute that after Plaintiffs
purchased the mortgage-backed securities at issue, the mortgage industry and mortgage-
backed securities have faced historically unprecedented declines with widespread
consequences."); *Bloomberg L.P. v. Board of Governors of Federal Reserve System*, 649 F.
Supp. 2d 262, 266 (S.D.N.Y. 2009); *Amida Capital Mgmt. II, LLC v. Cerberus Capital
Mgmt., L.P.*, 669 F. Supp. 2d 430, 433 (S.D.N.Y. 2009) ("July 2007 marked the beginning of
what was then called the 'credit crunch,' the first phase of the financial crisis that culminated
in the fall of 2008."); *City of Cleveland v. Ameriquest Mortgage Sec., Inc.*, No. 09-3608,
2010 WL 2901049, at *7-8 (6th Cir. July 27, 2010) (discussing impact and origins of
subprime mortgage crisis).  *See also In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
289 F. Supp. 2d 416, 419 (S.D.N.Y. 2003) (taking judicial notice of the internet bubble);
*Virtual Countries, Inc. v. Republic of S. Afr.*, 148 F. Supp. 2d 256, 267 n.12 (S.D.N.Y. 2001)
(taking judicial notice of the Internet market decline in 2000).

substantially more important as an explanatory factor for the spike in delinquencies and
foreclosures in 2007 and 2008 than poor underwriting quality.").

The performance of residential MBS, including both prime and subprime MBS,
has deteriorated substantially across the board.  Subprime MBS issued in 2006 and 2007 have
been hit particularly hard.  MBS pools from this vintage currently have delinquency rates near
50%.  *See* Exs. 8 at 2 and 9 at 2-3 (reports from Fitch, Moody's).   The vast majority of MBS
issued in those years have, like the Certificates, been downgraded by the rating agencies.  For
example, according to rating agency Fitch, 90% of subprime MBS issued in 2007 with an initial
AAA rating – and virtually all lower-rated tranches – have been downgraded as of June 2010.
*See* Ex. 8, Fitch RMBS Performance Update, July 2010, at 4.

Concurrently with the housing price correction, the subprime lending industry
essentially collapsed.  Dozens of subprime loan originators were acquired, closed, or filed
bankruptcy.  *See* Ex. 3, Worth Civils and Mark Gongloff, *Subprime Shakeout*, Wall Street
Journal Online (list of more than 100 companies that originated subprime loans had closed shop,
been acquired, or stopped originating loans through September 2007).

## ARGUMENT[9]

### THE AMENDED COMPLAINT
### SHOULD BE DISMISSED WITH PREJUDICE

## I.    PLAINTIFFS HAVE FAILED TO ALLEGE A CLAIM UNDER
## SECTIONS 11 AND 12(a)(2) OF THE SECURITIES ACT

### A.    Plaintiffs' Claims Must Comply with the Pleading Standards
### Set by the Supreme Court in *Twombly* and *Iqbal*

Section 11 of the Securities Act imposes liability for a registration statement that
"contained an untrue statement of a material fact or omitted to state a material fact required to be
stated therein or necessary in order to make the statements therein not misleading."  15 U.S.C.
§ 77k(a).  Section 12(a)(2) of the Securities Act imposes liability for "a prospectus or oral

---

[9]    A schedule identifying each count of the Amended Complaint and the arguments applicable
to it is attached as Schedule A.

communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading."  15 U.S.C. § 77*l*(a)(2).

Whether Plaintiffs have stated a claim is governed by the pleading standards of Fed. R. Civ. P. Rule 8(a), as recently interpreted by the Supreme Court in *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A complaint must plead "[f]actual allegations . . . to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555-56.  The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *Iqbal*, 129 S. Ct. at 1949; there must be enough factual detail (as opposed to conclusions) to nudge the claims "'across the line' from conceivable to plausible."  *Id*. at 1951.  "Where a complaint pleads facts that are 'merely consistent' with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* at 1949.

In analyzing the Amended Complaint, the Court should keep in mind several additional considerations.  First, Plaintiffs' claims should be tested on an offering by offering and allegation by allegation basis.  As the Second Circuit has noted, in the context of securities claims where the prospect of broad discovery itself has an *in terrorem* effect, "it is important that the wheat in Plaintiffs' pleading be separated from the chaff."  *Decker*, 681 F.2d  at 114-15 ("[A] Rule 12(b)(6) motion to dismiss need not be granted nor denied in toto but may be granted as to part of a complaint and denied as to the remainder.").  Here, each offering has a unique set of offering documents and a distinct pool of loans, originated by numerous different originators, each with their own underwriting guidelines.  Relatedly, the Court should assess separately each of the categories of purported misrepresentations and omissions – underwriting standards, loan-to-value ratios, overcollateralization, and ratings.  Courts have recognized these allegations "are factually varied and analytically distinct" and those that do not pass muster should be dismissed.

*New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*, 2010 WL 1473288, at *7
(S.D.N.Y. Mar. 29, 2010).[10]

      Second, the plausibility of Plaintiffs' claims should be measured with reference to
the market conditions that have prevailed since the offerings.  *Iqbal*, 129 S. Ct. at 1950
(analyzing complaint is "a context-specific task that requires the reviewing court to draw on its
judicial experience and common sense").  Plaintiffs allege that the mortgage loan pools have
performed poorly and that the Certificates have been downgraded, but this occurred during a
period in which similar loans have also performed poorly and similar MBS have been
downgraded.  So, the inference that the performance of the Certificates here is attributable to
misrepresentations is inherently weak and speculative.  *Cf. First Nationwide Bank v. Gelt
Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) ("[W]hen the plaintiff's loss coincides with a
marketwide phenomenon causing comparable losses to other investors, the prospect that the
plaintiff's loss was caused by the fraud decreases.").

      Third, a plaintiff must at the least allege facts from which the court could
conclude that any alleged misrepresentations were material.  Here, the Amended Complaint's
conclusory allegations' lack of specificity and Plaintiffs' failure to tie their allegations to the
loans included in the various trusts does not provide any basis to determine materiality.  *See ECA
& Local 134 IBEW Joint Pension Trust  v. JP Morgan Chase Co.*, 553 F.3d 187, 206-07 (2d Cir.
2009) (affirming dismissal of Section 11 claims for lack of materiality); *Garber v. Legg Mason,
Inc.*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008) (Section 11 and 12(a)(2) claims were "too
conclusory, as they offer no possibility at all of assessing materiality . . . .").

---

[10]  *See, e.g.*, *Tsereteli*, 692 F. Supp. at 390, 392-96 (dismissing allegations concerning appraisals,
LTV ratios, ratings, and rating methodologies while allowing underwriting allegations to go
forward); *In re IndyMac Mortgage-Backed Sec. Litig.*, 2010 WL 2473243 (S.D.N.Y. June 21,
2010) (same); *New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*, 2010 WL
1473288 (S.D.N.Y. Mar. 29, 2010) (same); *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F.
Supp. 2d 485 (S.D.N.Y. 2010) (same); *New Jersey Carpenters Vacation Fund v. Royal Bank
of Scotland Group, PLC*, 2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010) (dismissing
allegations concerning credit enhancements, ratings, and ratings methodology).

**B.      The Allegations Drawn from Pleadings in Unproven Cases and Vague Confidential Witness Accounts Should Be Disregarded in Assessing the Amended Complaint**

In this Circuit, "paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed.R.Civ.P. 12(f)" and should be stricken. *RSM Production Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009) (citing *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 892-94 (2d Cir. 1976)), *aff'd*, No. 09-1202-cv, 2010 WL 2838582 (2d Cir. July 21, 2010); *see also In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78-79 (S.D.N.Y. 2003) (Pollack, J.); *Dent v. United States Tennis Ass'n*, 2008 WL 2483288, at *3 (E.D.N.Y. 2008) ("In addition to being inadmissible as hearsay, unproved allegations of misconduct are not proof of anything.").  Among other reasons, Plaintiffs are not permitted to rely on investigations conducted by counsel in other cases because their duty to investigate the factual basis for their claims is "nondelegable." *Pavelic & LeFlore v. Marvel Entm't Group*, 493 U.S. 120, 126 (1989); *see also In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005-06 (N.D. Cal. 2008).

Here, the Amended Complaint is drawn largely from civil complaints that have not been adjudicated, as well as investigations and complaints filed by state attorneys general that have not resulted in proven claims.  For example, Plaintiffs' allegations relating to Countrywide, WMC Mortgage Corp. ("WMC") and GreenPoint Funding, Inc. ("GreenPoint") are either primarily or extensively drawn from complaints or reports of government investigations. (AC ¶¶ 64-85, 120-121, 164-166).

In addition, large swaths of the Amended Complaint are based on accounts by anonymous witnesses, designated "CWs."  While such allegations are not per se improper, they are inherently suspect and speculative.  *See Pyramid Holdings, Inc. v. Inverness Medical Innovations, Inc.*, 638 F. Supp. 2d 120, 127-28 (D. Mass. 2009).  In *Pyramid Holdings*, plaintiffs offered statements from twenty confidential witnesses in support of their Securities Act claims relating to statements in defendant's offering materials concerning problems encountered in

12

integrating numerous recent acquisitions.  *Id*. at 127-29.  The court found that "[s]ubjective

generalizations [by confidential witnesses] are insufficient to justify allegations of . . . problems."

*Id*. at 127.  Contentions such as "billing errors forced [the company] to write off collections it

was otherwise due" were inadequate, because plaintiffs failed "to plead how many collections

[the company] was forced to write off, what the value of those collections was, what percentage

of the total value of collections it represented, what the total value of all collections was, relative

to other business assets, and so on."  *Id.*  Allegations regarding a 65% increase in customer

complaints were dismissed as "too anecdotal to support claims of major . . . problems" or lacking

in "sufficient context for its true meaning or impact to be discernible."  *Id*. at 128.  The court

fundamentally concluded that "Lead Plaintiff must provide more than 'tales from the trenches'

from a score of former [company] employees."  *Id.  Pyramid Holdings* offers a clear

demonstration of how the statements of confidential witnesses in the Amended Complaint,

composed overwhelmingly of anecdotes of personal observation by lower-level employees, do

not adequately plead an actionable claim under Sections 11, 12, and 15 of the Securities Act.

These allegations, and all allegations similarly constructed, should be disregarded.

        **C.**      **Plaintiffs Fail to Allege Any Untrue Statement or
Misleading Omissions Regarding Appraisals,
Loan-to-Value Ratios, Overcollateralization, and Ratings**

                **1.**      **Appraisals and Loan-to-Value Ratios Are
Opinions and Not Actionable Under Section 11 or 12(a)(2)**

        Plaintiffs' allegations relating to the supposed inflation of appraisals and loan-to-

value ("LTV") ratios are nearly identical to allegations made in other actions involving MBS

offerings.  A series of recent decisions have held that Section 11 and 12(a)(2) claims based on

such allegations are subject to dismissal because they involve opinions and not actionable

misrepresentations.  This Court has recognized that statements in offering materials relating to

matters of opinion are generally not actionable under the Securities Act.  *Good Hill Partners L.P.*,

583 F. Supp. 2d at 520.  As to real property appraisals, Judge Kaplan observed:  "[N]either an

appraisal nor a judgment that a property's value supports a particular loan amount is a statement

of fact.  Each is instead a subjective opinion based on the particular methods and assumptions the appraiser uses.  A subjective opinion is actionable under the Securities Act only if the amended complaint alleges that the speaker did not truly have the opinion at the time it was made public."  *Tsereteli*, 692 F. Supp. 2d at 393.

The loan-to-value ratio is a simple ratio of the loan amount to the appraised value. Thus, the allegations concerning supposedly false and misleading disclosures relating to loan-to-value ratios are "completely derivative of . . . improper appraisal practices" allegations and therefore stand or fall with the appraisal claims.  *Id.*; *see also In re IndyMac*, 2010 WL 2473243, at *10-11; *DLJ Mortgage*, 2010 WL 1473288, at *7-8.

Here, Plaintiffs allege that the Prospectus Supplements "failed to disclose that Loan-to-Value Ratios would have been higher if the underlying properties were appraised according to pre-established, independent appraisal procedures and in accordance with [Uniform Standards of Professional Appraisal Practice ("USPAP").]"  (AC ¶ 186).  Plaintiffs add general allegations about appraisers being pressured, and vague accounts of confidential witnesses who thought some appraisals were "overinflated."  (*Id.* ¶ 183).  These allegations are insufficient to show that a vast group of independent appraisers violated USPAP for the tens of thousands of loans at issue here.  *In re IndyMac*, 2010 WL 2473243, at *10.  In *IndyMac*, the plaintiffs made four allegations to support a similar claim:  (1) congressional testimony given by Alan Hummel, chair of the Appraisal Institute's Governmental Relations Committee (that Plaintiffs here have cited in their complaint at AC ¶ 180), (2) "bald allegations" that bank employees would pressure appraisers into submitting artificially high appraisals, (3) confidential witnesses, who gave their opinion that there were "shoddy appraisals" and that "brokers who made the loans chose the appraisers," and (4) and a report from the Department of the Treasury's Office of Inspector General ("OIG"), criticizing IndyMac's appraisal quality, including the fact that IndyMac "accepted appraisals that were not in compliance with USPAP."  *In re IndyMac*, 2010 WL 2473243, at *10.

14

The court found that these allegations, individually and collectively, were insufficient. Judge Kaplan pointed out that Mr. Hummel's testimony was "nothing more than one man's opinion about the state of the appraisal industry generally at the time of his testimony on June 26, 2007. It not only says nothing about the USPAP standards, but also does not support any inference about the appraisals used to originate the mortgages underlying the Certificates." *Id*. Next, the allegations of poor appraisals and supposed conflicts of interest between the appraisers and the loan originators contained "insufficient factual amplification to support a plausible inference that the appraisers of the properties underlying the Certificates were subjected to pressure or that they succumbed to it in a way that violated USPAP." *Id*. Judge Kaplan dismissed the statements of the confidential witnesses as well, noting that the allegations "say[] nothing at all about whether the appraisals were made in accordance with USPAP." *Id*.

Lastly, in *Tsereteli*, the court gave three reasons why the OIG's statement that IndyMac's appraisals "contained weaknesses," "often [were] questionable" and were "not in compliance with the [USPAP]" were insufficient to state a claim. *Tsereteli*, 692 F. Supp. 2d at 393 (first alteration in original). First, "neither an appraisal nor a judgment that a property's value supports a particular loan amount is a statement of fact. Each is instead a subjective opinion based on the particular methods and assumptions the appraiser uses." *Id*. As such, the opinions are actionable only if there are allegations that the speaker did not truly have the opinion at the time of the statement. Second, the statements were simply legal conclusions that did not gain weight simply because they were stated by the OIG rather than by plaintiffs alone. *Id*. Third, Plaintiffs use of the report was misleading, because it reported only "instances" of non-conforming loans out of twenty-two analyzed by the OIG, which was not enough to "support the allegation that the loans in the pool underlying the Certificates were made on the basis of appraisals that did not conform to USPAP. . . . Nor does [the complaint] contain any suggestion that the loans the OIG examined were in the pools underlying the Certificates." *Id*. at 394.

Judge Kaplan's analyses in *In re IndyMac* and *Tsereteli* are directly on point here. Plaintiffs' allegations are of the same type, character, paucity, and in some instances, the very

same as found in those two cases.  Thus, Plaintiffs' claims here concerning alleged untrue

statements regarding appraisals and loan-to-value ratios should be dismissed.

### 2.   Investment Ratings and Credit Enhancements Are Not Actionable Under Section 11 or 12(a)(2)

Allegations concerning ratings and credit enhancements should be dismissed on

the same grounds.  Plaintiffs allege that "the Certificates were not protected with the level of

credit enhancement and overcollateralization represented to investors. . . ."  (AC ¶ 192).

Plaintiffs also alleged that the investment ratings were misrepresented because "the Rating

Agencies used flawed information and models to generate their ratings, the ratings assigned to

the Certificates did not accurately reflect their risk."  (AC ¶ 206).  These precise allegations have

been repeatedly rejected by courts in this district.  *See Royal Bank of Scotland Group*, 2010 WL

1172694, at *14; *Lehman Bros.*, 684 F. Supp. 2d at 494 (dismissing allegations concerning credit

enhancements and ratings based on out-of-date models); *Tsereteli*, 692 F. Supp. at 393 (same); *In

re IndyMac*, 2010 WL 2473243, at *10-11 (same); *DLJ Mortgage*, 2010 WL 1473288, at *7-8

(same); *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, 2010 WL 1257528, at

*6 (S.D.N.Y. Mar. 31, 2010) (same); *Plumbers' Union Local No. 12 Pension Fund v. Nomura

Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 309-10 (D. Mass. 2009) (same).

As Judge Baer explained in *Royal Bank of Scotland Group*, the allegations

concerning outdated models and inadequate credit enhancement are properly dismissed for

several reasons.  First, the offering materials adequately bespeak caution "about the risks entailed

by the credit ratings and credit enhancements."  *Royal Bank of Scotland Group*, 2010 WL

1172694, at *14.  Furthermore, Plaintiffs' allegations, even if interpreted to say that Prospectus

Supplements failed to disclose existing risks, "fail as they are hindsight allegations.  The

[certificates] actually received the ratings listed in the prospectus supplements, and Plaintiffs do

not allege to the contrary, so there is no misstatement on the face of the documents.  'The truth of

a statement made in the prospectus is adjudged by the facts as they existed when the registration

statement became effective.'"  *Id.*  (quoting *In re Agria Corp. Sec. Litig.*, 672 F. Supp. 2d 520,

16

526 (S.D.N.Y. 2009)).  Lastly, similar to the allegations regarding appraisals and loan-to-value

ratios, "credit ratings and the relative adequacy of protective credit enhancements are statements

of opinion, as they are predictions of future value and future protection of that value.  [A]ccurate

statements of historical fact and statements of opinion, including statements of hope, opinion, or

belief about . . . future performance or general market conditions are non-actionable under

Section 11 or 12(a)(2)."  *Id.*  (internal citations and quotation marks omitted).

        **D.**      **Plaintiffs' Allegations Concerning the Failure by**
                  **Loan Originators to Comply with Underwriting Guidelines**
                  **Fail to Allege an Untrue Statement or Omission**

As explained above, the offering materials explained that loan pools included

risky products such as stated income loans, option-ARM loans, and that borrowers often had

poor credit ratings.  The offering materials also "bespoke caution," warning that the collateral

was uniquely susceptible to economic conditions, including downturns in the housing market.

The offering materials also typically disclosed that the loan originators had discretion to deviate

from their stated underwriting.  This is all the disclosure that was required by the securities laws.

Indeed, Section 1111 of SEC Regulation AB, which governs the required disclosures for asset

backed securities, requires disclosure of the extent to which underwriting criteria "are or could be

overridden" only "to the extent known."  17 C.F.R. § 229.1111(a)(3) (2010).  There is no

allegation that the defendants knew of any undisclosed overrides to underwriting criteria.

In the face of such disclosures and cautionary language, several courts have

dismissed similar claims under the Securities Act.  *See, e.g.*, *Nomura Asset*, 658 F. Supp. 2d at

305-07; *see also City of Ann Arbor Employees' Retirement System v. Citigroup Mortgage Loan

Trust Inc.*, 2010 WL 1371417, at *10 (E.D.N.Y. Apr. 6, 2010) (requiring plaintiffs to replead

insufficient allegations concerning underwriting standards).  Courts that have permitted claims

based on the loan originators alleged disregard of underwriting standards have focused on

allegations showing that the loan originators *systematically* disregarded even the loose

underwriting standards that prevailed with respect to subprime loans.  *In re IndyMac*, 2010 WL

2473243, at *9 ("The crux of plaintiffs' claims, however, is that IndyMac Bank ignored even

those watered-down underwriting standards, including the standards for granting exceptions to the guidelines . . . ."); *see also Lehman Bros.*, 684 F. Supp. 2d at 493 (the complaint "alleges that the originators systematically failed to follow the underwriting guidelines"); *Royal Bank of Scotland Group*, 2010 WL 1172694, at *11 ("[S]tatements about the guidelines were themselves incorrect because the originators 'totally disregarded' them.").

Here, the Court had the opportunity to review the allegations in the Consolidated Complaint.  In its June 14 Opinion, the Court concluded that Plaintiffs had alleged "repeated deviation from established underwriting standards" for loans underlying the Certificates.  It bears emphasis, however, that the cited allegations related only to loans originated by Countrywide Home Loans, Inc., which had supplied mortgages for only 2 of 19 offerings remaining in the case, Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1 and Merrill Lynch Mortgage Investors Trust Series 2006-A1, at issue in Counts II and XVIII.  Plaintiffs have failed to allege that the loan originators that supplied loans for many of the other offerings disregarded their underwriting standards on a systematic basis.  As set forth below, at the very least, the counts relating to these offerings should be dismissed.

### 1.     First Franklin

First Franklin originated 100% of the loans included in five of the offerings, Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2 (Count III), Series 2007-3 (Count IV), Series 2007-4 (Count V), Series 2007-A (Count VI) and Merrill Lynch Mortgage Investors Trust, Series 2006-FF1 (Count XI).

Plaintiffs have not even come close to alleging that First Franklin systematically ignored its underwriting standards.  To be sure, Plaintiffs offer an *ipse dixit* that "First Franklin's loans suffered from the same problems as the rest of the industry . . . ." (AC ¶ 108).  But this is not a fact; it is a conclusion that cannot be credited on a motion to dismiss.  *See Tsereteli*, 692 F. Supp. at 393 (allegation that "IndyMac Bank's appraisals 'were not in compliance with'" appraisal standards was a legal conclusion).  The only purported "fact" recited in the Amended Complaint that even arguably relates to First Franklin's underwriting practices is the account of

"CW10" an underwriter who supposedly "estimated that one in four appraisals reviewed at First Franklin was overinflated." (AC ¶ 107). As discussed above, vague accounts by anonymous witnesses cannot satisfy Plaintiffs' pleading burden. *See Pyramid Holdings*, 638 F. Supp. 2d at 127-28. And a difference of opinion regarding appraisals performed by professional appraisers is not actionable for the reasons described above, *supra* at I(C)(1), and certainly does not amount to an indictment of First Franklin's entire, nationwide loan underwriting process. *See In re IndyMac*, 2010 WL 2473243, at *10 (accounts by two anonymous sources that Indy Mac's appraisals were "shoddy" insufficient to allege that appraisals did not comply with professional standards).

Plaintiffs also make allegations concerning a dispute between Merrill Lynch and National City, First Franklin's former parent company, as well as the SEC investigation into National City (*not* First Franklin). (AC ¶ 108) Plaintiffs make no effort to explain the relevance of these allegations to the underwriting procedures First Franklin used in connection with the five offerings at issue. As such, the claims relating to these offerings should be dismissed.[11]

### 2.    Ownit

Ownit Mortgage Solutions ("Ownit") originated the loans included in Ownit Mortgage Loan Trust, Series 2006-2 (Count XIX). Similar to the First Franklin allegations, Plaintiffs offer accounts from confidential witnesses who thought appraisals were "higher than the actual value of properties" by some unstated amount, (AC ¶ 98), or that appraisals were not sufficiently "scrutinized," (*id.* ¶ 99). Again, these employees' difference of opinion regarding appraised value does not make out a claim. Moreover, these anonymous sources were allegedly

---

[11]    Plaintiffs also allege that in addition to originating loans, First Franklin also acquired loans from third party originators, and disregarded its loan acquisition standards when doing so. (AC ¶¶ 53-60, 106). But other than an *ipse dixit* that First Franklin "approved loans from wholesale originators without proper documentation and verification of mortgagor information," Plaintiffs provide absolutely no factual allegations to support such a claim. Thus, these and similarly bare-bone allegations regarding the loan acquisitions by Merrill Lynch Mortgage Lending ("the Merrill Sponsor") should be dismissed.

regional loan underwriters located in Atlanta, Georgia and Portland Oregon.  The Ownit 2006-2

trust contains only 233 loans from Georgia and 171 loans from Oregon, out of a pool of 3,100

loans.  Ex. 34 at A-II-4 (Ownit 2006-2).  These allegations do not address underwriting

procedures and relate to, at most, a fraction of the loans originated by Ownit.  Allegations

predicated on the opinions of low level employees at satellite offices cannot adequately support a

plausible inference that Ownit was systematically disregarding its underwriting guidelines across

the entire corporation.

                    Plaintiffs further allege that Ownit's former CEO, William Dallas, "admitted" that

Ownit "lower[ed] its underwriting standards to increase volume and originated higher-yield,

riskier loans" after Merrill invested in Ownit.  (AC ¶ 97).  Plaintiffs do not allege that these

supposedly lowered underwriting standards differed from those described in the offering

materials and, importantly, do not allege that Ownit disregarded these guidelines, let alone that it

systematically did so.  Plaintiffs do not even explain in what manner the underwriting standards

were "lowered" or by how much.[12]  Lastly, Plaintiffs cite Ownit's bankruptcy and that fact that

Merrill made claims in the bankruptcy for the repurchase of loans.  (AC ¶ 100).  These were

common problems facing many subprime loan originators.  Again, such allegations do not speak

to Ownit's supposed disregard of underwriting standards.  Plaintiffs do not allege that loans were

being put back to Ownit because of underwriting defects.  Moreover, Plaintiffs' assertion that

Merrill was making claims against Ownit to repurchase loans implies that the loans subject to the

repurchase claims were *not* included in the Ownit 2006-2 Trust.[13]

---

[12]  Presumably, Plaintiffs drew this allegation from press reports in which Dallas claimed he was
convinced to originate more low-document, stated-income loans.  *See* Vikas Bajaj &
Christine Haughney, *Tremors at the Door*, N.Y. Times, Jan. 26, 2007 (Ex. 4); Vikas Bajaj,
*East Coast Money Lent Out West*, N.Y. Times, May 8, 2007 (Ex. 5).  But the fact that the
Ownit 2006-2 trust contained low- and no-document loans, and the details of such loans, was
disclosed in the offering materials.  Ex. 34 at S-32, A-II-1 – A-II-23 (Ownit 2006-2).

[13]  Plaintiffs also point to the fact that Ownit loans were included in the Merrill Lynch Investors
Trust, Series 2007-SD1 offering after Ownit's bankruptcy filing.  This trust is not at issue in
this action and, in any event, the offering materials for that trust clearly disclosed that Ownit
had filed for bankruptcy.  *See* Prospectus Supplement for Merrill Lynch Investors Trust,

*(cont'd)*

### 3. PHH Mortgage Corporation and First Republic

PHH Mortgage Corporation ("PHH"), under a private label arrangement with Merrill Lynch Credit Corporation, and First Republic Bank originated 76.10% and 23.90%, respectively, of the loans included in MLCC 2006-2 (Count XIII).  Notably, MLCC 2006-2 was not a subprime MBS.  Rather, 898 of the 945 loans, representing 96.4% of the balance of the mortgage pool, were to borrowers with FICO scores above 650.  For 729 loans, the borrowers had FICO scores over 700.  And over 801 loans, representing over 86% of the balance, were made with full documentation.  *See* Ex. 27 at A-II-1 – A-II-34 (MLCC 2006-2).

Plaintiffs have absolutely nothing to say about First Republic Bank's underwriting procedures.  *See* AC ¶¶ 170-172.  With respect to PHH, Plaintiffs' sole allegation is that PHH "admitted in its Form 10-Q filed August 8, 2008 to 'loans with origination flaws' and that demand for its mortgages in the secondary market had therefore declined."  (AC ¶ 172).  Plaintiffs' claim of a so-called "admission" is exceedingly misleading.  The full quote from PHH's 10-Q, makes clear that it made no such admission and was only speaking generally about market conditions:

> Demand in the secondary mortgage market for non-conforming loans was adversely impacted during the second half of 2007 and through the filing date of this Form 10-Q.  The deterioration of liquidity in the secondary market for these non-conforming loan products, including jumbo, Alt-A and second lien products and *loans with origination flaws* or performance issues ("Scratch and Dent Loans"), negatively impacted the price which could be obtained for such products in the secondary market.

Ex. 2 at 4 (emphasis added).  The reference to "loans with origination flaws" refers to the "Scratch and Dent" loans, which involves the distinct market for troubled loans, in which PHH participates.  *Id*. at 3 (noting that PHH held $59 million in "Scratch and Dent" mortgage loans

---

*(cont'd from previous page)*

Series 2007-SD1, at S-16, *available at* www.sec.gov/Archives/edgar/data/ 1389457/000095012307008520/x35800b5e424b5.txt ("Ownit Mortgage Solutions Inc., an originator of approximately 16.95% of the mortgage loans, filed for Chapter 11 bankruptcy protection . . . on December 28, 2006 and is no longer originating mortgage loans.").

held for sale as of June 2008).[14]  No reasonable inference can be drawn from this statement that PHH was "admitting" to having originated flawed loans or that any scratch and dent loans were included in the MLCC 2006-2 offering.  Plaintiffs' entire claim relating to the MLCC 2006-2 offering is based on speculation and should be dismissed.

### 4.      Mortgage Lenders Network USA, Inc.

Mortgage Lenders Network USA, Inc. ("MLN") originated all or some of the mortgages in three offerings:  MANA 2007-A3 (Count I), MANA 2007-AF1 (Count II), and MLMI 2006-MLN1 (Count IX).  First, Plaintiffs do not quote any supposedly misleading statement in any of the offering materials regarding MLN's underwriting standards.  That is not surprising, because the Prospectus Supplements for these deals both expressly state that MLN had filed for bankruptcy and that "[n]either the Sponsor nor the Depositor can provide any assurance that MLN followed the stated guidelines with respect to the origination of the Mortgage Loans."  Ex. 17 at S-54 (MANA 2007-A3).[15]

Second, Plaintiffs' offer no factual allegations relating to MLN's loan origination practices.  Plaintiffs point to an increase in early payment defaults in subprime loans originated by MLN that led to repurchases by MLN (AC ¶ 168), to the closure of MLN's loan origination business in early 2007, and to requests by regulators that MLN cease making loans.  (AC ¶ 169).  These are problems that plagued many subprime originators.  Moreover, as noted above, MLN's bankruptcy was disclosed in the offering materials.  Plaintiffs make no attempt to allege what MLN's relevant underwriting standards were, or how these immaterial facts, even if true, relate to those underwriting standards.  They certainly have not alleged facts from which it could be

---

[14]   Scratch and dent loans are "loans generally outside the standard credit guidelines, and thus involve elevated risk due to document deficiencies, such as income documentation, limited or poor credit histories, or borrower defaults."  *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 954 (S.D. Ohio 2009).

[15]   A similar warning appears in the prospectus supplement of MANA 2007-AF1 for MLN, GreenPoint Mortgage Funding Inc. ("GreenPoint"), and American Home Mortgage Corp. ("AHM").  Ex. 18 at S-44 (AHM) S-47 (MLN), S-49 (GreenPoint).

inferred that MLN systematically disregarded its underwriting standards with respect to loans included in the three offerings at issue.

### 5.   First National Bank of Nevada

First National Bank of Nevada ("FNBN") originated loans in MANA 2007-A3 (Count I).  Plaintiffs' sole allegation, that the Office of the Comptroller of the Currency closed FNBN due to "'unsafe and unsound' lending practices," (AC ¶ 167), is misleading.  The actual release, attached at Exhibit 7, does not include the word "lending" at all, leaving it impossible to conclude anything about the character of FNBN or its lending practices.  Beyond this misdirection, Plaintiffs have not identified any purported misrepresentation in any offering that relate to the underwriting practices of FNBN.  Plaintiffs' allegation that FNBN was closed and put into receivership adds nothing to its claim since, as noted above, more than 100 subprime originators had suffered the same or similar fates.  *See supra* at Factual Background (C). Plaintiffs' allegations are, at best, immaterial to their claim that FNBN systematically disregarded its underwriting guidelines with respect to the loans at issue, and their claims relating to FNBN should be dismissed.

### 6.   GreenPoint Funding, Inc.

GreenPoint Funding Inc. originated some of the loans included in MANA 2007-A3 (Count I), MANA 2007-AF1, (Count II), and MLMI 2006-A1 (Count XVIII). Plaintiffs again fail to quote any purported misrepresentation in any offering with regard to GreenPoint.  Again, that is not surprising.  The Prospectus Supplement for MANA 2007-AF1 affirmatively stated that "Neither the Sponsor nor the Depositor can provide any assurance that GreenPoint followed the stated guidelines with respect to the origination of any of the Mortgage Loans."  Ex. 18 at S-49 (MANA 2007-AF1).

Moreover, Plaintiffs apparently have no information of their own regarding GreenPoint's supposed disregard of its underwriting standards.  What little they have to say is drawn from complaints in lawsuits that have not yet been resolved, which as discussed above are improperly included in the Amended Complaint and should be disregarded.  (AC ¶¶ 164-66).

Having no other allegations to stand on, Plaintiffs cannot make a plausible claim that GreenPoint systematically disregarded its underwriting guidelines, and the claims relating to GreenPoint loans should be dismissed.

### 7.    The MANA 2007-F1 Offering (Argent, IndyMac and Wachovia)

The loans included in MANA 2007-F1 (Count VIII) were originated by Ameriquest Mortgage Company and its affiliates (31.96%), IndyMac Bank, F.S.B. ("IndyMac") (12.92%) and Wachovia Mortgage Corporation ("Wachovia") (38.76%).

As to IndyMac, Plaintiffs do not quote from the offering materials. Indeed, there is no description of IndyMac's underwriting guidelines in the Prospectus Supplement, so Plaintiffs cannot identify any false statement regarding those guidelines. Moreover, Plaintiffs do not allege that IndyMac disregarded its underwriting standards. They point to IndyMac's poor performance and bankruptcy, which shows only that IndyMac suffered from the economic downturn along with many other lenders. (*See* AC ¶ 155). Plaintiffs also point to statements by IndyMac employees that claim IndyMac "loosened its lending standards along with everyone else, *though in a more responsible way*." (*Id*. (emphasis added)). But Plaintiffs do not allege that these "loosened" guidelines were systematically disregarded.

Plaintiffs make allegations concerning Argent Mortgage Company, which is an affiliate of Ameriquest that originated a portion of the Ameriquest loans included in the pool. Plaintiffs cite two allegations: the opinion of an Argent underwriter working near Chicago, Illinois for some unknown time frame, and a news article describing home loans originated by Argent in Florida (AC ¶¶ 162-63). *See* Ex. 6 (*Miami Herald* article discussing Argent activities in Florida). Thus, on the face of the allegations, the only Argent loans possibly at issue were originated in Florida and Illinois. Yet of the 1,771 loans included in MANA 2007-F1, only 234 were originated in Florida, and 53 in Illinois – and undoubtedly not all of those loans were originated by Argent, since over two-thirds of the loans in MANA 2007-F1 were originated by other companies. *See* Ex. 16 at A-II-4, S-3 – S-4 (MANA 2007-F1). There are no allegations that the practices noted in the articles affected Argent on a nationwide basis. Indeed, they

24

suggest that the conduct was not widespread.  (AC ¶ 163 ("*some* Argent employees played fast and loose with the rules" (emphasis added).)  Thus, all Plaintiffs have shown, given all favorable inferences, it is *possible* that the behavior described in the Amended Complaint applies to fewer than 287 loans out of 1,771.  But the mere possibility of a claim is not enough under the *Twombly-Iqbal* standard.

With respect to Wachovia, Plaintiffs make allegations regarding various forms of adjustable rate loans ("Pick-a-Pay" or Option ARM loans) originated by Golden West, a Wachovia subsidiary.  The problem with these allegations is that *none* of the loans included in the MANA 2007-F1 Trust were adjustable rate loans.  As set forth in the tabular annex to the Prospectus Supplement, *all* of the 1,771 loans in the pool were fixed rate loans, and most of the loans originated by Wachovia were to borrowers with high credit scores.  *Id.* at A-II-3, A-II-7 (noting weighted average FICO score for Wachovia loans of 713).  Thus, the allegations from anonymous "Option ARM personnel" who purport to describe the alleged improper use of Option ARM loans for unqualified borrowers, simply have no relevance to the loans in the MANA 2007-F1 Trust.  (AC ¶¶ 134- 37).  Plaintiffs cannot allege that the loans in that trust were originated by Golden West or that Wachovia disregarded its underwriting standards for fixed rate loans.  Given the pleading defects with respect to IndyMac, Argent and Wachovia, the claims relating to MANA 2007-F1 should be dismissed.

### 8.      WMC Mortgage

WMC Mortgage originated 100% of the loans included in MLMI 2006-WMC1 (Count XVI)  and MLMI 2006-WMC2 (Count XVII).  With respect to the loans underwritten by WMC, the Prospectus Supplements for these offerings disclosed that "[i]t is expected that a *substantial number* of the Mortgage Loans to be included in the trust fund will represent . . . underwriting exceptions."  Exs. 24 at S-33 (MLMI 2006-WMC1), 25 at S-33 (MLMI 2006-WMC2).  Faced with this disclosure, Plaintiffs have not alleged facts showing that WMC systematically made underwriting exceptions without appropriate compensating factors.

First, Plaintiffs allege that WMC ran into financial difficulties and was shut down. (AC ¶ 118). Again, the same is true of dozens of subprime loan originators, so the allegation says nothing about WMC's practices or the loans included in the two offerings at issue. Next, Plaintiffs cite a report noting that WMC originated loans in markets where loans have performed poorly – and that its loans performed poorly in those markets. (AC ¶ 119). This allegation again says nothing about the origination practices associated with those loans. Plaintiffs also cite allegations culled from a complaint filed by PMI Mortgage Insurance Co. in California state court, concerning loans included in a different offering. (AC ¶ 120). But these allegations should be stricken for the reasons stated above because they were copied from an unproven civil complaint and do not concern the loans at issue here. Lastly, Plaintiffs cite charges allegedly filed by a Washington State regulator regarding WMC's origination of loans "with unlicensed or unregistered mortgage brokers, understated amounts of finance charges on multiple loans, understated amounts of payments made to escrow companies, understated annual percentage rates by almost .5%," among others. (AC ¶ 121). As with the allegations from the PMI complaint, these unproven allegations should be stricken. In any event, the regulatory allegations concerning apparent consumer protection violations bear no relation to WMC's assessment of its borrowers' ability to repay loans, which is the subject of the alleged misrepresentations, and certainly are insufficient to sustain a plausible inference that WMC abandoned its underwriting guidelines.

### 9.   C-BASS 2007-CB4 Trust (C-BASS and New Century Lending)

In the Consolidated Complaint, Plaintiffs' were unable to allege any misrepresentations in the offering materials for the C-BASS 2007-CB4 trust. *See Public Employees' Retirement System of Mississippi*, 2010 WL 2175875, at *6 (S.D.N.Y. June 1, 2010). Plaintiffs' renewed efforts in the Amended Complaint fair no better. The Merrill Defendants incorporate by reference the arguments made by defendants JP Morgan and ABN AMRO in their motion to dismiss Count VII relating to the C-BASS 2007-CB4 Trust. It also should be noted that the allegations concerning New Century Financial Corporation, which originated a portion

26

of the loans C-BASS purchased in the secondary market and included in the C-BASS 2007-CB4 Trust are based largely on vague confidential witness accounts and, in any event are essentially the same allegations that were included in the Consolidated Complaint (and previously dismissed by the Court).  Since the offering materials do not describe New Century's underwriting guidelines, Plaintiffs cannot identify any false statement regarding them.

### 10.   Accredited Home Lenders

Accredited Home Lenders Holding Co. ("Accredited), originated the loans for MLMI 2006-AHL1 (Count XIV).  As with other originators discussed above, Plaintiffs allegations regarding Accredited consist of vague confidential witness accounts and are insufficient.  These allegations do not support a plausible inference that Accredited systematically disregarded its underwriting standards for the loans at issue.

### 11.   ResMAE Mortgage Corporation

ResMAE Mortgage Corporation ("ResMAE") originated the loans for MLMI 2006-RM3 (Count XV) and MLMI 2006-RM5 (XII).  Plaintiffs' allegations regarding ResMAE consist entirely of vague, generalized accounts of confidential witnesses, which do not support an inference that ResMAE was systematically disregarding the underwriting guidelines described in the Prospectus Supplements.  Most of the allegations focus on the allegedly high rate of exceptions allowed for loans that did not comply with the underwriting guidelines.  (AC ¶¶ 112, 115).  But the offering materials disclosed that "[a] *substantial portion* of the Mortgage Loans [would] represent such underwriting exceptions."  *See* Exs. 28 at S-34 (MLMI 2006-RM3); 32 at S-36 (MLMI 2006-RM5).  Thus, the contentions of the anonymous sources are consistent with the prospectus disclosures.  Plaintiffs also point to the alleged excessive use of "stated income" loans, but the use of and the number of such loans in the loan pools was also disclosed.  *See* Exs. 28 at S-33 – S-35 (MLMI 2006-RM3), A-II-1 – A-II-27; 32 at S-35 – S-37, A-II-1 – A-II-25 (MLMI 2006-RM5).   Moreover, the anecdotal accounts by CW19 and CW21, an "area credit manager," and a "regional credit manager" do not give rise to an inference that ResMAE was ignoring its underwriting guidelines on a systematic basis nationwide.  (AC ¶¶ 111, 115).  These

job titles suggest familiarity with only isolated portions of ResMAE's nationwide operations. *See* Exs. 28 at A-II-3, 32 at A-II-3 (ResMAE originated loans in 33 states included in MLMI 2006-RM3 and 36 states included in MLMI 2006-RM5).

### 12.   Fremont Investment and Loan

Fremont Investment and Loan ("Fremont") originated the loans in MLMI 2006-FM1 (Count X).  The allegations relating to Fremont were drawn from lawsuits and administrative actions which should be disregarded for the reasons stated above.  (AC ¶¶ 124-128).  Indeed, the confidential witness allegations mirror those found in a series of complaints filed in the Central District of California, which were dismissed with prejudice.  (AC ¶¶ 128-130).  *See New York State Teachers' Retirement Systems v. Fremont General Corp.*, 2009 WL 3112574, *11 (C.D. Cal. Sep. 25, 2009) (concluding that statements by confidential witnesses merely reflected personal experiences and were insufficiently specific to bear on the substantive allegations); *New York State Teachers' Retirement Systems v. Fremont General Corp.*, 2010 WL 1473265 (C.D. Cal. Mar. 29, 2010) (dismissing third amended complaint due to plaintiffs' repeated failure to adequately allege factual allegations to support identified causes of action). The anecdotal accounts from these confidential witnesses scattered across Fremont's businesses are insufficient to state a claim.  *See Pyramid Holdings*, 638 F. Supp. 2d at 127-28.  Thus, the allegations relating to MLMI 2006-FM1 should be dismissed.

### 13.   American Home Mortgage

American Home Mortgage ("AHM") originated a subset (37.38%) of the loans in MANA 2007-AF1 (Count II).  Importantly, MANA 2007-AF1 is separated into two "stacks" of mortgage loans.  Ex. 18 at S-1 – S-4 (MANA 2007-AF1).  There is "no cross-collateralization between the stacks of mortgage loans."  *Id*. at S-4.  Here, Plaintiff LACERA holds tranche AV-1, which is paid out from the mortgage pool collateralizing Stack II.  *See* Exs. 1 at 15 (LACERA certification); 18 at S-2 (MANA 2007-AF1).  But AHM loans were only included in Stack I. Thus, none of the Plaintiffs' Certificates has exposure to any loans originated by AHM.  Any

statement regarding AHM would have been immaterial to LACERA, and it cannot allege any possible injury attributable to AHM's underwriting practices.

In any event, Plaintiffs' do not claim that AHM systematically abandoned the underwriting guidelines stated in the Prospectus Supplement.  Rather, the allegations only assert that AHM had supposedly lowered its guidelines, and that certain types of AHM loans required little or no documentation.  (AC ¶¶ 88-92).  But the fact that these types of loans were being issued by AHM was disclosed in the very section of the prospectus Plaintiffs claim was false. *See* Ex. 18 at S-45 (MANA 2007-AF1).  Plaintiffs also allege that AHM allowed exceptions to its underwriting standards.  But, once again, that underwriting exceptions would be allowed where compensating factors were present was disclosed.  *Id*. at S-42, S-45-47.  Plaintiffs do not allege that compensating factors were not present for loans with underwriting exceptions.

**E.    Plaintiffs Do Not Allege that Non-Compliant Loans Were Included in Each Loan Pool**

As Plaintiffs themselves conceded on the motion to dismiss the last complaint, they have been unable to establish a plausible link between the conduct alleged in their complaint and the actual loans underlying the Certificates.  In particular, Plaintiffs argued that the entire body of information available to them before December 2007, which includes all of the core allegations of the Amended Complaint, did not involve the issuance of the Certificates and could not have given them notice that there might be untrue statements about the loans in the loan pools.  (*See* Plaintiffs' Opposition to Motions to Dismiss, filed July 22, 2009, at 56).  It follows that there are no facts alleged from which it could be inferred that loans tainted by conduct alleged in the Amended Complaint were included in the loan pools backing the Certificates.  This failure is fatal to their claims.  To survive dismissal, Plaintiffs must be able to allege that supposedly defective loans were included in each of the Certificate trusts.  Moreover, they must allege that the number of such defective loans was sufficiently large to render the alleged misrepresentations material.  *See ECA & Local 134 IBEW Joint Pension Trust  v. JP*

29

*Morgan Chase Co.*, 553 F.3d 187, 206-07 (2d Cir. 2009); *Garber v. Legg Mason, Inc.*, 537 F.
Supp. 2d 597, 613 (S.D.N.Y. 2008).

   Lacking any link between the conduct alleged in the Amended Complaint and the
loans backing the Certificates, Plaintiffs point to the supposedly high delinquency and
foreclosure rates affecting the loan pools and the fact that the Certificates were downgraded. But,
as noted above, subprime MBS issued in 2006 and 2007 have been affected by high delinquency
rates and ratings downgrades across the board. *See* Exs. 8, 9 (rating agency reports showing
downgrades). Plaintiffs do not offer any allegations that suggest that the Certificates have
performed worse than other MBS of similar vintage. In fact, they affirmatively allege that many
of the Certificates maintain ratings of B- or better, even though 88% of subprime and Alt-A
MBS from 2006 and 2007 have been downgraded below CCC. (AC ¶ 208). Moreover, they
allege that the delinquency rates on all but seven of the offerings is lower than 50%, even though
subprime from the 2006 and 2007 vintage have average delinquency rates at 50%. (AC ¶ 209).
As noted above, when a plaintiff suffers losses in the midst of a market downturn affecting
similar securities, the prospect that such losses flowed from misrepresentations, is inherently
speculative. *Cf. First Nationwide Bank*, 27 F.3d at 772.

   Lastly, Plaintiffs use of the "performance and value of the Certificates" (AC ¶¶ 9,
208-09) as of June 2010 to support the claim that there were misleading disclosures in the
prospectus about loan is the sort of "fraud by hindsight" based upon ultimate loan performance
that has been held to be insufficient to allege statements were inaccurate when made. *See, e.g.*,
*Panther Partners, Inc. v. Ikanos Communications, Inc.*, 538 F. Supp. 2d 662, 669-72 (S.D.N.Y.
2008) (dismissing Section 11 claims based on allegations that various disclosures should have
been included in registration statement because the "allegations with regard to what [the
company] knew, and when they knew it, lack the specificity and detail needed to rise above the

'speculative' level and into the realm of a 'plausible' pleading") (quoting *Twombly*, 550 U.S. at 555-56), *aff'd*, 347 Fed.Appx. 617 (2d Cir. 2009).[16]

## II.   PLAINTIFFS HAVE FAILED TO ALLEGE ANY COGNIZABLE INJURY FOR CERTAIN OFFERINGS

Although Section 11 and 12(a)(2) do not require a plaintiff to plead damages, "[i]f a plaintiff has no conceivable damages under Section 11[(e)], [it] cannot state a claim upon which relief can be granted and [its] Section 11 claims must be dismissed." *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 299 (S.D.N.Y. 2008) (citations omitted).  Indeed, as a matter of constitutional standing, Plaintiffs must allege that they suffered "injury in fact." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (standing requires an "'injury in fact' – an invasion of a legally-protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical") (citations and quotation marks omitted).

The value of asset-backed securities such as the Certificates derives from the cash-flows generated by the underlying asset pool, here, residential mortgages.  *See Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 578 (E.D. Pa. 2009) ("[M]ortgage-backed securities are long-term debt instruments that represent the income stream . . . from the underlying pool of mortgage loans.").  Thus, an investor is not harmed if it receives all the payments to which it is entitled.  Here, none of Plaintiffs' Certificates have suffered losses of principal and Plaintiffs do not allege that any interest or principal payments have been missed.    Thus, Plaintiffs claims as to at least several of the trusts must fail.

---

[16]   In some of the recent MBS cases, the courts did find that the abandonment of underwriting standards could be linked to the actual certificates at issue in those cases based on allegations that the percentage of "defaulting" loans "rose dramatically shortly after the Certificates were issued." *Tsereteli*, 692 F. Supp. 2d at 392.  These decisions are distinguishable.  As discussed above, the delinquency statistics and ratings downgrades Plaintiffs cite are consistent with similar MBS.  Thus, pointing to the delinquency statistics and downgrades only presents an inference that Plaintiffs' so-called "losses" are the result of marketwide events. There is no indication that the securities in the other decisions were performing consistently with (as opposed to worse than) the market, or that Judge Kaplan was presented with such arguments.

First, as to five offerings (Counts VI, X, XIV, XV, XVI), the Certificates Plaintiffs purchased have been paid in full.  The certificateholder reports for June 2010 for these offerings show a zero principal balance and zero cumulative losses for the tranches Plaintiffs held.  *See* Exs. 11 - 15 (certificateholder reports for MLMI 2006-FM1, MLMI 2006-RM3, MLMI 2006-AHL1, MLMI 2006-WMC1, and FFML 2007-A).[17]  Having received all their principal and interest, Plaintiffs have suffered no cognizable injury and cannot credibly complain about the alleged loss of marketability or downgrades relating to these offerings.  *See First Nationwide Bank*, 27 F.3d at 768 ("[A]ny amounts paid on the debt reduce the amount the plaintiff can claims as damages resulting from the fraud.").

 Second, with respect to several trusts, Plaintiffs' own allegations conclusively demonstrate that they suffered no loss from the purported misrepresentations.  Specifically, Lead Plaintiff certified that it sold its entire investment in MLMI 2006-A1 in November 2006 and February 2007.  *See* Ex. 1 at 5.  The Court will recall that Plaintiffs took the position on the prior motion to dismiss that they could not have discovered any of the alleged untrue statements before April 2008, when some of the Certificates were first downgraded.  *See* Plaintiffs' Opposition to Motions to Dismiss, filed July 22, 2009, at 55.  Lead Plaintiff also alleges that it sold its Certificates for MLCC 2006-2 on July 30, 2008, which was before the so-called "admission" on August 8, 2008 by PHH, in a Form 10-Q (discussed above, *supra* at I(D)(3)) that supposedly revealed the truth about its loan underwriting problems.  Losses incurred before the truth about an alleged misrepresentation is revealed are not compensable under the Securities Act. *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003) ("Plaintiff here alleges that she has sustained a loss by pointing to declines in the price of her Fund's shares which occurred *before* public disclosure of the allegedly concealed

---

[17]   The Court may take judicial notice of these reports because Plaintiffs clearly have them in their possession and used them in drafting the Amended Complaint.  *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).  (*See, e.g.*, AC ¶ 209 (alleging delinquency and foreclosure statistics for the loan pools drawn from the June 2010 reports to Certificatesholders)).

information.  Such price declines may not be charged to Defendants under Section 11 or Section 12(a)(2)."); *see also Akerman v. Oryx Communications, Inc.*, 810 F.2d 336, 342 (2d Cir. 1987) ("The price decline before disclosure may not be charged to defendants.").  As a result, all claims relating to MLMI 2006-A1 and MLCC 2006-2 should be dismissed.

## III.  PLAINTIFFS HAVE FAILED TO ALLEGE RELIANCE FOR CERTAIN OFFERINGS

Plaintiffs' Section 11 claims with respect to certain of the Certificates must be dismissed because they have not alleged actual reliance on the alleged untrue statement or omission.  Under Section 11(a), the presumption of reliance otherwise applicable to such claims does not apply where the plaintiff "acquired the security after the issuer has made generally available to its security holders an earnings statement covering a period of at least 12 months beginning after the effective date of the registration statement."  15 U.S.C. § 77k(a); *see also Hevesi v. Citigroup Inc.*, 366 F.3d 70, 75 (2d Cir. 2004).  Here, plaintiff Wyoming acquired its Certificates for MLMI Series 2006-WMC1 on April, 2, 2007, for MLMI Series 2006-WMC2 on June 24, 2008, and for MLMI Series 2006-A1 on April 29, 2008, well more than a year after these offerings took place on February 10, 2006, March 28, 2006, and March 29, 2006, respectively, and after more than 12 or more monthly distribution reports became generally available to Certificatesholders for those offerings.[18]  Similarly, Plaintiff LACERA acquired its

---

[18]  For asset-backed securities, the monthly distribution reports are the equivalent of earnings statements typically filed by corporate entities, as the SEC has recognized.  *Asset-Backed Securities*, Securities Act Release No. 8518, Exchange Act Release No. 50,905, 70 Fed. Reg. 1506 (2005).  Issuers of such securities are exempt from filing on Form 10-Q, *see* 17 C.F.R. § 240.13a-13(b)(3) (2010), and are not required to include financial statements on their Form 10-Ks, *see* SEC Form 10-K, General Instruction J(1)(j), *available at* www.sec.gov/about/forms/form10-k.pdf.  Instead they attach their monthly distribution reports to a Form 10-D.  *See* SEC Form 10-D, Part I, Item 1, *available at* http://www.sec.gov/about/forms/form10-d.pdf.  Here, the duty of the issuing trusts to file periodic reports generally was suspended due to the small number of certificate holders.  *See* 15 U.S.C. § 78*o*(d).  But, as set forth in each of the Prospectus Supplements, the monthly reports were posted to an internet site and were available to certificate holders.  *See, e.g.*, Ex. 22 at S-57 (FFML 2007-A); Ex. 17 at S-96 – S-97 (MANA 2007-A3)

Certificates for MLMI 2006-A1 on June 8, 2007, well more than a year after the March 29, 2006 offering.  Their failure to allege reliance as to those Certificates is fatal to their claims.

## IV.  PLAINTIFFS HAVE FAILED TO ALLEGE A SECTION 15 CLAIM AGAINST MERRILL LYNCH.

Plaintiffs allege a claim against Merrill Lynch under Section 15 of the Securities Act, 15 U.S.C. § 78*o*.  (AC ¶ 478).  To survive a motion to dismiss, Plaintiffs "must allege: (i) an underlying primary violation of the securities laws by the controlled person; (ii) control over the controlled person; and (iii) particularized facts as to the controlling person's culpable participation in the violation of the controlled person."  *Demaria v. Andersen,* 153 F. Supp. 2d 300, 314 (S.D.N.Y. 2001) (citation omitted), *aff'd*, 318 F.3d 170 (2d Cir. 2003); *see also P. Stolz Family Partnership, L.P. v. Daum*, 166 F. Supp. 2d 871, 873 (S.D.N.Y. 2001) (Rakoff, J.) ("[A] complaint must allege, at a minimum, 'meaningful culpable conduct.'"), *aff'd in part, rev'd in part on other grounds*, 355 F.3d 92 (2d Cir. 2004).  Plaintiffs have failed to plead all three.

First, as discussed above, Plaintiffs have not pled a primary violation of the Securities Act by MLMI, the allegedly controlled person.  Second, Plaintiffs have not sufficiently pleaded that Merrill Lynch "controlled" MLMI.  "A control person must have the power, directly or indirectly, to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  *Public Employees' Retirement System of Mississippi*, 2010 WL 2175875, at *7 (citations and quotation marks omitted).  This Court previously dismissed Plaintiffs' Section 15 claims because they merely alleged that MLMI was a subsidiary of Merrill Lynch, noting that a "parent/subsidiary relationship is an insufficient basis from which to infer control because a parent corporation and its subsidiary are regarded as legally distinct entities."  *Id.*  Plaintiffs' new allegations do nothing more than describe parameters of a typical parent-subsidiary relationship and similarly fail.

Plaintiffs make four allegations related to control:  Merrill Lynch created the Merrill Depositor and defined its purpose; statements in Merrill Lynch's SEC filings supposedly show comprehensive involvement with the Merrill Depositor; revenue from the Merrill

Depositor's securitizations appeared on Merrill Lynch's financial statements; and the companies had overlapping employees who signed the registration statements on behalf of the Merrill Depositor.  (AC ¶¶ 210-15).  None of these allegations evince control.  The first three – creation of the subsidiary, conducting business with the subsidiary as an SPE, and booking revenue from the subsidiary – are part and parcel of a pedestrian parent/wholly-owned subsidiary relationship.

Plaintiffs' allegation that the Merrill Depositor shared some overlapping personnel with Merrill Lynch is also unavailing.  "A person's status as an officer, director or shareholder, absent more, is not enough to trigger liability under [§ 15]."  *Hemming v. Alfin Fragrances, Inc.*, 690 F. Supp. 239, 245 (S.D.N.Y. 1988); *see also Public Employees' Retirement System of Mississippi*, 2010 WL 2175875, at *8 ("[I]t is not sufficient . . . to simply allege that [defendants] were all either officers or directors of [the alleged controlled entity] at relevant times.").  Beyond the allegations that those employees served as officers and directors, and signed the registration statements on behalf of MLMI, there's no allegation that Merrill Lynch had control over MLMI.  Without more, these allegations do not meet the standard needed for a Section 15 claim to succeed.  *See Sloane Overseas Fund, Ltd*. v. *Sapiens International Corp., N.V*., 941 F. Supp. 1369, 1379 (S.D.N.Y. 1996) (Patterson, J.) (control person claims inadequately pled against entity alleged to have been a founder, creditor and 8% owner of alleged controlled person and an underwriter for offering); *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1162 (9th Cir. 1996) ("our inquiry must revolve around the 'management and policies' of the corporation, not around discrete transactions").

Lastly, Plaintiffs fail to allege any instance of "meaningful culpable" conduct on the part of Merrill Lynch.  *Public Employees' Retirement System of Mississippi*, 2010 WL 2175875, at *8; *see also Demaria*, 153 F. Supp. 2d at 314.  The appearance of the logo "Merrill Lynch & Co."[19] does not show "meaningful culpable" participation by Merrill Lynch in the

---

[19]   The logo "Merrill Lynch & Co." does not refer to defendant Merrill Lynch & Co., Inc. Rather, it is a trade name used by defendant MLPF&S.  Ex. 10 (certificate of assumed name filed by MLPF&S with New York Secretary of State regarding name "Merrill Lynch & Co.").  Indeed, the offering materials make it clear that MLMI is the depositor and MLFP&S the

*(cont'd)*

conduct of which Plaintiffs complain; to state a Section 15 claim, Plaintiffs must allege that "the control person must have participated in the action with knowledge that the securities laws were being violated, or with reckless indifference as to whether a violation occurred." *Wallace v. Buttar*, 239 F. Supp. 2d 388, 397 (S.D.N.Y. 2003), *rev'd on other grounds*, 378 F.3d 182 (2d Cir. 2004).  Plaintiffs have failed to allege all three elements of a viable Section 15 claim, and the claim should be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, the Defendants respectfully request that the Amended Class Action Complaint be dismissed in its entirety with prejudice.

Dated: New York, New York
       August 6, 2010

Respectfully submitted,

  /s/  Jay B. Kasner

Jay B. Kasner
   (jay.kasner@skadden.com)
Christopher P. Malloy
   (christopher.malloy@skadden.com)
Scott D. Musoff
   (scott.musoff@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER &
   FLOM LLP
Four Times Square
New York, New York  10036
(212) 735-3000

Attorneys for the Merrill Lynch Defendants
   and Individual Defendants

---

*(cont'd from previous page)*
     underwriter.  There is nothing in the offering materials that suggests involvement by the ultimate parent holding company.  *See, e.g.,* Ex. 16 at 1, S-4 (MANA 2007-F1)

Attachment 1

**Schedule A**
*Public Employees' Retirement System of Mississippi et al., v. Merrill Lynch & Co., Inc. et al.*
<u>**Summary of Claims Asserted in the Amended Complaint**</u>

| Count | Offering | Names of Defendants | Mortgage Originators in Prospectus Supp. | Relevant Arguments |
|---|---|---|---|---|
| I (§11) | MANA 2007-A3 | MLMI, MLPF&S, Brian T. Sullivan, Michael McGovern, Donald J. Puglisi, Paul Park | GreenPoint Mortgage Funding, Inc. First National Bank of Nevada Mortgage Lenders Network USA, Inc. | Sections I, I(D)(4), I(D)(5), I(D)(6) |
| II (§11) | MANA 2007-AFI | MLMI, MLPF&S, Sullivan, McGovern, Puglisi, Park | Stack 1: American Home Mortgage Corp. Mortgage Lenders Network USA, Inc. GreenPoint Mortgage Funding, Inc. Stack 2: Countrywide Home Loans, Inc. | Sections I, I(D)(4), I(D)(6), I(D)(I3) |
| III (§11) | FFML 2007-2 | MLMI, MLPF&S, Sullivan, McGovern, Puglisi, Park | First Franklin | Sections I, I(D)(I) |
| IV (§11) | FFML 2007-3 | MLMI, MLPF&S, Sullivan, McGovern, Puglisi, Park | First Franklin | Sections I, I(D)(I) |
| V (§11) | FFML 2007-4 | MLMI, MLPF&S, Sullivan, McGovern, Puglisi, Park | First Franklin | Sections I, I(D)(I) |
| VI (§11) | FFML 2007-A | MLMI, MLPF&S, Sullivan, McGovern, Puglisi, Park | First Franklin | Sections I, I(D)(I), II (Plaintiff's investment paid in full) |
| VII (§11) | C-BASS 2007-CB4 | MLMI, MLPF&S, Sullivan, McGovern, Puglisi, Matthew Whalen | New Century Mortgage Corporation People's Choice Home Loan Wilmington Finance Inc. Fieldstone Mortgage Company | Sections I, I(D)(9) |
| VIII (§11) | MANA 2007-F1 | MLMI, MLPF&S, Sullivan, McGovern, Puglisi, Whalen | Wachovia Mortgage Corporation Ameriquest Mortgage Company IndyMac Bank | Sections I, I(D)(7) |
| IX (§11) | MLMI 2006-MLN1 | MLMI, MLPF&S, Sullivan, McGovern, Puglisi, Whalen | Mortgage Lenders Network USA, Inc. | Sections I, I(D)(4) |
| X (§11) | MLMI 2006-FM1 | MLMI, MLPF&S, Sullivan, McGovern, Puglisi, Whalen | Fremont Investment & Loan | Sections I, I(D)(12), II (Plaintiff's investment paid in full) |
| XI (§11) | MLMI 2006-FF1 | MLMI, MLPF&S, Sullivan, McGovern, Puglisi, Whalen | First Franklin | Sections I, I(D)(I) |
| XII (§11) | MLMI 2006-RM5 | MLMI, MLPF&S, Sullivan, McGovern, Puglisi, Whalen | ResMAE Mortgage Corporation | Sections I, I(D)(11) |
| XIII (§11) | MLMI MLCC 2006-2 | MLMI, MLPF&S, Sullivan, McGovern, Puglisi, Whalen | Merrill Lynch Credit Corporation (via PHH Mortgage) First Republic Bank | Sections I(A), 1(D)(3), II |

| Count | Offering | Names of Defendants | Mortgage Originators in Prospectus Supp. | Relevant Arguments |
|---|---|---|---|---|
| XIV (§11) | MLMI 2006-AHL1 | MLMI, MLPF&S, Sullivan, McGovern, Puglisi, Whalen | Accredited Home Lenders, Inc. | Sections I, I(D)(10), II (Plaintiff's investment paid in full) |
| XV (§11) | MLMI 2006-RM3 | MLMI, MLPF&S, Sullivan, McGovern, Puglisi, Whalen | ResMAE Mortgage Corporation | Sections I, I(D)(11), II (Plaintiff's investment paid in full) |
| XVI (§11) | MLMI 2006-WMC1 | MLMI, MLPF&S, Sullivan, McGovern, Puglisi, Whalen, Donald Han | WMC Mortgage Corp. | Sections I, I(D)(8), II (Plaintiff's investment paid in full), III |
| XVII (§11) | MLMI 2006-WMC2 | MLMI, MLPF&S, Sullivan, McGovern, Puglisi, Whalen, Han | WMC Mortgage Corp. | Sections I, I(D)(8), II, III |
| XVIII (§ 11) | MLMI 2006-A1 | MLMI, MLPF&S, Sullivan, McGovern, Puglisi, Whalen, Han | Countrywide Home Loans, Inc. GreenPoint Mortgage Funding, Inc. MortgageIT, Inc. Washington Mutual Mortgage Sec. Corp. | Sections I, I(D)(6), II, III |
| XIX (§ II) | Ownit 2006-2 | MLMI, MLPF&S, Sullivan, McGovern, Puglisi, Whalen, Han | Ownit Mortgage Solutions, Inc. | Sections I, I(D)(2) |
| XX (§ 12) | Offerings at issue in Counts I, III, IV, V, VI, VII, VIII, X, XI, XII, XIV, XVIII, XIX | MLPF&S | See Counts above. | Sections I, II, III (Count XVIII). |
| XXI (§ 15) | All Offerings | ML & Co., Inc. | All originators | Section IV |