**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, et al., <br><br>            Plaintiffs, <br><br>    v. <br><br> MERRILL LYNCH & CO. INC., et al., <br><br>            Defendants. | Civil Action No. 08-cv-10841 (JSR) <br> ECF Case <br><br><br> PLAINTIFFS' OPPOSITION TO: <br> (1) THE MERRILL LYNCH DEFENDANTS' AND INDIVIDUAL DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT; AND (2) ABN AMRO, INC. AND J.P. MORGAN SECURITIES, INC.'s MOTION TO DISMISS THE AMENDED COMPLAINT |

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ....................................................................................1

II.  SUMMARY OF THE ACTION AND THE
     AMENDMENTS ....................................................................................3

III.  ARGUMENT ........................................................................................5

      A.  The Amended Complaint Re-Asserts Sustained
          Claims And Cures The Deficiencies That The Court
          Identified ......................................................................................6

          1.  Merrill Lynch Controlled The Merrill
              Depositor....................................................................................6

          2.  The Offering Documents For C-BASS
              2007-CB4 Contain Untrue Statements and
              Material Omissions ...................................................................9

          3.  Contrary To Defendants' Contentions, The
              Amended Complaint Alleges Injury Under
              Section 11(e) .............................................................................11

      B.  This Court Already Rejected Defendants'
          Contentions That Plaintiffs Do Not Adequately
          Plead Untrue Statements And Omissions ...................................14

          1.  Untrue Statements And Omissions Related
              To Underwriting Guidelines ...................................................15

              a.  As Before, The Amended Complaint Satisfies Rule 8 .................16

              b.  As Before, The Offering Documents' Purported
                  Disclosures Are Insufficient .......................................................21

          2.  Untrue Statements And Omissions Related
              To Appraisals and LTV Ratios ...............................................24

          3.  Untrue Statements And Omissions Related
              To The Certificates' Ratings....................................................26

          4.  Plaintiffs' Sources Are Reliable And
              Corroborate Their Allegations ................................................29

          5.  Rule 8 Does Not Require Identification Of
              Specific Loans In The Pools ....................................................32

          6.  Section 11 Does Not Require Plaintiff
              Wyoming To Plead Reliance ...................................................33

IV.  CONCLUSION........................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
  651 F. Supp. 2d 155 (S.D.N.Y. 2009)...................................................................28, 29

*In re AES Corp. Sec. Litig.*,
  825 F. Supp. 578 (S.D.N.Y. 1993) ......................................................................27

*Akerman v. Oryx Commc'ns, Inc.*,
  810 F.2d 336, 341 (2d Cir. 1987)...........................................................................7

*In re AOL Time Warner Sec. and ERISA Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004) ..................................................................29

*Arista Records, LLC v. Doe 3*,
  604 F.3d 110 (2d Cir. 2010).............................................................................5, 6

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009)...........................................................................6, 16, 29

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004)...................................................................30

*Atlas v. Accredited Home Lenders Co.*,
  556 F. Supp. 2d 1143 (S.D. Cal. 2008)..................................................................20

*In re BankAmerica Corp. Sec. Litig.*,
  210 F.R.D. 694 (E.D. Mo. 2002) .........................................................................14

*Barnes v. Osofsky*,
  373 F.2d 269 (2d Cir. 1967).................................................................................33

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................. passim

*Briarwood Invs., Inc. v. Care Invs. Trust, Inc.*,
  2009 WL 536517 (S.D.N.Y. Mar. 4, 2009) ...........................................................24

*In re Charles Schwab Corp. Sec. Litig.*,
  257 F.R.D. 534 (N.D. Cal. 2009)...........................................................................8

*In re Citigroup Inc. Bond Litig.*,
  2010 WL 2772439 (S.D.N.Y. July 12, 2010) ...................................................6, 7, 8

*City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortgage Loan Trust Inc.*,
  2010 WL 1371417 (E.D.N.Y. Apr. 6, 2010) .........................................................24

*In re Connetics Corp. Sec. Litig.*,
   2008 WL 3842938 (N.D. Cal. Aug. 14, 2008) ....................................................................31

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) ......................................................................6, 20

*Cromer Fin. Ltd. v. Berger*,
   137 F. Supp. 2d 452 (S.D.N.Y. 2001).............................................................................8

*De La Fuente v. DCI Telecomms., Inc.*,
   259 F. Supp. 2d 250 (S.D.N.Y. 2003).......................................................................18, 31

*Decker v. Massey-Ferguson, Ltd.*,
   681 F.2d 111 (2d Cir. 1982)........................................................................................5

*Dietrich v. Bauer*,
   76 F. Supp. 2d 312 (S.D.N.Y. 1999)..............................................................................7

*ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*,
   2009 U.S. App. LEXIS 972 (2d Cir. Jan. 21, 2009) ...............................................33

*Emmpresa Cubana Del Tabaco v. Culbro Corp.*,
   213 F.R.D. 151 (S.D.N.Y. 2003).................................................................................30

*Eskofot A/S v. E.I. Du Pont De Nemours & Co.*,
   872 F. Supp. 81 (S.D.N.Y. 1995).................................................................................30

*First Nationwide Bank v. Gelt Funding Corp.*,
   27 F.3d 763 (2d Cir. 1994)..................................................................................13, 14

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   618 F. Supp. 2d 311 (S.D.N.Y. 2009)..................................................................21, 23, 29

*Freudenberg v. E*Trade Fin. Corp.*,
   2010 WL 1904314 (S.D.N.Y. May 11, 2010) ........................................................30

*In re Fuwei Films Sec. Litig.*,
   634 F. Supp. 2d 419 (S.D.N.Y. 2009)..........................................................................23

*Garber v. Legg Mason, Inc.*,
   537 F. Supp. 2d 597 (S.D.N.Y. 2008) .........................................................................33

*In re Giant Interactive Group, Inc. Sec. Litig.*,
   643 F. Supp. 2d 562 (S.D.N.Y. 2009).........................................................................12

*Giarraputo v. Unumprovident Corp.*,
   2000 WL 1701294 (D. Me. Nov. 8, 2000)...................................................................23

*In re Global Crossing, Ltd. Sec. Litig.*,
  313 F. Supp. 2d 189 (S.D.N.Y. 2003)........................................................34

*Good Hill Partners L.P. v. WM Asset Holdings*,
  583 F. Supp. 2d 517 (S.D.N.Y. 2008)........................................................25

*Heller v. Goldin Restructuring Fund, L.P.*,
  590 F. Supp. 2d 603 (S.D.N.Y. 2008)........................................................29

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983)...................................................................15, 33

*Hevesi v. Citigroup Inc.*,
  366 F.3d 70 (2d Cir. 2004) ..............................................................35

*In re IndyMac Mortgage-Backed Sec. Litig.*,
  2010 WL 2473243 (S.D.N.Y. June 21, 2010) .........................................11, 20, 21

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003)....................................................12, 14

*In re Initial Pub. Offering Sec. Litig.*,
  358 F. Supp. 2d 189 (S.D.N.Y. 2004) ......................................................29

*LC Capital Partners, LP v. Frontier Ins. Group, Inc.*,
  318 F.3d 148 (2d Cir. 2003)...............................................................10

*In re Lehman Bros. Sec. & Erisa Litig.*,
  684 F. Supp. 2d 485 (S.D.N.Y. 2010)................................................. passim

*Levine v. AtriCure, Inc.*,
  508 F. Supp. 2d 268 (S.D.N.Y. 2007)......................................................14

*McMahan & Co. v. Wherehouse Entm't*,
  65 F.3d 1044 (2d Cir. 1995).......................................................6, 11, 12, 13

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003)......................................................14

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  218 F.R.D. 76 (S.D.N.Y. 2003) ...........................................................31

*Miller v. Lazard, Ltd.*,
  473 F. Supp. 2d 571 (S.D.N.Y. 2007)......................................................21

*In re Moody's Corp. Sec. Litig.*,
  599 F. Supp. 2d 493 (S.D.N.Y. 2009)......................................................20

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010)....................................................................................5

*Morris v. Wachovia Sec., Inc.*,
  2007 WL 2126344 (E.D. Va. July 20, 2007) .......................................................31

*N. J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*,
  2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) ....................................12, 16, 24, 32

*N.J. Carpenters Health Fund v. Residential Capital LLC*,
  2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) .....................................16, 21, 24, 32

*N.J. Carpenters Vacation Fund v. The Royal Bank Of Scot. Group, PLC*,
  2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010) ................................................ passim

*In re NationsMart Corp. Sec. Litig.*,
  130 F.3d 309 (8th Cir. 1997) ...............................................................................23

*In re New Century*,
  588 F. Supp. 2d 1206 (C.D. Cal. 2008) ...............................................................20

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000).............................................................................26, 30

*In re Number Nine Visual Tech. Corp. Sec. Litig.*,
  51 F. Supp. 2d 1 (D. Mass. 1999) .......................................................................23

*Olkey v. Hyperion 1999 Term TRUST*,
  98 F. 3d 2 (2d Cir. 1996) ...............................................................................21, 29

*Pavelic & LeFlore v. Marvel Entm't Group*,
  493 U.S. 120 (1989).............................................................................................30

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
  658 F. Supp. 2d 299 (D. Mass. 2009) ..................................................................24

*P. Stolz Family P'Ship L.P. v. Daum*,
  166 F. Supp. 2d 871 (S.D.N.Y. 2001)...........................................................8, 9, 29

*Pub. Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*,
  2010 WL 2175875 (S.D.N.Y. June 1, 2010) ................................................. passim

*Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.*,
  638 F. Supp. 2d 120 (D. Mass. 2009). ................................................................30

*Randall v. Loftsgaarden*,
  478 U.S. 647 (1986).............................................................................................15

v

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)....................................................................23, 29, 33

*RSM Prod. Corp. v. Fridman*,
    643 F. Supp. 2d 382 (S.D.N.Y. 2009) ................................................................31

*Schnall v. Annuity and Life Re (Holdings), Ltd.*,
    2004 WL 367644 (D. Conn. Feb. 22, 2004) .......................................................20

*In re Scottish Re Group Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007)..................................................................7

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996)...............................................................................7

*Shah v. Meeker*,
    435 F.3d 244 (2d Cir. 2006)...............................................................................11

*In re StockerYale Sec. Litig.*,
    453 F. Supp. 2d 345 (D.N.H. 2006).....................................................................20

*In re Stratosphere Corp. Sec. Litig.*,
    1 F. Supp. 2d 1096 (D. Nev. 1998).....................................................................24

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
    692 F. Supp. 2d 387 (S.D.N.Y. 2010)............................................................15, 32

*Unicorn Field, Inc. v. Cannon Group, Inc.*,
    60 F.R.D. 217 (S.D.N.Y. 1973) ..........................................................................33

*In re Vivendi Universal, S.A.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003)..................................................................21

*In re Wash. Mut. Inc. Sec., Deriv. & ERISA Litig.*,
    2009 WL 3517630 (W.D. Wash. Oct. 27, 2009) .............................................27-28

*In re Wells Fargo Mortgage-Backed Certificates Litig.*,
    2010 WL 1661534 (N.D. Cal. Apr. 22, 2010) ............................................. passim

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) ...................................................................34, 35

*In re WorldCom Inc. Sec. Litig.*,
    346 F. Supp. 2d 628 (S.D.N.Y. 2004)..................................................................33

*In re WRT Energy Sec. Litig.*,
    2005 WL 2088406 (S.D.N.Y. 2005)................................................................14, 33

**STATUTES, RULES & REGULATIONS**

15 U.S.C. § 77k ....................................................................................................33

      § 77k(a)(5) ...........................................................................................34

      § 77k(e) ......................................................................................11, 12, 14

      § 77l(a)(2) ............................................................................................15

17 C.F.R. § 230.158 (a)(2)(i)-(ii) ........................................................................34

Fed. R. Civ. P. 8(a) ..............................................................................................5

      P. 10(b) ..................................................................................................5

      P. 15(a) ................................................................................................36

The Public Employees' Retirement System of Mississippi (the "Lead Plaintiff"), the Wyoming State Treasurer ("Wyoming"), the Los Angeles County Employees Retirement Association ("LACERA"), the Connecticut Carpenters Pension Fund and Connecticut Carpenters Annuity Fund, and Iron Workers Local No. 25 Pension Fund (collectively with the Lead Plaintiff, "Plaintiffs"), submit this single Memorandum of Law in Opposition to the motions to dismiss by: (1) the Merrill Lynch Defendants and the Individual Defendants ("ML Mot.") (Dkt. No. 109); and (2) ABN AMRO, Inc. and J.P. Morgan Securities, Inc. ("ABN Mot.") (Dkt. No. 106).

I.     INTRODUCTION

This is a securities class action involving the sale of over $17 billion in mortgage pass-through certificates (the "Certificates") issued through offering documents that contained untrue statements and omitted material facts.[1]  Following full briefing and argument, the Court issued its prior Order sustaining Plaintiffs' Section 11 claims against Merrill Lynch Mortgage Investors, Inc. (the "Merrill Depositor"), Merrill Lynch, Pierce, Fenner & Smith ("Merrill PFS"), and the Individual Defendants for the 19 offerings in which Plaintiffs purchased Certificates.  *Pub. Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 2010 WL 2175875 (S.D.N.Y. June 1, 2010) ("June 1 Order").  The Court also afforded Plaintiffs leave to amend to state additional facts to support (1) Section 15 claims against Merrill Lynch & Co. ("Merrill Lynch"); (2) Section 12(a)(2) claims against Merrill PFS; and (3) Section 11 claims against JP Morgan and ABN AMRO for the 2007-CB4 offering.[2]

The Amended Complaint omits the claims and parties that the June 1 Order dismissed with prejudice ***and*** re-asserts the claims that the Court has already sustained.  The Amended Complaint alleges the same untrue statements and omissions that the Court sustained regarding

---

[1] ¶1.  "¶__" refers to paragraph(s) in the Amended Class Action Complaint For Violation Of §§ 11, 12(a)(2) And 15 Of The Securities Act of 1933 (the "Amended Complaint").  Dkt. No. 103.

[2] *Id.* at *5-8.  In addition, the Court afforded leave to allege Section 11 claims against Merrill Lynch (*id.* at *5) and Section 15 claims against the Individual Defendants.  *Id.* at *8.  The Amended Complaint omits such claims.

the originators' underwriting standards, inflated appraisals and understated Loan to Value ("LTV") ratios and credit ratings.  Moreover, as explained below, the Amended Complaint cures the deficiencies that the Court identified in its prior Order.  To support the Section 15 claims against Merrill Lynch, the Amended Complaint pleads the "closer connection between Merrill and the Merrill Depositor" that shows Merrill Lynch's control and participation in the conduct at issue and goes far beyond a mere parent/subsidiary relationship.  ¶¶210-15.  The Amended Complaint also includes specific allegations regarding the untrue statements and omissions in the offering documents for the 2007-CB4 Trust.  ¶¶138-47.  To support the Section 12(a)(2) claims, Plaintiffs allege – and Defendants do not dispute in their current motions to dismiss – their purchases of Certificates in 13 offerings directly from Merrill PFS.  ¶18.

Contrary to Defendants' contentions, the Amended Complaint amply alleges Plaintiffs' injuries.  Defendants' motions entirely ignore that Section 11(e) of the Securities Act of 1933 ("Securities Act") governs damages in this case, and it requires only diminished value of the securities at the time suit was brought.  Here, the Amended Complaint alleges such facts.  ¶9.

In their overlength motions, Defendants recycle prior unsuccessful contentions and attempt to re-challenge the claims that the Court already sustained.  Now, as before, the Amended Complaint meets Rule 8's notice pleading standard by stating "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The factual support includes witness accounts, internal documents and statements from management showing originators' failure to follow underwriting standards.  ¶¶53-172.  It includes the findings from governmental hearings, investigations and lawsuits (¶¶64-71, 85, 120-21, 126-27, 143, 164-65, 169), as well as delinquencies, defaults and downgrades linked to the underwriting failures.  ¶¶208-09.

In short, the Amended Complaint states claims for Defendants' violations of Sections 11, 12 and 15 of the Securities Act and complies with the June 1 Order and precedent from the Supreme Court and the Second Circuit.

## II.    SUMMARY OF THE ACTION AND THE AMENDMENTS

Before granting in part and denying in part Defendants' motions to dismiss the prior complaint, "the Court received extensive briefing, including voluminous exhibits, and heard oral argument on August 18, 2009, followed by still further briefing."   June 1 Order, 2010 WL 2175875, at *1.   The Court dismissed certain defendants and claims, but ordered that "defendants' motions to dismiss are in all other respects denied, meaning that the Section 11 claims [against the] Merrill Depositor, Merrill PFS, and the individual defendants survive the instant motions."  *Id.* at *8.

The Amended Complaint, like the prior complaint, alleges that, contrary to representations made in the Offering Documents, the originators failed to follow the stated lending guidelines to determine whether prospective borrowers were willing and able to repay their loans.   ¶¶53-172.   The Amended Complaint explains the industry-wide failures and identifies the material originators in each of the 19 offerings, including allegations for eight additional originators.   *Id.*   These originators repeatedly ignored the purported guidelines set forth in the Offering Documents, and were instead making loans to increase loan volume while disregarding the borrowers' ability and willingness to repay the loan. *Id.*

The Amended Complaint, like the prior complaint, alleges that Defendants misrepresented that the appraisals conformed to the standards of the Uniform Standards of Professional Appraisal Practice ("USPAP"), Fannie Mae or Freddie Mac.  ¶¶173-75.  In truth, appraisers systematically provided inflated appraisals in response to pressure from the originators.  ¶¶179-85.  Due to such improperly inflated appraisals, the LTV ratios disclosed in the Offering Documents and the supposed credit enhancements were untrue.  ¶186.

As in the prior complaint, the Amended Complaint alleges that the rating agencies' use of this faulty data when providing ratings, combined with outdated and unreliable methodologies, resulted in untrue and misleading "investment-grade" credit ratings.   Thus, contrary to representations in the Offering Documents, the Certificates exposed purchasers to increased risk with respect to absolute cash flow and the timing of payments.  ¶9.

The Complaint alleges the same untrue statements and omissions that the Court (with the exception of the 2007-CB4 Trust) previously found "to adequately plead plausible Section 11 violations." June 1 Order, 2010 WL 2175875, at *5. "*Without multiplying examples*, the Court concludes that the Complaint's allegations of how the registration statements were false and misleading are sufficient to escape dismissal." *Id.* (emphasis added). Further, the Amended Complaint includes a table that readily identifies the untrue statements and omissions in each prospectus supplement. ¶207.

To cure deficiencies that the Court previously identified, the Amended Complaint alleges additional facts to support Merrill Lynch's involvement in and control over the Merrill Depositor for purposes of Section 15 liability. ¶¶210-15. Merrill Lynch created the Merrill Depositor specifically to acquire mortgage loans and securitize them for sale to investors. ¶211. Publicly, Merrill Lynch represented that it controlled its securitization business. ¶212. Merrill Lynch further controlled the Merrill Depositor through executives (who signed the registration statements and are Section 11 defendants here). Defendant Park, a managing partner of Merrill Lynch, served as President and Chairman of the Board of the Merrill Depositor, and Defendant McGovern served as a director for both Merrill Lynch and the Merrill Depositor. ¶213. Each Prospectus Supplement has "Merrill Lynch & Co." emblazoned in bold on the cover. ¶214. Additionally, revenues from the securitization activities of the Merrill Depositor inured exclusively to the benefit of Merrill Lynch. ¶215.

The Amended Complaint also includes specific allegations regarding the untrue statements and omissions in the Offering Documents for the 2007-CB4 Trust. ¶¶138-47. Loans for that offering were originated by New Century, for which the underwriting violations are alleged in the Amended Complaint. *Id.* Multiple witnesses and the New Century Bankruptcy Examiner confirm that New Century systematically disregarded its underwriting standards, originated loans with exceptions in the absence of compensating factors and ultimately suffered from "serious loan quality issues." ¶¶143-47. The percentage of loans in the 2007-CB4 Trust

that are either 60 days or more delinquent, in foreclosure, or bank-owned is over 46%.  ¶¶140, 209.

The ratings on virtually all of the Certificates have since been downgraded and virtually all of the Certificates that were originally rated "AAA" have been downgraded below investment-grade.  ¶208.  Further, the delinquency, foreclosure and bank ownership rates on the underlying mortgages have soared.  ¶209.  Given the significant downgrades and delinquencies, Plaintiffs' Certificates lost substantial value.  ¶¶9, 208-09.

III.    ARGUMENT

Securities Act claims are governed by the notice pleading standard set forth in Fed. R. Civ. P. 8(a).  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010). Rule 8 only requires that Plaintiffs include "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.

The Amended Complaint asserts separate counts pursuant to Fed. R. Civ. P. 10(b).[3]  This formatting change from the original complaint, which had alleged all Section 11 claims in a single count, does not change the reasoning in the Court's prior order or the Rule 8 pleading standards.  In their motions, Defendants attempt to suggest that pleading claims in separate counts somehow changes the standard that the Court applied when sustaining Plaintiffs' Section 11 claims.  *See* ML Mot. at 3, 10 (citing *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111 (2d Cir. 1982)).  They are wrong.  In *Decker*, the Second Circuit applied Rule 9(b)'s heightened pleading standard to a single count of securities fraud under Section 10(b) of the Exchange Act of 1934. 681 F.2d at 113-15.  Here, Rule 8 notice pleading continues to apply.   "[T]he notion that *Twombly* imposed a heightened standard that requires a complaint to include specific evidence, factual allegations in addition to those required by Rule 8 . . . is belied by the *Twombly* opinion itself."  *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010) (rejecting defendants'

---

[3] Fed. R. Civ. P 10(b) states, "[i]f doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense."

contention that *Twombly*, and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), require the pleading of specific evidence or extra facts beyond what is necessary to make a claim plausible).

In their motions, Defendants again raise factual issues and affirmative defenses that are inappropriate at this stage. Throughout their papers, Defendants repeatedly assert that Plaintiffs must allege how the Certificates performed relative to other mortgage-backed securities. Defendants seek to create a pleading requirement that does not exist. Defendants' demand is the exact type of heightened pleading standard that "is belied by the *Twombly* opinion itself." *Arista Records*, 604 F.3d at 8. Defendants also attempt to blame the "worst economic climate since the Great Depression" and alternative factors for the soaring delinquencies and foreclosures.[4] If, at trial, Defendants wish to attempt to blame other causes, they may do so. At the pleading stage, however, Defendants' spin of "facts" from outside the record is inappropriate.[5] At a later stage, there will be a developed record for the Court.

A.    The Amended Complaint Re-Asserts Sustained Claims
       And Cures The Deficiencies That The Court Identified

1.    Merrill Lynch Controlled The Merrill Depositor

The Court previously sustained claims for primary violations of the Securities Act against the Merrill Depositor, and also afforded leave to amend the Section 15 claims against Merrill Lynch. Control for purposes of Section 15 entails "'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *In re Citigroup Inc. Bond Litig.*, 2010 WL 2772439, at *25 (S.D.N.Y. July 12, 2010) (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996)).

---

[4]  *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1173-74 (C.D. Cal. 2008). Plaintiffs respectfully refer the Court to Plaintiffs' Opposition To Motions To Dismiss The Consolidated Class Action Complaint By The Merrill Defendants, ABN Amro, Inc., JP Morgan Securities, Inc. And Credit-Based Asset Servicing And Securitization (Dkt. No. 81) ("Plaintiffs' Initial Opp.") at 44.

[5]  The affirmative defense of negative causation can only occur "where a defendant proves that the decline in the value of the security in question was not caused by the material omissions or misstatements in the registration statement [and that the] plaintiff is not entitled to recover any damages." *McMahan & Co. v. Wherehouse Entm't*, 65 F.3d 1044, 1048 (2d Cir. 1995).

Control allegations are governed by Rule 8(a), and "[w]hether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 401 (S.D.N.Y. 2007) (internal quotation marks and citation omitted).

In accordance with the Court's previous order, the Amended Complaint pleads the "closer connection between Merrill and Merrill Depositor" that shows Merrill Lynch's control and participation in the conduct at issue well exceeds a mere parent/subsidiary relationship. June 1 Order, 2010 WL 2175875, at *7. Merrill Lynch created the Merrill Depositor and defined its sole purpose.[6] Merrill Lynch publicly represented in its SEC filings that it (not the Merrill Depositor) controlled Merrill Lynch's securitization business: "In the normal course of business, Merrill Lynch securitizes … residential mortgage loans." ¶¶212, 215. Merrill Lynch's SEC filings admit to its extensive involvement with the operations of its special purpose entities ("SPEs"), including: "structuring and/or establishing selling assets to SPEs; managing or servicing assets held by SPEs; underwriting, distributing, and making loans to SPEs; making markets in securities issued by SPEs; engaging in derivative transactions with SPEs; owning notes or certificates issued by SPEs; and/or providing liquidity facilities and other guarantees to, or for the benefit of, SPEs." *Id.* Further, Merrill Lynch had ownership interests in several originators who supplied the Merrill Depositor with loans. It purchased a 20% share in Ownit in 2005 and acquired 100% of First Franklin in 2006. ¶¶97, 108.

Merrill Lynch's managing partner and its director and senior counsel signed the Merrill Depositor's registration statements. ¶¶213, 479. Merrill Lynch prominently featured its own name – rather than the name of the Merrill Depositor or Merrill PFS – on the front cover of each

---

[6] ¶211. *See CitiGroup*, 2010 WL 2772439, at *25 (sustaining Section 15 claims against parent corporation Citigroup "for the acts of Citigroup Funding, its 'wholly-owned subsidiary'"); *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 335 (S.D.N.Y. 1999) ("owner" is a "position[] from which control can be directly inferred without more") (internal quotation marks omitted). Defendants' reliance on *Akerman v. Oryx Commc'ns, Inc.* is misplaced. That case involved the dismissal of a Section 11 claim at the summary judgment phase. *Akerman*, 810 F.2d 336, 341 (2d Cir. 1987).

Prospectus and Prospectus Supplement.  ¶214.  In their motion, Defendants attempt to argue that the logo "Merrill Lynch & Co." actually refers to Merrill PFS.  ML Mot. at 35 n. 19. Defendants' *post hoc* explanation contradicts the face of the prospectus supplements.  ¶214. Numerous other courts have found similar allegations sufficient to state an actionable Section 15 claim.[7]

Contrary to Defendants' contention, the Court's prior order does not require that Plaintiffs plead Merrill Lynch's culpable conduct.  ML Mot. at 35.  Rather, the Court explained that "it is possible, as discussed earlier, that plaintiffs may be able to plead a closer connection between Merrill and Merrill Depositor," and consequently the Section 15 claim as to Merrill was dismissed without prejudice.   June 1 Order, 2010 WL 2175875, at *7.  In a separate discussion analyzing the Section 15 claims against the Individual Defendants, the Court required Plaintiffs to allege "meaningful culpable conduct *[by an individual defendant]* beyond mere status as a director or officer."   *Id.* at *8 (citations omitted, brackets in original, emphasis added). Defendants cite no authority requiring a plaintiff asserting Section 11 claims to allege a company's culpable conduct to state a Section 15 claim under Rule 8.

Moreover, the Amended Complaint sufficiently alleges Merrill Lynch's participation in the underlying conduct.  In *P. Stolz*, the Court sustained control claims against two individuals, even where the complaint "largely fail[ed] to particularize any individual acts of culpable misconduct."  *P. Stolz Family P'Ship L.P. v. Daum*, 166 F. Supp. 2d 871, 874 (S.D.N.Y. 2001) (cited with approval in June 1 Order, 2010 WL 2175875, at *8).  In that case, the complaint referenced a prospectus that "conveys to a reasonable investor that the investor can rely on [the

---

[7] *See, e.g., CitiGroup*, 2010 WL 2772439, at *25; *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 484 (S.D.N.Y. 2001) (allegations that "EYB 'owned and controlled' FASB and K & W by exercising 'direct, daily supervision, oversight and control' through common personnel and shared offices" and that "FASB and K & W [was] 'the corporate vehicle through which' EYB provided administrative services to its clients" sufficient to allege control); *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 550 (N.D. Cal. 2009) (sustaining Section 15 claims and stating that "[D]efendants may ultimately establish that the fund is 'completely separate' from Schwab and its subsidiaries, but that is not the only, or indeed the most natural, inference drawn from the allegations in the complaint.").

individual officer defendants] to 'control' all 'fundamental company actions,' including those here at issue." *Id*. The same is true here for Merrill Lynch. In its SEC filings, Merrill Lynch publicly described its comprehensive involvement in the Merrill Depositor's operations as part of Merrill Lynch's "normal course of business" of securitizing residential mortgage loans, and "Merrill Lynch & Co." was prominently featured on the front cover of each Prospectus and Prospectus Supplement. ¶¶211-12, 214. These allegations, taken together with the additional indicia of control and participation, cure the deficiency noted in the Court's previous order. June 1 Order, 2010 WL 2175875, at *7.

> ### 2.   The Offering Documents For C-BASS 2007-CB4 Contain Untrue Statements and Material Omissions

The June 1 Order found that the original complaint "makes no specific allegations about the offering documents for the 2007-CB4 Trust." June 1 Order, 2010 WL 2175875, at *6. The Amended Complaint cures this deficiency by making specific allegations for 2007-CB4 Trust. ¶¶138-47. The offering documents represented that the mortgage loans that C-BASS acquired from originators, including New Century, were "subjected to due diligence review" and that C-BASS "reviewed a majority of the files related to the Mortgage Loans in connection with the acquisition of the Mortgage Loans . . . for credit and compliance considerations." ¶139.

The 2007-CB4 Offering Documents stated that the "Sponsor evaluates the ***mortgagor's credit standing, repayment ability and willingness to repay debt***." *Id*. Further, the Offering Documents stated that a "mortgagor's ability and willingness to repay debts (including the Mortgage Loans) in a timely fashion is determined by the Sponsor by reviewing the quality, quantity and durability of income history, history of debt management, history of debt repayment and net worth accumulation of the mortgagor to the extent such information is available." *Id*.

The Amended Complaint alleges that these statements were untrue and omitted to state facts necessary to make the statements not misleading because C-BASS's supposed "due diligence review" was ineffective and did not result in a determination of "the mortgagor's ability and willingness to repay debts." ¶140. In truth, as detailed in the Amended Complaint,

9

originators, including New Century: (1) systematically disregarded their underwriting standards and originated mortgage loans with the intent of increasing volume, rather than evaluating the mortgagor's ability and willingness to repay the loan; and (2) regularly made exceptions to their underwriting guidelines in the absence of sufficient compensating factors.  ¶¶140, 143-47.

The terrible performance and subsequent credit rating downgrades of the 2007-CB4 Certificates support the allegation that C-BASS's "due diligence review" was ineffective and that the Sponsor did not determine "the mortgagor's ability and willingness to repay debts."  The percentage of loans in the 2007-CB4 Trust that are either 60 days or more delinquent, in foreclosure, or bank-owned is over 46% (¶¶140, 209), and the Certificates have been downgraded to below investment-grade (¶208).

In their motions to dismiss, the Underwriter Defendants again attempt to raise the statute of limitations defense, contending that their wrongdoing was so obvious and their statements were so clearly false that Plaintiffs should have commenced suit much sooner.[8]  The statute of limitations defense is fact-intensive and is "'often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6).'"  June 1 Order, 2010 WL 2175875, at *2 (quoting *LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 156 (2d Cir. 2003)).  The Court previously denied Defendants' motions to dismiss based on the statute of limitations.  *Id.*

The Underwriter Defendants contend, as they did in their prior motion to dismiss, that the complaint filed in *In re Radian Sec. Litig.* – a securities fraud action pursuant to Section 10(b) of the Securities Exchange Act of 1934 – triggered the statute of limitations as to the Securities Act claims related to the 2007-CB4 Trust.[9]  As the Court previously found, the existence of the

---

[8] *See* Plaintiffs' Initial Opp. at 53-68 (explaining why Plaintiffs' claims are timely).

[9] *See* ABN Mot. at 13; C-BASS Memorandum Of Law In Support Of Motion To Dismiss, Dkt. No. 69 at 17 ("Similarly, one of the plaintiffs, Iron Workers Local No. 25 Pension Fund, is currently the lead plaintiff in a Section 10(b) action originally filed on August 2007 against Radian Group Inc., one of the co-owners of C-BASS, which served as the sponsor for four of the offerings at issue here.").

*Radian* complaint does not establish that Plaintiffs' claims are time-barred as a matter of law.[10] The *Radian* lawsuit – a securities fraud action unrelated to the instant action – did not specifically identify the 2007-CB4 Trust.   Indeed, there is a factual dispute as to whether investors would be aware that underwriting failures affected the Certificates until, at the earliest, April 2008.[11]  The Plaintiffs' 2007-CB4 Certificates were not downgraded to below investment-grade until November 20, 2008.

>3.   Contrary To Defendants' Contentions, The
>Amended Complaint Alleges Injury Under Section 11(e)

The plain language of Section 11(e) provides the measure for damages for violations of Section 11(a), and courts must apply that method in every case.  *See McMahan*, 65 F.3d at 1048. Section 11(e) states in relevant part that "[t]he suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and … ***the value thereof as of the time such suit was brought*** …."  15 U.S.C. § 77k(e) (emphasis added).

The Amended Complaint alleges that the Certificates were no longer marketable near the prices paid by Plaintiffs at the time of suit.  ¶9.  In support of these allegations, Plaintiffs detail the substantial ratings downgrades and the soaring delinquency, foreclosure and bank ownership rates on the underlying mortgages in each of the 19 Offerings.  ¶¶208-09.  Plaintiffs further allege that the untrue statements and omissions exposed purchasers to increased risk with respect

---

[10] Several other courts have rejected similar statute of limitation arguments.  *See, e.g., In re IndyMac Mortgage-Backed Sec. Litig.*, 2010 WL 2473243, at *5 (S.D.N.Y. June 21, 2010) ("IndyMac MBS") ("the Court cannot conclude as a matter of law that the publicly available information was sufficiently specific to put the plaintiffs on ***actual or inquiry*** notice that a cause of action was probable.");  *In re Wells Fargo Mortgage-Backed Certificates Litig.*, 2010 WL 1661534, at *7 (N.D. Cal. Apr. 22, 2010) ("Wells Fargo MBS") ("the parties' competing contentions present a factual dispute that must be resolved by the trier of fact.").

[11] Other documents, such as the August 2007 Form 8-K and April 2007 conference call transcript (ABN Mot. at 15), do not constitute inquiry or actual notice as to the probability of the 2007-CB4 claims.  *See Shah v. Meeker*, 435 F.3d 244, 249 (2d Cir. 2006) (the statute of limitations is triggered only when the available information makes the wrongdoing "probable, not merely possible").  Contrary to Defendants' assertion, the fact that Plaintiffs use such documents to plead additional factual allegations – after timely filing the action – does not mean that those documents now constitute actual notice.

to absolute cash flow and the timing of payments.   ¶9.   Accordingly, Plaintiffs have clearly alleged a decline in the value of the Certificates, and thus damages (i.e., a cognizable injury) under the plain language of Section 11(e).  *See* 15 U.S.C. § 77k(e); *In re Giant Interactive Group, Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009) (denying defendants' motion to dismiss where "it cannot be said as a matter of law that 'it is apparent from the face of the complaint that the plaintiff cannot recover her alleged losses'"); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 351 n.80 (S.D.N.Y. 2003) ("IPO II") ("the determination of value is a fact-intensive inquiry . . . [that is] inappropriate to resolve . . . at the motion to dismiss stage").

In their motions, Defendants attempt to argue that Plaintiffs who purchased certain Certificates have no cognizable injury due to their receipt of principal payments.  ML Mot. at 31. Defendants, however, ignore Section 11(e) entirely.  The Amended Complaint unquestionably alleges injury under Section 11(e) based on the diminished value of the Certificates.  Courts routinely hold that plaintiffs who retain their securities need only allege a decline in value at the commencement of suit in order to state a cognizable claim for damages under Section 11.  *See McMahan*, 65 F.3d at 1048 (a "decline in market value permits plaintiffs to recover damages under the statutory scheme"); *IPO II*, 241 F. Supp. 2d at 351 n.80 ("Section 11(e) sets the measure of damages for a plaintiff still holding her securities at the 'value' of those securities at the time of suit").

Given Section 11(e), Plaintiffs are not required, as Defendants suggest, to allege payment information.  In *New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc.,* the Court addressed a similar contention – namely, that plaintiff has "failed to allege a cognizable injury" because plaintiff did "not allege that it failed to receive any principal or interest payments due under its Certificates."   2010 WL 1473288, at *5 (S.D.N.Y. Mar. 29, 2010) ("DLJ MBS"). Judge Crotty disagreed, stating that defendants' interpretation was "too cramped a reading of damages."  *Id*.  The Court held that "[m]any fixed-income debt securities, such as corporate bonds, do not trade on national exchanges and yet institutional investors routinely purchase corporate bonds hoping to realize a profit through resale."  *Id*.  Judge Crotty explicitly rejected

defendants' damages argument, holding that because "[t]his is a securities claim, not a breach of contract case . . . [p]laintiff's market value allegations are sufficient."[12]

Defendants further assert that certain Plaintiffs have not suffered a cognizable injury for certain Certificates because, according to Defendants, the Certificates Plaintiffs purchased in MLMI 2006-FM1, MLMI 2006-RM3, MLMI 2006-AHL1, MLMI 2006-WMC1 and FFML 2007-A have been paid in full.[13]  Not only do Defendants ignore Section 11(e), they make factual conclusions based on an incomplete record that would be the subject of expert opinion if it were relevant.  Attempting to create a factual record at the pleading stage, Defendants rely exclusively on the certificateholder reports for one month, June 2010, to conclude that Plaintiffs have "received all their principal and interest."[14]  The reports, however, do not indicate whether investors received payments *timely* and in the full coupon amount.  Likewise, they are silent regarding the overall performance of the Certificates and whether the increase in foreclosures and bank-owned properties negatively impacted the total yield and total interest payments received.  In fact, the Prospectus Supplements represent that the interest paid is calculated based on the outstanding principal balance in the particular tranche.  High default and foreclosure rates in these Offerings may have quickly reduced the total principal and negatively impacted the amount of interest paid to investors in those Certificates.[15]  These are factual issues that cannot

---

[12] *Id.  See also McMahan*, 65 F.3d at 1047-49 (holding that "benefit-of-the-bargain" damages, such as those Defendants seek to focus on here, are unavailable under Section 11).

[13] ML Mot. at 32.  The very reports that Defendants attempt to rely upon demonstrate that several "investment-grade" tranches in all five Trusts have not been paid in full and have suffered losses in principal and interest.  *See* Declaration of Jay B. Kasner In Support Of The Motion Of The Merrill Lynch Defendants And The Individual Defendants To Dismiss The Amended Class Action Complaint ("Kasner Decl."), Exs. 11-15.

[14] ML Mot. at 32.  Contrary to Defendants' assertions, Plaintiffs do not allege that they have been injured "because the [C]ertificates are illiquid."  Rather, as set forth above, Plaintiffs allege that they have been injured because the Certificates dramatically declined in value.  ¶¶9, 208-09.

[15] ¶¶9, 209.  Defendants' reliance on *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994), is misplaced.  In that case, a civil RICO action, the plaintiff sought damages it claimed to have suffered from the making of an under-secured loan to the defendant based on defendant's allegedly fraudulent representations.  *Id.* at 767.  The Second Circuit, applying New York state law, rejected the bank's claim that it was damaged by the making of the loan and found that the bank's injuries based on the fraud were limited to its out-of-pocket expenses as a

be determined without a developed record.  *Cf. IPO II*, 241 F. Supp. 2d at 351 n.80 ("The determination of value [in a Section 11 case] is a fact-intensive inquiry.").  *See also In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694, 702 (E.D. Mo. 2002) (securities trials generally involve "a veritable battle of the experts on the penultimate issues of causation and damages").

Lastly, Defendants inappropriately assert a negative causation defense that any losses incurred before the truth about an alleged misrepresentation is revealed are not compensable. ML Mot. at 32.  Section 11(e), however, measures damages for securities sold prior to the filing of suit as the difference between the amount paid and the price at which the security is sold before suit. 15 U.S.C. § 77k(e).  As explained above, the Amended Complaint clearly alleges a decline in the value of the Certificates since issuance.  ¶9.  Courts within this District refuse to consider a negative causation defense at the motion to dismiss stage even where plaintiffs assert claims for losses suffered prior to any alleged corrective disclosure.[16]

### B.    This Court Already Rejected Defendants' Contentions That Plaintiffs Do Not Adequately Plead Untrue Statements And Omissions

Defendants largely repeat arguments that this Court previously considered and rejected and cite many of the same cases from their previous motions.  This strategy of filing successive motions to dismiss serves only to waste the parties' and judicial resources.  Defendants could have moved for reconsideration of the June 1 Order in accordance with Local Rule 6.3.  They did not.

---

result of the fraud.  *Id.* at 768.  Here, the plain language of Section 11(e) prescribes the method for measuring damages.

[16]  *See, e.g., In re WRT Energy Sec. Litig.*, 2005 WL 2088406, at *2 (S.D.N.Y. 2005) (sustaining Section 11 claim that included declines in share value prior to the first alleged disclosure because "[t]o conclude otherwise places a burden of pleading loss causation on the plaintiffs, and removes the burden of establishing negative causation from the defendants, where it properly lies.").  Defendants' authority conflicts with the majority rule.  In *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003), the plaintiff alleged that she sustained a loss by pointing to declines in share price before any public disclosure of the concealed information.  In *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 273 (S.D.N.Y. 2007) Judge Howell recognized that *Merrill Lynch & Co.* is virtually unprecedented as it cites to no other cases in which a Rule 12(b)(6) motion to dismiss was granted based on the absence of loss causation in a Section 11 claim.  508 F. Supp. 2d at 273.

The Amended Complaint, like the sustained claims in the prior complaint, alleges that the Offering Documents contained untrue statements of material fact, or omitted to state material facts necessary to make the statements therein not misleading, regarding: (1) the underwriting standards purportedly used in connection with the origination of the underlying mortgages; (2) the maximum LTV ratios used to qualify borrowers; (3) the appraisals of the properties underlying the mortgages; (4) the debt-to-income ratios permitted on the loans; and (5) the ratings of the Certificates.  ¶7.

### 1.  Untrue Statements And Omissions Related To Underwriting Guidelines

Section 11 provides a "stringent standard of liability" that is "virtually absolute, even for innocent misstatements."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).  A plaintiff "need only show a material misstatement or omission to establish his *prima facie* case," which "places a relatively minimal burden on a plaintiff."  *Id*. at 382.  Section 12(a)(2) of the Securities Act provides similar liability for untrue statements and omissions in a prospectus.[17]

The Court previously found that "contrary to the representations in the registration statements that the certificates 'were originated generally in accordance with the underwriting guidelines,' the applicable underwriting standards were 'systematically disregarded' in ways detailed in the Complaint.  *See* ¶¶60-64, 67, 84-87."  June 1 Order, 2010 WL 2175875, at *5. The Court found "the alleged ***repeated deviation*** from established underwriting standards is enough to render misleading the assertion in the registration statements that underwriting guidelines were generally followed.  ***Without multiplying examples***, the Court concludes that the Complaint's allegations of how the registration statements were false or misleading are sufficient to escape dismissal."  *Id.* (emphasis added).  Numerous other courts are in accord.[18]

---

[17] *See* 15 U.S.C. § 77l(a)(2)*; Randall v. Loftsgaarden*, 478 U.S. 647 (1986).  As to Plaintiffs' Section 12(a)(2) allegations, Defendants do not dispute that Plaintiffs purchased their Certificates directly from Merrill PFS.

[18] *See, e.g., In re Lehman Bros. Sec. & Erisa Litig.*, 684 F. Supp. 2d 485, 493-94 (S.D.N.Y. 2010) ("Lehman MBS"); *Tsereteli v. Residential Asset Securitization Trust*, 692 F. Supp. 2d 387, 392-93 (S.D.N.Y. 2010); *N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*,

a.   As Before, The Amended
Complaint Satisfies Rule 8

The Amended Complaint repeats the allegations that originators, contrary to the representations in the Offering Documents, systematically disregarded their underwriting standards and made loans in order to increase loan volumes.   ¶¶53-172.   In *Twombly*, the Supreme Court held that in order to survive a motion to dismiss, Plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face."   550 U.S. at 570.   The Amended Complaint more than satisfies this requirement.

Ignoring the Court's explanation that the alleged underwriting violations cited in the Order were just "examples," Defendants attempt to re-challenge all of the Amended Complaint's allegations.   ML Mot. at 3, 18.   As before, Defendants demand a level of detail far beyond Rule 8, *Iqbal* and *Twombly*.   For example, Defendants erroneously contend that CW10's statement that one in four appraisals at First Franklin (which Merrill Lynch owned) was inflated is insufficient.   In fact, CW10 – who was a corporate underwriter – provided further details, including that: (1) CW10 rejected loans with overinflated appraisals, only to have them approved by managers; and (2) First Franklin had no blacklists to identify appraisers who consistently inflated appraisals.   ¶107.

Likewise, Ownit's founder and CEO admitted that Ownit lowered its underwriting standards to increase volume.   ¶97.   Witnesses in Georgia and Oregon corroborated the CEO's admission.   ¶¶98-99.   Defendants' attempt to limit the Amended Complaint's allegations to only loans in the Ownit 2006-2 pool from Georgia and Oregon imposes a level of particularity not

---

2010 WL 1172694, at *10-11 (S.D.N.Y. Mar. 26, 2010) ("RBS MBS"); *DLJ MBS*, 2010 WL 1473288, at *7; *N.J. Carpenters Health Fund v. Residential Capital LLC*, 2010 WL 1257528, at *4-7 (S.D.N.Y. Mar. 31, 2010) ("ResCap MBS"); *Wells Fargo MBS*, 2010 WL 1661534, at *12-13.

required under Rule 8.  ML Mot. at 20.  Regardless, 404 loans constitute 13% of the Ownit 2006-2 pool, an unquestionably material portion.[19]

Similarly, IndyMac was an originator in the MLALT 2007-F1 offering.  As before, the Amended Complaint alleges that IndyMac "loosened [its] guidelines *too far*."  The Amended Complaint further alleges that when it filed for bankruptcy, IndyMac was forced to retain $10.7 billion in loans that it was unable to sell in the secondary market.[20]  Likewise, contrary to Defendants' assertion, the Amended Complaint details that exceptions at American Home were the *norm*, and were not simply granted in the presence of compensating factors.[21]  These are *verbatim* allegations this Court previously found sufficient to plead a claim under Rule 8, *Iqbal* and *Twombly*.  June 1 Order, 2010 WL 2175875, at *5.

The Amended Complaint provides allegations for eight additional originators – Wachovia, MLN, ResMAE, WMC, GreenPoint, FNBN, Fremont and PHH – that systematically disregarded their stated underwriting guidelines.  For example:

- MLN admitted publicly that it experienced a significant increase in the number of early payment defaults in its subprime loans and that the Connecticut Banking Commissioner and other state regulators issued cease-and-desist orders which, among other things, ordered it to stop originating loans.  ¶169;

- CW21, a former regional credit manager at ResMAE from March 2004 through March 2007, saw appraisers, title companies and borrowers "altering documents and that kind of stuff; that was very big in 2005 and 2006.  Especially the stated income, they would state that they made this income and they didn't, it was [a] misrepresentation." ¶115;

- WMC's underwriting practices ranked it fourth in the Comptroller of the Currency's "Worst Ten of the Worst Ten" and it originated "some of the worst-performing loans in the . . . $575 billion market for home equity asset-backed securities."  ¶119;

---

[19] ¶¶98-99.  Defendants' attempt to limit the Argent allegations to Florida and Illinois loans is similarly misplaced.  The 287 loans in Florida and Illinois constitute 16% of the loans in the MLALT 2007-F1 pool.  ¶¶162-63.

[20] ¶155.  Defendants' contention that the Amended Complaint does not allege that the loosened guidelines were systematically disregarded ignores these plain allegations.

[21] ¶¶91, 92 (exceptions "were always being made" and were made "all the time").  Defendants' contention that Plaintiff LACERA suffered no injury because American Home did not originate loans underlying LACERA's certificates is misplaced.  In fact, Countrywide originated the loans underlying LACERA's certificates in MLALT 2007-AF1.  Defendants concede the sufficiency of Plaintiffs' allegations that Countrywide disregarded its underwriting standards.  Clearly, LACERA suffered injury as the result of its purchases.  ¶243.

- One consultant reviewed the documentation for GreenPoint loans underlying a securitized transaction and concluded that 93% of the loans that GreenPoint sold contained errors, omissions, misrepresentations, negligence, fraud or similar occurrences in connection with the origination and underwriting of the loans. ¶¶164-66;

- The Federal Deposit Insurance Corporation ("FDIC") forced Fremont out of the lending business in March 2007 for extending credit "in an unsafe and unsound manner" and concluded that Fremont was "operating with inadequate underwriting criteria and excessive risk ... operating with a large volume of poor quality loans," and "engaging in unsatisfactory lending practices." ¶¶124-25.

In their motions, Defendants attempt to challenge these additional allegations on similar grounds to those that the Court previously rejected as to the originators in the original complaint. For example, Defendants erroneously assert that the Amended Complaint's Wachovia allegations all relate to Option ARM mortgages. ML Mot. at 25. In truth, CW32 stated that underwriters at Wachovia could "make and break [their] own rules" and CW34 stated that Wachovia personnel often held "instant underwriting" events where large groups of high-risk loans were approved *en masse*. ¶¶132, 136-37. These statements were not limited to Option ARM mortgages. Likewise, the Amended Complaint alleges that at ResMAE – like at American Home – granting exceptions was the norm, and was done without regard to compensating factors. ¶¶111-15. Defendants similarly ignore PHH's own admission in its 10-Q that it had "loans with origination flaws." ¶172.

As detailed above, information revealed through regulatory investigations and findings and private litigation involving WMC and GreenPoint further support the inference that these originators, like those across the industry (¶¶150-54), disregarded stated underwriting guidelines in order to increase loan volume. *See De La Fuente v. DCI Telecomms., Inc.*, 259 F. Supp. 2d 250, 260 (S.D.N.Y. 2003). Moreover, additional sources in the Amended Complaint corroborate these allegations, including media reports, loan performance and ratings downgrades. For example, the Comptroller of the Currency's listing of WMC on its "Worst Ten of the Worst Ten" list of originators presented to the Financial Crisis Inquiry Commission in April 2010 corroborates the PMI Mortgage Insurance lawsuit against WMC. ¶119. Likewise, the poor

performance and ratings downgrades of the Certificates supported by GreenPoint loans confirms the consultant's findings in the U.S. Bank lawsuit against GreenPoint.  ¶164.

The Amended Complaint clearly identifies, by page number, the materially untrue statements and omissions in the Prospectus Supplement for MLMI 2006-MLN1.  ¶¶207, 327. The Amended Complaint details MLN's disregard for its underwriting standards, including that (1) MLN experienced a significant increase in the number of early payment defaults; (2) MLN was forced to buy back the increasing number of loans that were subject to repurchase requests; and (3) the Connecticut Banking Commissioner, and regulators from Massachusetts, Vermont, Rhode Island, Pennsylvania, New Hampshire, New York, Michigan, and Maine forced MLN to shut down its origination business.  ¶169.

Defendants also attempt to criticize the Amended Complaint's allegations of Fremont's underwriting violations by characterizing the witness accounts, and investigations and regulatory findings against Fremont as "unreliable."   ML Mot. at 28.   As detailed further below in (§ III.B.4), these challenges are devoid of merit.  The Massachusetts Attorney General and the FDIC concluded that Fremont was "operating with inadequate underwriting criteria and excessive risk in relation to the kind and quality of assets held by the Bank," "operating with a large volume of poor quality loans," and "engaging in unsatisfactory lending practices."  ¶125. Fremont received a Cease and Desist Order and was forced out of the lending business in March 2007 for extending credit "in an unsafe and unsound manner" and committing violations of law and FDIC regulations.  ¶124.  Confidential witness statements corroborate the allegations in the FDIC Cease and Desist Order and the Massachusetts Action.

Defendants repeatedly contend that the early payment defaults, repurchase requests, financial difficulties and bankruptcies for loans in the Merrill Lynch pools are: (1) typical of the subprime industry and (2) the result of a "housing price correction," rather than a widespread disregard for underwriting standards.[22]  Defendants' spin of the facts is irrelevant at this stage.

---

[22] ML Mot. at 8-9, 24, 30.

Defendants have not – and cannot – satisfy their "heavy burden" of **proving** that the loss in value to the Certificates was caused by other factors.[23]  Moreover, Defendants' contention is factually wrong.   According to Ben S. Bernanke, Chairman of the Federal Reserve Board, "[t]he deterioration in underwriting standards that appears to have begun in late 2005 is another important factor underlying the current crisis.  A large share of subprime loans that were originated during this time feature high combined loan-to-value ratios and, in some cases, layers of additional risk factors, such as a lack of full documentation or the acceptance of very high debt-to-income ratios."   ¶154.  Also, the President's Working Group on Financial Markets concluded that "[t]he turmoil in financial markets clearly was triggered by a **dramatic weakening of underwriting standards for U.S. subprime mortgages,** beginning in late 2004 and extending into early 2007." (Emphasis in original).

Defendants' attempt to distinguish the June 1 Order and the numerous other decisions in similar mortgage-backed securities is misguided.  ML Mot. at 17-18 (citing *Indymac MBS*, *Lehman MBS* and *RBS MBS*).  These decisions are not, as Defendants contend, limited solely to "allegations showing that the loan originators systematically disregarded even the loose underwriting standards that prevailed with respect to subprime loans."  ML Mot. at 17.  Rather, as the June 1 Order found, these decisions also found that the originators' alleged repeated deviation from the stated underwriting standards is sufficient to state a Section 11 claim.  *See*

---

[23] *See, e.g.*, *Countrywide*, 588 F. Supp. 2d at 1173-74; *In re New Century*, 588 F. Supp. 2d 1206, 1230 (C.D. Cal. 2008) (rejecting claim that mortgage lender and securitizer was "taken by surprise when the [housing] market took an unexpected turn for the worse"); *Atlas v. Accredited Home Lenders Co.*, 556 F. Supp. 2d 1143, 1161 n.7 (S.D. Cal. 2008) (refusing to consider defense counsel's summary of "non-prime lending industry events" as a defense to liability); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 513-14 (S.D.N.Y. 2009) (rejecting defendants' argument that the decline in stock price was due to intervening cause of market collapse as result of subprime mortgage crisis); *In re StockerYale Sec. Litig.*, 453 F. Supp. 2d 345, 359 (D.N.H. 2006) ("Defendants' reference to a wide range of economic and other factors that may have caused or contributed to the decline in price of StockerYale shares raises issues that will be addressed at later stages of this litigation, but those possibilities do not warrant dismissal…"); *Schnall v. Annuity and Life Re (Holdings), Ltd.*, 2004 WL 367644, at *9 (D. Conn. Feb. 22, 2004) ("While a trier of fact might blame market forces rather than accounting violations for that decline, the allegations in the Complaint are sufficient to withstand [this] motion to dismiss.").

*IndyMac MBS*, 2010 WL 2473243 at *8-9 (IndyMac allegations); *Lehman MBS*, 684 F. Supp. 2d at 493-95 (Countrywide, GreenPoint, IndyMac and First Franklin allegations); *see also RBS MBS* at 2010 WL 1172694, at *10-13 (Countrywide, American Home and IndyMac allegations).

In sum, the Amended Complaint provides "enough facts" to show a plausible claim, as required by *Twombly*, that statements in the Offering Documents were untrue or contained material omissions. As the Court previously found, these allegations satisfy Rule 8, and Defendants' motions should be denied.[24]

**b.    As Before, The Offering Documents'
Purported Disclosures Are Insufficient**

Repeating assertions previously raised and rejected, Defendants attempt to rely on boilerplate disclosures.[25]  ***None*** of these purported disclosures revealed the actual information that the Amended Complaint alleges was omitted, nor the Certificates' actual risks.[26]  As Judge Conner explained:

> The cautionary language must be specific, prominent and must directly address the risk that plaintiffs' claim was not disclosed.  (Citation omitted).  ***The requirement that the cautionary language must match the specific risk is particularly important***, considering that most, if not all, security offerings, contain cautionary language.  (Citation omitted).

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 322 (S.D.N.Y. 2009) (citing *Olkey v. Hyperion 1999 Term TRUST*, 98 F. 3d 2, 5-6 (2d Cir. 1996) and *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 579 (S.D.N.Y. 2007)).  *See also In re Vivendi Universal, S.A.*, 381 F. Supp.

---

[24] Defendants again contend that the Amended Complaint is insufficient because it contains no allegations that "the defendants knew of any undisclosed overrides to underwriting criteria."  ML Mot. at 17.  Defendants are wrong.  Numerous courts in mortgage-backed securities cases have recently rejected the argument that the phrase "to the extent known" in Section 111(a)(3) of Regulation AB compels plaintiffs to plead scienter facts in order to adequately plead a Section 11 claim.  *See, e.g., RBS MBS*, 2010 WL 1172694, at *11 (Regulation AB is immaterial because plaintiffs alleged that defendants "affirmatively misstated the guidelines used – or rather, disregarded – by the mortgage originators of the underlying loans"); *Lehman MBS*, 684 F. Supp. 2d at 493-94 (same); *ResCap MBS*, 2010 WL 1257528, at *5.

[25] *See* Plaintiffs' Initial Opp. at 37.

[26] *See* ML Mot. at 25, 27 (arguing that WMC and ResMAE's underwriting standards stated that a "substantial number" of loans would "represent … underwriting exceptions"); *Id.* at 29 (arguing that American Home originated loans pursuant to exceptions and certain types of its loans required no documentation).

2d 158, 183 (S.D.N.Y. 2003) ("boilerplate warnings will not suffice . . . . The cautionary statements must convey substantive information . . . ."). Here, Defendants' boilerplate risk disclosures are too general and do not address the omitted information.

Defendants again contend that the Offering Documents disclosed that the originators had discretion to deviate from their stated underwriting. ML Mot. at 17, 25, 27. Defendants miss the point:

> Plaintiffs' allegation is that the Offering Documents failed to disclose that variance from the stated standards was essentially defendants' norm. In other words, plaintiffs allege that the Offering Documents were misleading as to the **_extent_** to which Wells Fargo and the third-party originators deviated from their guidelines.

*Wells Fargo MBS*, 2010 WL 1661534, at *11 (emphasis in original). Here, Plaintiffs likewise allege that, regardless of the originators' stated ability to make exceptions, the originators issued loans with exceptions in the absence of compensating factors. ¶¶67, 83, 85, 91-92, 112, 114-15, 147. Nowhere did Defendants disclose these facts to Plaintiffs and the Class. *See RBS MBS*, 2010 WL 1172694, at *11-12.

Defendants also contend that the fact that the Offering Documents disclosed that many of the underlying mortgages were subprime loans absolves them of liability.[27] This case, however, is not about the nondisclosure of the risk of subprime loans, or whether subprime loans are riskier than conforming loans. Subprime borrowers may have financial and credit profiles that render them unable to qualify for prime loans, but originators still must properly underwrite subprime loans and value the collateral through legitimate appraisals. Indeed, such underwriting assumes particular importance for subprime borrowers precisely because they do not qualify for prime loans. As a result of originators ignoring their obligation to underwrite loans in accordance with their stated standards, between 35% to 50% of loans in 15 of the 19 offerings are either 60 days or more delinquent, in foreclosure, or bank-owned, and virtually all of the AAA tranches – those

---

[27] *See* Plaintiffs' Initial Opp. at 13.

Certificates which were supposed to carry the least investment risk – have been downgraded to below investment-grade.  ¶¶208-09.

Defendants assert that three trusts disclosed that MLN had filed for bankruptcy and stated that the Sponsor and the Merrill Depositor could provide no assurances that MLN had followed its stated guidelines.  ML Mot. at 22.  This is factually inaccurate as to MLMI 2006-MLN1.  The offering occurred September 27, 2006, nearly four months prior to MLN's bankruptcy.  As to the other two trusts, these purported disclosures are ineffective because the cautionary language (no assurances that MLN had followed its stated guidelines) does not match the specific facts (MLN had actually systematically ignored its guidelines).[28]  Moreover, risk disclosures can only apply to *future* events and not to MLN's *past* compliance with underwriting standards.  *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("'The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'").[29]  In addition, blanket disclosures stating that "no assurances" could be made about whether MLN underwrote the loans in accordance with its guidelines are not meaningful and do not match the omitted facts.[30]

_____

[28] *See Flag Telecom*, 618 F. Supp. 2d at 322.  Defendants' contention that the Offering Documents for 2007-CB4 disclosed the People's Choice and New Century bankruptcies fails for similar reasons.  ML Mot. at 7.  Specifically, it was not until over a year after the 2007-CB4 offering that the Bankruptcy Examiner issued its report and detailed the "serious loan quality issues."  ¶143.

[29] *See also, In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 442 (S.D.N.Y. 2009); *Giarraputo v. Unumprovident Corp.*, 2000 WL 1701294, at *16 (D. Me. Nov. 8, 2000) ("the statement in question must be a 'forward looking statement' such as a financial projection, future management plans or objectives, statements of future economic performance or other statements of prediction"); *In re Number Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1, 23 (D. Mass. 1999) ("bespeaks caution" doctrine may not be invoked to protect defendants' misrepresentations regarding present facts).

[30] *See, e.g., In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 317-18 (8th Cir. 1997) (warning that "[t]here can be no assurance … that the Company as a whole will generate income from

In sum, while the Offering Documents contained boilerplate disclosures, Defendants cannot establish that the disclosures in the Offering Documents "cured" the alleged untrue statements and omissions as a matter of law. *See Briarwood Invs., Inc. v. Care Invs. Trust, Inc.*, 2009 WL 536517, at *3-4 (S.D.N.Y. Mar. 4, 2009).

2. Untrue Statements And Omissions
Related To Appraisals and LTV Ratios

The Offering Documents contained statements that appraisals were conducted by a qualified, independent appraiser, and each appraisal was on forms acceptable to Fannie Mae and Freddie Mac. ¶¶42-43, 187. As required by Fannie Mae and Freddie Mac, and as represented by the underwriting standards set forth in certain of the Prospectus Supplements, the appraisals were to be in conformity with USPAP. ¶¶173-75. In reality, appraisers industry-wide "experience[d] systemic problems of coercion" and were compelled to inflate valuations in order to avoid the "negative ramifications" if they did not "cooperate, alter their appraisal, and provide a higher valuation." ¶¶180-81. According to the testimony of the Chair of the Appraisal Institute before the Senate Committee on Banking, appraisers were "ordered to doctor their reports" or else they would never "see work from these parties again" and could be "placed on exclusionary or 'do-not-use' lists." *Id.* at 180. Additionally, 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to make mortgage deals go through. ¶181.

_____

operations or provide cash from operating activities" did not provide sufficient detail to bespeak caution); *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1117-18 (D. Nev. 1998) (holding that "general warnings that 'no assurances' could be made" in prospectus did not "insulate" defendants' "actionable misstatements"). Defendants' authority is off-point or actually supports Plaintiffs. In *City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortgage Loan Trust Inc.*, 2010 WL 1371417 (E.D.N.Y. Apr. 6, 2010), the court **did not** dismiss the complaint based on purported disclosures. ML Mot. at 17. Rather, the court found the "case very close to the dismissal line … [h]owever … the court will not dismiss the case at this time." *Ann Arbor*, 2010 WL 1371417, at *10. Defendants also attempt to rely on *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 305-07 (D. Mass. 2009) – as they did in the last round of briefing – a district court decision from the First Circuit that is currently on appeal. *Nomura* is an outlier that conflicts with the June 1 Order and additional decisions from this district. *See Lehman MBS*, 684 F. Supp. 2d, at 493-94; *RBS MBS*, 2010 WL 1172694, at *10-11; *DLJ MBS*, 2010 WL 1473288, at *6-7; *ResCap MBS*, 2010 WL 1257528, at *4-7.

Confidential witnesses corroborate the allegations of industry-wide inflation.  ¶¶84, 98-99, 115, 160, 183-84.

In their current motions, Defendants recycle their unsuccessful contention that the appraisals are opinions and that Plaintiffs must plead that the appraisers did not truly have the "opinion."  ML Mot. at 13-16.  Defendants continue to misunderstand the nature of Plaintiffs' allegations.[31]  The Offering Documents stated that appraisals were conducted in conformity with USPAP.  In truth, however, the appraisals were generally not performed in conformity with USPAP, were not performed by truly "independent" appraisers, or both.  ¶186.  As a result of this failure to follow stated guidelines, appraisals were inflated and LTV ratios were misstated.[32]

In *Wells Fargo MBS*, the court considered the same allegations at issue here and held that pleading appraisal misstatements does not require plaintiffs to plead subjective belief: "[P]laintiffs have alleged that Wells Fargo's practices permitted the pervasive and systematic use of inflated appraisals, affecting all types of mortgages.  Plaintiff need not allege anything further in order to state a claim."  2010 WL 1661534, at *12.  Here, as in *Wells Fargo MBS*, Plaintiffs' claims that the statements in the Offering Documents regarding USPAP and "independent" appraisals were untrue are more than plausible under *Twombly*.[33]

_____

[31]  *See* Plaintiffs' Initial Opp. at 42-43.

[32]  The Offering Documents also contained false and misleading statements regarding credit enhancement, including overcollateralization and excess interest.  ¶187.  Overcollateralization and other forms of credit enhancement are directly dependent on accurate appraisals.  In other words, the statement that the "principal balance of mortgage loans ... is larger than the principal balance of the related certificates," is untrue and misleading because the appraisals for the collateral were systematically inflated.  Accordingly, the credit enhancement misstatements are actionable for the same reasons that the appraisal statements are.  Curiously, Defendants' motion improperly groups the "credit enhancement" misstatements together with the "ratings" misstatements.

[33]  This case is not like *Good Hill Partners L.P. v. WM Asset Holdings*, 583 F. Supp. 2d 517, 520 (S.D.N.Y. 2008).  In *Good Hill*, the offering documents contained "certain graphs and tables [which] set forth 'loss scenarios'" that did not ultimately reflect the policy applied to the bonds.  This Court found that the loss scenarios were non-actionable opinions.  Here, unlike the future projections in *Good Hill*, the statement that properties were evaluated in accordance with USPAP was a verifiable fact that existed at the time of the offerings and did not depend on a projection or future "loss scenario."

25

While Defendants assert in this motion that appraisals are just opinions, this is a *post hoc* explanation during litigation.  The Offering Documents themselves do not say that appraisals are just subjective opinions.  Rather, they represent that appraisals are based on industry standards.

Even assuming, *arguendo*, that a fact finder determines that appraisals were opinions, statements of opinion are actionable if the speaker could not have genuinely or reasonably believed the accuracy of the statement.  *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (finding statements that company's situation was "in good shape" or "under control," where defendants "allegedly knew the contrary was true," to be false and misleading).  The Amended Complaint amply alleges facts showing that appraisal values were not genuine or believed.  For example, appraisers industry-wide were aware of "do-not-use" lists, and 90% reported that they were pressured to raise property valuations.  ¶¶180-81.  Additionally, "negative ramifications" would result if they did not "cooperate, alter their appraisal, and provide a higher valuation." ¶181.  Such facts call into serious doubt whether appraisals were genuinely or reasonably believed or conducted in accordance with USPAP.

### 3.   Untrue Statements And Omissions Related To The Certificates' Ratings

The ratings were based on faulty data provided to the rating agencies.  ¶196.  This data was inaccurate due to the systemic violations of the underwriting standards, inflated appraisals, and inaccurate LTV ratios.  *Id.* The Offering Documents failed to disclose that the ratings were based on inaccurate data, outdated models and stale assumptions about likelihood of borrower delinquencies and defaults.  ¶¶8, 196, 202-05.  At the time the Certificates were issued, updated models were developed, but not implemented.  *Id.*  The SEC found that the rating agencies failed to document or provide rationale for ***deviations from models*** or to identify or address errors in their models.  ¶199.  As a result, the ratings were unjustifiably high and the Certificates were far

riskier than other investments with the same ratings.[34]  Likewise, the statements about how the

ratings were determined were untrue and contained material omissions.  ¶189.

The Dodd-Frank Wall Street Reform and Consumer Protection Act, H.R. 4173, 111th

Cong. (2010) ("Wall Street Reform Act") further supports the Amended Complaint.  It states, in

relevant part:

> In the recent financial crisis, ***the ratings on structured financial products have
> proven to be inaccurate.***  This inaccuracy contributed significantly to the
> mismanagement of risks by financial institutions and investors, which in turn
> adversely impacted the health of the economy in the United States and around the
> world.

*Id.* at § 931 (emphasis added).

In *Wells Fargo MBS*, the court held that plaintiffs had adequately pled the falsity of

ratings based on allegations nearly identical to those here.  2010 WL 1661534, at *12-13.  Like

Plaintiffs here, the *Wells Fargo MBS* plaintiffs cited the SEC Summary Report and "statements

by executives of defendants Moody's and Standard & Poor's in which the executives admitted

that they were aware at the time the subject ratings were made that the agencies' rating models

were outdated."  *Id.*  The court concluded that plaintiffs' complaint was "sufficient to establish

an actionable misstatement with respect to the rating process."  *Id.* at 12.

In their motions, Defendants again attempt to import a scienter requirement into Section

11 that does not exist.  ML Mot. at 16-17.  They contend that the statements in the Offering

Documents related to ratings are "opinions" and that Plaintiffs must plead that the "opinions" are

subjectively false.[35]  This "subjective falsity standard," however, does not apply to verifiable

factual statements.[36]  Here, statements in the Offering Documents that ratings addressed "the

---

[34] Defendants' citation of *RBS MBS*, 2010 WL 1172694, at *14 in support of their argument that
there was no ratings-related misstatement on the face of the Offering Documents is unavailing.
In fact, Plaintiffs do not allege that the Certificates did not receive the ratings listed in the
Prospectus Supplements, but that the ratings were unjustifiably high compared to other
investments with similar ratings.

[35]  *See* Plaintiffs' Initial Opp. at 45-47.

[36] *In re AES Corp. Sec. Litig.*, 825 F. Supp. 578, 589 (S.D.N.Y. 1993) (applying a "subjective
falsity standard" to "statements of fact would be tantamount to reading a scienter requirement
into sections 11 and 12(2) which is contrary to the text of these statutes").  *See also In re Wash.*

likelihood of the receipt … of principal and interest" and "the nature of the underlying mortgage loans" are factual assertions that the Certificates' value and risk had been evaluated, and that the ratings accurately reflected the character of the underlying mortgage pools at the time.  ¶189.

Moreover, even if ratings are opinions, they are actionable when not genuinely or reasonably believed.  *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 176 (S.D.N.Y. 2009) (finding that the credit ratings were actionable misstatements because "plaintiffs have sufficiently pled that the Rating Agencies did not genuinely or reasonably believe that the ratings they assigned … were accurate and had a basis in fact."). Here, the rating agencies had access to more sophisticated models which "covered the full spectrum of new mortgage products."  ¶203.  Indeed, former managing directors at both Moody's and S&P testified that the old models were outdated and failed "to capture changes in performance of the new non-prime products."  *Id*.  Yet, in rating the Certificates, they did not update the models, despite deterioration in credit standards.  ¶204.  Such allegations support a plausible claim that the ratings were not genuinely or reasonably believed to be accurate.  *Abu Dhabi*, 651 F. Supp. 2d at 175-76.

Defendants further contend that the "disclosures" in the Offering Documents – generally asserting that: (1) the ratings are not recommendations to buy, sell or hold the Certificates; (2) the ratings do not guarantee payment; and (3) a downgrade could affect the Certificates' liquidity and market value – protect the ratings under the "bespeaks caution" doctrine.  ML Mot. at 7-8, 16.  Defendants are mistaken.  The ratings purported to reflect the ***present*** risk of the Certificates based on ***historical*** facts such as the borrower's credit, employment and payment history, and ***historical*** delinquency and default statistics.  Likewise, the existence of, but failure to implement, updated models and data is a fact which was ***existing***, but undisclosed, at the time of the Certificates' issuance.  ¶203.  Accordingly, the ratings were misrepresentations of present or

_____

*Mut., Inc. Sec., Deriv. & ERISA Litig.*, 2009 WL 3517630, at *21-22 (W.D. Wash. Oct. 27, 2009) (finding that statements that internal control reports were audited "in accordance with the PCAOB's standards" and that financial statements were presented "in conformity with accounting principles generally accepted in the United States of America" were opinions).

28

historical fact to which the "bespeaks caution" doctrine does not apply.  *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 617 (S.D.N.Y. 2008).  "[C]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."[37]

Even if the misstatements and omissions regarding the ratings were forward-looking, the boilerplate disclosures in the Offering Documents are not ***meaningful*** cautionary language.  "[C]autionary language must be specific, prominent and must directly address the risk that plaintiffs' claim was not disclosed."[38]  Here, the disclosures related to the ratings are far too general to qualify as "meaningful."  Defendants do not – and cannot – cite any disclosures warning that the risk of the Certificates was far greater than the ratings represented.  Further, they cannot point to any statement disclosing that they were using inaccurate loan data, failed to implement updated models or deviated from their models.  *See Abu Dhabi*, 651 F. Supp. 2d at 176 (disclaimer stating that "[a] credit rating represents a Rating Agency's opinion regarding credit quality and is not a guarantee of performance or a recommendation to buy, sell or hold any securities" was insufficient); *see also Wells Fargo MBS*, 2010 WL 1661534, at *12 (upholding ratings as actionable misstatements).

### 4.   Plaintiffs' Sources Are Reliable And Corroborate Their Allegations

Under *Twombly*, 550 U.S. 544, a pleader must "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal*, 129 S. Ct. at 1944 (emphasis in original).  Here, the Amended Complaint provides several categories of information to support the claims, including witness accounts.

Defendants attempt to challenge the reliability of the Amended Complaint's confidential witness statements.  ML Mot. at 12-13.  As before, the Amended Complaint describes the

---

[37] *In re AOL Time Warner Sec. and ERISA Litig.*, 381 F. Supp. 2d 192, 223 (S.D.N.Y. 2004) (citing *Rombach*, 355 F.3d at 173); *P. Stolz*, 355 F.3d at 96-97.

[38] *Flag Telecom*, 618 F. Supp. 2d at 322 (citing *Olkey*, 98 F.3d at 5-6); *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 211-12 (S.D.N.Y. 2004) (generalized disclosures will not shield defendants as cautionary language "must 'warn investors of exactly the risk that plaintiffs' claim was not disclosed.'").

confidential witnesses "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. *See also In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 493 (S.D.N.Y. 2004); *Freudenberg v. E*Trade Fin. Corp.*, 2010 WL 1904314 (S.D.N.Y. May 11, 2010). For example, CW4 was "an Executive Vice President of Production Operations and later an Executive Vice President of Process Improvement," who worked *for 17 years* at Countrywide. ¶83. CW18 was the Chief Appraiser at Accredited for five years. ¶160. CW22, an Assistant Vice President, and Regulatory Risk Examiner at Fremont, was involved in the FDIC's Fremont investigation. ¶128. These individuals, along with the other confidential witnesses, clearly possess first-hand knowledge concerning violations of underwriting and appraisal standards. Nothing more is required.[39]

Defendants' claim that allegations based on related investigations, regulatory inquiries and litigation "should be disregarded" because counsel has a non-delegable duty to investigate ignores counsel's extensive investigation described above.[40] Plaintiffs' counsel, however, conducted an extensive investigation that included, among others, witness interviews, the review and analysis of offering documents, media reports, loan performance data, Congressional testimony and findings, and related regulatory investigations and private lawsuits. Moreover, even after *Pavelic*, "an attorney may rely on other attorneys for factual assertions, if that reliance

---

[39] *Novak*, 216 F.3d at 314. Defendants' assertion that confidential witnesses are inherently suspect is *not* the law in the Second Circuit. ML Mot. at 12 (citing *Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.*, 638 F. Supp. 2d 120, 128 (D. Mass. 2009). In any event, the confidential witnesses in *Pyramid* provided only subjective generalizations and the company's Selling, General, and Administrative Costs did not materially increase as a proportion of revenue. *Id.* at 127-28. Here, the 37 confidential witnesses provide details regarding the disregard for underwriting standards.

[40] ML Mot. at 12-13 (citing *Pavelic & LeFlore v. Marvel Entm't Group*, 493 U.S. 120, 126 (1989)). Defendants, while citing Fed. R. Civ. P. 12(f), did not file a motion to strike and do not indicate which specific paragraphs or allegations they claim should be stricken. Motions to strike are viewed with disfavor and will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation. *Eskofot A/S v. E.I. Du Pont De Nemours & Co.*, 872 F. Supp. 81, 93 (S.D.N.Y. 1995); *Emmpresa Cubana Del Tabaco v. Culbro Corp.*, 213 F.R.D. 151, 155 (S.D.N.Y. 2003).

is reasonable." *Morris v. Wachovia Sec., Inc.*, 2007 WL 2126344, at *9 (E.D. Va. July 20, 2007). *See also De La Fuente*, 259 F. Supp. 2d at 260 ("there is nothing improper about utilizing information from the SEC as evidence to support private claims. Indeed … 'it would have been irresponsible for plaintiff to have ignored the SEC's highly relevant allegations and findings.'"). Given the evidence of widespread and pervasive underwriting violations, Defendants fail entirely to establish that the allegations are unreasonable.

The sources in the Amended Complaint corroborate the government investigations, regulatory inquiries and additional litigation. *See In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, at *4 (N.D. Cal. Aug. 14, 2008) (finding that excerpts from a related SEC complaint satisfied Rule 11 because other sources in the complaint "corroborate[d] some, though not all, of the allegations from the SEC complaint."). Despite admitting that the Court itself cited to allegations related to Countrywide's underwriting when sustaining Section 11 claims (ML Mot. at 18), Defendants nevertheless attempt to challenge the reliability of the very sources that the Court has already considered. ML Mot. at 12. This challenge should be rejected.

The same types of information that support the allegations of Countrywide's violations, as well as additional corroborated facts, support the allegations of the additional originators. For example, the Comptroller of the Currency's ranking of WMC fourth on its "Worst Ten of the Worst Ten" list corroborates the PMI Mortgage Insurance lawsuit against WMC. ¶119. The abysmal loan performance and ratings downgrades in the MLALT 2007-A3 and MLALT 2007AF1 offerings, where GreenPoint was a material originator, corroborate allegations related to U.S. Bank's lawsuit against GreenPoint.[41] Four confidential witnesses corroborate the New Century Bankruptcy Examiner's report detailing New Century's systematic disregard for its

---

[41] ¶¶208-09. Defendants' authority is factually distinguishable. For example, in *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382 (S.D.N.Y. 2009), the plaintiffs' complaint included references to two complaints that had been previously dismissed with prejudice. In *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76 (S.D.N.Y. 2003), the court granted defendants' motion to strike material from related complaints in part because the complaint contained "prolix, discursive, redundant, argumentative, and disjointed assertions." *Id.* at 78 ("[t]he present pleading is so steeped with impertinent and verbose material that the Court is compelled to reinforce Rule 8 with Rule 12(f)"). *Id.*

underwriting standards.  Without continuing to multiply examples, the Amended Complaint provides factual support and details showing that the originators, contrary to the representations in the Offering Documents, systematically disregarded their stated underwriting guidelines and made loans in order to increase loan volumes. ¶¶53-172.

> 5.     Rule 8 Does Not Require
>        Identification Of Specific Loans In The Pools

Defendants, repeating a previous unsuccessful argument, insist that "there are no facts alleged from which it could be inferred that loans tainted by conduct alleged in the Amended Complaint were included in the loan pools backing the Certificates."  ML Mot. at 29. Defendants also assert that Plaintiffs must allege that the Certificates performed worse than other MBS of similar vintage.  ML Mot. at 30.  These misguided attempts to invent a heightened pleading standard – one that no court has ever applied to Securities Act claims – should again be rejected.[42]

Courts evaluating nearly identical allegations of widespread abandonment of underwriting guidelines, high default rates and significant downgrades hold that plaintiffs have created a sufficient nexus between the underwriting standard abandonment and the loan pools to support a reasonable inference that the Offering Documents' description of the underwriting guidelines was materially misleading.[43]  These decisions also reject Defendants' contention that the only way to demonstrate that alleged widespread improper origination practices affected the

---

[42] *See* Plaintiffs' Initial Opp. at 24-25.

[43] *See, e.g., Wells Fargo MBS*, 2010 WL 1661534, at *11 (plaintiffs need not directly "tie[] any inconsistent underwriting conduct to the specific Certificates at issue in this case"); *Tsereteli*, 692 F. Supp. 2d at 392 (plaintiffs need not identify "the [specific] loans underlying the Certificates were issued in deviation from IndyMac Bank's underwriting standards"); *Lehman MBS*, 684 F. Supp. 2d 485, 494 (plaintiffs need not identify "the volume of loans that departed from the stated underwriting guidelines"); *ResCap MBS*, 2010 WL 1257528, at *6 ("[The complaint's] factual allegations about HFN's improper underwriting practices coupled with the loan pools' near-total credit rating collapse and default rate spike are sufficient to create a fair inference that HFN totally disregarded the underwriting guidelines"); *DLJ MBS*, 2010 WL 1473288, at *7; *RBS MBS*, 2010 WL 1172694, at *12-13.

loans underlying the Certificates is to identify the specific loans that were affected.[44] Moreover, the Amended Complaint alleges extraordinary ratings collapse from "AAA" to below investment-grade and the terrible performance which amply link the unsound lending practices to the pools of loans in this case.

Moreover, causation is presumed in the context of a Section 11 claim. *See* 15 U.S.C. § 77k. The absence of causation (i.e., negative causation) is an affirmative defense and Defendants carry a "heavy" burden. *In re WorldCom Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 659 (S.D.N.Y. 2004). Defendants' attempt to require Plaintiffs to affirmatively plead causation (i.e., that the Certificates have performed worse than other MBS of similar vintage) would improperly remove the burden from Defendants. *See WRT Energy*, 2005 WL 2088406, at *2 (sustaining Section 11 claim that included declines in share value prior to the first alleged disclosure because "[t]o conclude otherwise places a burden of pleading loss causation on the plaintiffs, and removes the burden of establishing negative causation from the defendants, where it properly lies.").

>    6.    Section 11 Does Not Require
>          Plaintiff Wyoming To Plead Reliance

Reliance is presumed for claims pursuant to Sections 11 and 12(a)(2). *Rombach*, 355 F.3d at 169 n.4 (citing *Herman*, 459 U.S. at 382). Section 11 carries a presumption that "any person acquiring [a] security" pursuant or traceable to a registration statement containing an untrue statement or omission was legally harmed by the defective registration statement. *Barnes v. Osofsky*, 373 F.2d 269, 272 (2d Cir. 1967); *see also Unicorn Field, Inc. v. Cannon Group, Inc.*, 60 F.R.D. 217, 227 (S.D.N.Y. 1973). Only if an investor purchased securities after the

---

[44] As before, Defendants' authorities are inapposite. For example, in *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597 (S.D.N.Y. 2008), the plaintiffs alleged the failure to disclose immaterial facts surrounding a swap transaction. *Id.* at 612. That is not the case here. Further, the plaintiffs in that case, unlike here, alleged the failure to disclose known trends as required by Item 303 of Regulation S-K – a provision that is inapplicable to the Certificates. Likewise, *ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 2009 U.S. App. LEXIS 972 (2d Cir. Jan. 21, 2009), is off point. On the unique facts of that case, the court found alleged misrepresentations were immaterial because they related to less than two percent of defendant's assets. *Id.* at *204.

issuance of an "*earnings statement*" which covers "a period of at least twelve months beginning after the effective date of the registration statement," must that investor prove reliance.  15 U.S.C. § 77k(a)(5).  *See, e.g., In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 288-89 (S.D.N.Y. 2003) (Cote, J.); *see also In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 206 (S.D.N.Y. 2003).

Here, Plaintiffs made 22 separate Certificate purchases in the 19 offerings at issue.  As to three purchases, Defendants contend that Plaintiff Wyoming must prove individual reliance because, according to Defendants, it purchased the three Certificates after the issuance of distribution reports which covered a period of at least twelve months after the effective date of the registration statement.  ML Mot. at 33.  In other words, Defendants assume that the monthly distribution reports are "earning statements" for purposes of section 11(a).[45]  Defendants are wrong.

Distribution reports on Form 10-D are not "earning statements" under section 11(a).  An "earning statement" must consist of one, "or any combination of," the following corporate reports: Forms 10-K, 10-Q, 8-K, 20-F, 40-F, 6-K or in the annual report pursuant to Rule 14a-3 of the Exchange Act.  17 C.F.R. § 230.158 (a)(2)(i)-(ii).  These corporate reports differ fundamentally from Form 10-D because the disclosure required of operating companies is more rigorous than that required of mortgage-backed securities.  Unlike a corporation, the loan pools are static.  There is, therefore, no corporate earnings statement concerning the corporation's assets, revenues and earnings.  The Forms 10-D only report information related to a static loan pool.

Moreover, the question of whether a corporate earnings report serves as an "earning statement" depends on its compliance with SEC rules and regulations governing disclosure.  *See, e.g., WorldCom*, 219 F.R.D. 267 at 293 (finding that a report or statement that violates SEC rules

---

[45] Wyoming acquired its MLMI 2006-WMC1, 2006-WMC2 and 2006-A1 Certificates on April 29, 2008, June 24, 2008, and April, 2, 2007, respectively.  The Prospectus Supplements for these offerings were dated  February 10, 2006, March 28, 2006, and March 29, 2006, respectively.

and regulations is not considered an "earning statement" for Section 11 purposes).  Judge Cote's

decision in *WorldCom* is instructive.  219 F.R.D. at 287-95.  There, plaintiffs purchased bonds

after WorldCom issued an "earning statement" which post-dated the registration statement by

more than 12 months.  *Id.* at 294.  The defendants contended, as Defendants do here, that each

plaintiff who purchased the bonds after this "earning statement" had to establish individual

reliance.  *Id.*  The court found, however, that the "earning statement" at issue was misleading and

omitted material information which the SEC required to be disclosed.  *Id.*  Accordingly, the court

stated:

> An earning statement that violates the SEC filing requirements should not be
> considered an 'earning statement' for purposes of Section 11, and should not
> function in a Section 11 claim to shift to the plaintiff the burden of proving
> reliance.  ***It would be illogical indeed if any filing – no matter how inaccurate or
> misleading, and despite its perpetuation of the very misrepresentations at stake
> in the Section 11 claim – were sufficient to shift the burden to the plaintiffs to
> establish reliance on the Registration Statement.***  Whether a filing is sufficient to
> shift the burden must depend on whether it meets the requirements for earning
> statements imposed by the SEC rules and regulations.

*Id.* at 293-94 (emphasis added).

Here, none of Defendants' Forms 10-D related to the 2006-WMC1, 2006-WMC2 and

2006-A1 disclose information necessary to make the information provided in the Offering

Documents not misleading.[46]  Defendants do not – and cannot – cite information disclosing that

originators systematically disregarded their underwriting standards, that appraisals and LTV

ratios were inaccurate, or that the credit ratings were unjustifiably high.  The information in

Defendants' Forms 10-D related to 2006-WMC1, 2006-WMC2 and 2006-A1 perpetuated "the

very misrepresentations at stake" in Plaintiffs' Section 11 claim.  *WorldCom*, 219 F.R.D. at 294.

---

[46] Defendants cite only a single case, and it actually supports Plaintiffs.  In *Hevesi v. Citigroup
Inc.*, 366 F.3d 70, 75 (2d Cir. 2004), the Second Circuit reviewed certain defendants' petitions
for interlocutory appeal of Judge Cote's rulings in *WorldCom*.  After considering the holding that
a false financial statement does not qualify as an "earning statement" for Section 11 purposes,
the Second Circuit denied defendants' petition for leave to appeal.  *Hevesi*, 366 F. 3d at 84-85
("we decline to consider the reliance issue presented by the Underwriters on an interlocutory
basis").

Accordingly, the Forms 10-D were not "earning statements" and Plaintiff Wyoming is not required to plead actual reliance.

IV.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully submit that Defendants' motions should be denied in their entirety.  In the event the Court decides to dismiss all or part of Plaintiffs' allegations, Plaintiffs respectfully request leave to replead.  Fed. R. Civ. P. 15(a).

Dated: August 20, 2010                    BERNSTEIN LITOWITZ BERGER
                                          & GROSSMANN LLP


                                          _____/s/ David R. Stickney_____
                                          DAVID R. STICKNEY

                                          DAVID R. STICKNEY
                                          TIMOTHY A. DeLANGE
                                          MATTHEW P. JUBENVILLE
                                          TAKEO A. KELLAR
                                          12481 High Bluff Drive, Suite 300
                                          San Diego, CA 92130
                                          Tel:    (858) 793-0070
                                          Fax:    (858) 793-0323
                                          davids@blbglaw.com
                                          timothyd@blbglaw.com
                                          matthewj@blbglaw.com
                                          takeok@blbglaw.com
                                                  -and-
                                          DAVID WALES
                                          1285 Avenue of the Americas, 38th Floor
                                          New York, NY 10019
                                          Tel:    (212) 554-1400
                                          Fax:    (212) 554-1444
                                          davidw@blbglaw.com

                                          *Lead Counsel for the Class and Counsel for Lead Plaintiff Public Employees' Retirement System of Mississippi and Plaintiff Los Angeles County Employees Retirement Association*

POND, GADOW & TYLER, P.A.
JOHN GADOW
BLAKE TYLER
502 South President Street
Jackson, MS 39201
johngadow@pgtlaw.com
btyler@pgtlaw.com

*Counsel for Plaintiff Public Employees'*
*Retirement System of Mississippi*

ROBBINS GELLER RUDMAN & DOWD
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARIO ALBA, JR.
CAROLINA C. TORRES
58 South Service Road, Suite 200
Melville, NY 11747
Tel:     (631) 367-7100
Fax:     (631) 367-1173

*Counsel for Plaintiff Iron Workers*
*Local No. 25 Pension Fund*

BERMAN DeVALERIO
JEFFREY C. BLOCK
One Liberty Square
Boston, MA 02109
Tel:     (617) 542-8300
Fax:     (617) 542-1194
          -and-
JOSEPH J. TABACCO, JR.
NICOLE LAVALLEE
425 California Street, Suite 2100
San Francisco, CA 94104
Tel:     (415) 433-3200
Fax:     (415) 433-6382

*Special Assistant Attorneys General*
*for the State of Wyoming*

BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP
KATHARINE M. RYAN
JOHN A. KEHOE
KAREN E. REILLY
280 King of Prussia Road
Radnor, PA 19087
Tel:     (610) 667-7706
Fax:     (610) 667-7056

*Counsel for Plaintiffs Connecticut
Carpenters Pension Fund and Connecticut
Carpenters Annuity Fund*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, et al., | Civil Action No. 08 CIV. 10841 (JSR) ECF Case |
| Plaintiffs, | |
| v. | CERTIFICATE OF SERVICE |
| MERRILL LYNCH & CO. INC., et al. | |
| Defendants. | |

I, Kaye A. Martin, hereby certify that on August 20, 2010, I caused the foregoing document,

> PLAINTIFFS' OPPOSITION TO: (1) THE MERRILL LYNCH DEFENDANTS' AND INDIVIDUAL DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT; AND (2) ABN AMRO, INC. AND J.P. MORGAN SECURITIES, INC.'S MOTION TO DISMISS THE AMENDED COMPLAINT

to be filed and served via ECF in accordance with the Federal Rules of Civil Procedure, the Southern District's Local Rules, and the Southern District's Rules on Electronic Service.

*Kaye A Martin*

KAYE A. MARTIN

1