# Exhibit 2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MERRILL LYNCH MORTGAGE-BACKED CERTIFICATES LITIGATION | Civil Action No. 08 CIV. 10841 (JSR) CONSOLIDATED CLASS ACTION ECF |

**EXPERT REPORT OF JOSEPH R. MASON**

## I.   INTRODUCTION AND SUMMARY OF OPINIONS

1.      I am a Senior Consultant with Precision Economics, which specializes in applying accounting, economics, and finance to business consulting, legal, and regulatory issues. I discuss my qualifications in more detail in Section II and present my publications in the last ten years and case testimony in the last four years in Appendix A to this report.

2.      This case is a class action relating to the issuance of $16.5 billion in mortgage-backed securities issued by Merrill Lynch Mortgage Investors, Inc. in 18 public offerings (Offerings) that occurred between February 14, 2006 and September 7, 2007.[1] It is my understanding that the proposed class is defined as:

> All persons or entities who purchased or otherwise acquired Merrill Lynch Alternative Note Asset Trust Series 2007-A3, 2007-AF1, 2007-F1, Merrill Lynch First Franklin Mortgage Loan Trust Series 2007-2, 2007-3, 2007-4, 2007-A, Merrill Lynch Mortgage Investors Trust Series 2006-MLN1, 2006-FM1, 2006-FF1, 2006-RM5, MLCC 2006-2, 2006-AHL1, 2006-RM3, 2006-WMC1, 2006-WMC2, 2006-A1, Ownit Mortgage Loan Trust Series 2006-2 and who were damaged thereby. Excluded from the Class are Defendants and their respective officers, affiliates and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

3.      I have been asked by Plaintiffs' Counsel to provide my expert opinion with respect to the following points: (1) Whether the securities in each offering are interrelated; (2) Whether untrue statements and material omissions in the offering documents would similarly affect the securities in each offering; (3) Whether there are numerous investors in the proposed class; and (4) Whether the securities can be valued as of different dates and whether damages to members of the class can be measured using a common methodology. In conducting my analysis, I reviewed documents produced in this action as well as other materials identified in Appendix B. I reserve the right to supplement my analysis in response to any newly produced evidence or facts or in rebuttal to any opinions offered by defendants' experts.

---

[1] Each of the Merrill Lynch Certificates issued through the Offerings is traceable to Merrill Lynch's registration statements dated August 5, 2005 (as amended) (the "August 2005" registration statement), December 21, 2005 (as amended) (the "December 2005" registration statement), or February 2, 2007 (as amended) (the "March 2007" registration statement), and to the prospectuses and prospectus supplements that were used to offer or sell each Certificate.

4.      In summary, I am of the opinion that the nature of mortgage-backed securities generally, and these Offerings specifically, is that each of the securities within an offering represents a claim on the cash flows of the underlying collateral. The nature of each of those claims is, therefore, undoubtedly interrelated.

5.      In all cases, the source of the cash flows derives from the loans in the collateral pools. Underwriting and associated controls help ensure that pools of like loans are securitized together, contributing to consistency and homogeneity that, as explained below, reduces investors' adverse selection – or "lemons" – discounts. If underwriting processes and procedures break down or if underwriting standards, generally, shift to more permissive conditions, the resulting deterioration in the forecast accuracy of the loan pool performance will affect all bonds.

6.      As losses are realized, the extent to which the more senior securities are exposed to credit risk increases, and all else equal, this adversely impacts the market value of these securities. That is to say, losses/prepayments do not have to flow through to a given security to affect the value of that security – as long as they are of a magnitude that was not expected, all securities in the offering will be affected. In sum, all the securities in an offering are interrelated and untrue statements and material omissions in the offering documents similarly affect the securities in each offering.

7.      Mortgage-backed securities (MBS) trade in a well-organized long-established over-the-counter (OTC) market. Investors in private-label MBS include both institutions and individuals. My analysis shows that there were, in fact, numerous individual and institutional investors in the eighteen offerings. As explained below, I estimate that the cumulative number of investors exceeds 1,600. While my analysis includes all data produced to date, additional data would likely increase the number of investors established here.

8.      Damages to each of the class members can be calculated in a formulaic manner. I describe in detail below how values can be used to calculate losses to each class member.

9.      Section II below provides a brief overview of my qualifications. Section III provides an overview of the economics of securitization. Section IV describes the components of a typical securitization.

10.     Section V relates the prior material to the Merrill Lynch deals that are the subject of the present litigation. Section V.a shows how the securities related to the present litigation are interrelated. Section V.b describes how the allegedly untrue statements and material omissions relate to all investor classes as a matter of the economics of securitization, generally. Section V.c demonstrates the numerosity of proposed class members. Section V.d discusses common valuation techniques that can be applied to the securities purchased by the proposed class members.

## II.    QUALIFICATIONS

11.     I am the Hermann Moyse, Jr./ Louisiana Bankers Association Chair of Banking at the Ourso School of Business, Louisiana State University, Senior Fellow at the Wharton School, and Senior Consultant at Precision Economics, LLC.

12.     My consulting practice specializes in applying financial, economic, valuation, and statistical analyses to complex commercial litigation and corporate strategic decision-making. I have provided expert consulting services and testimony in a broad range of banking and financial services industry matters.

13.     I am Professor of Finance and Hermann Moyse, Jr./Louisiana Bankers Association Chair of Banking at the Ourso School of Business at Louisiana State University and Senior Fellow at the Wharton School and have held visiting appointments at the Federal Reserve Bank of Atlanta, the Federal Deposit Insurance Corporation, and the Federal Reserve Bank of Philadelphia. I have testified before numerous Congressional Committees, European Parliament, and the Federal Reserve Board. I previously served as a Financial Economist at the Office of the Comptroller of the Currency and Director at Navigant Economics LLC. I hold a Ph.D. and a M.S. from University of Illinois at Urbana Champaign (Monetary Economics and Financial Institutions). A list of all cases in which I have testified at trial or deposition in the last four years appears in Appendix A.

14.     My academic research has been published in top-tier scholarly journals and books. My research and economic commentary is cited by media throughout the world, including The Wall Street Journal, The New York Times, Washington Post, Financial Times, the Economist, Barrons, Business Week, die Zeit, Neue Zürcher Zeitung, Forbes, Fortune, Bloomberg Magazine, American Banker, and on press syndicates such as Associated Press, Reuters, Bloomberg, KnightRidder, and MarketWatch-Dow Jones Newswire. I have been a frequent guest on CNBC, Bloomberg Television, and Fox Business News and have appeared on NBC News, CNN Headline News, CNBC Asia, National Public Radio, BBC Radio, Bloomberg Radio, and NBC Radio.

15.     Precision Economics is being compensated for my work in this matter at my standard hourly rate of $700. Other Precision Economics professionals, working under my direction and supervision, assisted in my analyses and Precision Economics was or will be compensated for their work at their customary hourly rates. Our compensation is not contingent in any way upon the outcome of this matter.

### III.   MODERN SECURITIZATION IS BUILT UPON ECONOMIC THEORIES OF ASYMMETRIC INFORMATION THAT EMPHASIZE LOAN CONSISTENCY AND HOMOGENEITY

16.     Nobel Laureate George Akerlof (1970)[2] first became famous for describing how buyers and sellers act when faced with "asymmetric information" – that is, when sellers have more information about product quality than buyers. In some cases, the asymmetric information can never be fully reconciled, meaning the seller can never completely credibly commit to their assertions of product quality. When asymmetric information remains unreconciled, the buyer will impose a "lemons discount" on the price in order to adjust for hard-to-verify information about quality. In Akerlof's classic example of the used car, information that cannot be communicated from seller to buyer will prevent the seller from realizing the car's true worth upon sale. If information asymmetries are perceived as too large (valuable) the sale becomes uneconomical: the seller won't bother to sell a used car at all if the price the car can fetch is too low (because of the lemons discount) relative to its true value.

---

[2] Akerlof, George A., "The Market for Lemons: Quality Uncertainty and the Market Mechanism." *The Quarterly Journal of Economics*, vol. 84, no. 3, (Aug 1970), pp. 488-500.

17.     The key problem to be overcome in any loan sale and securitization is the asymmetric information. Market arrangements to reduce the "lemons discount" in loan sales are therefore of interest in finance and economics, and institutional arrangements in loan sale markets reflect Akerlof's theories.[3] There exist several common mechanisms used to align incentives between sellers and buyers in the face of substantial asymmetric information and reduce the lemons discount. The point of each of those mechanisms is to credibly disclose information so that purchasers reduce their lemons discounts. One such mechanism is to provide credible representations with regard to (but not limited to) the application of underwriting guidelines and appraisal standards to the pools of mortgages. After having performed consistently in such capacity, issuers may build credibility based upon a reputation for consistently selling homogenous pools of loans. Thus, representations support higher prices for loans underwritten on the basis of hard- or impossible-to-verify origination information than would occur in the absence of such mechanisms.

18.     Viewed through the lens of asymmetric information and economic research on loan sales markets, therefore, if the risk of a loan pool is increased, all investors – unable to discern, *ex ante*, whether risk had increased – would be induced to overpay for their investment shares.

IV.     **OVERVIEW OF SECURITIZATION**

19.     The present section provides an overview of the economically important aspects of securitization that support the ability to sell high-asymmetric information financial assets at reasonable prices, devoid of the significant lemons discounts described above.

20.     I show in this section that the basic securitization strategy and mechanism hinges crucially on creating consistent pools of homogenous loans whose performance can be predicted to a degree of accuracy that supports pooling and tranching – that is, securitization. I show that while many different types

---

[3] For instance, see Gorton, Gary B., and George G. Pennacchi (1995). "Banks and Loan Sales Marketing Nonmarketable Assets," Journal of Monetary Economics 35, 389-411; and Benveniste, Lawrence M. and Allen N. Berger (1987), "Securitization with Recourse: An Instrument that Offers Uninsured Bank Depositors Sequential Claims." Journal of Banking and Finance 11, 403-24.

of loans are produced for securitization, the production process and means of consistently creating homogenous pools is common across different types of mortgages, even if each type is securitized separately.

21.     Moreover, while common credit enhancement structures control similarly for risk, credit enhancement structures built upon consistent and homogenous pools of loans, accurately described, provide cheaper funding than those built upon inconsistent and heterogeneous pools of loans, *ceteris paribus*.

      **a.  The Basic Securitization Strategy and Mechanism Hinges Crucially on Pool Homogeneity and Consistency**

22.     Securitization is nothing more than a means by which the fair market value of proceeds of future cash payments can be received by the securitizer as a lump sum today, rather than waiting to receive those as a series of cash payments in the future.  Hence, securitizers take the lump sum today in exchange for selling the future payments to investors who are willing to wait until tomorrow.

23.     In basic finance, the payment to be received today is just the net present value (NPV) of the expected payments in the future. Hence, securitization begins with the basics of net present value discounting. The standard NPV formula discounts the expected future cash payment by a discount rate that is compounded across time.

24.     As with any interest rate, the discount rate is the sum of a number of factors, beginning with the time value of money – or rental rate on capital – and inflation. The discount rate also includes the default risk premium, prepayment risk premium, and other typical risk premia, such as those represented in the offerings. Last, the discount rate takes into account the remaining uncertainties about the loan characteristics and other elements of the securitization by adding a lemons premium – akin to Akerlof's lemons discount on the price of the car – to the discount rate as a penalty for information about the loans that remains unverified.[4]

---

[4] Hereinafter referred to as a lemons discount, for the sake of simplicity.

25.     Loans with lower credit risk or other risk factors will be discounted more favorably in terms of NPV than those with higher credit risk or other risk factors. Hence, representing riskier loans as less risky loans would be misleading, since the risky loans' value is lower.

26.     But loan pools sold by a sponsor with a reputation for past consistency and homogeneity at any particular level of credit or other risk can also be more valuable than others because they can be securitized at a discount rate with a lower lemons discount. Securitization sponsors (the institutions that initially purchase and then securitize the loans – Merrill Lynch in this case) have historically gone to lengths to build credibility based upon reputation for selling consistently homogenous pools loans in order to drive down the lemons discount.

27.     Literature on securitization as early as 1996 established that some of the key elements for successful securitization are: standardized contracts; consistent grading of risk via underwriting; databases of historical performance statistics; standardization of applicable laws; and standardization of servicer capabilities and quality.[5] Without such consistency, "…the determination of the size of financial guarantees or excess collateral needed to enhance ratings to optimal levels for salability in the market becomes very difficult, and the price of such coverage prohibitive. Securitization can make efficient use of insurance principles and the bifurcation of cash flows, provided a reliable body of data on past performance is available for analysis."[6]

28.     Moody's confirms that sponsor differences in maintaining consistency in "underwriting standards, selection of assets, and servicing" are a substantial basis for material risks in securitization performance.[7] Without underwriting that leads to consistent pools of homogenous loans, the basis for initially valuing all the securities within any series breaks down.

---

[5] Kendall, Leon T. "Securitization: A New Era in American Finance," A Primer on Securitization, Leon T. Kendall and Michael J. Fishman, eds, MIT Press, 1996, at 7.
[6] *Id.*
[7] Hu, Jian; Cantor, Richard; Weill, Nicolas; and Phillip, Tad. "Deal Sponsor and Credit Risk of U.S. ABS and MBS Securities," Moody's Special Comment, December 2006.

29.     The stages of securitization are supposed to provide two main functions: those that consistently produce loans that are homogenous with respect to risk grade and type and those that verify the consistency and homogeneity of the loan production to drive down investors' lemons discount.

30.     Securitization, therefore, begins with loan origination. Loan originators are in direct contact with the borrowers, facilitating the loan application process by providing forms and sometimes helping gather documentation and performing other tasks.

31.     If loans are not intended for securitization they can be originated using any variety of forms,[8] documents, procedures, etc… (or none, if desired). When securitization is desired, however, such forms, document, procedures, etc… are typically standardized to a high degree in order to reduce asymmetric information and the commensurate lemons discount by consistently generating homogenous pools of loans. For the same reasons, even when loans are originated by third-party mortgage brokers for eventual securitization, such elements are typically standardized by (or the degree of standardization and consistent implementation is monitored or overseen by) the institution that is expected to be purchasing those loans. Those forms, documents, and procedures are determined by and produced according to the underwriting criteria established for the purpose of origination.

32.     As a result, the institution that expects to initially purchase and securitize the loans (usually referred to as the deal sponsor – in this case, Merrill Lynch Mortgage Lending, Inc. (an affiliate, through common parent ownership, of Merrill Lynch, Pierce, Fenner & Smith Incorporated and a direct, wholly owned subsidiary of Merrill Lynch Mortgage Capital Inc.) and First Franklin Financial Corporation (which, after its acquisition by Merrill Lynch on December 31, 2006, became an operating subsidiary of Merrill Lynch Bank & Trust Co., FSB, and an affiliate of Merrill Lynch, Pierce, Fenner & Smith Incorporated) – also typically establishes acceptable underwriting criteria by which the loans they will purchase will be or were originated. In other words, the sponsor sets the decision rules that determine which loans are to be accepted

---

[8] Beyond, of course, those required specifically be regulatory agencies.

as suitably homogenous to support reasonably accurate predictions of pool performance that may allow eventual securitization.

33.     The deal sponsor may deposit the loans in a conduit (sometimes called the depositor – Merrill Lynch Mortgage Investors, Inc. in this case), pending securitization. The conduit is similar to the sponsor in that it is another entity that can own the loans in the intermediate stage between origination and securitization.

34.     The conduit is merely a means to legally segregate the loans so that they can be pledged to the securitization trust (the Merrill Lynch offering series in this case), which raises funds to purchase the loans by selling securities to investors: that is, through securitization.

35.     The process of issuing the securities to fund the loans – the process of securitization, strictly speaking – then follows the typical steps in any securities issue. The securities underwriter (Merrill Lynch, Pierce, Fenner & Smith Incorporated) are supposed to verify key information to include in the offering documents and – in the case of debt securities – seek credit ratings on the securities to be sold on the basis of that, as well as potentially additional information from the sponsor, originators, and others. The securities underwriters then sell the securities to other investment bank, financial institution, and individual investors.

36.     Of particular economic importance is information about the loans that has been aggregated through the mortgage lending and securitization process with the express purpose of establishing consistency and homogeneity, and therefore the predictability, of the collateral performance. As described above, investors crucially rely on consistent underwriting to produce a homogenous pool of loans whose performance can be predicted accurately enough to justify senior and subordinate bonds bought without a significant lemons discount.

    **b.    Different Types of Mortgage Loans Are Securitized Separately to Maintain Pool Homogeneity**

37.     Heterogeneity that can confound a securitization can come from many sources. The most basic type of heterogeneity would be mixing materially different loans in the same pool. Figure 1 shows a

stylized segmentation of the market for first-lien mortgage debt, delineating twenty-four different classes of mortgages, each potentially with unique characteristics relative to others that may be important for accurately modeling and securitizing the loans, as well as investing in the securitizations funding those loans.

**Figure 1: Segmentation of the Outstanding First-lien Mortgage Debt Market**



*Credit Suisse US Mortgage Strategy, "Credit Suisse - Mortgage Liquidity du Jour-Underestimated No More," March 12, 2007.*

38.     The left half of Figure 1 relates to agency MBS. Agency MBS include only "conforming" loans – that is, conventional loans to borrowers with demonstrably sound credit and typical loan amounts relative to collateral values, i.e., FICO scores, debt-to-income ratios, and loan-to-value ratios (LTVs). Even in agency MBS it is important to realize that loan consistency and homogeneity are key factors in the ability to properly sponsor and underwrite securitizations.

39.     The right half of Figure 1 relates to private-label MBS, such as the MBS at issue in this case. Mortgages in private-label MBS are generally those that do not qualify for securitization in agency (i.e., Fannie Mae or Freddie Mac) MBS. Private-label lenders therefore produce a wider range of loan types than agencies.

40.     "Prime" private-label mortgages are usually jumbo loans, which exceed the size limits for agency MBS but conform to agency guidelines in all other respects, including FICO scores, debt-to-income ratios, and LTVs. While such attributes would typically be reflective of "prime" credit status, jumbo loans are usually priced higher than agency conforming loans because they are not subsidized by the Government Sponsored Enterprises (GSEs) that are the source of most other prime (conforming) loans.

41.     In contrast, subprime mortgages are typically loans to borrowers with blemished credit records. That is, borrowers with low FICO scores and/or high (verified) debt-to-income ratios. Some subprime borrowers may have been delinquent on their existing mortgage in the past year. Alternatively, subprime borrowers may simply lack financial reserves or income usually associated with the size and type of loan they are seeking.

###### c.     Underwriting, Quality Controls, and Due Diligence Should Ensure Sufficient Consistency and Homogeneity of Like Loans to Support Securitization

42.     It is up to the parties securitizing and selling the offerings to ensure that collateral is not comingled to such an extent that the degree of predictability required for securitization is lacking. Changing or not adhering to underwriting criteria, whether to generally relax guidelines or to expand guideline application to other types of borrowers or loan uses, can result in material adverse effects on securitization performance.

43.     One way that agency MBS control heterogeneity is by requiring that all loans securitized through their facilities are underwritten on their own software platform to their express specifications, regardless of origination channel (retail, wholesale, or correspondent). For instance, all Fannie Mae loans are underwritten according to their Loan Prospector tool according to set procedures for verifying income and

assets, as well as other factors. Again, the purpose is to constrain loan heterogeneity so that the loans can be securitized in consistent and homogenous pools that investors can reasonably price.

44.     In private label lending for securitization, sponsors typically stated that they require processes and procedures for underwriting and enforce conformity for the same purpose as GSEs: to accurately estimate credit risk in order to maintain loan consistency and homogeneity that crucially supports securitization and investment.

> **d.  Typical Credit Enhancement Structures Can Only Control for Loan Risks in Consistently Homogenous Pools**

45.     Unlike corporate securities issues, where debt and equity may be issued at different times subject to different information sets – including prospectuses and marketing literature – all securities issued in any one MBS are issued at the same time on the basis of the same information set and collateral. More generally, even securitizations issued on the basis of the same collateral type over time are usually issued on the basis of nearly identical information and collateral in order to take advantage of the decreased lemons discount arising from past consistency and homogeneity. Loans originated on the basis of greater underwriting heterogeneity will rationally be subjected to a higher lemons discount (a lower price, as described above) if such characteristics have been disclosed explicitly.

46.     Securitization of many product classes is a relatively mature industry. So while there has been a long-term evolution in securitization features, most were fairly standardized by the time of the Offerings. Indeed, prospectus supplements for the Merrill Lynch MBS referenced in the present Complaint illustrate that the Offerings use most all of the common types of credit enhancements typical in the industry.

47.     Most private-label mortgage securitizations by 2005 used a very common structure of credit enhancement based on a senior-subordinate structure. In a senior-subordinate structure, one or more subordinate classes of securities absorb losses before any losses accrue to the senior class.

48.     Most private label jumbo and Alt-A MBS are based on a common "six-pack" structure of credit enhancement. The six-pack contains six layers of subordination in a standard senior-subordinate framework.

49.     A typical feature of many MBS is a condition whereby prepayments are initially allocated to the senior class to preserve the dollar amount of the subordinate classes that create the credit enhancement. As long as the deal performs as expected, prepayments are eventually allocated to subordinate classes. If the underlying pool experiences high delinquencies or losses, prepayments remain allocated to the senior class. Nonetheless, the value of the A class can still be adversely affected even if the prepayment allocations prevent bond defaults in the senior class – preserving such allocations just reduces the magnitude of the decline in value of the senior securities as it mitigates the rising probability of default.

50.     Some Alt-A MBS and most subprime mortgage MBS may include an "OC", or overcollateralization, structure. OC deals use "excess spread" as credit enhancement. Excess spread is the difference between the net interest rate on the underlying loans and the weighted-average coupon on the certificates. Excess spread may be used to cover current period cash flow shortfalls, if any such shortfalls exist. If no cash flow shortfalls exist, the excess spread may be contributed to pay down the principal balance of the senior certificates, accelerating their amortization and providing greater buffer against future loss because of the additional collateral buffer – the overcollateralization – underlying the remaining senior certificate balance.[9]

51.     Similar to an extreme form of OC, some mortgage securitizations have used a "fast pay/no-pay" structure, whereby no distributions of principal whatsoever may be made to holders of the subordinate certificates until the senior certificates have been retired. A variation on the fast-pay/no-pay theme is a structure in which all prepayments of principal are allocated to the senior certificates until they are retired,

---

[9] Some past MBS used excess spread to build up a reserve fund (trap) as a savings account to be held against future losses. Such a reserve fund is similar to OC but its source can be subordinate allocations rather than excess spread.

while scheduled principal payments remain allocated between the senior certificates and the subordinated certificates on a pro rata basis.

52.     Some MBS use bond insurance or other outside guarantees for credit enhancement. Those typically consist of guarantees of collections on the underlying pool. Such guarantees provided by banks typically take the form of stand-by letters of credit, while others are usually referred to simply as "guarantees."

53.     Securitizations may also contain cross-collateralization features that allow more loans to be securitized at any one point in time than would otherwise typically be the case. As before, the key reason for doing so is to maintain pool consistency and homogeneity, both of which enhance that ability to securitize the loans.

54.     Up until now the discussion of MBS credit enhancement structures has consisted only of what are called "I" structures, where the "I" describes the "shape" of the structure, meaning there is one set of credit enhancement – in terms of subordinate bonds and other features – underlying the senior bonds. Common "H" and "Y" cross-collateralization structures provide additional flexibility and scale to securitizations.

55.     An H structure is built upon two collateral groups and two groups of subordinated bonds. The groups of bonds, however, are cross-collateralized by the excess interest created by the combined pool of loans. Y structures are similar, in that there exist two pools of loans and two sets of senior bonds, but only a single set of subordinate bonds that have collateral claims on both pools. The remainder of the typical terms usually apply to a typical H or Y structure, so that – after accounting for the cross-collateralization in the collateral pools – they differ very little – from the perspective of economics – from an I structure.

     **e.   Typical Cash Flow Allocation in Securitizations**

56.     Cash flows are allocated in securitizations according to the senior-subordinate structure. Losses are allocated first to the subordinate bonds and then to the senior bonds in order of relative seniority, subject to the credit enhancement rules stipulated above. In all cases, however, the source of the cash flows

derives from the loans in the pools. If underwriting processes and procedures break down or if underwriting standards, generally, shift to more permissive conditions, the resulting deterioration in the forecast accuracy of the loan pool performance will affect all bonds.

## V.   OPINIONS

57.    This action arises from the sale of over $16.5 billion in Merrill Lynch mortgage-backed certificates issued between February 14, 2006 and September 7, 2007.[10]   The table below summarizes the offerings at issue:

| Offering | Registration Statement | Prospectus Supplement Date | Principal Amount |
|---|---|---|---|
| Merrill Lynch Alternative Note Asset Trust, Series 2007-A3 | March 2007 | 4/30/2007 | $483,874,100 |
| Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1 | March 2007 | 6/1/2007 | $680,620,637 |
| Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2 | March 2007 | 4/27/2007 | $1,937,062,100 |
| Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3 | March 2007 | 5/30/2007 | $1,835,617,100 |
| Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4 | March 2007 | 6/26/2007 | $1,547,200,100 |
| Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-A | March 2007 | 9/7/2007 | $219,636,100 |
| Merrill Lynch Alternative Note Asset Trust, Series 2007-F1 | December 2005 | 3/28/2007 | $439,565,336 |
| Merrill Lynch Mortgage Investors Trust, Series 2006-MLN1 | December 2005 | 9/28/2006 | $787,216,100 |
| Merrill Lynch Mortgage Investors Trust, Series 2006-FM1 | December 2005 | 6/29/2006 | $424,683,100 |
| Merrill Lynch Mortgage Investors Trust, Series 2006-FF1 | December 2005 | 12/22/2006 | $2,280,872,100 |
| Merrill Lynch Mortgage Investors Trust, Series 2006-RM5 | December 2005 | 10/27/2006 | $520,625,100 |
| Merrill Lynch Mortgage Investors Trust Series MLCC 2006-2 | December 2005 | 4/27/2006 | $628,422,100 |
| Merrill Lynch Mortgage Investors Trust, Series 2006-AHL1 | December 2005 | 6/29/2006 | $413,329,100 |

---

[10] *See generally*, Complaint paragraphs 1-4 38-40.

| Offering | Registration Statement | Prospectus Supplement Date | Principal Amount |
|---|---|---|---|
| Merrill Lynch Mortgage Investors Trust, Series 2006-RM3 | December 2005 | 6/27/2006 | $740,607,100 |
| Merrill Lynch Mortgage Investors Trust, Series 2006-WMC1 | August 2005 | 2/14/2006 | $1,204,884,100 |
| Merrill Lynch Mortgage Investors Trust, Series 2006-WMC2 | August 2005 | 3/28/2006 | $1,205,046,100 |
| Merrill Lynch Mortgage Investors Trust, Series 2006-A1 | August 2005 | 3/29/2006 | $656,531,100 |
| Ownit Mortgage Loan Trust, Series 2006-2 | August 2005 | 3/9/2006 | $533,541,100 |
| | | | **$16,539,332,573** |

58.     Lead Plaintiffs allege in the Complaint that the offering documents contained untrue statements of material fact, or omitted to state material facts necessary to make the statements therein not misleading regarding the underwriting standards purportedly used in connection with the origination of the underlying mortgages, the maximum loan-to-value ratios used to qualify borrowers, the appraisals of the properties underlying the mortgages, and the ratings of the Certificates.[11]

59.     Those underwriting standards and their implementation were monitored by Merrill Lynch for the purpose of maintaining the type consistency and homogeneity that is crucial for securitization. For example, fourteen of the prospectuses include the specific language: "Prior to acquiring any residential mortgage loans, MLML reserves the right to conduct a review of the related mortgage loan seller that is based upon the credit quality of the selling institution. MLML's review process may include reviewing select financial information for credit and risk assessment and conducting an underwriting guideline review, senior level management discussion and/or background checks."[12] In three other deals, the loans were underwritten

---

[11] See, *e.g.*, Complaint, paragraph 7.
[12] Merrill Lynch Alternative Note Asset Trust, Series 2007-A3, at S-41; Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1, at S-39; Merrill Lynch Alternative Note Asset Trust, Series 2007-F1, at S-32; Merrill Lynch Mortgage Investors Trust, Series 2006-MLN1, at S-38; Merrill Lynch Mortgage Investors Trust, Series 2006-FM1, at S-38; Merrill Lynch Mortgage Investors Trust, Series 2006-FF1, at S-39; Merrill Lynch Mortgage Investors Trust, Series 2006-RM5, at S-39; Merrill Lynch Mortgage Investors Trust, Series MLCC 2006-2, at S-31; Merrill Lynch Mortgage Investors Trust,

subject to Merrill Lynch's "Direct Access Program," in which third-party originators underwrote the loans according to Merrill Lynch's own underwriting model and guidelines.[13] In the sole remaining case, Merrill Lynch First Franklin Mortgage Loan Trust, 2007-A (FFMER 2007-A), "All of the Mortgage Loans were originated generally in accordance with First Franklin Financial's Underwriting Guidelines." (p. 28, S-28) under its CORE program.

60.    Similar statements support the assertion that Merrill Lynch originated and/or reviewed loans (or should have done so) to maintain the consistency and homogeneity necessary for securitization. Prospectuses for seven deals stated specifically that loans were originated, "…with a view toward the resale of the mortgage loans in the secondary mortgage market,"[14] or "…underwritten to be eligible to be sold in the secondary market,"[15] suggesting that they were selected with an eye toward the consistency and homogeneity necessary for securitization.

61.    In addition, eight of the prospectuses (including those underwritten to Merrill Lynch's own standards) maintained that loan reviews were used "to confirm the existence and accuracy of credit documentation, appraisal analysis and underwriting decision. A report detailing audit findings and level of error is sent monthly to each branch for response. The audit findings and branch responses must then be reviewed by the third party originator's senior management. Adverse findings are to be tracked monthly and over a rolling six month period. This review procedure allows the third party originator to assess programs

---

Series 2006-AHL1, at S-38; Merrill Lynch Mortgage Investors Trust, Series 2006-RM3, at S-36,37; Merrill Lynch Mortgage Investors Trust, Series 2006-WMC1, at S-43; Merrill Lynch Mortgage Investors Trust, Series 2006-WMC2, at S-44; Merrill Lynch Mortgage Investors Trust, Series 2006-A1, at S-23; Ownit Mortgage Loan Trust, Series 2006-2, at S-33.

[13] Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2, at S-35; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3, at S-36; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4, at S-36.

[14] Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2, at S-34; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3, at S-35; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4, at S-35; Merrill Lynch Mortgage Investors Trust, Series 2006-FM1, at S-34; Merrill Lynch Mortgage Investors Trust, Series 2006-FF1, at S-36.

[15] Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1, at S-47,48, and Merrill Lynch Mortgage Investors Trust, Series 2006-MLN1, at S-37.

for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training" (or substantially similar language).[16]

62.     The eight deals with the loan review language in the preceding paragraph also included language to the effect that, "[originators] are required to conduct a number of quality control procedures, including a post funding compliance audit as well as a full re-underwriting of a random selection of loans to assure asset quality. Under the asset quality audit, all loans are required to be reviewed to verify credit grading, documentation compliance and data accuracy. Under the asset quality procedure, a random selection of each month's originations must be reviewed by each [originator or its senior management]."[17]

63.     Every prospectus contained language giving Merrill Lynch the rights and ability to review extensively the quality control processes, procedures, and outcomes of the originating lenders to varying degrees. Hence, Merrill Lynch had the ability to and would reasonably be expected to monitor loan origination for the type of consistency and homogeneity that could support securitization according to the originator's underwriting standards.

64.     The underwriting standards applied to the loans in each pool are described in each prospectus supplement. For example:

> The Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the [mortgage] in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults.… WMC Mortgage Corp. verifies the loan applicant's eligible sources of income for all products, calculates the amount of income from eligible sources indicated on the loan application, reviews the credit and mortgage payment history of the applicant and

---

[16] Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2, at S-37; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3, at S-38; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4, at S-38; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-A, at S-31; Merrill Lynch Mortgage Investors Trust, Series 2006-FM1, at S-36; Merrill Lynch Mortgage Investors Trust, Series 2006-FF1, at S-38; Merrill Lynch Mortgage Investors Trust, Series 2006-RM5, at S-37; Merrill Lynch Mortgage Investors Trust, 2006-RM3, at S-35.

[17] Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2, at S-37; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3, at S-38; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4, at S-38; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-A, at S-31; Merrill Lynch Mortgage Investors Trust, Series 2006-FM1, at S-36; Merrill Lynch Mortgage Investors Trust, Series 2006-FF1, at S-38; Merrill Lynch Mortgage Investors Trust, Series 2006-RM5, at S-37; Merrill Lynch Mortgage Investors Trust, 2006-RM3, at S-35.

> calculates the Debt Ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the Underwriting Guidelines.[18]

And:

> The underwriting standards of ResMAE are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. ResMAE considers, among other things, a mortgagor's credit history, repayment ability and debt service-to income ratio (referred to herein as the Debt Ratio), as well as the value, type and use of the mortgaged property …. ResMAE has one underwriting program called the "TotalScore Program."[19]

And:

> Each mortgage loan originated or acquired by Accredited is underwritten prior to loan closing, or re-underwritten after loan closing but prior to purchase by Accredited, in accordance with Accredited's underwriting guidelines.  Accredited's underwriting process is intended to assess a mortgage loan applicant's credit standing and repayment ability and the value and adequacy of the real property security as collateral for the proposed mortgage loan… Each prospective mortgagor completes a mortgage loan application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information.[20]

65.     In addition, the prospectus supplements included statements concerning the appraisals of

the properties underlying the mortgages.  For example:

> Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisals Practice…. The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment. In addition, each appraisal is reviewed for accuracy and consistency by the Originator's vendor management company or an underwriter of the Originator or a mortgage insurance company contract underwriter.[21]

And:

> First Franklin Financial is required to comply with applicable federal and state laws and regulations and generally requires an appraisal of the mortgaged property which conforms to Freddie Mac and/or Fannie Mae standards; and if appropriate, a review appraisal. Generally,

---

[18] Merrill Lynch Mortgage Investors Trust, Series 2006-WMC1, at S-32 to S-33.
[19] Prospectus supplement for Merrill Lynch Mortgage Investors Trust, Series 2006-RM5, at S-35
[20] Merrill Lynch Mortgage Investors Trust, Series 2006-AHL1, at S-34.
[21] Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1, at S-46

> appraisals are provided by appraisers approved by First Franklin Financial, but all review appraisals may only be provided by First Franklin Financial. . . .[22]

And:

> Ownit will evaluate the property by reviewing uniform residential real estate appraisal reports, along with other data sources, to determine whether the collateral is sufficient to secure the mortgage…. All appraisals should conform to the Uniform Standards of Professional Appraisal Practices. Ownit requires the underwriter to review all appraisals for content and accuracy, pulling additional data if available or warranted. Loan amounts in excess of $600,000 require a second full appraisal. [23]

66.    Relatedly, the prospectus supplements also included a variety of statements about the loan-to-value ratios used to qualify borrowers. For example:

> Countrywide Home Loans may provide secondary financing to a borrower contemporaneously with the origination of a mortgage loan, subject to the following limitations: The Loan-to-Value Ratio of the senior (i.e. first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%.[24]

And:

> The appraiser's value conclusion is used to calculate the ratio (loan-to-value) of the loan amount to the value of the property. For loans made to purchase a property, this ratio is based on the lower of the sales price of the property and the appraised value. The Originator sets various maximum loan-to-value ratios based on the loan amount, property type, loan purpose and occupancy of the subject property securing the loan.[25]

And:

> Under the CORE Program, various risk categories are used to assess the likelihood that the applicant will satisfy the repayment conditions of the loan. These risk categories establish the maximum permitted loan-to-value ratio and loan amount, given the occupancy status of the mortgaged property and the applicant's credit history and Debt Ratio.[26]

67.    Finally, each of the prospectus supplements made substantially similar statements about the ratings of the Certificates and stated that the receipt of certain predetermined ratings from the credit-rating

---

[22] Merrill Lynch First Franklin Mortgage Loan, Trust Series 2007-A, at S-30
[23] Ownit Mortgage Loan Trust, Series 2006-2, at S-32,33.
[24] Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1, at S-54, Merrill Lynch Mortgage Investors Trust, Series 2006-A1, at S-27.
[25] Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1, at S-46.
[26] Merrill Lynch First Franklin Mortgage Loan, Trust Series 2007-A, at S-31.

agencies was "a condition of the issuance of the Offered Certificates that they be assigned." For example, one prospectus supplement included the following chart identifying each Series 2007-A Certificate rating[27]:

### Ratings

It is a condition of the issuance of the Offered Certificates that they be assigned the ratings designated below by each of Moody's and S&P.

| Class of Certificates | Moody's | S&P |
|---|---|---|
| A-1 | Aaa | AAA |
| A-2 | Aaa | AAA |
| A-3 | Aaa | AAA |
| M-1 | Aa1 | AA+ |
| M-2 | Aa2 | AA |
| M-3 | Aa3 | AA- |
| M-4 | A1 | A+ |

| Class of Certificates | Moody's | S&P |
|---|---|---|
| M-5 | A2 | A |
| M-6 | A3 | A- |
| B-1 | Baa1 | BBB+ |
| B-2 | Baa2 | BBB |
| B-3 | Baa3 | BBB- |
| R | NR | AAA |

The Prospectus Supplements further stated language to the effect that:

> Moody's ratings on mortgage pass-through certificates address the likelihood of the receipt by certificate holders of all distributions to which such certificateholders are entitled. Moody's ratings opinions address the structural and legal issues associated with the Offered Certificates, including the nature of the underlying Mortgage Loans. S&P ratings on mortgage pass-through certificates address the likelihood of receipt by certificateholders of payments required under the operative agreements.

> S&P's ratings take into consideration the credit quality of the mortgage pool including credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream of the mortgage pool is adequate to make payments required under the certificates.[28]

68.    According to the Complaint, the above and similar statements regarding underwriting standards, loan-to-value ratio, collateral appraisals, and credit ratings are untrue or omitted material facts because (1) Merrill Lynch and third-party originators disregarded stated underwriting standards or failed to

---

[27] Merrill Lynch First Franklin Mortgage Loan, Trust Series 2007-A, at S-89, 90.
[28] See, for instance, Merrill Lynch First Franklin Mortgage Loan Trust, May 30, 2007 at S-124-5.

follow loan purchasing guidelines when acquiring or issuing loans that were unlikely to be repaid; (2) issued mortgages to buyers with higher-than-stated loan-to-value ratios; (3) issued mortgages based on collateral appraisals that overinflated the value of the underlying properties or appraisals that were invalid or incomplete; and (4) provided credit ratings that were based on outdated assumptions, relaxed ratings criteria, and inaccurate loan information.[29]   According to the Complaint, the disregard for underwriting standards, loan quality, and adequacy of collateral within the loans exposed purchasers to increased risk with respect to absolute cash flow and the timing of payments.

69.     I have been asked by Plaintiffs' Counsel to provide my expert opinion with respect to the following points: (1) Whether the securities in each offering are interrelated; (2) Whether untrue statements and material omissions in the offering documents would similarly affect the securities in each offering; (3) Whether there are numerous investors in the proposed class; and (4) Whether the securities can be valued and whether damages to members of the class can be measured. In conducting my analysis, I reviewed documents produced to date in this action as well as other materials.[30] I reserve the right to supplement my analysis in response to any newly produced evidence or facts or in rebuttal to any opinions offered by defendants' experts.

### a.   The Interrelatedness of the Securities in Each Offering

70.     The nature of mortgage-backed securities generally, and these Offerings specifically, is that each of the securities within an offering represents a claim on the cash flows of the underlying collateral. The nature of each of those claims is, therefore, undoubtedly interrelated. The relevant cash flows from the collateral are in two forms – interest and principal payments made by the mortgage-holders. The cash flows are directed to investors based on pre-determined formulas explained in the offering documents. The basis of distinction among the different securities within an offering is merely the level of risk that each bears.

---

[29] See, *e.g.*, Complaint, paragraphs 8, 82, 85, 107, 109-115, 116- 121, 127, 154, 156-161, 165, 173-186, 193-206, etc.
[30] See Appendix B for a full list of materials reviewed.

71.     The offering documents clearly describe how risk is divided among the different securities. Each offering is comprised of senior securities (Class A) and subordinated securities (Class M and B). Payments from the underlying mortgages (including prepayments of principal) flow first to the senior securities and then flow down to the subordinated securities in their order of subordination. On the other hand, losses are allocated first to the most subordinated security and then flow up through the subordinated securities to the senior securities. As made clear on page S-5 of the Merrill Lynch Mortgage Investors 2006-A1 prospectus supplement, "If the mortgage loans in a pool experience losses, then the principal amount of the subordinate class of certificates that is lowest in seniority and still outstanding will be reduced by the amount of those losses until the total outstanding principal balance of such class equals zero."[31] In this way, the subordinated securities assume more of the credit risk and the senior securities assume more of the prepayment risk. However, all the securities retain related credit risk and prepayment risk.

72.     The risks borne by the holder of a particular security are therefore a function of the corresponding risks of the underlying mortgages. As an example, credit risk is always highest for the more subordinated securities in the offering. As losses are realized, the extent to which the more senior securities are exposed to credit risk increases, and all else equal, this adversely impacts the market value of these securities. That is to say, losses/prepayments do not have to flow through to a given security to affect the value of that security – as long as they are of a magnitude that was not expected, all securities in the offering will be affected. In this way, all the securities in an offering are interrelated.

73.     As explained above, all cash flows to the different securities are based on the performance of the same underlying collateral – the pool of residential mortgage loans. To the extent that there are untrue statements and/or material omissions in the offering documents, all securities in the offering will be adversely affected.

---

[31] Merrill Lynch Mortgage Investors Trust, Series 2006-A1 Prospectus Supplement, at S-5.

74.      It stands to reason that securities that have more credit enhancement (i.e., are more insulated from losses due to default) will be less affected by a repricing of the credit risk, but they will clearly be affected directionally the same way as those securities that have less credit enhancement. Nonetheless, such differences are a matter of degree rather than substance, as the substantial source of the losses regardless of degree exists in the same underwriting consistency and homogeneity relied upon to derive the properties that support the structure and pricing of each securitization.

**b.      Untrue Statements and Material Omissions in the Offering Documents Affect the Securities Similarly Within Each Offering**

75.      In this section I first describe how the securitization offering documents are nearly identical. Then, I show that the underwriting processes and procedures approved for securitized loans by Merrill Lynch and at all times under their direct oversight and/or control were a primary feature in every prospectus in efforts to achieve the loan pool homogeneity and consistency necessary to support securitization. As discussed above, consistent and homogenous loans produced according to proper controls and accurately disclosed are crucial to securitization.

The Securitization Offering Documents

76.      Each prospectus supplement contains a section called "Relevant Parties" or "Transaction Parties," which lists the relevant parties to the transaction. In each of those, either First Franklin Financial Corporation or Merrill Lynch Mortgage Lending is listed as the sponsor, who is supposed to bring together like loans for securitization. Merrill Lynch Mortgage Investors is listed as depositor for each and every deal. Merrill Lynch PFS acted as an underwriter for each of the offerings at issue in this action, helping to structure the securities and credit enhancement to absorb the risk of the loans in a manner reflective of the target credit quality of the certificates. One or more of these entities conducted due diligence on the mortgage loans acquired from loan sellers.[32]  Such involvement supports my assertion that the important economic sources

---

[32] See_Merrill Lynch Alternative Note Asset Trust, Series 2007-A3, at S-41; Merrill Lynch Mortgage Investors Trust, Series 2006-A1 at S-23; Merrill Lynch Alternative Note Asset Trust, Series 2007-F1 at S-32; Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1 at S-39; Merrill Lynch Mortgage Investors Trust, Series MLCC 2006-2 at S-31; Merrill Lynch Mortgage Investors Trust, Series 2006-FM1 at S-38; Merrill Lynch Mortgage Investors Trust, Series 2006-

of Untrue Statements and Material Omissions lie at the level of Merrill Lynch and named Defendants and those statements and omissions affect all securities similarly.

77.     All the prospectus supplements indicate that "…information concerning the Sponsor's prior residential mortgage loan securitizations involving [similar] loans is available on the internet at http://www.mlabsreports.ml.com" (or substantially similar language).[33] While the supplements indicate that "[t]here can be no assurance" that "the delinquency and foreclosure experience" of the Issuing Entity's mortgage Loans "will be similar" or "will correspond" to that which was reflected in the Servicer's Static Pool Information,[34] the static pool information is the only source of information regarding historical delinquency, cumulative loss and prepayment experience of the Sponsor's prior residential mortgage loan securitization and is a key element of establishing a reputation for consistency and homogeneity across time, which reduces substantially the lemon's discount investors would otherwise apply to the certificates sold to securitize the loans.[35]

78.     All of the offering documents are generally in a similar format and their language describing possible features of the securitizations is very similar.  The offering documents for the Merrill Lynch MBS

FF1 at S-39;  Merrill Lynch Mortgage Investors Trust, Series 2006-RM5 at S-39; Merrill Lynch Mortgage Investors Trust, 2006-RM3 at S-37; Merrill Lynch Mortgage Investors Trust, Series 2006-MLN1 at S-38; Merrill Lynch Mortgage Investors Trust, Series 2006-AHL1 at S-38; Merrill Lynch Mortgage Investors Trust, Series 2006-WMC1 at S-43; Merrill Lynch Mortgage Investors Trust, Series 2006-WMC2 at S-44; and Ownit Mortgage Loan Trust, Series 2006-2, at S-33.

[33] See, for instance, Merrill Lynch Alternative Note Asset Trust , Series 2007-F1 prospectus supplement dated March 28, 2007 at S-43.  The URL was subsequently changed, and this data is now hosted on the Bank of America website at http://www.bankofamerica.com/rmbs.

[34] See Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2, at S-42; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3, at S-41; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4, at S-42; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-A, at S-34.

[35] Belying the disclaimers in the prospectus, the SEC commented in the consideration of Regulation AB that mandated disclosure of such information, that, "In the Proposing Release, we noted the development of static pool information as an increasingly valuable tool in analyzing performance. Such information indicates how the performance of groups, or static pools, of assets, such as those originated at different intervals, are performing over time. By presenting comparisons between originations at similar points in the assets' lives, such data allow the detection of patterns that may not be evident from overall portfolio numbers and thus may reveal a more informative picture of material elements of portfolio performance and risk. (Securities and Exchange Commission 17 CFR Parts 210, 228, 229, 230, 232, 239, 240, 242, 245 and 249, [Release Nos. 33-8518; 34-50905; File No. S7-21-04], RIN 3235-AF74, Asset-Backed Securities at 129, available at www.sec.gov/rules/final/33-8518.pdf. See also, e.g., Moody's Investors Service, Inc., "Undisclosed Truths: Are ABS Investors Being Left in the Dark?" May 23, 1996 and Letter from AIMR to Brian J. Lane, Director, Division of Corporation Finance, "Recommendations for a Disclosure Regime for Asset-Backed Securities" Sep. 30, 1996.)

referenced in the present Complaint make available to the deals the typical types of credit enhancement structures described above. For example, five prospectuses were issued in connection with the Offerings at issue. Each described the credit enhancements potentially available to a particular offering and state that, "If so provided in the related Prospectus Supplement, partial or full protection against certain defaults and losses on the Assets in the related Trust Fund may be provided to one or more classes of Securities in the related series in the form of subordination of one or more other classes of Securities in such series and/or by one or more other types of credit support, such as a letter of credit, insurance policy, surety bonds, guarantee, reserve fund or a combination thereof."[36]

79.     Each prospectus supplement described in further detail the particular credit enhancements applicable to each offering. Each of the Offerings had credit enhancement in the form of subordination. The tranche structure of is a senior-subordinate structure, with layers of subordinate bonds underlying the senior A-class. Fourteen deals had overcollateralization/excess interest features and four had shifting interest structures.[37] In addition, as described further below, fifteen of the Offerings contained elements of "Y" cross-collateralization features and two of the Offerings contained elements of "H" cross-collateralization features. One of the Offerings had interest rate support for one tranche through a certificate guaranty insurance policy with a third party.[38] All of the loan pools still derive their performance from a singular set of processes and procedures implemented for internal underwriting, external underwriting, or acquisition by the securitization sponsor (Merrill Lynch Mortgage Lending or First Franklin Financial Corporation) and certified by the associated securities underwriters and rating agencies associated with each deal.

---

[36] See Merrill Lynch Alternative Note Asset Trust, Series 2007-F1 prospectus, at 12.

[37] See Merrill Lynch Mortgage Investors Trust, Series 2006-A1, Merrill Lynch Alternative Note Asset Trust, Series 2007-F1, Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1, and Merrill Lynch Mortgage Investors Trust, Series MLCC 2006-2 at S-1, and Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2, Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3, Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4, Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-A, Merrill Lynch Mortgage Investors Trust, Series 2006-FM1, Merrill Lynch Mortgage Investors Trust, Series 2006-FF1,  Merrill Lynch Mortgage Investors Trust, Series 2006-RM5, Merrill Lynch Mortgage Investors Trust, 2006-RM3, Merrill Lynch Mortgage Investors Trust, Series 2006-MLN1, Merrill Lynch Mortgage Investors Trust, Series 2006-AHL1, Merrill Lynch Mortgage Investors Trust, Series 2006-WMC1, Merrill Lynch Mortgage Investors Trust, Series 2006-WMC2, Merrill Lynch Alternative Note Asset Trust, Series 2007-A3, and Ownit Mortgage Loan Trust, Series 2006-2, at S-1, respectively.

[38] See Merrill Lynch Mortgage Investors prospectus supplement Series 2006-WMC1 at S-10.

Loan Underwriting

80.    No matter what the origination channel, underwriting processes and procedures are meant to ensure sufficient consistency and homogeneity exists to support securitization.

81.    In one deal, Merrill Lynch First Franklin Mortgage Loan Trust, 2007-A (FFMER 2007-A), "All of the Mortgage Loans were originated generally in accordance with First Franklin Financial's Underwriting Guidelines." (p. 28, S-28-29) under its CORE program, which was at all times in the direct control of Merrill Lynch.

82.    In three deals, the loans were underwritten subject to Merrill Lynch's "Direct Access Program," in which third-party originators underwrote the loans according to Merrill Lynch's own underwriting model and guidelines, which were also at all times in the direct control of Merrill Lynch.[39]

83.    Even where originators originated loans to their own underwriting standards, such originators, their origination processes and procedures, and their loans were supposed to be monitored and screened by Merrill Lynch's for conformity with underwriting standards sufficient to support securitization. For instance, the prospectus supplements state that Merrill Lynch conducted due diligence on the mortgage loans acquired from loan sellers and that "[t]he scope of the mortgage loan due diligence varies based on the credit quality of the mortgage loans."[40]    In addition, language in many of the prospectus states: "The underwriting guideline review entails a review of the mortgage loan origination processes and systems. In addition, such review may involve a consideration of corporate policy and procedures relating to state and

---

[39] Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2, at S-35; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3, at S-36; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4, at S-36.

[40] See Merrill Lynch Alternative Note Asset Trust, Series 2007-A3, at S-41; Merrill Lynch Mortgage Investors Trust, Series 2006-A1 at S-23; Merrill Lynch Alternative Note Asset Trust, Series 2007-F1 at S-32;Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1 at S-39; Merrill Lynch Mortgage Investors Trust, Series MLCC 2006-2 at S-31; Merrill Lynch Mortgage Investors Trust, Series 2006-FM1 at S-38; Merrill Lynch Mortgage Investors Trust, Series 2006-FF1 at S-39;  Merrill Lynch Mortgage Investors Trust, Series 2006-RM5 at S-39; Merrill Lynch Mortgage Investors Trust, 2006-RM3 at S-37; Merrill Lynch Mortgage Investors Trust, Series 2006-MLN1 at S-38; Merrill Lynch Mortgage Investors Trust, Series 2006-AHL1 at S-38; Merrill Lynch Mortgage Investors Trust, Series 2006-WMC1 at S-43; Merrill Lynch Mortgage Investors Trust, Series 2006-WMC2 at S-44; and Ownit Mortgage Loan Trust, Series 2006-2, at S-33.

federal predatory lending, origination practices by jurisdiction, historical loan level loss experience, quality control practices, significant litigation and/or material investors."[41]

84.     Additional language in the many of the prospectus supplements states that originators reportedly face initial qualification hurdles before they can sell loans to Merrill Lynch as well as ongoing monitoring constraints. "Prior to acquiring any residential mortgage loans, MLML reserves the right to conduct a review of the related mortgage loan seller that is based upon the credit quality of the selling institution. MLML's review process may include reviewing select financial information for credit and risk assessment and conducting an underwriting guideline review, senior level management discussion and/or background checks."[42]

85.     As presented above, eight of the prospectuses (including those underwritten to Merrill Lynch's own standards) maintained that loan reviews were used "to confirm the existence and accuracy of credit documentation, appraisal analysis and underwriting decision. A report detailing audit findings and level of error is sent monthly to each branch for response. The audit findings and branch responses must then be reviewed by the third party originator's senior management. Adverse findings are to be tracked monthly and over a rolling six month period. This review procedure allows the third party originator to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training" (or substantially similar language).[43]

---

[41] See for example, prospectus supplement for Merrill Lynch Alternative Note Asset Trust, Series 2007-F1, at S-31.
[42] Merrill Lynch Alternative Note Asset Trust, Series 2007-A3, at S-41; Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1, at S-39; Merrill Lynch Alternative Note Asset Trust, Series 2007-F1, at S-32; Merrill Lynch Mortgage Investors Trust, Series 2006-MLN1, at S-38; Merrill Lynch Mortgage Investors Trust, Series 2006-FM1, at S-38; Merrill Lynch Mortgage Investors Trust, Series 2006-FF1, at S-39; Merrill Lynch Mortgage Investors Trust, Series 2006-RM5, at S-39; Merrill Lynch Mortgage Investors Trust, Series MLCC 2006-2, at S-31; Merrill Lynch Mortgage Investors Trust, Series 2006-AHL1, at S-38; Merrill Lynch Mortgage Investors Trust, Series 2006-RM3, at S-36,37; Merrill Lynch Mortgage Investors Trust, Series 2006-WMC1, at S-43; Merrill Lynch Mortgage Investors Trust, Series 2006-WMC2, at S-44; Merrill Lynch Mortgage Investors Trust, Series 2006-A1, at S-23; Ownit Mortgage Loan Trust, Series 2006-2, at S-33.
[43] Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2, at S-37; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3, at S-38; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4, at S-38; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-A, at S-31; Merrill Lynch Mortgage Investors Trust, Series 2006-FM1, at S-36; Merrill Lynch Mortgage Investors Trust, Series 2006-FF1, at S-38; Merrill Lynch Mortgage Investors Trust, Series 2006-RM5, at S-37; Merrill Lynch Mortgage Investors Trust, 2006-RM3, at S-35.

86.     The eight deals with the loan review language in the preceding paragraph, also included language to the effect that, "[originators] are required to conduct a number of quality control procedures, including a post funding compliance audit as well as a full re-underwriting of a random selection of loans to assure asset quality.  Under the asset quality audit, all loans are required to be reviewed to verify credit grading, documentation compliance and data accuracy. Under the asset quality procedure, a random selection of each month's originations must be reviewed by each [originator or its senior management]."[44] Every prospectus contained language giving Merrill Lynch the rights and ability to review extensively the quality control processes, procedures, and outcomes of the originating lenders to varying degrees.

87.     As presented above, prospectuses for seven deals stated specifically that loans were originated, "…with a view toward the resale of the mortgage loans in the secondary mortgage market,"[45] or "…underwritten to be eligible to be sold in the secondary market,"[46] suggesting that they were selected with an eye toward the consistency and homogeneity necessary for securitization.

88.     Hence, Merrill Lynch represented that it took steps to monitor loan underwriting for the type of consistency and homogeneity that could support securitization according to the originator's underwriting standards. In my opinion, the language giving the appearance of consistent underwriting processes and procedures across origination channels purposefully suggests a level of consistent homogeneity that can be relied upon to derive stable senior and subordinate securities that can withstand a wide variety of credit scenarios – a "bulletproof" offering.

---

[44] Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2, at S-37; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3, at S-38; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4, at S-38; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-A, at S-31; Merrill Lynch Mortgage Investors Trust, Series 2006-FM1, at S-36; Merrill Lynch Mortgage Investors Trust, Series 2006-FF1, at S-38; Merrill Lynch Mortgage Investors Trust, Series 2006-RM5, at S-37; Merrill Lynch Mortgage Investors Trust, 2006-RM3, at S-35.
[45] Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2, at S-34; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3, at S-35; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4, at S-35; Merrill Lynch Mortgage Investors Trust, Series 2006-FM1, at S-34; Merrill Lynch Mortgage Investors Trust, Series 2006-FF1, at S-36.
[46] Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1, at S-47,48, and Merrill Lynch Mortgage Investors Trust, Series 2006-MLN1, at S-37.

### c. Numerosity

89.     Investors in the private-label MBS market include a wide variety of institutions and individuals, including, "… institutions of all sizes: corporations, commercial banks, life insurance companies, pension funds, trust funds, and charitable endowments. In recent years, individual investors have also become increasingly active in the mortgage securities market."[47]

90.     In addition to purchasing in the offering market, mortgage-backed securities trade in a well-organized long-established OTC market. According to data from the Securities Industry Financial Markets Association, annual issuance of private-label mortgage backed securities peaked in 2006 at $917 billion, which was about the same level as agency MBS that year ($925 billion). While there is no one single source for private-label MBS OTC secondary market trading volumes, average daily trading volume in agency mortgage backed securities was $359.3 billion in December 2010.[48]

91.     Securities are issued in book entry form through The Depository Trust Company (DTC). According to the language in the prospectus, "DTC is a limited purpose trust company organized under the laws of the State of New York, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to Section 17A of the Securities Exchange Act of 1934, as amended."[49]

---

[47] Bond Market Association at www.freddiemac.com/mbs/docs/about_MBS.pdf
[48] See the Securities Industry Financial Markets Association web page at http://www.sifma.org/research/statistics.aspx.
[49] See Merrill Lynch Mortgage Investors Trust, Series 2006-A1, Merrill Lynch Alternative Note Asset Trust, Series 2007-F1, Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1, and Merrill Lynch Mortgage Investors Trust, Series MLCC 2006-2 , Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2, Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3, Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4, Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-A, Merrill Lynch Mortgage Investors Trust, Series 2006-FM1, Merrill Lynch Mortgage Investors Trust, Series 2006-FF1, Merrill Lynch Mortgage Investors Trust, Series 2006-RM5, Merrill Lynch Mortgage Investors Trust, Series 2006-RM3, Merrill Lynch Mortgage Investors Trust, Series 2006-AHL1, Merrill Lynch Mortgage Investors Trust, Series 2006-WMC1, Merrill Lynch Mortgage Investors Trust, Series 2006-WMC2, Merrill Lynch Alternative Note Asset Trust, Series 2007-A3, Merrill Lynch Mortgage Investors Trust, Series 2006-MLN1, and Ownit Mortgage Loan Trust, Series 2006-2, at 28.

92.     DTC holds securities for its participating members ("DTC Participants") and facilitates the clearing and settlement of those securities in transactions among DTC Participant members. DTC Participants include "securities brokers and dealers, …banks, trust companies and clearing corporations."[50]

93.     Non-participant investors can only obtain indirect access to the DTC system by maintaining a custodial relationship with a DTC Participant, either directly or through another related entity or a correspondent relationship. "Beneficial Owners who are not Participants may transfer ownership of Book-Entry Certificates only through Participants and Indirect Participants by instructing… Participants and Indirect Participants…" to transfer across DTC on their behalf.[51]

94.     Hence, ownership records of the DTC will only list Participant institutions. While Participants may be Beneficial Owners of some of the securities registered in their name, other securities registered in the Participant's name will be registered on behalf of downstream-related entities and correspondents. The relationships are clear in the prospectus language regarding payment of cash flows to the Beneficial Owners: "Distributions on the Book-Entry Certificates will be made on each Distribution Date to Cede, as nominee of DTC. DTC will be responsible for crediting the amount of such payments to the accounts of the applicable DTC Participants in accordance with DTC's normal procedures. Each DTC Participant will be responsible for disbursing such payments to the Beneficial Owners of the Book-Entry Certificates that it represents and to each Financial Intermediary for which it acts as agent. Each such

---

[50] *Id.*

[51] See Merrill Lynch Mortgage Investors Trust, Series 2006-A1, at S-38; Merrill Lynch Alternative Note Asset Trust, Series 2007-F1, at S-52; Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1, at S-69; Merrill Lynch Mortgage Investors Trust, Series MLCC 2006-2 at S-59; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2, at S-54; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3, at S-55; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4, at S-55; Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-A, at S-47; Merrill Lynch Mortgage Investors Trust, Series 2006-FM1, at S-56; Merrill Lynch Mortgage Investors Trust, Series 2006-FF1, at S-55; Merrill Lynch Mortgage Investors Trust, Series 2006-RM5, at S-56; Merrill Lynch Mortgage Investors Trust, 2006-RM3, at S-53; Merrill Lynch Mortgage Investors Trust, Series 2006-MLN1, at S-57; Merrill Lynch Mortgage Investors Trust, Series 2006-AHL1, at S-56; Merrill Lynch Mortgage Investors Trust, Series 2006-WMC1, at S-59; Merrill Lynch Mortgage Investors Trust, Series 2006-WMC2, at S-59; Merrill Lynch Alternative Note Asset Trust, Series 2007-A3, at S-66; Ownit Mortgage Loan Trust, Series 2006-2, at S-46.

Financial Intermediary will be responsible for disbursing funds to the Beneficial Owners of the Book-Entry Certificates that it represents."[52]

95.     I have reviewed data provided by 13 entities on holdings of and trades in securities of the Offerings in the proposed class.[53] My analysis shows that there were, in fact, numerous investors in the Offerings. Conservatively, the cumulative number of individual investors exceeds 1,600. The numbers presented below are in all cases minimum estimates based on the limited data available to date. Discovery continues from large institutional clearing firms including J.P. Morgan Securities, Inc. and Credit Suisse Securities (USA) LLC, which can be expected to significantly increase the numbers of investors derived below.

**Table 2: Minimum Number of Investors Established in each Offering Based on Discovery Materials (rounded to the lowest ten)**

| Offering | Minimum Number of Investors |
|---|---|
| MLMIT 2006-A1 | >150 |
| MLMIT 2006-AHL1 | >60 |
| MLMIT 2006-FF1 | >160 |
| MLMIT 2006-FM1 | >40 |
| MLMIT 2006-MLN1 | >110 |
| MLMIT 2006-RM3 | >80 |
| MLMIT 2006-RM5 | >70 |
| MLMIT 2006-WMC1 | >120 |
| MLMIT 2006-WMC2 | >130 |
| MLMIT MLCC 2006-2 | >60 |
| MLANAT 2007-A3 | >30* |
| MLANAT 2007-AF1 | >50 |
| MLANAT 2007-F1 | >50 |
| MLFFMLT 2007-2 | >90 |
| MLFFMLT 2007-3 | >100 |
| MLFFMLT 2007-4 | >100 |
| MLFFMLT 2007-A | >50 |
| OWNIT 2006-2 | >200 |

*So far, I have established that there exist at least 36 investors in MLANAT 2007-A3.*

---

[52] Merrill Lynch Mortgage Investors Trust, Series 2006-FF1 prospectus supplement at S-57.

[53] The data I reviewed were provided by: Alliance Bernstein, Barclays Capital, Bank of New York Mellon, Brown Brothers Harriman, Cantor Fitzgerald, Charles Schwab, DTCC, Merrill Lynch, Mesirow Financial, NFS, Raymond James, RBC and State Street Corporation. My estimates of the number of distinct investors consider holdings of and trades in securities from the date of each offering through February 15, 2009.

96.     It is important to note that my estimates of the number of distinct investors are quite conservative. I relied solely on the lowest-level account records in all instances in order to avoid double-counting. When the lowest-level accounts were not identifiable entities, I did not count those records as investors. For example, some of the production yielded, to date, ownership data for which the account names were not provided. Those records, though likely representing additional investors, were excluded from my analysis because I could not be certain that they represented investors who were not already counted. Hence, the actual number of investors per offering even based on existing data production is likely to be significantly greater than the amounts in the table above. However, even the numbers above show that these securities were widely held and there are already numerous identifiable different members of the proposed class.

97.     The data I reviewed also show that there is a wide range in the size of transactions, with some transactions for as little as 10,000 units and others for hundreds of millions of units. In addition, the investors are from all over the country – from New York to California, Texas, Wisconsin, Wyoming, and Hawaii. Transaction records in the data include individual investors as well as institutional investors.

### d.   The Securities Can be Valued at Different Points in Time and Damages to the Members of the Class Can be Measured

98.     Section 11(e) of the Securities Act sets forth the method for calculating damages for violation of Section 11 (a). It states, in relevant part:

> The suit authorized under subsection (a) may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought …[54]

---

[54] 15 U.S.C. § 77k(e)

99.     There are many ways in which the securities that make up these Offerings can be valued at different points in time. The most straightforward way to value the securities is to observe prices paid in market transactions, particularly those driven by indicative bids in the marketplace. Indicative prices are effectively prices at which securities are offered for sale or purchase, typically by broker/dealers.

100.     Yet another way to value the securities is to model the expected cash flows from the underlying collateral and the way those expected cash flows translate into cash flows for security-holders. The main components of such a modeled price are an interest rate model, a prepayment model, and a default model. The interest rate model primarily affects the likelihood of prepayment (i.e., if interest rates go down, mortgage-holders are more likely to refinance their mortgage which involves a full prepayment of the existing mortgage), but it also has some effect on default risk, especially for adjustable rate mortgages (i.e., when rates are higher, the effective rate on adjustable rate mortgages that are not in their fixed term will be higher, leading to a greater likelihood of default).

101.     Independent third parties, such as Interactive Data Corporation, regularly keep track of and model prices of securities like those in the Offerings.

102.     Damages to each of the class members can be calculated in a formulaic manner. As mentioned above, values can be used to calculate losses to each class member.

Executed this 22nd day of March, 2011,

_____

Joseph R. Mason, Ph.D.

35

## APPENDIX A: PUBLICATIONS IN PAST TEN YEARS AND

## TESTIMONY IN PAST FOUR YEARS

EXPERT WITNESS TESTIMONY:

MBIA Insurance Corporation v. Patriarch Partners VIII, LLC and LD Investments, LLC. United States District Court Southern District of New York, Case No. 09 Civ. 3255 (RWS). (Deposed November 2010.)

The Charlotte-Mecklenburg Hospital Authority v. Wachovia Global Securities Lending and Metropolitan West Securities LLC. North Carolina General Court of Justice, Superior Court Division, 08 CVS 2779. (Deposed June 2010.)

J. Gallagher, Trustee for Spiegel Creditor Trust vs. KPMG, LLP. Circuit Court Of Cook County, Illinois, County Department, Law Division, Case No. 05 L 3030 Judge McGrath. (Deposed 2008.)

Lumpkin v. Farmers Group, Inc., No. 05-2868 MAV (W.D. Tenn. 2005) (Deposed 2008.)

McKenzie et al vs. Southern Casualty Insurance Company . United States District Court for the Northern District of Mississippi, Western Division, Case No. 3:06cv013-B-A 2007. (Deposed 2007.)

PUBLISHED CONGRESSIONAL, REGULATORY TESTIMONY, AND BRIEFS:

*Testimony before the House of Representatives, Committee on Energy and Commerce, Subcommittee on Energy and Power, "The American Energy Initiative," (March 17, 2011)*

*Testimony before the House of Representatives Committee on the Judiciary*, "Foreclosed Justice: Causes and Effects of the Foreclosure Crisis," (December 2, 2010).

*Testimony before the Senate Committee on Small Business and Entrepreneurship*, "The Deepwater Drilling Moratorium: A Second Economic Disaster for Small Businesses," (July 27, 2010).

*Testimony before the House Financial Services Committee, Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises, "*Credit Default Swaps on Government Debt: Potential Implications of the Greek Debt Crisis," (April 29, 2010).

*Testimony before the Senate Committee on the Judiciary, Subcommittee on Administrative Oversight and the Courts*, "Could Bankruptcy Reform Help Preserve Small Business Jobs," (March 17, 2010).

*Testimony before the United States Senate Energy & Natural Resources Committee*, "The Economic Policy Risks of Cap and Trade Markets for Carbon Emissions," (September 15, 2009).

*Testimony before the United States House of Representatives, Committee on the Judiciary, The Subcommittee on Commercial and Administrative Law*, "Role of the Lending Industry in the Home Foreclosure Crisis," (September 9, 2009).

*Testimony before the Congress of the United States Joint Economic Committee*, "Current Trends in Foreclosure and What More Can Be Done To Prevent Them." (July 28, 2009).

Robert Litan, Joseph Mason, and Ian Ayres as Amici Curiae Supporting Petitioners, *on Writ of Certiorari to the United States Court of Appeals for the Seventh Circuit, in the Supreme Court of the United States*, Jerry N. Jones, Mary F. Jones, and Arline Winerman, Petitioners, v. Harris Associates L.P., Respondent. June 17, 2009.

*Testimony before the Congress of the United States Joint Economic Committee*, "Restoring the Economy: Strategies for Short-term and Long-term Change," (February 26, 2009).

*Testimony before the European Parliament, Economic and Monetary Affairs Committee*, "Workshop on the Credit Rating Agencies," (December 4, 2008, Brussels).

*Testimony before the United States Senate Committee on Banking, Housing, and Urban Affairs, Subcommittee on Securities, Insurance, and Investments,* "Transparency in Accounting: Proposed Changes to Accounting for Off-balance Sheet Entities" (September 18, 2008).

*Testimony before the United States Senate Judiciary Committee on the Judiciary*, "The Looming Foreclosure Crisis: How to Help Families Save Their Homes, "(December 5, 2007).

*Testimony before the United States House of Representatives Committee on Financial Services*, Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises, "Hearing on the Role of Credit Rating Agencies in the Structured Finance Market," (September 27, 2007).

*Testimony before the Federal Reserve Board*, "Hearing on the Home Equity Lending Market and Regulation under the Home Ownership and Equity Protection Act," (June 13, 2007).

ACADEMIC PUBLICATIONS:

"'Blood and Treasure': Exiting the Great Depression and Lessons for Today," (with Kris Mitchener). *Oxford Journal of Economic Policy*, October 2010.

"The Economic Impact of Eliminating Preemption of State Consumer Protection Laws," (With Hal Singer and Rob Kulick), *The University of Pennsylvania Journal of Business Law,* Vol 12:3, 2010.

"Real Options Approach to Life Settlements Valuation," (with Hal Singer) in *Life Markets: Trading Mortality and Longevity Risk with Life Settlements and Linked Securities*, Vishaal Bhuyan, ed. Wiley Finance, 2009, pp. 135-152.

"Structuring for Leverage: CPDOs, SIVs, and ARSs," in *Prudent Lending Restored: Securitization after the 2007 Mortgage Securities Meltdown,* part of the Brookings-Wharton Series on Financial Intermediaries, Robert Litan, Richard Herring, and Yasuyuki Fuchita, eds. Washington, DC: Brookings Institution Press, 2009.

"The Evolution of the Reconstruction Finance Corporation as a Lender of Last Resort in the Great Depression," in *Bailouts and Government Rescues*, Robert E. Wright, ed. New York: SSRC/Columbia University Press, 2009.

"Regulating for Financial System Development, Financial Institutions Stability, and Financial Innovation," in *Financial Market Regulation after Financial Crises: The Historical Experience*, Gianni Toniolo and Eugene White, eds. 2009, Rome: Banca d'Italia.

"Cliff Risk and the Credit Crisis," in *The First Credit Market Turmoil of the 21st Century: Implications for Public Policy,* Douglas Evanoff and George Kaufman, eds. World Scientific Studies in International Economics – Vol. 10. London: World Scientific Publishers Co. Pte. Ltd., 2009, pp. 141-160.

"Fundamentals, Panics and Bank Distress during the Depression," (with Charles Calomiris). *Financial Crises: The International Library of Critical Writings in Economics*. Franklin Allen, ed. London: Edward Elgar Publishers 2008.

"The Summer of '07 and the Shortcomings of Financial Innovation." *Journal of Applied Finance*, Summer 2008.

"Resolving the Puzzle of the Underissuance of National Bank Notes." (with Charles Calomiris). *Explorations in Economic History*, September 2008 (45:4), pp. 327-355.

"Herding Behavior in Chinese Stock Markets: An Examination of A and B Shares," (with Tom Chiang, Edward Nelling, and Lin Tan). *Pacific-Basin Finance Journal,* January 2008 (16: 1-2), pp. 61-77.

"Positive performance and private equity placements: Outside monitoring or inside expertise?" (with D. Marciukaityte, E. Higgins, and H. S. Friday). *Journal of Real Estate Portfolio Management* (13: 4), pp. 389-399.

"A Real Options Approach to Bankruptcy Costs: Evidence from Failed Commercial Banks during the 1990s." *Journal of Business*, July 2005 (79:3), pp. 1523-53.

"Bank Asset Liquidation and the Propagation of the Great Depression," (with Ali Anari and James Kolari). *Journal of Money, Credit, and Banking*, August 2005 (37:4), pp. 753-773.

"Credit Card Securitization and Regulatory Arbitrage," (with Charles Calomiris). *Journal of Financial Services Research*, August 2004 (26:1), pp. 5-27 (lead article).

"What is the Value of Recourse to Asset Backed Securities? A Study of Credit Card Bank ABS Rescues," (with Eric Higgins). *Journal of Banking and Finance*, April 2004 (28:4), pp. 875-899.

"Fundamentals, Panics and Bank Distress during the Depression," (with Charles Calomiris). *American Economic Review,* December 2003 (93:5), pp. 1615-1647.

"Too-big-to-fail, Government Bailouts, and Managerial Incentives: The Case of Reconstruction Finance Corporation Assistance to the Railroad Industry during the Great Depression," (with Daniel Schiffman). In *Too-Big-To Fail: Policies and Practices in Government Bailouts*, Benton E. Gup, ed. Westport, CT: Greenwood Press, 2003, pp. 49-75.

"How to Restructure Failed Banking Systems: Lessons from the U.S. in the 1930s and Japan in the 1990s," (with Charles Calomiris). In *Privatization, Corporate Governance and Transition Economies in East Asia*, Takatoshi Ito and Anne Krueger, eds. Chicago: University of Chicago Press 2004, pp. 375-420.

"Consequences of U.S. Bank Distress during the Great Depression." (with Charles Calomiris). *American Economic Review*, June 2003 (93:3), pp. 937-947.

"The Political Economy of RFC Assistance during the Great Depression." *Explorations in Economic History*, April 2003 (40:2), pp. 101-121.

"Do Lender of Last Resort Policies Matter? The Effects of Reconstruction Finance Corporation Assistance to Banks." *Journal of Financial Services Research*, September 2001 (20:1), pp. 77-95.

"Reconstruction Finance Corporation Assistance to Financial Institutions and Commercial & Industrial Enterprise in the US Great Depression, 1932 – 1937." In *Resolution of Financial Distress*, Stijn Claessens, Simeon Djankov, and Ashoka Mody, eds. Washington: World Bank Press, 2001, pp. 167-204.

PROFESSIONAL PUBLICATIONS:

"CDS: Still Not Ready for Prime Time." *Commercial Lending Review*, Fall 2008.

"A Real Options Approach to Valuing Life Settlements Transactions." *Journal of Financial Transformation*, September 2008.

"Why ABS and CDO Ratings Substantially Differ from Corporate Bond Ratings." *Bank Structure and Competition Conference Proceedings*. Chicago: Federal Reserve Bank of Chicago, May 2008.

"The (Continuing) Information Problems in Structured Finance." *Journal of Structured Finance*. Spring 2008, v. 14 no. 1, pp. 1-11 (lead article).

"Credit Card Securitization, Recourse, and Regulatory Arbitrage," (with Eric Higgins and Charles Calomiris). *Bank Structure and Competition Conference Proceedings*. Chicago: Federal Reserve Bank of Chicago, May 2003, pp. 471-492.

"A Real Options Approach to Bankruptcy Costs: Evidence from Failed Commercial Banks during the 1990s." *Bank Structure and Competition Conference Proceedings*. Chicago: Federal Reserve Bank of Chicago, May 2002, pp. 108-128

"Causes of U.S. Bank Distress during the Great Depression," (with Charles Calomiris). *Bank Structure and Competition Conference Proceedings*. Chicago: Federal Reserve Bank of Chicago, May 2001, pp. 530-554.

BOOK REVIEWS:

Review of "International Financial History in the Twentieth Century: System and Anarchy," by Marc Flandreau, Carl-Ludwig Holtfrerich, and Harold James, eds. EH.net. February 2004.

Review of "Capital Flows and Crises," by Barry J. Eichengreen. EH.Net. August 2003.

OTHER PUBLICATIONS:

"Savings Banks." Dictionary of American Economic History, Charles Scribner's & Sons: Boston, 2002.

## APPENDIX B: MATERIALS RELIED UPON

### ACADEMIC LITERATURE

Akerloff George A., "The Market for Lemons: Quality Uncertainty and the Market Mechanism." *The Quarterly Journal of Economics*, vol. 84, no. 3 (Aug 1970) pp. 488-500.asdf

Benveniste, Lawrence M. and Allen N. Berger (1987) "Securitization with Recourse: An Instrument that Offers Uninsured Bank Depositors Sequential Claims," *Journal of Banking and Finance*, 11, 403-24.

Gorton, Gary B., and George G. Pennacchi, (1995). "Banks and Loan Sales Marketing Nonmarketable Assets," *Journal of Monetary Economics*, 35, 389-411.

Hu, Jian; Cantor, Richard; Weill, Nicolas; and Phillip, Tad.  "Deal Sponsor and Credit Risk of U.S. ABS and MBS Securities," *Moody's Special Comment*, December 2006.

Kendall, Leon T. "Securitization: A New Era in American Finance," *A Primer on Securitization*, Leon T. Kendall, and Michael J. Fishman, eds. MIT Press, 1996, at 7.

Moody's Investors Service, Inc., "Undisclosed Truths: Are ABS Investors Being Left in the Dark?" May 23, 1996.

### DISCOVERY MATERIALS

Documents produced by Defendant Merrill Lynch: ML00121477-1659.

Documents produced by non-party Alliance Bernstein.

Documents produced by non-party Barclays Capital: BARC000001 – 000015.

Documents produced by non-party Bank of New York Mellon.

Documents produced by non-party Brown Brothers Harriman.

Documents produced by non-party Cantor Fitzgerald.

Documents produced by non-party Charles Schwab.

Documents produced by non-party DTCC.

Documents produced by non-party Mesirow Financial.

Documents produced by non-party NFS.

Documents produced by non-party Raymond James: RJA-PublEmpl-ML-000001.

Documents produced by non-party RBC.

Documents produced by non-party State Street Corporation

### SECURITES AND EXCHANGE COMMISSION FILINGS

Merrill Lynch Alternative Note Asset Series 2007-A3 Prospectus Supplement, dated April 30, 2007.

Merrill Lynch Alternative Note Asset Series 2007-AF1 Prospectus Supplement, dated June 1, 2007.

Merrill Lynch Alternative Note Asset Series 2007-F1 Prospectus Supplement, dated March 28, 2007.

Merrill Lynch First Franklin Mortgage Loan Series 2007-2 Prospectus Supplement, dated April 27, 2007.

Merrill Lynch First Franklin Mortgage Loan Series 2007-3 Prospectus Supplement, dated May 30, 2007.

Merrill Lynch First Franklin Mortgage Loan Series 2007-4 Prospectus Supplement, dated June 26, 2007.

Merrill Lynch First Franklin Mortgage Loan Series 2007-A Prospectus Supplement, dated September 7, 2007.

Merrill Lynch Mortgage Investors 2006-RM3 Prospectus Supplement, dated June 27, 2006.

Merrill Lynch Mortgage Investors Series 2006-A1 Prospectus Supplement, dated March 29, 2006.

Merrill Lynch Mortgage Investors Series 2006-AHL1 Prospectus Supplement, dated June 29, 2006.

Merrill Lynch Mortgage Investors Series 2006-FF1 Prospectus Supplement, dated December 22, 2006.

Merrill Lynch Mortgage Investors Series 2006-FM1 Prospectus Supplement, dated June 29, 2006.

Merrill Lynch Mortgage Investors Series 2006-MLN1 Prospectus Supplement, dated September 28, 2006.

Merrill Lynch Mortgage Investors Series 2006-RM5 Prospectus Supplement, dated October 27, 2006.

Merrill Lynch Mortgage Investors Series 2006-WMC1 Prospectus Supplement, dated February 14, 2006.

Merrill Lynch Mortgage Investors Series 2006-WMC2 Prospectus Supplement, dated March 28, 2006.

Merrill Lynch Mortgage Investors Series MLCC 2006-2 Prospectus Supplement, dated April 27, 2006.

Ownit Mortgage Loan Series 2006-2 Prospectus Supplement, dated March 7, 2006.

Merrill Lynch Mortgage Investors Prospectus, dated January 18, 2006.

Merrill Lynch Mortgage Investors Prospectus, dated March 31, 2006.

Merrill Lynch Mortgage Investors Prospectus, dated September 8, 2006.

Merrill Lynch Mortgage Investors Prospectus, dated March 22, 2007.

Merrill Lynch Mortgage Investors Prospectus, dated May 15, 2007.

Merrill Lynch Registration Statement, dated August 5, 2005 (as amended).

Merrill Lynch Registration Statement, dated December 21, 2005 (as amended).

Merrill Lynch Registration Statement, dated February 2, 2007 (as amended).

## PLEADINGS AND OTHER LEGAL DOCUMENTS

Amended Class Action Complaint For Violations of §§ 11, 12(a)2 and 15 of the Securities Act of 1933, dated July 6, 2010, Docket No. 103.

## OTHER PUBLICLY-AVAILABLE MATERIAL

Bank of America website: http://www.bankofamerica.com/rmbs.

Securities Industry Financial Association Website: http://simfa.org/ research/statistic.aspx.

Bond Market Association Website: http://www.freddiemac.com/mbs/docs/about_MBS.pdf.

Credit Suisse US Mortgage Strategy "Credit Suisse - Mortgage Liquidity du Jour-Underestimated No More" March 12, 2007.

The Securities Act of 1933, 15 U.S.C. § 77k, select provisions.

Securities and Exchange Commission 17 CFR Parts 210, 228, 229, 230, 232, 239, 240, 242, 245 and 249, [Release Nos. 33-8518; 34-50905; File No. S7-21-04], RIN 3235-AF74, Asset-Backed Securities, available at www.sec.gov/rules/final/33-8518.pdf.

Letter from AIMR to Brian J. Lane, Director, Division of Corporation Finance, "Recommendations for a Disclosure Regime for Asset-Backed Securities" Sep. 30, 1996.