**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, et al., | Civil Action No. 08-cv-10841 (JSR) ECF Case |
| Plaintiffs, | |
| v. | |
| MERRILL LYNCH & CO. INC., et al., | |
| Defendants. | |

**DECLARATION OF DAVID R. STICKNEY IN SUPPORT OF**
**(A) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS**
**ACTION SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION**
**AND (B) LEAD COUNSEL'S MOTION FOR AN AWARD OF**
**ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

## TABLE OF CONTENTS

Page

I.      PRELIMINARY STATEMENT ................................................................................1

II.     HISTORY OF THE ACTION ..............................................................................5

      A.      The Commencement And Consolidation Of The Class Actions And The
           Appointment Of The Lead Plaintiff ............................................................5

      B.      The Consolidated Complaint, And Overcoming Defendants' First
           Motions to Dismiss ..................................................................................6

      C.      The Amended Complaint, And Overcoming Defendants' Second Motions
           to Dismiss ................................................................................................9

      D.      The Sustained Claims ............................................................................10

      E.      The Pretrial Schedule ............................................................................13

      F.      Preparing The Case For Trial ................................................................13

           1.      Discovery ....................................................................................13

                 a)      Obtaining Evidence From The Defendants........................14

                 b)      Obtaining Discovery From Multiple Non-Parties..............17

                 c)      Loan File Collection And Review ......................................19

                 d)      Depositions Of Merrill Lynch And Non-Party Employees ..................20

                 e)      Responding To Defendants' Discovery Requests................22

           2.      Motion Practice ..........................................................................24

                 a)      Plaintiffs' Motion For Class Certification .............................24

                 b)      Defendants' Motion For Reconsideration And Petition
                      Pursuant To Fed. R. Civ. P. 23(f) ......................................26

                 c)      Lead Plaintiff's Motion To Compel Electronic Discovery....................27

                 d)      Defendants' Motion To Compel Discovery From Absent
                      Class Members ..................................................................28

           3.      Consultation With Consultants And Experts ......................................29

III.    THE SETTLEMENT ..........................................................................................30

      A.      Settlement Negotiations ........................................................................30

      B.      Reasons For The Settlement ................................................................32

C.      Notice To The Class Meets The Requirements Of Due Process And Rule
        23 Of The Federal Rules Of Civil Procedure................................................36

D.      Plan Of Allocation ........................................................................................38

IV.     THE APPLICATION FOR ATTORNEYS' FEES AND EXPENSES........................39

A.      Application For Attorneys' Fees...................................................................40

        1.      The Requested Fee Of 17% Of The Settlement Fund Is Fair And
                Reasonable ........................................................................................40

        2.      Standing And Expertise Of Plaintiffs' Counsel.................................44

        3.      Standing And Caliber Of Opposing Counsel......................................45

        4.      The Risks Of Litigation And The Need To Ensure The
                Availability Of Competent Counsel In High-Risk, Contingent
                Securities Cases ................................................................................45

        5.      The Reaction Of The Class To Date...................................................46

B.      Application For Reimbursement Of Expenses ............................................47

I, David R. Stickney, do hereby state, under penalty of perjury, as follows:

1.      I am a partner of the law firm of Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz"), Court-appointed Lead Counsel in this Action and counsel for Lead Plaintiff, the Public Employees' Retirement System of Mississippi ("Lead Plaintiff"), and named plaintiff the Los Angeles County Employees Retirement Association ("LACERA"). I have personal knowledge of all material matters related to the Action based upon my active supervision and participation in the prosecution of this Action since its inception. While I personally devoted substantial time to this case, additional experienced and senior attorneys at Bernstein Litowitz also dedicated themselves and their time to this litigation. If called upon to do so, I could testify to the matters set forth herein.

2.      This declaration is submitted pursuant to Federal Rule of Civil Procedure 23(e) in support of: (i) Lead Plaintiff's motion for final approval of the settlement of this class action (the "Settlement") and approval of the plan for allocating the settlement proceeds (the "Plan of Allocation"); and (ii) Lead Counsel's motion for an award of attorneys' fees and reimbursement of litigation expenses.

3.      This Court, having overseen the proceedings for nearly three years, is familiar with the case and its complex legal and factual issues. Accordingly, this declaration does not seek to detail each and every event that occurred during the litigation. Rather, it provides highlights of the events leading to the Settlement and the basis upon which Lead Plaintiff and Lead Counsel recommend its approval.

## I.      PRELIMINARY STATEMENT

4.      After nearly three years of litigation, Lead Plaintiff has achieved an exceptional result on behalf of the Class. The Settlement requires Merrill Lynch to pay $315,000,000 in cash

(the "Settlement Amount").[1]   The Settlement Amount was paid into escrow on December 20, 2011 and has been invested for the benefit of the Class.  The Settlement confers a guaranteed, immediate and substantial benefit to the Class and avoids the risks and expense of continued litigation, including the risk of recovering less than the Settlement Amount after substantial delay, or of no recovery at all.  As explained below, Lead Plaintiff, Lead Counsel, and the additional Plaintiffs had a firm grasp of the strengths and weaknesses of the case prior to agreeing to the Settlement due to extensive information obtained through discovery, consultation with multiple experts, motion practice and the mediation process.

5.     The Settlement was reached only after Lead Plaintiff conducted an extensive investigation, drafted thorough complaints asserting claims under the Securities Act of 1933, opposed two motions to dismiss, moved successfully for class certification, opposed Defendants' petition for appellate review pursuant to Fed. R. Civ. P. 23(f), consulted extensively with experts and obtained evidence through discovery including a substantial volume of documents and testimony from key witnesses.  The parties reached agreement to settle just 11 days before the deadline for completion of fact discovery.

6.     Throughout the litigation, Lead Plaintiff worked closely with experts in areas requiring specialized knowledge, such as mortgage-backed securities, loan underwriting, statistics, and economics.  Lead Plaintiff retained consultants to analyze potential damages and, likewise, to oppose the defense that the decline in value of the securities was caused by factors

---

[1] "Merrill Lynch" refers collectively to Merrill Lynch & Co., Inc., Merrill Lynch Mortgage Investors, Inc. (the "Merrill Depositor") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch PFS").  Unless otherwise noted, all capitalized terms herein have the meanings set forth in the Stipulation and Agreement of Settlement ("Stipulation of Settlement").  ECF No. 174-1.  Nothing herein is intended to alter, nor shall it be construed as altering, the terms of the Stipulation of Settlement.

other than the alleged untrue statements and omissions in the offering documents.  Further, Lead Plaintiff consulted with a statistician to analyze the data of the underlying mortgages in the Offerings and with experts in the areas of due diligence and underwriting.  Such consultation assisted Lead Plaintiff with the analysis and organization of over 20 million pages of documents and preparation for depositions.

7.     The extensive settlement negotiations were overseen by the Honorable Layn R. Phillips (Fmr.).[2]  In advance of the multi-day mediation session, Lead Plaintiff prepared and provided Judge Phillips with detailed mediation briefs and analysis of estimated damages.  Lead Plaintiff also responded in writing to Defendants' various factual contentions and legal defenses. During negotiations, active discovery continued with the deposition of a key witness taken on the second day of the mediation.  Ultimately, after extensive negotiations and reaching an impasse, the parties separately agreed to the mediator's recommendation of a settlement of $315 million. As set forth in the accompanying declaration of George W. Neville, attached hereto as Exhibit 2, the Lead Plaintiff participated in all aspects of the litigation, remained informed throughout the settlement negotiations, and ultimately approved the Settlement Amount.

8.     In addition to seeking final approval of the Settlement, Lead Plaintiff seeks approval of the proposed Plan of Allocation as fair and reasonable.  The Plan of Allocation is based on the statutory calculation of damages set forth in § 11(e) of the Securities Act.  Lead Counsel engaged AlixPartners, a well-recognized firm of senior business and consulting professionals, to work on the Plan of Allocation.  *See* Declaration of Brett Brandenberg, attached hereto as Exhibit 3.  Pursuant to the Plan of Allocation, the Settlement Amount of $315 million

---

[2] *See* Declaration of the Honorable Layn R. Phillips in Support of Final Approval of Class Action Settlement (the "Phillips Decl.") attached hereto as Exhibit 1.

3

plus interest accrued (after deduction of Court-approved expenses and attorneys' fees) will be distributed on a *pro rata* basis to members of the Class who timely submit valid proofs of claim.

9.      Lead Counsel also applies for an award of attorneys' fees and reimbursement of expenses.  Specifically, Lead Counsel is applying for attorneys' fees of 17% of the Settlement Amount, or $53,550,000, plus interest thereon at the same rate and for the same time as earned by the Settlement Fund, and for reimbursement of Plaintiffs' Counsel's litigation expenses in the amount of $3,280,523.87.  Lead Counsel and Lead Plaintiff also request that the Court grant reimbursement of expenses incurred by Lead Plaintiff and the additional Plaintiffs directly related to their representation of the Class pursuant to 15 U.S.C. § 77z-1(a)(4).

10.     Lead Counsel submits that the Fee Application is fair and reasonable. Respectfully, Lead Counsel's work in investigating and prosecuting this case and arriving at this Settlement for $315 million has been time-consuming and challenging.  As explained below, Lead Counsel undertook the representation with no guarantee of payment, faced substantial risk surrounding class litigation over the sale of mortgage-backed securities during the housing boom, committed substantial resources that included devoting three partners and a team of attorneys to prepare the case for trial in accordance with the compact pretrial schedule, and succeeded in obtaining an exceptional recovery for the Class after prosecuting the case for years.

11.     The requested fee of 17% is squarely within the range of reasonable fees approved by courts in this District and around the country, and is amply supported by each of the relevant factors set forth in *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000).  The reasonableness of the 17% fee request is confirmed with a lodestar cross-check resulting in a multiplier of approximately 2.3, which is well within the range of multipliers awarded in other

complex cases, and below the multiplier awarded in many other cases in the Second Circuit involving settlements of greater than $100 million.

## II.    HISTORY OF THE ACTION

### A.    The Commencement And Consolidation Of The Class Actions And The Appointment Of The Lead Plaintiff

12.    This litigation arises from the sale of Merrill Lynch MBS issued between 2006 and 2007 pursuant to three registration statements and accompanying prospectus and prospectus supplements (the "Offering Documents").  The litigation began in December 2008, when two related class actions were filed alleging violations of the Securities Act of 1933 (the "Securities Act").

13.    On December 5, 2008, class representative, Connecticut Carpenters Pension Fund, filed the first complaint asserting claims under §§ 11, 12(a)(2) and 15 of the Securities Act related to Merrill Lynch MBS in Los Angeles County Superior Court.  *Connecticut Carpenters Pension Fund v. Merrill Lynch & Co.*, BC403282 (Cal. Super. Ct. Dec. 5, 2008).  On February 13, 2009, the case was removed to federal court and subsequently transferred to the Southern District of New York pursuant to 28 U.S.C. § 1404(a).  *Connecticut Carpenters Pension Fund et al. v. Merrill Lynch & Co., Inc. et al.*, 09-cv-04543-JSR (S.D.N.Y. May 13, 2009) (the "Connecticut Carpenters Action")

14.    On December 12, 2008, another complaint asserting claims under §§ 11, 12(a)(2) and 15 related to Merrill Lynch MBS was filed.  *Iron Workers Local 25 Pension Fund v. Credit-Based Asset Servicing and Securitization LLC, et al.*, No. 08-cv-10841 (S.D.N.Y.) ("Iron Workers Action").  Counsel for Iron Workers issued a press release, alerting investors to that action and notifying them of the opportunity to move for appointment as lead plaintiff.

15.     On February 17, 2009, Lead Plaintiff, the Public Employees' Retirement System of Mississippi ("MissPERS"), filed a separate complaint, captioned *Public Employees' Retirement System of Mississippi et al. v. Merrill Lynch & Co. Inc. et al.*, No. 09-cv-1392 (S.D.N.Y.) (the "MissPERS Action"), and moved for appointment as lead plaintiff and approval of its selection of lead counsel.  ECF No. 7.  Iron Workers filed a competing lead plaintiff motion.  ECF No. 12.

16.     On March 27, 2009, class representative, the Wyoming State Treasurer ("Wyoming"), filed a separate complaint asserting claims related to certain offerings that were not included in the Iron Workers Action and the MissPERS Action.  *Wyoming State Treasurer v. Merrill Lynch & Co., Inc., et al.*, 09 Civ. 3030 (JSR) (the "Wyoming Action").

17.     On April 1, 2009, the Court heard argument on the competing motions for lead plaintiff appointment, including testimony from Mr. Neville on behalf of MissPERS.  Thereafter, the Court received supplemental submissions from each movant.  ECF Nos. 37, 42, 47.  On April 23, 2009, the Court appointed MissPERS as Lead Plaintiff and Bernstein Litowitz as lead counsel for the Action.  ECF No. 49.  The Court explained its decision in an Opinion filed May 27, 2009.  *See Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing and Securitization, LLC*, 616 F. Supp. 2d 461, 467 (S.D.N.Y. 2009), ECF No. 53.

18.     By Orders dated April 2, 2009, May 6, 2009, and May 19, 2009, the Court consolidated the MissPERS Action, the Wyoming Action and the Connecticut Carpenters Action into the Iron Workers Action with docket number 08-cv-10841.

**B.     The Consolidated Complaint, And**
**Overcoming Defendants' First Motions to Dismiss**

19.     Lead Counsel engaged in a thorough investigation in preparation for drafting the consolidated class action complaint ("Consolidated Complaint").  The investigation included,

6

among other things, locating and interviewing numerous individuals with first-hand knowledge of the events alleged; an in-depth review and analysis of the Offering Documents; and a careful analysis of other court filings, investigations, media reports, congressional testimony, SEC filings, press releases, and additional public statements made by Merrill Lynch, the rating agencies and various mortgage originators that provided loans to the offerings at issue.

20.    On May 20, 2009, Plaintiffs filed the 68-page Consolidated Complaint asserting claims under §§ 11, 12(a)(2) and 15 of the Securities Act on behalf of persons and entities who purchased or otherwise acquired Merrill Lynch MBS in 84 offerings pursuant or traceable to three Merrill Lynch Registration Statements.

21.    The Consolidated Complaint asserted Securities Act claims against (1) Merrill Lynch & Co., Inc. ("Merrill Lynch & Co."), the Merrill Depositor, Merrill Lynch Mortgage Lending, Inc. (the "Merrill Sponsor"), Merrill Lynch PFS, and Matthew Whalen, Paul Park, Brian T. Sullivan, Michael M. McGovern, Donald J. Puglisi and Donald C. Han (the "Individual Defendants") (together with Merrill Lynch & Co., the Merrill Depositor and Merrill Lynch PFS, the "Defendants"); (2) J.P. Morgan Securities, Inc. ("J.P. Morgan") and ABN AMRO Incorporated ("ABN AMRO") (the "Junior Underwriter Defendants"); (3) McGraw-Hill Companies (through its division Standard & Poor's) and Moody's Investors Service, Inc. ("Moody's") (the "Rating Agency Defendants"); and (4) Credit-Based Asset Servicing and Securitization LLC ("C-BASS") and First Franklin Financial Corporation ("First Franklin").

22.    On June 17, 2009, the Defendants, the Junior Underwriter Defendants, both Rating Agency Defendants and C-BASS each filed separate motions to dismiss the Consolidated Complaint.  ECF Nos. 56-77.

7

23.     Defendants argued, *inter alia*, that: (1) Plaintiffs were on notice of their claims at least one year before the filing of the Connecticut Carpenters Action (i.e., December 2007) and that the claims were, according to Defendants, time-barred; (2) Plaintiffs lacked standing to assert claims related to 65 of the 84 offerings; (3) Plaintiffs had not adequately alleged any untrue statements or omissions in the Offering Documents; and (4) Plaintiffs had failed to properly allege a control person claim under § 15 of the Securities Act.  ECF No. 60.  The Rating Agency Defendants filed separate motions and argued that (1) Plaintiffs' claims were precluded by express SEC rule; (2) there was no claim for "underwriter" liability against them; and (3) the alleged misstatements and omissions were not actionable.  ECF Nos. 65-66.  The Junior Underwriter Defendants argued that Plaintiffs lacked standing to assert claims with respect to the two offerings that they underwrote.  ECF No. 58.  C-BASS argued that it was not a proper defendant under § 11 and that Plaintiffs' allegations were insufficient to maintain a claim related to the one offering where it acted as a sponsor.  ECF No. 69.

24.     Lead Plaintiff researched, prepared and filed briefs, totaling 106 pages, opposing the motions to dismiss.  ECF Nos. 81-82.   Many of the legal and factual issues raised in the motions were issues of first impression, or for which there was no controlling authority, in the context of MBS litigation.  After full briefing, the Court heard argument on August 18, 2009.

25.     On March 31, 2010, the Court granted in part and denied in part defendants' motions to dismiss the Consolidated Complaint.  ECF No. 101.  The Court explained its ruling in an Opinion issued June 1, 2010.  *Pub. Emps' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475 (S.D.N.Y. 2010) ("June 1 Order").  Specifically, the Court sustained Plaintiffs' § 11 claims against the Merrill Depositor, Merrill PFS and the Individual Defendants as to 18 of the 19 offerings in which Plaintiffs purchased Certificates.  The Court dismissed with prejudice

all claims (1) based on the 65 offerings in which no Plaintiff purchased securities; and (2) against the Rating Agency Defendants, C-BASS, the Merrill Sponsor and First Franklin.  The Court granted Plaintiffs leave to amend with respect to: (1) their § 12(a)(2) claims against Merrill PFS and the Junior Underwriter Defendants; and (2) their § 15 control person allegations against Merrill Lynch & Co.

### C.      The Amended Complaint, And Overcoming Defendants' Second Motions to Dismiss

26.      On July 6, 2010, Plaintiffs filed the 123-page Amended Complaint following additional research and investigation.  The Amended Complaint re-asserted the sustained § 11 claims and alleged additional facts supporting Plaintiffs': (1) § 11 claims against the Junior Underwriter Defendants; (2) § 12(a)(2) claims; and (3) § 15 control person allegations against Merrill Lynch & Co.  Specifically, the Amended Complaint detailed: (1) Merrill Lynch & Co.'s control and participation over the entities responsible for the conduct at issue; (2) facts showing the untrue statements and omissions in the Offering Documents for the C-BASS 2007-CB4 Offering (underwritten by the Junior Underwriter Defendants); (3) additional facts related to the sustained offerings showing that originators systematically disregarded their underwriting and appraisal standards; and (4) that Plaintiffs purchased Certificates in 13 offerings directly from Merrill PFS.

27.      On August 6, 2010, the Defendants and the Junior Underwriter Defendants filed separate motions to dismiss the Amended Complaint.  ECF Nos. 104-109.  Defendants argued, *inter alia*, that the Amended Complaint failed to adequately plead (1) claims under §§ 11 and 12 of the Securities Act; (2) cognizable injury as to certain offerings where, according to Defendants, Plaintiffs' Certificates had been paid in full and had not missed a principal or interest payment; (3) reliance for Plaintiff Wyoming related to offerings it purchased following

9

the issuance of more than twelve MBS distribution reports; and (4) a § 15 claim against Merrill Lynch & Co.   Defendants also challenged the reliability of certain sources in the Amended Complaint.

28.    On August 20, 2010, Lead Plaintiff filed a 37-page omnibus opposition to the separate motions to dismiss the Amended Complaint.   ECF No. 110.   Lead Plaintiff explained how the Amended Complaint cured the deficiencies that the Court identified in its June 1 Order. Following full briefing, the Court heard oral argument on September 15, 2010.

29.    On November 8, 2010, the Court issued its bottom-line order largely sustaining the claims asserted in the Amended Complaint.   ECF No. 115.   On December 1, 2010, the Court issued its memorandum explaining its conclusions.   *Pub. Emps' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 2010 WL 4903619 (S.D.N.Y. Dec. 1, 2010), ECF No. 117.   Specifically, the Court found that Plaintiffs had adequately pled untrue statements related to underwriting standards, appraisal standards and ratings as to 18 of the 19 offerings in which Plaintiffs purchased Certificates.   The Court sustained Plaintiffs' control person claims against Merrill Lynch & Co. However, the Court dismissed with prejudice Plaintiffs' claims relating to the C-BASS 2007-CB4 Offering.

### D.    The Sustained Claims

30.    As a result of the Court's decisions on the motions to dismiss, the sustained claims were narrower than the initial case.   As set forth in the operative Amended Complaint, Plaintiffs' alleged that the Offering Documents for the MBS contained a series of representations about the character and quality of the MBS.

- **Underwriting Guidelines** – The Offering Documents represented that the mortgage loans underlying the MBS "were originated generally in accordance with the [stated] underwriting guidelines" and that exceptions to those guidelines were authorized only in the presence of compensating factors.   They further represented that underwriting standards were primarily intended to assess the

ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgaged loan.

- **Property Appraisals** – The Offering Documents represented that the mortgaged properties would provide adequate security for the mortgage loans, based in part on the appraised value of the properties securing the securitized mortgage loans. Each securing property was to be appraised by a qualified, independent appraiser, and each appraisal was required to satisfy applicable government regulations and be on forms acceptable to Fannie Mae and Freddie Mac. As required by Fannie Mae and Freddie Mac, the appraisals were to be in conformity with the Uniform Standards of Professional Appraisal Practice, as adopted by the Appraisal Standards Board of the Appraisal Foundation.

- **Credit Ratings** – The Offering Documents represented that (1) it was "a condition of the issuance of the Offered Certificates that they be assigned" specific ratings; (2) the ratings "address the likelihood of the receipt by certificate holders of all distributions to which such certificateholders are entitled"; and (3) the ratings accounted for "the credit quality of the mortgage pool including credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream of the mortgage pool is adequate to make payments required under the certificates."

31.      The Amended Complaint alleges that the representations regarding the character and quality of the loans underlying the Merrill Lynch MBS at issue were untrue or contained omissions, and that, in truth: (1) loan originators did not follow their stated underwriting standards when issuing loans; (2) Merrill Lynch and First Franklin failed to follow their loan purchasing guidelines when acquiring many of the underlying mortgage loans; (3) the underlying mortgages were based on appraisals that overstated the value of the underlying collateral; and (4) the MBS ratings in the prospectus supplements were based on outdated assumptions, relaxed ratings criteria, and inaccurate loan information.

32.      The Amended Complaint alleged that, as a result of these untrue statements and omissions, Lead Plaintiff and the Class purchased MBS that were far riskier than represented and were damaged.

33.      Throughout, Defendants denied the allegations and vigorously asserted myriad affirmative defenses.  For example, on December 1, 2010, Defendants filed their Answer,

11

Affirmative And Other Defenses To The Amended Class Action Complaint ("Answer").  ECF No. 118.  The Answer was a 61-page document beginning with a preliminary statement which (1) asserted that Defendants "deny each and every allegation contained in the Amended Complaint, including without limitation any allegations contained in the preamble, headings, subheadings or footnotes"; (2) requested that, "documents and third-party publications [referred to in the Amended Complaint] should be considered, if at all, in context and/or in unmodified form and Defendants respectfully refer the Court to the respective documents for their complete and accurate contents"; and (3) expressly reserved the right to seek to amend and/or supplement the Answer.

34.    The Answer contained responses to each of the 481 paragraphs in the Amended Complaint, and asserted 34 affirmative defenses, including: (1) failure to state a claim; (2) statute of limitations; (3) no damages; (4) failure to plead/prove reliance; (5) absence of material false statements and/or omissions; (6) the statements at issue were opinions that Plaintiffs had not alleged, and could not prove, were not truly held; (7) negative causation; (8) due diligence; (9) the sole remedy was to have mortgage loans cured, repurchased, or substituted; (9) no section 12 standing; (10) Defendants had no duty to verify, opine upon, audit, review, or correct information disclosed in the Offering Documents; (11) all principal and interest payments were made as due; (12) laches; (13) Plaintiffs and other members of the Class had knowledge of the alleged false statements or omissions at the time they purchased the securities at issue; (14) Merrill Lynch did not have "control," as the term is defined in the federal securities laws; and (15) equitable estoppel, waiver, or other related equitable doctrines.

E.      **The Pretrial Schedule**

35.     On December 9, 2010, the Court established a pretrial schedule, setting a deadline of June 29, 2011 for disclosure of experts; September 1, 2011 for completion of discovery; September 12, 2011 for filing of summary judgment motions; and January 2012 for trial readiness. ECF No. 120. The Court also set a schedule for Lead Plaintiff's motion for class certification. The pretrial schedule afforded 10 months to prepare the case for trial, including obtaining and analyzing thousands of loan files (many of which were held by third parties), serving and responding to written discovery, analyzing millions of pages of internal Merrill Lynch documents, conducting depositions of fact and expert witnesses and completing additional motion practice.

36.     On July 6, 2011, the Court extended the deadlines by 60 days, resetting the expert discovery cut-off to September 20, 2011, and the fact discovery cut-off to October 31, 2011. On September 15, 2011, the Court extended the expert discovery date to December 2, 2011.

F.      **Preparing The Case For Trial**

37.     During the course of the litigation, Lead Plaintiff conducted extensive discovery, engaged in motion practice and consulted regularly with various experts and consultants on subject matters related to the claims at issue. As a result, Lead Plaintiff and Lead Counsel were fully aware of the strengths and weaknesses of the case when the Settlement was reached.

1.      **Discovery**

38.     Discovery commenced on December 10, 2010, following the lifting of the discovery stay imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and entry of the Court's pretrial order. That same day, Lead Plaintiff served its First Set of Document Requests on Defendants.

39.     Lead Plaintiff obtained evidence from multiple sources and through different discovery procedures.  Lead Counsel prepared and propounded 35 document requests, two interrogatories (each with multiple subparts per local rules), and 402 requests for admission.  In addition, Lead Counsel propounded subpoenas to over 75 non-parties for documents and testimony.  As explained below, Lead Counsel obtained over 20 million pages of documents for analysis and to support its claims.

40.     Moreover, Lead Counsel conducted 11 depositions, defended 7 depositions and examined a key third-party witness at his deposition.  In total, Lead Counsel committed a team of lawyers and devoted thousands of hours to discovery in this Action.  The discovery process was far advanced, with only 11 days remaining in the fact discovery period, at the time Lead Plaintiff reached agreement to settle.

### a)     Obtaining Evidence From The Defendants

41.     **Document Requests** – On December 10, 2010, Lead Counsel prepared and served its First Set of Document Requests on Defendants.  The First Set contained 35 separate requests, and requested, *inter alia*, documents and communications regarding (1) Merrill Lynch's securitization business; (2) underwriting and appraisal guidelines; (3) audits and/or quality control reviews regarding the loans and offerings; (4) the due diligence performed on the loans; (5) loan performance; (6) repurchase requests; (7) the Certificates' ratings and credit enhancement; (8) the rating agencies; (9) the content of the Offering Documents; (10) the Certificates' pricing; (11) the Certificates' structure; (12) any change in the Certificates' value; (13) governmental or other investigations of Merrill Lynch related to its securitization business; and (14) Defendants' affirmative defenses.

42.     On January 12, 2011, Defendants served their Responses and Objections to Plaintiffs' First Set of Document Requests.  Thereafter, Lead Counsel engaged in extensive

negotiations with Defendants' counsel regarding Defendants' Responses and Objections and the scope of the document production. The parties reached resolutions on many of their disputes. As detailed further below (*see* ¶¶ 78-79), however, Lead Plaintiff moved to compel production of certain categories of documents.

43.     Between January 14, 2011 and February 16, 2011, the parties participated in several meet-and-confer sessions and exchanged various proposals regarding the appropriate scope of a confidentiality order. Such an order had to address the protection of personal financial information of borrowers, including information protected from disclosure under the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, and the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801, *et seq.* On February 25, 2011, the Court adopted the parties' Proposed Protective Order. ECF No. 125.

44.     On March 7, 2011, Defendants began their rolling document production. The documents in the initial production included deal files for the offerings at issue and spreadsheets containing trading information relevant to Plaintiffs' Motion for Class Certification. Throughout the litigation, Lead Plaintiff pursued and obtained the production of additional responsive documents, including, for example, (1) quality control reviews, analyses, evaluations and/or audits; (2) due diligence reports; and (3) reports regarding repurchase claims.

45.     Substantial evidence in the case came from electronically-stored information, including email from key personnel. After extensive negotiations, Lead Plaintiff reached agreement on a protocol governing the search and production of electronic discovery ("E-Discovery Protocol"). The protocol covered 47 custodians, eight distinct searches and over 200 search terms. As the litigation progressed, Lead Plaintiff requested that Defendants add various custodians based on information obtained during discovery.

46.     In response to Lead Counsel's discovery efforts, between March and October 2011, Defendants produced over 16 million pages in 20 separate installments.  Lead Plaintiff utilized a sophisticated, electronic document review system to analyze and organize the documents for use in the Action.

47.     Analyzing the substantial volume of documents and the complex subject matter presented challenges and required extensive resources and organization.  Lead Counsel devoted substantial resources to locating relevant and supportive evidence and placing such material into context for use at depositions and to prepare for trial.  Through this effort, Lead Counsel developed evidence supporting the claims.

48.     **<u>Interrogatories</u>** – On December 17, 2010, in accordance with Local Civil Rule 33.3(a), Lead Counsel prepared and served its First Set of Interrogatories on Defendants.  The First Set of Interrogatories requested that Defendants identify all persons or entities with knowledge of (1) the 18 offerings; (2) the loans underlying the offerings; (3) the Certificates; (4) the originators that contributed loans to the offerings; (5) any informal or formal investigation of Merrill Lynch concerning mortgage-backed securities, collateralized debt obligations, or mortgage repurchase claims; (6) Merrill Lynch's creation of the Merrill Depositor; (7) Merrill Lynch's document destruction policies; and (8) any insurance policies providing coverage in connection with the claims asserted in the Action.  The First Set of Interrogatories also requested that Defendants provide the custodian, location and general description of all documents relevant to the above categories.

49.     On January 21, 2011, Defendants served their Responses and Objections to Plaintiffs' First Set of Interrogatories.  Thereafter, the parties conducted several meet and confers regarding Defendants' responses.  Ultimately, Defendants provided Plaintiffs with additional

information.  The information Lead Plaintiff gathered regarding the location and description of categories of relevant documents assisted in the negotiation of the E-Discovery Protocol, described above, and in the preparation of the case.

50.     **Requests For Admission** – On September 30, 2011, Lead Counsel prepared and served its First Requests for Admission to Defendants, which contained 402 requests related to various subjects in the litigation, including (1) the identity and structure of various entities that played roles in structuring and selling the offerings; (2) whether Merrill Lynch & Co. controlled the Merrill Depositor; (3) the due diligence performed on the loans underlying the offerings; (4) the structuring and rating of the offerings; and (5) whether the Offering Documents contained untrue statements and omissions.

### b)      Obtaining Discovery From Multiple Non-Parties

51.     Non-parties possessed highly relevant evidence, including loan files for loans in the pools.  Lead Counsel prepared and issued over 75 document subpoenas to non-parties, including custodial banks that cleared MBS transactions, rating agencies that rated the securities, due diligence firms that reviewed the loans underlying the MBS, lenders that originated the loans and servicers that had possession of the loan files:

(a)     **Clearing Banks** – Lead Counsel served subpoenas on dozens of major custodial banks whose internal records reflect holdings and transactions in the MBS at issue, including Bank of New York Mellon Corp., Barclays Capital, Inc., Brown Brothers Harriman, Cantor Fitzgerald, L.P., Charles Schwab & Co., Inc., ING Bank, F.S.B., Mesirow Financial, Inc., Morgan Stanley & Co., Inc., National Financial Services, LLC, Pershing LLC, PNC Bank, Raymond James Financial Services, Inc., RBC Capital Markets Corporation, Sanford C. Bernstein & Co., LLC, State Street Corporation and United Capital Markets, Inc.  Lead Counsel

also served a subpoena on the Depository Trust & Clearing Corporation ("DTCC"), which provides clearing and settlement information for MBS.

(b)    **Rating Agencies** – Lead Counsel served subpoenas on the three major rating agencies which assigned ratings to the Certificates, including Moody's Investors Service, Inc., Fitch, Inc. and McGraw-Hill Companies, through its division, Standard & Poor's Corporation.

(c)    **Due Diligence Firms** – Lead Counsel served subpoenas on firms that Defendants engaged to perform loan level underwriting due diligence and valuation analysis on the loans underlying the offerings, including Clayton Holdings LLC, The Bohan Group and AllonHill LLC.

(d)    **Loan Originators** – Lead Counsel served subpoenas on the entities that originated the loans that Merrill Lynch purchased for inclusion in the Offerings, including First Franklin Financial Corporation ("First Franklin"), Countrywide Home Loans, Inc. ("Countrywide"), First Republic Bank, Washington Mutual Bank, MortgageIT, Inc., PHH Mortgage Corporation and Wachovia Mortgage Corporation.  The subpoena to First Franklin was particularly significant because First Franklin originated nearly 55% of the loans in the case (100% of the loans in five of the 18 offerings).  Merrill Lynch & Co. acquired First Franklin in late 2006, and Defendants' counsel represented First Franklin in the negotiation of the subpoena. As with Plaintiffs' party discovery to Defendants, counsel conducted numerous meet-and-confer sessions regarding the scope of First Franklin's production. At the time of the Settlement, First Franklin had produced over 41,000 pages of documents, and four massive databases related to loan origination and repurchases.

(e)    **Loan Servicers** – As detailed further below, Lead Counsel served subpoenas on many of the entities that serviced the loans underlying the offerings at issue in order to gain

18

access to the loan files.  These entities included BAC Home Loan Servicing, LP, Wells Fargo Bank, N.A., Wilshire Credit Corporation, PHH Mortgage Corporation, Litton Loan Servicing LP, Home Loan Services, Inc., Ocwen Loan Servicing LLC, First Republic Bank, Central Mortgage Company, CitiMortgage, Inc., One West Bank FSB, Option One Mortgage Corporation, Prudential Mortgage Corporation, GreenPoint Mortgage Funding, Inc., LaSalle Bank, N.A., Wachovia  Mortgage Corporation, IndyMac Bank, FSB, Saxon Mortgage Services, Inc. and Washington Mutual Bank.

      (f)    **Trustees and Custodians** – Lead Counsel served subpoenas on the entities that acted as trustees and servicers for the offerings at issue, including HSBC USA, N.A. and LaSalle Bank, N.A. (Bank of America as successor to LaSalle Bank).

      (g)    **Regulator** – Lead Counsel served a subpoena on the Financial Industry Regulatory Authority, Inc. ("FINRA").  FINRA regulated the accuracy of Merrill Lynch's disclosures regarding its MBS offerings under Regulation AB, 17 C.F.R. § 229.1100, *et seq.*

      52.    In total, non-parties produced over four million pages of documents in response to Lead Plaintiff's subpoenas.

### c)    Loan File Collection And Review

      53.    In the course of gathering evidence of untrue statements and omissions, Lead Plaintiff subpoenaed and obtained loan origination files ("loan files").  Each offering was supported by between 945 and 15,100 mortgage loans, and there were over 86,000 total mortgages.  Each loan file ranged between 100 and 600 pages.  Lead Plaintiff's expert conducted statistical analyses of the loan pools and identified a representative sample.  This "sampling" enabled Lead Plaintiff to focus on certain loans to prepare the case for trial.

      54.    Collecting the loan files from various third parties required substantial time and resources.  Lead Plaintiff served subpoenas on 19 loan servicers requesting the production of the

underlying loan file for each loan.  Many servicers initially indicated that they were not in possession of the requested loan files as a result of the extensive consolidation and acquisition activity that had occurred among servicers and banks from 2007-2009.  Other servicers represented that the loan files were extremely difficult and potentially costly to locate.  Often, when servicers did produce loan files, they would be incomplete or difficult to read, necessitating further follow-up.

55.     Each loan file contained confidential personal information.  The protective order addressed confidentiality concerns, but nonetheless, many servicers requested additional protections.  Ultimately, Lead Plaintiff and the servicers reached agreements regarding the treatment of confidential information.

56.     In total, Lead Counsel devoted hundreds of hours to interacting with third parties regarding locating and producing loan files.  After Lead Counsel located and obtained the file, such material was thoroughly reviewed and analyzed by Lead Counsel and its underwriting consultant.  In this manner, Lead Counsel developed additional evidence to support Lead Plaintiff's claims.

### d)     Depositions Of Merrill Lynch And Non-Party Employees

57.     In total, Lead Plaintiff deposed eleven witnesses, including Defendants' class certification expert witness, a Merrill Lynch & Co. designee pursuant to Fed. R. Civ. P. 30(b)(6), eight former employees of Merrill Lynch and an Individual Defendant.  Moreover, Plaintiffs defended seven depositions, including one of Plaintiffs' class certification expert and six of representatives from the Plaintiffs, and elicited testimony in the deposition of a non-party money manager.

58.     Starting in April 2011, Lead Plaintiff issued notice of over 30 fact depositions of relevant Merrill Lynch, non-party, and expert witnesses:

- On April 18, 2011, Lead Plaintiff served a notice of deposition related to Defendants' expert witness Dr. Anthony Sanders;

- On May 25, 2011, Lead Plaintiff served a notice of deposition of Defendant Merrill Lynch & Co. pursuant to Federal Rules of Civil Procedure 30(b)(6);

- On July 18, 2011, Lead Plaintiff served a notice of deposition relating to a deposition of a former Merrill Lynch employee;

- On August 19, 2011, Lead Plaintiff served a notice of depositions relating to the depositions of 20 former Merrill Lynch employees, including six Individual Defendants;

- On August 23, 2011, Lead Plaintiff served a notice of deposition relating to a deposition of a former Merrill Lynch employee;

- On September 23, 2011, Lead Plaintiff served a notice of depositions relating to depositions of non-parties First Franklin Financial Corp., Moody's Investors Service, Inc. and Standard & Poor's Corp.;

- On October 7, 2011, Lead Plaintiff served a notice of deposition relating to a deposition of non-party Joshua Adler;

- On October 11, 2011, Lead Plaintiff served a notice of deposition relating to a deposition of non-party John McMurray; and

- On October 14, 2011, Lead Plaintiff served a notice of deposition relating to a deposition of non-party Clayton Holdings, LLC.

59.    Lead Plaintiff obtained testimony from the following individuals:

- On April 22, 2011, Lead Counsel deposed Defendants' expert witness Dr. Anthony Sanders in New York, NY;

- On July 8, 2011, Lead Counsel deposed Merrill Lynch & Co. designee Ketan Parekh in New York, NY;

- On September 15, 2011, Lead Counsel deposed former Merrill Lynch employee Gregory Amoroso in New York, NY;

- On September 18, 2011, Lead Counsel deposed former Merrill Lynch employee Diane Alexander in Orlando, FL;

- On September 19, 2011, Lead Counsel deposed former Merrill Lynch employee Sean Smith in New York, NY;

- On September 27, 2011, Lead Counsel deposed former Merrill Lynch employee Timothy Loughlin in Los Angeles, CA;

- On September 30, 2011, Lead Counsel deposed former Merrill Lynch employee Richard Florin in New York, NY;

- On September 21, 2011, Lead Counsel deposed former Merrill Lynch employee Vincent Mora in New York, NY;

21

- On October 5, 2011, Lead Counsel deposed former Merrill Lynch employee Shannon Madden in Minneapolis, MN;

- On October 14, 2011, Lead Counsel deposed former Merrill Lynch employee Brian Brennan in New York, NY; and

- On October 18, 2011, Lead Counsel deposed Individual Defendant Matthew Whalen in New York, NY.

Additional depositions were scheduled at the time the agreement-in-principle to settle was reached on October 20, 2011.

e) **Responding To Defendants' Discovery Requests**

60. Defendants propounded extensive discovery, both to oppose class certification and on the merits. Lead Counsel:  (1) responded to Defendants' 38 separate document requests; and (2) responded to Defendants' interrogatories.  Further, Lead Counsel, on behalf of Lead Plaintiff and LACERA: (1) reviewed and produced a significant number of responsive documents; (2) prepared 30(b)(6) designees to testify on 20 topics; and (3) defended four 30(b)(6) depositions.  Counsel for Plaintiffs Connecticut Carpenters and Wyoming also produced documents on behalf of their clients and defended the depositions of their client's 30(b)(6) designees.

61. On December 17, 2010, Defendants served their First Set of Document Requests To Plaintiffs.  The requests sought documents related to (1) the purchase and sale of the Certificates; (2) Plaintiffs' investment strategies; (3) communications with loan originators and rating agencies; (4) insurance policies related to the claims at issue; (5) individual and class-wide damages related to the claims at issue; (6) the confidential witnesses identified in the Complaint; (7) law firm engagement letters; and (8) document retention policies.

62. On January 12, 2011, Lead Plaintiff served Plaintiffs' Responses to Defendants' First Request for Production of Documents.  Thereafter, the parties engaged in several meet-and-confer sessions regarding Defendants' requests.  In total, Plaintiffs reviewed and produced over

22

34,000 pages of relevant documents and prepared a log for documents withheld on the basis of privilege or attorney work product.

63.     On December 17, 2010, Defendants served their First Set of Interrogatories To Plaintiffs.  The First Set requested that Plaintiffs identify numerous categories of persons, including those (1) involved in Plaintiffs' decision to purchase or sell the Certificates; (2) responsible for the accounting and valuation of the Certificates; (3) at any originator with whom Plaintiffs had communicated; (4) at Moody's, Standard & Poor's and Fitch Ratings with whom Plaintiffs had communicated regarding the Certificates; (5) at the Defendants with whom Plaintiffs had communicated regarding the Certificates: (6) who provided Plaintiffs information regarding the allegations in the Amended Complaint; and (7) who monitored Plaintiffs' fixed income investments for violations of the federal securities laws.

64.     Defendants served subpoenas to several non-parties, including Plaintiffs' money managers Pacific Investment Management Co. ("PIMCO"), Western Asset Management Co. ("WAMCO"), Loomis Sayles & Co. ("Loomis"), Global Asset Management (Americas), Inc., UBS Global Asset Management (US), Inc. ("UBS"), JP Morgan Inv. Management, Inc., Goldman Sachs Asset Management LP ("Goldman"), Columbia Management Investment Advisers, LLC and Neuberger Berman LLC.  Lead Counsel monitored the responses.  Plaintiffs served cross-notices of deposition on PIMCO, Loomis, Principal, UBS, WAMCO, Aberdeen and Goldman.  Lead Counsel conducted an examination of the 30(b)(6) witness from PIMCO, and elicited testimony which confirmed that PIMCO had no knowledge of the violations of the underwriting or appraisal standards at the time it purchased securities on behalf of Wyoming. Following this testimony, Defendants abandoned their deposition notices for Plaintiffs' other money managers.

65.     As detailed below, Defendants filed, before this Court, and later in the Central District of California, motions to compel PIMCO to produce documents.

66.     Defendants also served a subpoena on Pond Gadow & Tyler, counsel for the Lead Plaintiff.  Such subpoena naturally implicated issues of privileged communications and attorney work product.  Lead Counsel met and conferred with Defendants' regarding the scope of the requests.

### 2.     Motion Practice

67.     During the course of discovery, the parties engaged in the motion practice over myriad contested issues.  Such motions included the following: (1) Plaintiffs' Motion for Class Certification; (2) Lead Plaintiff's Motion To Compel Electronic Discovery; and (3) Defendants' Motion To Compel Discovery From Absent Class Members.

### a)     Plaintiffs' Motion For Class Certification

68.     On March 22, 2011, Plaintiffs filed their Motion for Class Certification ("Plaintiffs' Class Certification Motion").  ECF No. 130.  In support of their motion, Plaintiffs submitted the expert report of Dr. Joseph R. Mason ("Mason Report").  Dr. Mason is the Hermann Moyse Jr./Louisiana Bankers Association Chair of Banking at the Ourso School of Business, Louisiana State University, a Senior Fellow at the Wharton School, and Senior Consultant at Precision Economics, LLC.  On or about April 4, 2011, Defendants deposed Dr. Mason regarding the Mason Report.

69.     Additional depositions relating to class certification are as follows:

- On March 30, 2011, Counsel for Plaintiff Wyoming defended the deposition of Michael Walden-Newman, Chief Investment Officer, Wyoming State Treasurer;

- On March 31, 2011, Lead Counsel defended the deposition of Lorrie Tingle, Chief Investment Officer, Lead Plaintiff MissPERS;

- On April 5, 2011, Counsel for Plaintiff Connecticut Carpenters defended the deposition of Richard Monarca, Executive Director of Connecticut Carpenters Benefit Fund;

- On April 8, 2011, Lead Counsel defended the deposition of Vache Mahseredjian, Principal Investment Officer at Plaintiff LACERA;

- On April 8, 2011, Lead Counsel defended the deposition of Michael Herrera, Senior Staff counsel at Plaintiff LACERA;

- On April 12, 2011, Counsel for non-party PIMCO defended the deposition of Richard Fulford, Corporate Representative of PIMCO; and

- On April 13, 2011, Lead Counsel defended the deposition of George Neville, Special Assistant Attorney General for the Mississippi Attorney General's Office.

70.     On April 15, 2011, Defendants filed a 35-page opposition to Plaintiffs' Class Certification Motion.  ECF No. 136.  Attached to Defendants' Opposition were 66 exhibits, including a 60-page expert report authored by Anthony B. Sanders, Ph.D ("Sanders Report").  ECF Nos. 136-137.  Defendants argued that class certification was inappropriate for multiple reasons, including because individual issues predominate over common issues. Additionally, Defendants contended that (1) Plaintiffs' claims were not typical of the Class; (2) Plaintiffs had failed to establish numerosity; (3) Plaintiffs were not adequate class representatives; and (4) a class action was not a superior method of adjudicating the controversy.

71.     In their class certification opposition, Defendants relied on *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160, 168 (S.D.N.Y. 2011) ("*RALI/Harborview*"), a mortgage-backed securities case where the court denied plaintiffs' motion for class certification.  At the time of Defendants' opposition, *RALI/Harborview* was the only class certification decision in the MBS context.  On the factual record in *RALI/Harborview*, the court found that class members had differing levels of knowledge regarding the abandonment of mortgage underwriting standards, which subjected them to unique defenses under the

Securities Act.  Accordingly, the court concluded that individual issues predominated over common ones and class certification was inappropriate.

72.     On April 29, 2011, Plaintiffs filed their class certification reply brief that responded to each of Defendants' arguments.  ECF No. 141.  Plaintiffs' reply was supported by additional discovery materials, including the deposition testimony of Dr. Mason and Dr. Sanders.

73.     The Court heard oral argument on Plaintiffs' Class Certification Motion on May 9 and 10, 2011.  On June 15, 2011, the Court issued an order granting Plaintiffs' Motion for Class Certification (the "June 15 Order").  ECF No. 149.  The June 15 Order explained that "[a]fter careful consideration, and for reasons that will be stated in a forthcoming written opinion, the Court hereby grants both motions."  *Id.* at 2.  By Opinion and Order dated August 22, 2011, the Court further explained the June 15 Order.  *Pub. Emps' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97 (S.D.N.Y. 2011), ECF No. 156 (the "August 22 Order").

74.     To my knowledge, this action is the first to be certified as a class action on behalf of investors in mortgage-backed securities asserting Securities Act claims.  While the adverse decision in *RALI/Harborview* was the only other precedent at the time, other courts have since certified similar classes.  *See, e.g., Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp.*, No. 09 CV 1110 (HB), 2012 WL 336146 (S.D.N.Y. Feb. 3, 2012); *N.J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*, No. 08 Civ. 5653 (PAC), 2011 WL 3874821 (S.D.N.Y Aug. 16, 2011).

**b)      Defendants' Motion For Reconsideration
And Petition Pursuant To Fed. R. Civ. P. 23(f)**

75.     On September 9, 2011, Defendants filed a Motion for (A) Partial Reconsideration of the Opinion and Order on Class Certification or (B) in the Alternative, Clarification That Certain Case Issues Will Not Be Considered Law of the Case ("Motion for Reconsideration").  ECF 158.  In their Motion, Defendants contended that claims related to a particular offering –

26

2006-WMC1 – were untimely as the result of the expiration of the statute of repose.  Defendants also reiterated their claim that Plaintiff Wyoming would have to prove reliance, thus creating an individual issue.  On September 23, 2011, Lead Plaintiff filed its opposition and responded to Defendants' claims.

76.     On June 30, 2011, Defendants filed a petition pursuant to Federal Rule of Civil Procedure 23(f) for leave to appeal the class certification order.  *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, No. 11-cv-2671 (2d Cir.).  Defendants also filed motions for certain portions of the record to be filed under seal and to expedite resolution.  On July 11, 2011, Plaintiffs filed their opposition to both Defendants' Rule 23(f) petition and the motion to expedite.  On July 18, 2011, Defendants filed their reply.  The Second Circuit thereafter denied Defendants' motion to expedite.

77.     On October 28, 2011, Defendants moved to stay their petition for leave to appeal under Rule 23(f) pending final approval of the Settlement.  On October 31, 2011, the Second Circuit Court of Appeals granted the motion.

### c)     Lead Plaintiff's Motion To Compel Electronic Discovery

78.     Throughout discovery, Lead Counsel and Defendants' counsel disagreed regarding the timing and pace of Defendants' document production, with Lead Counsel consistently seeking to increase the pace of production.  When Lead Counsel was unable to obtain from Defendants a date certain for them to complete their production, Lead Plaintiff requested leave from the Court to file a motion to compel substantial completion of documents by August 12, 2011.

27

79.     The Court granted the request and on August 3, 2011, Lead Plaintiff submitted a letter in support of its motion.  That motion was fully briefed and *sub judice* when the parties reached agreement to settle.

**d)      Defendants' Motion To Compel**
**Discovery From Absent Class Members**

80.     On August 4, 2011, Defendants propounded additional document requests to Lead Counsel, seeking various categories of documents from absent class members.  In addition to the document requests, Defendants proposed that they be allowed to depose certain of the absent Class Members, as needed, depending on the documents produced.  Lead Counsel opposed such highly-unusual discovery from absent Class Members.

81.     On August 17, 2011, Defendants submitted a five-page letter brief in support of their motion to compel.  Attached to the letter brief were 62 pages of exhibits.  Defendants contended that discovery from absent Class Members on the issues of Class Member knowledge, statute of limitations, materiality and reliance was necessary and proper.  The motion contended that the discovery was not available from Plaintiffs and would not impose any undue burden on the absent Class Members.

82.     On August 22, 2011, Lead Plaintiff submitted a five-page opposition.  Lead Plaintiff explained that Defendants had failed to make the required "strong showing" that the discovery sought was "necessary."  In particular, Lead Plaintiff noted that the requested relief was contrary to the August 22 Order – which addressed Defendants' contentions about the significance of individualized issues of knowledge, statute of limitations, materiality and reliance – and (if accepted) would allow discovery of every absent class member in every securities class action.  Further, Lead Plaintiff noted that the proposed discovery was neither focused on common issues nor narrowly tailored.

28

83.     On September 6, 2011, the Court issued an order denying Defendants' motion to compel "without prejudice to being renewed after the Court of Appeals issues its opinion on defendant's pending appeal on this Court's Order certifying the class (which arguably may clarify if there is any need for such discovery)."  ECF No. 157.

### 3.     Consultation With Consultants And Experts

84.     In prosecuting the claims, Lead Counsel worked extensively with experts and consultants at different stages of the litigation.  Consultants assisted in preparing the complaints, crafting discovery requests, analyzing documents, preparing mediation briefs, analyzing estimated damages, reviewing Defendants' affirmative defenses and preparing for trial. Consultants were retained in various areas related to the complex and specialized areas of residential mortgage loan underwriting and the MBS industry.  One consultant, a statistician, developed a representative sample of residential mortgage loans within the Offerings.  Another led a team of experienced loan underwriters in reviewing loan files.   Another assisted in estimating damages, including the impact of various micro- and macro- economic factors on damages.  Another, who worked with a team from a prominent financial services company, reviewed documents and testimony related to the purported "due diligence" Merrill Lynch conducted for the offerings.  Lead Counsel engaged many of these consultants to compose and submit expert reports in support of their findings.  On October 18, 2011, the parties exchanged expert disclosures in accordance with the Court's pretrial schedule.

85.     As described above, Lead Plaintiff retained Dr. Joseph Mason on issues particular to class certification.  Dr. Mason submitted an expert report and deposition testimony in support of Lead Plaintiff's motion for class certification.  In both his expert report and sworn testimony, Dr. Mason described the MBS industry and the common issues and interconnectedness within the Offerings.

29

86.     Lead Plaintiff's experts and consultants reviewed documents and testimony in this litigation and consulted with Lead Counsel regarding the relative strengths and weaknesses of the claims and defenses.  The views of each of Lead Plaintiff's experts and consultants were thoroughly considered by Lead Counsel and Lead Plaintiff prior to agreeing to the Settlement.

## III.   THE SETTLEMENT

87.     As set forth more fully below, the Settlement achieved in this case of $315,000,000 (plus interest) was the result of arm's-length negotiations overseen by Judge Phillips.  The Settlement provides the Class an immediate and substantial benefit and eliminates the significant risks of continued litigation under circumstances where a favorable outcome could not be assured.  Lead Counsel believes that the Settlement is fair, reasonable, and an excellent result for Class Members considering the risk of recovering nothing or less after substantial delay.

### A.     Settlement Negotiations

88.     In April 2011, counsel for the parties explored the possibility of settlement. Initial negotiations were unsuccessful because the parties held fundamentally divergent views of the merits of the case and defenses.  The parties discontinued their preliminary discussions in the Spring of 2011.

89.     In early September 2011, the parties agreed to engage in private mediation and selected Judge Phillips to serve as the mediator.  In advance of the mediation sessions, the parties exchanged mediation briefs and responsive briefs.  Judge Phillips was also provided with the orders and significant briefs in the case.  Lead Plaintiff's submissions were supported by evidence collected through document and written discovery, deposition testimony, and the

opinions and analyses of experts and consultants on issues ranging from loan underwriting to due diligence to damage calculations.

90.     On October 13-14, 2011, the parties participated in confidential mediation sessions with Judge Phillips in New York.  George Neville, Special Assistant Attorney General in the Office of the Attorney General of the State of Mississippi and legal counsel to Lead Plaintiff, attended and participated in the negotiations.  At the mediation, the parties presented their respective views on the merits of the Action, the evidence and the estimated damages.  The parties, however, were unable to reach a resolution and remained far apart at the conclusion of the last session.  Discovery and trial preparation continued, including the deposition of an Individual Defendant on October 18.  Judge Phillips, however, maintained contact with both parties and ultimately made a mediator's recommendation that the case settle for $315 million. *See* Phillips Decl. ¶ 6.  The mediator's recommendation was based on Judge Phillips' familiarity with the facts in the Action, his assessment of the claims and defenses, estimated damages and the applicable law.  *Id.* ¶¶ 4-5.  The parties each independently accepted the mediator's recommendation on October 19, 2011.

91.     On October 20, 2011, the parties executed a term sheet, reflecting an agreement in principle to settle the Action for $315 million.  That same day, the Settling Parties informed the Court in writing that they had reached the agreement in principle and jointly requested that the Court suspend the pretrial deadlines while the parties focused on documenting the Settlement.  Similarly, Defendants moved to stay the Appeal proceedings before the Second Circuit so that the parties could pursue approval of the Settlement before the Court.  On October 31, 2011, the Second Circuit Court of Appeals granted the motion to stay the Appeal pending final approval by this Court of the Settlement.  Over the course of the next several weeks, the parties engaged in

31

additional negotiations regarding the full terms of the Stipulation of Settlement and related settlement documents.  The detailed Stipulation of Settlement was executed on December 5, 2011.

92.    On December 5, 2011, Lead Plaintiff filed its motion for preliminary approval of the Settlement.  By Order filed December 15, 2011, the Court (1) granted preliminary approval of the Settlement; (2) certified the Class for settlement purposes; (3) authorized the issuance of the Notices; and (4) set a schedule for the motion for final approval of the Settlement.  ECF No. 176.  The $315 million Settlement Amount was deposited into an escrow account on December 20, 2011 and has been invested for the benefit of the Class.

### B.    Reasons For The Settlement

93.    As stated in the Notice, Lead Plaintiff and Lead Counsel endorse the Settlement. Lead Plaintiff has actively overseen each step in the prosecution of the Action.  Lead Counsel is a law firm that specializes in complex securities litigation, including litigation involving mortgage-backed securities, and is highly-experienced in such litigation.   Based on their experience and close knowledge of the facts and applicable law, Lead Counsel and Lead Plaintiff determined that the Settlement was in the best interest of the Class.

94.    Lead Counsel engaged a consultant to assist in estimating potentially recoverable damages using the statutory measure under § 11.  This estimate, before taking into account causation or other defenses to damages, amounts to billions of dollars in the aggregate based on certain assumptions.  Defendants, however, contended that various defenses to the claims at issue would substantially reduce or eliminate altogether the amount of damages for which they were liable.

95.     The Settlement enables the Class to immediately recover a substantial sum of money, while avoiding protracted litigation and the following risks, among others:

(a)     ***Establishing Liability.***  To avoid summary judgment and prevail at trial, Lead Plaintiff would need to present evidence that the Offering Documents contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein related to (1) the underwriting of the loans underlying the MBS; (2) the appraisal and loan-to-value ratios of the loans underlying the MBS; or (3) the ratings assigned to the MBS.  Defendants argued that the Offering Documents contained no untrue statements or omissions.  In so doing, Defendants relied on and would continue to rely on disclosures and warnings in the offering documents about various risks associated with the MBS.  For example, Defendants would rely on statements such as "[a] substantial portion of the mortgage loans" in the underlying pools represented "underwriting exceptions" and that Merrill Lynch could provide "no assurance that [the originators] followed stated guidelines …"  Additionally, Defendants would contend that recent Second Circuit case law potentially raised the standard of proof for statements of opinion from strict liability (customary in Securities Act cases) to one close to knowing misconduct.  *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011).

(b)     ***Defenses to Damages.***  Under § 11(e) of the Securities Act, damages may be reduced or eliminated if the defendant proves that a portion or all of the statutory damages are attributable to causes other than the misstatements or omissions.  Throughout the litigation, Defendants asserted – and were expected to continue to assert through summary judgment and trial – that the overall economic downturn, housing price declines and reduced liquidity in the market for mortgage-backed securities, not the alleged untrue statements and omissions, were to blame for the decline in the Certificates' value.  If Defendants were successful in establishing

33

this so-called "negative causation" defense, it is anticipated that Defendants would argue that estimated damages ranged between zero and approximately $200 million, depending on the assumptions used.

(c)   ***Additional Defenses.***   Defendants raised numerous defenses in this Action, including "statute of limitations," the "knowledge" of investors, due diligence, and inability to prove reliance.  Specifically, Defendants contend that:

•   Merrill Lynch had conducted a reasonable investigation of the loans and the Certificates at issue and therefore "had reasonable ground to believe and did believe" that the Offering Documents contained no untrue statements or omissions.  15 U.S.C. §77k(b)(3)(A). This so-called "due diligence" defense to Securities Act claims is an issue that would have been decided at trial by expert testimony.

•   Plaintiffs' claims were untimely because information related to the allegedly untrue statements was in the market more than one year before the suit was filed.  Specifically, Defendants asserted that various press coverage, investigations and lawsuits demonstrated that the market was aware no later than mid-2007 that originators were ignoring underwriting guidelines and that appraisals were inflated.

•   Plaintiffs, and various members of the Class, had actual knowledge of the untrue statements and omissions at the time they purchased the Certificates.

•   Certain Plaintiffs lacked standing because they received all principal and interest payments due to them from the Certificates and their Certificates were paid in full.

•   Plaintiff Wyoming and certain other Class Members must prove individual reliance because they purchased Certificates after the issuance of distribution reports which covered a period of at least twelve months after the effective date of the registration statement.

34

- The Merrill Lynch mortgage-backed securities in this Action performed no worse than other mortgage-backed securities of similar vintage.

(d)     **Defendants' 23(f) Petition.**   As detailed above, Defendants filed a petition pursuant to Fed. R. Civ. P. 23(f), which requested that the Second Circuit review the Court's order granting class certification.   Although Lead Plaintiff opposed the petition, and was confident that the Court had come to the proper conclusion when granting certification, had the Second Circuit allowed Defendants to appeal, the Class may have been de-certified.   Notably, district courts in similar contexts have denied motions for class certification.   *See RALI/Harborview*, 272 F.R.D. at 168 (plaintiffs' Rule 23(f) appeal of court's denial of certification of class of MBS investors is currently pending).   Similarly, certain district courts have limited class actions to just the tranches in which named representatives purchased.   *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-CV-0302 MRP (MANx), 2011 WL 4389689, at \*2 (C.D. Cal. May 5, 2011); *Wash. Mut.*, 276 F.R.D. at 663-64; *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08 CV 1713 (ERK) (WDW), 2011 WL 6182121, at \*7 (E.D.N.Y. Dec. 13, 2011) (petition for interlocutory appeal pending).

96.     Although Defendants had been unsuccessful with such arguments at the motion to dismiss and class certification stages, the recovery to the Class would have been reduced or eliminated if Defendants prevailed at summary judgment, trial or on appeal.   The Settlement eliminates the risks and guarantees the Class a cash recovery now.   Lead Counsel firmly believes that settling the Action at this juncture was in the best interest of the Class.[3]

---

[3] As set forth below, Notice of the Settlement has been widely disseminated.   To date, Lead Counsel has not received any objections to the proposed Settlement.

C. **Notice To The Class Meets The**
**Requirements Of Due Process And**
**Rule 23 Of The Federal Rules Of Civil Procedure**

97.     As required by the Court's Preliminary Approval Order, beginning on December 27, 2011, Lead Plaintiff (through the Claims Administrator, The Garden City Group, Inc. ("GCG")) notified potential Class Members of the Settlement by mailing them a copy of the Notice.  Lead Counsel had obtained the identity of certain known holders of the mortgage pass-through Certificates, and had researched the contact information for the investors of the approximately 1,920 known accounts.  Specifically, to identify potential Class Members, Lead Counsel (1) served subpoenas on dozens of major custodial banks whose internal records reflect holdings and transactions in the MBS at issue; (2) obtained transactional information from DTCC, which provides clearing and settlement information for MBS; and (3) reviewed Defendants' internal files for information about the initial purchasers of the MBS.

98.     Lead Counsel forwarded 1,926 names and addresses of Certificate investors to the Claims Administrator.  The list was supplemented by a proprietary database maintained by the Claims Administrator, containing the names and addresses of 2,193 of the largest and most common U.S. nominees (*i.e.,* brokerage firms, banks, and institutions who hold securities in the name of the nominee, on behalf of the beneficial purchasers).  The Court-approved Notice requires nominees, within 7 days, to either (1) send a copy of the Notice and the Claim Form to the beneficial owner of such Certificates, or (2) provide to GCG the names and addresses of such persons.  *See* Affidavit of Jennifer M. Keough Regarding (A) Mailing of Notice and Proof of Claim; (B) the Publication Notice; and (C) Report on Requests for Exclusion Received to Date ("Keough Aff."), attached hereto as Exhibit 4, ¶¶ 4-5.  As of February 14, 2012, over 10,000 Notices were mailed to potential Class Members.  *Id*. at ¶ 7.

99.     In addition, a Summary Notice was published in the national edition of *The Wall Street Journal* and over the *PR Newswire* on December 29, 2011.   *See id.* ¶ 8.   Information regarding the Settlement, including downloadable copies of the Notice and Claim Form, was posted on the website established by the Claims Administrator specifically for this Settlement, www.MerrillLynchRMBSLitigation.com, *id.* ¶ 10, as well as on Lead Counsel's website, www.blbglaw.com.   This method of giving notice, previously approved by the Court, is appropriate because it constitutes "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," Fed. R. Civ. P. 23(c)(2)(B), and because it directs notice in a "reasonable manner to all class members who would be bound by the propos[ed judgment]."   Fed. R. Civ. P. 23(e)(1).

100.     The Notice advises Class Members of the essential terms of the Settlement, sets forth the procedure for objecting to the Settlement or requesting exclusion, and provides specifics on the date, time and place of the final approval hearing.   The Notice also contains information regarding Lead Counsel's fee application and the proposed plan of allocating the settlement proceeds among Class Members.

101.     The Notice fairly apprises Class Members of their rights with respect to the Settlement and therefore is the best notice practicable under the circumstances and complies with the Court's December 15, 2011 Order Preliminarily Approving Settlement And Providing For Notice, ECF No. 176, Federal Rule of Civil Procedure 23, and due process.[4]

---

[4] *See In re Warner Chilcott Ltd. Sec. Litig.*, No. 06 Civ. 11515 (WHP), 2008 WL 5110904, at *3 (S.D.N.Y. Nov. 20, 2008); *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 448-49 (S.D.N.Y. 2004); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 114 (2d Cir. 2005) (notice is satisfactory if it "fairly apprise the prospective members of the class of the terms of the proposed settlement[s] and of the options that are open to them in connection with the proceedings").

D.     **Plan Of Allocation**

102.   Lead Plaintiff has proposed a plan to allocate the proceeds of the Settlement among Class Members who submit valid Proofs of Claim.  The objective of the proposed Plan of Allocation is to equitably distribute the Settlement proceeds to those Class Members who suffered losses as a result of the alleged misrepresentations and omissions.

103.   The Plan of Allocation, as set forth in the Notice, is based on the statutory calculation embodied in § 11.  *See* 15 U.S.C. § 77k(e).  Specifically, § 11 provides for calculation of damages as the "difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought . . . ." *Id.*

104.   The proposed Plan of Allocation takes into account the statutory damages permitted under § 11 and was set forth in the Notice sent to Class Members.  It tracks the theory of damages asserted by Plaintiffs and is consequently fair, reasonable and adequate to the Class as a whole.

105.   Lead Plaintiff requested that Brett Brandenberg of AlixPartners examine the Plan of Allocation.  The Declaration of Brett Brandenberg ("Brandenberg Decl."), attached hereto as Exhibit 3, explains the methodology used in determining the Recognized Claims and the basis for the analysis.  As explained more fully in the Notice – including through illustrative examples

38

– and in the Brandenberg Declaration, a "Recognized Loss or Gain Amount" will be calculated for each purchase or acquisition of a Certificate.  The calculation of the Recognized Loss or Gain Amount will depend on several factors, including:  (1) when the Certificate was purchased or acquired; (2) whether it was sold, and if so, when it was sold and for how much; and (3) the value of the Certificate on the applicable Date of First Suit.[5]

106.    Counsel for each of the Plaintiffs (representing, as a whole, purchasers of securities in each of the 18 Offerings) reviewed and approved the Plan of Allocation.   In addition, in response to over 10,000 Notices that have been mailed, there have been no objections to date to the proposed Plan of Allocation.

**IV.    THE APPLICATION FOR ATTORNEYS' FEES AND EXPENSES**

107.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is also applying to the Court for an award of attorneys' fees and expenses. Specifically, Lead Counsel is applying for a fee of 17% of the Settlement Fund (*i.e.*, $53,550,000, plus interest at the same rate as that earned on the Settlement Fund), and for reimbursement of $3,280,523.87 in Plaintiffs' Counsel's litigation expenses.

108.    In determining whether a requested award of attorneys' fee is fair and reasonable, district courts are guided by the factors first articulated by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).  As summarized in *Goldberger,* 209 F.3d 43, these factors include:

> (1) The time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation…; (4) the quality of representation;

---

[5]  As explained in the Notice, if a claimant had a Recognized Gain Amount for a Certificate, the claimant will not receive a recovery in the Settlement for that Certificate and any Recognized Gain Amounts would offset that Claimant's Recognized Loss Amounts in the same security (*i.e.*, Certificates with the same CUSIP).

(5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50.  Based on consideration of each of the foregoing factors as further discussed below, and on the additional legal authorities set forth in the accompanying Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Fee Memorandum") filed contemporaneously herewith, we respectfully submit that Lead Counsel's requested fee should be granted.

## A.   Application For Attorneys' Fees

### 1.   The Requested Fee Of 17% Of The Settlement Fund Is Fair And Reasonable

109.   For the extensive efforts on behalf of the Class, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis.  As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the Class in achieving the maximum recovery in the shortest amount of time required under the circumstances, is supported by public policy, has been recognized as appropriate by the United States Supreme Court for cases of this nature and represents the overwhelming current trend in most circuits, including the Second Circuit.

110.   Based on the result achieved for the Class, the extent and quality of work performed, the risks of the litigation and the contingent nature of the representation, Lead Counsel submits that a 17% fee award is justified and should be approved.

111.   As discussed in the Fee Memorandum, a 17% fee is fair and reasonable for attorneys' fees in common fund cases such as this, is well within the range of the percentages typically awarded in securities class actions in this Circuit, and is below the percentage often awarded in this Circuit in securities class actions with multi-hundred million dollar recoveries.

112.    The work undertaken by Lead Counsel in prosecuting this case and arriving at this Settlement has been time-consuming and challenging.  I maintained daily control and monitoring of the work provided by lawyers on this case.  While I personally devoted substantial time to this case, other experienced attorneys at my firm undertook particular tasks appropriate to their levels of expertise, skill and experience, and more junior attorneys and paralegals worked on matters appropriate to their experience levels.  Lead Counsel committed three partners to prepare the case for trial in accordance with the pretrial schedule, as well as committing the continuous involvement of the senior partner who spearheaded the negotiations.  Throughout the Action, Lead Counsel allocated work assignments among its attorneys and other Plaintiffs' Counsel to avoid unnecessary duplication of effort.

113.    From the outset, Lead Counsel and Lead Plaintiff appreciated the unique and significant risks inherent in this litigation arising from complex structured securities.  As of the date of the Complaint, to my knowledge, no court had ever sustained similar securities law claims relating to MBS; accepted the theory of damages; certified a class of similar MBS investors; or addressed many of the legal and factual issues presented in the Action.  As a result, it was unclear at the time of the filing of the original complaint whether Lead Plaintiff would overcome Defendants' anticipated motions to dismiss – much less, obtain class certification, survive summary judgment, and prevail at trial and on any post-trial appeals.  The risks in the cases were very real, as evidenced by the unsuccessful outcome in class actions arising from the sale of similar mortgage-backed securities.  *See, e.g.*, *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299 (D. Mass. 2009) (dismissing the complaint with prejudice and holding that (1) plaintiffs lacked standing, (2) the registration statements did not contain false statements, and (3) certain alleged misrepresentations were not

material), *rev'd in part*, 632 F.3d 762 (1st Cir. 2011); *NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, 743 F. Supp. 2d 288 (S.D.N.Y. Oct. 14, 2010) (granting defendants' motion to dismiss for failure to plead a cognizable injury); *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,* No. 3:08-CV-0261-L, 2008 WL 4449508 (N.D. Tex. Sept. 30, 2008) (dismissing the action with prejudice and holding that defendants did not make any misrepresentations), *aff'd*, 594 F.3d 383 (5th Cir. 2010); *Boilermakers Nat'l Annuity Trust Fund v. WaMu Mortg. Pass Through Certificates, Series AR1*, 748 F. Supp. 2d 1246 (W.D. Wash. 2010) (granting defendants' motion to dismiss certain of plaintiffs' claims for lack of standing, dismissing control person claims against individual defendants, and dismissing plaintiffs' Section 11 claims based on appraisals and loan-to-value ratios); *N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.*, No. 08 Civ. 5310 (DAB), 2011 WL 1338195 (S.D.N.Y. Mar. 31, 2011) (dismissing certain claims for lack of standing, dismissing with prejudice Section 11 and Section 15 claims against rating agency defendants, and dismissing plaintiff's Section 11, Section 12(a), and Section 15 claims against the NovaStar defendants).

114.    In addition, at the time Lead Counsel filed the motion for class certification, the only court to have decided a motion for class certification involving a class of mortgage-backed securities investors had denied the motion. *See RALI/Harborview*, 272 F.R.D. at 168.

115.    This Action settled only after Lead Counsel overcame multiple legal and factual challenges.  To do so, Lead Counsel conducted an extensive investigation into the underlying facts; researched and prepared detailed Complaints; successfully moved to certify the Class after highly-contested proceedings; engaged in extensive negotiations with Defendants and non-parties to obtain documents; secured over 1,350 loan files; engaged in motion practice with Defendants regarding discovery disputes; obtained, organized and analyzed over 20 million

pages of documents; conducted 11 depositions of key witnesses; defended 7 depositions; consulted extensively with experts and consultants; and engaged in hard-fought settlement negotiations with experienced defense counsel.  The requested fee is particularly justified here given the uncertainties and risks surrounding complex securities, such as mortgage-backed certificates.

116.    As described in Lead Counsel's Fee Memorandum, the requested fee is not only fair and reasonable under the percentage approach but a lodestar cross-check confirms the reasonableness of the fee.  Attached hereto as Exhibit 5 are declarations from Plaintiffs' Counsel in support of an award of attorneys' fees and reimbursement of litigation expenses.  Included with each firm's declaration is a schedule summarizing the lodestar of each firm, as well as the expenses incurred by category.[6]  Plaintiffs' Counsel include the Court-appointed Lead Counsel for the Class, Bernstein Litowitz; additional counsel for Lead Plaintiff Pond Gadow & Tyler; and counsel for Plaintiffs Connecticut Carpenters and Wyoming.  As explained in the Declarations of the other Plaintiffs' Counsel, among other things, other Plaintiffs' Counsel analyzed the claims on the Offerings, drafted initial complaints, held conferences with their clients and Lead Counsel, participated in discovery and reviewed and assisted in drafting briefs.  *See* Exhs. 5B, 5C and 5D attached hereto.

117.    As set forth in Exhibit 5, Plaintiffs' Counsel have expended a total of 56,150 hours in the prosecution and investigation of this Action.  The resulting lodestar is $23,066,836.65.  The requested fee, therefore, yields a 2.3 multiplier and is fair and reasonable based upon the significant risk of the litigation and the quality of representation by Plaintiffs' Counsel in achieving the exceptional Settlement before the Court.  Indeed, as discussed in the

---

[6] The first page of Exhibit 5 is a summary chart of the lodestars and expenses of all of the firms.

Fee Memorandum, when using a lodestar cross-check, courts have routinely awarded fee requests with similar and larger lodestar multipliers in securities fraud class actions.

118.    The lodestar summaries were prepared from contemporaneous daily time records regularly prepared and maintained by Plaintiffs' Counsel, which are available at the request of the Court.  Plaintiffs' Counsel's hourly rates are the same as the regular current rates charged for their services in non-contingent matters and/or which have been accepted in other securities or shareholder litigation.  For personnel who are no longer employed by Plaintiffs' Counsel, the lodestar calculation is based upon the billing rates for such personnel in his or her final year of employment.

119.    Plaintiffs' Counsel took this case on a contingency basis, committed their resources and litigated it for nearly three years without any compensation or guarantee of success.  Based on the excellent result achieved for the Class, the quality of work performed, the risks of the Action and the contingent nature of the representation, Lead Counsel submits that the request for a 17% fee award is fair and reasonable and consistent with other similar cases in the Second Circuit.

## 2.    Standing And Expertise Of Plaintiffs' Counsel

120.    The expertise and experience of counsel are other important factors in setting a fair fee.  As demonstrated by Lead Counsel's firm resume, attached hereto as Exhibit 3 to Exhibit 5A, the attorneys at Bernstein Litowitz are experienced and skilled class action securities litigators and have a successful track record in securities cases throughout the country – including within this Circuit – and in MBS litigation, in particular.  Plaintiffs' Counsel Kessler Topaz Meltzer & Check, LLP and Berman DeValerio also have substantial experience and successful track records in securities class actions.  *See* Exhs. 5B-3 and 5C-3.

44

### 3.      Standing And Caliber Of Opposing Counsel

121.     The quality of the work performed by counsel in attaining the Settlement should also be evaluated in light of the quality of opposing counsel.  Plaintiffs were opposed in this case by very skilled and highly-respected counsel.  The Defendants were represented by Skadden, Arps, Slate, Meagher & Flom LLP, who spared no effort in the defense of their clients.  In the face of this knowledgeable and formidable defense, Lead Counsel was nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle on terms that are favorable to the Class.

### 4.      The Risks Of Litigation And The Need To Ensure The Availability Of Competent Counsel In High-Risk, Contingent Securities Cases

122.     As noted above, the Action was undertaken on a wholly contingent basis.  From the outset, Plaintiffs' Counsel understood that they were embarking on a complex and expensive litigation with no guarantee of compensation for the investment of time, money and effort that the case would require.  At the outset of the case, Plaintiffs' Counsel understood that very limited precedent existed for similar claims arising from the purchase of mortgage-backed securities.  In addition, Plaintiffs' Counsel understood that Defendants would raise myriad challenges based on the structured nature of the securities and that liability, damages and class certification would be heavily contested with no assurance of success.

123.     In undertaking the responsibility for prosecuting the Action, Lead Counsel assured that sufficient attorney resources were dedicated to the investigation of the Class claims against the Defendants and that sufficient funds were available to advance the expenses required to pursue and complete such complex litigation.  Indeed, Plaintiffs' Counsel received no compensation and incurred $3,280,523.87 in expenses in prosecuting this Action for the benefit of the Class.

45

124.    Plaintiffs' Counsel also bore the risk that no recovery would be achieved.   As discussed herein, this case presented a number of risks and uncertainties which could have prevented any recovery whatsoever.   Despite the vigorous and competent efforts of Plaintiffs' Counsel, success in contingent-fee litigation, such as this, is never assured.

125.    Lead Counsel firmly believes that the commencement of a securities class action does not guarantee a settlement.   To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations.

126.    Courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws.   As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private plaintiffs − particularly institutional investors − take an active role in protecting the interests of securities purchasers.   If this important public policy is to be carried out, plaintiffs' counsel should be adequately compensated, taking into account the risks undertaken in prosecuting securities class actions.

## 5.    <u>The Reaction Of The Class To Date</u>

127.    As set forth above, more than 10,000 Notices have been mailed to potential Class Members.   Keough Aff., Ex. 4, ¶ 7.   In addition, the Summary Notice was published in the national edition of *The Wall Street Journal* and over the *PR Newswire*.   *See id.* ¶ 8.   The Notice explains the Settlement and Lead Counsel's anticipated fee request.   The deadline to object to Lead Counsel's fee request is February 29, 2012.   To date, no Class Member has objected.

128.    In sum, given the complexity and magnitude of the Action; the responsibility undertaken by Lead Counsel; the difficulty of proof on liability and damages; the experience of

Plaintiffs' Counsel and defense counsel and the contingent nature of Plaintiffs' Counsel's agreement to prosecute this Action, Lead Counsel respectfully submits that the requested attorneys' fees are reasonable and should be approved.

### B. Application For Reimbursement Of Expenses

129.    Lead Counsel also requests $3,280,523.87 in expenses reasonably and necessarily incurred by Plaintiffs' Counsel in the prosecution of this Action.[7]   Lead Counsel respectfully submits that the expense application is appropriate, fair, and reasonable and should be approved in the amounts submitted herein.

130.    From the beginning of the case, Plaintiffs' Counsel were aware that they might not recover any of their expenses, and, at the very least, would not recover anything until the Action was successfully resolved.  Plaintiffs' Counsel also understood that, even assuming that the case was ultimately successful, an award of expenses would not compensate them for the lost use of the funds advanced to prosecute this Action.  Thus, Lead Counsel was motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

131.    The application for expenses is within the upper limit of $4 million contained in the Notice mailed to the Class.  As noted above, in response to over 10,000 Notices, as of the date of this Declaration, there are no objections to such expenses.

132.    The expenses were necessary and appropriate for the prosecution of this Action. These include charges for depositions and court transcripts; payments to experts and consultants;

---

[7] As set forth in the respective declarations of Plaintiffs' Counsel, attached hereto as Exhibits 5A to 5D, the expenses for which reimbursement is sought are reflected on the books and records of their respective firms, which are prepared from expense vouchers, check records and other source materials and are an accurate record of the expenses incurred.

computer research devoted to the case; costs incurred in out-of-town travel; charges for photocopying; telephone, postal and express mail charges; and similar case-related costs.   A chart reflecting all expenses by category for which reimbursement is sought is attached hereto as Exhibit 6.   Courts have typically found that such expenses are reimbursable from a fund recovered by counsel for the benefit of the class.

133.    Included in the amount of expenses is $2,340,576.37 paid or payable to Plaintiffs' experts and consultants.  This encompasses over 71% of Plaintiffs' Counsel's total expenses.  As detailed above in paragraphs 84 to 86, Plaintiffs worked extensively with experts and consultants at the different stages of the litigation.  Experts were utilized to prepare the complaints, craft discovery requests, analyze documents, draft the mediation briefs, prepare for trial, and to examine the Plan of Allocation.  Experts were retained in the complex and specialized areas of residential mortgage loan underwriting, due diligence, the mortgage-backed securities industry, statistical sampling, and securities law damages.

134.    In addition, Lead Counsel received over 20 million pages of documents produced by both parties and non-parties during the course of the Action.  In order to effectively and efficiently review and analyze 20 million pages, a document management system was necessary. Duplication of many of these documents obtained in discovery was also necessary for the effective prosecution of the case.  Included in the expense request above is $510,759.98, for reimbursement of expenses related to the document management system, and $98,456.59, for reimbursement of Plaintiffs' Counsel's internal and external copying costs.

135.    The expenses also include the costs of online research in the amount of $79,451.32.  These are the charges for computerized factual and legal research services such as *Lexis-Nexis* and *Westlaw*.  It is standard practice for attorneys to use *Lexis-Nexis* and *Westlaw* to

assist them in researching legal and factual issues, and, indeed, courts recognize that these tools create efficiencies in litigation and, ultimately, save clients and the class money.

136.   In addition, Plaintiffs' Counsel were required to travel in connection with prosecuting and settling the Action, and thus incurred the related costs of airline tickets, meals and lodging.   Included in the expense request above is $72,175.23, for travel expenses necessarily incurred for the prosecution of this litigation.

137.   In connection with depositions and court proceedings, Plaintiffs' Counsel also incurred $71,932.93 for court reporting and transcripts.

138.   Lead Counsel also seeks approval for reimbursement of certain of Plaintiffs' costs and expenses incurred by Plaintiffs directly relating to their representation of the Class pursuant to 15 U.S.C. § 77z-1(a)(4), as set forth in Exhibits 2, 7, 8 and 9, attached hereto, in the total amount of $62,434.

139.   As the Notice described, approval of the Settlement is independent from approval of Lead Counsel's application for an award of attorneys' fees and expenses.   Any determination with respect to Lead Counsel's application for an award of attorneys' fees and expenses will not affect the Settlement, if approved.

I declare under penalty of perjury that the foregoing facts are true and correct and that this declaration was executed this 15th day of February, 2011.

_/s/ David R. Stickney_
DAVID R. STICKNEY

#112979

49